UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Tampa, Florida |
| | ) | |
| Plaintiff, | ) | No. 8:18-cr-236-T-33TGW |
| | ) | |
| | ) | Docket No. 184 |
| vs. | ) | |
| | ) | May 28, 2019 |
| DION GREGORY FISHER, | ) | |
| | ) | |
| Defendant. | ) | Courtroom 14B |
| ______________________________ | ) | |

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

(Vol. I of VII)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Kenneth B. Martin, Esq.**
Law Office of Ken Martin
P.O. Box 10456
Tampa, Florida 33679
(813) 431-3310

**ALSO PRESENT:**

Adam Phelps, DEA Case Agent

Robert Liberto, IRS Case Agent

- - -

**P R O C E E D I N G S**

May 28, 2019 9:03 a.m.

\- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good Morning.

Is there anything I need to take up before we bring the panel up? Let's go ahead and bring them up here. Is that okay?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: I'll go ahead and call the case. We are here for the jury trial in United States versus Dion Gregory Fisher, Case No. 8:18-cr-236-T-33TGW.

I'll begin by having counsel state their appearances. Who do we have for the government?

MS. HOWARD-ALLEN: Good morning, Your Honor. Kelley Howard-Allen on behalf of the United States, and the agents with me at counsel table, Adam Phelps from the DEA and Robert Liberto from the IRS.

MS. GUZMAN: Maria Guzman, Assistant United States Attorney.

THE COURT: Who do we have for the defendant?

MR. MARTIN: Ken Martin on behalf of Mr. Fisher.

THE COURT: Thank you, Mr. Martin. Welcome, Mr. Fisher.

So what I'm going to do is -- I think I called in 42 members of the venire. Yes, Mr. Martin?

MR. MARTIN: I did have one objection to one of the government's proposed voir dire questions. It's No. 9.

THE COURT: Are these from a pattern, Miss Howard-Allen?

MS. HOWARD-ALLEN: Your Honor, they are just the standard ones that we usually submit.

THE COURT: Normally there are certain patterns that I see. Maybe pattern isn't the right word, but pretty standard ones.

What's your objection to this, Mr. Martin?

MR. MARTIN: My objection is, there is a lot of -- well, there is one, technical, co-defendant, but there are a lot of alleged co-conspirators. And the way it reads, "You cannot consider any evidence about that person," et cetera. So, in other words, if you read the way this -- if you follow this instruction, if someone testified that's pending sentencing or pending a trial and you decided they were a liar based on the evidence, you shouldn't consider that.

THE COURT: I mean, I tend to agree. This is why I asked did this come from some kind of pattern. I could see

how someone would give it that interpretation. I wouldn't give it that interpretation if it were being read to me, but I could see how somebody, in theory, could give it that interpretation.

I know what you are trying to say, Miss Howard-Allen, but can you say it another way so it doesn't look -- not to put words in your mouth. Mr. Martin -- I think what his concern is, let's say there is somebody else out there who is the true culprit.

Is that what you are trying to say, Mr. Martin? The true culprit is another person, whether it's a co-defendant or just another individual. And I think your concern is, does this jury instruction prevent you, so to speak, putting blame on that other person. Is that really what you are saying? Or defend your client by putting blame on the other person.

MR. MARTIN: I think it's also covered properly by their question 11.

THE COURT: No, I don't think it does, but I think there is another way for them to say No. 9 without saying it this way.

Miss Howard-Allen?

MS. HOWARD-ALLEN: Your Honor, I think it just clearly states that no other person is on trial, which is the point of the voir dire question. And I know these are just

proposed voir dire questions, so Your Honor asks some and you have given us 20 minutes. So those 20 minutes were based on how people respond to the questions. So I'm not sure that we would ask that exact question if Your Honor did not. We have got areas to cover in voir dire that, frankly, are not that question.

THE COURT: And you are absolutely right, but he also wants to make certain that you don't ask this question, or at least stated as it is. Also, let me say, you don't have to submit questions in advance to me. I don't require that anymore.

MS. HOWARD-ALLEN: I understand. We just proposed them, and I did have a couple of objections. I don't know if you were going to undertake any of Mr. Martin's submitted juror questions, as well.

THE COURT: It's not my intention to ask a whole lot of these questions, but he's now raised it. You submitted it; he raised it. I feel like I should address it.

My concern is that it's going to infringe on his right to defend his client. So I just ask you to please word it differently. The first part of the question I have no problem with -- the first paragraph. It's when it goes on -- I guess it's mostly the second and the third. I just don't want it that his right to -- it's just that I don't want his rights to be infringed. So just go ahead and word it another

way.

MS. HOWARD-ALLEN: That's no problem, Your Honor.

When I look at Mr. Martin's, I think that there is an issue with his question No. 2, all the sub-parts on No. 6 and 9. I don't think 6 is appropriate under any circumstances because --

THE COURT: Oh, my gosh. Come on. There is no way you are going to ask that question, Mr. Martin. No. 6 is so out of line.

MS. HOWARD-ALLEN: I think No. 2 and then No. 9, guns are not at issue in this case, Your Honor.

THE COURT: No. 2?

MS. HOWARD-ALLEN: I don't think there is any relevance to these programs or the shows.

THE COURT: Originally people thought they were buying -- was it Oxycontin? Was that what it was, and they were really buying -- didn't I see something in the motion to suppress?

MS. HOWARD-ALLEN: Your Honor, this case is about the fentanyl pills that Mr. Fisher distributed were made to look exactly like oxycodone 30-milligram tablets.

THE COURT: So why do you think about the opioid crises -- why do you think that's not an appropriate question?

MS. HOWARD-ALLEN: No. 2 is about Prince's death and the "60 Minutes" case. I'm not familiar with that, or

"20/20," what killed Prince. I don't think that's relevant.

THE COURT: What does that have to do with it, Mr. Martin?

MR. MARTIN: Your Honor, the reason I may ask a question is I watched the show and the show is -- a lot of it is his sister saying that he was taking what turned out to be fentanyl without knowledge, so someone killed him, et cetera. And it's more if we have a big Prince fan that thinks Prince got murdered by someone in a similar type crime --

THE COURT: Did anybody die here? Miss Howard-Allen, did anybody die?

MS. HOWARD-ALLEN: Oh, no. That's not part of this case.

THE COURT: Nobody died of a drug overdose. So what's the whole Prince stuff? Why is it even relevant?

MR. MARTIN: I would just like to know if they viewed that.

THE COURT: No. I'll tell you what, we can ask, if you have any strong feelings, once they see what this case is about.

And by the way, do I have a short statement of what this case is about? Because, otherwise, I'm going to say he's been charged with selling fentanyl, distributing fentanyl, and laundering the proceeds.

MS. HOWARD-ALLEN: I assumed you were going to

read the redacted indictment.

THE COURT: I normally don't read the whole redacted indictment. Let me see. Do I have it here?

MS. HOWARD-ALLEN: Yes. It was submitted last week to your -- I can --

THE COURT: Let me see. I've got --

MS. HOWARD-ALLEN: There are two kinds of fentanyl and a controlled substance called pentylone, so those are the three drug charges -- the five drug charges involve those controlled substances and then there are eight money laundering charges.

THE COURT: Could I get the redacted indictment? Did you say you turned it in to us?

MS. HOWARD-ALLEN: It was sent to chambers, along with all the other jury instructions and the voir dire, I think, were asked to be submitted.

THE COURT: We will pull it up. I don't see it here. But what I'm going to say is -- I don't read the whole indictment to them. What I will say is he's been charged with selling.

MS. HOWARD-ALLEN: You could say a conspiracy.

THE COURT: You start making it too complicated. I will say he's been charged with selling drugs, fentanyl, and laundering proceeds.

MS. HOWARD-ALLEN: Yes. There are five charges of

fentanyl, two kinds of fentanyl, and pentylone, are the controlled substances charged.

THE COURT: What was the other one other than fentanyl?

MS. HOWARD-ALLEN: Pentylone. Count Seven. And then there are two kinds of fentanyl in the charges.

THE COURT: This isn't like the jury instruction. This is just to tell them what the case is about, just to see, for instance, if somebody had a family member who has had a drug overdose, if somebody thinks all drugs should be legal. That's really what I'm trying to get at.

I think, Mr. Martin, you can get that information in another way without having to go into this Prince stuff.

MS. HOWARD-ALLEN: I think we both submitted questions about the opioid crises and that would certainly --

THE COURT: I just don't think that's all that relevant.

MS. HOWARD-ALLEN: I think No. 9, asking about anti-gun organizations, guns aren't part of this case.

THE COURT: What do guns have to do with this?

MR. MARTIN: I don't know how people are going to testify. There were some guns that were seized in the search and seizure.

THE COURT: Any from your client? Any guns seized from your client?

MR. MARTIN: Not his person, no.

THE COURT: Okay. So I don't see what guns have to do with it. Or anti-gun organizations.

What does the dark web have to do with any of this stuff?

MS. HOWARD-ALLEN: There may be testimony from one of the cooperators about Mr. Fisher being on the dark web, so that is -- that may potentially come out with a witness.

Just so you know, Your Honor, there were guns found in a couple of search warrants, but they are not by felons and they are not going to be at issue, just so the Court is clear.

THE COURT: Say that again.

MS. HOWARD-ALLEN: There were guns at a couple of search warrants, including Mr. Fisher's, but they are not part of this case because he's not a convicted felon. We don't have any evidence to present on that issue, and I don't expect anyone to testify to that issue.

THE COURT: You don't have witnesses who would be talking about, oh, we found guns in his apartment?

MS. HOWARD-ALLEN: Not unless Mr. Fisher brings it up with one of the cooperators that they had a gun at their location. I don't suspect that will be the case.

THE COURT: There are some people that have strong feelings about guns. Mr. Martin, do you think you are --

MR. MARTIN: If it's not going to be part of the case, I will not ask about it.

THE COURT: Okay. So the dark web stuff is okay.

The rest of it is okay. Especially not okay is No. 6.

I think we have the panel there; is that right, Nona?

COURT SECURITY OFFICER: Yes, Your Honor. We are missing one that did not come up. They cannot find him.

THE COURT: Remember to please use their numbers. Everybody ready? Okay. We will bring the venire in.

(The venire enters the courtroom.)

THE COURT: Good morning, everybody.

My name is Virginia Hernandez Covington, and I'm a judge of the United States District Court for the Middle District of Florida.

I want to welcome you on behalf of all the judges of the District Court. We appreciate your presence here and are fully aware that many of you would rather be elsewhere, attending to your jobs or home or other things you had planned.

Jury service is not always convenient, but I hope you will realize that the service you will perform is extremely important. One of our greatest badges of freedom in the United States and one of our most cherished

Constitutional rights is a right to trial by jury.

I think we had a missing juror, juror No. 16.

(The prospective juror enters the courtroom.)

THE COURT: If you or I or anyone else should be charged with a crime, we have an absolute right in most cases to have the facts of the dispute or charge heard and decided by a completely impartial group of our fellow citizens serving as a jury.

You've been selected at random. Some of you have been seated in the jury box, others out in the audience. You are going to be asked some questions. The purpose of this questioning is to determine something about your background, whether you know anything about the case, the people involved and so on. Some of this questioning may seem personal, but I assure you that we have no intention of embarrassing you in any way. Our sole interest is to make sure that those selected to sit on the jury are impartial persons available in relation to the issue being tried.

If you are selected for the jury, you will be expected to be here around 9 a.m. and usually excused around 5 p.m., if not earlier, for the evening. While you are here you will find that the security officers and clerks are more than willing to assist you in every reasonable way.

Madam Clerk, has the jury been generally qualified?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: Thank you very much.

Each of you has been found to have the requisite qualifications to serve as a juror of this Court. No one should avoid fulfilling this obligation. The demand upon our time for this jury duty will not be unreasonable or unduly prolonged. Every effort will be made to see that your time is not wasted.

I expect this trial to last no more than two weeks. So we will go this week and we will go next week, but I will make every effort to see that we are able to move it as quickly as possible.

In order that you will know the court personnel with whom you will be working, I'll introduce them to you at this time.

The deputy clerk is Tamecika Lee. She serves as the Court's administrator in the courtroom. The court reporter is Scott Gamertsfelder. He transcribes and takes down everything that is said in the courtroom. The Court security officer is Nona Dyess. She enforces the Court's orders and is in charge of the jury while it is away from the courtroom.

The case set for trial today is United States of America versus Dion Gregory Fisher.

Is counsel for the United States ready?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Thank you.

Is counsel for the defendant ready?

MR. MARTIN: Yes, Your Honor.

THE COURT: Thank you.

In just a few minutes I'll be asking you questions as to your qualifications to serve as jurors in this particular case. This part of the case is known as the voir dire examination. Those are old French words which literally mean to speak the truth. Under your oath as a prospective juror you agree to truthfully answer questions concerning your qualifications.

Our object is to obtain a jury which will impartially try the issues of this case upon the evidence and the law presented in this courtroom without being influenced by any other factors.

A certain number of jurors will be excused. If you are excused, do not be offended or feel that your honesty or integrity is being questioned. It is not. This is simply a part of the jury selection system.

You've been given some questions and you see them on the piece of paper in front of you. What we will do is we are going to go juror by juror -- or prospective juror by prospective juror. I will follow this up with some other questions, but we are going to get some preliminary questions out of the way.

In all of my cases, I have jurors answer questions without using their name. I just do that to give you an additional level of privacy, although there is nothing secret here, but we just do that, just as I said, to give you little bit more level of privacy.

So what I will do is ask you each, without stating your name, to please answer the questions that are on that list in front of you. We are going to begin with the juror in seat No. 1. When you identify yourself, please use your number, and then we will go through this. And, as I said, I may decide to ask an additional question here or there. Actually, we will pass the microphone. Very good.

All right. I just ask juror No. 1 to please answer the questions that are on the piece of paper in front of you.

JUROR NO. 165: Just go in order of the questions?

THE COURT: Yes.

JUROR NO. 165: Okay. My city of residence --

THE COURT: Juror number.

JUROR NO. 165: Juror No. 1.

THE COURT: Is there another number there? Do you have 0165? You're in seat No. 1.

JUROR NO. 165: 102490775.

THE COURT: No, that's not what I have here, so there is something off. The last three numbers should be

0165. Does everybody see where that is? So the next gentleman would be 0027. Next one, 0020. Next one, 0095. But you are in seat No. 1.

JUROR NO. 165: Correct. My sequence number is 0165.

THE COURT: That's it. Last three numbers. That's what I'm looking for. Perfect. Go ahead, juror No. 1.

JUROR NO. 165: My city of residence is Winter Haven, Florida. Been there over 50 years. Also lived in Florida over 50 years. Highest level of education is two years of college. My current occupation is vice president of an appraisal management department for CenterState Bank.

I'm a widow. My spouse's occupation before he passed away was a district sales manager for a tile company. I have three children. One is 49. She's a pre-K teacher. One is 39. She's an L.P.N. Then I have a disabled son due to Crohn's Disease, and he is 37. No military service. I've not served on a jury before.

THE COURT: Okay. And as you heard me say, this trial may take about two weeks. Is there any reason why in the next two weeks you can't serve as a juror?

JUROR NO. 165: My grandson graduates from high school on Thursday afternoon in Lakeland, at 6 p.m.

THE COURT: Well, if you are selected, we would

most certainly end in enough time for you to get over there, including ending early. I have a few other matters set at the end of the day on certain days. So it's not a problem ending with enough time for you to get there.

JUROR NO. 165: Thank you.

THE COURT: Thank you. I appreciate it.

Juror No. 027.

JUROR NO. 027: So I've lived in St. Petersburg since 1994. I've lived in Florida since 1985. I have a bachelor's degree. I'm a waiter. I'm single. No children. No military. No previous jury.

THE COURT: Okay. Do you work regular workday hours as a waiter or do you work in the evening? What is your schedule?

JUROR NO. 027: My schedule is flexible. I'm a full-time waiter at the Vinoy, and as a full-time server you have to be whatever they -- it's a hotel. It's open all the time.

THE COURT: Yes. So you can work evenings, then? Things like that?

JUROR NO. 027: I do work evenings and days.

THE COURT: Okay. Does the Vinoy pay you if you are doing jury duty? Do you know how that works?

JUROR NO. 027: The Vinoy is run by Marriott, and they do pay for jury duty.

THE COURT: Normally most larger organizations will do that.

JUROR NO. 027: Yes, ma'am.

THE COURT: Okay. All right. Did you go through all the questions?

JUROR NO. 027: I did.

THE COURT: Thank you very much. I appreciate it.

The person in seat No. 3, 020.

JUROR NO. 020: I've lived in Bradenton, Florida, for 23 years. I've lived in Florida for 23 years. I've completed high school. I don't currently have a job. I used to work at Macy's. I'm not married. I don't have kids. I'm not in the military, and I've never had previous jury service.

THE COURT: Are a student at this point?

JUROR NO. 020: Not at this time.

THE COURT: Okay. Any reason why you can't serve for the next two weeks?

JUROR NO. 020: I have a family vacation starting next Friday.

THE COURT: Today is the 29th, so that would be June the 7th.

JUROR NO. 020: That's correct.

THE COURT: Is this a vacation where you are flying someplace?

JUROR NO. 020: No, it's local, so I could come

back if I needed to.

THE COURT: It's within driving distance where, push comes to shove, you can meet up with your family?

JUROR NO. 020: Yes.

THE COURT: I appreciate that flexibility. Thank you so much.

The person in seat No. 4, 095.

JUROR NO. 095: Yes, that's the number. I've lived in Palm Harbor for 23 years. I've lived in the state of Florida for 40 years. Highest level of education is the 11th grade. My occupation, I don't have one, but I'm a stay-at-home mother. Prior to that I worked at the Lockheed Martin facility in Oldsmar.

I am married. I have one daughter. She is 23 and a full-time college student. I have no previous military service, and the only thing I have coming up is my daughter is having surgery tomorrow.

THE COURT: She's having surgery tomorrow?

JUROR NO. 095: Yes.

THE COURT: Is it some kind of -- I don't want to pry. Is it outpatient or in the hospital?

JUROR NO. 095: Hopefully it's outpatient. They are checking for melanoma, so it would be one --

THE COURT: Is there somebody else in your family that can help her?

JUROR NO. 095: No, not really.

THE COURT: Okay. All right. I'll come back to that.

JUROR NO. 095: My husband travels, travels for a living, and he's out of town. So that's why I said, no, not really.

THE COURT: I have one more question for you. You said you were a stay-at-home mom for a while and you also worked at Lockheed. When you worked at Lockheed, what type of work did you do?

JUROR NO. 095: Factory. Line work.

THE COURT: Line work, okay. Thank you very much. I appreciate it.

The next person in seat 5, 162.

JUROR NO. 162: I've lived in Valrico for the past five years, lived in Florida the past 32 years. Highest level of education, I have vocational school. I work for Costco Wholesale. I am married. My wife is a Realtor and a teacher.

I have three children. I have a six-year-old, four-year-old. The six-year-old is William. David is four, and Chloe is one year old.

I have been in the military. I served eight years in the Army. Three years were active and five in the National Guard here in Florida. I was on a jury, but the

case got dismissed.

THE COURT: Okay. So you never got to go back and deliberate? Did you even get to hear any evidence in that case?

JUROR NO. 162: Actually I did. Basically I was there for a second day and it basically got -- not dismissed, but a mistrial.

THE COURT: Do you remember if it was a civil case or criminal case?

JUROR NO. 162: It was criminal.

THE COURT: Anything about that experience that left a bad taste in your mouth?

JUROR NO. 162: Negative. No.

THE COURT: You said you were in the military. Was it the Army?

JUROR NO. 162: Regular Army three years and National Guard.

THE COURT: What type of work did you do in the military?

JUROR NO. 162: I was a track vehicle repair. I fixed military vehicles. Humvees.

THE COURT: The United States has brought this case against Mr. Fisher. Is it fair to say you are retired military, or you did your years of service?

JUROR NO. 162: I completed my eight-year

obligation.

THE COURT: Anything about that that makes it difficult for you to serve?

JUROR NO. 162: No, ma'am.

THE COURT: Okay. Any other reason why you can't serve on this jury if you are selected to serve?

JUROR NO. 162: Negative.

THE COURT: Thank you very much.

The next person, 130, in seat 6.

JUROR NO. 130: Yes. Let's see. I've lived in Odessa, Florida, for 22 years and I've lived in the state of Florida for 40 years. I have a doctorate. I'm an equine veterinarian, which is a horse veterinarian.

I am married. My wife is a pharmacist. I have four kids. One daughter is 23. I have twins, actually, 23. One is a kindergarten teacher and one works in the health industry. Then I have two younger kids that are 11 and 13. They are in school. No previous military service, and I have not served on a jury.

THE COURT: Okay. Is there any reason why you can't serve as a juror for the next two weeks?

JUROR NO. 130: I feel that -- yes, I do think that the nature of my -- I'm an equine veterinarian. I work on horses, and a large part of my workload is emergencies. Right now I have someone covering for me for the next few

hours. And I have agreed to cover for another veterinarian next week, who is having neck surgery. He's having his disk replaced in his neck and cervical spine, and it's just really tough to be in one place for more than a few hours. It's really difficult.

THE COURT: I normally don't excuse professionals because I think we all need to do our civic duty.

JUROR NO. 130: I agree.

THE COURT: We want people who are engaged and we want people who are going to do a good job. At this juncture -- I mean, I understand what it's like. Normally what I tell people is you have to treat it as if you were taking a vacation. It's not a vacation.

JUROR NO. 130: I can never take a vacation for that long.

THE COURT: It's a two-week trial. I understand. If it was a two- or three-day trial, it would be different. I most certainly understand. I'm just going to wait and see, and let's see how it goes. I am not going to excuse you at this juncture because it's -- I'm just not going to do it because I think it then -- it's like I'm applying two different standards, and I'm not going to do that. You will just -- we will wait and see how it goes, but I will note on there that it is a challenge for you with respect to your profession. And somebody who has had pets her entire life, I

understand how important a call me is. To me it's as important as a human doctor, if not more so. I understand, but you are just going to have to -- we will get to it when we get to it.

JUROR NO. 130: Thank you, Your Honor.

THE COURT: Thank you very much.

All right. Next, in seat No. 7, No. 34.

JUROR NO. 034: Juror 0034. I've been a resident of Florida and lived in Tampa my entire life. Education, some college. I was in nursing school, but I didn't complete it. I do care coordination. I follow patients admitted to the hospital, babies. I work for an insurance company.

THE COURT: What does that mean, care coordination, if you work for an insurance company?

JUROR NO. 034: I follow the inpatient side, so I follow when they are admitted, when they are discharged. I update everything so that claims are paid. Babies, I follow them for when they are enrolled and added to policies. I get that updated so everything can be paid.

THE COURT: I see.

JUROR NO. 034: I've done that for 23 years. I also worked in the hospital emergency room as a tech.

Children, we have a nine-year-old grandson that lives with us. My husband is a nurse. No military services. I did serve civil in November, around Thanksgiving time. It

was a week long. I could not attend that last day, Friday, because we had an emergency. My granddaughter was put into ICU and almost expired, so they excused me from it.

THE COURT: I'm sorry for all those challenges.

JUROR NO. 034: She's fine now.

THE COURT: All right. A couple of questions. You said your nine-year-old grandson lives with you. Are you his --

JUROR NO. 034: Legal guardian.

THE COURT: You are his legal guardian.

JUROR NO. 034: We have had him since he was two.

THE COURT: Is your husband able to care for him? Who is taking care of the child now?

JUROR NO. 034: This week there is school. So today he made arrangements to drop him off and pick him up. Next week he starts with the police athletic league. I mean, I can try to get my daughter and stuff to help out with that.

The only concern is he's a national speed skater, so we are leaving Friday night. He's got a competition to qualify for an event in Washington.

THE COURT: That's June 7th you are leaving?

JUROR NO. 034: Yes. It's this coming weekend. It's over Sunday. It's like a seven-hour drive, so we should be back.

THE COURT: What city is that?

JUROR NO. 034: We are going to Milton. It's in Florida.

THE COURT: Is it in the Panhandle? Is that where it is?

JUROR NO. 034: Not too far from Pensacola. We should be back.

THE COURT: The reason I asked about your child is, if somebody has a young child that they are taking care of, normally we will try to excuse them if there isn't anybody else. But it sounds like you've been able to make arrangements, which I really appreciate.

How about your work, do you get paid for serving on the jury, or are you able to make arrangements with your employer?

JUROR NO. 034: I have to let them know. We are really busy and shorthanded.

THE COURT: Well, here's how I do it. If you don't get paid, I evaluate that differently, but most companies today understand it's people's civic duty. And a lot of people are just willing to do it because they recognize how important it is.

JUROR NO. 034: Yes. The last one they worked with me.

THE COURT: All right. Thank you very much. I appreciate it.

The person in seat No. 8, 047.

JUROR NO. 047: I have lived in Lakeland, Florida, for 33 years and in Florida for 33 years. My highest level of education is an associate of science degree in nursing, and I work as a Registered Nurse.

I am married. My husband is a truck driver. I have two children. A four-year-old daughter and one that will be two next month. Two daughters. I have never served in the military and I was previously selected for a jury.

I think I was 18 at the time, and the case was dismissed because the person pleaded guilty after they realized there was surveillance, video footage and stuff. So that's the only time.

THE COURT: Okay. Do you work at a hospital or do you work in a doctor's office?

JUROR NO. 047: I work at Lakeland Regional.

THE COURT: At a hospital. Any problem with your -- because you've got young children, with serving? Are you able to do that? Do you have child-care?

JUROR NO. 047: I have family that -- my father-in-law can watch them this week, and my mother-in-law is a teacher and can watch them next week.

THE COURT: Please tell them thank you.

JUROR NO. 047: They help regularly and get thanked.

THE COURT: No. 196, seat No. 9.

JUROR NO. 196: I've lived in St. Petersburg, Florida, for the last 24 years. I've lived in Florida for all but two years of my life when I was in college. So about 50 years. I've got a master's degree.

THE COURT: What is your master's in?

JUROR NO. 196: Music. I'm a musician. I am married. My wife is also a musician. Three children; 25, 21, and 13. College, college, middle school. No military service. I was on a jury once in the '90s. It was a civil case.

THE COURT: Anything about that experience that left a bad taste in your mouth?

JUROR NO. 196: No.

THE COURT: You understand this is a criminal case where it's a different burden? In a civil case it's by the preponderance of the evidence. Here, the burden is on the government beyond a reasonable doubt. Do you understand that difference.

JUROR NO. 196: Yes.

THE COURT: You said you work as a musician. Do you have a band or do you play at different --

JUROR NO. 196: I actually play in the Florida Orchestra, which is -- I'll get to my point -- seasonal work. It's October through part of May. We just wrapped up, so

currently I'm unemployed. So as it works out, the next two weeks are the only freelance money that I'm going to be able to pick up. I'm the only person working in the house. So, like, if I had to miss those, I would basically not have any income for the next month.

THE COURT: Okay. Are most of those opportunities in the evening, though?

JUROR NO. 196: No. Actually the first one is tomorrow during the afternoon.

THE COURT: Okay. And I understand that it may be a financial hardship. Is this one -- is this a concrete deal that you are having to say no to?

JUROR NO. 196: Yeah. No, it's stuff that I've already signed a contract to do.

THE COURT: You signed a contract to perform tomorrow?

JUROR NO. 196: Yeah.

THE COURT: Okay. What time is that?

JUROR NO. 196: 2 o'clock.

THE COURT: So it's from two to what?

JUROR NO. 196: Two to five. And then I've got other things scattered over this week and next week, too, some engagements that are, like, rehearsals and concerts ultimately. It just happens to be over these next two weeks.

THE COURT: Well, my job is to seat a jury. I'll

see. Just like the gentleman who is a veterinarian, we will see. I will do my best here, but I can't promise it. But I most certainly understand that it's a financial hardship. So we will go person by person and we will see when we get to the end. Thank you very much. I appreciate it.

The person in seat 10, No. 022.

JUROR NO. 022: I've lived in Florida for 29 years. I've lived in Temple Terrace for 28 of those. My highest level of education is associate's degree in data processing. I am currently part-time customer service at a supermarket.

I'm married. My husband has been disabled for 28 years. I have children. Their ages are 38, 48, and somewhere around 32. I can't remember all their ages. I have -- one of them is my son, who is the youngest, and he has been a diabetic since two. My daughter has problems that they just currently had with the lesion in the brain. My son has a part-time job at Busch Gardens. I have not done any military service, and I have not previously been in jury service.

THE COURT: You said you work part-time in customer service. What store do you work for?

JUROR NO. 022: Winn-Dixie.

THE COURT: Any problem with serving as a juror over the next two weeks?

JUROR NO. 022: No. I made accommodations for that. I talked to my supervisor at work. And I have family members that have come down here just to help watch and help me with the family. I'll just have to reschedule some of my appointments that I've had.

THE COURT: I really appreciate you're doing your civic duty and helping. Thank you so much.

The person in seat No. 11, 124.

JUROR NO. 124: Yes, ma'am. I live in Lakeland, Florida. I've lived there for 19-and-a-half years. I do have some college. I'm currently retired. I retired previously from being a local and regional human resource manager for a security company. I'm single. I have no children. I did retire from the United States Air Force after 24 years, and I was a criminal and traffic accident investigator.

THE COURT: Okay. So when you say a criminal investigator -- I understand traffic accident investigator. What type of work did you do as a criminal investigator?

JUROR NO. 124: I handled a lot of larcenies, assaults, spousal and child abuse, suicides, and whatever else came up. Thefts.

THE COURT: Okay. So if you are selected for this jury, you will be hearing from -- or you may be hearing from some law enforcement officers who will be testifying. Is

there any reason why you can't be fair and impartial to both sides?

JUROR NO. 124: I'm going to be honest. I'm more partial to law enforcement but ...

THE COURT: Is that something that you can set aside? It's one thing to be more partial to law enforcement, but can you say, look, it's my job to give this gentleman his day in court?

JUROR NO. 124: Yes, ma'am.

THE COURT: He's come in here, and it's my job to make certain the jury that's seated can follow the instructions from the Court and can be fair and impartial to both sides.

Let's just say you've got certain beliefs because of the fact that you did work in criminal investigation and you were to a certain extent, I would say, a law enforcement officer. Is that a correct statement?

JUROR NO. 124: Yes, I started as a law enforcement officer and then worked my way up to investigator.

THE COURT: But is this something you can put aside and say I'm going to give this gentleman his day in court? The government -- the burden of proof is on the government. I can follow the instructions that the judge gives me, and I can be fair and impartial with respect to rendering a verdict that's fair and based on the evidence.

Is that something you think you can do, or do you not think you are able to do that?

JUROR NO. 124: No, ma'am, I can be fair and impartial.

THE COURT: Okay. I appreciate it. Any other reason -- or any reason, I should say, why you can't serve as a juror over the next two weeks?

JUROR NO. 124: No, ma'am.

THE COURT: Thank you very much. I appreciate it.

The person in seat No. 12, 097.

JUROR NO. 097: I live in Wesley Chapel. I've lived there for 16 years. I've lived in Florida about 60 years. I have a doctorate in engineering. I'm a professional engineer.

Married. My wife is a homemaker. I have two kids, 18 and 19. They are students. One is graduating this year. I was previously four years active in the United States Coast Guard and five years active in the Reserves. I did search and rescue, law enforcement, customs laws, and fisheries, and I haven't served in any courts.

THE COURT: So when you worked in the Coast Guard, one of the things that you did, would it be, for instance, if Customs saw that there was maybe something illegal being brought into the United States or on the navigable waters, you would help, what, try to find that vessel or rescue that

vessel, et cetera?

JUROR NO. 097: We would search it and arrest them if they had contraband, both fisheries and drug interdiction.

THE COURT: How many years ago did you do that?

JUROR NO. 097: Forty. Thirty-five. A long time.

THE COURT: Okay. If you are selected for this jury, you may be hearing testimony from law enforcement officers. Mr. Fisher has been charged with drug distribution, among other matters. He's been charged with distributing fentanyl as well as another drug called pentylone, and he's been charged with laundering the proceeds of those sales.

Is that something you can be fair and impartial?

JUROR NO. 097: I think so.

THE COURT: Okay. I know you are a professional engineer. Are you able to serve as a juror for the next two weeks if you are selected?

JUROR NO. 097: I believe so, yes. I have tickets to go to Germany June 10th with the family.

THE COURT: Let's see. Well, June 10th is a Monday. If you are selected, don't worry about that. I would most certainly respect your vacation plans. So we would work that out. So that's not an issue.

Any other reason why workwise?

JUROR NO. 097: No.

THE COURT: Okay. Thank you very much. Again, that's Monday June 10th that you are leaving; correct?

JUROR NO. 097: Yes.

THE COURT: Thank you.

The person in seat 13, 190.

JUROR NO. 190: Hi. I live in Parrish, Florida. I've lived there three years; lived in Florida three years. Master's degree. I'm retired. I'm a nurse practitioner for the State Department and other government agencies. Prior to that I worked for them.

THE COURT: So you would work overseas, for instance, in an embassy? Is that it?

JUROR NO. 190: No, I was in D.C.

I am married. My spouse was a senior executive for the U.S. federal government.

THE COURT: What agency did he work for?

JUROR NO. 190: Defense contract audit agency.

THE COURT: Is he retired now?

JUROR NO. 190: Yes. No prior military service, and I have one stepdaughter, and my children are deceased.

THE COURT: Is there any reason why you can't serve as a juror over the next two weeks?

JUROR NO. 190: Well, I do have a chronic degenerative disk and I'm in the middle of dental surgery. One corner of my mouth has a temporary bridge, and I just

lost a bone graft.

THE COURT: Do you have a dental appointment scheduled over the next two weeks?

JUROR NO. 190: I need to call the dentist today because I lost this thing over the weekend. No one was open, so I was hoping to get back in and put it back in. Otherwise, I will have atrophy of the gum and they won't be able to put the permanent bridge in.

THE COURT: If you are selected, we will work with you on that. Are you able to sit?

JUROR NO. 190: After about three hours or so it's painful to get up, and sit that long and have to get up. Thirty minutes. When I'm at home, I'm up, like, every television commercial, watching a movie or something.

THE COURT: Okay. All right. Well, I've got these notes down. I know you are a retired government employee, as is your husband. Is there any -- do you see any conflict with that? Is there any reason why you can't be fair and impartial to the United States, who has brought this case?

JUROR NO. 190: Personally, I understand the significance of what these drugs do because I used some of it in my job, but I think I could be impartial as much as I can.

THE COURT: Thank you very much. I appreciate that.

Seat 14, 131.

JUROR NO. 131: Yes, ma'am, 131. I live in Bradenton, Florida. I've lived there for 31 years. I've lived in Florida for 31 years. High school graduate. I am a sole proprietor of a pest control company in Bradenton.

I am single. No kids. I have not served in the military, and I've been called to jury service three times previously.

THE COURT: Okay. Let me get back to your business. So this is a company that you own?

JUROR NO. 131: Yes, ma'am.

THE COURT: You go to people's houses and spray for bugs?

JUROR NO. 131: Yes, ma'am.

THE COURT: Is this a financial hardship for you to serve on the jury? It would be for two weeks. Is there anybody that can cover for you?

JUROR NO. 131: Quite bluntly, it would be a hardship. I'm co-owner with my sister. She does the office and scheduling and I do the fieldwork.

THE COURT: I understand. And I will factor this in, just as I will with the other people who have indicated a hardship. Thank you. Anything else you would like to say?

Did you go through all the questions?

JUROR NO. 131: Yes, ma'am, I went through all the

questions. And, no, that's it.

THE COURT: Thank you very much.

The person in seat 15.

JUROR NO. 076: I live in Winter Haven. I've been there for two years, lived in Florida all my life. I finished high school. Occupation, I'm retired, but I just went back to work three weeks ago as a cashier. My husband is retired. He was a maintenance supervisor. I have two children and two stepchildren, ranging from 38, 45, 46, and 48.

THE COURT: Okay. What store do you work at now as a cashier?

JUROR NO. 076: Winn-Dixie.

THE COURT: Normally the bigger stores do pay. I know Publix pays. I haven't had very many Winn-Dixie people.

JUROR NO. 076: I don't know. I've only been there for three weeks. I have been on grand jury. It's been about 20-some years ago, and I've been a juror and both of them were criminal cases.

THE COURT: Couple of things. You understand the world of the grand jury is different than the world of a petit jury?

JUROR NO. 076: Yes.

THE COURT: Anything about those other criminal cases that you sat on that may have left a bad taste in your

mouth?

JUROR NO. 076: No.

THE COURT: Without telling me what the verdict was, did you reach a verdict?

JUROR NO. 076: Yes, ma'am. Guilty. I'm sorry. I'm sorry.

THE COURT: It's all right. It's okay. I do that kind of stuff, too. All right. Thank you. I appreciate it.

No. 16, 050.

JUROR NO. 050: I've been living in Carrollwood, Florida, for 29 years and Florida for 29 years. My highest educational level is bachelor's degree in computer science and my occupation is an IT help desk supervisor. My marital status is single and no kids and never served in the military and never been on a jury.

THE COURT: Is there any reason why you can't serve over the next two weeks?

JUROR NO. 050: Right now -- we have a critical project right now and shorthanded. I have to move people around.

THE COURT: Well, you know, normally that is not enough to excuse you.

JUROR NO. 050: I understand. I just have to tell them so that the nightshift guy can cover me. Then when I get back home, I can work the nightshift.

THE COURT: Tell them the judge says that's not enough to be excused, although we appreciate the sacrifice the business is making, too.

THE COURT: No. 17, 008.

JUROR NO. 008: I've lived in Dunedin, Florida, for the last three months. Before that I lived in Seminole, Florida, my entire life, 29 years. I have a bachelor's degree in mass communications, journalism, and media studies. I'm in marketing for a global outsourcing company.

I was recently married. This month, actually. My spouse is a personal trainer. No children, no military service, and I was called for the Pinellas Circuit Court last year but was not seated.

THE COURT: Is there any reason why you can't serve over the course of the next two weeks?

JUROR NO. 008: No. Usual work, shifting responsibilities, but doable, I guess.

THE COURT: I really appreciate it. Thank you very much.

The next person in seat 18.

JUROR NO. 061: I lived in the Bronx, New York, for 28 years, been living in Lakeland, Florida, for 14. I have an associate's degree in social science. I'm not married. I'm single. I have three children. Twenty-three, who is an electrician for TECO; 17, who is an L.P.N.; a

16-year-old. I did not serve in the military and I've never served as a juror.

THE COURT: Okay. You say you have an associate's degree in social science. I'm sorry, I'm not certain I have -- what is your current occupation?

JUROR NO. 061: Medical scheduler now. Before that I was an executive assistant for a mental nonprofit organization.

THE COURT: Okay. So as a medical scheduler, do you work for --

JUROR NO. 061: A nonprofit organization. I will schedule for 15 clinics.

THE COURT: Let me ask you, I don't know how the nonprofit works. They are a little bit different than businesses. Are they able to pay you during the time that you would be engaged in jury duty?

JUROR NO. 061: They actually told me, no, we won't pay you for the time you are off.

THE COURT: Is that a financial hardship or something you can do?

JUROR NO. 061: It is a financial hardship for me because I'm a single mom, and my son is currently -- the 23-year-old is living with me because he's -- TECO is doing this as a -- he's being sponsored to become a lineman. So he's living at home with me.

THE COURT: All right. I understand that. As you you've heard, I've had one, two, three, four, five, six, seven, eight -- this is the eighth one where somebody has --

JUROR NO. 061: It's fine. I understand. This is just a sacrifice as a parent that we do.

THE COURT: And this is what I tell people: For those of us who have not served in the military, this is our opportunity to give back to our community or those who haven't done other types of volunteer projects. But I understand. You don't get work, you don't get paid, and that can be very, very challenging. So I have it down as something that's an issue and, if I can, work with it. I most certainly understand. So I'm going to do my best, but I can't make any promises until I get through everybody. Thank you very much. I appreciate it.

We are going to move now to the person in seat 19.

JUROR NO. 151: No. 186.

THE COURT: Seat 19, 151.

JUROR NO. 151: Sorry.

THE COURT: That's okay. I get challenged with this, too. Don't feel bad. Go ahead.

JUROR NO. 151: I am in Port Richey for two-years-and-a-half. I've been in Florida for almost six. One year college. I'm a Certified Nurse Assistant, independently, and on an agency. I'm married. My husband's

occupation is a truck driver, over the road.

I have three children and a nephew at home. Ages 8 -- well, my nephew is 6, daughters 8, 14, and 16. Never been in the military and never served as a juror before.

THE COURT: Okay. As you've heard, this is a trial that will take approximately two weeks. As a Certified Nursing Assistant, you go out on different jobs and you get paid for those jobs; is that right?

JUROR NO. 151: Yes, ma'am.

THE COURT: So if you don't work, you don't get paid? Is that it?

JUROR NO. 151: Well, not only I don't get paid, but I work independently and they depend on me going to their houses. So they won't have service or they won't be taken care of either if I don't work.

THE COURT: All right. We will see. Thank you very much. I appreciate it.

The person in seat 20, 112.

JUROR NO. 112: I've been in Florida 25-and-a-half years. Spring Hill, Florida, the whole time. I have an A.S. and a B.S. I am a retired and disabled veteran. Married. My wife is a Registered Nurse.

Four children. Two boys, two girls. The youngest boy is 24. He's a bum at home, and the rest I wouldn't know the ages. I was in the United States Marine Corps. I was

antitank demolitions expert as well as security, and I've been here three times already and haven't served yet.

THE COURT: Into this courthouse?

JUROR NO. 112: Yes, once in the grand jury and two-and-a-half years ago here.

THE COURT: You understand, as I said to the other potential juror, that the role of the grand jury is different than the role of a petit juror. The grand jury decides whether someone is going to be charged with a crime. So it's a probable cause standard, which is a lower standard. This is beyond a reasonable doubt.

JUROR NO. 112: Correct.

THE COURT: Is there any reason why you can't serve over the next two weeks?

JUROR NO. 112: I take medication for several things, and I don't know if you want to do a sidebar or you want me to just --

THE COURT: We will do it at sidebar. How about that?

JUROR NO. 112: Okay.

THE COURT: Because there are a couple of other issues that I'll take up, generally speaking, with people at sidebar. And I will just make a note to myself to take this up at sidebar.

JUROR NO. 112: Thank you, Your Honor.

THE COURT: Thank you. I appreciate it very much. Anything else?

(Juror No. 112 shakes head.)

THE COURT: All right. Other than that, I'll come back to you in a bit.

The juror in seat No. 21, 185.

JUROR NO. 185: I live in Bradenton, Florida. I've lived there for 26 years. I've lived in Florida all my life, which is 62 years. My highest education, I have two years in college. I'm retired. I was a salesman. I do contract work now.

I'm married. My wife is a real estate broker. I have three children. My oldest is 35, who is severely handicapped. He has shaken baby syndrome. My daughter is 32. She's a schoolteacher, and my son works with me as a contractor. I've never served in the military, and I have been on a jury before.

THE COURT: Without telling me the verdict, did you reach a verdict in that case?

JUROR NO. 185: Yes, ma'am.

THE COURT: Was it criminal case or a civil case?

JUROR NO. 185: Civil.

THE COURT: Anything about that experience that left a bad taste in your mouth?

JUROR NO. 185: No, ma'am.

THE COURT: I understand the challenges there, but is there any reason you can't serve as a juror over the next two weeks?

JUROR NO. 185: No, ma'am.

THE COURT: Seat 22, 015.

JUROR NO. 015: I live in Zephyrhills. I've lived there for five years. I've lived in the state of Florida for 29. I have vocational school. I am a landscaper. I have my own landscape company. I am divorced with three kids; 10, 9, and 6. No previous military, and I have served on a jury before.

THE COURT: Without telling me the verdict, did you reach a verdict in that case?

JUROR NO. 015: No, we did not.

THE COURT: Okay. Was it a civil case or criminal case?

JUROR NO. 015: Criminal. He took a deal.

THE COURT: So it's not that you couldn't reach a verdict. Did the defendant take a plea offered to him? Is that what happened?

JUROR NO. 015: Yes. There was a deal offered to him in the middle of the case.

THE COURT: I see. All right. I know you are a landscaper and you've got your own company. Can you serve as a juror for the next two weeks or is that going to be a

financial hardship?

JUROR NO. 015: I can. It's just my father would have to go out and do it, and he's almost 60. So it just puts a strain on him.

THE COURT: Well, as I've said, you can see how these questions have gone so far. It's my job to seat a jury here.

JUROR NO. 015: I understand.

THE COURT: So I've got down that you are willing to but that it's a challenge, particularly since you have to get your father to help you.

JUROR NO. 015: Correct.

THE COURT: I appreciate it.

The person in seat No. 23.

JUROR NO. 198: No. 198. I live in Parrish and been in Parrish for 16 years, Florida for 35. High school graduate. I'm a general manager for a cabinetry company. Married. Three children; 17, 16, and 12. No military service and no jury service.

THE COURT: Is there any reason why you can't serve over the next two weeks?

JUROR NO. 198: No.

THE COURT: I appreciate it very much. Thank you.

The person in seat 24, No. 167.

JUROR NO. 167: I've lived in Bradenton, Florida,

my whole life except for time at university. I have lived in Florida my entire life, which today is 36 years. My highest level of education is a master's degree. I am a business analyst for a nonprofit substance abuse and mental healthcare provider.

I'm married. My spouse works for Publix for 30-something years. I have one child. She is ten and she is a 5th grader. So her 5th grade graduation is tomorrow. I have no previous military service and no previous jury service.

THE COURT: What time is the graduation tomorrow?

JUROR NO. 167: 9-ish.

THE COURT: 9 a.m.?

JUROR NO. 167: Yes.

THE COURT: You said your husband works for -- I'm sorry. I take that back. You work as a business analyst for a nonprofit substance abuse.

JUROR NO. 167: And mental healthcare provider.

THE COURT: But you don't actually work with the people who are having these issues; correct?

JUROR NO. 167: No. I manage the dataset and reporting for our state contracts.

THE COURT: You heard what this case is about, that Mr. Fisher has been charged with -- and I'm summing it up. It's more detailed than this. I'm just summarizing it -- selling fentanyl.

JUROR NO. 167: Yes.

THE COURT: And with laundering the proceeds of the sale.

Is there any reason why you can't be fair and impartial in this case?

JUROR NO. 167: No. It's all according to how the details go.

THE COURT: So the only thing right now you have is the 5th grade graduation at 9 o'clock tomorrow morning?

JUROR NO. 167: Correct. Everything else I can juggle.

THE COURT: Do you know how long that graduation will take?

JUROR NO. 167: No. I'm guessing an hour. It's just on Anna Maria Island, so getting here would be tricky.

THE COURT: I understand. So that's the morning, basically. Tomorrow morning.

JUROR NO. 167: Correct. She will understand if I have to -- my husband can just fill in.

THE COURT: No, you will not miss a graduation. That's not going to happen. If you are selected, we would do something so you could go to your child's graduation.

JUROR NO. 167: Thank you.

THE COURT: That's pretty important. I can't imagine that I would make a parent --

JUROR NO. 167: Unless she goes to medical school, she will never be at another school longer than elementary.

THE COURT: Not a problem. I've got it down.

The person in seat 25.

JUROR NO. 145: Yes. I live in Sarasota, Florida. I've lived there for 26, 27 years. I've been in Florida for 40 years. High school, I graduated high school. Well, actually, I got a GED. I used to work for the post office. I'm retired from the post office, on a disability. I'm married. I've been married for 26 years.

I have four children. Well, I have a 30-year-old daughter who is in school to be a teacher. She works as a preschool teacher right now, but she's in school to be a teacher.

I have a 22-year-old daughter that lives out of the country, in Sweden. I had a son that passed away many years ago, and then I have a youngest daughter that's 19.

I'm not sure about the being impartial because of having to put one of my children in a drug rehab recently, and it's -- I've just seen a lot of bad things with drugs.

Also, I have really bad migraine headaches and they are like -- I don't really want to go into it. I get stroke-like symptoms where I have to be hospitalized. I have an appointment scheduled at Mayo Clinic tomorrow in Jacksonville.

I'm also doing a temporary trial thing for the headaches with the medical device, that I don't know at any given time if I need to go and use. So I don't know if I could do that or whatnot. I don't know.

THE COURT: I'll factor all this in. I appreciate it very much.

No. 26, 035.

JUROR NO. 035: I've lived 14 years in Lakeland, Florida; all my life in Florida. I have a bachelor's, four years of college. Retired. My wife is retired, and no children from my wife, but she's had two children, and one of them has a drug problem. I spent two years in the United States Army as a food inspector.

THE COURT: Let me ask you, you said a B.S. What is the B.S. in?

JUROR NO. 035: I worked as a drafter/cutter.

THE COURT: But you said you had a Bachelor of Science. I'm just trying to figure out what your Bachelor of Science --

JUROR NO. 035: Commercial art.

THE COURT: And you had also, then, said that you were doing something in design. I'm so sorry. I missed that. If you could, speak into the microphone.

JUROR NO. 035: I just used the autoCAD about ten years. Drafting.

THE COURT: Okay.

JUROR NO. 035: Computer.

THE COURT: The computer-assisted design.

JUROR NO. 035: Correct.

THE COURT: You said you are retired now, but you said that your wife's child had had a drug problem; is that right?

JUROR NO. 035: Still does.

THE COURT: He still does, okay. Is that something that you think would impact on your ability to be fair and impartial in this case?

JUROR NO. 035: I think it would.

THE COURT: Why? I mean -- let me put it this way: I'm going to tell you what the law is and I'm going to ask you to apply the law to the facts that have been presented here and to not let any biases that you have impact on your verdict and to put those biases or those feelings aside.

And I understand what you are saying. I can understand, if I were married to somebody and they had a child who had issues, how that would be an important component of my thinking. So I most certainly understand where you are coming from, but I want to just explore that some more and for you to explain why it is that you think --

JUROR NO. 035: I can set it aside.

THE COURT: Is what you are saying, you would be able to consider the evidence? Or I'm not certain I understand what you would be able to consider.

JUROR NO. 035: Yes, I would be able to consider the evidence.

THE COURT: Do you think you could be fair and impartial to Mr. Fisher?

JUROR NO. 035: Yes.

THE COURT: Okay. Thank you very much.

JUROR NO. 035: This past week I've had a problem with falling, dizziness. In fact, I fell down twice and have gone to the doctor, but it hasn't been resolved. And I don't think I should be driving back and forth from Lakeland to here.

THE COURT: I can understand that. Okay. I'll take this up. Thank you. And I appreciate your coming in today despite these health issues that you've been dealing with. I'll get back to you. Thank you very much.

No. 27, 148.

JUROR NO. 148: I live in Tampa, Florida; lived here 35 years. I've lived in Florida 59 years. I have a B.A. in finance. I am a stay-at-home mom. I was previously in commercial finance. I am married. My spouse is in commercial finance. I have three children; 28, who is a project manager for a digital advertising company; 25, who is

a student; and 21, who is a student. I have no military service, and I have never been a juror.

THE COURT: Any reason you can't serve over the next two weeks?

JUROR NO. 035: No, ma'am.

THE COURT: Thank you very much. I appreciate it.

No. 28.

JUROR NO. 113: No. 113. I've lived in Tampa for 25 years and lived in Florida for 25 years. I graduated high school, and I'm a warehouse manager for a genuine parts company. I am single. I do not have any kids. No military service and no previous jury.

THE COURT: Okay. What company? You said for a genuine parts company?

JUROR NO. 113: Yes. It's NAPA.

THE COURT: Is there any reason why you can't serve over the next two weeks as a juror?

JUROR NO. 113: No, ma'am.

THE COURT: Okay. Thank you. I appreciate it very much.

The person in seat 29, 048.

JUROR NO. 048: I live in Tampa; lived in Tampa for six years; lived in Florida for six years. I have a B.S. in finance and accounting. Retired. I was formerly at a global insurance company. Married. My husband is retired.

He's formerly from a global insurance company. Two children, 17 and 20. No military service and no previous jury service.

THE COURT: Any reason why you can't serve over the next two weeks?

JUROR NO. 048: I'm supposed to fly my son up to move into his apartment for college this Friday.

THE COURT: And how many days did you plan to be gone for that?

JUROR NO. 048: Just Friday, Saturday, Sunday.

THE COURT: And what time are you planning on leaving on Friday?

JUROR NO. 048: Friday morning. I think between 9 and 10.

THE COURT: Leaving Friday morning.

JUROR NO. 048: Leaving Friday, yes. Back Sunday.

THE COURT: Back Sunday. That's the only thing you have right now; right? That's the only reason why you couldn't serve?

JUROR NO. 048: That's right.

THE COURT: All right. Thank you very much. I appreciate it.

No. 071, person in seat 30.

JUROR NO. 071: I've lived in Lakeland for 17 years. I've lived in Florida for 26 years. I completed high school. I work for the City of Lakeland. I am single and

have a three-year-old daughter. No previous military and no previous jury.

THE COURT: Is there any reason why you can't serve over the next two weeks?

JUROR NO. 071: I'm responsible for my daughter half the time and picking her up and dropping her off for school and stuff, but that's it.

THE COURT: What time do you pick her up at school?

JUROR NO. 071: I pick her up before 6 and she's dropped off at around 7:30.

THE COURT: Well, if you are selected, I would most certainly work around that on the days that you do that as part of your duties as a father.

JUROR NO. 071: Yes, ma'am. Thank you.

THE COURT: Thank you.

The person in seat 31.

JUROR NO. 067: No. 067. I've lived in Riverview, Florida, my whole life. I have a bachelor's in health sciences. I work -- I'm a patient coordinator for Audibel Hearing Centers. Single with no kids, no military service and no jury service.

THE COURT: Is there any reason why you can't serve over the next two weeks?

JUROR NO. 067: I don't think so. I'll just have to get someone to cover me if possible.

THE COURT: Okay. Because normally I don't excuse people for challenges in the workplace unless someone were to tell me, for instance, they didn't get paid. Somebody who is self-employed who doesn't get paid, I would probably feel a little bit different about that. But an inconvenience to an employer, having to shift employees around, I would never seat a jury because it's always an inconvenience. So I appreciate that very much. Thank you.

JUROR NO. 067: You are welcome.

THE COURT: The person in seat 32, 045.

JUROR NO. 045: I've lived in St. Petersburg for 19 years. I've lived in Florida for 19 years. I stopped going to high school in the 11th grade, but I did enroll myself into an adult education center and got my diploma.

I currently work for R'Club. It's a child-care facility. I'm single. I don't have kids. I've never served in the military, and I've never served for a jury.

THE COURT: So you provide child care, then, at this facility; is that right?

JUROR NO. 045: Yes.

THE COURT: Is there any reason why you can't serve over the next two weeks?

JUROR NO. 045: Transportation. It would take me $60 to get here and to my home every day I have to be here.

THE COURT: So how did you get here? Did you have

to take an Uber?

JUROR NO. 045: My grandfather dropped me off this morning, but I have to take Uber back home.

THE COURT: Okay. I appreciate your making the financial sacrifice and being here today. Thank you.

JUROR NO. 045: Thank you.

THE COURT: No. 33, 093.

JUROR NO. 093: I live in Tampa. I've lived here for about eight years now. Born and raised in Florida. Twenty-nine years now. Highest level of education is B.S. in management information systems. I work as a project manager for an IT audit firm. I'm single. No kids. I haven't served in the military, and I don't have any previous jury service.

THE COURT: Okay. Is there any reason why you can't serve as a juror over the next two weeks?

JUROR NO. 093: I have -- I mean, I have client work next week that requires travel.

THE COURT: Okay. Well, here's what I would say. I mean, you brought it to my attention and I've said, if I can't seat a jury, I'm going to need your services. Is that something you can tell your supervisors at work or your colleagues and somebody could cover? Or what's the story?

JUROR NO. 093: Um, yeah. I mean, if need be, yeah, I'm sure we could arrange it.

THE COURT: Just so I understand, right now you have travel scheduled for next week?

JUROR NO. 093: Correct. We work on --

THE COURT: To where?

JUROR NO. 093: Orlando. We work on client sites for IT.

THE COURT: You go to where the clients are located?

JUROR NO. 093: Correct.

THE COURT: Is that normally what you do? Is that part of your normal workday, to go to client sites?

JUROR NO. 093: It is, yes.

THE COURT: Okay. Thank you.

The person in seat 34, No. 207.

JUROR NO. 207: Resident of Largo, Florida, 45 years; lived in Florida 45 years. High school, followed by adult evening vocational, four years carpentry, two years electrical, two years mechanical, half a year welding. Occupation, construction manager. Preconstruction manager. Married. Wife lives at home. Daughter is 37 years old, works for Google. No military service and have not served on a jury.

THE COURT: Okay. Is there any reason why you can't serve over the next two weeks as a juror?

JUROR NO. 207: None.

THE COURT: Okay. Thank you very much. I appreciate it.

The person in seat 35, 146.

JUROR NO. 146: I've lived in Auburndale, Florida, for 51 years and I've lived in Florida for 51 years. I have a Bachelor's of Science in criminal justice. I'm an ESE teacher. I'm single. I have two boys. One is 26 and one is 31. One is a correctional officer and the other one works for retail. I've never been in the military service, and I've never done jury service.

THE COURT: You said your Bachelor's of Science was in criminal justice. Were you thinking about going into law enforcement for a while?

JUROR NO. 146: Yes, ma'am. I was going to be a cop and I got in a car accident.

THE COURT: Well, you may be hearing from some law enforcement officers as witnesses in this case. I just want to make certain you can be fair and impartial to both sides. Is that something you can do?

JUROR NO. 146: Yes, ma'am, I can be impartial.

THE COURT: And the same thing with your son working as a correctional officer. You can put all that aside and be fair and impartial to both sides?

JUROR NO. 146: Yes, ma'am, I can be fair and impartial.

THE COURT: Is there any reason why you can't serve as a juror over the next two weeks?

JUROR NO. 146: No, ma'am.

THE COURT: Thank you very much.

The person in seat 36.

JUROR NO. 123: I've lived in Plant City for 28 years. I've lived in Florida all my life. I'm a high school graduate. I work for CenterState Bank as customer service. I'm married. My husband is a truck driver.

I have two daughters. One is 40; one is 39. One of them is a homemaker. The other one is a flight attendant for Southwest Airlines. I have no military service, and I have served on a civil case here in Tampa where the jury reached a verdict.

THE COURT: Okay. Anything about that experience that left a bad taste in your mouth?

JUROR NO. 123: No. And, Your Honor, I would like to say, I did fill out a hardship form because I have a 92-year-old mom that has a fractured hip, but I didn't realize, you know, when I filled that out that the hours would be from 9 to 5. So I would consider it an honor and privilege if I got chosen to serve as a juror.

THE COURT: Thank you. I appreciate it. You can see some of the challenges that I'm having today. You do have somebody to help you with your mother?

JUROR NO. 123: I do during the day. My daughter, who is a homemaker, can take care of her during the day.

THE COURT: Thank you very much.

The person in seat 37.

JUROR NO. 036: I have lived in Tampa 20 years in July. The same for Florida. I have a master's of science in food science and technology. I am employed as a food scientist currently. I am married, but my wife does not work. She's not been able to work for a number of years.

We do not have any children. I have no previous military service. I served in Howard County, Maryland, in a criminal case where we reached a decision, and I also served a little over ten years ago here in county court on a criminal case there, which we did reach a verdict, as well.

THE COURT: Anything about either of those experiences that left a bad taste in your mouth?

JUROR NO. 036: No, ma'am.

THE COURT: I know that you are a food scientist. Do you work for a company? Or who do you work for?

JUROR NO. 036: I do. I work for a global international company that is headquartered in Ireland.

THE COURT: Is there any reason why you can't serve as a juror over the next two weeks?

JUROR NO. 036: My wife has a medical procedure where they will be sedating her tomorrow. She will be under.

We have been waiting about three months for this. She had an emergency surgery in February. It was basically life-saving, and they are now able to do the diagnostic tomorrow and we will find out, hopefully, the result of what all the causality was.

THE COURT: Okay. So that's scheduled for tomorrow at a local hospital; is that right?

JUROR NO. 036: Yes, at a surgery center. Yes.

THE COURT: I take there is no one else to help you?

JUROR NO. 036: There is not. And the nature of what they will do to her, when she gets home I will need to care for her.

THE COURT: Thank you. I will jump back to that, but I understand the seriousness of it. Thank you.

No. 38, 208.

JUROR NO. 208: I'm currently living in Tampa. I've lived here 12 years; lived in Florida 41 years. I have a bachelor's in graphic design and a bachelor's in interactive media. I'm a creative design manager. I'm single. I have no children. I have not served in the military, and I've never served on a jury before.

THE COURT: Okay. Is there any reason why you can't serve over the next two weeks?

JUROR NO. 208: No.

THE COURT: Thank you very much. I appreciate it.

The person in seat 39, 104.

JUROR NO. 104: I've lived in Land O' Lakes, Florida, for 12 years. I was born in Florida. Collectively, I've lived in Florida about 42 years. I did one year of vocational school after high school for computer programmer training. I am a membership representative at Navy Federal Credit Union.

I'm married. My husband is retired from the Navy for 24 years. He's a millwright where he works now. They repair stuff when it's broken. We have two sons. The 35, he's a solar installer and the 30-year-old works for a company that helps other companies find people to hire.

I didn't serve, but I was a Navy spouse, and I haven't served on a jury before.

THE COURT: Is there any reason why you can't serve as a juror in this case over the next two weeks?

JUROR NO. 104: No, ma'am.

THE COURT: Thank you very much.

The person in seat 40, 003.

JUROR NO. 003: I live in Clearwater, Florida; lived in Florida for 35 years. I have a medical doctorate degree. I'm a physician. That's four years after college. I'm a physician/radiologist. I am currently employed part time at the VA Medical Center. I work every other week. I'm

married. My husband is a physician, as well. He also works at a VA Medical Center but not at the same place.

My husband currently has a dispute as a plaintiff with the Merit System Protection Board that's currently ongoing right now. I have three children. My daughter lives in Seattle. She's a TV news reporter.

I have a son who is a former -- a farmer. Although sometimes I think he should be a former son, and a son who is a math and science teacher and lives in New York. No previous military service and no jury service.

THE COURT: Couple of things. I know you said that your husband has a dispute with the Merit System Protection Board. But the people who are here today representing the United States have nothing to do with the Merit System Protection Board. They are Assistant United States Attorneys.

JUROR NO. 003: I just wanted to be forthcoming.

THE COURT: I appreciate that. I wanted to make certain that there isn't -- and I appreciate it. You are being forthcoming. That is exactly what we want so we can explore these things, but I wanted to make certain that you understood that they have nothing to do with that. It's a different agency, I think. I don't think the U.S. Attorney's Office has anything to do with the Merit System Protection Board. I wanted to make certain that was something that you

understood and could still be fair and impartial to both sides. Or you don't think you can be?

JUROR NO. 003: It's been a long process. It hasn't been a two-week process. It's been several years.

THE COURT: But they are just employees of the United States government. I mean these folks here are just employees of the United States government. They have nothing to do with the Merit System Protection Board.

JUROR NO. 003: I understand that.

THE COURT: So I'm not certain I understand your hesitation. I want to make certain I understand it. I mean, if there is something later on you want to take up at sidebar -- it sounds like you have some strong feelings about it. I just wanted to explore it, but not excuse you unless there is a good reason for doing it.

JUROR NO. 003: Okay.

THE COURT: I'll take that up at sidebar. I appreciate it. Anything else you want to tell us now?

JUROR NO. 003: No.

THE COURT: Thank you.

The person in seat 41, No. 72.

JUROR NO. 072: I've lived in St. Pete 22 years; same as state of Florida. I finish high school and two years of college. My occupation is house cleaner. I'm married and I have two daughters, 22 and 19. The older one is a

hygienist and the second child is in college. No military service and no jury service.

THE COURT: Okay. Is there any reason why you can't serve over the next two weeks? Does your job interfere with that?

JUROR NO. 072: Yes. English is my second language, so I can't understand everything in court. First time here. So I don't know.

THE COURT: All right. I appreciate that. Thank you very much.

The person in seat 42.

JUROR NO. 080: I live in Tampa. I've lived here five years; Florida 49 years. Highest level of education is associate in business. Currently I work for a company that maintains foreclosure properties nationwide. I'm divorced. I do have two children that are 26 and 31, living in other states. One is a homemaker and one is a roofer. No former military, and I was called by the county clerk last year and was excused due to my medical history.

THE COURT: Is your medical history something that would infringe on your ability to serve?

JUROR NO. 080: It's Lupus, so it makes it difficult for me to sit for long periods of time.

THE COURT: Did you have a doctor's note? We will excuse people who bring doctor's notes or a statement from a

doctor.

JUROR NO. 080: I did not. I didn't bring anything with me. I have surgery coming up. I brought paperwork for the surgery on June 20th.

THE COURT: But that's after this case. If your doctor says that you can't serve, because that used to be my job, was to excuse people, you would just send a note in and you would automatically be excused.

Is that what your doctor says, you can't --

JUROR NO. 080: I didn't ask. I'm dealing with a different medical issue now.

THE COURT: Do you think you're able to serve on the jury or do you think your medical issue is such that you can't serve?

JUROR NO. 080: I can. I take medication. So it's up and down.

THE COURT: Okay. Is there anything else that would preclude you from serving over the next two weeks?

JUROR NO. 080: No, just the appointments to get myself ready for surgery. I just have three appointments.

THE COURT: You say you have that on June 20th?

JUROR NO. 080: Surgery.

THE COURT: Are your medical appointments anytime this week or next week?

JUROR NO. 080: They are not currently scheduled.

I did the blood work last week and, of course, I was waiting to see what happened here before I scheduled anything else.

THE COURT: Thank you very much. I appreciate it.

I think I've gone through everybody. Is that right? I think what I will do is I'm going to excuse the venire for a short recess. It's about a quarter of eleven. We are going have you come back at 11 o'clock. So you are excused for a short break.

(The venire exits the courtroom.)

THE COURT: Look, I never do jury selection this way. I never do it this way. But because it's a two-week trial, I went ahead and did it this way because I think this is a bad time of the year. This is the last week of school and people are leaving for vacations. I also do think that if you don't want to be here, you shouldn't be here, and that person doesn't necessarily make a good juror.

There are other people that we can bring up, and we haven't even gotten to the questions of, by the way, of any prejudices, law enforcement, family and friends, or people who have been arrested or people who are victims. We haven't even gotten to that. The reason I'm taking a break now is because Judge Jung's case resolved itself and so there are an additional 30-some people downstairs.

THE COURTROOM DEPUTY: Thirty-eight.

THE COURT: An additional 38 people downstairs.

I'm going to tell you who I see as the people with issues, and really what we need to decide is, do I set this group of people aside, those that we decide to stay in the mix, set them aside, bring in the other people, do the same thing that we just did with these people with the other people and whittle this down to a reasonable group where we can then start asking questions, such as, is there any reason why you can't be fair and impartial other than what we have already gone through.

Some were excused in front of Judge Jung. Some were excused. Maybe they had, I don't know, work issues or health issues, or who knows what. I'm going to go through this and tell you what I identify as the issues.

No. 4, her daughter is having surgery tomorrow. That's a challenging one. The equine veterinarian does not believe he can serve. I could see that he really didn't want to -- how should I put it? Would have issues serving.

No. 9. Let's see. Well, first of all, No. 7, she said she would be back. She would have to leave on June 7th, looks like toward the end of the day, but she would be back. So I didn't view that as a problem.

No. 9, everything else being equal, I would ask him to come, but he did say that he's a musician and he has a contract on some performance tomorrow that he feels he needs to fulfill. So I do view it as a bit of a challenge.

No. 12 has to leave to go to Germany on vacation on June 10th. I don't know if we will be done by then. No. 13, let's see, it's really painful to sit. No. 14. People, when they are self-employed, they don't work, they don't get paid. I would excuse them over the doctor and the veterinarian, to be very honest with you.

No. 18, it's a financial hardship. No pay. I think that's the lady who works for the nonprofit if I'm not mistaken. No. 19, same thing. CNA. It's a financial hardship. No. 20, I don't know what medicine he takes. He was going to discuss it at sidebar.

No. 22, even though he's got a 60-year-old father helping him, it's a bit of a challenge. I don't know if I would excuse him, but I'm just bringing that out there as a bit of a challenge. No. 24, gosh, I didn't write down. The 8th grade graduation tomorrow. We would not have court in the morning if we select her so she could go to her child's 8th grade graduation.

No. 25, child in rehab at Mayo Clinic. It was a long history of issues. No. 26, step-child has -- this one I think he said -- no. Am I off on my numbers? Who said he had been dizzy?

MS. HOWARD-ALLEN: Twenty-six.

THE COURT: Has been dizzy this past week. Unresolved. Yes, I would send him home for fear that he

would have a car accident and somebody would come back on me.

No. 29, let's see. Leaving Friday morning, back Sunday. We wouldn't be able to have court on Friday morning. Friday, period.

Let's see, No. 30. I think we can work with him. He has child care issues, but just know that we have somebody who has the child half the time who is a young child, but I think it's okay. Number 32, the poor lady doesn't have transportation. I don't think we give vouchers for transportation. I don't think we do. I can't expect somebody to pay 30 bucks or whatever in Uber charges to get here.

But let's check with somebody in Jury Services to see what arrangements we make for somebody who doesn't have transportation so that I can find out.

No. 33, client issues. But I don't know. No. 37, the wife has the medical procedure. I view that as pretty serious. No. 40, I don't know. No. 40 had some issues with -- even though the U.S. Attorney's Office has absolutely nothing to do with the Merit Systems Protection Board, or whatever it's called, this lady most certainly had some issues with the United States government, despite working herself for the United States government.

So, folks, that's where we are at. Just counting the ones that I have circles on, I have 17. It's 10 and 6.

Assuming you all used all your challenges, just for the sake of argument -- and, again, I haven't heard -- I think if there was something really serious somebody would have said it. I mean, who knows. Who knows what they will say once we start exploring.

So this is what I think, but I will hear from you in case there are other thoughts on this. I think we should bring in the other group, the one that Judge Jung didn't want, and go through some of these preliminary questions with this group and then bring them all back in and have that bigger group to choose from.

That's what I think preliminarily, but I have never done it this way. It's just, with a two-week trial, bad time of the year, a drug case, with people who are addicted to drugs or impacted by drugs, I don't know.

What do you think, Miss Howard-Allen?

MS. HOWARD-ALLEN: I would certainly concur with the Court. I think we need at least a dozen more to feel like we could get a jury.

THE COURT: Yes. What do you think, Mr. Martin?

MR. MARTIN: I agree. I don't disagree. I agree with the Court. I think that's a good way to do that.

THE COURT: Okay. I'm going to do that.

MR. MARTIN: I do have one question, because one of the questions I'm obviously going to ask when we are

asking, a couple of people brought up drug issues with kids or loved ones. I'm going to ask that question. Do I need to explore that in front of everyone or could that be at sidebar?

THE COURT: I normally do that at sidebar because it's embarrassing to talk about it. And I think you are more apt to get an honest answer at sidebar. So what I'm going to do -- some people don't care. They are open about their own issues. Look at some of the things you see people talk about that are pretty private.

So what I do is, I give them the option to do it at sidebar. It's better to do it in the -- I think it's better to do it in the open. It's just easier than whispering over there on the side, but let's give them that option.

MR. MARTIN: My only concern with that option is then everybody gets to hear it, everybody being the other jurors; and if it's very impactful to that person -- I understand the Court. I understand the time it takes to do it at sidebar, but the defense would prefer sidebar.

THE COURT: Some judges don't even do any sidebars on these things. I give them the option. I think that once you ask questions such as can you put all this aside, any feelings that you have aside and be fair and impartial, then I think that answers your concern.

We are going to take a short break. Let me say

one thing, because it will take some time to get these people up here. What I will do -- I'm assuming Judge Jung has already given them the introduction. So what I will do is, we are going to start out with having them stand up and answer these questions, and then I'm going to ask if there is any reason why they can't serve over the next two weeks and tell them what the case is about.

I think we will get to the heart of it this afternoon with the entire panel. Also, think about -- I'm not excusing anybody right now because I've got to know what I have before I do that. But just so that the courtroom deputy can start working on this -- it's going to take time -- let's bring up whatever we have downstairs. It's going to be less than 36 because some have already been excused.

Do you know how many have been excused?

THE COURTROOM DEPUTY: We have 36 left.

THE COURT: Wow, that's a lot. Do you think we need 36? I don't know. What do you think?

THE COURTROOM DEPUTY: They didn't go up to Judge Jung for the intro.

THE COURT: Oh, okay. I'm happy to bring whatever and we can excuse some of these people who don't want to be here, like the medical doctor, the veterinarian, the guy who's -- you know, people who have surgery in their family.

I suspect we are going to have the same amount here in the next go-round. I don't know.

What do you think? It's taken us two hours to this point. It's 11.

MS. HOWARD-ALLEN: I guess it's always better to be safe than sorry. I think we would be good with 24, but the difference between 24 and 36 -- it's up to the Court. I'm certain we would need at least 20, I would think.

THE COURT: Mr. Martin?

MR. MARTIN: I would agree. I think 24 would be enough.

THE COURT: Okay. Twenty-four. We are going to bring up the next 24 and let's -- it will take them about ten minutes to get up here. So we are going to take about a ten-minute break. I'll see you back here in ten minutes, and we will have 24 people up here.

(Recess taken from 11:00 a.m. to 11:15 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: The other group is on their way.

(The venire enters the courtroom.)

THE COURT: Welcome, ladies and gentlemen.

My name is Virginia Hernandez Covington, and I'm a judge of the United States District Court for the Middle District of Florida.

I want to welcome you on behalf of all the judges of the District Court for the Middle District. We appreciate your presence here and are fully aware that many of you would rather be elsewhere, attending to your jobs or home or other things you had planned.

I understand that jury service is not always convenient, but I hope you realize that the service you will perform is extremely important.

You're experiencing one of the highest rights and honors of citizenship: The privilege and responsibility of being a member of a jury.

I hope that when you finish you will have had an interesting, challenging, and informative experience, as well as the satisfaction that comes with a job well done.

You've been seated at random either in the jury box or out in the audience, and we are going to ask you some questions. I think you've got the list of questions in front of you, and our sole interest is to make certain those who are selected for the jury are the most impartial persons available in relation to the issues of this case being tried.

While you are here, you'll find that the court security officers and clerks are more than willing to assist you in every reasonable way.

Madam Clerk, has the jury been generally qualified?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: Thank you.

Each of you has been found to have the requisite qualifications to serve as a juror of this Court, and no one should avoid fulfilling this obligation except for the most pressing circumstances.

This trial will last about two weeks. We are starting today or tomorrow, and we anticipate being finished by June 7th.

I'll introduce to you some of the people that you will be working with if you're selected to serve on the jury. Tamecika Lee is the deputy clerk. She serves as the Court's administrator in the courtroom. The court reporter is Scott Gamertsfelder. He transcribes and takes down everything that is said in the courtroom, and the court security officer is Nona Dyess. She enforces the Court's orders and is in charge of the jury while it's away from the courtroom.

The case set for trial today is United States versus Dion Gregory Fisher.

Is counsel for the United States ready?

MS. HOWARD-ALLEN: We are, Your Honor.

THE COURT: Thank you.

Is counsel for Mr. Fisher ready?

MR. MARTIN: Yes, Your Honor.

THE COURT: In just a few minutes I'll be asking

you questions as to your qualifications to serve as jurors in this case. This part of the case is known as the voir dire examination. Those are old French words which literally mean to speak the truth.

Under your oath as a prospective juror you agree to truthfully answer questions concerning your qualifications. Please understand that we are not trying to pry into your affairs. We are just trying to make certain that we are able to get a jury which will impartially try the issues of the case.

If you are excused, do not be offended or feel that your honesty or integrity are in any way being challenged. This is just part of the jury selection process.

So what I'm going to do is, I'm going to begin -- you've got the list of questions in front of you. Is that right?

(The prospective jurors nod heads.)

THE COURT: Okay. And I do not identify my jurors by name. That's just to give you an extra level of privacy or confidentiality, so I use your juror number.

We will begin with the gentleman in seat No. 1. I think it's 127. Do you see that number? It's 0127 on your juror identification. I ask that you stand so we are all able to hear you and understand you. Sometimes the acoustics are less than perfect. I ask, if you can, please answer

those questions for us.

JUROR NO. 127: State your city of residence and how long have you lived there. I live in Spring Hill, Florida. I've been living in Spring Hill since 1991.

THE COURT: I need the mic a little bit closer to you, sir. Thank you.

JUROR NO. 127: I've been living in Spring Hill since 1991 permanently. How long have I lived in Florida? Since '91.

THE COURT: We have the questions. It's just the answers. You can just go one right after the other.

JUROR NO. 127: Highest level of education, I'm a college graduate. Occupation, I'm vice president of operations for Labcorp service reps.

THE COURT: What kind of company is that?

JUROR NO. 127: Labcorp. We do tests for medical offices.

THE COURT: For medical offices? Okay.

JUROR NO. 127: For doctors. I've been married. I'm married since 1981. My wife is retired now. She was administration for a hospital, for Advent Health. We weren't able to have any children.

I was in ROTC in college and served a couple of years over in Germany. The previous jury experience I've had was a couple of local juries in Pasco County. I was picked

to serve on one and then they had an agreement and so I wasn't able to serve.

THE COURT: Anything negative about that experience that left a bad taste in your mouth?

JUROR NO. 127: No, not at all.

THE COURT: Okay. This trial is expected to take two weeks, as you've heard me say. Is there anything that would preclude you from serving as a juror over the course of the next two weeks?

JUROR NO. 127: No.

THE COURT: Thank you very much. I appreciate it.

The person in seat No. 2, 014.

JUROR NO. 014: I live in Brooksville, Florida; 15 years in Florida. I'm a graduate of high school. I'm a truck driver. I'm married. And my wife works. She's a teacher for special needs children. I have three children. The 46 is a lawyer; 45, anesthesiologist; and 45, she's self-employed. No military experience, and I've never sat on a jury before.

THE COURT: Okay. Couple of questions. The one that's a lawyer, what type of work does that child do?

JUROR NO. 014: DCFS in Chicago, Illinois, Cook County.

THE COURT: Department of Children and Family Services.

JUROR NO. 014: Yes.

THE COURT: And the one who's self-employed, what type of work does the self-employed person do?

JUROR NO. 014: Massage therapist.

THE COURT: All right. Is there -- I know you said you are an employed truck driver; is that right?

JUROR NO. 014: Yes.

THE COURT: Is there any reason you can't serve over the next two weeks?

JUROR NO. 014: No.

THE COURT: Thank you very much. I appreciate it.

The person in seat 3, No. 187.

JUROR NO. 187: I live in Ruskin. I've lived there for six years; been in Florida for seven years. Education, two years post-high school. I was an x-ray technologist. I no longer do that. I was hurt at work, so I am disabled.

Married 35 years. My husband is in sales. Three children. Oldest is 32. She's a human resource manager. The 30-year-old, he's a consultant, and the youngest is 29. He's a civil engineer. And the two last questions don't apply.

THE COURT: Is there any reason why you can't serve as a juror for the next two weeks?

JUROR NO. 187: No, ma'am.

THE COURT: You said -- I know you were disabled from your job, but are you able to sit without pain or anything like that? Or do we need to, like, periodically take breaks? I know sometimes those are issues.

JUROR NO. 187: Kind of is. I do need to change positions every once in a while.

THE COURT: If you are selected for this jury, then, most certainly know that we will accommodate you on that in any way that we can. We want to make certain that you can serve. We just don't want it to be too taxing on you. Thank you.

Next, the person in seat 4, No. 118.

JUROR NO. 118: I've lived in the current city for 30 years; same in the state, 30 years. Highest education, completed high school. I'm retired now. I was a business owner of real estate title companies. Married. My husband is also retired. I have two step-children, 49 and 45. Not in the military and have not done jury service.

THE COURT: Okay. Is there any reason why you can't serve over the course of the next two weeks?

JUROR NO. 118: No.

THE COURT: Thank you very much. I appreciate it.

The person in seat 5, No. 191.

JUROR NO. 191: I live in Port Richey. I've lived there for 14 years. Highest education, college graduate.

Occupation, sales associate for Home Depot. Marital status, married. My wife's occupation is Pasco County School Board. Two children, ages 12 and 10. No. 8, U.S. Army, served ten years, did logistics and transportation, and not served in any other jury before.

THE COURT: Okay. I know you said you are a sales associate for Home Depot. Are you compensated for the time that you are serving on jury duty? Do you know if that's an issue at all for you?

JUROR NO. 191: Yes, they compensate me.

THE COURT: Normally the big companies like Home Depot, Publix, the school board, of course, compensate, but the smaller businesses I know sometimes it's a problem.

Is there any reason why you can't serve as a juror over the next two weeks?

JUROR NO. 191: My children. Their mother is working over the summer, so probably they are staying at home. Right now they have a baby-sitter; but if it's two weeks, I don't think I could do a baby-sitter.

THE COURT: What do you normally do when you work for Home Depot for child care? How does that normally work?

JUROR NO. 191: Their grandmother sometimes watches them, but they are at school. School is over now.

THE COURT: Is school on this week or was last Friday the last day?

JUROR NO. 191: Last Friday it was over. Now that their mother is working -- I work six to three, so I'm usually home before they get home from school. But now that they are home all day --

THE COURT: You work 6 a.m. to 3 p.m.?

JUROR NO. 191: Yes, ma'am.

THE COURT: And then you -- okay. And so now that summer break is here, what would you do? Who do you have? Do you have somebody in the morning helping you with the kids?

JUROR NO. 191: Probably one of the neighbors, but I can't really count on them. I really don't talk to them.

THE COURT: We normally excuse people who have young children who don't work because they normally take care of their children. We normally don't do it for people who do work unless, for instance, if you were to say to me you work during the day, you pick your children up at 3 p.m. every day, I understand. I just want to make certain I do it correctly and that I understand correctly.

There isn't anybody in the morning that can help you?

JUROR NO. 191: No, because their mother is working over the summer, to at least July. So she has to work. And so now that I work six to three, I would have to get a family member to watch them, but it's not going to be every day, though.

THE COURT: Okay. And when you are at Home Depot, who watches them? A family member?

JUROR NO. 191: I live a mile away, so I come home for lunch and check up on them and go back. And sometimes a family member drops by.

THE COURT: I see. You are able to go home and check in on them.

JUROR NO. 191: Yes, ma'am.

THE COURT: I now understand what you are saying.

How would are your kids?

JUROR NO. 191: Twelve and ten.

THE COURT: All right. We will see, but I understand now the situation. Thank you very much. I appreciate it.

The person in seat No. 6, 38.

JUROR NO. 038: All right. I live in Land O' Lakes, Florida. I've lived in Florida for 40 years. Highest level of education is 12. I graduated 12th grade. I have my own business. It's a handyman company. I am divorced. I have two children, 13 and 10. I have not been in the military, and I have not served on a jury.

THE COURT: Okay. Is there anybody that can help you run your business during the two weeks of service if you are selected for jury duty?

JUROR NO. 038: No, it's only me.

THE COURT: And do you have any jobs lined up?

JUROR NO. 038: Oh, yeah. Yep. I'm already missing work today.

THE COURT: And is that a financial hardship for you?

JUROR NO. 038: Well, it's only me. I have my kids every other week. So, like, next week I'll have my kids, so I'll have to have people lined up to watch them because normally they are at school. So when school is over, I'm normally done working.

THE COURT: Well, I'll see what I can do. I have to go through everybody, but I understand the sacrifice, and I thank you. We will see what I'm able to do as time goes on. Thank you.

The person in seat 7, No. 018.

JUROR NO. 018: I live in Palm Harbor. I've been here 29 years. Some college, but graduated high school. I am an event planner and coordinator for a large medical corporation. I am divorced. I have a 30-year-old daughter who is a background screener. I've not been in the military, and I have served on a jury. The verdict was guilty, and that was a year-and-a-half ago.

THE COURT: Okay. And it's best not to tell me what the verdict was, just that you did reach a verdict.

Anything about that experience that left a bad

taste in your mouth?

JUROR NO. 018: Not particularly. I did not care for his attorney, but that's personal.

THE COURT: Okay. All right. As I said earlier, this case is scheduled to take about two weeks. Is there any reason why you could not serve as a juror over the course of the next two weeks?

JUROR NO. 018: I do -- I take care of all the conferences for a large medical corporation. I'm sure someone could do it for me, but I just also have been back from vacation, so I haven't even been back to work.

THE COURT: All right. I appreciate it. Thank you very much.

The gentleman in seat No. 8, 144.

JUROR NO. 144: All right. I live in Auburndale, Florida; been there for ten years; been in Florida 38 years. High school education completed. I'm a meat-cutter for Costco Wholesale. I'm married. My wife works for Better Crust Bakery. She's a baker. I have two children, age 18 and 16. I've never been in the military and never served on a jury.

THE COURT: Okay. Let's just see. Is there any reason why you can't serve as a juror, if you are selected, over the next two weeks? Is there a work issue or anything like that?

JUROR NO. 144: No.

THE COURT: Very good. We appreciate it very much.

Now we are on to seat No. 9, 155.

JUROR NO. 155: I live in Riverview and have been there for five years; in Florida five years, two years as a child. I've graduated high school. I am a call center agent in a large company. I'm single. I do not have children, and I have not served in the military or been on a jury.

THE COURT: Is there any reason why you can't serve if you are selected as a juror, like, workwise or anything like that?

JUROR NO. 155: I don't think so. I would need to let work know. I do work an odd shift, Thursday through Sunday.

THE COURT: You work Thursday through Sunday, and do you work regular business hours or evenings or what?

JUROR NO. 155: Like, 7 to 5:30.

THE COURT: 7 a.m. to 5:30?

JUROR NO. 155: Yes.

THE COURT: They are required to let you off. That's technically a violation of the law if they don't. So they have to accommodate you. The issue comes in on whether they pay you or not. The bigger companies will pay you regardless. That's why I asked. But at least you are good

until Thursday; right?

JUROR NO. 155: Yes.

THE COURT: Okay. Anything else that you can think of?

JUROR NO. 155: Not off the top of my head.

THE COURT: Thank you very much. I appreciate it.

The lady in seat 10, No. 059. Should be 02-0059.

JUROR NO. 059: I live in Tampa, Florida. I've lived here 21 years. I've lived in the state of Florida for 25 years. I have two master's degrees. I am a Special Ed. counselor. I'm not married. I don't have any children. I've never been in the military, and I did do previous jury service, but I was excused because I knew the defendant.

THE COURT: Okay. All right. Do you work for the school system or privately employed?

JUROR NO. 059: The Diocese of St. Petersburg. I work at Tampa Catholic High School.

THE COURT: Very good. Is there any reason why you can't serve as a juror over the next two weeks?

JUROR NO. 059: No. We just finished school.

THE COURT: Since my kids have been out of school, I don't know exactly when school begins or ends anymore. So I guess they just finished on Friday. I saw Tampa Catholic got a big gift from a former graduate.

JUROR NO. 059: Yes, ma'am.

THE COURT: Thank you very much.

Seat 11, No. 054.

JUROR NO. 054: Hi. I live in Pasco County, Wesley Chapel. I've lived there 18 years. I graduated high school. I am an administrative assistant for an ALF.

THE COURT: Assisted living facility?

JUROR NO. 054: Yes, ma'am. Memory care facility. I'm in a domestic partnership for 26 years. One child. She's 35. She's an executive assistant for Moët. I've never been in the military and never served.

THE COURT: And I'm sorry. I didn't get the organization that she was an administrative assistant for.

JUROR NO. 038: Moët champagne company.

THE COURT: Very good. I know you are an administrative assistant. This is probably a smaller facility.

JUROR NO. 038: Yes, 50 bed.

THE COURT: Any issue with serving on a jury for the next two weeks?

JUROR NO. 038: It will be rough, but they can handle it.

THE COURT: I appreciate it. Thank you very much.

Person in seat 12, No. 069.

JUROR NO. 069: I live in Spring Hill. I lived there for three years. My education, I graduated 9th grade. I am married. My wife's occupation is an R.N. I have three

boys, ages 25, 28, and 30. They are all plumbers. I served on a jury several years ago. The verdict, we came to a verdict.

THE COURT: Okay. Anything about that experience that left a bad taste in your mouth?

JUROR NO. 038: No, ma'am.

THE COURT: And I'm sorry. I didn't get what your occupation was.

JUROR NO. 038: Plumber.

THE COURT: So your sons followed in your footsteps.

JUROR NO. 038: Yes, ma'am.

THE COURT: Very good. Now, are you self-employed or work for a company?

JUROR NO. 038: I work for a company.

THE COURT: Are you able to serve -- I don't know if there is a pay issue. I know some companies pay; other companies don't.

JUROR NO. 038: My company don't pay.

THE COURT: Doesn't pay you. Is that a financial challenge for you? I know that --

JUROR NO. 038: Yes, ma'am.

THE COURT: So it would be a financial hardship for you to serve?

JUROR NO. 038: Yes.

THE COURT: I will see what I can do. I know I've

had a couple of other people say that they have had challenges, as well. So I will see what I can do as time goes on. But, anyway, I appreciate it.

JUROR NO. 038: Thank you.

THE COURT: Thank you very much.

Next we have the lady in seat 13, No. 119.

JUROR NO. 119: I've lived in Brandon, Florida, for four years; Florida, as a whole, for five. I'm a college graduate. Centralized recruiter for Speedway.

THE COURT: You do what for Speedway?

JUROR NO. 119: Centralized recruiter.

THE COURT: Speedway is a gas station. What does a centralized recruiter do?

JUROR NO. 119: I handle two districts in the area, recruiting for the stores, and also do special assignments for my human resources advisor.

THE COURT: Sounds like human resources sort of.

JUROR NO. 119: Yes. I'm married. My husband, I think his title is millworker. He makes doors for a building company. I have no children and never been in the military and never served on a jury.

THE COURT: All right. Are you able to serve on this jury for two weeks, or are there any issues we need to be aware of?

JUROR NO. 119: No issues.

THE COURT: Okay. Thank you very much.
Next, the gentleman in seat 14, No. 139.
JUROR NO. 139: I've lived in Palm Harbor, Florida, for four years; lived in Florida for 35 years. College graduate. I work for Coca-Cola of Florida as a sales merchandising supervisor. My marital status is married. Wife's occupation is an accountant. I have two children, 14 and 19. No previous military experience, and I served on a jury a year ago and we came to a verdict. Civil.
THE COURT: So I guess lightning struck twice in one year.
JUROR NO. 139: It did.
THE COURT: You must have been in state court; is that right?
JUROR NO. 139: Pinellas County, yes.
THE COURT: Was that a criminal case or a civil case?
JUROR NO. 139: It was civil.
THE COURT: Anything about that experience that left a bad taste in your mouth?
JUROR NO. 139: Not at all.
THE COURT: Any reason why you can't serve for two weeks if you are selected?
JUROR NO. 139: No, ma'am.
THE COURT: Thank you very much. I appreciate it.

Seat 15, No. 0110.

JUROR NO. 110: I live in Tampa, Florida. I've been here since '97. Twelfth grade education. I'm self-employed limousine driver. Married. My wife is a waitress. No children. And 8 and 9 doesn't apply.

THE COURT: Let me ask you, in your work as a self-employed limo driver, do you have jobs during the day where serving as a juror would impact on your ability to earn a living, or are the jobs at night? How does that work?

JUROR NO. 110: I work pretty much around the clock.

THE COURT: Is it a financial hardship for you to serve?

JUROR NO. 110: Yes, ma'am.

THE COURT: Okay. Well, I will see. I've got to look at all of these issues and decide. We will do our best to accommodate. So thank you very much. I appreciate it.

The next person is in seat 16, No. 0062. Are you from Land O' Lakes?

JUROR NO. 062: Yes, Land O' Lakes. I've been there for nine years; Florida about 20 years, 19 maybe. Currently in college. I have my associate's degree.

THE COURT: You are in college?

JUROR NO. 062: Yes.

THE COURT: Are you at USF?

JUROR NO. 062: I go to SPC. I'm transferring to another college right now.

THE COURT: Are you in school right now? Are you taking classes at this moment?

JUROR NO. 062: Not in the summertime, no.

THE COURT: I just wanted to make certain it didn't interfere with school.

JUROR NO. 062: I work for a food service agent for an assist living facility. I'm not married, don't have any kids, don't have any previous jury service or military.

THE COURT: Any reason you can't serve over the next two weeks?

JUROR NO. 062: No.

THE COURT: Thank you.

The person in No. 17, 0209.

JUROR NO. 209: I've lived in Venice, Florida, for the past three years. I have lived in Florida for seven. I am a college graduate. I'm a dining director at a CCRC. I'm single. I have no children. No. 8 and 9 do not apply.

THE COURT: Okay. A dining director at a -- I'm sorry, you said the initials.

JUROR NO. 209: Continuing care rehab center. I have the assisted living, memory care, and assisted skill facility.

THE COURT: These are individuals who either have

memory issues, with Alzheimer's or other kinds of issues, other kinds of disabilities that you are working with.

JUROR NO. 209: Yes.

THE COURT: Is there any reason why you can't serve as a juror for two weeks?

JUROR NO. 209: I just really have to let work know because June 1st we are in our window for the state to come in for our annual inspection. Everybody else has to come back from vacation, but I'm sure this qualifies as being excused.

THE COURT: Okay. Well, you know, normally I don't excuse because it's a difficulty for the work because they have got to sacrifice, too. I would normally do it when somebody tells me, if I don't work, I don't get paid and I can't pay the rent, I can't put food on the table. Those are good excuses for excusing somebody.

JUROR NO. 209: I agree.

THE COURT: You are okay pay-wise and things like that?

JUROR NO. 209: Yes.

THE COURT: Thank you very much. I appreciate it.

The person in seat 18, No. 091.

JUROR NO. 091: I live in Pinellas Park, Florida. I've been here, like, 19 years. I have -- my dad owns a European bakery and grocery. I work for him every day. It's

a small business.

THE COURT: Small family owned business.

JUROR NO. 091: Yes. I'm the delivery girl. I deliver to the different restaurants and all the bread and all the stuff he needs me to. So, like, my dad is the only one that works, so I help deliver and everything.

THE COURT: So you work for your family business, and your job is to deliver the baked goods.

JUROR NO. 091: Yes, to different restaurants and the different things. I'm the only one that does it.

THE COURT: Okay. So it would be -- well, I understand what you are saying. It's a challenge for your family business. It's hard for your father because he depends on you.

JUROR NO. 091: Yes. He's the only one that does everything. Yes.

THE COURT: Okay.

JUROR NO. 091: I'm not married or anything. I'm single. No kids. I never been in the military, no. But I did -- in Pinellas Park I did go to another jury, like, three years ago, but the case -- he was -- they came to a verdict. I don't know. He just didn't want to take it.

THE COURT: They resolved it somehow.

JUROR NO. 091: Yes.

THE COURT: All right. Any other reason why you

can't serve other than what you've told me that it's a hardship on your family business?

JUROR NO. 091: No, that's the only one.

THE COURT: All right. I appreciate it. Thank you very much.

The person in seat 19, No. 0009.

JUROR NO. 009: I've lived in Florida for almost 19 years. I've lived in Pinellas County, in Largo, for 17. Associate's degree in computer applications. I currently work for Macy's as an attendance coordinator. I review paychecks to make sure that clockings are correct and vacation pay is correct and holiday pay is correct.

My husband is semi-retired. He works part time as a furniture and delivery expediter. He resolves issues with the deliveries.

We have been married eleven years. There are two children. I have a son 40, who is an electrician; my daughter is 36, and she's an accountant.

I have never served in the military and never been on a jury.

THE COURT: Okay. Any reason why you can't serve as a juror for the next two weeks?

JUROR NO. 009: No, ma'am.

THE COURT: Thank you very much. I appreciate it.

The person in seat 20, No. 0081.

JUROR NO. 081: Yes, ma'am. I've lived in Wimauma, Florida, for the last three-and-a-half years, lived in the state of Florida for 32 years. I've had some college. My occupation, I own a construction firm. I'm married. My wife is a stay-at-home mother and secretary for our company.

My children are -- my youngest is six months old, five years old, and seventeen years old. Eight and nine don't apply. And thank you.

THE COURT: Is this your own construction firm that you work for?

JUROR NO. 081: Yes, ma'am.

THE COURT: Okay. Is there somebody who could help you with the duties if you are selected for this jury, or is that going to be a challenge for you?

JUROR NO. 081: No, ma'am, it is going to be a challenge for me because I'm a general contractor and it's not -- there is not somebody else I can have do estimating, bidding, all that sort of thing.

THE COURT: What I'm trying to get at -- I probably didn't say it very well, because it's always a challenge for everybody, but I mean is it a financial issue for you? If you don't work, you don't get paid? Or how does that happen?

JUROR NO. 081: Correct. I own my company, so whenever I'm off the clock I don't get paid.

THE COURT: All right. We will see. I'm going to factor this in with everybody else. Anything else you need to tell me or anything else I need to consider?

JUROR NO. 081: No.

THE COURT: Thank you very much. I appreciate it.

Next person is in seat 21, No. 0195.

JUROR NO. 195: I live in Sarasota, been there for 14 years; at my current address for four-and-a-half years. High school education. I am a retired teaching assistant. I'm married. My husband is in sales. I have two grown children; 41, she is currently a stay-at-home mom, and a son, 39, who is a photographer. And I've never been in the military, and I have not served on a jury before.

THE COURT: Okay. Is there any reason why you can't serve over the course of the next two weeks?

JUROR NO. 195: No, except we had travel plans to go north, but that's the end of the first week in June.

THE COURT: Would that be on June the 7th? Is that when you are planning on leaving?

JUROR NO. 195: Yes, ma'am.

THE COURT: Well, we would hope to be finished by then. Do you have airline reservations or driving?

JUROR NO. 195: Just driving.

THE COURT: You are driving on June 7th or the next day?

JUROR NO. 195: Right around there. I'm not exactly sure of the date.

THE COURT: Okay. Thank you very much.

The next person in seat 23, No. 0037 [sic].

JUROR NO. 106: Yes, I live in Bradenton and I've lived there all my life.

THE COURT: You are in Bradenton?

JUROR NO. 106: Yes, right about 60 years.

THE COURTROOM DEPUTY: You should be on 22.

THE COURT: I am off one. I'm sorry. I'm sorry. You are 00106; is that right?

JUROR NO. 106: Yes.

THE COURT: Okay. I'm sorry. Go ahead.

JUROR NO. 106: I graduated high school. My occupation is, I work for Bealls Distribution Center. I've been there 30 years. I'm married. My husband is a truck driver for a road company.

I have four adult children. The oldest one works in a physical therapist's office, next one works as a drug coordinator for Manatee County State Attorney's Office, the third one works for Publix as a meat-cutter, and the youngest one works in landscaping. No military and no previous service.

THE COURT: Let me ask you, you said you have a child that works for the Manatee County State Attorney's

Office.

JUROR NO. 106: Yes, ma'am.

THE COURT: What does that child do?

JUROR NO. 106: Drug coordinator for drug court.

THE COURT: The defendant in this case is Mr. Fisher. Mr. Fisher has been charged with selling fentanyl, an illegal substance, and he's been charged with laundering the proceeds of the sale of that substance.

Is there anything about that that would cause you not to be fair and impartial? In other words, can you still be fair and impartial, given what your daughter does?

JUROR NO. 106: I don't think one would have a thing to do with the other.

THE COURT: Okay. I just wanted to double-check that you could be fair and impartial to both sides here.

Is there any reason why you couldn't serve as a juror over the next two weeks?

JUROR NO. 106: Only if my job doesn't pay me to be here.

THE COURT: Okay. Remind me, where is it that -- what type of work -- I know what type of work you do, but who do you work for?

JUROR NO. 106: I work for Bealls Department Store, but I work in the distribution center.

THE COURT: Bealls is a major company. I would

hope they would pay their employees for jury duty. Most major companies do, but I'll put a little note here that it would be a financial issue if you did not get paid.

JUROR NO. 106: Yes, ma'am.

THE COURT: We will see if we can look that up.

Tamecika, let's see what we can find out about that.

It would be odd for a company that size not to pay because most companies recognize that -- I would just say it's their civic responsibility. I'll go out on a limb and say that, but a smaller company can't. They just can't afford to pay, but a company like Bealls should be able to pay. But we will see if we can find out. Thank you very much.

Now I have the person in seat 23, 037, from Plant City.

JUROR NO. 037: Yes.

THE COURT: I got off before on my numbers, but I think I'm back on right now. Go ahead.

JUROR NO. 037: I live in Plant City, been there four years, been in Florida about 13. I have a master's degree. I'm a nurse anesthetist. I'm married. My husband is a chef. We don't have any children. No military service, and I've never served on a jury before.

THE COURT: Okay. Do you work for a hospital or a

private group?

JUROR NO. 037: I work for an anesthesia group that's contracted by different hospitals.

THE COURT: Is there any reason why you can't serve for the next two weeks?

JUROR NO. 037: No.

THE COURT: Thank you. I appreciate it very much. I'm always grateful when people in the medical field are willing to step up to the plate, so I appreciate you doing that.

The person in seat 24, No. 78.

JUROR NO. 078: I've been living in Tampa for the last 27 years. My highest education level is, I have two associate's. I'm currently working on a business degree. I am a dental hygienist. I work in Downtown Tampa. It's a private office. I am married. No kids. My husband is a director of operations at a St. Pete hotel. Never served in the military or never been on jury service.

THE COURT: Okay. Is there any reason why you can't serve for the next two weeks? I know you are employed as a dental hygienist, so that means you are employed by a dentist office. Is there a reason why you can't serve or are there any work issues there?

JUROR NO. 078: We just have to cancel the patients for the next couple of weeks, and I don't get

compensated.

THE COURT: You don't get paid?

JUROR NO. 078: No. I'm hourly pay.

THE COURT: Is that a financial hardship for you?

JUROR NO. 078: Yes.

THE COURT: Sort of?

JUROR NO. 078: Yes. Yeah.

THE COURT: All right. I'll see what I can do with respect to that. Okay?

JUROR NO. 078: Thank you.

THE COURT: So what I'm going to do is, ladies and gentlemen, we are going to take a lunch break now. I know that this has been a bit of a challenging morning the way it's been done, but I'm going to go ahead and excuse you.

I'm going to ask you to please come back at 1 o'clock. That's just shy of an hour, but that should at least let you run out and grab a sandwich. Please come back at 1 o'clock, and I'm doing my very best -- or let's say five after one. I know it's hard to eat lunch in under an hour. Please come back at five after one, and we will wrap this up today.

I give you my word. We will be finished with this, but we just need to do this in this order. So we will excuse you, and we will see you back here at five after one. Go to the third floor.

(The venire exits the courtroom.)

THE COURT: I'm just kind of thinking out loud here because I don't know what the best way is to do this. I'm going to give you the two options, and let's just kind of work through it and figure out the best way.

Option No. 1 is to excuse those people who we know we are going to excuse regardless and get them out of the mix and bring in one group that consists of the people that we have not excused.

The only thing is, logistically it's going to be hard to figure out who is on first. That's the only thing, because it gets confusing. I have to say, to their credit, they did do this correctly downstairs. They started out with No. 1 and they have worked through.

I said, gosh, why don't we have -- why did they do it this way? But I now see why they did it this way, and it really does make sense. On mine, for instance, No. 43, I have 43 and 1, 44 and 2, 45 and 3. So I think that we could probably figure it out without too much trouble. So that's option No. 1, which is what I think is the best way of doing it.

Option No. 2 would be to bring back group No. 1 and to then ask the more challenging questions, but I just think that would be -- that would take a lot of time, and then we would have to do it all over again with group No. 2.

So thinking about it, I don't think that's the best way. I don't think so.

Let me just count up -- I'm going to tell you that on this group we actually had fewer people proportionately that had issues.

Let's see. The first person I have is -- I don't know, I don't feel so bad. This is No. 47/5. I mean, he works for heaven's sake. He has a ten-year old and 12-year-old but he works. He's a mile away from Home Depot.

No. 48, financial hardship, handyman. When you have your own business, I understand it's a problem.

No. 12/54, he's a plumber. I understand. You don't fix people's drains or overflow, you don't get paid. I totally get it. I would excuse him, too.

The next one, No. 57/5, self-employed limo driver. Okay. I would excuse him, too, because he doesn't get paid.

Next one, No. 60, I don't know. I feel less bad about her. It's her father's bakery that's being penalized. I probably feel the same way with her as I do with the Home Depot guy.

And No. 62, construction firm. I don't know. He owns his business. He's there on the gray area, too.

No. 63, she's going north. This is where I got screwed up on my people. I think that's the lady going north, No. 63.

THE COURTROOM DEPUTY: Yes.

THE COURT: She's going north sometime around the 7th.

No. 64, problem if not paid. Okay. Were we able to find out about Bealls?

THE COURTROOM DEPUTY: No, Your Honor.

THE COURT: Can somebody in the jury department help us on that?

THE COURTROOM DEPUTY: Okay.

THE COURT: I bet a company like that pays its people. I just bet they do. I would be surprised if they didn't.

Let's see. No. 66, she gets paid by the hour. She doesn't want to be here for two weeks if she gets paid by the hour. I get it. It's the dental hygienist.

I bet the Bealls lady gets paid. I bet somewhere there, there is something on those people getting paid because that's a big company.

So that's sort of where I'm at. Do you want to take a moment to think about this? Don't take more than a few minutes because they are coming back at five after one and you need to have -- you need to take a short break, too.

What I would do is I would consolidate these two lists, and if we do that -- I'm going to make certain that my math is right, and that you agree with excusing these

people -- if you don't agree with it, then we won't do it. Or if you agree with some or -- some I'm in the gray area on, quite frankly. Like the Home Depot guy. The bakery lady. I put them in the gray area.

There are some where I would most certainly excuse. If your spouse is having surgery tomorrow, what are you going to do? People who don't work, don't get paid, they need the money, particularly the lower income people, I feel much sorrier for them. They are much needier than, I'll just say, a veterinarian. Where I'm sympathetic, wanting to take care of the horses, but he's still going to have money coming in. He'll have money to pay his mortgage.

I don't know. But everything else, I would want -- everything else being equal, I would want to excuse him, too.

Why don't you think about it for a minute and I'll come back to you.

(Brief pause.)

THE COURT: I've counted this up; and I think even if we excuse all the ones that I have circles next to, we will have a pretty big venire there. So let's just make certain. Let's go through these again and tell me -- and let's count it up to make certain that I haven't made a mathematical error here. Let's just make certain that we are all okay with this.

Let's count it in total. Let's just see here. In total, we have 66 people here. That's a lot of people.

The problem is, once I excuse them I can't bring them back, and I don't know what people are going to say about -- I just don't know what they are going to say. Oh, I had a child that was addicted to drugs or my brother is in jail for whatever, I don't like DEA, or I don't like the IRS, or whatever they are going to come up with. So there will be other people that we are going to have to excuse.

I would like to excuse those that we think, regardless, we would excuse. Let's just go back and let's start with the first row here. If we haven't decided, we haven't decided. If somebody is on the gray area, we will keep them in.

The first one that I see is the daughter who is having -- No. 4, that's 0095, the daughter is having surgery tomorrow. That means we would not have court tomorrow. If her daughter is having surgery tomorrow, we are not going to have court tomorrow.

Then we have the equine veterinarian. I think No. 4 would be here but for the fact that her daughter is having surgery. I'm just going to do it a page at a time. And then we have the equine veterinarian, who clearly does not want to be here.

In the next row we have, let's see, the musician

does not want to be here, and we have the gentleman who is leaving on the 10th to go on vacation to Germany. We have No. 13, the lady who is in pain. It can be really painful to sit. Is that the lady that we saw come down -- did she have, like, a cane or something?

THE COURTROOM DEPUTY: Yes.

THE COURT: Okay. Then we have No. 14. What's his problem? Self-employed bug control. No. 18, a financial hardship. What does he do? Medical something or another. Anyway, it's a financial hardship.

What are your thoughts on any of these people on the first page here? Miss Howard-Allen, what are your thoughts? Would you excuse any of these?

MS. HOWARD-ALLEN: Your Honor, we can concur with everybody except juror No. 12 or 97, because we will be out by the 10th. So I don't think that presents any issue.

THE COURT: Okay. So 12, we would keep him here. And who is the other one you said? No. 97? That's the same person.

MS. HOWARD-ALLEN: Sorry. I wasn't sure if we were going by the numbers or their numbers.

THE COURT: That's fine. When do you anticipate this trial will be over if we had to --

MS. HOWARD-ALLEN: Your Honor, with us starting on a Tuesday, we have anticipated -- always hard to tell with

cross-examination. We have roughly 30 witnesses, so we anticipate going, potentially, the full week if we -- so the full two weeks. The full two weeks.

THE COURT: Remember, I've got a few things at four in the afternoon. I have one today at four.

MS. HOWARD-ALLEN: For sure we need all the time.

THE COURT: Okay. But if we are not done, we are going to have to excuse them, because he's getting on that plane and going on his family vacation to Germany. Just know that.

All right. How about you, Mr. Martin, on that first page?

MR. MARTIN: I agree and disagree. I think we should excuse 12 also.

THE COURT: I don't know. I'm kind of on the fence on that one, Mr. Martin. I probably would not, but let me see.

All right. I need somebody to help me take good notes on this in case I screw up, because this is hard to do. So I'm going to excuse, then -- because we are not going to bring them back up -- No. 4, No. 6, No. 9. I'm not going to excuse No. 12. No. 13, No. 14, and No. 18 on that first page. Are we all okay with that?

(No audible responses.)

THE COURT: Okay. Let's go to the second page.

No. 19, she's a certified nursing assistant, financial hardship. I don't know about No. 20, so he's not in the mix. I have to find out what medical issues he has.

No. 22, the landscaper, I would excuse him. No. 24, what was his problem? Oh, the 8th grade graduation. So, if we pick her, we would have to not have court tomorrow morning. So I don't know what to tell you about that.

No. 25, I don't know, child in rehab, Mayo Clinic, headaches. I think she's gone off the panel. No. 26, he's been dizzy. I don't know, I don't think I want somebody driving here from Lakeland who's been dizzy, accepting what he says at face value.

No. 29, leaving Friday morning, back on Sunday. That means we could not have court this Friday. That's No. 29. No. 30, I'm okay with that. He just needs to be out of here at a certain time. No. 32 -- oh, we do have transportation.

What were the arrangements on that? What did they tell us?

THE COURTROOM DEPUTY: We had her go down there to speak to jury services. We just need to get an order from the Court, but arrangements can be made.

THE COURT: So that means we pay her for her Uber driver.

THE COURTROOM DEPUTY: I'm not sure of the

details, but they say arrangements can be made with the order from the Court.

THE COURT: I'm not going to excuse her; but before we come back, we need to know as opposed to taking eight buses and getting up at 4 a.m. to get to Downtown Tampa. Because they are depending on public transportation and I'll just say, having grown up in Tampa, it's not exactly great.

So here's who I would excuse from the second page. I would excuse No. 19, who says it's a hardship. I would excuse No. 22 for the same reason. I don't know what to tell you about the 8th grade graduation. I would probably excuse her or just not have court in the morning. I don't know what to do.

No. 25 I would excuse. That person has some issues. No. 26 I would excuse. I don't know about No. 29. That means no court on Friday. No. 32, transportation. I think we have transportation covered. Or we will. I wouldn't necessarily excuse that person right now because I think we can get the transportation.

All right. So you guys tell me what you want to do with the person with the 8th grade graduation and the person who wants to leave on Friday. What do we want to do? So let's do the easy ones first: 19, 22, 25, and 26. Are those okay?

MS. HOWARD-ALLEN: Your Honor, I don't recall --

THE COURT: Wait a minute. No. 26? How did I mess up? I messed up on that. Sorry. No, 26, the guy who says he's dizzy; right?

THE COURTROOM DEPUTY: Yes.

THE COURT: Okay. Are we okay with 19, 22, 25, and 26 being excused? Miss Howard-Allen?

MS. HOWARD-ALLEN: I don't recall what 19's issue was.

THE COURT: CNA. She works independently, Certified Nursing Assistant.

MS. HOWARD-ALLEN: So we're at 19, 22, 25, and 26?

THE COURT: Right. The nursing assistant said that it was a financial hardship.

MS. HOWARD-ALLEN: All right. I think we are okay with those, as well, Your Honor.

THE COURT: Those four?

MS. HOWARD-ALLEN: As to the Friday, I just think with this time, I don't think that we can take, for sure, a day off, and I wouldn't suggest we take a morning off.

THE COURT: How about the lady tomorrow morning with the 8th grade graduation? I'm not going to make her miss her child's graduation. Nobody here is going to do that. So she's either off the panel or we are not working tomorrow morning, because it's Anna Maria Island, which is

pretty far away.

MS. HOWARD-ALLEN: Again, I thought that was Friday morning. But either way, I don't think we should. I guess it's tomorrow morning. I don't think we should take a morning or a day off to accommodate a juror.

THE COURT: Okay. So you would add 24 and --

MS. HOWARD-ALLEN: Twenty-nine, I believe, was the college trip.

THE COURT: Okay. How do you feel about that, Mr. Martin?

MR. MARTIN: I'm fine with all of them being excused.

THE COURT: So it's 19, 22, 24, 25, 26, and 29. All right. Those I'm going to excuse from this batch.

Let's go to the next page. And there is still plenty of people here. This is a huge panel still.

Okay. On this next group, which is 35 to 42, I only see two. Let me get my other notes. I see, No. 37, the wife has the medical procedure. No. 40, I don't know. I wouldn't necessarily excuse her, but I don't know. She seemed to have problems with the federal government. She seemed to put you in the same category as whatever it is. The Merit System Protection Board, even though I explained they have nothing to do with it, and she kind of shrugged when I said, can you be fair and impartial. She has some

history there, and she herself is employed by the federal government.

MR. MARTIN: Your Honor, not that it makes a difference, but I have no problem with her being excused.

THE COURT: I think she kind of needs to be. What do you think, Miss Howard-Allen?

MS. HOWARD-ALLEN: Either way. You can voir dire her or if you want --

THE COURT: I'm going to excuse her. She was either laying it on thick because she didn't want to be here or she really does have --

MS. HOWARD-ALLEN: Also, we could talk about 41 and 42, as well, but 41 --

THE COURT: Yes, the English as a second language. Yes, of course. I always hate to excuse people for that reason because I think our community is composed of all kinds of different individuals. Some are immigrants, some have been here forever, but she did not understand my question, which was something else, and then she said something else, and I don't remember exactly what it was, but she did not completely understand my question. So I would, based on that -- not on the fact that English is her second language but based on the fact that she did not seem to understand perfectly my question. Thank you very much for reminding me of that, Miss Howard-Allen. She was 41.

Mr. Martin, are you okay with 41?

MS. HOWARD-ALLEN: She brought it up, Your Honor. That's why I did --

THE COURT: Of course.

MR. MARTIN: Yes, Your Honor, I am.

THE COURT: How about the lady who has Lupus? She says with medication she's okay. I don't know. I would probably hold off on her for the time being.

MS. HOWARD-ALLEN: I would, too.

Did we excuse 37?

THE COURT: I would excuse 37 and 40, and let's excuse 41. So it's 37, 40, and 41. And, then, before we do anything formally, I want to count this up just so that there are no mistakes and no misunderstandings.

Then I go to the next page. We are going to start with 43. On that page, the two that I have circled are -- I wouldn't excuse the Home Depot guy. Maybe with more questioning. I just wouldn't excuse him. I mean, he works. He's got to take care of his children while he works. I don't know. Maybe he's got a family member who can help him. Or maybe you all are more merciful than I am when it comes to that.

No. 48, the handyman, I would excuse him. I don't know, I'll take my cue from you. Whatever you want to do with 47, if we want to excuse him, not excuse him. And

whatever we want to do with 48. I would excuse somebody who is a handyman because they are on limited incomes and they need their money. If they don't work, they don't get paid.

What do you all think about those two folks?

MS. HOWARD-ALLEN: I think we can leave No. 47, and then we could excuse, consistent with what we have done, those who are self-employed and won't have any income.

THE COURT: That's what I would do. Let me tell you, somebody has children at home and they don't work, they are automatically excused. You have a child under -- whatever it is, 12, no one is going to force you to be on a jury when you are responsible. The thing is, you work. I mean, they are kind of using it as an excuse, but they work.

All right. Mr. Martin, what do you say?

MR. MARTIN: I'm fine with excusing 48.

THE COURT: I will excuse 48. I'm not excusing 47. We can inquire some more and handle it differently if we can.

All right. The last page. Let's see. Here's what I have on this page. No. 54 is the plumber, 9th grade education, works as a plumber. I'm sure he's on limited resources. I would excuse him. And I would excuse 57, the self-employed limo driver.

Are we okay with 54 and 57?

MS. HOWARD-ALLEN: We are, Your Honor.

THE COURT: How about you, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay. Then, let me go back to -- well, another easy one there is 66, who is the dental hygienist. No work, no pay. And I get it. So I would excuse her, too.

Are we okay with that? No. 66?

MS. HOWARD-ALLEN: Yes.

MR. MARTIN: Yes, Your Honor.

THE COURT: The more challenging ones are -- let's see. Let me see what my problems were. I don't know, the delivery person. I don't know about her. I really don't know. Then we have 62, the construction guy. I don't know about him either. No. 63, going north around June 7th. Not an air flight, just around, where she could probably go a little bit later. I don't know about her. So that's sort of what I think about 62 and 63. I would probably not excuse them right now, but let me hear from you.

MS. HOWARD-ALLEN: Your Honor, I don't know that I would excuse any of them, although we are considering those with their own businesses, and the only one of those would be No. 62.

THE COURT: I could -- I mean, it's just that I put him at a different level. I put him more in the veterinarian level. I think he makes more income.

MS. HOWARD-ALLEN: But I think we excused the veterinarian if I'm not mistaken.

THE COURT: You are right. To be consistent, we probably ought to. Are you okay with that, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: To be consistent, I should most certainly excuse 62. Okay. I will do that.

So on that last page, I've got 54, 57, 62, and 66, and I have not excused the others. Somebody said a problem if not paid. Who was that? Was that 64?

THE COURTROOM DEPUTY: No. 64, Bealls. That's the Bealls worker.

THE COURT: We are still trying to find out.

THE COURTROOM DEPUTY: We called. The person that makes that decision is out until 1:15, on lunch.

THE COURT: We will find out about Bealls. We have called and the person who makes the decision is out for lunch, but we will know by the time we select that jury. I bet you dollars to donuts they pay. Big companies do. I don't know if Bealls follows that policy or not.

So let me just count up my numbers and tell you what we have. We started out with 66. Let me count these up. That's 20. That still leaves us 46.

MS. HOWARD-ALLEN: That's what I have.

THE COURT: That's plenty.

MS. HOWARD-ALLEN: And I don't think they can all fit in here.

THE COURT: I think they can.

MS. HOWARD-ALLEN: I think they can. We had 42 and we had some space there.

THE COURT: I will try now, in the time that we have, to reorganize this chart. I just need to figure out how to excuse these people and work with the jury services.

What I will have them do is stay separately downstairs and not bring them up here. I think that's what I will do with these excused people. I'm just going to segregate them downstairs. That's what I will do, and not excuse them, excuse them yet, but we are excusing them. Okay? Just segregate them downstairs.

So we are going to find out about Bealls.

What was the other thing?

THE COURTROOM DEPUTY: Transportation, they can arrange a cab to get her here.

THE COURT: My gosh, she has no excuse. The woman that didn't have -- the young woman -- youngish woman who had the issues with the transportation, they will pay for a cab.

THE COURTROOM DEPUTY: They are just getting permission from the clerk, but they don't believe that will be a problem.

THE COURT: I just didn't want her to have to ride

eight buses to get to Tampa.

We have half an hour. Five after one. If you have to take a little bit longer, that's okay.

All right. Thank you for your patience. We will see you back here at five after one.

(Recess taken from 12:36 p.m. to 1:06 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: So forgive me if I get lost in the shuffle. I've not had to unite two juror groups before. I'm going to do my best here to not get lost and try to use color coding and everything. But, please, please, if you see that I've made a mistake, please speak up. Please speak up if I mess something up.

So what I have done is, I have segregated out those jurors that we had issues with or that had conflicts or other matters, et cetera. I have segregated them out, but I have not excused them, excused them. They are sitting downstairs in a segregated area from the others. So push comes to shove, if we have a problem, we can always bring them back.

In addition to that, how many additional jurors do we have? Is it six or eight? She will get the exact number. It's something like six or eight, and I'm not excusing them. So push comes to shove, we have additional people that we can

get and it's not a hopeless situation. I just wanted to let you know that we do have plenty of people. We have a good number of backups.

What will be confusing is, where does everybody sit? Where do we put them? What do we call them? It's going to be a mess, but I'm going to do my best here to not have it be a total mess.

I'm hoping we can figure it out. It's bad enough that I'm using numbers. I know that makes it challenging and it's going to add insult to injury, but combining these two groups -- that's all I can say. I'm going to do my best. And as I said, just forgive me if I make a mistake, but please call me out on it, if you see that I have made a mistake. Please, please, please call me out on it.

MR. MARTIN: Your Honor, can I ask the Court a question?

THE COURT: Of course.

MR. MARTIN: Do the jurors know their numbers that are on these sheets? Like, I'm juror No. 2 or 3?

THE COURT: Well, they knew at one point. And the second group I now have two numbers for. I called them by their original numbers. That will be the problem. I will put the first group in their original seats. And then the next group I'm going to say, you were No. 1 before; you are now number whatever. The problem is that these numbers are

not -- because we have excused some people, I don't know whether to leave a blank seat, which I don't think I will do. It's just going to be challenging. I don't know what the best way is.

Thirteen other jurors. And on the Bealls lady, we are still trying to find out if the employee gets paid.

I have a sentencing at 4. It doesn't mean it's got to take place at four. It just means somebody is coming up here at 4 and thinks they are going to be sentenced. I think they are all local lawyers. So if I'm really in a pickle, I could do something about it.

I think what I will do, when they come in, we will make certain we know who is in seat 1, who is in seat 2, and just do what you can to figure out who is where.

(The venire enters the courtroom.)

THE COURT: Thank you. Welcome back, ladies and gentlemen.

As you can see, I've brought together two different groups of jurors, so I appreciate your patience in working with me. I just want to make certain there is no misunderstanding as to who's here and present, so I'm going to begin, in seat No. 1, we have the last four numbers -- please look at your juror number. We have 0165, and you are from Winter Haven. Next one, 0027, and you are in St. Petersburg; 0020, you are from Bradenton, seat 3. Now in

seat 4 we have 0162 from Valrico. Now in seat 5 we have 0034 from Tampa. Then in seat 6 we have 0047 from Lakeland.

In seat 7 we have 0022 from Temple Terrace. In seat 8 I have 0124 from Lakeland. So far so good.

In my new seat 9 I have 0076 from Winter Haven.

UNIDENTIFIED JUROR: No.

THE COURT: Oh, dear. I'm just going back here. I have 7 was the lady from Temple Terrace, 0022. Next to her is the lady from Lakeland, 0124.

UNIDENTIFIED JUROR: Yes, ma'am.

THE COURT: Very good. Now, 9, the lady from Winter Haven, 0076. Perfect. Next I have the gentleman from Tampa, 0050.

MS. HOWARD-ALLEN: Your Honor, I think we missed 097 from Wesley Chapel. That was before 76.

THE COURT: I did. I did miss you. Thank you. You are at the end there. I'm so sorry. The gentleman that has his vacation in Germany. Thank you. And I am sorry. Sorry for the musical chairs. I'm just trying so hard not to make a mistake.

The gentleman from Wesley Chapel who is, on June 10th, a vacation in Germany. Thank you. Then No. 10, the retired cashier. Right? Winter Haven, 0076.

JUROR NO. 076: Yes.

THE COURT: Then No. 11, computer science, from

Tampa. Very good. Now, No. 12, B.S. in mass communications from Seminole.

JUROR NO. 097: Yes.

THE COURT: Okay. Seat 13, I know at some point you want a sidebar. I have it here. We haven't forgotten. In seat 14, from Bradenton, 0185. Right?

JUROR NO. 185: Yes.

THE COURT: That's 14. Seat 15, from Parrish, general manager. Okay. Seat 16, from Tampa, 0148.

JUROR NO. 067: No, 0067.

THE COURT: I need 0148. 02-0148, from Tampa.

MS. HOWARD-ALLEN: She's in the back.

THE COURT: So we need to switch you around. You are up here.

JUROR NO. 067: Yes, ma'am.

THE COURT: But don't go too far. I need 02-148, from Tampa. You need to be in seat 16. Perfect. In seat 17 is 02-0113, from Tampa, warehouse manager. You have to come up here. You will be in seat 17.

In seat 18, 02-0048, from Tampa. Where is 02-0048, from Tampa, B.S. financial accounting?

MS. HOWARD-ALLEN: I think that one was not brought up. I think the next one might be 0071.

THE COURTROOM DEPUTY: No. 071 is next.

THE COURT: Okay. That's what it was. Thank you.

I'm glad you all are keeping me straight here. So it is 02-0071, from Lakeland. I'm so sorry. It's really confusing, and I apologize for not getting it just right. Thank you.

You are 02-0071, from Lakeland; right?

JUROR NO. 071: Yes, ma'am.

THE COURT: I have 18 here. Then we are going to start back there (indicating).

Okay. Then, do we have 0067, from Riverview?

JUROR NO. 067: Yes.

THE COURT: You will be in seat 19. That's the first seat there. And seat 20, do I have 02-0045, from St. Petersburg?

JUROR NO. 045: Yes.

THE COURT: That's 20. Very good. Seat 21, 02-0093, from Tampa.

JUROR NO. 093: Yes.

THE COURT: Thank you. Seat 22, 02-0207, from Largo.

JUROR NO. 207: Yes.

THE COURT: Thank you. Seat 23, 02-0146, from Auburndale.

JUROR NO. 146: Yes.

THE COURT: Okay. Seat 24, 02-0123, from Plant City.

JUROR NO. 123: Yes, I am.

THE COURT: Thank you so much. Seat 25, 02-0208, from Tampa.

JUROR NO. 208: Yes.

THE COURT: That's No. 25. No. 26 is 02-0104, from Land O' Lakes.

JUROR NO. 104: Yes.

THE COURT: Very good. No. 27 is 02-0080, from Tampa.

JUROR NO. 080: Yes.

THE COURT: Thank you. Seat No. 28 is 02-0127, Spring Hill.

JUROR NO. 127: Yes, ma'am.

THE COURT: Okay. Seat 29, 02-0014, from Brooksville.

JUROR NO. 014: Yes.

THE COURT: Thank you very much. Thank you for working with me.

No. 02-0187, seat 30.

JUROR NO. 187: Yes.

THE COURT: Okay. Seat 31, 02-0118, Sarasota. High school, real estate, title work. No?

JUROR NO. 118: Yes.

THE COURT: Seat 32, 02-0191, Port Richey.

JUROR NO. 191: Yes.

THE COURT: Thank you. No. 33, 02-0018, from Palm Harbor.

JUROR NO. 018: Yes.

THE COURT: Okay. Very good. No. 34 is 02-0144, from Auburndale.

JUROR NO. 144: Yes.

THE COURT: Thank you.

No. 35 is 02-0155, Riverview.

JUROR NO. 155: Yes, ma'am.

THE COURT: Thank you. Seat No. 36 is 02-0059, from Tampa.

JUROR NO. 059: Yes.

THE COURT: Thank you. Seat No. 37 is 02-0054?

JUROR NO. 054: Yes.

THE COURT: Seat No. 38, 02-0119.

JUROR NO. 119: Yes.

THE COURT: Thank you.

Seat No. 39, 02-0139, Palm Harbor.

JUROR NO. 139: Yes.

THE COURT: Okay. Seat No. 40 is 02-0062, Land O' Lakes.

JUROR NO. 062: Yes.

THE COURT: Thank you. Seat 41 is 02-0209, from Venice.

JUROR NO. 209: Yes.

THE COURT: Seat 42 is 02-0091, Pinellas Park.

JUROR NO. 091: Yes.

THE COURT: No. 43 is 02-0009, Largo.

JUROR NO. 009: Yes.

THE COURT: Okay. Seat No. 44 is 02-0195, from Sarasota.

JUROR NO. 195: Yes.

THE COURT: Seat No. 45 is 02-0106, Bradenton.

JUROR NO. 106: Yes.

THE COURT: Okay. That's 45.

No. 46 is 02-0037, from Plant City.

JUROR NO. 037: Yes.

THE COURT: And I think that's it; right? Okay. Thank you. Thank you for bearing with me.

All right. I will give you each the opportunity -- as I said, we are going to have some other questions. We will pick our jury today, but we are going to have some other questions to go through with you, including what I'm going to do now.

I will begin by having the lawyers introduce themselves to you. In the case of the government, the law enforcement agents who are sitting with them at counsel table. In the case of Mr. Martin, Mr. Fisher. I will read to you the list of individuals who may testify as witnesses. It doesn't mean they will, but may testify as witnesses.

If any of these names are individuals who you may know, please let me know. If you are selected for the jury and you don't recognize the name, but when the person comes up to testify you do realize that's who it is, please let me know. It is okay. That has happened to me. Somebody I hadn't seen from high school, I didn't recognize the name, lo and behold, it was somebody who I knew. Just let me know and we will deal with it at that time.

We will also have the opportunity at sidebar for issues that you feel more comfortable discussing. It's not complete privacy. There is a court reporter taking down what is said, but there is more privacy than speaking here in front of 40-some-odd people.

Miss Howard-Allen, I'll begin with you, by introducing yourself.

MS. HOWARD-ALLEN: Good afternoon. My name is Kelley Howard-Allen.

MS. GUZMAN: Good afternoon. My name is Maria Guzman.

AGENT PHELPS: Good afternoon. My name is Adam Phelps.

AGENT LIBERTO: Good afternoon. My name is Robert Liberto.

THE COURT: Thank you. Anybody know any of these folks?

(Unanimous negative responses.)

THE COURT: Mr. Martin.

MR. MARTIN: Good afternoon. My name is Ken Martin and my client's name is Dion Fisher.

THE COURT: Anybody know either of those two gentlemen?

(Unanimous negative responses.)

THE COURT: Okay. So you've heard the two case agents introduce themselves to you. Normally I do have people who will say yes to the next question, that they do have friends or family members in law enforcement. I'm going to do it row by row, but really what I would like to know here is if you have a very close relative, like a spouse, like a child, like a parent, a brother, or a sister who is in law enforcement or employed by an agency, such as, the State Attorney's Office or the U.S. Attorney's Office.

That's what I'm interested in, and I'm going to do it row by row because that's the easiest way for me to do it. So if it's your second cousin in New Jersey who you haven't seen in 35 years and it doesn't have an impact, I don't need to know about it. But if it's your brother or your spouse who you see every day -- something that it has an impact.

Why am I asking this? I need to have a jury that's fair and impartial. If the person sitting next to you every day, your spouse, is a law enforcement officer and you

think, hey, he's the best thing in the world, I want to make certain that you are going to be fair and impartial. So that's what I'm getting at.

In the first row, anybody here have a family member in law enforcement or at the State Attorney's Office, U.S. Attorney's Office? Anybody in the first row?

(Unanimous negative responses.)

THE COURT: In the second row? All right. Let's see. You are --

JUROR NO. 124: 0124.

THE COURT: Thank you. As you know, you know how bad I was before. I have to write that. 0124, the lady in seat 8. And, gentleman, if I come to you, I will say the same thing. Ladies, I will say, the lady.

In seat number -- now in seat No. 8, 0124, yes.

JUROR NO. 124: Yes, ma'am. My dad was a retired deputy with St. Lawrence County in Upstate New York; however, he's been deceased for nine years.

THE COURT: Anything about that relationship that would preclude you from being fair and impartial; that is, as a child of a law enforcement officer? Can you be fair and impartial?

JUROR NO. 124: No. But that was my deciding factor to go into law enforcement in the Air Force.

THE COURT: Fair enough. I just want to make

certain that, by the same token, you can be fair to Mr. Fisher here. That you, yourself, were in law enforcement in the military. Your father was a law enforcement officer. I want to make certain that you can still give him his day in court that he's entitled to.

JUROR NO. 124: Yes, ma'am.

THE COURT: Very good.

Anybody else in that second row?

(Unanimous negative responses.)

THE COURT: Okay. In the third row? Okay.

JUROR NO. 185: 0185.

THE COURT: Yes, you are now in seat 14. Yes, sir. Who do you have in law enforcement?

JUROR NO. 185: My daughter-in-law works for Child Services Protection.

THE COURT: Okay. So this is investigating whether children have been abused or mistreated?

JUROR NO. 185: Correct.

THE COURT: Anything about that relationship that would preclude you from being fair and impartial in this case?

JUROR NO. 185: Not at all.

THE COURT: Thank you. Anybody else here?

(Unanimous negative responses.)

THE COURT: How about down here?

(Unanimous negative responses.)

THE COURT: We will move back to this side. So sometimes I overlook. So if I do, just please speak up.

Anybody over here in this group? Friends, family in law enforcement. You are going to have to tell me -- by some chance you remember your new seat, you can tell us that. But if you don't, that's okay, too. What is your number?

JUROR NO. 123: 0123, No. 24.

THE COURT: No. 24. Thank you very much.

Who do you have in law enforcement?

JUROR NO. 123: My son-in-law works for Hillsborough County Sheriff's Office. He's actually in the courthouse in Plant City, but we don't discuss any legal terms, so it would not interfere with my decision.

THE COURT: You would be okay with it?

JUROR NO. 123: Yes, ma'am.

THE COURT: Thank you very much.

Anybody else over there? Okay. You are seat 25, No. 0208.

JUROR NO. 146: I'm 23, 146.

THE COURT: No. 23, yes, 02-0146. Go ahead.

JUROR NO. 146: My son is a correctional officer.

THE COURT: That's right. You did tell us that. Anything about that relationship that would in any way impact on your ability to be fair and impartial?

JUROR NO. 146: No, ma'am.

THE COURT: Thank you very much.

Anybody else over here? Okay. In the row behind. And if you can give us your number, terrific. If you know your seat number, terrific. If you don't, give us your regular number.

JUROR NO. 187: Seat 30, juror 187. My one sister is a corrections officer. My other sister is her boss. She's a jail administrator.

THE COURT: Anything about those relationships which would in any way impact on your ability to be fair and impartial?

JUROR NO. 187: No.

THE COURT: And you were 02-0187, in seat 30?

JUROR NO. 187: Correct.

THE COURT: Very good. Anybody else back there?

JUROR NO. 014: My daughter is with the Department of Family Services in Chicago, Illinois.

THE COURT: You are seat 29 --

JUROR NO. 014: Juror 014.

THE COURT: So what does she do there? Tell me a little bit about --

JUROR NO. 014: She defends the children.

THE COURT: So she represents their interest?

JUROR NO. 014: Their interest, yes.

THE COURT: Anything about that relationship that

would prevent you from being fair and impartial?

JUROR NO. 014: No.

THE COURT: Thank you. Anybody else over here?

(Unanimous negative responses.)

THE COURT: All right. Let's move over to the other side. Anybody over here?

JUROR NO. 106: Yes, my daughter works as a drug coordinator for Manatee County State Attorney.

THE COURT: And you did tell us you had a daughter that worked there. Give me your number again.

JUROR NO. 106: No. 106, seat 45, I believe.

THE COURT: And you are okay with that, then, you said. Thank you.

Anybody else that I may have missed?

(Unanimous negative responses.)

THE COURT: I'm going to wait a minute for the next two questions because I'm going to do them at sidebar, and that is whether you've ever been the victim of a crime or whether you have ever been under investigation or charged with a crime.

I'm going to expand that to include a very close family member. Again, if it's your second cousin that you haven't seen in a long time, you don't need to tell me about it; but if it's you, yourself, or a very close family member or a friend, who it's as if it is your family member, then

you need to let me know.

Why do I ask this? I ask this, again, if you've been a victim of a crime, maybe you affiliate too much with law enforcement. We want to make certain that you can put that line there. And, likewise, if you've ever been under investigation, maybe you have some issues in the way you were treated, and we need to explore that to make certain that you are okay on this case. So that's really what I'm talking about.

I know a number of you have already answered this. I want to make certain that I haven't missed anybody. You've told me already you served either as a grand juror in a civil case or criminal case. Is there anybody who didn't give us that information?

(No audible responses.)

THE COURT: So what I need to do is, I need to read the list of individuals who may testify in this case. We are not certain that they are going to testify. This is just who we think is going to testify.

Elizabeth Adkins, Victoria Broadstreet, Marsha Collins, Gary Corbett, Carlos Diaz, Nicholas Forgione, Michael Gilbert, Konrad Gusewicz. That is G-u-s-e-w-i-c-z.

Nicholas Hammack, Roman Hernandez, Samuel Huffman, Lindsay Kaufman, James King, Diane Knott. That's K-n-o-t-t. Danny Kulic, K-u-l-i-c. Cory List, Shawn Livernois, Dexter

McGee, Christopher McKinney, Joseph Miner, Phil Morose. Thaddeus Mostowtt, Reta Newman, Philip Pione, Walter Rodriguez, Ivette Vallejo, V-a-l-l-e-j-o. Kristian Walguarnery, W-a-l-g-u-a-r-n-e-r-y. Brian Zdrojewski, Z-d-r-o-j-e-w-s-k-i.

Anybody know any of those individuals?

(No responses.)

THE COURT: As I said earlier, there are two law enforcement officers at the table with Miss Howard-Allen and Miss Guzman. Mr. Phelps is with DEA. Is that correct? Or Special Agent Phelps.

AGENT PHELPS: Yes, Your Honor.

THE COURT: And Agent Liberto is with IRS Criminal Investigation Division.

AGENT LIBERTO: Yes, Your Honor.

THE COURT: Does anybody have any -- how should I put it? Any biases, either favorably or negatively, that would impact in your ability to be impartial in this case? In other words, favorable or unfavorable as to the DEA or favorable or unfavorable as to the IRS Criminal Investigation Division?

(No responses.)

THE COURT: If you don't want to answer in front of everybody else, we do these matters at sidebar. So please tell us. We want to know.

As I said earlier, Mr. Fisher has been charged with dealing and distribution of fentanyl. He's also been charged with distribution of pentylone, p-e-n-t-y-l-o-n-e. He's been charged with money laundering.

You can also discuss this at sidebar. If there are any reasons why you don't think you can sit on this case -- for any reasons -- and be fair and impartial to both sides, please let me know. Please let me know so that we can then ask some follow-up questions.

If there is anything that you thought of, any reason why you don't think you can be fair, please tell us. I would like to hear it because my job is to make certain that I have a jury that can be fair to both sides. That can be fair to the United States and that can be fair to Mr. Fisher. That's what I'm looking for, a fair and impartial jury.

All right. So you know what we want to take up at sidebar; that is, if you've ever been a victim of a crime, if you've ever been charged with a crime or a very, very close family member, where it's had an impact on you.

Anything else you wish to discuss -- medical issues -- and you want a little bit of privacy with, any reason why you think you can't be fair and impartial that you would like to tell us, we are going to discuss that at sidebar. Anything else that you would like to discuss, we

will do it at sidebar.

What will then happen after we do that, I will give the lawyers the opportunity to ask you some questions. It will not be anywhere as long as this. It will be about 20 minutes. Then after that we will recess to pick the jury. So I have every reason to believe that by 4 o'clock we will be finished.

I'll just say a couple of things. The lady that had the concern about transportation -- I don't know where you are, but they will pay for a taxi for you, and you should get a taxi paid for today. Whether you're chosen or not, they will pay for that today. So you need to go downstairs when we finish to make those arrangements. And if you are selected, they will pay for a taxi.

I'm not certain if we found out about Bealls Department Store. I'll have to get to that in a minute. I don't have the answer yet. I will get that in a minute.

All right. So, again, bear with me because I have you united two groups. You can see that I got a little bit lost there on my numbers; and that's why I keep on repeating myself, so I don't make a mistake. Please bear with me.

When you come up here, if you know your seat number, please tell me. And your juror number. So we are going to do this row by row. Now, normally when I do this, everybody starts talking. You can whisper. You can whisper,

but please don't engage in out-and-out conversation because it's hard for us to hear here on the side.

If you need to get up to use the rest room, it is okay. Because we are going to do this here at sidebar, you can get up and go use the restrooms, which are outside. But please, obviously, come back because I am then going to turn it over to the lawyers as soon as I finish doing this.

Okay. I'll begin with the first row. Here's the information I have from the lady that works at Bealls Department Store (indicating), so when it's time to talk to you, you'll have the answer. It was that it depends on your status. If you are what's called a flex employee, you're not entitled to benefits. If you are full time or part time, they will pay for jury service on the days that you are scheduled to report to work. So that's the way it is for the lady from Bealls.

So let's go with the first row.

I'll see counsel at sidebar, please. First row.

(The following was held at sidebar:)

THE COURT: Give me your seat number.

JUROR NO. 027: Seat 2, No. 027. I brought a doctor's note that I have some problems with arthritis and a cyst on my spine that would cause me -- I would be taking pain medicine if I had to sit on the jury every day.

THE COURT: Too painful for you to participate,

then; is that it? You would have to take the pain medication?

JUROR NO. 027: I would.

THE COURT: Does the pain medication in any way impact on your ability to process information or does it have any kind of impact on your ability to process information and understand what's going on or dull your senses?

JUROR NO. 027: I don't take that strong of medicine, but I also will still be in pain.

THE COURT: Will you be in so much pain that you don't think you can pay attention to what's going on?

JUROR NO. 027: It might hurt my focus, yes, ma'am.

THE COURT: Do you want to ask some questions, anybody?

MS. HOWARD-ALLEN: No.

MR. MARTIN: No, Your Honor.

THE COURT: Okay. I don't think I have anything else. Thank you.

JUROR NO. 027: Yes, ma'am.

THE COURT: We are finished with the first row. Now we are on the second row.

JUROR NO. 076: I'm in seat 9.

THE COURT: What city are you from?

JUROR NO. 076: Winter Haven.

THE COURT: What is your name?

JUROR NO 076: Linda.

MS. HOWARD-ALLEN: No. 10. New No. 10.

THE COURT: Yes, Winter Haven.

JUROR NO 076: Yes. I just -- I didn't want to say it out loud, but my brother, who I have not seen now in five or six years, is a big druggie. He's been in prison, but I don't see him. I don't associate with him. I never have. I just want to say it so in case something came up.

THE COURT: That's okay. And that's why we are doing it at sidebar, because that's the more appropriate. So has he been charged with any crime?

JUROR NO. 076: Yeah, ever since 16. He's over 60. Four years younger than I am.

THE COURT: That's okay. Here's my next question to you -- and I know this is your brother and so I just want to make certain that this doesn't hit too close to home, that you can sit and give this gentleman the day that he deserves in court, but that you can also be fair to the government. Can you do both of those? Can you be fair to the government and to Mr. Fisher?

JUROR NO. 076: Yes, I can.

THE COURT: Okay. Miss Howard-Allen?

MS. HOWARD-ALLEN: No further questions.

THE COURT: Mr. Martin?

MR. MARTIN: Did this cause the family some problems?

JUROR NO. 076: Just me, because we kind of split. My mother took his side and it was just -- yeah. But my mother is deceased now, and I haven't associated with him.

MR. MARTIN: Older brother or younger?

JUROR NO. 076: Four years younger than I am.

MR. MARTIN: At times -- you don't associate with him now. Did you try to help him early on?

JUROR NO. 076: I was married, so, no.

THE COURT: Okay.

JUROR NO. 076: I tried as much as I could.

THE COURT: All right. Thank you. I appreciate it.

JUROR NO. 124: No. 8, 0124. Seat 8. Lakeland. My problem is that my best friend's grandson was just murdered in August during a drug sale gone bad. I've known that young man since he was a baby, so I knew him 18 years.

THE COURT: And he was involved in, what, buying drugs from somebody?

JUROR NO. 124: No, he was selling drugs.

THE COURT: Okay. Here's my question to you: Is this the kind of thing where you can be fair to both sides, be fair to Mr. Fisher and be fair to the government? Or does it hit too close to home, where you don't think you can do it?

JUROR NO. 124: I have to be honest. First of all, I have a bias when it comes to law enforcement, but I

can always put that aside because I'm used to dealing with strictly evidence. But when it comes to an 18-year-old child who is selling it and is murdered, no, that affects me deeply. So I don't know that I could be fair to this young man.

THE COURT: Let me let the lawyers ask you some questions.

MS. HOWARD-ALLEN: Do you know what type of drugs it was?

JUROR NO. 124: Marijuana.

MS. HOWARD-ALLEN: And you said, when the judge asked you, you could be fair and impartial in this case?

JUROR NO. 124: I don't know, because it's still so new. It's drugs. That's all we know. I can't tell you I can; can't tell you I can't, because it hits very close to home.

THE COURT: Mr. Martin?

MR. MARTIN: I think it's been covered.

THE COURT: Thank you.

JUROR NO. 022: No. 0022, Temple Terrace. My brother is doing time for drugs.

THE COURT: Okay. So he's in prison?

JUROR NO. 022: Yes.

THE COURT: Okay. Well, how do you feel about that? Does that --

JUROR NO. 022: I don't mind being here. I haven't really addressed the feelings because I don't want to approach that or anything.

THE COURT: My concern is, I want to make certain we have a jury that's fair to both sides. I know this is your brother, and it makes it hard when it's your brother. But I want to make certain that in looking at this case you can put those feelings aside and be fair to both the government and to be fair to Mr. Fisher. Is that something you can do?

JUROR NO. 022: I can try. That's all. I can try.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: She said she can try to be fair. I don't have any other questions.

THE COURT: Mr. Martin, do you have anything?

MR. MARTIN: You are trying to be fair, and were you concerned you couldn't be fair to --

JUROR NO. 022: I guess it's just both ways, you know. The way they handled it, and the grandson being in it, too. I mean they did -- you know, it's just the way they handled it and the way they handled them inside and stuff like that.

THE COURT: Okay.

JUROR NO. 022: Like I said, I could try.

THE COURT: Okay. I don't have anything else.

JUROR NO. 185: Seat 14.

THE COURT: Yes.

JUROR NO. 185: You asked if whoever --

THE COURT: You are 02-0185?

JUROR NO. 185: Yes, ma'am.

My son, who is 35 now, and was six months old, was abused by a baby-sitter. I was his guardian, so I had pretty much sole custody of him. And whenever his routine gets screwed up, he gets frantic. There are issues. Even though my wife is at home, he still looks for dad when he gets home. But I'm here to do whatever you need.

THE COURT: So what you are saying is, if we absolutely need you --

JUROR NO. 185: I'll be here.

THE COURT: But that if you could be excused in favor of somebody else, that would be better for your family?

JUROR NO. 185: Yes, ma'am. Otherwise, I will be here.

MS. HOWARD-ALLEN: What time do you normally get home?

JUROR NO. 185: I get home at 3 o'clock in the afternoon.

THE COURT: All right. Any questions for this gentleman?

MR. MARTIN: You say you help with your son. How

old is he?

JUROR NO. 185: He's 35 now.

THE COURT: Thank you.

JUROR NO. 112: Good afternoon.

THE COURT: I know you had wanted --

JUROR NO. 112: No. 112, seat No. 13.

THE COURT: I know that you had wanted to do the sidebar.

JUROR NO. 112: I was the one, yes. I take medications for Parkinson's and I take medication for memory loss and I have acute neurological damage that I got in the service. I'm not going to remember half the stuff that goes on. And the last time, I went to my car to take my pills, but I was shaking like a leaf just before. When it comes on, it comes on. I didn't want to say this in front of everybody.

THE COURT: Of course not. I understand that. That's challenging.

JUROR NO. 112: Sorry to take way from the time, but with the VA -- it's actually Thursday, and they won't let me come sooner.

THE COURT: I have it down here and we will deal with this. Thank you very much. I need to talk to them, rather than just saying -- normally we wait until the end to excuse people. I just wait until the end, just because it's the better way of doing it. If you will, just bear with me.

JUROR NO. 112: That's fine.

THE COURT: Thank you. I will excuse him based on what he said.

MR. MARTIN: No objection.

MS. HOWARD-ALLEN: Yes.

THE COURT: I could excuse him now, if you want me to, or we could wait.

MR. MARTIN: It doesn't matter.

THE COURT: When someone says they have memory loss and shaking ...

MR. MARTIN: My only concern is he said he was shaking and it's a timely manner.

THE COURT: I would probably wait. Not having done it before, I would wait. But we will just wait on him.

Okay. Tell me your number.

JUROR NO. 008: Seat No. 12, juror 0008.

MS. HOWARD-ALLEN: From Seminole.

JUROR NO. 008: Yes.

THE COURT: Right. B.S. in mass communications.

JUROR NO. 008: So in 2008 I was charged with misdemeanor shop-lifting and marijuana possession. I went through that and it was all settled. I was 18. Then at 23, 2013, I was the victim of a home invasion, with my now husband, where they came in and he was shot and they stole all of our stuff.

THE COURT: Is your husband okay after that?

JUROR NO. 008: He had some lingering health issues, but he isn't disabled permanently.

THE COURT: Okay. Well, two things. First of all, the first two, those were misdemeanors. So did you think you were treated okay by the system?

JUROR NO. 008: Oh, yes.

THE COURT: The home invasion, the police came in right away and investigated it?

JUROR NO. 008: Yes.

THE COURT: Were you satisfied with the way they investigated the matter?

JUROR NO. 008: Well, really, we never -- I kind of still feel -- and our family felt like they could have investigated a little further because they never had enough evidence to charge them, even though they know who -- they know who it was. But nobody was ever charged and it was kind of forgotten about that way. But that I know happens. I'm not, like, holding any grudges because of it.

THE COURT: Okay. Anything else? Any other reason why you think you can't be fair and impartial to both sides?

JUROR NO. 008: No, I can still be impartial. It happened.

THE COURT: Okay. Anybody, any questions?

MR. MARTIN: I just have one. Home invasion, did drugs have anything to do with it?

JUROR NO. 008: We had just moved into the house and apparently the previous tenant there was dealing drugs. So people came in yelling at us, "Where are the drugs? Where are the drugs"?

We are not those type of people, so we didn't have them. So it was drug related, but we weren't the drug people. We just moved into a bad house.

MR. MARTIN: Now, the judge told you about the charges, that they involve drugs. Are you confident you would be fair to Mr. Fisher with this in your background? It's a traumatic thing.

JUROR NO. 008: I could try. I know the duty that's put before me.

THE COURT: If I read to you what the law is and I tell you that you have to follow the law and put your personal feelings aside, you can do that?

JUROR NO. 008: Yes, definitely.

THE COURT: Okay. All right. Thank you very much. I appreciate it.

(Addressing everyone as follows:)

THE COURT: Anybody else in this group over here (indicating)?

(Unanimous negative responses.)

THE COURT: Then, very good. We will go to this group.

(Continued at sidebar:)

JUROR NO. 067: Seat 19, 0067.

THE COURT: Riverview, patient coordinator.

JUROR NO. 067: Yes. Two-and-a-half, three years ago my grandfather was arrested. It wasn't in the U.S., though. So I don't know if that counts.

THE COURT: He was arrested in another country?

JUROR NO. 067: Another country.

THE COURT: Well, you wouldn't hold the U.S. law enforcement -- you wouldn't hold that against law enforcement here in the United States; would you?

JUROR NO. 067: No.

THE COURT: Was it drugs?

JUROR NO. 067: Yes.

THE COURT: Do you know what drug he was charged with?

JUROR NO. 067: Cocaine. He didn't do it on purpose. I guess because he's old, he got scammed. He did the whole internet thing, and they blamed it on it was a family inheritance thing. So he was going to pick up this thing in the airport and he picked up someone's drugs and it was $300,000 worth of cocaine. He turned himself in, but he still had to be in jail over there for a year.

THE COURT: What country was this?

JUROR NO. 067: Ireland. It was just an awful year of trying to get him out.

THE COURT: That does sound awful. Well, can you be fair to the government in this case, or does that just bother you so much that you don't think you can be fair to --

JUROR NO. 067: Like, after you asked if anyone dealt with any family situation, I wasn't thinking about it all day, and now it just popped up.

THE COURT: Let me let the lawyers ask you some questions. Go ahead.

MS. HOWARD-ALLEN: I guess the question is: Do you think, given what you have told us, that you could be fair and impartial to both sides in this case?

JUROR NO. 067: I can try. I can try my best.

MS. HOWARD-ALLEN: Is he out now?

JUROR NO. 067: He's out. This was at a time when it was just a terrible year, not knowing whether he would stay there and come back home. That's all.

THE COURT: Mr. Martin?

MR. MARTIN: You may have said this. About when did this happen? What year? Estimate.

JUROR NO. 067: About three years.

MR. MARTIN: Three years ago.

THE COURT: It was not that long ago.

JUROR NO. 067: Not long ago, because my sister just turned four, and she was just a few months old when this happened.

THE COURT: The bottom line is, only you can answer this. Can you be fair to both sides?

JUROR NO. 067: I can.

THE COURT: You can follow the instructions that I give you and you can be fair to both the government as well as to the defendant?

JUROR NO. 067: Uh-huh.

THE COURT: Okay. I don't have any other questions, then. Thank you.

JUROR NO. 191: Juror 32, Port Richey, 191.

THE COURT: Go ahead.

JUROR NO. 191: I'm a little nervous. I don't know how to put it in better words, but I've never been the victim of a drug crime or anything like that, but I've seen what it does to people. I grew up in a poor neighborhood in Los Angeles.

But I have friends that are cops here in Pasco County and they tell me everything they do, and I personally think that if he sells drugs, I think personally he is guilty. I understand he has the right to go to court. He chose to sell drugs. To me, I think the laws are for law-abiding citizens. If you have a gun illegally, sell

drugs illegally, you should serve the time. You get caught, you should serve the time. I don't know if that's -- I don't think I could be impartial. I think he's guilty regardless.

THE COURT: All right. Any questions for this gentleman?

MS. HOWARD-ALLEN: So do you feel, basically, you couldn't be fair and impartial to both sides?

JUROR NO. 191: No, because I know for a fact that in my neighborhood there are drugs right now. And if they get caught, they are guilty. I see them all the time, and they are around my kids. Kids are playing outside and a guy is selling cocaine outside in the neighborhood.

THE COURT: Okay. Any questions, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: Okay. You can return. Thank you.

Jury number?

JUROR NO. 127: It's 0127, Spring Hill, seat 28.

THE COURT: I have it. Spring Hill. Okay.

JUROR NO. 127: About 30 years ago I had a sawed-off shotgun put in my face.

THE COURT: Is that something that -- I know that's got to be frightening. Is that something you can put aside and be fair to both sides in this case?

JUROR NO. 127: Sure. Not a problem there.

THE COURT: Any questions for this gentleman with

respect to that?

MS. HOWARD-ALLEN: No, Your Honor.

MR. MARTIN: No, Your Honor.

THE COURT: Thank you very much. I appreciate it.

If you can, give me your number.

JUROR NO. 014: No. 0014, seat 29.

THE COURT: From Brooksville?

JUROR NO. 014: Yes. I was charged with carrying a concealed weapon but not guilty. My daughter was convicted of mortgage fraud here in Tampa during that time.

THE COURT: So she was charged by this U.S. Attorney's Office?

JUROR NO. 014: I think so. I would imagine.

THE COURT: Did she go to trial?

JUROR NO. 014: Oh, yes.

THE COURT: She didn't plead guilty. She went to trial?

JUROR NO. 014: She pled guilty and did two years.

THE COURT: She was sent to prison for two years?

JUROR NO. 014: Yes.

THE COURT: Okay. Can you be fair in this case?

JUROR NO. 014: Yes. It doesn't bother me.

THE COURT: You don't hold it against this U.S. Attorney's Office?

JUROR NO. 014: No. Or her. Nobody. Just one of

those things. The guy that was the head of it just recently got out. I have no feelings against him. It's one of those things.

THE COURT: Okay.

JUROR NO. 014: Same thing with my gun. I was a little too young. That's why I don't carry a gun or buy a gun. That's 30-some years ago.

THE COURT: Okay. Any questions?

MS. HOWARD-ALLEN: Do you remember the name of the main guy who just got out in your daughter's case?

JUROR NO. 014: Oh, it's on the tip of my tongue.

MS. HOWARD-ALLEN: If I said it, would you remember? Was it Stephen Maher?

JUROR NO. 014: No it wasn't. Matt something.

THE COURT: Does your daughter -- what is your daughter's name?

JUROR NO. 014: Alison.

THE COURT: Alison. Same last name?

JUROR NO. 014: She used Arnold, A-r-n-o-l-d. She uses my name now.

THE COURT: All right. Any other questions?

MR. MARTIN: No.

THE COURT: Again, you can be fair and put all this aside?

JUROR NO. 014: Yes. Just thought I would let you

guys know.

THE COURT: Thank you. Very much appreciate it.

MS. HOWARD-ALLEN: The concealed weapon charge, who brought that against you? What local law enforcement office?

JUROR NO. 014: City of Chicago. It wasn't here.

THE COURT: Okay. Thank you very much. I appreciate it.

JUROR NO. 018: Seat 33, juror 018.

THE COURT: Event planner, Palm Harbor.

JUROR NO. 018: My grandmother was raped and beaten by a black man and my whole family never got over it. And I didn't either. It eventually led to her death because she could not take it.

THE COURT: Do you think you can be fair and impartial in this case?

JUROR NO. 018: I would like to say I would, but I can't promise anything. Certain things you just don't forget. Crimes against kids and elderly are just a bit too much.

THE COURT: Okay. Any questions for this lady?

MS. HOWARD-ALLEN: No.

MR. MARTIN: No, Your Honor.

THE COURT: We don't have any. Thank you so much.

JUROR NO. 119: I'm 38, 0119.

THE COURT: Speedway HR.

JUROR NO. 119: Yes. Like 29 years ago I was caught with an open container in college. I thought I would let you guys know.

THE COURT: Not a big deal.

MR. MARTIN: There but for the grace of God.

THE COURT: Okay. You are okay with the way you were handled with the police and you don't hold it against them?

JUROR NO. 119: No. I just thought I would tell you.

THE COURT: Any questions for her?

MS. HOWARD-ALLEN: No, Your Honor.

MR. MARTIN: No.

THE COURT: Thank you.

Tell me your number again.

JUROR NO. 195: No. 195.

THE COURT: Do you remember what seat?

JUROR NO. 195: Seat 44, I think.

THE COURT: Yes, from Sarasota. Yes, ma'am.

JUROR NO. 195: I was the victim of a crime -- both my sister and I, as children, were physically and sexually abused for several years of our childhood. And I have very little tolerance for people who take advantage of other people or are predators, I call them. So I don't know

if that pertains to this or not, but you asked if anyone had been --

THE COURT: Sure.

JUROR NO. 195: -- a victim of a crime.

THE COURT: Well, I can only imagine how hard that has to be. I just want to make certain, if you are selected for this jury, that you can be fair to this defendant, recognizing that he's not been charged with those kinds of crimes. He's been charged with selling drugs.

I don't know if you put that -- I don't know if this is the kind of thing that you can give him his day in court or if it's, because of what you've been through, the kind of thing that's hard to do. So, really, only you can tell me if you can be fair to him or if it's too --

JUROR NO. 195: I would like to think I could be, but I don't know. There are so many things for me that trigger just bad memories. And I only found out a month ago that my sister had been abused. I didn't know it all these years, and so it's all just very fresh and being regurgitated. She's now in counseling, and so it's just -- it's just -- you asked if we had been a victim of a crime. Yes.

THE COURT: Okay. Any questions for this lady?

MS. HOWARD-ALLEN: No, Your Honor.

MR. MARTIN: No, Your Honor.

THE COURT: Thank you. Thank you for coming forward.

This is why I do it at sidebar rather than in open court. Without fail we have somebody who's been through that.

Anybody else? I will turn it over to you. I don't know if they need to take a break. I think we can go. What did I say, about 20 minutes each? And I'll start with you. Okay.

MS. HOWARD-ALLEN: Can we take a two-minute comfort break.

(Sidebar ended.)

THE COURT: We will take a short break, ladies and gentlemen, before we go to the questioning. We are still on target. We will be finished by 4 o'clock, but I need to take a short rest room break. Maybe ten minutes. Then each lawyer will ask you 15 or 20 minutes worth of questions. We will then excuse you.

After we come back, the government will have the opportunity to ask you about 20 minutes' worth of questions. They may not take that entire time. Then Mr. Martin will have the opportunity to ask you 20 minutes of questions. He may not take that much time either.

After that happens, I will excuse you. It will probably take about 20 to 25 minutes. We will then select

our jury, and I'll have you back here. I still plan to end around 4 o'clock. That's still my goal, to end by 4 o'clock, and I think we are on target to do that.

So we are going to excuse you for ten minutes. Please come back and sit in the same seat you were in before.

(Recess taken from 2:28 p.m. to 2:34 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: We can bring the venire in.

Do we have everybody present and accounted for? Very good.

COURT SECURITY OFFICER: No, we are missing one.

(Discussion held off the record.)

The venire enters the courtroom.)

THE COURT: I understand one of our jurors is not feeling well. Is that right? You're not feeling well? You are sick?

JUROR NO. 091: I've been throwing up.

THE COURT: But are you sick? You just need to shake your head if you're sick. Is that right?

Counsel, she's been sick. Any objection to excusing her? This is juror number -- she was originally 42 and then seat 18, 0091, from Pinellas Park. Your father has the bakery; correct? Do I have the right person is there? She's been sick. Is it okay if I excuse her now so she can

leave since she's been sick to her stomach?

MS. HOWARD-ALLEN: No objection, Your Honor.

MR. MARTIN: No objection.

THE COURT: You may go ahead and leave. Thank you for having come in today. You are excused if you are sick. You've told us you are sick to your stomach. You may leave. Thank you for coming in today even after being sick. I really appreciate it. I hope you feel better.

JUROR NO. 091: Thank you.

THE COURT: Thank you.

Miss Howard-Allen, do you have a few minutes' worth of questions? I think I said up to 20 minutes you could have.

MS. GUZMAN: Actually, Your Honor, I will be addressing them.

THE COURT: Very good. I'll ask you to please keep time there. The courtroom deputy can please keep time.

MS. GUZMAN: Thank you very much.

I'm addressing a crowd to my right and to my left, so if you can't hear me, would you raise your hand and let me know?

Good afternoon, again. You've been here for quite a while. Let me reintroduce myself. My name is Maria Guzman, and I'm an Assistant United States Attorney, and I am here to really address an area or topic that hasn't been

addressed yet, so it won't be a lot of the same. It will be a little bit different.

As you know -- you don't know a lot about this case, but you do know, as has been advised to you by Judge Covington, the case involves drugs. It also involves accusations of money laundering.

One of the things or one topic that has not been addressed yet with you is one that I think is important, and I think it's very important that you be honest because, really, your answers to these questions are really all we know about you. We don't know anything else about you other than your answers. We know where you live in terms of the region that you live in; but other than that, we don't know much about you, your beliefs, your concerns. And this is really the only opportunity that the government and the defense is going to have to get to know you a little bit better.

So the one topic that I really wanted to raise with you is, in this case, there may be some evidence that involves people, individuals, testifying that either, one, have served as confidential informants -- I don't know, does everyone here know what a confidential informant is? Maybe I should say, does anyone not know what a confidential informant is?

A confidential informant would be an individual,

perhaps working with law enforcement in an undercover capacity, to assist law enforcement in getting some information about an individual -- another individual.

It is part of law enforcement on many occasions to use confidential informants. You've probably seen it on television or heard about it in the news or you just know about it.

What I would like to address with regards to a confidential informant or the use of confidential informants in the practice of law enforcement investigations is this:

Does anyone here have a problem or a concern that law enforcement in a given situation would have someone assist them in an undercover capacity who is not a police officer? Who is an individual assisting law enforcement but is not a police officer? Does anyone here have any concerns about that?

I believe, again --

THE COURT: Just because it's hard for us under the circumstances today to figure out who is who, please, if you know what seat you are in, what your number is, that would help us a lot.

MS. GUZMAN: Let me see if I can get the first one right at least. Let's see. If you are seated in 13, it's 112.

JUROR NO. 112: Correct.

MS. GUZMAN: Yes, I got it right.

THE COURT: You are putting me to shame there because I didn't do so well.

MS. GUZMAN: That's probably the only one I will get right.

So what are some of your concerns with regards to what I just said about the use of a confidential informant?

JUROR NO. 112: The problem I have is when you use an informant that is being used because they have a charge on them, they will give false information just to get the charge off. That is my impression. That's the way I feel about it.

MS. GUZMAN: Let me say this: Sometimes confidential informants can be used in a couple of different ways. You are correct. Sometimes they have been charged or been accused of a crime, and in order to help themselves, in a way, they will assist law enforcement because they actually have information that can assist law enforcement.

JUROR NO. 112: I understand that.

MS. GUZMAN: Now, I understand what you are saying; however, part of what you said was, well, they will provide false information. Would you agree with me, though, that sometimes they might very well provide truthful information?

JUROR NO. 112: Absolutely.

MS. GUZMAN: And that may be, because they are

involved in an illegal activity with someone, the only way that anyone would know was because they were involved in the illegal activity together. Would you agree with me that could happen?

JUROR NO. 112: Yes, I do.

MS. GUZMAN: And I appreciate you bringing that up because it is, obviously, something that is of concern to you. And I would ask the other members of what's left of our jury venire, does anyone else have similar concerns with the use of confidential informants? No one?

(No responses.)

MS. GUZMAN: And I would preface this by saying that any witness that testifies in any trial should be assessed for their credibility. So that's a different issue, that if you are selected as a member of the jury that will listen to this case, you will have to determine the credibility of any witness that comes in and testifies. Any witness whatsoever.

Whether it's law enforcement, whether it's civilian, or forensic, you'll have to make that determination. But is there anyone here who would simply preclude or not listen or believe the testimony of a confidential informant simply because they were a confidential informant? Anyone here?

(No responses.)

MS. GUZMAN: The second -- and I take that to mean that no one else has any other concerns or questions. Anybody have any questions about that.

(No responses.)

MS. GUZMAN: The other issue is that there could be testimony in this case, or any other case, that someone who comes to testify has not worked as a confidential informant but has plea bargained.

Does everybody know -- first of all, we use these words and we just figure you know what they mean. Does anyone here not know what a plea bargain is? Please be honest. If you don't know, that's okay. I'll try to explain it the best I can.

(No responses.)

MS. GUZMAN: Well, everyone seems to know what a plea bargain is, so this is a very smart jury. But I would just preface it by saying, a plea bargain can be someone who is accused of a crime and decides to accept responsibility for their participation in a crime but, in addition, provide information or cooperate against other people at trial.

Let's assume, hypothetically, that there are five people charged in a crime. It could be that one individual would then decide to plead guilty, perhaps, and then offer information against the other four. Does everyone understand that concept?

So assuming that one individual has accepted their responsibility, has then pled guilty to whatever their role was in the offense and then offered to testify against the remaining four, does anyone here have a particular problem with that type of testimony?

(No responses.)

MS. GUZMAN: Again, I guess it's difficult to assess these things in hypothetical form, but plea bargaining occurs -- plea bargaining can many times be a way of life, and the point that I'm trying to just address with all of you --

MR. MARTIN: Your Honor, I object. She's not asking questions. She's more or less making a speech.

THE COURT: All right. Go ahead. She's going to go ahead and ask a question now.

MS. GUZMAN: With the issue of a plea bargain, if a defendant -- if an individual were to testify in this case and there was information that that person had reached a plea bargain, is there anyone here who would have difficulty in assessing the credibility of that testimony simply because that person had plea bargained or cut a deal?

Okay. I believe -- let's see if I get a second one right. You are in seat 32 and you are 191?

JUROR NO. 191: Yes, ma'am.

THE COURT: Okay. Please tell me what your

concerns would be.

JUROR NO. 191: I guess it would be it just depends on the crime. If somebody wants to get off easy and want to go against the other people, I don't have a problem. I think they should all be the same. Because you want to get off easy, you go against the other people that committed the crime. I think I have a problem with that.

MS. GUZMAN: Okay. So if someone pled guilty -- what you are saying is, if someone pled guilty -- and I'm going to make sure that I understand. If someone pled guilty and as part of that guilty plea offered to cooperate against someone else, you would have a problem with that?

JUROR NO. 191: I think I would, because they probably get a lighter sentence than the other people. They all should get the same sentence.

MS. GUZMAN: Again, you would have to assess their credibility. But assuming they were providing truthful information, would that not matter?

JUROR NO. 191: I suppose.

MS. GUZMAN: And would it depend -- you said, depending on the crime. Would it depend on the type of crime?

JUROR NO. 191: I mean, somebody -- I mean, for instance, like you said, the crime -- depending what the crime is. I think they should all get the same sentence, not

just -- somebody killed somebody and all four of them participated, why does someone get a lighter sentence than the other person? You know?

MS. GUZMAN: Well, what if the situation was that there were two individuals and one person pled guilty and the other one did not but that person testified against them?

JUROR NO. 191: I don't think so, no.

MS. GUZMAN: Okay. Does anybody have any similar-type opinions as the juror that's in seat 32? Anyone else?

UNIDENTIFIED JUROR: I have a question. Will the jury be informed whether a plea bargain resulted in a reduced sentence for the person involved?

MS. GUZMAN: Again, not going into the facts of any case, I would assume -- I would assume -- and in my hypothetical I just addressed to you, yes, the jury would know.

UNIDENTIFIED JUROR: So we would have more complete knowledge. It wouldn't just be someone decided that a life of crime was not for them and, therefore, pled guilty. It would be the life of crime perhaps was not for them and they were incentivized to give further information and we would know that.

MS. GUZMAN: The jury would be made aware.

UNIDENTIFIED JUROR: Super.

THE COURT: Normally the jury and the judge have to rely on the questions that the lawyers ask. So those are questions that are up to the lawyers to ask either in direct examination or in cross-examination. So we hope that they cover the questions that we have and they are able to address those questions. But I think the fact that you raised it probably will put a seed in their mind that those are -- whether you are seated on the jury or not, that those are issues that they might want to address down the road.

MS. GUZMAN: Anyone else that has a similar type of concern or any other concern regarding either confidential informants or individuals that would have cut deals to accept responsibility and cooperate?

(No responses.)

MS. GUZMAN: Your Honor, if I may have just a moment.

(Discussion held off the record.)

MS. GUZMAN: Unless anyone has any other questions, I will give my time up to defense counsel. Thank you very much.

THE COURT: Thank you, Miss Guzman.

Mr. Martin, you have up to 20 minutes.

MR. MARTIN: Thank you, Your Honor.

Good afternoon, everyone. I'm not going to try to spin around. You guys are lucky; I'm no Brad Pitt. You will

all have to take it (indicating). Sorry about that. Somebody has to.

Some people came up to sidebar -- and I won't get into what they addressed, but some people addressed this question already. If you've already addressed it at sidebar, I don't need you to revisit it again. So you can just -- it's already been answered by you.

Okay. This is a drug case. Sometimes people deal with drugs and drug addiction of a family member or someone close to them and that has an effect on them, and I'm just asking any -- and it may affect how they view certain cases. I'm asking you, as a juror, if you have any -- it could be a family member, it could be a neighbor, someone close to you or whatever, but drugs have somehow affected your life.

I'll start with the first row. If you could, just raise your hand if it has. In a negative fashion. Okay. And that's a positive response. That is seat 5 and that would be 02-0034; correct?

JUROR NO. 034: Yes. It's my son. But, I mean, I feel it takes them saying no also. Nobody is forcing you to do it, and he's stopped --

THE COURT: We need to give you the microphone. I'm so sorry. We can't hear you. Tell us what juror number you are again.

JUROR NO. 034: No. 034.

THE COURT: Thank you.

JUROR NO. 034: It was just my son was involved in using drugs.

MR. MARTIN: How old is your son?

JUROR NO. 034: He's 36.

MR. MARTIN: Has it been resolved?

JUROR NO. 034: Yes, yes.

MR. MARTIN: Was it when he was younger and living with you?

JUROR NO. 034: No. Well, it started there, but he was late 20s, 30s. But I just view it, nobody is forcing them to do it. It's a decision that he made.

MR. MARTIN: Do you think that will have an effect on you in this case?

JUROR NO. 034: No.

MR. MARTIN: You are confident you can be fair and impartial?

JUROR NO. 034: Yes.

MR. MARTIN: Thank you, ma'am.

Anyone in the second row? How about the third row? That's a positive response from -- if you can give me your juror number.

JUROR NO. 008: No. 0008, seat 12. My ex-boyfriend overdosed and died from oxycodone while we were together. Oxycontin.

MR. MARTIN: How long ago was that approximately?

JUROR NO. 008: About 12 years. It's been a while, and I think I could be impartial still, but I wanted to let you know.

MR. MARTIN: Were you there with him when he actually overdosed?

JUROR NO. 008: No, I was not.

MR. MARTIN: Recognizing the whole purpose is to be fair and impartial, do you think that will, in the back of your mind, affect you in any way?

JUROR NO. 008: I mean, it's something that I think about. But I know my duty here, and I think I could put it aside for the job that I have here.

MR. MARTIN: So you are confident you can put that out of your mind?

JUROR NO. 008: Yes.

MR. MARTIN: Thank you.

Now the jurors to my right. Anybody in the first row? Anybody in the second row? Jurors to my left, anyone in the first row? Anyone in the second row?

That was a negative response from all those jurors.

Do any of you think you know anything about this case at all, prior to getting in here, other than what you've been told briefly, which is not evidence? In other words, do

you think you've heard about it anytime, anyplace? If anyone does -- I'll first look here. No hands are raised. To my right? No hands are raised. To my left? No hands are raised. So that would be a negative answer.

Do any of you sell items on the internet? To the right? Okay. And that's a positive response. And if you could, give your juror number, sir.

JUROR NO. 185: Seat 14, 185.

MR. MARTIN: What types of things do you sell on the internet?

JUROR NO. 185: Fishing gear. My wife sells a lot of stuff from -- she used to make sandals and stuff like that. Crafts.

MR. MARTIN: Okay. Thank you, sir.

Anybody to my right? Anyone to my left? That would be a negative response.

Judge, I have no further questions. Thank you.

THE COURT: Thank you. So let me just make certain, going through the schedules, of who has vacation plans, just so that we know as we work around this. Let's see, the gentleman who is going to Germany on June 10th, No. 97. Okay. 02-0097. You are leaving, let's see, June 10 th?

JUROR NO. 097: Monday.

THE COURT: You are leaving Monday, June 10th. I

believe that will be fine, without any issue at all.

There was somebody else who was leaving. Let me see. No. 0034. 02-0034. The lady from Tampa, insurance company, June 7th, leaving but will be back.

JUROR NO. 034: For the weekend.

THE COURT: So you are leaving on June -- is that the evening of June 7th?

JUROR NO. 034: Friday evening.

THE COURT: Friday evening and you'll be back Sunday evening?

JUROR NO. 034: Yes.

THE COURT: I believe that we will be finished by then, but I was just double-checking.

Anybody else here with vacation plans that I may have missed?

(No responses.)

THE COURT: Couple of other things. In criminal cases, such as this, the entire burden of proof is upon the government from the beginning to the end of the trial and this burden never shifts from the government to the defendant.

The defendant in any criminal case is presumed to be innocent until the government, by competent evidence, has shown his guilt beyond a reasonable doubt.

The presumption of innocence remains with a

defendant as to each and every material allegation in the Indictment until it has been met and overcome by the evidence beyond a reasonable doubt.

A defendant has a right not to testify, and no juror is allowed to hold this against the defendant or draw any adverse inference if the defendant exercises his constitutional right not to testify.

Does everybody understand that and everybody can follow that law?

(Unanimous affirmative responses.)

THE COURT: Is there anything anybody else wants to tell me? Any reason other than what you've already told me? I know some of you have child-care issues and other issues that I've got down.

Anybody else need to tell me anything else? Any other reason why you cannot give this case your undivided attention and render a fair and impartial verdict? I know some of you have already told me things at sidebar. I have that information. Anything that you've neglected to tell me?

(No responses.)

THE COURT: I'm going to excuse you. I think it's going to take us until 3:30, so I'm going to excuse you until 3:30. When you come back at 3:30, we will announce who's been selected for the jury. So that's our game plan. Actually, it's going to be 3:35 because we need half an hour.

I will see you back here at 3:35.

(The venire exits the courtroom.)

THE COURT: Folks, I want to decide what jurors we are going to excuse for cause to make certain that I can then -- they are asking me downstairs, can you excuse those other nine or ten which I'm holding onto, as well as the other ones that I initially set aside. I want to make certain we have enough here. So let's just go through which other ones we are going to excuse for cause.

Let's just see here. Hopefully my notes are okay. I've got the gentleman in seat No. 2 who says he's on some kind of drugs that might hurt his focus. Remember that? Number 02-0027. He's a waiter. He's single. Says he's on drugs, might hurt focus. Do you remember that?

MS. HOWARD-ALLEN: I do, Your Honor. That was his testimony, that he couldn't focus because of his pain, and I wouldn't object to a cause determination.

MR. MARTIN: No objection.

THE COURT: So I'm going to strike No. 2.

Anybody else in that first row for cause? Okay. The next one -- well, let's see here. I don't know, the lady in what was seat 11 then seat 78, 02-0124. The lady was in the military, criminal investigator. Her father was law enforcement. Here's what she said. She said -- who did I miss? I missed somebody. I'm going to come back to this one

in a minute, but let me talk about this one right now.

Best friend's brother -- best friend's brother, was it, or the son or somebody? Somebody related to her best friend, 18-year-old kid, got shot in a drug deal.

I mean, I think she kind of went back and forth on her ability to be fair. She said it hits close to home. She kind of went back and forth there. I'll just set that aside for a moment. She kind of went back and forth.

What else do we have here?

Moving to the last row, the lady from Winter Haven, brother had drug use, but I think she said she was okay. I mean, on this page, those are the only two I think I see. I don't know, the lady from Lakeland, kind of a close call there on whether it's for cause. I mean, she waffled back and forth there. I don't know.

What are your thoughts, Miss Howard-Allen?

MS. HOWARD-ALLEN: The others on that page I had in the waffling category, Your Honor.

THE COURT: Yes. I think I would keep her. Mr. Martin?

MR. MARTIN: I didn't think she waffled at all. She said her friend's son that was not shot, but murdered, and fairly recently, that she could not put that out of her mind and she kind of volunteered again and, oh, by the way -- I mean, it was almost like, oh, by the way, I told you

earlier I'm biased because I'm law enforcement. So I think she's clearly a challenge for cause.

THE COURT: No, she did say -- I've got it written right down here. Can't be fair; hits close to home. I mean, she kind of was rehabilitated, but probably not enough to make me feel comfortable. So I think I'm going to strike her based on what she said. That's No. 0124.

On that page, I don't have anybody else. I think the rest of them rehabilitated themselves enough. That one is a little too close for comfort.

All right. On the next page, there are two of them that concern me a little bit. Let's see. I don't know, the poor gentleman, I think we need to hold off on him. The gentleman that had the baby that was shaken. God bless him. I don't know what to do with him. We will just hold off on him, but you could see that he really feels he needs to be available for his son.

The gentleman who pointblank told us he wouldn't remember. I'm just taking what he says at face value. He says, I won't remember. That's the gentleman that is 02-0012, from Spring Hill.

Do you know who I'm talking about? Seat 13. The one who saw us at sidebar.

MS. HOWARD-ALLEN: Yes, Your Honor, he clearly said he had memory issues.

THE COURT: I think I have to get rid of him.

Is that okay with you, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay. I'm going to hold off on the gentleman who has the son who was shaken. Let's see where we are on numbers.

How about the gal whose grandfather went to jail? Did she say Ireland? Is that where it was?

MS. GUZMAN: Yes, Your Honor.

THE COURT: What do you think about her, Miss Howard-Allen?

MS. HOWARD-ALLEN: I think she said she was going to try to be impartial.

THE COURT: So she could be okay. All right. I think she ultimately did say that.

Mr. Martin?

MR. MARTIN: I agree.

THE COURT: Okay. I'm going to leave her on. Somebody can use a challenge.

Let's see. I don't think there was anybody else there. Let's see. There was somebody here who had a problem -- let's start with -- I don't quite know how to put this. No. 49, or 7, or 33, depending how you count it. 02-0018. I just think she needs to be excused based on --

MS. HOWARD-ALLEN: What number?

THE COURT: Well, it's 02-0018. I will tell you exactly why I think she needs to be excused. She had -- she just -- you know what I'm talking about? Had she just said -- as horrible as it is, had she just said her grandmother had been raped, I would have felt differently, but she said it was a black man who raped her grandmother, and this just bothers me.

MS. HOWARD-ALLEN: We have no objection.

THE COURT: I think she needs to be excused.

Mr. Martin?

MR. MARTIN: I agree.

THE COURT: Okay. I didn't want to go into that kind of detail, but it is jury selection. So I think she needs to be excused.

Let's see, No. 47, the gentleman from Port Richey. I know he's got -- this is the one that has the children in school; but now he's gone on and he says, see what drugs can do to people?

I don't know about the other gentleman whose daughter -- I didn't look that up. I need to. Let me just ask, could the courtroom deputy look up the case? See if there is a criminal defendant Alison Arnold. That's the other gentleman who said his daughter was a defendant.

What do you think about the gentleman from Port Richey who says, I see what drugs do to people, and who

has the two little kids he's worried about?

MS. HOWARD-ALLEN: Your Honor, I think he said enough when we were at sidebar that he could be struck for cause, Your Honor.

THE COURT: Yes, I think that's right. He couldn't be impartial. He did say that. I will strike him.

We are looking up this Alison Arnold right now. He did say -- the father said that he could put this all aside. Let's see, who do I have on the next page? Okay. Why did I write this down? On the next page, what was original 63 --

THE COURTROOM DEPUTY: Judge Whittemore.

THE COURT: It was in front of Judge Whittemore. Who was the prosecutor? Bob Mosakowski was the prosecutor, Miss Howard-Allen.

MS. HOWARD-ALLEN: That's who I thought it was, Your Honor.

THE COURT: Okay. When was that case prosecuted? It was indicted in 2004?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: Indicted September 30th, 2004. What happened? Did she plead?

THE COURTROOM DEPUTY: Yes, plea agreement.

THE COURT: She pled guilty right away. She pled to an Information in 2004.

All right. Who was the other person I had a problem with? There was somebody on the next page I had a problem with. 20-195. Doesn't know if can be fair. She waffled a little bit. Maybe she's okay; maybe she's not.

Miss Howard-Allen?

MS. HOWARD-ALLEN: What seat?

THE COURT: No. 63 originally. Last thing I have here is, doesn't know if can be fair. I think she was rehabilitated enough, to tell you the truth. That's what I have written.

MR. MARTIN: If I may, Your Honor, she was the one, although it's different, it was child sexual abuse, but her sister -- she had just discovered her sister went through the same thing and that discovery was less than a month ago.

I got the feeling that although it's a different case, a predator is a predator. So I would ask that she be challenged for cause, and part of it is it's so fresh. It's not a year ago. It's three or four weeks ago that the recalling of everything in the sister.

THE COURT: Let me just count up my numbers here.

What do you say, Miss Howard-Allen?

MS. HOWARD-ALLEN: I do agree that it was fresh. She also has travel plans.

THE COURT: I'm going to excuse her. I have counted up the numbers. And we can excuse the gentleman who

said that his son, while he was a baby, was shaken by a baby-sitter.

MS. HOWARD-ALLEN: I think that's 14.

THE COURT: Are you okay with doing that, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: And you are okay, Miss Howard-Allen?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: I'm going to excuse him.

That's still enough. Now we are at 36, I think. Yes, I think so. I don't know. I've counted them up. I think we are okay. All right. So let's decide who is still in the pool, and I'll give you a few minutes. Just please catch me if I'm wrong.

So I'm going to go through who's in the pool. In other words, these people have not been excused. No. 1, 02-165 is still in the pool.

If I don't hear anything, I'm going to assume I'm okay.

No. 3, 02-0020, still in the pool. No. 02-0162, still in the pool. That's it for the first row.

Second row, still in the pool: 02-0034, 02-0047, 02-0022. That's right so far? Last row: 02-0076, 02-0050, 02-0008. Correct? All right. That's the first page.

MS. HOWARD-ALLEN: I think 0297 is also still on.

THE COURT: That poor guy. I keep on excusing. I accidentally wrote the line for it. Yes, 02-0097 is still in. I have it written in red, not excused.

Okay. Thank you. Next page. 02-0198 is still in. Next line, 02-0148, 02-0113, 02-0067, 02-0045, 02-0093, 02-0207.

All correct on that? All right.

THE COURTROOM DEPUTY: Judge, I didn't hear you say this person.

THE COURT: Did I not say 02-008? Did I leave that one out?

I'm on Page 3. 02-0146, 02-0123, 02-0208, 02-0104, 02-0080. Remember, that's the lady who has Lupus, but I didn't hear too much from her, but that's the lady who takes medication for Lupus.

Now, 02-0127, 02-0014, 02-0187, 02-0118, 02-0144, 02-0155, 02-0059. Did I release the next lady? I think I did. Did I? I have it crossed out.

MS. HOWARD-ALLEN: No. 54? No.

THE COURT: No. 53. I have it crossed out and then I put, you made a mistake.

MS. HOWARD-ALLEN: No. 54.

THE COURT: No. 0054, I can't tell what I did.

MS. HOWARD-ALLEN: I believe we did due to financial hardship.

THE COURT: We did kick her out. Thank you.

MS. HOWARD-ALLEN: I think that was a he.

THE COURT: Then we have 02-0119, 02-0139, 02-0062, 02-0209, 02-0009, 02-0106, 02 -- wait a minute. Who is the one who was sick? I already crossed her out. Never mind. 02-0037. That's what I have.

All right. So why don't you take a few minutes. Tell them -- we need to tell Nona to tell them it's going to be -- it's not going to be at 3:35. It's going to be at 3:45.

MS. HOWARD-ALLEN: I want to make sure No. 37 is in. I believe that one is in. 0054.

THE COURT: Well, I don't know. I've got it crossed out and then I said, in.

MS. HOWARD-ALLEN: She was in. I apologize. I thought you were talking about the one next to it.

THE COURT: She's in.

MS. HOWARD-ALLEN: Correct.

THE COURT: This is what happened. When I make a mistake, then I get confused. So, yes, she's in. No. 53 is in.

MS. HOWARD-ALLEN: I think the only other one that we thought that you might have missed was 18, 071. I don't think you read him, but he is in. No. 18. I thought you missed reading that one.

THE COURT: I may have. Let's see. What's the

rest of the number?

MS. HOWARD-ALLEN: His number is 0071.

THE COURT: Give me a second. I see that there. That was another mistake. Yes, he is in. Thank you. He's in.

The three that I had messed up on, because I made a mistake on my notes, were the gentleman who is the professional engineer in seat 12, 02-0097. He's in. The lady in seat, originally, 53, 02-0054, she's in. And the gentleman in original seat 30, then 18, 02-2071, yes, he's in. You have plenty to choose from.

If you need to step out or something for a few minutes, that's fine.

(Brief pause.)

THE COURT: I think we should probably go ahead and get started. I've counted up again. We have enough of a cushion, and I think we have about seven or so. That's assuming you use all of your challenges.

Who was the lady, No. 42, 0080? This is the lady who has Lupus. I'm not certain exactly what Lupus is. I know I've heard of the disease. I think it causes you pain. I think it's, in essence, when the body attacks itself. I'm not certain precisely what it is, but I believe that's what it is. Some kind of -- sort of like fibromyalgia, but I'm not exactly certain. I know there is pain medication for it.

I don't know if we want to excuse her or not. She said she did have pain and she has Lupus, but she's on medication for it. Well, when we get to her, you can let me know.

MS. HOWARD-ALLEN: Your Honor, are we picking alternates?

THE COURT: We are going to pick two alternates. So what we will do is, the defendant has ten challenges and the government has six, okay, and two alternates. When we get to that, we will give you each one.

So my numbers are a little bit off. I think that will be an extra one each, but I think we will still be okay.

The first person that I have is 02-0165, No. 1. And remember, no backstrikes. So, Miss Howard-Allen, is she okay?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: We use a challenge.

THE COURT: Let me make my notes. This is your first one. Defendant one.

Okay. I think the next person I'm going to is No. 3, 02-0020, from Bradenton. Mr. Martin, acceptable?

MR. MARTIN: Yes, Your Honor.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: We will be using a peremptory, Your Honor.

THE COURT: Miss Howard-Allen, next I go to No. 5, 02-162, from Valrico. Is that person acceptable? Is he acceptable?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: That's No. 1.

Mr. Martin, 02-0034, from Tampa, No. 7.

MR. MARTIN: Acceptable.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: Yes, that's fine, Your Honor.

THE COURT: That's No. 2, Miss Howard-Allen, 02-0047, from Lakeland.

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: Use a peremptory, Your Honor.

THE COURT: That's No. 2.

Mr. Martin, No. 10, I think it is, 02-0022, from Temple Terrace.

MR. MARTIN: Acceptable.

THE COURT: All right. Miss Howard-Allen?

MS. HOWARD-ALLEN: We would use a peremptory, Your Honor.

THE COURT: That's your second.

Miss Howard-Allen, No. 12, 02-0097.

MS. HOWARD-ALLEN: I think we are at No. 9, Your Honor.

THE COURT: Gosh. I don't know. He's 02-0097.

MS. HOWARD-ALLEN: Oh, yes, I'm sorry. That's acceptable, Your Honor.

MR. MARTIN: Use a peremptory, Your Honor.

THE COURT: That's right. That was yours. Thank you. So you are using -- that's your third one. Okay.

Now, moving on to Miss Howard-Allen, No. 15, 02-0076, from Winter Haven.

MS. HOWARD-ALLEN: That's acceptable, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: Peremptory.

THE COURT: That's your fourth.

Mr. Martin, No. 16, 02-0050, from Tampa, the IT gentleman.

MR. MARTIN: Acceptable.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: All right. That is No. 3.

Miss Howard-Allen, No. 17, 02-0008.

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: Mr. Martin.

MR. MARTIN: Peremptory, Your Honor.

THE COURT: That is your fifth. Okay.

Mr. Martin, No. 23, 02-0198, from Parrish.

MR. MARTIN: Acceptable, Your Honor.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: Acceptable.

THE COURT: Okay. That's No. 4.

Miss Howard-Allen, No. 27, 02-0148, from Tampa.

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: Acceptable, Your Honor.

THE COURT: That's No. 5.

Mr. Martin, 02-0113, No. 28, from Tampa.

MR. MARTIN: Acceptable, Your Honor.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: That's No. 6.

No. 30, 02-0071, from Lakeland, Miss Howard-Allen?

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: All right. Mr. Martin?

MR. MARTIN: Acceptable, Your Honor.

THE COURT: Let me just see here. That's No. 7.

Mr. Martin, No. 31, 02-0067, from Riverview.

MR. MARTIN: Peremptory, Your Honor.

THE COURTROOM DEPUTY: That was juror No. 8.

THE COURT: That was juror No. 8? He just used a peremptory. I'm sorry. Did I mess up? 02-0071, that was

juror No. 8.

THE COURTROOM DEPUTY: Is that 7?

THE COURT: Not by my calculations. Go back and check, but not by my calculations.

MR. MARTIN: I have it as juror 7.

MS. HOWARD-ALLEN: I have 7, as well.

THE COURT: That's what I have, 7. Let her check to make certain we haven't made a mistake. Juror 28 is 6.

Where were we? I got lost. So No. 7 is okay? So No. 31, 02-0067, you are using a peremptory challenge?

MR. MARTIN: Yes, Your Honor.

THE COURT: That's your sixth.

Miss Howard-Allen, No. 32, 02-0045.

MS. HOWARD-ALLEN: We would use a peremptory, Your Honor.

THE COURT: That's your third.

Mr. Martin, No. 33, 02-0093.

MR. MARTIN: Acceptable, Your Honor.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: All right. That's No. 8.

Miss Howard-Allen, No. 34, 02-0207.

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: Acceptable, Your Honor.

THE COURT: That's No. 9.

Mr. Martin, No. 35, 02-0146, from Auburndale.

MR. MARTIN: Peremptory, Your Honor.

THE COURT: Are you using a peremptory on 02-0146?

MR. MARTIN: Yes, Your Honor.

THE COURT: That's your seventh.

Miss Howard-Allen, No. 36, 02-0123.

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: Mr. Martin.

MR. MARTIN: Peremptory, Your Honor.

THE COURT: Okay. That's 8.

Miss Howard-Allen, No. 38? Mr. Martin. I'm sorry. Mr. Martin, No. 38?

MR. MARTIN: Acceptable, Your Honor.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: We would use a peremptory, Your Honor.

THE COURT: Okay. That's four.

Miss Howard-Allen, No. 39.

MS. HOWARD-ALLEN: Acceptable.

THE COURT: Mr. Martin?

MR. MARTIN: Acceptable, Your Honor.

THE COURT: That is No. 10.

All right. What do we want to do with the lady with Lupus? We have -- let me tell you how many -- if we set

her aside, I'll tell you what we have. We have one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen. Fifteen available.

You can calculate by your challenges. The defendant has, let's see, two more, I think, and the government has -- let's see, you get six, so you have two more also. We are on No. 10. Plus you each get a challenge for the alternate.

Do we want to excuse her? She sounded like she was more or less okay, but she does have Lupus. What do you want to do, Miss Howard-Allen?

MS. HOWARD-ALLEN: I was just trying to calculate. Do we have enough with the two peremptories and picking 14?

THE COURT: I think we do. I think we do. Well, we only have -- we have two more.

MS. HOWARD-ALLEN: I think we have nine left for five more spots, by my calculations.

THE COURT: So there could be six challenges, including the alternates, and we need to seat 10. I need to have 10. We have enough. I think we have enough.

MS. HOWARD-ALLEN: I think she went back and forth, but she did say it was hard to sit, I think, due to her Lupus, even though she was getting surgery on the 20th.

THE COURT: Mr. Martin, what do you want to do?

MR. MARTIN: I hate to say this. I could care

either way.

THE COURT: I'm going to let her go. When somebody brings it up, if I can accommodate them, I will. So I'm going to excuse her for cause, No. 42, because of the illness she identified.

We have ten, so that brings us -- we are now on 43. It's 0127. Who did I go with last? I don't remember.

Miss Howard-Allen, 43, is she acceptable?

MS. HOWARD-ALLEN: Yes.

THE COURT: Mr. Martin?

MR. MARTIN: Peremptory.

THE COURT: I think that's nine.

MR. MARTIN: I agree, Your Honor.

THE COURT: Mr. Martin, No. 44.

MR. MARTIN: Acceptable, Your Honor.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: I think -- one moment, Your Honor. I think we will use a peremptory on that, Your Honor.

THE COURT: Okay. That's five.

Mr. Martin, No. 45, 02-0187.

MR. MARTIN: Acceptable.

THE COURT: All right. Miss Howard-Allen?

MS. HOWARD-ALLEN: That's acceptable, Your Honor.

THE COURT: Okay. That is No. 11.

Miss Howard-Allen, No. 46, 02-0118.

MS. HOWARD-ALLEN: Acceptable, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: Acceptable, Your Honor.

THE COURT: All right. That's No. 12. That's our jury. So we are going to pick two alternates. I think two alternates because it's a two-week trial. So, Mr. Martin, No. 50, 02-0144, is he okay?

MR. MARTIN: Yes, Your Honor.

THE COURT: Miss Howard-Allen?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: That's alternate No. 1.

Miss Howard-Allen, No. 51, 02-0155, acceptable?

MS. HOWARD-ALLEN: Your Honor, I believe that's acceptable. I wasn't sure if she got paid. I thought there was an issue about that.

THE COURT: Is this the lady who works at Bealls?

MS. HOWARD-ALLEN: No, some call center, Thursday through Sunday, is what I have.

THE COURT: Call center agent. She didn't say anything to me that I can remember, but we got plenty more. If there is an issue ...

I have one, two, three, four, five, six, seven, eight, nine, ten left. So if you have any worries about her, we can let her go and go to the next one.

MS. HOWARD-ALLEN: She wasn't sure she would be

paid, is what my notes say.

THE COURT: Let's see here. Are you okay with excusing her, Mr. Martin?

MR. MARTIN: I'm okay. My notes don't reflect it, but I don't have a problem.

THE COURT: Let's excuse her, then, if there is a doubt about her being paid.

Next person up is No. 52, 02-0059, special ed. counselor.

MS. HOWARD-ALLEN: We don't have an objection.

THE COURT: Are you okay with her, Miss Howard-Allen? How about you, Mr. Martin?

MR. MARTIN: Okay, Your Honor.

THE COURT: That is alternate No. 2.

So here's who we have:

No. 1, seat 5, 02-0162. No. 2, in seat 7, 02-0034. No. 3, in seat 16, 02-0050. No. 4, in seat 23, 02-0198. No. 5, in seat 27, 02-0148. No. 6, in seat 28, 02-0113. No. 7, in seat 30, 02-0071. No. 8, in seat 33, 02-0093. No. 9, in seat 34, 02-0207. No. 10, in seat 39, 02-0104. No. 11, in seat 45, 02-0187. No. 12, in seat 46, 02-0118. Alternate No. 1, in seat 50, 02-0144, and alternate No. 2, in seat 52, 02-0059.

Are we all okay with that jury?

MR. MARTIN: Yes.

THE COURT: Okay. All right. So first of all, let me just tell the courtroom deputy, the people downstairs can be excused except for the people on this jury. They all need to come back in. The extras that I had downstairs, tell them thank you for their service.

I am not even going to swear them in today or do anything today. We are just going to start tomorrow at 9 o'clock, because I've got a sentencing at 4.

(The venire enters the courtroom.)

THE COURT: Thank you, ladies and gentlemen. I know it has been a very long day, and I really appreciate your patience, but we are now ready to announce our jury. I will make eye contact with you when I call your number out just to make certain I know who you are and that I've called your number. The rest of you need to go back down to the third floor, and I thank you all for your patience in working through with me since I was uniting two groups. It was a bit of a challenge, so I appreciate it.

No. 1, 02-0162, from Valrico, you are on our jury. 02-0034, from Tampa, you are on our jury. 02-0050, from Tampa, you are on our jury. 02-0198, from Parrish, you are on our jury. 02-0148, from Tampa, you are on our jury. 02-0113, from Tampa, you are on our jury.

02-0071, from Lakeland, you are on our jury. 02-0093, from Tampa -- back there. Is that you? Thank you.

You are on our jury. 02-0207, from Largo, you are on our jury. 02-0104, from Land O' Lakes, you're on our jury. 02-0187, from Ruskin, you are on our jury. 02-0118, from Sarasota, you are on our jury.

02-0144, from Auburndale -- 02-0144. I think that's you, sir. You are on our jury. 02-0059, from Tampa, you are on our jury.

The rest of you, please go downstairs to the third floor. Those of you whose numbers I've called out, just stay for one minute. Thank you.

(The venire exits the courtroom.)

THE COURT: Thank you for your patience. Please be seated.

We have gone on longer than what I wanted to do. Couple of things. First of all, we are going to try -- here's what I will do. We can deliver the orders ourselves later on. We don't need to give it to them. We can deliver it to the court security officer.

I want you to be able to bring your personal electronic devices into the courthouse tomorrow, so that is iPhones, somebody has a laptop, but I'm going to give you an instruction in a minute. IPads. All that stuff. It's going to say "electronic devices." You can bring it into the courthouse tomorrow.

You have not heard anything about this case. You

haven't even heard any evidence. You haven't received any instructions, but you've heard some names and you've heard some witnesses' names and you've been introduced to some of the -- you've been introduced to the parties and you've heard my name.

I'm telling you as an instruction, do not Google or do any independent research on anything that you have heard today; on any of us, on what you think the case is about.

Does everybody understand that?

(Unanimous affirmative responses.)

THE COURT: I'll tell you what, I'll sum up what the instructions say. The instructions that I will read to you tomorrow are that somebody's interpretation of what occurred or didn't occur is not what counts. What counts is what you hear here in the courtroom.

If we had longer -- well, I will tell you my own personal incident with doing research on a legal issue on a neighbor's fence. When I Googled it, just to see what it said, I got one result. When I did the correct legal analysis and the correct legal research, I got another result. You cannot trust the internet. Some things are correct and some things are not correct.

If we had more time, I would give you the ten-minute version, but I'll tell you right now in 30

seconds.

Do not do any of that research because you cannot trust anything on the internet. Because it's late and I don't want you to have to sit and wait, and I have another matter to take up now, we will have those orders downstairs with your names on it.

We will deliver it to the court security officer; and when you come in in the morning, we will give you each a copy of it, but you will be able to bring in all of those devices. If anybody has any problems downstairs, please, please, please call up to us and I will call down to the court security officer, because normally I hand you those orders today.

No. 2, we will do orders to your employers, if you need it, saying that you will be in a two-week trial. I have every reason to believe that this trial will be finished by June 7th, and I will do everything that I can, within reason, to finish it. There are some days we will stop at 4, like today, because I have another matter to take up, and that will happen periodically.

I already know what some of those days are. When I have more time I will explain to you the days where I've got a little bit more. Please feel free to bring coffee, soft drinks, water into the courtroom. It is perfectly fine. We have a coffee machine there; but if you like to drink

Coke, Diet Coke, tea, whatever, please bring it in.

I think that's all I've got quickly to say. But what I will need is, I will need the name and an e-mail of your boss or an employer. I can't get it today to you, but I will be able to -- we will e-mail those letters out first thing in the morning, as soon as we get that from you.

If you have a problem and you cannot get here on time, please call the courtroom deputy. Do not call the jury people because they are away from their desks and they are tied up with other things. You've got to call Tamecika Lee.

And, Tamecika, can you give them a phone number or something?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: So she will give you a phone number, but that's what you need to do. You need to call, because if you are tied up in traffic, we won't know. We won't know, and we will be sitting here waiting. And that's happened before.

You can bring -- we have a refrigerator. You can bring, you know, frozen dinners. You can bring sandwiches. Whatever you want to bring.

Does anybody have any questions?

(No responses.)

THE COURT: Okay. Please remember, do not do any independent research. Do not discuss this with your

significant other, neighbors, friends. Do not say, oh, I'm on a, you know, jury, and X, Y, Z are the allegations. Please, please, please don't do that.

Yes, sir.

UNIDENTIFIED JUROR: About the letter for your boss, when I get a paper form, it has to be, like, e-mailed because HR is the one that does it.

THE COURT: What?

UNIDENTIFIED JUROR: HR is actually the one that needs it, not my boss.

THE COURT: I can either -- if you leave it for us now in there, we will try to get it today. If not, it will be first thing in the morning, but you need to tell us who to send it to. We won't know.

UNIDENTIFIED JUROR: Can I give it to you tomorrow?

THE COURT: Of course. We will get it out within 15 or 20 minutes of your telling us.

UNIDENTIFIED JUROR: The problem for me, I need to put it in the system to request it. Just giving it to him probably will not have too much importance. If they can, send it in PDF format and I can put in the system.

THE COURT: I'm happy to send it to you in PDF. I normally do it that way in an e-mail and attached as a PDF. If you want me to send it to you, I will do that. If you

want to leave your e-mail on a piece of paper today, we will do it first thing in the morning.

Anybody wants to leave -- I'll tell you what. In the little jury room over there, if you want to leave that with your name and an e-mail, then we will work on it and get it out first thing in the morning. We just can't get it today. Maybe after 5 o'clock we can. I don't know.

But she's working on the letter, and so this is the order (indicating). I think she's almost done. So, yes, I think if you've got it -- she worked very fast and did the order, so I think we have that. It says, "electronic devices." You're not limited to an iPhone.

I will let you bring it in there, as opposed to locking it on the third floor. But I have to have everybody's word that you're not going to use it.

Until about two years ago, jurors were not allowed to bring electronic devices into the courthouse. Do I have everybody's word that you're not going to use your iPhones to do any research, or electronic devices? Over here?

(Unanimous nods by the jurors.)

THE COURT: Okay. Then you all can have it in there. You do not need to lock it up on the third floor. There is a locker there. You can lock it up. But, otherwise, I'm going to let you keep it in there. So when you come up, if you have work to do, you can continue to do

work, until you have to come into the courtroom, during the break. Otherwise, you have to go down to the third floor, which is fine, too. There are lockers there.

All right. Any questions from anybody?

Yes, sir.

UNIDENTIFIED JUROR: What's the lunch arrangements?

THE COURT: Well, unfortunately, we don't pay for lunch. You will need to either go out to lunch or you can bring a sandwich or a frozen meal. There is -- I believe, we have a little refrigerator there.

COURT SECURITY OFFICER: And a microwave and toaster.

THE COURT: There is also that on the second or third floor. And we have coffee. There isn't much else here. It's pretty bare.

UNIDENTIFIED JUROR: How long of a lunch break typically?

THE COURT: Normally an hour. We will begin at 9 a.m. Let me see if I have anything tomorrow. I don't think I do. I think tomorrow is a regular day.

We are going to end, though -- I have something else at 4 o'clock tomorrow. So tomorrow we will end at 4. Tomorrow we will not go until 5. Tomorrow we will end at 4. We will begin at 9 a.m. We will take a break in the

mid-morning, like at 10:30. We will take another break in the mid-afternoon. Probably a shorter break since we are ending at 4, and we will take an hour for lunch.

UNIDENTIFIED JUROR: Tomorrow, when we come in, just come right in here?

COURT SECURITY OFFICER: I'll show you where to go.

THE COURT: But you will need to show this order that either we are going to give to you. And this is filed -- by the way, since your names are on it, this is filed under seal. So since we don't publicize jurors' names, it's filed under seal, but it has your names on it. You will know each other's names that are on it. That's what we will hand to them downstairs. But I think she was able to do it.

This is a little bit different because it says you can only use it on the third floor. We will need to change it, because I let you use it up here. Just not to do any research.

Okay. Well, I'm giving them the specific permission -- you know what? I've just given them the specifics. It's all ready. You can leave that language in there. I'm giving them specific permission. So it's okay. The language says you can only use it on the third floor, unless you are given specific permission from the judge. I'm giving you specific permission to use it there (indicating).

So, this is the 14th floor little jury room, or the third floor. Those are the two places you can use your equipment. You do not need to keep it locked up.

Okay. I think that's it. Yes, sir.

UNIDENTIFIED JUROR: What's the protocol for alternate jurors?

THE COURT: That will be something that we will cross that bridge when we are ready to begin our deliberations.

Anything else?

UNIDENTIFIED JUROR: Is this signed today or timestamp?

THE COURT: I don't normally sign it, no.

COURT SECURITY OFFICER: If all the jurors want to come into the jury room, I will explain to you everything.

THE COURT: Thank you. We will see you all tomorrow morning at 9 a.m.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 4:13 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Anything else that I need to take up today, Miss Howard-Allen?

MS. HOWARD-ALLEN: I don't think so, Your Honor.

THE COURT: Okay. So how about your side, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: What we will do is we are going to begin at 9 o'clock. Then what I will do is I will swear them in. I'll read them the preliminary instructions. Then you'll be ready with your witnesses tomorrow morning?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Okay. We are only going to go to 4 because I have a sentencing at 4 p.m.

MS. HOWARD-ALLEN: Your Honor, there are a number of business records that I spoke with Mr. Martin about that I'm going to admit at the beginning of our case before we call the first witness.

I think I had spoken to you at status conferences about the need to substitute -- we are going to put in photographs of the drugs, along with the drugs, and so those will both be admitted and, obviously, the drugs will be removed at night and won't be back -- they will be admitted in trial, along with the photograph of them with the exhibit tag, but that's not going to go back -- the drugs can't go back to the jury room.

THE COURT: Oh, I know. No, no drugs in the jury room. That's for sure.

MS. HOWARD-ALLEN: Your Honor, what is your policy -- we have a number of transcripts that we have synced with the video. Are the transcripts put into -- admit into

evidence in your courtroom or are they demonstrative?

THE COURT: I've done it both ways. If you have a preference one way or the other. I've done it both ways.

MS. HOWARD-ALLEN: We will ask they be admitted, then, at that time.

THE COURT: Then I'll hear from Mr. Martin when we get to it. However you feel, Mr. Martin. If they are matters that we need to take up, we ought to meet a little bit before 9 o'clock.

MS. HOWARD-ALLEN: Those were the only issues, and I had spoken with Mr. Martin about all of them.

THE COURT: Mr. Martin, you let me know tomorrow morning about the transcripts, because I think I said in there it's just to help you read along. I think that's what it says.

MS. HOWARD-ALLEN: I think that's what the instructions say.

THE COURT: I think we are okay. If there are any interns -- are you an intern in the back? You can come sit up front so you can see better, where my interns are. If you want to come watch tomorrow, that's where you can sit so you can see better.

All right. Thank you. We are in recess.

(Proceedings adjourned at 4:16 p.m. and reconvened on May 29, 2019.)

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 216), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ *Scott N. Gamertsfelder*, *RMR, FCRR*

*Official Court Reporter*

Date: January 20, 2020