UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Tampa, Florida |
| | ) | |
| Plaintiff, | ) | No. 8:18-cr-236-T-33TGW |
| | ) | |
| | ) | Docket No. 186 |
| vs. | ) | |
| | ) | May 29, 2019 |
| DION GREGORY FISHER, | ) | |
| | ) | |
| Defendant. | ) | Courtroom 14B |
| | ) | |

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

(Vol. II of VII)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Kenneth B. Martin, Esq.**
Law Office of Ken Martin
P.O. Box 10456
Tampa, Florida 33679
(813) 431-3310

**ALSO PRESENT:**

Adam Phelps, DEA Case Agent

Robert Liberto, IRS Case Agent

\- - -

## TABLE OF CONTENTS

### EXAMINATIONS


| GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRIAN ZDROJEWSKI | 37 | 74 | 81 | |
| SAMUEL B. HUFFMAN | 86 | 144 | 151 | |
| ELIZABETH ADKINS | 154 | 167 | | |
| JAMES KING | 172 | | | |
| DANI KULIC | 193 | | | |

(Witness Kulic resumed on May 30, 2019.)


### EXHIBITS


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 1 through 5............. | 42 | 8 |
| 110, 110A, 110B......... | 48 | 12 |
| 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 124, 125, 126, 127, 129, 130, 131, 132, 133, and 134 ........... | 49 | 20 |
| 221, 221A, 222, 222A, 2224, 224A, 225, 225A, 226, and 226A .................... | 68 | 17 |
| 304, 307 ............... | 176 | 11 |

**ADDITIONAL INDEXING**


| | PAGE | LINE |
|---|---|---|
| Juror oath administered...................... | 12 | 5 |
| Initial Jury Charge.......................... | 12 | 7 |
| Government's Opening Statement............... | 22 | 6 |
| Defense Opening Statement.................... | 34 | 8 |


- - -

**P R O C E E D I N G S**

May 29, 2019 9:01 a.m.

\- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good morning, everybody.

We're still three jurors short.

MR. MARTIN: Your Honor, while we're waiting I have one issue I wanted to bring up to the Court.

THE COURT: Of course.

MR. MARTIN: I brought it up to Miss Lee. I don't know if she talked to you about it. As you know, I'm appointed. My client Mr. Fisher is indigent. He no longer has a ride home from court. So he's asked me to request to ask the Court could he get cab fare or some arrangements to help him get home. He has a ride to court, but not from court.

THE COURT: Well, I know how challenging that's got to be, but, no, we don't -- no, I'm sorry to say this, he can be taken into custody and the marshals would provide the transportation, but I don't believe there's any resources available for that.

Are you aware of any, Miss Howard-Allen? I don't know.

MS. HOWARD-ALLEN: No, Your Honor. When Judge Wilson granted him home detention, it was with the agreement that he would come to court when necessary.

THE COURT: There aren't any resources available for that.

(*Brief pause*.)

I'll just tell you one more thing since I always tell you what jurors -- send me notes and they have questions, so I'll tell you what juror this is. This is the lady in seat No. 2, who had the problem with Friday. So now it's earlier on Friday.

Initially, the best of my recollection, it was to leave Friday after the close of business, and since I believe I have a sentencing at 4 p.m. on Friday, I wasn't too worried about it. Now she's saying that she wants to leave by 2 p.m. on Friday. And she forgot to say that her husband does drug testing, federal and state employees. Just for our information.

So here's what I would do. I would let it ride for the time being, and we can see where we're at. That's three hours early. One other possibility is, had I known about this yesterday, I would have moved the sentencing that I have today at four to Friday and just kind of do one right

after the other, but I'm hearing about it now for the first time. I don't think I can do that for a 4 o'clock sentencing today.

I would just let it ride, but I wanted to let you know there's a note. Kind of let me know later on what you all think about it.

COURT SECURITY OFFICER: She told me the latest at 3.

THE COURT: If possible, leave by 2, at the very latest by 3. That's what we're looking at. I just wanted to let you all know. You don't have to tell me right now. You can think about it. Okay.

We're still waiting for somebody, Nona?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Not that I'm the model of punctuality, but --

MR. MARTIN: While we're waiting, if I could ask one other question of the Court. I filed a search motion, docket 111, which was denied and I understand that.

THE COURT: What kind of motion?

MR. MARTIN: It was a search and seizure motion which was denied regarding -- I'm not trying to relitigate it. I'm just asking the Court --

THE COURT: Let me just pull it up. Because I'm not exactly following you until I have it up in front of me.

Okay.

I'm sorry, it was docket what now?

MR. MARTIN: It was 111. That was the actual motion.

THE COURT: Oh, yes. A motion to suppress, sure.

MR. MARTIN: Do I need to renew what when the items come in from that search?

THE COURT: I don't think so.

MR. MARTIN: I just wanted to make sure. So the issue is preserved?

THE COURT: I would think so, yes. I mean, despite the fact that I spent three years on the state appellate court, I don't always know all of the preservation issues.

But I think that if you filed a motion for -- is he okay? He's got his head back. Can you sit up, please. I mean, it's not a movie theater. You have to sit up and not relax like you're in an easy chair.

Anyway, no, I don't think you need to do something else to preserve it. I think that you have preserved it by filing that motion to suppress. I don't think you need to object again when the evidence comes in.

Do you agree with that, Miss Howard-Allen?

MS. HOWARD-ALLEN: I'm not an appellate attorney either.

THE COURT: Well, if we tell him it's sufficient, I don't think the government could turn around and say, oh, you didn't preserve your issue. I think that by virtue of the fact that he objected to it, he's fine. I don't want to put you on the spot that way.

MS. HOWARD-ALLEN: No, I don't have any idea. I wouldn't opine one way or the other without an appellate lawyer giving me advice.

THE COURT: Well, look, I don't want to put her on the spot. So you need to do what you need to do, Mr. Martin, to preserve the issue. I'm not positive either.

My inclination is to think that it's preserved, but I'm not positive and I can't give you that assurance without her agreeing to that. I mean, it's unfair to her. She's not an appellate lawyer either.

So if you feel you need to preserve it, then you should object, and she can -- and then I'll rule on it.

MR. MARTIN: I understand. I'd just prefer not to continue that in front of the jury since it's really already been ruled on.

THE COURT: I mean, I think you're okay. I'm not a hundred percent positive that it's preserved. I would say that I'm probably 99 percent certain, but not 100 percent. So I don't want to tell you that and then be wrong and, you know, have an appellate court tell us we're both wrong.

MS. HOWARD-ALLEN: Certainly, Your Honor, if he wants to make that objection, I have no problem going to sidebar so he can do so if that's -- if -- when that evidence is.

THE COURT: How about that?

MR. MARTIN: Thank you, Your Honor.

THE COURT: You're welcome.

Did we hear from the juror who's late? Have we heard anything? Did we get a phone call from somebody?

THE COURTROOM DEPUTY: There are three of them. Two of them, one was stuck in traffic, one forgot his glasses in the car. And the third --

THE COURT: Because I haven't heard anything from anybody. Have they called?

THE COURTROOM DEPUTY: One contacted us. His glasses was in the car, and he asked if he could get it because he couldn't see. But that was 8:45. So he should be walking in any minute.

The other guy was stuck in traffic. He thought he was going to make it at nine, but he said he may be a little late. The third person I have not heard from. But I see the phone was ringing. Someone is on the line.

THE COURT: Can we call the third person.

(*Brief pause.*)

COURT SECURITY OFFICER: We have two that have

come in. The one is stuck in traffic.

THE COURT: We're still waiting on the one?

COURT SECURITY OFFICER: Just the one stuck in traffic.

THE COURT: Do we know where that person is?

COURT SECURITY OFFICER: They said he's coming from Valrico, but I don't know where he's at.

THE COURTROOM DEPUTY: His phone is going straight to voice mail now.

COURT SECURITY OFFICER: It's actually juror No. 1.

He's here.

THE COURTROOM DEPUTY: All are here.

THE COURT: All right. They're all here now? Well, we'll bring them in. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 9:14 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Thank you. Nona, can you please hand out the pads of paper and the pens for them to write, please.

COURT SECURITY OFFICER: Yes.

THE COURT: We will now swear in the jury. Could the courtroom deputy please do that.

THE COURTROOM DEPUTY: Do each of you solemnly

swear or affirm under penalty of perjury that you will well and truly try the issues in the case now on trial and a true verdict render according to the evidence and the charge of this Court.

(Unanimous affirmative responses by the jurors.)

THE COURT: Thank you. Please be seated.

Members of the jury, now that you have been sworn, I need to explain some basic principles about a criminal trial and your duty as jurors. These are preliminary instructions. At the end of the trial, I will give you more detailed instructions.

It will be your duty to decide what happened so you can determine whether the defendant is guilty or not guilty of the crime charged in the Indictment.

At the end of the trial, I will explain the law that you must follow to reach your verdict. You must follow the law as I explain it to you, even if you do not agree with the law.

You must decide the case solely on the evidence presented here in the courtroom. Evidence can come in many forms. It can be testimony about what someone saw or heard or smelled. It can be an exhibit admitted into evidence. It can be someone's opinion.

Some evidence proves a fact indirectly, such as a witness who saw wet grass outside and people walking into the

courthouse carrying wet umbrellas. Indirect evidence, sometimes called circumstantial evidence, is simply a chain of circumstances that proves a fact. As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe or disbelieve either kind and should give every piece of evidence whatever weight you think it deserves.

Certain things are not evidence and must not be considered. I will list them for you now.

Statements and arguments of the lawyers. In their opening statements and closing arguments, the lawyers will discuss the case, but their remarks are not evidence.

Questions and objections of the lawyers. The lawyers' questions are not evidence. Only the witnesses' answers are evidence. You should not think that something is true just because a lawyer's question suggests that it is. For instance, if a lawyer asks a witness: You saw the defendant hit his sister, didn't you? That question is no evidence whatsoever of what the witness saw or what the defendant did unless the witness agrees with it.

There are Rules of Evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit, and a lawyer on the other side thinks that it is not permitted by the Rules of Evidence, that lawyer may object.

If I overrule the objection, then the question may be answered or the exhibit received.

If I sustain the objection, then the question cannot be answered and the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and not try to guess what the answer would have been.

Sometimes I may order that evidence be stricken and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider that evidence. Some evidence is admitted only for a limited purpose. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and no other.

In reaching your verdict, you may have to decide what testimony to believe and what testimony not to believe. You may believe everything a witness says or part of it or none of it. In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to.

The witness's memory. The witness's manner while testifying. The witness's interest in the outcome of the case and any bias or prejudice. Whether other evidence contradicted the witness's testimony. The reasonableness of the witness's testimony in light of all the evidence and any

other factors that bear on believability.

I will give you additional guidelines for determining credibility of witnesses at the end of the case.

As you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind. First, the defendant is presumed innocent until proven guilty. The indictment against the defendant brought by the government is only an accusation, nothing more. It is not proof of guilt or anything else.

The defendant, therefore, starts out with a clean slate. Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent and may choose whether to testify, you cannot legally put any weight on a defendant's choice not to testify. It is not evidence.

Third, the government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later. But bear in mind that the level of proof required is high.

Our law requires jurors to follow certain instructions regarding their personal conduct in order to help assure a just and fair trial. I will now give you those instructions.

Number one, do not talk, either among yourselves or with anyone else, about anything related to the case. You may tell the people with whom you live and your employer that you are a juror and give them information about when you will be required to be in court. But you may not discuss with them or anyone else anything related to the case.

Number two, do not at any time during the trial request, accept, agree to accept, or discuss with any person any type of payment or benefit in return for supplying any information about the trial.

Number three, you must promptly tell me about any incident you know of involving an attempt by any person to improperly influence you or any member of the jury.

Number four, do not visit or view the premises or place where the charged crime was allegedly committed or any other premises or place involved in the case. And you must not use internet maps or Google Earth or any other program or device to search for a view of any location discussed in the testimony.

Number five. Do not read, watch or listen to any accounts or discussions related to the case which may be reported by newspapers, television, radio, the internet or any other news medium.

Number six. Do not attempt to research any fact, issue, or law related to this case, whether by discussions

with others, by library or internet research or by any other means or source.

In this age of instant electronic communication and research, I want to emphasize that in addition to not talking face to face with anyone about the case, you must not communicate with anyone about the case by any other means, including by telephone, text messages, e-mail, internet chat, chat rooms, blogs or social networking sites, such as Facebook, Myspace or Twitter.

You must not provide any information about the case to anyone by any means whatsoever and that includes posting information about the case or what you are doing in the case on any device or internet site including blogs, chat rooms, social websites or by any other means.

You also must not use Google or otherwise search for any information about the case or the law that applies to the case or the people involved in the case, including the defendant, the witnesses, the lawyers, or the judge.

It is important that you understand why these rules exist and why they are so important.

Our law does not permit jurors to talk with anyone else about the case or to permit anyone to talk to them about the case, because only jurors are authorized to render a verdict. Only you have been found to be fair and only you have promised to be fair. No one else is so qualified. Our

law also does not permit jurors to talk among themselves about the case until the Court tells them to begin deliberations because premature discussions can lead to a premature final decision.

Our law also does not permit you to visit a place discussed in the testimony. First, you can't be sure that the place is in the same condition as it was on the day in question.

Second, even if it were in the same condition, once you go to a place discussed in the testimony to evaluate the evidence in the light of what you see, you become a witness, not a juror. As a witness, you may now have a mistaken view of the scene that neither party may have a chance to correct. That is not fair.

Finally, our law requires that you not read or listen to any news accounts of the case and that you not attempt to research any fact, issue, or law related to the case. Your decision must be based solely on the testimony and other evidence presented in the courtroom.

Also, the law often uses words and phrases in special ways so it's important that any definitions you hear come only from me and not from any other source.

It wouldn't be fair to the parties for you to base your decision on some reporter's view or opinion or upon other information you acquire outside the courtroom.

These rules are designed to help guarantee a fair trial, and our law accordingly sets forth serious consequences if the rules are not followed. I trust that you understand and appreciate the importance of following these rules, and in accord with your oath and promise, I know you will do so.

Moving on now, if you wish, you may take notes to help you remember what witnesses said. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.

Do not let note-taking distract you so that you do not hear other answers by witnesses. When you leave the courtroom, your notes should be left in the jury room. Whether or not you take notes, you should rely on your own memory of what was said. Notes are to assist your memory only. They are not entitled to any greater weight than your memory or impression about the testimony.

The trial will now begin. First, the government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in. Next, Mr. Fisher's attorney may but does not have to make an opening statement. Opening statements are neither evidence nor argument.

The government will then present its witnesses and Mr. Martin may cross-examine them. Following the

government's case, Mr. Fisher may, if he wishes, present witnesses whom the government may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you. I will then instruct you on the law. After that you will go to the jury room to decide your verdict.

So a couple of things. As I said, you can take notes, of course, during the course of the trial. As we mentioned earlier, there is a court reporter transcribing what is being taken down, but if a transcript is made at some point, it's not going to be available to you, so I can't read back testimony to you. Nor can you have access to his notes. So I wanted you to understand that.

Number two, in federal criminal trials, we do not permit jurors to ask questions. We allow that in civil cases. And I believe in state court it's being permitted in many trials, but it's not permitted here.

So I wanted you to understand that you can't ask questions. So you just have to hope that the lawyers do ask the questions that you have.

There will be exhibits that are received into evidence. Most of those exhibits will be sent back. Not all of them. When there's an exhibit that's not going to be sent back, I'll let you know so that you can closely look at it

here in the courtroom. But most of the exhibits will go back with you for your deliberations.

All right. Now, did everybody get -- and, I'm sorry, I neglected to ask, but I should have asked earlier while we had a lull in the proceedings. Did everybody get a copy of the order to give downstairs?

(Unanimous affirmative responses.)

THE COURT: So you have that to give to the court security officers. Did anybody have any problems coming in upstairs?

(Unanimous negative responses.)

THE COURT: Letters to supervisors, I don't know if we have -- do we have that information?

THE COURTROOM DEPUTY: Yes.

THE COURT: Okay. And do we have -- have you gotten letters yet?

(Unanimous affirmative responses.)

THE COURT: All right. So I guess you're all set on that. Very good.

How long would you like for your opening statement, Miss Howard-Allen?

MS. HOWARD-ALLEN: I think you indicated about 30 minutes.

THE COURT: And, Mr. Martin, that's okay with you then, 30 minutes? Is that what you would like?

MR. MARTIN: Yes. Mine will be real short, Your Honor.

THE COURT: I now ask that you give the lawyers your attention while I recognize them for opening statement. Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor. May it please the Court, Counsel.

This case is all about the blues and the whites. Those are pills pressed to look just like oxycodone 30-milligram pills but made with fentanyl by this defendant Dion Fisher (indicating.)

In this case you will hear Dion Fisher's own words in a videotaped deal that if someone uses Dion Fisher's pressed blue fentanyl pills, they won't want the ones from the pharmacy. They won't want to go to all the work to go to the doctor and get a script for real oxycodone. Those pills, those fentanyl pills, are that good.

You will also hear in Dion Fisher's own words that he won't sell less than a hundred at a time. And that's way down from when he sold 500 a day or 3,000 a week. A time when he was making what he calls mad money, enough money to by high-end cars. Cars like a Bentley, an Aston Martin, a Maserati. Ladies and gentlemen, this case is all about fentanyl pills and money.

Now, I just want to take a moment. I know

yesterday was a long day, and I wanted to make sure that we re-introduced ourselves. I'm Kelley Howard-Allen. I'm an Assistant United States Attorney. My college Maria Guzman, also an Assistant United States Attorney who you met yesterday.

We represent the United States in this case, and we're assisted by the agents you met yesterday. Adam Phelps from the DEA, and Roberto Liberto from the IRS. Both of those will be assisting us and moving around the courtroom with evidence and witnesses, and I don't want that to distract you. And I thank you in advance for your attention.

Now, the story of Dion Fisher selling and making fentanyl pills has many different actors sharing the stage with him. Many of whom have pled guilty to the same charges. And you will meet them and hear their stores over -- through their testimony through this week and next week.

First, though, I want to give you some background on the charges. The judge summarized the indictment to you, talking about distribution of fentanyl and money laundering charges. There's a total of seven drug charges. Six of those include -- involved fentanyl and another type of fentanyl called methoxyacetylfentanyl. And one count involves a controlled substance known as Pentylone.

Now, the overarching charge that runs from late 2013 to February of 2018, is a fentanyl what they call a

conspiracy, which is an agreement to make and distribute fentanyl. The other six counts are charged on six specific dates.

Four of those dates are from undercover buys, and from -- buying pills from Dion Fisher. And then the other two charges are from February 15th, 2018, when three search warrants were executed on locations controlled by Dion Fisher.

Now, all of these controlled substances we intend to present to you, both from the search warrant and from the buys. This evidence was seized by law enforcement officers, both DEA agents and Pinellas County Sheriff's Officers.

Now, each of these seizures was done over a number of places over a period of time, and so the law enforcement officers who are going to testify about that, two of them will testify from the search locations, and they'll show video recordings of the search locations as they executed the search. And you'll see that they were dressed in some protective clothing due to the presence of fentanyl.

Now, for each of these drug items seized, they had to be tested.

So you will hear from nine different forensic chemists, both from the DEA Southeast Laboratory and from the Pinellas County Forensic Laboratory. Each of those who sampled, weighed, analyzed, and tested each piece of drug

evidence to determine what, if any, controlled substance was in there.

And quite simply, that testimony takes time.

Now, don't get nervous. The fentanyl which will be here in the courtroom, but not in the jury room, is double sealed and double bagged, and you may see some of the seizing agents and forensic chemists put on gloves just to be on the safe side.

All of these items were photographed as best as we can through two bags and sometimes three bags, and those photographs will be admitted as evidence as will the fentanyl. But only the photos are going back in the jury room with you.

So, as I mentioned, some of this fentanyl was seized from these undercover buys. Some of them -- three of them were recorded -- four of them were recorded in December of 2017. There are a number of recorded phone calls and three undercover buys, including a five-pill sample of what ended up being just over a thousand fentanyl pills. Pills sold by Dion Fisher to an individual named Dani Kulic.

Now, you will hear about each of these deals and the phone calls from Mr. Kulic. And you will hear and see some of the video from inside his car and inside a local Walmart where some of these deals took place. Now, I know what you might be thinking from CSI or whatever your favorite

crime show is, I'm going to see some really awesome video. Well, this is not.

But you can hear Dion Fisher's words. You can see Dion Fisher's face at times, and most importantly, you can see the fentanyl pills that Dion Fisher pressed and sold to Mr. Kulic while he was working under the direction of law enforcement.

You will also hear from several other people who built and made this highly profitable fentanyl pill empire with Dion Fisher. First, you will hear from the manpower and the mechanical power behind pressing the pills. Someone who was charged with Dion Fisher and pled guilty to those charges who's named Sam Huffman.

I think you will hear in the video to him being referred to as the press man. You will see Sam Huffman's automotive work bay location on 66th Street in Pinellas County where he pressed the pills for Dion Fisher, a location that was also searched on February 15th of 2018, along with Dion Fisher's house and Dion Fisher's work bay location.

Now, Sam Huffman, who often went out and partied with Dion Fisher was paid for his work pressing pills in cash or pills or a combination thereof. And you'll see a photo of a big black locker that was inside the work bay where Mr. Huffman kept all of Mr. Fisher's fentanyl pills and manufacturing items under lock and key. A key that only

Mr. Huffman and Mr. Fisher had.

You will also hear from Mr. Huffman about the recipe that Dion Fisher provided to him to make the fentanyl pills in the right strength.

Now, you'll see pictures of the pill presses that Sam Huffman used and fixed when they were broken down, which was often. And I say "pictures," because the pill presses were destroyed due to the fentanyl contamination. You will hear how late in the night Sam Huffman worked pressing pills for Dion Fisher, and that he often did so using cocaine.

You'll also hear and you will always hear that the source of the fentanyl and the pill presses that Sam Huffman used was Dion Fisher. You also will hear from Dion Fisher's partner in crime in the fentanyl pill business, Christopher McKinney.

Mr. McKinney and Dion Fisher, you will hear, grew up together in Michigan. Together once they got to Florida, they began to come up with the recipes to mix and press these counterfeit oxycodone pills made of fentanyl. Both the blues and the whites. Complete with counterfeit stamps that matched and were designed to look just like pharmacy brands of oxycodone, 30 milligrams, like with stamps like A 215 or ETH 446.

You also will here that Mr. McKinney and Dion Fisher pressed other pills made with Molly, which were

stamped with other types of insignias like LV for Louis Vuitton. Both Dion Fisher and Christopher McKinney, who has also pled guilty to these same fentanyl charges, sold these fentanyls for a period of years.

And you will hear that both Dion Fisher and Christopher McKinney made a lot of money selling the blue and white counterfeit oxycodone pills made with fentanyl. Both Dion Fisher and Christopher McKinney used that money not only to keep buying the fentanyl and the manufacturing materials and pill presses they needed to keep making the pills, but also to buy high-end cars, houses, high-end retail items like Louis Vuitton, and jewelry, and a number of other items that you'll see presented to you here in this case. Including buying tickets to high profile and expensive boxing fights in Las Vegas.

Like Sam Huffman, Christopher McKinney will always testify that the source of the fentanyl was Dion Fisher (indicating.)

And you'll hear phone calls and a recording of video of Dion Fisher and Christopher McKinney meeting -- who was wearing a recording device -- meeting at the direction of law enforcement at Dion Fisher's work bay on 49th Street. And you'll hear them talking about the strength of the fentanyl, the right mixture to make the pills, the right strength.

And you'll hear about them talking about the color of the fentanyl, because some of it when cooked turned purple. And you'll see that fentanyl. The purple fentanyl both on the video and here in court.

And, in fact, you'll hear that their financial deal was that Christopher McKinney paid Dion Fisher half of what Mr. McKinney made selling the fentanyl pills. Well, that's because Dion Fisher was the source of the fentanyl.

A deal that Mr. McKinney got tired of as his pill sales grew with what he'll tell you was his biggest customer, a guy known as Boston P. And as sales to Boston P grew and grew, he got tired of this deal. And as drug dealers go, not surprisingly, they don't always tell the truth about what each one of them are learning -- or earning or who they're selling to. Nor do they pay their taxes.

So you will see the money made when you hear about the night that the law enforcement officers stopped Christopher McKinney with fentanyl powder and fentanyl pills that he bought from Dion Fisher, coming from Dion Fisher's 49th Street work bay location in late January 2018.

At the time the fentanyl, and he had some cash in the car, was found and seized, Mr. McKinney decided to cooperate with law enforcement agents. And he took them to his house where he had more fentanyl powder and lots more money. How much more money? At his house in several

briefcases he had nearly $1.4 million in cash from selling fentanyl pills.

That was seized by law enforcement officers with Mr. McKinney's consent. And then Mr. McKinney took law enforcement officers to two other locations where he had fentanyl stored and pill presses stored, fentanyl that he bought from Mr. McKinney. And pressed some pills.

He took them to a work bay location that he had, a second house that he had that you will hear paid for in cash by fentanyl sales. And some of the pills were made -- he had methoxyacetylfentanyl there, all that he bought from Dion Fisher.

But Dion Fisher made lots of money selling fentanyl pills and fentanyl and other controlled substances as well. That's why Dion Fisher is also charged, as you've heard, when the judge mentioned yesterday that he was charged with money laundering. Specifically there's eight money laundering charges.

Each transaction you will hear at the time that you are instructed on the law, involved more than $10,000 in cash that Dion Fisher earned from selling fentanyl pills and other controlled substances. Something we refer to as narcotics proceeds.

See, Dion Fisher found a place called Onyx Automotive and AK Tire and Rims. They were nearby businesses

owned by and operated by an individual you'll hear from. Konrad Guzwicz. It was owned by him and his wife.

This is where Dion Fisher bought the high-end cars, where he bought a Porsche Panamera, an Aston Martin, an Audi Q5, an Audi R8, a BMW. Some of those all with cash from fentanyl sales. Some of these he bought with salvaged titles using Mr. Gusewicz's dealer's license.

In fact, one of the charges, one of the eight money laundering charges in the indictment, is for a 2009 Audi R8 that Dion Fisher bought from Mr. Guzwicz in August of 2015 for $42,000 in cash. Part of which he paid for with a $22,000 cashier's check.

See, Dion Fisher and Konrad Guzwicz became friendly and along with his wife, as they -- as Mr. Fisher was buying these high-end cars from his businesses.

And you will hear from Mr. Guzwicz that Dion Fisher asked, and Mr. Guzwicz agreed, to launder $140,000 in cash that Dion Fisher had accumulated from selling fentanyl, all over about a period of two months in the summer of 2015.

The agreement was that Dion Fisher brought Konrad Guzwicz $35,000 in cash, four times over two months, and in turn Mr. Guzwicz wrote four separate checks for $30,000, sometimes falsely saying in the line of the check that it was for loan or loan payment.

So basically he was earning $5,000 times four or

$20,000 for writing checks to Dion Fisher for him to deposit in his bank accounts.

When Mr. Guzwicz wrote these checks back to Mr. Fisher, these four checks, he wrote them from four different bank accounts. He had two business accounts and two personal accounts with his wife, and each check was from four separate accounts. Mr. Guzwicz you will hear also pled guilty to these four money laundering charges.

And as you can imagine, and to say the very least, Mr. Guzwicz's business practices with regard to paying taxes and reporting these financial transactions was not necessarily truthful or above the board.

But that worked to both of their benefit. Now, Dion Fisher's also charged with three other money laundering transactions. Two in connection with two other high-end cars and one in connection with buying a piece of property.

Now, you will get to see Dion Fisher's bank accounts that were involved in each of these transactions and you'll get to see how he spent his money when you hear the testimony of a financial analyst from our office by the name of Diane Knott. She will show how Dion Fisher used almost $23,000 in cash that he earned from selling fentanyl to send a wire transfer to pay off his 2008 Maserati Gran Turismo in March of 2015.

Miss Knott will also trace $30,000 in cash from

fentanyl proceeds that Mr. Fisher used to purchase a 2005 Bentley Continental coupe in August of 2015.

The last money laundering transaction you will hear about is a $30,000 wire transfer on July 21st, 2015, to purchase a piece of property here in the Middle District of Florida.

Now, that's a lot of evidence to present over a two-week period, but as Judge Covington told you both yesterday and today, it is the government's burden to prove beyond a reasonable doubt that Dion Fisher committed the 15 crimes alleged in the Indictment.

And that is a burden that we are prepared to meet. Your role is simply to observe the witnesses' testimony, as the judge indicated, their credibility, observe the witness, the evidence that we put in front of you, the drug evidence, the documentary evidence, and just use your everyday common sense.

The kind of common sense that tells you if you see a turtle on a fence post, somebody put it there. Just you're everyday common sense. At the close of all this evidence, all the witnesses, all the documents, all the drugs that we put before you, and at the close of all of the evidence presented by both sides, I will have the opportunity to address you again.

And at that time I will be asking you to find that

the government has met its burden, and I will be asking you to return a guilty verdict on all 15 counts of the Indictment.

Thank you.

THE COURT: Thank you, Miss Howard-Allen.

Mr. Martin, do you wish to make an opening statement?

MR. MARTIN: Yes, Your Honor. May it please the Court, Counsel. Good morning. Again, my name is Ken Martin, and I represent Dion Fisher.

I'm going to be real brief, just a couple of things that I think you should keep in mind as it goes through, because you're the evaluator of evidence.

One of the things you need to do is evaluate each witness. Some witnesses, my term is they don't have a dog in the fight. You know, they just saw something, happened to be there, and they are just relating what they saw or observed.

Other witnesses have some type of bias. They have something invested in the outcome. Some people have a little bit of bias. Some people have a lot of bias. Also, some people have problems that keep them from accurately relaying information even if they're trying to.

Somebody under the influence of drugs is not as accurate relaying information as someone that's sober. So all the factors that I've mentioned and just factors from

your own common sense background, you need to look at each witness and evaluate them.

The second thing I'm going to ask you to do and I'm just generally telling you, you need to look at the size of the fentanyl and the government theory of this case and ask if that makes any sense.

The next thing you need to do for me, and this sounds really easy, the judge told you you can't started making decisions until after the evidence is in. She's instructed you. And you're back in the deliberation room, you know, approximately two weeks from now.

That means you have to keep an open mind throughout the trial. That's not how most of us think. You know, we kind of make decisions along the way. So I'm going to ask you to keep an open mind throughout the trial, and although that sounds simple, that's pretty difficult to do.

Just as Miss Howard told you, I get an opportunity to speak with you after the evidence is closed, and I won't be this brief at that time.

We ask you to keep an open mind. Once all the evidence is in, the judge has instructed you, we're confident that the government won't meet its burden of proof, and you'll find Mr. Fisher not guilty of all the counts.

Thank you.

THE COURT: Thank you, Mr. Martin.

Miss Howard-Allen, are you ready with your first witness?

MS. HOWARD-ALLEN: We are, Your Honor. At this time I would call Brian Zdrojewski to the stand.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, ma'am.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Brian Zdrojewski, Z-d-r-o-j-e-w-s-k-i.

THE COURTROOM DEPUTY: Thank you. You may take a seat in the witness stand.

THE COURT: And, Mr. Zdrojewski, you're going to be asked some questions by Kelley Howard-Allen, Assistant U.S. Attorney, and then Mr. Martin, who represents Mr. Fisher who may ask you some questions in cross-examination.

If you don't understand the question, please say so so they can state it another way. You do have that microphone so make certain that we can hear you. If you have the tendency to speak quickly, please slow down so we can understand what you're saying. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Go ahead, Miss Howard-Allen.

BRIAN ZDROJEWSKI,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good morning, Agent Zdrojewski.

A. Good morning, counselor.

Q. Can you tell the ladies and gentlemen of the jury where you work.

A. I'm an agent with the Drug Enforcement Agency.

Q. And how long have you been an agent with DEA?

A. Since January of 2002.

Q. So where are you currently assigned, Agent Zdrojewski, within the DEA?

A. I'm currently assigned to the Tampa District Office, tactical diversion squad.

Q. What is the tactical diversion squad?

A. Primarily what we do in the tactical diversion squad or TDS is investigate criminal diversion of controlled substances and mainly registrants which would be physicians, pharmacies and pharmacists, pill manufacturers, or controlled substance manufacturers and distributors.

Q. Agent Zdrojewski, how long have you been in the

diversion group at -- with DEA?
A. Since January of 2009.
Q. So about ten years?
A. Yes, ma'am.
Q. Agent Zdrojewski, you had mentioned that there's some DEA registrants, and can you explain in diversion do you do enforcement or regulation?
A. Both. There's a criminal enforcement aspect of what we do and also a regulatory aspect. Primarily the agents in the TDS work in the criminal side, and then what we have is diversion investigators which work the regulatory side of it.
Q. And the diversion investigators, what type of things do they regulate?
A. They regulate registrations, recordkeeping of registrants, machinery, controlled substances and like processing and manufacturing of controlled substances.
Q. What kind of machinery do they regulate, what kind of equipment?
A. Controlled substance processing machinery. I.e., pill press, pill presses, tableting machines.
Q. So, Agent Zdrojewski, you're on the criminal enforcement side?
A. Yes.
Q. What type of -- what are part of your duties as a criminal special agent on the enforcement side of the

tactical diversion squad?
A. Can you repeat that?
Q. What are your duties on the criminal enforcement side?
A. What I've done over the last ten years, I've been case agent for cases that involved the illegal prescribing of controlled substances by physicians, distribution by pharmacists. I've interviewed witnesses related to that. I've conducted surveillance. I've talked to confidential sources. I've talked to patients.
I've talked to family members of deceased. For approximately ten months from 2017 to 2018 I was the supervisor of that group. So I've covered a lot of different aspects, and I've done a lot of undercovers dealing with the illicit use and distribution of oxycodone, Oxycontin, Dilaudid, Xanax. Things of that nature.
Q. So through this familiarity and experience, are you familiar with different types of pills, specifically oxycodone 30 milligram pills?
A. I am.
Q. And are you familiar with what type of prescription drugs are primarily diverted?
A. I am.
Q. What are those?
A. The ones that I just testified to, primarily oxycodone, which would be the 30s, which would be 30 milligram

oxycodones. They come in several different varieties, oxycodone 30s, oxycodone 15s. I'm saying these numbers in milligrams. So 30 milligrams, 15 milligrams, 10s, 5s.

Oxycontin, which are 40s, 60s and 80s. Dilaudid 2s, 4s, 8s. The Xanax, I'm not really sure the dosage milligram units, but those used to be highly diverted.

Q. Agent Zdrojewski, what are some of the markings or brands that are on 30 milligram oxycodone pills?

A. Depending on the manufacture and type, the manufacturing company activist, it uses an A 215 stamped on the tablet. Tablets blue in color, fairly smooth and solid throughout. And so it would be A 215. A Mallinckrodt stamp with an M and a 30 on the other side. Different manufacturers have different types of stamps and brandings showing their trademark and type of tablet they produced.

Q. Is there a street slang name for the A 215s, the blue pills, that you actually just referred to?

A. Blues, oxys, roxys. There is a ton of street names for it.

Q. Are you familiar with the markings on any white 30 milligram oxycodone pills?

A. There are. Primary based in -- in the northeast region of the U.S. Don't see many of them in Florida, but they're made by the Essex Company, and it's ECK 447 is the trademark marking on those, or the marking on those, not specifically

trademark.
Q. And that says -- the marking, is it on one side and the other? There's ETH on one side and the 446 on the other?
A. Yes, ma'am.
Q. Agent Zdrojewski, I've put some government exhibit -- at least photographs at this time in front of you. And I'm going to ask you if you could take a look at Government's Exhibits 1 through 5 and tell me if you recognize those items.
A. Yes, ma'am, I do.
Q. How do you recognize them, Agent Zdrojewski?
A. These are photographs of a tableting machine or pill press that I had observed in June -- on June 19th of 2016 in Ybor City at the Department of Homeland Security Customs House.
Q. And how did you come to be at this customs house to observe this pill press?
A. I was contacted -- the DEA does have a regulatory basis for these types of machines. If you are to import a machine, like a pill press, from out of country, you have to register it with DEA. And once you have it in your possession, and you are going to transfer it to someone else, you also have to let DEA know that you are transferring it.
Q. Agent Zdrojewski, are these pictures, Government's Exhibits 1 through 5, accurate depictions of what you saw

that day back in June of 2016?

A. Yes, they are.

MS. HOWARD-ALLEN: At this time, Your Honor, I would ask to admit Government Exhibits 1 through five and publish them to the jury.

THE COURT: Okay. One through five are received into evidence and may be published to the jury.

(*Government Exhibits 1 through 5 received in evidence.*)

BY MS. HOWARD-ALLEN:

Q. All right. Then I'd like you to take a look at Government's Exhibit 3 first.

A. You say No. 3, ma'am?

Q. Yes, Agent, No. 3. What does Government's Exhibit 3 show? Maybe we could turn those lights down to see a little better.

A. What it shows is the pill press machine or the pressing machine in its crate with the crate top taken off, looking down into the crate.

To the right you see the big red wheel, hand wheel. In the center it looks like a cam, and then on the darker gray portion, kind of in the shadow at the top part of the machine looks like it's the motor.

Q. Let's just take a look at the second page of this exhibit a little closer up.

And is that just a close-up of the wheel?
A. It is. You see a little grease fitting on it, on the cam.
Q. Then let's look at the third page. What is that black item on the back on Page 3? Sort of at the top?
A. The gray? Electric motor. On the left is a belt drive.
Q. And this is an electric then pill press?
A. Yes, ma'am.
Q. All right. And Agent Zdrojewski, let's take a look at Government's Exhibit 5. What part of the pill press does this show?
A. It's a photo, a close-up photo of a placard that's attached to the motor. It's giving the wiring diagrams, the horsepower of the motor, a little bit of identifiers, says where it was made, made in China.
Q. Then if we could look at the second page. And another label on that. What does that indicate?
A. It's a warning label, don't power on before trial. Use the hand wheel to avoid breakage of parts. So when you put the dies in the machine, make sure everything is lined up and pressing correctly, you want to turn the hand wheel before using the electric motor so it doesn't break the dies or smash the machine.
Q. What does that appear to be at the bottom of that

label? Is that --
A. The writing?
Q. Yes.
A. It's a foreign language in writing. I'm not sure what it is.
Q. All right. Let's take a look at Government's Exhibit 4. What part of the -- of what you observed that day, what is that?
A. Appears to be a funnel which would attach to the machine, where you put your material in so it would pull the material into the punch die area and punch out the tablets.
Q. And were you able to -- did you know who this was addressed to?
A. Dion Fisher.
Q. Let's take a look at Government's Exhibit 1. Was this the label attached to the packaging?
A. Yes.
Q. And what does it say?
A. Dion Fisher, 2481 Northeast Coachman Road, Apartment 107, Clearwater, Florida.
Q. And who does it appear to be mailed from?
A. Ecco Sources. Looks like it's out of Hong Kong.
Q. All right. Was there -- and let's take a look at Government's 2. What is this portion of what you observed that day?

A. The packing slip to the same information. Mr. Dion Fisher, 2481 Northeast Coachman. And then coming out of Fujian, China.
Q. And let's just take a look at the third page of this. Does it indicate -- what does it indicate it is and what it cost?
A. Punching machine, 180 U.S. dollars.
Q. Agent Zdrojewski, as your role in being a DEA regulatory or being called out there by the Homeland Security to take a look at this, were you able to see whether this item was registered or whether Mr. Fisher was registered? Did you check on something like that?
A. We checked on it.
Q. And what did you find out?
A. Negative results on anyone by the name of Dion Fisher trying to register a punching device around that time frame. Or any other time frame.
Q. All right. Agent Zdrojewski, I'd like you to turn now to -- I'd like to turn to the events of February 15th, 2018.
Where were you that day?
A. I was asked to participate in a search warrant which was located at 11788, 66th Street in Pinellas Park. I was told that there was a potential fentanyl laboratory at that site, and being that I'm part of a clan lab response team, which means I'm clan lab certified, I was asked to help in

the execution of that search warrant to locate evidence and process that scene.

Q. All right. What type of location was this?

A. It was an industrial complex. The actual facility we went into at unit B1 was -- looked like a mechanic's shop.

Q. Now, Agent Zdrojewski, you mentioned that you were part of some -- had some clan lab training. What does that involve?

A. Usually with clandestine laboratories you are dealing with a lot of unknown substances. You are also dealing with known substances, which can be highly toxic. So the folks that are clan lab certified are trained in using special gear, safety gear, to be able to go in and conduct their investigations in these type of environments.

Q. So what were you wearing that day?

A. That day we went in and basically wearing a big plastic bag with air tanks. We were taped up, had air tanks on, and you had roughly 15 minutes per tank to go in, evaluate, and process that scene before you had to cool down and change out your tank.

Q. Now, after you entered 11788 66th Street, was it filmed?

A. It was.

Q. Was it also photographed?

A. It was.

Q. Were there controlled substances seized?
A. There were.
Q. Were there pill stamps seized?
A. There were.
Q. At this time I'd ask you to just look at the two discs in front of you that are marked 110 and 110A. Do you recognize those?
A. Yes, ma'am, I do.
Q. And how do you recognize those?
A. Because I placed my initials on these disks and these exhibits after viewing them.
Q. And if you could also look at -- take a look at picture Government's Exhibit 110B. Is that photograph which was taken from the videotapes, and the videotapes, are those true and accurate depictions of what you saw when you entered 11788 66th Street on February 15th, 2018?
A. It is. That's the facility, facility B1.
MS. HOWARD-ALLEN: And at this time, Your Honor, I'd ask to admit Government's Exhibit 110, 110A, and 110B.
MR. MARTIN: No objection, Your Honor.
THE COURT: All right. 110 -- -
MS. HOWARD-ALLEN: At this time I'd ask --
THE COURT: Hold on a second. Let me just go through and mark it so I can keep track. One second.
All right. 110, 110A, and 110B are received. I

don't think I have 110B on the list you gave me.

MS. HOWARD-ALLEN: I think it was -- we filed an exhibit list on Monday that included it. And I provided your clerk with a copy of it this morning.

THE COURT: Okay. I'll have that. I think the one I have is May 24th. So, we'll get another copy of that. Okay. 110?

MS. HOWARD-ALLEN: 110A and 110B.

THE COURT: Okay. Thank you. All right. 110, 110A and 110B are received into evidence and may be published to the jury.

(*Government Exhibits 110, 110A, 110B received in evidence.*)

MS. HOWARD-ALLEN: All right. At this time I'd ask the agent to pull up 110B, please.

BY MS. HOWARD-ALLEN:

Q. Is this the location that was searched that day by you and other agents?

A. Yes, ma'am, it was.

Q. And so you mentioned that items were photographed, and just to move things along, if you could take a look at Government's Exhibit 111 through 134. And I'll ask you the same question if those are true and accurate depictions of what you found inside this location that's being shown in 110B.

A. Would that include 123, Counselor?
Q. I'm sorry, 123 is blank. So I appreciate that there's no 123. So it's 111 to 122 and 124 to 134.
A. I don't have a 128 either.
Q. And no 128.
A. Fantastic. Yes.
MS. HOWARD-ALLEN: At this time, Your Honor, I will ask just so the record is entirely clear to admit Government Exhibits 111 through 122, 124 through 127, and 129 through 134.
MR. MARTIN: No objection, Your Honor.
THE COURT: All right. 129 through 134. Right. I see those intentional blank ones. So, Government Exhibits 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 124, 125, 126, 127, 129, 130, 131, 132, 133, and 134.
MS. HOWARD-ALLEN: Yes, Your Honor.
THE COURT: They're all received into evidence. They may be published to the jury.
MS. HOWARD-ALLEN: Thank you, Your Honor.
(*Government Exhibits 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 124, 125, 126, 127, 129, 130, 131, 132, 133, and 134 received in evidence.*)
MS. HOWARD-ALLEN: At this time, Agent Phelps, I'm going to ask if you will play the video that's been marked 110B. And there is no volume on this. 110A. Thank you. If

you could, tell us 110A.

(Video played.)

BY MS. HOWARD-ALLEN:

Q. And where is there located?

A. Pinellas Park.

Q. What is that nearby corner?

A. 66th Street. We're on the north side of the building, garage door is facing north. This is after we have already gone in and cleared it, make sure there's no persons in there or active labs going on.

Q. So what do you see --

A. I'm sorry.

Q. Go ahead. What do you see when you walked in?

A. You walk in, you see an Infiniti, a couple of motorcycles. To the right you see a press. You see a blue container right there. We ended up finding three hand cracked tableting machines in there.

Q. Were those photographed?

A. They were. As he's walking through, kind of walking fast through, and now we're looking east, there's a ladder that goes up on top of the office, a storage area up there.

Q. Is that area searched as well?

A. It was. Car lift, couple of more motorcycles, black Bentley. You can see the truck in the back. There's a door leading out to the south side of it, and that back left

corner where he's pointing right now you'll see a black stack-on safe. It's miscellaneous repair equipment, tooling.
Q. Did you find fentanyl products throughout this area, looking at right now?
A. Throughout, no.
Q. What did this all appear to be?
A. Just a mechanic's shop.
Q. Maybe you could ask to -- when to stop when you see the items -- where the fentanyl manufacturing materials were concentrated.
A. We are walking north through the garage again.
Q. Is that an office on the left?
A. It is. The door that you see open, that little box or that box room, if you will, that's the office. These are done just to show the condition of what the areas look like before we go in and start processing it.
So you see the safe in the back corner where we just paused right behind that ATV, you see the Yamaha ATV directly behind that, that's where all the lab material was found, if you will. The controlled substances, the counterfeited tablets, one electronic pill press, binding material was all contained within that safe.
Q. All right. Let's continue to go through.
A. That window leads into the office. And that would be the office in there.

Q. And when you went through the office, were there any fentanyl materials in the office?
A. There were none.
Q. Was there any controlled substances that were found in the office?
A. Marijuana, couple of glass pipes that ended up breaking prior to us getting them out of there.
Q. And there wasn't any cocaine or any other controlled substance you found there?
A. No, there was not.
Q. All right. Then at this time, if we could pull up these Government's Exhibit 134. Is this the vehicle that we just saw with the plastic cover off?
A. It is.
Q. What does it appear to be?
A. Looks like a Bentley.
Q. All right. So let's start with the black locker. Let's pull up Government's Exhibit 111. So was this the locker that we saw in the video?
A. Yes, it is. That's the black stack-on that I was saying was sitting in the corner that contained all the material.
Q. Was it locked?
A. It was.
Q. It appears someone is using a key. Where did that come

from?

A. We moved that out closer to the front door. We got it away from the corner. You want to get as close to the outside as you can in case something happens or you run out of air, and you don't want to be working back in that environment so we moved that out.

As you see, it's hard to talk and communicate in that type of suit. So prior to that, we tried to see if we could just pop it open with a tool, if you will, and then we were able to get a key from Sam Huffman.

And then here we're trying to use the key to open it up. It would turn, but it did not open. I think we damaged the safe with the tool before actually trying to get the key.

Q. Let's look at 112. What does this picture show?

A. That's when we put it on its back, and we're starting to pry it open.

Q. And let's look at the second page.

A. Now we've got the bigger tools out. We had already tried to use the key, which did not work, and we were unable to get into it. So we used that to pop the safe open.

Q. And was there a reason why the key didn't work if it fit?

A. Probably because we were prying on it prior to getting the key.

Q. All right. So let's take a look at Government's Exhibit 113. What was found in there once the safe was opened?
A. All right. Once we had the safe open, we wanted to document and memorialize the stuff that we were starting to pull out of this container. From my experience of seeing clan lab -- clandestine laboratory style environments, top right looks to be a coffee grinder or a small mixer.
You have a crushing bowl to the left of that, a make-shift funnel, which you see that silver thing between the little bowl and the red cup. Sifter cups. And in the safe sitting on top of the white box looks a clear Pyrex dish with like a blue powder substance in it.
Q. And there appears to be some other powder up there as well.
A. Yes, and it's unknown substance.
Q. All right. So let's take a look at Government's Exhibit 114. Another picture of what was inside the safe once it was opened. Is this before it was disturbed?
A. Yes.
Q. And what did you see?
A. You see in the far left you see another style safe, smaller digital combo safe. Priority mail box, couple of brown boxes, and then a pill press machine, punch press machine.

Q. All right. And then we'll just take a look at the second page. There's a couple of different views of what you found inside. The next page. How did this particular safe appear to get open? Is it a key safe as well?
A. It's a key safe and also a combo safe.
Q. We'll take a look at that in a minute. Can you look at the next picture.
A. Again, there's the materials with the mixing bowl, the makeshift funnel, the Pyrex dish. This was after it was actually opened up before we started pulling it out.
Q. And then the final picture. The next page.
A. Again, some mixing cups, unknown substances contained in the clear plastic baggies.
Q. All right. And I believe there's another page. Another view. And then finally, the last page. Were there labels that were later obtained off of some of these boxes and items taken out of them?
A. Yes, there were.
Q. All right. Let's take a look at Government's Exhibit 116. Again, another view of the locker and some of the items that you previously described on the second page?

Agent Zdrojewski, these items were being photographed. Were any of these particular items maintained, like do we have them today?
A. These were all destroyed.

Q. And why was that?
A. Because they are all covered in unknown substances, believed to be fentanyl, highly dangerous.
Q. If we could take a look at Government's Exhibit 115.
A. It's another reason why you see a lot of these redundant photographs. We're trying to document it the best we can in the environment we're in.
Q. And another close-up of -- what did you describe that as?
A. A makeshift funnel.
Q. All right. And then let's take a look at the second page of Government's Exhibit 117. What does this item show?
A. Pyrex dish with the blue substance in it. Sitting on top of a New York Giants tray.
Q. Is there something about that spoon?
A. Looks to be a spoon scale or some sort of measuring spoon.
Q. What do you mean by a spoon scale?
A. You put a material in it, and it may give you a weight, if it works.
Q. Let's take a look at Government's Exhibit 119. Are these some of the other items that were removed from the safe?
A. Yes, ma'am.
Q. What's that big thing at the top that looks like it's

in everyone's house?
A. Looks like a sifter or a colander.
Q. In your experience what would that be used for?
A. Kind of get the chunks out of the material if you're trying to sift it and keep it a fine powder.
Q. On the lower right what does that appear to be?
A. A cup. It would be a mixer. Electronic mixer.
Q. Like a small mixer?
A. Ninja or a Bullet, something along those lines. You use it to mix up your material, chop your material up.
Q. Let's look at Government's Exhibit 120. This is the safe that we saw previously. Were you able to get into this safe?
A. I was. I got the combo from Sam Huffman.
Q. All right. Let's take a look at Government's Exhibit 121. What is this picture?
A. It's -- once the safe was open, obviously it was all disturbed because we were pulling it out. We ended up flipping it over in the big safe, so everything in there is kind of jumbled, if you will. You see a lot of small, little baggies. You see a prescription bottle.
Q. And these small baggies, what in your experience do those demonstrate?
A. They're used to retail narcotics. In my line of work that's what they're used for.

Q. Let's take a look at Government's Exhibit 122. What does this picture show?
A. This is once the contents of that smaller safe was laid out onto the ground. Far left side you see looks like a greeting card. Miscellaneous paperwork, a title. As we're moving to the right, you see hundreds of little blue tablets. Further examination that I noticed on those, those tablets had --- they didn't have a consistent color or a texture to them. So it indicated to me that they were counterfeit.
Counterfeit trademark tablets because those tablets were marked A 215 on them, which would have represented the Actavis Pharmaceutical Company which produces 30-milligram oxycodone tablets. Looks like they're trying to represent a 30-milligram oxycodone tablet. The street value of a real tablet would be approximately $30 per tablet on the street.
Q. What does that -- there's a small bag in the front. Was that something separate that got analyzed from the other blue pills?
A. The blue and yellow pills?
Q. Yes.
A. Yes. Being that -- when we send things to our laboratory, you have to separate if they're not the same type of tablets. If they're all blue and they're all marked A 215, you put them in one type of exhibit and send it down.

If they're commingled like that, you separate them out.
Q. Let's go to the second page of this exhibit. What is that large -- what is that blue thing, the large kind of blue thing in the middle?
A. Next to the pen?
Q. Yes.
A. Looks like a small digital scale.
Q. What are those used for?
A. To achieve weight.
Q. All right. Let's go to the fourth page of this exhibit. And what did you notice -- you mentioned what you noticed about these, but about how many pills did you see there?
A. I don't know. I didn't count them. At least a hundred per small baggie. That's just by looking at them right there.
Q. Were these items seized by the DEA?
A. They were.
Q. And typically, what's the process when you seize a suspected controlled substance?
A. Well, suspected controlled substance, we're operating in a laboratory -- a clandestine laboratory environment so this is a little bit different. If you're seizing a kilogram of cocaine, you put it in baggies, zip it up, fill it out, and then send it to the lab for further analysis.

Here, you're dealing with a substance that's highly toxic, highly deadly, so we're double bagging it, we're taking it to neutral sites, we're cleaning these bags off. So there's a large, a heavy process to try to make sure everybody that's not in the suits are safe, and the people that are in the suits when they get out of the suit are still safe.

So these along with anything else that we actually did seize and not destroy were all double bagged or had to be prior cleaned before taken out.

Q. Let's take a look at some of the equipment that we saw earlier. Let's take a look at Government's Exhibit 129. What is this?

A. Automatic pill press machine, pill punch machine.

Q. And let's take a look. Was this in the black safe or in the blue container?

A. This was in the black stack-on safe with the unknown materials and the pills.

Q. All right. And let's go through some of the other pages of this exhibit. Look at the next page, which appears to be a closer view. And then let's look at Page 3. What is this part of the pill press?

A. It's either -- it looks -- I don't know actually. It kind of looks like where the die would come down and actually punch out the tablet.

Q. Have you ever operated one of these, Agent Zdrojewski?
A. No.
Q. Let's take a look at the last picture, and if you can make out anything about this label.
A. It's from -- looks like to be from possibly China.
Q. Let's take a look at Government's Exhibit 130. Does anyone else hear that, or is it just me? I'm hearing noises.
MR. MARTIN: I hear a noise. I don't know.
MS. HOWARD-ALLEN: I don't know what the sound is.
THE COURT: Do we need to take a break or anything?
MS. HOWARD-ALLEN: No. There was just some noise on the intercom that was distracting. I think it's gone.
BY MS. HOWARD-ALLEN:
Q. What's Government's Exhibit 130, Agent Zdrojewski?
A. Again, it shows the machine sitting in a vertical position where one of us is trying to take out the die, the lower portion or the lower portion of the press die.
Q. What's down there?
A. It would be the die.
Q. Which is what part, what does that do?
A. It actually punches and presses the tablet into the tablet shape and pushes in the marker that would be located on the tablet.
Q. So is that where the stamp is located?

A. Yes. Die or stamp, yes.
Q. All right. Let's take a look at Government's Exhibit 132. And what do we have there?
A. A blurry picture of one of the portions of the die, whether it's upper or lower, I don't know.
Q. Let's look at the second page and see if that's any clearer.
A. All right. Now that's definitely me holding that because I was the one that took it out, and I recall that, because I remember cutting my gloves and I was getting a little worried. But we wear multiple layers of gloves underneath it. Obviously the outside is more of a security layer.
In this photograph I was trying to get them to take pictures of what the die said, which would have been A/215.
Q. Or let's take a look also at closer view of Government's Exhibit 133. And see what -- was that another pill stamp found there?
A. That's another one. If you recall correctly, it was Lou, and it's a Louis Vuitton stamp. Obviously not a pharmaceutical trademark copy. But usually Louis Vuitton or any type of popular brand name type of trademark you'll see used in MDMA or ecstasy type of tablets.
So if you run across MDMA labs or ecstasy labs,

you'll see those type of things that indicated they may have been possibly doing that also.

Q. Let's take a look at Government's Exhibit 131. And what does this picture show?

A. Those were the three hand crank pressing machines that were located in that blue tub. As we were talking in -- I saw on the video as we were walking in to the right. That's them pulled out into the parking lot and obviously we're processing stuff now. So now we're taking it out of this environment.

Q. So are these substantially different than the presses that had motors?

A. I wouldn't say substantially. But they are different. The fact that these are hand cranked, and the other ones are electronic, the electronic ones seem to go faster if it's set up properly.

Q. Do they appear to have all their parts, or are you aware?

A. Looks like they're missing the punch parts the one in the front at the bottom, you see the big hole, so parts seem to be missing.

Q. Let's go to Page 2 of this exhibit. Another view. And Page 3. Again, were any of these pill presses maintained?

A. They were not. They were destroyed.

Q. All right. So in the -- also in -- still going back to

some items in the locker, let's take a look at Government's Exhibit 124. And let's take a look at the second page, which might be a little clearer. What is this item?
A. Obviously from a clan lab environment, even if it says on there microcrystalline cellulose, I don't take it that's what it is. It's an unknown substance, but microcrystalline substance is used as a binder or filler to make tablets if you will.
Q. And did you find -- how much of that did you find? Let's take a look at the next page.
A. Four or five kilos of it.
Q. And the next page.
A. That's it laid out.
Q. An then the next page. I think you're able to indicate what size it is?
A. Says one kilo, so there's four, four and a half kilos, with that one being open.
Q. And the rest of Government's Exhibit 124 is a number of other views of those bags. All right. Let's take a look at Government's Exhibit 125. What does this item show?
A. It's -- again, it's a two kilogram. It's labeled as two kilograms of blue Firmapress. It's either No. 13 or 1 Bravo at the top, handwritten on there. But again in that type of environment, we treat it as unknown substances. We never go off of what the label is.

Q. Let's just take a close-up look at the label on the second page of this exhibit. What is -- what are you aware in your experience is Firmapress is used for and the color blue?
A. Again, a binder, a filler, something if you're pressing something, and again as you look closer at that hand written area, it says 12 or 13 on it.
Q. All right. Let's take a look at Government's Exhibit 126. What is this item?
A. Again a clear plastic baggie, it's got a sticker on it that says magnesium stearate.
Q. What is that generally used for?
A. Generally I don't know, but in what we've seen it, we've seen again as the others, fillers and binders.
Q. And let's take a look at the third page of this exhibit again to see a very close-up of the label. The same bags; correct?
A. Yes, ma'am.
Q. All right. Let's take a look at Government's Exhibit 127. What does this show?
A. This is a box that was taken out of that black safe from wish.com to Dion Fisher, 10124 Nassau Court, Seminole.
Q. And what location was this found in?
A. In that black stack-on safe.
Q. Was this -- the work bay location 11788, whose location

was that?
A. Sam Huffman's.
MS. HOWARD-ALLEN: Your Honor, may I approach.
THE COURT: I'm trying to come up with a good break time. You know, we started at about 9:15. It's close to a quarter of eleven. So it's probably a good break point right now.
MS. HOWARD-ALLEN: That's fine, Your Honor. Whatever. Whatever the Court wishes.
THE COURT: All right. So, ladies and gentlemen, we're going to go ahead and take a ten-minute morning break. Please don't discuss the case or form any opinions until you've heard all the evidence.
And I think I neglected to tell you earlier that if you run into any of the parties in the hallway, the lawyers, please don't talk to them, and I'm instructing them to please not talk to you. All right. So you are excused for a ten-minute break.
COURT SECURITY OFFICER: All rise for the jury.
(Jury exits courtroom at 10:41 a.m.)
COURT SECURITY OFFICER: Please be seated.
THE COURT: Please be seated. Anything that I need to take up now at the break, Miss Howard-Allen, anything at all?
MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: How about you, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: We're in recess.

(Recess taken from 10:42 a.m. to 10:52 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Do we have all jurors present and accounted for?

COURT SECURITY OFFICER: Yes.

THE COURT: Welcome back, ladies and gentlemen.

You may resume. I'll just remind, special agent, you are still under oath. Do you understand that, sir?

THE WITNESS: Yes, I do, Your Honor.

THE COURT: Go ahead, Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:

Q. Agent Zdrojewski, while we were on break, I placed a number of exhibits in front of you. Specifically I placed drug exhibits that are marked 221, 222, 224, 225 and 226.

A. Yes, ma'am.

Q. And also up there are photographs of these exhibits that have been marked as 221A, 222A, 224A, 225A, and 226A. Do you see those photographs?

A. I do.

Q. Are those photographs accurate depictions of the

exhibits that are sitting in front of you, complete with their exhibit tags?
A. Yes, they are.
Q. And, Agent Zdrojewski, are these the items, some of which we -- all of which we viewed in the video and photographs we just reviewed before the break?
A. Yes, they are.
Q. And were they items that were seized from 11788 66th Street?
A. Yes, ma'am.
Q. And at this time, I would ask to admit Government's Exhibit 221, 221A, 222, 222A, 2224, 224A, 225, 225A, 226, and 226A.
THE COURT: All right. Those exhibits, 221, 221A, 222, 222A, 2224, 224A, 225, 225A, 226 and 226A are received into evidence and may be published to the jury.
(*Government Exhibits 221, 221A, 222, 222A, 2224, 224A, 225, 225A, 226, and 226A received in evidence*.)
MS. HOWARD-ALLEN: Thank you, Your Honor.
BY MS. HOWARD-ALLEN:
Q. Let's take a look, first, Agent Zdrojewski, at Government's Exhibit 225.
A. Yes, ma'am.
Q. I believe. And what is 225?
A. It's an evidence bag labeled DEA exhibit No. 30.

Contained within it are multiple bags, if you will, and it looks like a white powder substance, and it looks like the cellulose.

Q. Okay. And was that the microcrystalline cellulose that we saw?

A. Yes, ma'am, I'm sorry.

Q. What is the exhibit number -- there's two exhibit numbers on there. First there's the government tag in the upper -- at the top of the bag which is 225. Is there another exhibit number on that bag?

A. There is, as I was explaining. You have for tracking purposes and inventory purposes within Drug Enforcement Agency, we have like our evidence labels. And what it will have is the case number, and this example you have G6170066. It's simple if you're aware of what it means.

Q. May I ask you to pause for just a minute. Could you pull up 224A. I'm sorry. There we go. Thank you.

So I'll let you go ahead and continue, Agent Zdrojewski. I just wanted the jury to be able to see the bags a little closer. I'm sorry, 225A we're on. Excuse me. 225A, Agent. Go ahead.

A. As you see here, to reference the photographs in the big numbers, 49629, so this is the label we're looking at, at the top it will say evidence, case number G617066G. G6 represents Tampa. 17 was the year that the case was opened

up. 0066 was the number of cases that was opened up at that time when that one came about. Exhibit number would be 30. That was the 30th drug exhibit that was seized so far in this case.

The date acquired, February 15th of '18. Location 11788 66th Street. Acquired by Task Force Officer John Wilson, and you'll have the signature, sealed by, that's John Wilson. And witnessed by line. And if you go down, you have a couple of blank lines where it says laboratory use below this line, which I don't know if they can enlarge it. Because I can barely see that. There we go.

Once this bag, we seal it, processes the evidence in-house, but we can't determine what the substance is. We suspect what it is, but, again, these are unknown substances. Until you actually analyze it or have a chemist analyze it, you really don't know what it is.

So we sent it to the lab. The lab goes through the bottom of the bag, opens it up, who's it open, when's it open. They put their information in there and then they seal it back up on the bottom.

So the top seal is this red strip here. That's when we seal it and the date we seal it. And then at the bottom if it's opened for processing or further analysis, that's done down here and a little sticker is placed on it.

Q. You indicated that 225 was the microcrystalline

cellulose that we saw previously in some pictures. Let's take a look at Government's Exhibit 226. Is this similarly a substance that you found in the black locker?
A. Yes.
Q. And what does this appear to be?
A. That blue material and another white unknown material.
Q. And was that the blue Firmapress bag that we saw and the silver bag earlier?
A. Yes.
Q. What DEA exhibit numbers are on these items?
A. This one's DEA Exhibit Number 32.
Q. And it's got both exhibits in it. Can we also look at -- 226 has both in it; right? 27 and 32?
A. Yes.
Q. All right. Then let's take a look at Government's Exhibit 224. Now, what is Government's Exhibit -- what's contained inside Government's Exhibit 224?
A. 224, these are going to be the punch dies or the dies or the stamps, if you will, that I took out of the machines. See, they're approximately an inch long as I'm holding them up.
These are the actual physical dies that were taken out of the machines on that day. When you saw my hand with the cut glove, that's what I pulled out.
Q. Were you able -- when you examined them through the

double bags, were you able to make out what was at the end of those pill stamps?

A. Yes, it looked like the Actavis trademark A slash 21. You can barely see the 5.

Q. Agent Zdrojewski, when you look at this, the front of this bag, it appears to have been tested. Is it typical to test these kind of items or at least send them to the lab to be tested?

A. Yes, because there's substance on it.

Q. Usually some kind of residue?

A. Within the die, yes.

Q. All right. And then let's take a look at the final two. Let's take a look at Government's Exhibit 221A or 221. And then the photograph 221A. What is this exhibit, Agent Zdrojewski?

A. Okay. Again, with the multi-bagging process that we do, it's kind of difficult to see, but you can see the hundreds of tablets or pills that are in here. And these are those blue pills that look like Actavis oxycodone 30-milligram tablets. These are the counterfeit pills.

Q. And you can see them -- when you hold it up, you can seek the back, I think, from --

A. Yes. With the light, if you push kind of tight, you can see them.

Q. And that are all those bags that we saw when that small

tan safe was opened that were laying on -- laying across the ground?

A. Yes, ma'am.

Q. And what is the DEA exhibit number on these blue pills that were found from 11788 66th?

A. Thirty-three.

Q. And are you able to ascertain if there is a chemist signature at the bottom and who that is?

A. It says Collins or Calling.

Q. And that's one of the -- where are these kind of items sent if they're filled out by a DEA -- by a DEA laboratory, where are these items sent? Is there a lab in this area that you send these to?

A. When we seize it as field agents or street agents, us on the front lines, once we get it, we send it down to the Southeast Laboratory in Miami.

Q. And are some of these other stickers that are on the back, are those placed on the bag by the DEA Southeast Laboratory?

A. Yes.

Q. All right. Let's look at the final Government's Exhibit No. 222 and then the corresponding 222A. What is this item, Agent Zdrojewski?

A. These are -- when you're looking at the photos previously, we saw the pills, the yellow and blue, that's

what these are. These are smashed up by this time. I believe they're analyzed, and that's why they're not in the pill form anymore.

MS. HOWARD-ALLEN: May I have a moment, Your Honor?

THE COURT: Yes.

(Discussion held off the record.)

MS. HOWARD-ALLEN: I don't have any other questions for Agent Zdrojewski at this time, Your Honor.

THE COURT: Thank you. Any cross-examination for this witness?

MR. MARTIN: Yes, Your Honor.

THE COURT: You may proceed, sir.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good morning.

A. Good morning, Mr. Martin.

Q. As I understand your testimony, the first thing you do -- and I know there's more than you; there's a team?

A. Yes.

Q. Is clear people?

A. Yes, sir.

Q. And you're probably clearing people from both the inside and outside; correct?

A. Yes, sir.

Q. Like if I was milling around, you'd ask me who I was and what I'm doing there?
A. Yes, sir. Or a member of the team would. Clearly us in the bags wouldn't do it. We'd pass them to someone else and let them do it, but, yes, sir.
Q. That doesn't mean everyone has to stay there, but you're going to find out what they --
A. Yes.
Q. Was Mr. Huffman there when you got there?
A. He was not. We waited till he left. Obviously, hazard environment. We're in these weird suits. For safety reasons we waited until he left. We stopped him away, and then we went in hoping there was no one else inside that location.
Q. Okay. So you let Mr. Huffman leave, and he was detained by someone else; correct?
A. Yes, sir.
Q. Was there anyone in this area?
A. Area, or what are you considering area, sir?
Q. Was there anyone inside?
A. Inside of B1? No, there were not.
Q. Was there anyone that you had that you remember or your team had to detain that was in the area of B1?
A. I believe there were some peripheral people that were later let go with adjacent businesses, but I wasn't a part of that.

Q. So you didn't have anything to do with anybody that might have been talked to that was found in the area?
A. No, I did not.
Q. And you're wearing, you and your members of your team are wearing protective gear; correct?
A. Correct.
Q. Because you don't know what substances are in there.
A. Correct.
Q. And for lack of a better way of describe it, some type of drugs that are illegal -- are illegal, but they're not dangerous to touch; is that fair to say?
A. Would you mind repeating that?
Q. Yes. In other words, not every drug that's illegal is dangerous to touch.
A. True.
Q. But you don't know what's what?
A. I don't know. I don't know.
Q. Now, some drugs that are illegal based on your experience are dangerous to touch.
A. Yes.
Q. Okay. What about fentanyl, is that one of those dangerous to touch or don't need to worry about?
A. I don't want to touch it.
Q. Okay. So my interpretation of that answer would be it's dangerous?

A. Dangerous, yes, sir.
Q. And how would you rank, based on your experience, fentanyl and the danger category? Is it one of the most dangerous?
A. From my experience, it is. I mean it's an opiate, so, yes, sir, it's pretty dangerous, and it's very concentrated in its raw form.
Q. Maybe the dangerous?
A. That's what we see on the news right now.
Q. That's a fair statement.
A. Yes, sir.
Q. All right. So that's why you have on -- and it's because it's unknown, but this case you had some idea that fentanyl might be in there before you went in there?
A. Yes, sir.
Q. All right. So, now, when you went through -- and one of the things that you also noticed is -- my term may not be good -- this was a mechanic shop, auto shop also?
A. Fair enough. Motorcycle shop, go-cart shop, ATV shop. Some sort of repair shop.
Q. Fix things, maybe even paint things, et cetera?
A. Yes, sir.
Q. And did you and your team search the area pretty good?
A. Yes, sir.
Q. Did you notice any type of protective gear?

A. Did not.
Q. Okay. So you all had protective gear on, but you didn't notice like a suit like you had on or anything similar laying around or hanging up?
A. No, sir, I did not.
Q. Would that be something that you would take note of if you saw it?
A. Protective gear in there?
Q. Yes.
A. Yes, sir.
Q. Because obviously everything that you see when you're doing a search, you're not necessarily taking note of, fair to say?
A. You take a mental note, but not -- like the toolboxes in there. Note the toolboxes are in there. It's in the shop, but I'm not thinking it's being used to manufacture fentanyl tablets.
Q. And maybe like you see a screwdriver or something?
A. Yes, sir.
Q. You know, you see it, but it's really not part of what you're looking for?
A. Yes, sir.
Q. Okay. And there are probably a number of items in a mechanics shop that you saw, you noticed, but didn't really have anything to do with why you were there?

A. Yes, sir.
Q. But protective gear would be on the other end, in other words, that's something you would have noticed and made note of; correct?
A. Yes.
Q. Okay. Just like pills.
A. Oh, clearly. Yes, sir.
Q. Now, if you know -- and if you don't know, that's fine. How many of you were on the team that was searching B1?
A. There was -- the actual entry team and search team there was four of us. You have to go in in pairs in case somebody goes down, you need somebody to come out for safety reason.
We had two that were kind of backed off so we could rotate 15 minutes in, 15 minutes out, you know, change out our tanks and so on and so forth as the air went down. So it was roughly four. There were a lot of people there, but not many folks are clan lab certified because it doesn't look like that fun of a job and really isn't.
But, you know, four of us were certified at the time, and we went in and got it done.
Q. I can appreciate it. I'm a retired marine. It isn't fun being protected.
A. Very hot that day.
Q. Now, all the other members of your team, they were also

in that protective gear?
A. Yes, sir. When you say the "team," people that were going inside and processing those pieces of evidence raw before they were taken into a neutral site, yes, we were all in that gear?
Q. That's what I'm focusing on. I'm not talking maybe you had someone at the end --
A. Peripheral --
Q. -- of the block for security or something. I'm not talking about them.
A. I got you.
Q. I'm talking about the people that went in to process.
A. Yes, sir. There were four of us.
Q. How many -- and if you can tell me, how many pill presses did you find there?
A. Four.
Q. Okay. And one -- was it one electric and three -- and I'm using the term "manual"?
A. We'll say three manual and then the one that was located in that black safe was electric. It looked like you could hook something to it, a motor to it, and make it automatic, if you will.
Q. Okay. And once Mr. Huffman returned to the scene, he helped you get in the safe; correct?
A. He gave us the keep to the black one. We ended up

having to manually get into it, and he did give us the code, or whoever gave me the code said he gave us the code to get into the little tan one, if you will, the smaller one contained within the black.

Q. He gave you the key for the outside. Probably was no good because you all kind of busted it, fair to say?

A. Fair to say.

Q. And then he gave you have the manual combo?

A. Digital combo, yes, sir.

Q. Whatever it was. Okay.

Thank you, no further questions.

THE COURT: Thank you. Any redirect?

MS. HOWARD-ALLEN: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Agent Zdrojewski, Mr. Martin was asking you, Mr. Huffman didn't personally come up to you and hand you the key or tell you the code, did he?

A. No, he did not.

Q. Did you even see him?

A. I did see him.

Q. Did you know was he -- before he was at the shop, do you know whether he was at the shop or where he was, at home, or where he was before you entered?

A. When we heard that -- we weren't going to go in there

until we knew he left.
Q. I was asking personally if you saw him leave or you knew where he was?
A. No, I did not.
Q. Agent Zdrojewski, Mr. Martin asked you about the danger of fentanyl. Are there different types that are more dangerous than others?
A. There are. And it also depends on a person's --
Q. Deadly?
A. -- use of it. And use of opioids.
Q. Are you familiar with the term "opiate naive"?
A. I am.
Q. What does that mean?
A. I don't take opiates, so I'd be naive if I were to take, say, an oxycodone 30. It would affect me different than someone who takes oxycodone 30s every day. You tend to build up a tolerance.
If somebody who has built up a tolerance to say opiates and are working around these type of substances, whether it be some sort of opiates --
MR. MARTIN: Objection, Your Honor. I don't think this witness has this expertise in this area.
THE COURT: What's your response?
MS. HOWARD-ALLEN: I'm happy to qualify him further.

THE COURT: Why don't you do that. Go ahead.

BY MS. HOWARD-ALLEN:

Q. And the tactical diversion squad, is opiate naive a significant term to the tactical diversion squad?

A. It is.

Q. Why so?

A. Because we deal with patients and patients of these pain clinics that become addicts, and you'll see some folks that they'll take up to -- I've seen them take a hundred oxycodone 30s a day, and they're not opiate naive. They have built up a tolerance over the years.

I've interviewed and spoken with expert witnesses that have described that type of phenomenon, how it works within the human body, and how the receptors get used to the opiates. And the tolerance then builds up within and you need more and more of the substance to, say, feel an effect or even, say, overdose.

Q. And you'd indicated, is fentanyl an opiate?

A. It is.

Q. And so what would be the effect of someone in terms of needing any kind of protective gear or being able to take that if they were opiate naive?

A. If you were naive, you'd -- like I was, definitely going to wear a garbage bag and be on air going in there.

But if I were around it or on an opiate, whether

it be morphine, fentanyl, Oxycontin, oxycodone, my body would probably tolerate it if I did ingest some sort of opiate.
Q. The same if you were around it working a pill press or having it in the area?
A. Yes, ma'am.
MS. HOWARD-ALLEN: Nothing further, Your Honor.
THE COURT: Thank you. Anything else, Mr. Martin?
MR. MARTIN: No, Your Honor.
THE COURT: The witness is excused. We appreciate you coming in today to testify.
Are you ready with your next witness, please?
MS. GUZMAN: Yes, Your Honor. The government would call Samuel Huffman.
THE COURTROOM DEPUTY: Please raise your right hand.
Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes, ma'am.
THE COURTROOM DEPUTY: Please state and spell your name for the record.
THE WITNESS: Samuel Blaine Huffman, Jr., H-u-f-f-m-a-n.
THE COURT: Thank you. You may be seated, Mr. Huffman.

And, Miss Howard-Allen, when we finish with this witness, we can go ahead and display these exhibits to the jury since these exhibits will not go back with them. It's just the photographs.

MS. HOWARD-ALLEN: That would be great. Thank you.

THE COURT: I meant to do that with the other witness, and I forgot to do it. But we will do it sometime either this morning or this afternoon.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: Mr. Huffman, you're going to be asked some questions by Maria Guzman, Assistant United States Attorney. And then in cross-examination, Mr. Martin who represents Mr. Fisher, may ask you some questions.

If you don't understand the question, please say so so they can state it another way. You need to speak up because we need to hear you.

THE WITNESS: Yes, ma'am.

THE COURT: If you have the tenancy to speak quickly, please slow down. If you have the tendency to mumble, please speak clearly so that we can understand you. All right? Okay?

THE WITNESS: Yes, ma'am.

THE COURT: All right. Very good. Go ahead, Miss Guzman.

SAMUEL B. HUFFMAN, JR.,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good morning, sir. Would you please statement your name again for -- when I ask you something, let me furnish because if not --

THE COURT: And that's another thing I forgot to say. You've got to wait until the question is finished. Because if two people are speaking at the same time, it's hard for us to understand what's being said and the court reporter can't take it down.

So wait for her to finish and then you answer. I know it can be a nervous situation to be here in the courtroom, but that's just the way we have to do things so we can all understand. All right? Okay. Go ahead.

BY MS. GUZMAN:

Q. Thank you, Your Honor.

Please state your name again for the Court and the jury.

A. Samuel Blaine Huffman, Junior.

Q. And, again, keep your voice up as much as you can.

THE COURT: Ladies and gentlemen, if you can't hear, just let me know and we will give him a handheld mic.

Some people don't do well with these lavalier mics. So please let me know. Go ahead.

BY MS. GUZMAN:

Q. Mr. Huffman, were you charged with federal drug charges?

A. Yes.

Q. And were you charged with those federal drug charges along with Dion Fisher?

A. Yes, ma'am.

Q. And what is -- what happened to your case?

A. I don't understand.

Q. Did you plead guilty to your case?

A. Yes, ma'am.

Q. Are you awaiting sentencing?

A. Yes, ma'am.

Q. Mr. Huffman, if you remember, about when did you meet Dion Fisher?

A. Around 2014.

Q. Okay. I need you again try as much as you can --

THE COURT: I have trouble understanding you. You just need to --

THE WITNESS: I have bronchitis, too.

THE COURT: Hold on. Hold on, folks. I don't know if we ought to give him a handheld mic. I don't know if that will be better. But you've got to speak clearly because

the acoustics here aren't very good, Mr. Huffman. I'm sorry. I just think you're going to be better with a handheld mic.

All right. Now, you've got to hold it right here. That's it. Hopefully it will be better.

MS. GUZMAN: Thank you, Your Honor.

BY MS. GUZMAN:

Q. Mr. Huffman, my last question was, do you recall when you met Dion Fisher?

A. Around 2014.

Q. And do you remember how you met Dion Fisher?

A. Through a friend of mine.

Q. Do you recall what friend?

A. Yes, John Green.

Q. And do you remember where you met Dion Fisher?

A. I think it was at the club.

Q. And do you recall what clubs those were?

A. Hideaway.

Q. Hideaway?

A. Hideaway Bar.

Q. And where is the Hideaway located, if you remember?

A. On McMullen-Booth.

Q. I'm sorry?

A. McMullen-Booth.

Q. And in what city is that located?

A. I guess it would be Clearwater.

Q. When you met Mr. Fisher, what was your relationship with Mr. Fisher?
A. I didn't really know him. I just hung out with John, and then we started talking, drinking and stuff.
Q. Would you say that your relationship initially with Mr. Fisher was social?
A. Yes.
Q. At some point, did you engage in a business relationship with Mr. Fisher?
A. Yes, ma'am.
Q. And what was that business?
A. Selling ecstasy pills.
Q. And where were you selling the ecstasy pills?
A. Strip clubs and to friends.
Q. And how did that work?
A. I called him and tell him I needed certain amount and go and pick it up, and then go distribute it.
Q. And this might be a good time for purposes of the record, do you see Dion Fisher in the courtroom here today?
A. Yes, ma'am.
Q. And would you please identify where Mr. Fisher is and an article of his clothing?
A. (Indicating) The gentleman sitting right here with the lawyer. In the gray jacket.
MS. GUZMAN: Your Honor, if the record would

reflect the witness has identified Dion Fisher?

THE COURT: The record will so reflect.

BY MS. GUZMAN:

Q. You indicated that you would call Mr. Fisher for ecstasy pills; is that correct?

A. Yes.

Q. Are ecstasy pills also called Molly?

A. It can be.

Q. At some point did you become involved with Mr. Fisher in other types of drugs?

A. Later on.

Q. Do you recall approximately what year you met Mr. Fisher?

A. Around 2014.

Q. And do you recall in 2016 getting involved in some other type of drug?

A. Yes.

Q. And what was that drug?

A. Pressing roxies.

Q. Would you please explain to us how that happened.

A. I was brought pill presses and was asked if I could fix it.

Q. Okay. So who brought you the pill presses?

A. Dion Fisher.

Q. And who asked you to fix them?

A. Dion Fisher.
Q. And did you fix them?
A. Yes.
Q. And then what happened with those pill presses?
A. They kept breaking, got other parts and pieces and tried to make them work.
Q. Now, as I understand it -- well, first of all, what kind of work do you do?
A. I own a mechanic and auto body shop.
Q. When you were provided these pill presses by Mr. Fisher, where would you fix them?
A. It started off at my little storage bay that I had. Fix it.
Q. And where was that storage bay located?
A. 49th Street and 126th.
Q. At some point, did you obtain a second storage warehouse or bin at 66th Street North?
A. Yes. That's my business now.
Q. And, again, just for purposes of the record, is it located at 11788 66th Street North?
A. Yes, Largo.
Q. And is there a particular unit number?
A. B1.
Q. And what city is that in?
A. Largo.

Q. You indicated that you fixed these pill presses, and what did you do with them?
A. Well, I had to take a bunch of pieces and try to make one work, started off with a hand crank pill press.
Q. What is a hand crank pill press?
A. You had to crank it like this (indicating) to get one to go.
Q. For purposes of the record, you're using your right hand, and it looks like you are just going in a circular motion. Is that how you would use it?
A. Yes.
Q. Are there other types of pill presses?
A. Yes, there's electric ones with motors.
Q. And what is the difference between a hand crank and an electric one?
A. Well, the electric one you have to just push a button and it would go.
Q. When you started using the first, the manual presses, what were you doing? What were you using them for?
A. To press blues.
Q. And when you testify that you were pressing blues, blue what? What were blues?
A. Roxies, '30s.
Q. Did there come a point that you were pressing fentanyl pills?

A. Yes.
Q. And tell us how that happened.
A. That's more of the roxies. They were fentanyl pressed to look like roxies.
Q. And who were you pressing pills with?
A. Dion Fisher.
Q. Now, who was the person physically using the hand crank and -- in order to get these pills?
A. I was.
Q. I'm sorry?
A. I was.
Q. And what was Dion Fisher doing?
A. He'd be watching, giving me the formula for how to do it.
Q. Okay. You said that Mr. Fisher would give you what, a formula?
A. Yeah.
Q. And a formula to do what?
A. To mix the chemicals together for the binding agents to put through the machine to actually make the pills.
Q. And how would you obtain these binding materials or chemicals?
A. From Dion Fisher.
Q. Now, this recipe that was provided by Dion Fisher, do you recall what it was?

A. I know it's blue press, firm press. There's a white powder and then another white powder and then the fentanyl.
Q. And when you were doing the hand crank, how many pills could you actually, for lack of a better word, crank out?
A. With the hand crank, it would take a long time to do, maybe a couple hundred.
Q. A couple of hundred?
A. Yeah.
Q. And when would you do this?
A. At nighttime.
Q. And how long would it take you when you would be doing this at night?
A. Well, if the machines weren't jamming up, and if it was going okay, to do a hundred, probably about three or four hours.
Q. And when you were able to create these hundred pills?
A. Yes.
Q. What would you do with the hundred pills?
A. Then I would bag them up, count them, then bag them and then put them in the safe.
Q. And after you put them in the safe, what would you do?
A. I don't understand.
Q. After you took the pills and you put them in the bag and you put them in the safe, what was Dion Fisher's role?
A. To come get them and distribute them.

Q. And would you be paid?
A. Yes.
Q. And what were you paid?
A. Sometimes I was paid in pills and sometimes I was paid in money.
Q. And for let's say a hundred pills, how much would you generally get in cash?
A. Well, we tried to do at least a thousand through the whole city, and I'd make like 250 bucks. Or I'd make maybe a hundred for two pills.
Q. So for -- if I understand your testimony correctly, for every thousand pills that you were able to produce, your payment was $250?
A. Yes.
Q. And who would pay you the $250?
A. Dion Fisher.
Q. Who would take the thousand pills?
A. Dion.
Q. And how long did you have this business relationship with Dion Fisher?
A. I can't really recall how long.
Q. Well --
A. It was from like 2016 to 2018.
Q. So the best you remember, about two years?
A. Yes.

Q. And during a week, a normal week, how many times were you pressing pills?
A. Well, it would all depend on the orders. So, I mean, I could do it two times a week, three times a week.
Q. And these orders, were they from -- who were the orders from?
A. Dion Fisher.
Q. And, again, at this time, were you working -- between 2016 and 2018, were you working exclusively with Dion Fisher?
A. Yes.
Q. Aside from working and creating these pills, did you socialize with Dion Fisher?
A. Yes.
Q. Did you go to sporting events with Dion Fisher?
A. Yes.
Q. Do you recall any sporting events that you went to with him?
A. Yes. We went to the Mayweather retirement fight.
Q. Where was that?
A. In Vegas.
Q. And who paid for the tickets?
A. I paid for my plane ticket, and he paid for the fight and hotel stay.
Q. When you say he paid for --
A. Dion Fisher. Sorry.

Q. Did you go to any other sporting events that you recall?
A. Yes, I went to Vegas twice with him.
Q. And who was footing the bill for those trips?
A. Dion Fisher.
Q. Did you receive any type of jewelry?
A. Yes.
Q. Or gifts from Dion Fisher?
A. Yes, ma'am.
Q. What kind of gifts would you receive?
A. I received a skull ring, diamond ring. And I received a skull pendant and chain, and then another blue skull pendant.
Q. And you indicated that you received some kind of a skull ring?
A. Yes, ma'am.
Q. And that is skull, s-k-u-l-l?
A. Yes, like the skull and crossbones.
Q. Any other gifts that you remember?
A. Yes, he also bought me a pair of sunglasses.
Q. Now, you indicated earlier that the recipe to essentially press these pills or cook these pills was provided to you by Mr. Fisher; correct?
A. Yes, ma'am.
Q. Do you recall whether Mr. Fisher also brought you --

what kind of materials he brought you?
A. Yes, ma'am.
Q. What kind of materials did he bring you?
A. He would bring me the fentanyl, and then he would bring me the white powder, the blue Firmapress, and the fluffy white powder.
Q. Do you remember what the fluffy white powder was called?
A. No, I don't.
Q. Do you recall whether Mr. Fisher provided you with any instruments for your pressing the pills?
A. Yes, ma'am.
Q. What kind of instruments did he provide you?
A. It was a little bowl.
Q. I'm sorry. A little what?
A. A little mixing bowl that you had to grind the fentanyl down. I've gotten a coffee grinder to grind it to finish, to make it into a powder form. And then another mixing grinder, a container for mixing it all together. Once you've poured all the different things into it, you had to mix it. And then it would, you know -- I don't know how to explain it -- mix it all perfectly. So it's all --
Q. What about dishes or things to actual carry the materials, did he provide that for you as well?
A. Yes, ma'am. There were glass cookie sheets that he'd

bring the fentanyl in that was stuck to it.
Q. Any others that you recall?
A. Not at this point.
Q. Now, there came a point -- and I'm going to have some other additional questions for you in a few minutes, but did there come a point that there was -- that officers and law enforcement executed a search warrant at your business on 66th Street?
A. Yes, ma'am.
Q. And do you recall where you were when the search warrant took place?
A. I was at my house.
Q. And at some point, did you leave your house and go to where the search warrant was being executed?
A. Yes, ma'am.
Q. And how did that happen?
A. Well, I was arrested, tooken to the Police Department, questioned, asked for a lawyer. They took me back to my house, dropped me off. When I proceeded to go in my house and I started unloading my guns into my dad's car, they were watching me so they came and re-arrested me and took me to the site.
Q. Okay. When you went to the site, was law enforcement still there?
A. Yes, ma'am.

Q. A question that I have for you, when you were -- you indicated that when you would prepare or press these pills, you did them at night; is that correct?
A. Yes.
Q. Did you always do it at night, or did sometimes you do it during the day?
A. No. It was always at night.
Q. And reference the 66th Street warehouse, your work bay, were there any other people there with you?
A. Yes.
Q. And at the time that you did these pill presses, did you have any type of ventilation? Did you have any type of windows open, or did you have any type of garage doors open?
A. No.
Q. Now, you said you were a mechanic or you are a mechanic. Did you also use your work bay for regular mechanic business?
A. Yes.
Q. If you had a car inside of the work bay, what would happen to that car when you were doing your pill pressing?
A. Nothing.
Q. Would you leave it in the garage, or would you take it outside?
A. No; I'd leave it in there.
Q. Okay. When the search warrant took place -- if I could

have Government's Exhibit 110B. Mr. Huffman, can you see that on your monitor?
A. Yes, ma'am.
Q. Okay. Now, what is -- what is it that you are seeing in Government's Exhibit 110B?
A. This is the front of my building.
Q. And when you're referring to your building, is that the 11788 66th Street North, Unit B1?
A. Yes, ma'am.
Q. Is this the front or the back of that unit?
A. It's the front.
Q. And I see in that particular photograph there's a door that says B1. Where does that door lead to?
A. That leads to my office.
Q. Is that the only entrance to that particular work bay?
A. That's the only way you can get in with a key.
Q. Okay. Now, let me show you -- I think this would be a good time to show a video, which has been marked as 110A. Introduced into evidence as 110A.
THE COURT: Okay.
BY MS. GUZMAN:
Q. Can you see that on your monitor, Mr. Huffman?
A. Yes, ma'am.
Q. Now, if I could just stop for just a moment, the video. This particular car looks like it's an Infiniti. Whose car

did this belong to?
A. That's my old employee Zach Cadden. That's his mother's car.
Q. Thank you.
If I could just stop the video at this point. This blue bin, what is inside that blue bin?
A. That is the hand crank pill presses. All the part ones.
Q. And why were they in that blue container?
A. That's the parts that I would take from to build the machines that we was using.
Q. And who would provide you those pill presses?
A. Dion Fisher.
Q. Is this your office?
A. Yes.
Q. If I could stop the video here. There is a black vehicle that's covered in, I guess, some type of plastic or covering. Whose car is that?
A. That is Dion Fisher's.
Q. And why was that car in your warehouse or in your work bay? Let's be consistent. In your work bay.
A. He had a little accident, and I was doing an insurance job on it.
Q. Did you sometimes do mechanical work for him as well?
A. Yes.

Q. If I could stop the video here. Again, it appears that there are several vehicles or vehicle parts in the bay. Anything of importance? Was this your business?
A. Yes.
Q. Okay. I see here -- if we could stop it. Actually we can move forward. Stop it right here.
Now, if we could stop it here. In this particular part of your work bay, were there any drugs or instruments of drugs being stored?
A. Yes.
Q. Where?
A. This (indicating).
Q. You have a pointer in front of you. There is a pointer here. You can press that.
A. It was more over here.
Q. Press it on the actual screen.
A. It was over here in this corner. (Indicating)
Q. And what was located in that area?
A. There is a safe in the corner.
Q. Okay. If we can continue with the video. Anything that we are seeing here that was storing any type of drugs?
A. No.
Q. Okay. Let me stop it here. Where is the safe? If you can see it from this snapshot, where is the safe?
A. It's still to this left corner. (Indicating)

Q. So it's still moving a little bit towards your office?
A. Yes.
Q. Okay. Is there a generator in your business?
A. Generator?
Q. Generator. Did you have a big generator?
A. No, ma'am. I have an air compressor.
Q. Now, do you see the safe yet?
A. No.
Q. Okay. Anything in particular about this particular area of your work bay?
A. No, ma'am.
The safe is right there in the corner.
Q. Okay. So, again, using your pointer, it appears that -- to be a black freestanding -- do you call it a safe?
A. Yes, it's a gun safe.
Q. Okay. And what would you store inside that safe?
A. All the pill press, the binding agents, another smaller safe that's got the fentanyl pills in.
Q. And was this the location in your work bay where you would store all of your narcotics and your narcotics instruments?
A. Yes, ma'am.
Q. And why would you keep it in the safe?
A. Just because it looks hidden.
Q. Because it looks hidden. Was it locked?

A. Yes, ma'am.
Q. And how would this particular black safe lock?
A. With a key.
Q. And did you have a key?
A. Yes, ma'am.
Q. Did anyone else have a key?
A. Dion Fisher had a key.
Q. Okay. What are some of these items?
A. That's just my four-wheeler and go-cart and stuff.
Q. I'm going to show you some photographs after the video, but other than this particular black safe, any other location in the work bay that contained any type of narcotics or products or instruments that we should be aware of?
A. No.
Q. Well, we've moved forward to an office. Was that your office?
A. Yes.
Q. Were there any narcotics that you would store in your office?
A. No, ma'am.
Q. At the time that this search warrant occurred -- this was back in 2018 -- were you using drugs?
A. Yes.
Q. What kind of drugs did you use?
A. Cocaine.

Q. And what other -- any other drug?
A. No. Marijuana.
Q. Okay. Do you know if you had any type of cocaine or marijuana inside of your office?
A. I'm not sure.
Q. Would you have had any type of fentanyl or fentanyl instruments inside of your actual office?
A. No.
Q. Now, I'd like to show you some photographs. I believe that you have some. They're in front of you, but they're also going to be up for you to view. So I'd like to go back to Government's Exhibit 111.
Now, previously in the video, which again the video was Government's Exhibit 110A, as in apple, you referenced this black safe. Is this the same black safe that's depicted in this photograph?
A. Yes, ma'am.
Q. If I could go to -- now, before I go away from this picture, again, it appears that there was a lock; is that correct?
A. Yes, ma'am.
Q. Now, you indicated that you had a key?
A. Yes.
Q. At some point did you give the key to law enforcement?
A. Yes.

Q. Your key to law enforcement?
A. Yes, ma'am.
Q. And were they able to open the lock?
A. No, they were not.
Q. Okay. If I could go to Government's Exhibit 112. Again, it appears that this is -- well, you tell me. Is this the safe, the same safe?
A. Yes, ma'am.
Q. Government's Exhibit 113. So, is this the same safe?
A. Yes, ma'am.
Q. And does it appear to you that the safe is open?
A. Yes.
Q. I'm going to ask you to use your pointer again. Was the safe opened when you were there, or was it opened before you got there?
A. It was opened before I got there.
Q. Okay. Now, there are some items that are depicted in this exhibit, which is, again, Government's Exhibit 113. There appears to be some type of a glass dish. Could you point to that, please.
A. (Witness complies.)
Q. What is that?
A. That's the dish that he would bring the fentanyl in.
Q. When you say "he would bring the fentanyl," again who are you referring to?

A. Dion Fisher.
Q. It appears that there's some -- is there some powder on that dish in that photograph?
A. Yes, ma'am.
Q. And do you know what that powder is?
A. That's the mixture of the fentanyl and the binding agents.
Q. And the what?
A. Binding agents.
Q. Binding agents, okay. Now, on the other -- on the top side, it looks like, of the safe there are some other instruments. If you would go from -- what is this?
A. That is a coffee grinder.
Q. And what was that used for?
A. That was used for turning the hard fentanyl into a powder form.
Q. And how did you obtain this particular grinder?
A. Dion Fisher.
Q. When you say Dion Fisher, did Dion Fisher provide it to you?
A. Yes, ma'am.
Q. What is this?
A. That is --
Q. Depicted in the photograph as some type of a bowl?
A. That's the little bowl that we would put the hard

fentanyl in to get it crushed down enough to be able to put it into this to get it into the actual powder form.
Q. And who provided you with this particular bowl?
A. Dion Fisher.
Q. What is this particular cylinder?
A. That is where you would put the powder that was already mixed. That's the chute that goes down to the pill press, and there was a shaker that would shake the powder into the hole and the press would come down and press it into a pill.
Q. So was that why you had to have a chute?
A. Yes.
Q. What is this?
A. That's the --
Q. This red cup or glass.
A. That's the other grinder to mix the fentanyl and the other binding agents together so it would all get mixed properly.
Q. And then this last?
A. That is the mixer. That's the top for the mixer that you put it in.
Q. And what is this over here, does this have any significance, this white?
A. I think that's the fluffy white powder.
Q. So this is what you refer to as the fluffy white?
A. Yes.

Q. Now, you indicated that the grinder was provided to you by Mr. Fisher.
A. Yes.
Q. And you indicated that, I guess, the bowl for lack of a better word. What about these other items that you've now identified. Who provided you with those items?
A. Well, I had the New York Giants tray. And I had --
Q. These other items on top.
A. On the top, all Dion Fisher.
Q. What about the fluffy powder?
A. Dion Fisher.
Q. So, what is yours here that you yourself bought was the New York Giants tray?
A. Yes, ma'am, and the screen here.
Q. Let me show you what's been marked as Government's Exhibit 114. And what does that photograph show us?
A. That's the inside of the safe, as I had it all stacked in there.
Q. Now, what is there?
A. That's the little safe that I keep the pills in for Dion to come pick up.
Q. And these other items that are depicted in Government's Exhibit 114, what is this box?
A. That is the white powder for the mixing, for pressing the pills.

Q. How did you obtain this box which is located in the black safe?
A. From Dion Fisher.
Q. What are these brown boxes? Looks like a brown box. Do you know what that is?
A. I think that's the box that I was using to hold my drill.
Q. And this particular silver-type item, what is this?
A. That is the motor part for the electric pill press.
Q. And how did you obtain this particular electric part?
A. Dion Fisher.
Q. This item over here to the right of the photograph, what is this -- what this is showing?
A. That is the actual press.
Q. And this portion of the press, do you know what this is?
A. It's just a plate that was on it.
Q. Now, the electric -- this particular electric device that you -- I think you called it a motor.
A. That's where the old motor bolted to.
Q. Now, you said that Dion Fisher provided you this.
A. Yes, ma'am.
Q. And does this particular motor attach to this particular item, which is what you referred to as the electric pill press?

A. Yes, ma'am. It's all connected.
Q. And, again, who provided you all these items?
A. Dion Fisher.
Q. If I could go to Government's Exhibit 115. What does this picture show?
A. That's the chute for the powder to go down to the machine. That is the grinder to mix everything up. And then that's the inside of the safe.
Q. Is this just a different angle of the safe?
A. Yes, ma'am.
Q. Okay. Let me go to Government's Exhibit 116. Again, is this the same safe?
A. Yes, ma'am.
Q. Government's Exhibit 119. What is this particular silver item?
A. That is the screen.
Q. And what is that used for?
A. I would use that for -- to set inside of that glass container and then made a chute for the extra powder that would get shaken out to come down the chute and fall in there. And the pills would roll down into that and hold inside of that, and the powder would go through it down to the bowl so I could reuse it.
Q. And when you were mixing all of these items together, Mr. Huffman, what did you think -- what was it you were

creating? What was it that you were mixing?
A. Fentanyl and other binding agents to make roxies.
Q. When Mr. Fisher would bring the fentanyl to you, what would it look like?
A. It was hard, like chunks. It would be stuck inside of the glass containers that he'd bring in.
Q. So these mixing materials that you have referenced to and identified in these photographs, what would you do with these rock-like substances with these materials? What was your job?
A. To weigh the hard material, then grind it down, put it into the different grinders. It would go into the coffee grinder first. After the bowl it would go into the coffee grinder, and it would get ground to powder. And then I'd weigh out in cups the different materials that would go into it. And then it would get put into the other grinder to get all mixed together.
Q. Let me show you what's been marked as Government's Exhibit 117. What was the purpose of this New York Giants tray?
A. That's where I would dump the pills out from the screen and count them.
Q. And do what?
A. And count them.
Q. And count them. Okay. What about the spoon that we

see here? What would you do with this spoon?
A. I would just use that spoon to dip in the bags and put the other binding agents into the cup.
Q. Did anyone else -- I'd asked you whether anyone had a key to the safe. You indicated Mr. Fisher. Did anybody else have a key -- first of all, did you have a key to your own work bay?
A. Yes.
Q. Did anybody else have a key to your work bay?
A. Yes.
Q. Who would that be?
A. Zachary had it, and Dion Fisher.
Q. Why did Dion Fisher have a key to your work bay?
A. So that he could come in, drop stuff to me for me to press and to pick up different things.
Q. If I could go to Government's Exhibit 120, you had previously identified a smaller safe. Do you see the smaller safe in Government's Exhibit 120?
A. Yes, ma'am. The white safe.
Q. And who bought that safe?
A. I did.
Q. And what was the purpose of having a smaller safe?
A. Well, it was for my own property, and then once I started this, I moved it here and used it to hold the actual pills that were already counted and bagged up.

Q. And in order to open the smaller safe, how would you open it?
A. With a combination.
Q. And did you have a combination code?
A. Yes.
Q. Did anybody else have a combination code?
A. Me and Dion Fisher.
Q. If we could go to Government's Exhibit 121. Now, it -- what does 121 show?
A. It shows the inside of the safe. It has a lot of the little baggies I would use to count and put them in the bags.
Q. So these little baggies were used for what again?
A. For -- to hold the pills to distribute them.
Q. Once you pressed the pills, and you actually had the pills and counted them, where would you put them?
A. Put them inside of there. Inside of the safe.
Q. What else is shown in this particular photograph, if you can see, other than these baggies?
A. Well, this pill bottle was mine. It was an old medication bottle that I had.
Q. Anything else that you can see from this photograph other than the baggies?
A. These are the fentanyl pills already bagged up.
Q. If we could go to Government's Exhibit 122. Again, this particular item, is this a safe?

A. Yes, ma'am.

Q. There are items on the floor. What are those items next to the smaller safe? What are these blue baggies?

A. These are all the 50 packs of fentanyl pressed pills. These are just miscellaneous pills. And this is a bag of the ones that I didn't get to count.

Q. Now, how did these blue pills get in these small plastic baggies?

A. I counted them and put them in there.

Q. And once you counted them and put them in the smaller baggies and then put them in the safe, what would happen next?

A. Then I would tell D that they're done, and he would come collect them.

Q. Who is D?

A. Dion Fisher.

Q. And was that a routine procedure for you?

A. Yes, ma'am.

Q. Approximately how many times a week would you put these in these baggies, put them in the smaller safe, and call Dion to come pick them up?

A. It would all depend on the orders. Or what he would drop me off to press.

Q. What was an average?

A. Two, maybe three times a week.

Q. Now, if I could go to -- I would like to go to Government's Exhibit 129. What is this? What does this photograph show us?
A. That's the electric pill press.
Q. And where was this electric pill press located?
A. Inside of the --
Q. In your work bay, where was it located?
A. Inside of the black safe.
Q. And we had seen some hand cranked presses before, if you recall, in your back bay in that blue tub?
A. Yes, ma'am.
Q. How many electric presses did you have?
A. Just one.
Q. And how did you obtain the electric pill press?
A. From Dion Fisher.
Q. If I could go to, I guess, Page 2 of that exhibit. Again, this is Government's Exhibit 129, Page 2 of that exhibit. What is depicted here? What are we seeing here in this photograph?
A. Well, this is the top of the press. This is the shafts that go around. This would make come down and make the shaker shake. This is where the powder was put into. This is where I hooked the drill up to.
Q. If I could go to, I guess, Page 3 again of Exhibit 129. What are we seeing in this particular photo?

A. This is where that shaft would come down the chute, would drop powder into this thing, and then this would come down further and shake onto the surface.
Q. And, again, for purposes of the record it seems like it's a silver -- is this like a silver cylinder?
A. Yes, ma'am.
Q. Page 4 of Exhibit 129. It appears this is some type of label?
A. Yes, ma'am.
Q. Is the label in English?
A. No.
Q. Do you know what language that's in?
A. I think it's Chinese.
Q. Again, did you receive this particular item from Dion Fisher?
A. Yes, ma'am.
Q. Now, I'd like to go to Government's Exhibit 130 because you had referenced a die. So I want to talk to you a little bit about that. Now, in Government's Exhibit 130, this is the same electric pill press; correct?
A. Yes, ma'am.
Q. Now, what portion of the pill press are we looking at here on the bottom? What is this?
A. This is right here is the stamp that would come down into this round cylinder, and then this one come up this way,

this one comes down. This here shakes the powder onto here. Then these two connect together to press out a pill. And then it would fall right here.

Q. And how did you learn how to do this?

A. From Dion Fisher.

Q. Now, when you say that you learned from Dion Fisher, how did he teach you how to do this?

A. Well, he brought me these machines, and I started working on them, fixing them. And he gave me just a blue Firmapress at first to be able to get it to actually work. And then after I learned from the hand crank machines, it was kind of pretty much the same thing with this.

Besides the motor was burned up. That was on the backside of here. And once the motor was burned up, I tried to put a bigger motor here so that's why this bracket's here to hold the other motor so that I could get the shaft onto here to make it work, but it didn't never work properly. So I kept trying and trying.

Q. Let me show you what's been marked as Government's Exhibit 125. You referenced a Firmapress. What is contained in this particular --

A. That's the blue Firmapress.

Q. What was the purpose of this, of the contents of this bag that says blue?

A. That was -- that would give it its press to hold it

together.
Q. Was this some kind of like a molding filler, or what exactly would this do when you were pressing pills?
A. Well, that would give it its strength, I guess, to stay together and the color for the -- to make the blues.
Q. And how did you learn how to use this Firmapress blue?
A. From Dion Fisher.
Q. Let me show you Government's Exhibit 124. You've talked about a fluffy powder. Is that what you call it?
A. Yes.
Q. In Government's Exhibit 124, what are we seeing in Government's Exhibit 124?
A. Well that's the other white powder.
Q. Okay. Is this the fluffy powder or is this a different type of powder?
A. No, that's the other powder. That was another binding agent.
Q. And did you use this in order to create these pills?
A. Yes, ma'am.
Q. If I could go to -- okay. If you see it, there are several images here in Government's Exhibit 125. What are these packages?
A. That's the white filler.
Q. And did you have all of these? It seems like there's a lot?

A. Yes, they were in that box.
Q. And how much would you use when you were doing a batch of a thousand pills?
A. I can't recall exactly, but it was around 32 grams of it to make a thousand pills.
Q. Now, Government's Exhibit 126.
A. That's the fluffy white powder.
Q. Okay. So Government's Exhibit 126 is what you call the fluffy white powder, and there's a label, and the label says magnesium stearate.
A. Yes, ma'am.
Q. What would you use this particular item for?
A. That would give it the shine and make the imprint, like stand out.
Q. Now, referencing this fluffy white powder and the other bags of white powder that we saw right before, who provided you this powder?
A. Dion Fisher.
Q. Now, the pill presses that were located in your back bay, the ones in the blue container and then the electric one, why did Dion Fisher provide you these?
A. To press these pills.
Q. Going back to Government's Exhibit 122, all of these pills that we have seen before, Government's Exhibit 122, whose pills were these?

A. They were Dion Fisher's and myself.
Q. Who created them, or who produced them?
A. I created them. We both produced them.
Q. And once they were finished, who were they going to?
A. The ones that I couldn't sell, they would go to Dion Fisher.
Q. These particular baggies here that are depicted in Government's Exhibit 122, what were their final destination? Who was going to pick up these bags?
A. Dion Fisher.
THE COURT: Let me know when you have a good stopping point.
MS. GUZMAN: Yes, Your Honor.
BY MS. GUZMAN:
Q. Let me just do Government's Exhibit 127. This particular box, where was this particular box located?
A. In the safe.
Q. Was it in the large black safe or in the smaller tan safe?
A. It was in the large black safe.
Q. And who was this particular box addressed to?
A. Dion Fisher.
Q. And why was this particular box in your safe?
A. That was what carried the white powder.
Q. And how did you -- how did you obtain or how did you

get this particular brown box?
A. From Dion Fisher.
Q. Now, it's addressed to a different address than your work bay. So how did it end up in your work bay?
A. He brought it to me.
Q. Who brought it to you?
A. Dion Fisher brought it to me.
MS. GUZMAN: Your Honor, if I may have a moment.
(Discussion held off the record.)
MS. GUZMAN: Your Honor, I'm going to show one more exhibit, and perhaps we can take a break.
THE COURT: Of course.
BY MS. GUZMAN:
Q. Government's Exhibit 120. Government's Exhibit 125. We've seen this before. You've already explained this was the Firmapress blue.
A. Yes, ma'am.
Q. There's something here, there's some writing. What is that?
A. That was a 12, and then I changed it to 13.
Q. And what does that mean? What is that number?
A. That's how much of that product I had to put in the mixture.
Q. And how -- and how did you learn that that's what you needed to do in terms of this mixture being used?

A. From Dion Fisher.
Q. Is this your handwriting?
A. Yes, ma'am.
MS. GUZMAN: Your Honor, I think this might be a good time to take a break.
THE COURT: Okay. Ladies and gentlemen, we're going to take our lunch break. We're going to take about an hour. So we'll come back a little bit after 1:15.
Please remember if you run into any of these people, not to talk to any of the witnesses, or parties or participants. We'll resume a little bit after 1:15 this afternoon. We'll see you back here then.
COURT SECURITY OFFICER: All rise for the jury.
(Jury exits courtroom at 12:17 p.m.)
COURT SECURITY OFFICER: Please be seated.
THE COURT: Please be seated. Let me just remind Mr. Huffman, we're in the middle of your testimony, so please don't discuss it with anyone. Do you understand that?
THE WITNESS: Yes, ma'am.
THE COURT: All right. You're excused. You should come back here at 1:15 so we can promptly start.
THE WITNESS: Thank you.
THE COURT: Anything from the government's perspective? Please don't let me forget to show this to them today before you take it back, to show it to the jury or just

have one of the case agents, the DEA agent, walk it in front of the jury. Are you going to then after court, are you going to take it back to the evidence room?

THE AGENT: Yes, Your Honor.

THE COURT: Okay.

MS. HOWARD-ALLEN: We intend to bring it all back the last day to sort of put there, you know, so if they need to come out. But I don't know that we were going to return it every day in between. So if we show them that day, then it will all be there. And then if they want to leave the jury room and come out and look at it, the DEA agent will be sitting here all day while it's up there.

THE COURT: Let's go ahead and show it to them today before you take it back to the evidence vault, and then, of course, the last day. That's perfectly fine.

MS. HOWARD-ALLEN: Maybe we'll just start there after lunch before we get back into the rest of Miss Guzman's direct.

THE COURT: That's a good idea. Because what happens is we just forget about it. I meant to do it with that witness you brought in earlier today.

Anything from your side there, Mr. Martin?

MR. MARTIN: No, Your Honor.

MS. HOWARD-ALLEN: Your Honor, we just have to call a chemist -- Miss Guzman has to call a chemist this

afternoon out of order. She was going on with as many chemists as we had going on two weeks vacation. So we'll be putting in more evidence, but just for identification, since it's not in evidence, since she was being called out of order. But we have to get her on this afternoon after Mr. Huffman.

THE COURT: Okay. All right. Thank you, and we are in recess. Thank you.

(Recess taken from 12:19 p.m. to 1:18 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Are the jurors all here?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Very good. Were we going to show them the exhibit first?

MS. HOWARD-ALLEN: Oh, yes. Would you like him to wait outside?

THE COURT: I think he should do that. I think he should wait out there.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: I don't want to forget. I forgot twice already.

MS. HOWARD-ALLEN: And I'm just going to have these two agents -- and I told Mr. Martin, Your Honor -- that the next time that drugs are admitted, I'm just going to have

the admitting agent do it at the end of his testimony so we don't run into that issue again.

THE COURT: Should have done that.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 1:19 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

So I just wanted to make certain that you had the opportunity to see these exhibits that had previously been admitted, and so I'm going to -- so this is -- let's see, the 221 range; is that right, Miss Howard-Allen?

MS. HOWARD-ALLEN: Yes, Your Honor. I believe it's 221, 222, 224, 225 and 226.

THE COURT: So from those exhibits, the letter A after that exhibit number represents the photograph. As I said, we are not going to send drugs back to the jury room, but what we're going to do is we're going to have the case agent or two case agents are going to show you those exhibits and you'll be able to take a look at them.

They'll just hold them and walk in front of you so that you can see. But the photographs have been admitted into evidence as well, and the photographs can go back to the jury room when you begin your deliberations.

So, if the case agent can come forward, please,

Special Agent Phelps and Special Agent Liberto. Let's see what number we have so we're clear on it.

THE AGENT: 221, Your Honor.

THE COURT: The first one is 221. Thank you.

The next exhibit is 222. There is no Exhibit 223. So the next exhibit is 224.

The next one is 225. The last one is 226.

(Exhibits shown to the jury by agents.)

THE COURT: Thank you. What we will do in the future if there are any other exhibits of contraband, or what's purported to be contraband, what we will do is I'll have the agent who is testifying show it to you at the end of the testimony, and then it goes back into the evidence vault so it doesn't stay here in the courtroom.

The last day, when you go to deliberate, it will be here in the courtroom. And I don't know if -- well, if the prosecutors need it for any reason or the defense attorney needs it for any reason, we can most certainly make arrangements to have it back. Okay?

So that's the way it works. All right. And, Miss Howard-Allen, are you ready with -- to recall that witness?

MS. HOWARD-ALLEN: Yes.

THE COURT: Thank you. I'm going to remind you, Mr. Huffman, you are still under oath. Do you understand

that, sir?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Very good. You may proceed, Miss Guzman.

MS. GUZMAN: Thank you very much, Your Honor.

DIRECT EXAMINATION (resumed)

BY MS. GUZMAN:

Q. Mr. Huffman, good afternoon now.

A. Good afternoon.

Q. I'd like to refer you to a couple of additional exhibits and photographs. If I may, first, Government's Exhibit 119. Do you have it in front of you, Mr. Huffman?

A. What's that, ma'am? Yes, it's there.

Q. You can see it?

A. Yes, ma'am.

Q. Now, in Government's Exhibit 119 there appears to be a brown box. Do you see that?

A. The brown box? Yes, ma'am.

Q. Now, within that brown box, there appears to be some cards. Looks like playing cards. Do you see them?

A. Yes, ma'am.

Q. Do those have any significance or any importance?

A. We just used them to slide the powder down and to use them to count the pills.

Q. Okay. And how would you use them to count the pills?

A. So I could slide them on the tray to make piles of ten so that I can count.
Q. And when you refer to the tray, are you referring to that New York Giants tray that you talked about?
A. Yes, ma'am.
Q. Now, let me show you what's Government's Exhibit 133. Do you see that?
A. Yes, ma'am.
Q. Okay. Now, referring specifically to this item here, what is that?
A. That's a stamp.
Q. And what is it used for?
A. That's what gives the imprints on the pills.
Q. And is this something that you used?
A. Yes, I've used it.
Q. And how do you use it? If you could explain to us how you use this for imprint purposes?
A. It goes inside of the press machine to the shaft that would come down, and it presses together and imprints the imprint onto the pill.
Q. Let me show you Government's Exhibit 129. Is this the press pill that you were referring to?
A. Yes, ma'am. This is the shaft right here, that comes down that attaches to. This shaft here comes up, and there's a flat one at the bottom, kind of rounded, to give the other

rounded edge at the bottom. This one here would come down and go into the little hole. And that's where it would press that.

Q. Now, you had previously stated that at some time, the press pill was broken?

A. Yes, ma'am.

Q. And I think you stated that you fixed it, you repaired it?

A. Yes, ma'am.

Q. How did you repair it?

A. Well, there's lots of different ways. None of the machines worked as I got them.

Q. Let me show you this. I'm going to show you an exhibit and maybe that will help you. Government's Exhibit 129. Looking at this exhibit, looking at Government's Exhibit 129, will this help you in showing us how you fixed it?

A. Well, on here, I had to take wire and wrap it around this. That's all this wire that would attach to this shaft and this makes this shake to put the powder in here. I had to keep messing with this. This shaft here, all these different Allen keys would loosen up. It would throw -- the key are the adjustments to how deep the -- how thick the pill would be.

And you always had to adjust this, and there's been broken pieces inside of here. So there was a lot of

fixing.
Q. Okay. Again, referring to Government's Exhibit 129, where is the motor on that particular press?
A. This is like a gearbox. The motor would actually attach here, which I had to build this piece to fit a drill. Because the motors that I kept putting on there were for compressors, and they wouldn't be consistent with the speed or anything with it. So I ended up building this little piece that attached to the motor, and then I could put a drill on and actually run the drill.
Q. So was the motor or the drill, was this attached to this particular piece that you created?
A. Yes, I would attach the drill right here.
Q. And how was it attached?
A. You just open the drill piece up, slide it over it and then tighten it down. And then once it was tight, that's what I used one of the boxes for. I built up a box to set the drill on sideways so that I could run a piece of tape around the trigger and kind of keep cleaning the powder out so it wouldn't jam up.
Q. What was the purpose of the tape that you described?
A. So that I didn't have to hold it.
Q. Because if you didn't have the tape, then what would happen?
A. I would have to hold the drill the whole time to keep

it going.
Q. Once you were able to install the tape, did that make things easier for you?
A. Yeah, that would free my hands up to keep moving the powder out of the way so it didn't put too much in this spot here. So I put the card because it would just -- the powder would just keep coming out. It only fills the little holes so I had to keep pushing the powder back away from there so it didn't put too much to where it would jam up.
Q. Okay. Let me show you Government's Exhibit 133 one last time. I forgot to ask you, this particular -- what do you call this? What do you call this particular instrument, this little steel knob, what do you call this?
A. I guess that would be the print.
Q. The what?
A. The print.
Q. Okay. And what does this print? What do you use this for? To print what?
A. That would show the sign of A 215 for the roxie stamp on there so it would look like a pill.
Q. And you said it was A 215?
A. Yes, I'm pretty sure.
Q. Did you print out any other pills that weren't A 215?
A. We did ecstasy pills, but we didn't do very many of that, or I didn't.

Q. Now, you stated that -- speaking of this ecstasy, you stated when you first testified, that when you first met Mr. Fisher, you were buying ecstasy pills?
A. Yes, ma'am.
Q. I believe you stated that you sold them to the strip joints?
A. Yes, ma'am.
Q. Did you use ecstasy also?
A. Yes.
Q. Were you addicted to ecstasy?
A. No.
Q. And did you take ecstasy with Mr. Fisher?
A. Yes.
Q. And what does ecstasy do? What kind of stimulant is it? If you take an ecstasy pill, what would be your reaction?
A. You want to hang out and party and be with a girl.
Q. Okay. Was there a point in time that you were -- you've talked about using cocaine, and I think you've also discussed marijuana?
A. Yes, ma'am.
Q. Was there a point that you were using drugs regularly?
A. I was on cocaine a lot.
Q. Okay. And are you still using cocaine?
A. No, ma'am.

Q. And are you now sober?
A. Yes.
Q. How long have you now been clean?
A. Sixteen months.
MS. GUZMAN: Your Honor, may I approach the evidence table?
THE COURT: Yes, you may.
MS. GUZMAN: Your Honor, may I approach the witness?
THE COURT: You may do so.
MS. GUZMAN: Let me tender this to counsel first.
MR. MARTIN: Thank you.
BY MS. GUZMAN:
Q. Mr. Huffman, I am showing you what's been previously marked and admitted as Government's Exhibit 224. Do you see what's inside that packet?
A. Yes, that is the prints.
Q. And when you described the prints -- I had previously shown you in Government's Exhibit 133 the prints that you indicated was used for the A 215s; correct?
A. Yes, ma'am.
Q. Now, what's contained within Government's Exhibit 224, is that the same thing, or is that something different?
A. Yes, ma'am. That is the same thing.
Q. It is the same thing?

A. Yes.
Q. Would you -- I think you've explained that these are the prints that are used to create these tablets that are A 215?
A. Yes, ma'am.
Q. How were these attached to the actual power drill or electric drill?
A. They go in the shaft I was telling you. It goes in the shaft, and you've got to bolt them in. And then the other one goes in the bottom, which gives it the round surfaces. And the top one actually leaves the print.
Q. And did you do that few or many times?
A. What do you mean?
Q. Well, during the time that you were working with Mr. Fisher, did you do that many times, that process you've just described?
A. Taking them out and putting them in?
Q. Yes.
A. They pretty much stay in the machine the whole time. Unless one of these broke, and then you would have to order new ones.
Q. Did you ever order any of these replacements on your own?
A. No.
Q. If there were any replacements that were required for

any of the instruments that you were using, how would you obtain them?

A. Through Dion Fisher.

Q. Now, during the time that you were creating these pills, you knew it was illegal?

A. Yes, ma'am.

Q. And you knew that you were dealing with a dangerous narcotic, which was fentanyl?

A. Yes, ma'am.

Q. You indicated earlier in your testimony that you would be making about $250 per 1,000 batch of pills?

A. Yes, or pills.

Q. Do you know -- do you have any personal knowledge of how much Mr. Fisher was selling them for?

A. No, I don't.

Q. In your relationship with Mr. Fisher, did you ever have an opportunity to do some wires, some money wires?

A. Yes, ma'am.

Q. And if you would explain to us what you did.

A. Dion Fisher asked me if I can send some money to China. He said that he sent too much, and that they ain't letting him send no more money. So we went to Walmart and --

Q. So let's take this in parts. Mr. Fisher asked you to send money orders or money transfers to China?

A. Yes, ma'am.

Q. And did you do that?
A. Yes, once.
Q. Once. And where did you go to get that done?
A. At the -- it was a store off of -- I forget exactly, but it was like a Walmart store. We went in, and he handed me the money. I went in, paid.
Q. Do you remember how much money that was?
A. I don't recall.
Q. Okay. So after he gave you the money, what did you do?
A. I actually messed up on signing it, so they called us and we had to go back and redo it. And then we got it finished and got it shipped out.
Q. Do you remember what, if any, was Mr. Fisher's reaction when you messed up?
A. Yeah. He was pretty much cussing me out. Telling me I'm a dump ass, that I couldn't even fill out the papers that he already had written out for me.
Q. Did you ever do that for him again?
A. No. My wife did it.
MR. MARTIN: Objection. Sounds like he's going to talk about someone else.
THE COURT: Yes. Well, I'm not certain what he's going to say. But at this juncture don't say what somebody else told you. He's objecting based on hearsay. Okay.
BY MS. GUZMAN:

Q. Just yourself, did you ever do it again?
A. No.
Q. Do you know whether Mr. Fisher wired money to China?
A. I have no idea.
Q. I want to show you an exhibit, if I may.
MS. GUZMAN: Your Honor, again, if I could briefly approach the witness.
THE COURT: Yes, you may.
(*Document tendered.*)
BY MS. GUZMAN:
Q. Mr. Huffman, would you please look at Government's Exhibit 146.
A. Yes, ma'am.
Q. Do you see an item on the lower portion of that exhibit?
A. Yes, it's the skull ring.
Q. You indicated, I think, previously Mr. Fisher gave you a skull ring?
A. Yes, ma'am.
Q. Does this look like the skull ring that he gave you?
A. Yes, ma'am.
Q. Did he give you more than one skull ring?
A. No.
Q. Again, that was Government's Exhibit 146.
When -- the search warrant occurred on February

15, 2018; is that correct?
A. Yes, ma'am.
Q. Up to that point were you still making fentanyl pills with Mr. Fisher?
A. Yes, ma'am.
Q. And was it your arrest that ended that?
A. Yes, ma'am.
Q. You indicated, I believe, that you had done this for an approximate period of 2016 to 2018.
A. Yes, ma'am.
Q. With 2018, of course, being the arrest date?
A. Yes, ma'am.
Q. Can you approximate how many pills you might have actually pressed during that two-year period?
A. I cannot recall.
Q. And I understand you can't recall. Let me do this. Was it in the thousands?
A. Yes. Yeah, hundreds of thousands, probably.
Q. Hundreds of thousands?
And during that time period, were you giving those pills that you were pressing and that you were producing, did you give them only to Dion Fisher?
A. No.
Q. Did you give them mostly to Dion Fisher?
A. Yes, ma'am.

Q. Did you use any of them for your personal use?
A. Not for my personal use.
Q. Because you've admitted that you were using drugs during a good portion of that period of time, I think you said you were using cocaine?
A. Yes, ma'am.
Q. Was that your drug of choice?
A. Yes, ma'am.
Q. Is your memory clear despite having been addicted to cocaine as to what you were doing in terms of the pill presses?
A. It is.
Q. Do you have any idea when the electric -- well, let me do this: When you were using the electric pill press -- and I'm talking about the electric one now -- do you know when it was running correctly and properly, how many pills you could crank out in one night?
A. I would usually do about a thousand. One or two times I've done up to 2000. But that was mostly at a sitting we'd do a thousand.
Q. Is this a tedious process even with an electric pill press?
A. Yes, ma'am.
Q. Explain for the jury why it's tedious even with an electric pill press.

A. Well, because if too much of the powder got put in, and the shaker would come out, if it would put too much in, it would jam up. Then I'd have to pretty much tear apart the whole machine, clean out the shaft and everything. And then put it all back.

Once I got it all back together then I had to dial it back in to the right size and dimensions and how much pressure that could be put.

Q. When you were using the hand crank, how many would you be able to produce in one night?

A. I was probably doing 500. Trying for a thousand. But the dowels jammed up so much.

Q. And you explained that with the electric pill press, it was easier; correct?

A. Yes, ma'am.

Q. But it was still tedious?

A. Yes, ma'am.

Q. So how tedious was it or how difficult was it with the hand crank?

A. It was very difficult. It was a lot of pressure, a lot of cranking. If it got too much in there -- because the flow would just keep going by gravity. So if you don't go at a right speed, then it could put too much in there. Too much in there means that it jams up, and then you've got to start all over.

Q. Were you selling any pills?
A. Yes, ma'am.
Q. How many pills do you think you sold?
A. Quite a bit.
Q. Okay. And were you -- did you have a particular customer that you were selling to?
A. Yes, ma'am.
Q. Did Mr. Fisher know that you were also dealing on the side?
A. Yes.
Q. And how much were you charging?
A. I was charging 15.
Q. 15?
A. Apiece, yes.
Q. Per pill?
A. Yes. Then it got down to where I was only able to charge 10.
Q. And I asked you this at the beginning, and I don't want to be repetitive, but you obviously have already pled guilty to your participation?
A. Yes, ma'am.
Q. And obviously you are testifying here today?
A. Yes, ma'am.
Q. And we have obviously met a couple of times at least in preparation for your testimony today.

A. Yes, ma'am.
Q. And do you know at this point what your sentence is going to be?
A. No, I do not.
Q. Are you currently set for sentencing in the future?
A. Yes, ma'am.
MS. GUZMAN: I have no further questions, Your Honor.
THE COURT: Okay. Thank you. Any cross-examination?
MR. MARTIN: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MR. MARTIN:
Q. Good afternoon.
A. Good afternoon.
Q. Your business, you said you had a business that you ran out of the 66th Street North involving cars and et cetera; correct?
A. Yes, sir.
Q. Did that business have a name?
A. Yes.
Q. What was the name?
A. Garage Unit Customs.
Q. Was it just your business, or did you have a partner?
A. No, just mine.

Q. No partner. And as I understand your story, you met Mr. Fisher, according to you, sometime in 2014?
A. Yes, sir.
Q. Do you remember what time of the year that was?
A. I don't.
Q. You don't know if it was near Valentine's Day or near Christmas?
A. No, sir, I don't.
Q. So it could have been the end of 2014; it could have been January 1st.
A. I'm not sure, sir.
Q. Okay. And then around sometime in 2016, as I understand your story, is when you started -- I'm going to use the term -- "pressing pills;" correct?
A. Yes, sir.
Q. With 2016, do you remember if that was in the beginning of the year, end of the year or middle of the year?
A. No, I don't.
Q. So you don't know if it was around Valentine's Day, Cinco de Mayo, Thanksgiving, or Christmas?
A. I'm not sure, sir.
Q. And you stated, as I understand your story, that it ended when you were -- the search was conducted on February 15th?
A. Yes, sir.

Q. And you were happy with the arrangement until then?
A. Yes.
Q. Now, and your testimony is you knew one of the ingredients that you were using to make the pills was a drug called fentanyl?
A. Yes, sir.
Q. And you don't use that drug; correct?
A. No, sir.
Q. Your drug of choice was cocaine?
A. Yes, sir.
Q. During this time period, if you could give me an estimate, from 2016 to 2018, how often were you using cocaine?
A. We would go out about five to six nights a week. So I was probably using it five to six nights a week.
Q. Okay. So basically when you used it is when you work at night pressing pills?
A. Yes, sir. And any time we were going out.
Q. And you used a little bit of marijuana, but as I think you told the prosecutor, your drug of choice was cocaine?
A. Yes, sir.
Q. Now, when you were making these pills, with fentanyl, you weren't using any type of protection, were you?
A. No, sir.
Q. No gloves; correct?

THE COURT: I need you to stand at the podium so we can hear you.

BY MR. MARTIN:

Q. Were you using any gloves?

A. No, sir.

Q. Were you using a mask?

A. No, sir.

Q. Were you using a ventilator?

A. No, sir.

Q. So you were just like you are right now; correct?

A. Yes, sir.

Q. I mean, you mean might not have had the same outfit on, but regular clothes, et cetera?

A. Yes, sir.

Q. And your testimony is at least a couple of nights a week for two years, you were actively working with fentanyl?

A. Yes, sir.

Q. With no protection?

A. Yes, sir.

Q. And add to that, you were high on cocaine when you were doing this?

A. Yes.

Q. And I would assume high on cocaine makes you feel good and happy?

A. Yes.

Q. Kind of carefree?
A. Keeps you awake.
Q. Okay. Keeps you awake. And do you feel kind of euphoric or happy and carefree?
A. Yes.
Q. Now, have you ever heard of the website wish.com?
A. Yes.
Q. Could you tell me what wish.com is?
A. It's where you can buy clothes, anything pretty much for your house, anything.
Q. And so it's a website where you can order goods off the internet?
A. Yes.
Q. And to your knowledge -- I'm going to use the term "normal." I'll kind of explain that to you. In other words, I don't know if you can buy a suit, but you can buy a shirt, some pants, a belt; correct?
A. Shoes.
Q. Shoes, whatever.
A. Yes.
Q. It's not a buy pill presses or drugs or anything like that site, is it?
A. Not to my knowledge.
Q. Okay. So it's something that you just buy normal stuff that you can buy in the mall?

A. Yes, sir.
Q. Now, there was a search on February 15th that found a lot of things in the 66th Street business of yours; correct?
A. Yes.
Q. And you ultimately pled guilty to that?
A. Yes.
Q. And you're awaiting sentencing?
A. Yes.
Q. And it's fair to say that you're hoping that one result from your testimony is you'll be considered for a substantial assistance motion; correct?
A. Yes.
Q. Okay. And what that is, is the prosecutor makes a decision and can make a motion on your behalf to reduce the sentence?
A. Yes.
Q. Okay. And that's up to the prosecutor; correct?
A. As far as I know, it's up to the judge.
Q. Okay. But the prosecutor has to make the motion for you; correct?
A. Yes. Yes, sir.
Q. Now, it sounds like based on your testimony and also your profession that you're pretty mechanical; is that fair to say? Would you agree with that or disagree with that?
A. Yes, sir.

Q. Because that's -- you worked on cars, et cetera; correct?
A. Yes.
Q. Now, it sounds like from your testimony your story about these pill presses is they break down a lot; is that fair to say?
A. Yes.
Q. Okay. When they break down, is it something that they break down for a few minutes, or do you have to work to fix them up?
A. No. You have to pretty much take it apart and clean it up and then put it back together and then re-adjust it.
Q. Okay. And on a typical night, your story as you were pressing these pills, how long would you be there?
A. Sometimes I would start at 8, 9 o'clock and wouldn't get out of there until the next day.
Q. Now, were you still conducting your normal business, your car business?
A. During the day.
Q. Now, my understanding from your testimony, and I could be wrong, that your story was Mr. Fisher was there helping you?
A. On occasions.
Q. On occasion?
A. Yes.

Q. Was he typically there?
A. He was there quite a bit.
Q. And quite a bit would be most of the time, at least more than half time?
A. At least more than half the time.
Q. He'd be there all night with you?
A. Not all night.
Q. Now, the 66th Street warehouse or storage area, business area, do you know about when you moved into that?
A. I think it was 2017.
Q. Okay. Do you know if that was early in the year, middle of the year, or don't really know?
A. I can't recall.
Q. No further questions. Thank you.

THE COURT: Thank you. Anything else, Miss Guzman?

MS. GUZMAN: Your Honor, just very briefly.

REDIRECT EXAMINATION

BY MS. GUZMAN:
Q. Mr. Huffman, let me direct you to Government's Exhibit 127. Can you see it?
A. Yes, ma'am.
Q. Is it on your monitor?
A. Yes, ma'am.
Q. Mr. Martin asked about wish.com. In Government's

Exhibit 127, do you see wish.com?
A. Yes, ma'am.
Q. I believe you previously testified this was a brown box that Mr. Fisher had brought to you?
A. Yes, ma'am.
Q. And obviously 10124 Nassau Court, do you know that that address is?
A. 10124?
Q. Yes.
A. That's Dion Fisher's house.
Q. Okay. What was in this particular box?
A. That's what the white powder was in. The filler.
Q. Were there any clothes or things that were not narcotics related in this particular box?
A. No, ma'am.
Q. In any of these boxes provided by Mr. Fisher, did he ever bring you clothes and not narcotics?
A. No. That box was sealed up.
Q. So this particular exhibit which is Government's Exhibit 127, when you received it from Mr. Fisher, it was sealed?
A. Yes, factory sealed.
Q. And who opened it?
A. I did.
Q. Who gave it to you?

A. Dion Fisher.
Q. And when you opened it, was Mr. Fisher there?
A. Yes.
Q. And when you opened it, what was in it?
A. The white powder.
Q. And was this the white fluffy powder or the other white powder?
A. No, the filler. White filler.

MS. GUZMAN: I have no further questions. Thank you very much, Mr. Huffman. Thank you, Your Honor.

THE COURT: Okay. Mr. Martin, anything else, sir?

MR. MARTIN: No, thank you, Your Honor.

THE COURT: May I excuse the witness then?

MS. GUZMAN: Yes, Your Honor.

THE COURT: All right. Thank you. You are excused, sir. Appreciate you coming in today to testify.

And the government may call its next witness.

MS. GUZMAN: Yes, Your Honor. The government will call Elizabeth Adkins.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Elizabeth, E-l-i-z-a-b-e-t-h, Adkins, A-d-k-i-n-s.

THE COURT: Thank you, Miss Adkins. If you could, please take the witness box. Miss Adkins, you are going to be asked some questions by Maria Guzman Assistant United States Attorney. And then Mr. Martin, who represents Mr. Fisher may ask you some questions as well.

If you don't understand the question, please say so. You need to speak up so that we can hear you. That lavalier is here, but I just ask that you speak up. You need to wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you are soft-spoken, please speak up. And if you have the tendency to speak quickly, please slow down. All right?

THE WITNESS: Yes.

MS. GUZMAN: May I proceed, Your Honor?

THE COURT: Yes.

MS. GUZMAN: Thank you.

ELIZABETH ADKINS,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:
Q. Would you please state your name for the record and introduce yourself to the Court and jury.
A. My name is Elizabeth Adkins. I'm a forensic chemist for the Department of Justice Southeast Laboratory in Miami, Florida.
THE COURT: We cannot hear you. You need to move up that lavalier microphone. I can't hear you. Let's see if that's better now. Go ahead.
BY MS. GUZMAN:
Q. Maybe spell your last name for us.
A. A-d-k-i-n-s.
Q. Now, Miss Adkins, you indicated that you work for the Department of Justice Southeast Laboratory in Miami, Florida?
A. Yes, that's correct.
Q. And how are you employed with that laboratory?
A. I am a forensic chemist.
Q. And briefly summarize for us your educational qualifications.
A. I've Bachelor of Science degree from Ohio University in forensic chemistry.
Q. And how long have you worked for the Southeast Laboratory?
A. Eighteen years.
Q. And what in particular are your duties or

responsibilities with regards to your laboratory work?
A. I analyze exhibits that are assigned to me to see if they contain a controlled substance. I report my findings and testify in court when I'm needed.
Q. Have you ever testified in federal court before?
A. Yes.
Q. On few or many occasions?
A. Many.
Q. And have you been qualified to testify in the area of forensic chemistry?
A. Yes.
Q. And as a result of being qualified, to testify in the area of forensic chemistry, have you offered an opinion as to substances that you have analyzed?
A. Yes.
Q. You've indicated that you've worked for the Southeast Laboratory for a period of, I think, 18 years?
A. Yes.
Q. Have you always worked in that particular laboratory analyzing exhibits provided to you, or have you had any other job responsibilities during that time frame?
A. For the first two years I worked in the Chicago laboratory, and then the last 16 I've been in Miami.
Q. And during that time frame, the 18 years in Chicago and then in Miami, have you essentially done the same type of

analysis work?
A. Yes.
MS. GUZMAN: Your Honor, at this time I would tender her as an expert in the area of forensic chemistry in order to render an opinion as to substances analyzed.
THE COURT: Do you wish to voir dire the witness at this time, Mr. Martin?
MR. MARTIN: No objection, Your Honor.
THE COURT: I find that the witness is qualified to render an expert opinion in the field of forensic chemistry and is designated an expert in a that field. You may proceed.
MS. GUZMAN: Thank you, Your Honor.
BY MS. GUZMAN:
Q. With relation to this case, have you had an opportunity to analyze four exhibits?
A. Yes.
Q. I would like to take them individually, if I can. And I'll do it chronologically, with exhibit number. I first want to address an exhibit that you were provided that -- well, first of all, when you were provided an exhibit, it is given a particular exhibit number; is that correct?
A. Yes.
Q. And is that a number that is associated with DEA?
A. Yes.

Q. Is it what we call a DEA number, exhibit number?
A. Yes.
Q. In this particular case, were you provided four exhibits with numbers, Exhibit 14, Exhibit 19, Exhibit 21, and Exhibit 22?
A. Yes, I was.
Q. And when I refer to those specific exhibit numbers for the record those are the DEA numbers that were assigned to those particular exhibits; is that correct?
A. Yes.

MS. GUZMAN: Your Honor, may I approach the witness?

THE COURT: You may.

(*Document tendered.*)

BY MS. GUZMAN:
Q. Let me direct you to Government's Exhibit 202. Do you have that in front of you?
A. Yes.
Q. Okay. Now, Government's Exhibit 202, what actually is contained within Government's Exhibit 202 what is that package? It's a plastic package; is that not correct?
A. Yes, it's a DEA heat sealed evidence envelope.
Q. And does it reflect Exhibit 14?
A. Yes.
Q. For purposes of the government exhibit -- I don't want

to confuse that. The Government's Exhibit is Government's Exhibit 202, and the DEA exhibit is 14 --
A. Yes.
Q. -- is that correct?
Now, did you have an opportunity to analyze the contents of Government's Exhibit 202?
A. Yes.
Q. And explain for the jury -- first of all, when you received Exhibit 202, what was contained within that -- well, Government's Exhibit 202, DEA Exhibit 14. What was contained within the DEA Exhibit 14?
A. There is another heat sealed evidence envelope in there and then a little Ziploc bag that had a capsule in it.
Q. Did you analyze that capsule?
A. Yes.
Q. And what type of testing did you do on that particular capsule?
A. I did a gas chromatograph examination and a gas chromatograph mass spectrometry analysis.
Q. Now, are those two separate type of tests?
A. Yes.
Q. And why did you conduct two different types of tests?
A. It's DEA policy.
Q. And is it DEA policy within the southeast laboratory to always conduct at least two tests?

A. Yes.
Q. And do you know what the reasoning or the principle behind that is?
A. Just to ensure, be positive the results that each chemist gets on the exhibit.
Q. So I think for accuracy purposes. Would that be fair to say?
A. Yes, it would.
Q. Okay. Now, if you could, explain for the jury briefly what a gas chromatography test and then a gas chromatography mass spectrometry test are so that the jury understands what you did?
A. The gas chromatograph is a box, and it's an oven and inside is a column which looks like a thin piece of spaghetti. And the compound is introduced into there, and where -- as it becomes a gas, and it's kind of like a race -- if there's a mixture of, for example, like cocaine and caffeine, the two will be separated in this instrumentation.
And the fastest one will come out first, and it will have a time given to that compound which is also compared to a known standard.
The gas chromatograph mass spectrometer has the gas chromatograph portion as well. But then it acts with the gas chromatograph portion where it's broken into pieces, the compound is, and it's shattered into pieces much like the

fair -- at the fair where you throw the ball at the plate and it breaks into pieces.

Except for in this instance the pattern will be exactly the same. For instance, fentanyl will come out the exact same every single time, and it's also compared to a known standard.

Q. After conducting the tests that you testified to, were you able to make a determination of a substance identified within that capsule?

A. Yes.

Q. What was that substance?

A. The capsule contained pentylone and methylone.

Q. Were you able to determine a weight?

A. Yes.

Q. And what was the weight?

A. 0.0417 grams.

MS. GUZMAN: Your Honor, may I approach the easel?

THE COURT: You may.

BY MS. GUZMAN:

Q. You testified about the substance and the weight.

THE COURT: I want to make certain we can hear you there. I don't know, you may need to get a microphone. Are you just going to write it up there and then go back to the podium?

MS. GUZMAN: Yes.

THE COURT: That's fine then.

BY MS. GUZMAN:

Q. Miss Adkins, if you would, for illustration purposes indicate on the easel, again, the weight and the substance that you determined was identified.

(Witness complies.)

Q. If you would initial -- just put your initials there so that we know that was you that wrote it.

(Witness complies.)

Q. Now, you were given another exhibit, which would be Government's Exhibit 204 and DEA Exhibit 19. Do you see that in front of you?

A. Yes.

Q. And, likewise, is it sealed in a DEA sealed package?

A. Yes.

Q. And how do you know that that is -- that that exhibit was analyzed by you?

A. I see my handwriting and signature on the evidence label here, and my signature and seal on the bottom. And I recognize my handwriting on the interior packaging.

Q. And I think I neglected to ask you that with respect to Government's Exhibit 14, which was the previous one. Does that particular envelope also have your markings?

A. Yes.

Q. Now, with regards to Government's Exhibit 204, which is

DEA Exhibit 19, again, what tests were performed on that particular package?
A. The gas chromatograph and the gas chromatograph mass spectrometry.
Q. Same tests that you had previously testified about with regards to Government's Exhibit 202?
A. Yes.
Q. Now, when you received the packet, what was contained within the packet?
A. Another heat sealed evidence envelope and two Ziploc bags that had tablets and tablet fragments in it.
Q. Let me specifically address the fact that there were two separate bags?
A. Yes.
Q. What did 19.01 -- I think that you generally divide them into 19.01 or 19.02; correct?
A. Yes.
Q. So as far as 19.01, what did that particular plastic bag contain?
A. It contained 42 blue, round tablets.
Q. And what were your findings as to what was contained within 19.01?
A. The exhibit contained fentanyl.
Q. Were you able to determine a weight?
A. Yes.

Q. And what was the weight on Government's Exhibit 204, DEA Exhibit 19.01?
A. 4.00 grams.
MS. GUZMAN: Your Honor, I'm going to approach the easel one last time.
THE COURT: Okay.
BY MS. GUZMAN:
Q. Miss Adkins, once again I will ask you to go to the easel and where it's identified Government's Exhibit 204, if you would, write the exhibit number, the DEA exhibit number, the substance identified and the weight.
(Witness complies.)
Q. I now refer you to Government's Exhibit 205, which is DEA Exhibit 21. Do you see that in front of you as well?
A. Yes.
Q. Likewise, is that a DEA sealed plastic package?
A. Yes.
Q. And how do you know that the substances contained within Exhibit 21 were analyzed by you?
A. I recognize my handwriting on the seal here, my signature and seal at the bottom, and I also recognize my handwriting on the interior packaging.
Q. And what was contained within Exhibit 21?
A. A Ziploc bag.
Q. And, again, were the tests that you conducted, were

they the same tests that you had previously conducted and explained as to Government's Exhibit 202 and Government's Exhibit 204?
A. Yes.
Q. And what were your findings after conducting those tests?
A. The exhibit contained methoxyacetylfentanyl.
Q. Were you able to determine a weight?
A. Yes.
Q. And what was the weight?
A. 2.17 grams.
Q. Once again, I would ask you to go to the easel on Government's Exhibit 205, note the DEA Exhibit number, the substance identified, and the weight.
(Witness complies.)
Q. Exhibit 22, do you have that in front of you as well? And that would be Government's Exhibit 206, DEA Exhibit 22.01 and 22.02. Do you have that in front of you?
A. Yes.
Q. Same question again. How do you know that particular package was analyzed by you, the contents of that particular package were analyzed by you?
A. I recognize my handwriting on the seal, my signature and seal on the bottom, and I also recognize my handwriting on the interior packaging.

Q. With reference to 22.01, what were your findings? Let me ask -- before I ask that, within DEA Exhibit 22.01, 22.02, what did you receive to analyze?
A. Two Ziploc bags.
Q. And so I would assume that 22.01 and 22.02, the DEA numbers, refer to the two separate Ziploc plastic bags; correct?
A. Yes.
Q. So dealing with 22.01, what substance was identified?
A. Fentanyl.
Q. And what was the net weight determined?
A. 6.40 grams.
Q. With regards to 22.02, again, the DEA number, 22.02, what substance was identified?
A. Pentylone.
Q. What was the net wait?
A. 1.10 grams.
Q. Now, you had indicated that you were provided these two DEA exhibits in Ziploc plastic bags; correct?
A. Yes.
Q. What form were they in? What did the content look like?
A. Powder.
Q. And was that the same for 22.01 and 22.02?
A. Yes.

Q. I'm going to ask you one last time, where it notes Government's Exhibit 206, to please note the two separate DEA exhibit numbers, the substances and the weights.

(Witness complies.)

Q. Thank you very much, Miss Adkins.

MS. GUZMAN: I have no further questions.

THE COURT: Okay. Any cross-examination?

MR. MARTIN: Yes, thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good afternoon.

A. Good afternoon.

Q. Now, the tests you ran on the four exhibits, were you doing any qualitative or quantitative analysis?

A. Qualitative.

Q. And would you agree with me, a qualification -- qualitative analysis is to identify the drug; correct?

A. Yes.

Q. Whereas a quantitative analysis is to tell how much of a particular drug is in the particular sample; correct?

A. Yes.

Q. Okay. So what you found in all four of those tests is that there is some detectable amount of either fentanyl or the other drug that I can't pronounce, pentylone, in there; correct?

A. Yes.
Q. Okay. So you're not saying, for instance, and I can't see the actual gram weight, but, for instance, if you said it was one gram, all you're saying is qualitatively, there is some detectable amount of fentanyl in that one gram; correct?
A. Yes.
Q. You're not saying it's one gram of fentanyl?
A. No.
Q. Okay. Because you're not analyzing what else is in there to make up whatever the weight is; is that fair to say?
A. Well, I notate there's insolubles, but I don't know the quantity of the controlled substance in each one because I didn't do a quantitative analysis.
Q. You know it's in there, but not how much?
A. Correct.
Q. And you don't know what binding agent or what else may be in there; correct?
A. No.
Q. That's incorrect? I may have asked it wrong. You don't know what other substances are in there; you just detected some amount of fentanyl?
A. Or whatever else was --
Q. Or whatever the drug you named?
A. Yes.
Q. Now, you testified that you ran it through a test and

what was the name of the test again?
A. The gas chromatograph and the gas chromatograph mass spectrometer.
Q. Are those commonly called one a GC, and one, when it's together, GCMS test?
A. Yes.
Q. Okay. I'm going to get away with using the initials because my pronunciation is bad. So you understand what I'm saying when I say GCMS; correct?
A. Yes.
Q. As I understood your testimony, basically it's running through and you're comparing it with an analysis of what you called a known sample; correct?
A. Yes.
Q. And if what you're testing looks the same as the known sample analysis, then that's how you can say I detect fentanyl; correct?
A. Yes.
Q. Where do the known samples come from in your lab?
A. It depends.
Q. How many different places?
A. A handful.
Q. What's the more popular or the most where you get them from?
A. Special testing lab in Maryland. They actually make

the standards, and they're part of the DEA so they make them and send them to us.
Q. Is that another DEA lab?
A. Yes.
Q. Okay. So the DEA lab -- another DEA lab produces the known sample for your lab to use?
A. Yes. But when they come into the laboratory, they are also verified by a chemist in our laboratory to make sure that's what it is.
Q. Okay. Now, you testified you saw -- you detected fentanyl in one of the exhibits. In the last exhibit, you detected -- how do you pronounce it?
A. Pentylone.
Q. What is that?
A. It's a controlled substance that is -- we commonly see. It looks like it's a crystalline substance.
Q. But it's different from fentanyl?
A. Yes.
Q. And one of the exhibits had some blue pills and some yellow pills?
A. Yes.
Q. And you testified in the blue pills you found detectable fentanyl; correct?
A. Yes.
Q. Did you testify about the yellow pills?

A. I did not testify about them.
Q. Did you find anything in them?
A. Yes.
Q. What did you find?
A. Alprazolam.
Q. Thank you. No further questions.

THE COURT: Okay. Anything else for this witness?

MS. GUZMAN: No, Your Honor. Thank you.

THE COURT: Okay. All right. The witness is excused. Thank you for having come in today to testify.

Ready with your next witness?

MS. GUZMAN: Yes, Your Honor. The government would call James King.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, madam.

THE COURTROOM DEPUTY: Please state your name for the record.

THE WITNESS: James King, K-i-n-g.

THE COURT: Thank you, Mr. King. You may be seated. Mr. King, you're going to be asked some questions by Maria Guzman, Assistant United States Attorney, and

Mr. Martin, who represents Mr. Fisher, may ask you some questions in cross-examination.

If you don't understand, please say so so they can state it another way. Wait until the question is finished before you begin answering. If you have the tendency to speak quickly, slow down so we can understand you. And speak up so that we can hear you. All right?

THE WITNESS: Yes.

MS. GUZMAN: May I proceed, Your Honor?

THE COURT: Yes, you may.

JAMES KING,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Would you please state your name for the Court and the jury.

A. My name is James King.

Q. Okay. You're going to have to speak up?

A. My name is James King.

THE COURT: That was better, Mr. King. The first time we couldn't quite hear you.

BY MS. GUZMAN:

Q. How do you spell your last name?

A. K-i-n-g.

Q. Mr. King, how are you employed?
A. Through Walmart as an asset protection associate.
Q. What is an asset protection asset at Walmart?
A. We call it like a security guard, but we pretty much handle shortages, situations that happen at Walmart, customers who get violent or crazy.
Q. And how long have you been employed in that capacity with Walmart?
A. As an AP, for two years.
Q. And prior to the two-year period?
A. I've been with Walmart four years.
Q. How many?
A. Four years.
Q. So a total of six?
A. Yes, ma'am.
Q. Okay. In connection with your position as asset protection manager at Walmart, do you deal with Walmart surveillance tapes?
A. That's pretty much all I do is video all day. Statements.
Q. So explain for us how a Walmart surveillance tape works.
A. Most of the time somebody commits a theft, and I go back on video, look up the person, get a picture of the person, prove that they committed the theft, and just keep it

on record in case they come back and commit it again.

Q. Are you assigned to a particular Walmart store, or is there just a general security office?

A. I'm assigned to a specific store.

Q. And what store is that?

A. The one on Roosevelt and U.S. 19. I believe that is 2677 Roosevelt Boulevard.

Q. Now, the surveillance tapes obviously would deal with surveillance cameras.

A. Yes, ma'am.

Q. Are there surveillance cameras at Walmart?

A. Yes.

Q. And in this particular store, do you know how many surveillance cameras are spread out throughout the store?

A. More than 30. Roughly.

Q. These tapes that belong to these cameras, are they secured and kept within the security office at Walmart?

A. Yes, ma'am. There's only two other people that have keys to that office. Me and two other associates.

Q. And why is that?

A. Our job is considered a little more secure. We do deal with people's personal files and surveillance and stuff like that.

Q. At our request were you asked to pull two surveillance videos in this case?

A. Yes.
Q. And were they with respect to two different dates, if you recall?
A. I just believe it was two different time frames. I don't know if there were two different dates.
Q. Let me show you what's been marked as Government's Exhibit 304 and Government's Exhibit 307. Do you have those in front of you?
A. Yes.
Q. Now, if you would look at them, what is contained within Government's Exhibit 304 and Government's Exhibit 307?
A. Two CDs.
Q. And have you previously had an opportunity to review the contents of those two CDs?
A. Yes, ma'am.
Q. And how do you know that you previously reviewed them?
A. I have initialed them.
Q. And when you say that you've initialed them, do your initials appear on those CDs?
A. Yes, ma'am. Both on the right side.
Q. And when you reviewed Government's Exhibit 304 and Government's Exhibit 307, were they -- did they accurately depict the contents of the tapes with regards to the surveillance cameras at Walmart during those dates and times?
A. Yes, ma'am.

Q. And when you had an opportunity to review Government's Exhibit 304 and Government's Exhibit 307, had they been altered, materially altered, changed, or deleted in any way from your observations?
A. No, ma'am.
MS. GUZMAN: Your Honor, at this time the government would move to introduce Government's Exhibit 304 and Government's Exhibit 307.
THE COURT: All right. 304 and 307 are received into evidence and may be published to the jury.
(*Government Exhibits 304, 307 received in evidence*.)
BY MS. GUZMAN:
Q. If I would address Government's Exhibit --
MS. GUZMAN: Your Honor, at this time if I would be allowed to publish Government's Exhibit 304.
THE COURT: 304, yes.
(Video played to the jury.)
BY MS. GUZMAN:
Q. Mr. King, do you have that up on your monitor?
A. No, ma'am.
Q. Hopefully you will.
While we're waiting, is there a particular -- in order to open up these surveillance videos, is there a particular code that has to be entered in order to be able to

access them?
A. Once we burn them, there's an option that you have to click in order for outside people can see the footage. If you don't click it, you're not able to see it.
Q. And is that an additional security device within the exhibit, within a surveillance tape?
A. Yes, ma'am. We usually don't click it when it's -- the CD is for in-house, because we have the software. But when we provide the video for the cops or other people, we have to click it.
Q. So it's not like clicking the video. We have to go through certain steps. Okay.
A. Yes.
Q. Okay. Prior -- let me ask you this: Prior to your employment with Walmart, had you had any security training? Where did you work before Walmart?
A. No. I worked at Walmart. But before that, I was in the military. I did four years in the Navy and got out. But I've never worked with surveillance before.
Q. So the six years that you've worked at Walmart, you've just had different hats?
A. Yes.
Q. Are you still currently employed in that position?
A. Yes.
Q. As asset manager?

A. Yes, ma'am.

THE COURT: We can take a break while you try to fix that. We are finishing today at four because I have another matter. Another court proceeding to handle at four. So this is probably as good a time as any. Would that be okay with you, Miss Guzman?

MS. GUZMAN: Yes, Your Honor. I think that would, absolutely.

THE COURT: Okay. So, ladies and gentlemen, we're going to take our afternoon break. If I forget to tell you every time, I'm going to remind you, please don't discuss the case amongst yourselves, don't form any opinions until you've heard all the evidence, and please don't do any research on this case. The parties, et cetera.

I've done an amended order here to allow -- somebody wanted to bring a Mifi in. A hotspot. Is that true? A juror did? Okay. So I've done that. I've amended it so that you can bring in your Mifi is what I always call it, the hotspot. So you're allowed to bring that in.

Because while there is an internet service here, it's for lawyers, and it's paid for by their Bench-Bar fund dues. I don't think jurors are allowed to use it. So you can bring your Mifi, if you have a hot spot. So I'm going to go ahead and excuse you. And we'll see you back here in about ten minutes.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 2:42 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Let me just remind the witness, Mr. King, we are in the middle of your testimony so you're not allowed to talk to anybody about your testimony right now. Do you understand?

THE WITNESS: Yes, ma'am.

THE COURT: And if you run into the jurors or anything, please don't talk to them.

THE WITNESS: Yes, ma'am.

THE COURT: I ask you to come back here in about 8 minutes or so so that we can start promptly in ten minutes. You are excused, sir.

THE WITNESS: No problem.

THE COURT: Let me just wait for the witness to leave and see if there's anything else.

(The witness exits the courtroom.)

THE COURT: Anything else that I need to take up now, Miss Guzman?

MS. GUZMAN: No, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: Just so you know, in that amended order, I did say that when the jury begins their

deliberations, they must leave their personal electronic device downstairs locked up, and they may not use it in the courthouse at all.

Until that time, look, somebody wants to look on the internet, they're going to do it at home at 3 a.m. They're not going to do it in the courthouse. At least that's my own theory on it. But it's got strict language in there. Okay.

We'll see you back here in a few minutes. Thank you.

(Recess taken from 2:43 p.m. to 2:53 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Tell the jury it will be a few minutes because of some technical issues.

COURT SECURITY OFFICER: Yes, Your Honor.

(*Brief pause.*)

THE COURT: We will go ahead and bring the jury in. Everybody understands, these things happen. Not to worry. Thank you for your patience, Mr. Martin. And the witness, too. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 3:17 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

There were some technical glitches that just took a little bit of time to work through it. But everything should work fine now. We appreciate your patience.

Miss Guzman, you may continue.

MS. GUZMAN: Thank you, Your Honor.

I think before the technical glitches, I had moved to publish Government's Exhibit 304.

THE COURT: 304. You may do so.

BY MS. GUZMAN:

Q. Mr. Smith, do you have it up on your monitor?

A. King.

Q. Mr. King. Mr. King, do you have it up on your monitor?

A. Yes.

Q. Okay. In this particular video it indicates a date on the bottom.

A. Yes, ma'am.

Q. What date does this particular exhibit, which is Government's Exhibit 304 reflect?

A. 12/15/2017.

Q. And would that have -- what does that date reflect on the video?

A. Every video has the time frame on the bottom along with the time and the camera angle.

Q. And then it has 001508. Is that military time?

A. It's midnight, 12:15.
Q. In normal time, what time?
A. Actually, 1:15.
Q. 1:15 in the morning?
A. Yes, ma'am.
Q. Clearly it's a produce aisle. The camera, the surveillance camera that would have taken this particular video, can you tell from this video whether it was in the front of the store, the back of the store?
A. That's on the right side of the store, as soon as you come in through the grocery side. You take a right, produce is right there.
Q. So is the produce section -- first of all, do you know offhand which Walmart this depicts, which location?
A. It's my Walmart. The one I work at.
Q. Is that the one that you indicated was on Roosevelt?
A. Yes, ma'am.
Q. If you would provide that address again.
A. 2677 Roosevelt Boulevard.
Q. Okay. The -- at that particular Walmart, is the produce section or department as you walk in?
A. Yes, as soon as you walk in it's right to your right.
Q. Okay. And are there cameras also in the back of the Walmart?
A. Yes. There's a camera angle pointing this way, and

there's one coming from the other side (indicating).
Q. Okay. All right. You can play the video.
(Video played to the jury.)
BY MS. GUZMAN:
Q. You can stop it there. So, again, there was the produce section. It's 1 o'clock in the morning, right, 1:16 in the morning. It doesn't appear there's a lot of people. There's one individual walking here.
Is this all considered just the produce area?
A. Yes, ma'am. This is the produce angle camera. The only thing it doesn't cover is like the bananas, but that's pretty much the whole area.
Q. For example, over here it would be produce and then in the middle, and then over here, is this produce as well?
A. Yes. Frozen fruit.
Q. Okay.
(Video played to the jury.)
BY MS. GUZMAN:
Q. Now, obviously this video does not have any sound. Is that the way the surveillance tapes are?
A. Walmart doesn't have sound yet.
Q. If we could stop for just a moment.
Now it appears that we see two individuals walking again to the produce area; is that correct?
A. Yes, ma'am.

Q. And the way that they are walking, is this -- would this be towards the back of the Walmart?
A. They would be going towards -- it's like an L shape. So they have to take a left, or they do a U-turn and go back around.
(Video played.)
BY MS. GUZMAN:
Q. If we could stop for a moment. I don't know, we don't see anyone right now at all reflected in the video, but this aisle over here which would be to the left of the produce, would this still be produce, or is this another section?
A. That's housewares, I believe.
Q. Okay.
A. First aisle of housewares.
(Video played.)
BY MS. GUZMAN:
Q. Now, this is a different angle or a different section; correct?
A. It would be as -- when they're walking and when they turn left, this is the aisle they're turning down into.
Q. Okay. If we could stop for just a moment. Just geographically, what you're indicating -- first of all, this particular portion of the Walmart, this hallway, what is it?
A. It's action alley.
Q. Why is it called action alley?

A. That's what it was named, because everything in the middle is on sale.
Q. Okay. That's good to know.
So the produce section, so this is action alley?
A. Yes, ma'am.
Q. That's what it's really called?
A. Yes, we have three of them. All the aisles going against are called action alley.
Q. Very good to know. So this would have been the produce section here to the right?
A. Yes. To the left?
Q. To the left?
A. Yeah. They would have walked down the hallways, both hallways, and they would have turned left.
Q. Correct. Into action alley?
A. Yes, ma'am.
Q. Okay.
(Video played to the jury.)
BY MS. GUZMAN:
Q. If we could stop for just a moment. The two individuals that are walking now up, I guess, action alley, do these appear to you to be like the same individuals that we saw earlier based on their clothing?
A. Yes, ma'am.
Q. Okay.

(Video played to the jury.)

BY MS. GUZMAN:

Q. As the time continues to run on the tape, it's now 1:18 in the morning?

A. Yes, ma'am.

Q. Quick question. As I'm looking at the time frame, you had said it was 1:18, but is zero zero not 12:18?

A. It is 12:18.

Q. I don't know much about military time.

A. 12:18.

Q. So it's actually 12:18 not 1:18. It's in the morning?

A. Yes.

Q. Okay. I would assume this is not a very busy time at the Walmart?

A. No.

Q. At Roosevelt.

A. No, ma'am.

Q. Okay. Do the surveillance videos run 24 hours a day?

A. Yes, ma'am.

Q. Stop for just a moment. First of all, this particular row, are we back in the produce section?

A. No. They're doing a big circle, so they were coming down the produce. Produce leads into the meat area. They're both together. So they split up in the middle, took a left, going down aisle 11. And now they're going back up the meat

wall which leads them back into produce.

Q. So this portion here to the right of the video, this is the meat section?

A. The meat section.

Q. Okay.

(Video played.)

BY MS. GUZMAN:

Q. I would assume they were going back to the produce section? And we are back in produce.

Now, we do not see the two individuals in this frame; is that correct?

A. They walked out of frame, that's right.

Q. So that's the end of -- that would be the end of Government's Exhibit 304.

And you don't know who these people are. You can only testify as to your observations; correct?

A. Yes, ma'am.

MS. GUZMAN: Your Honor, at this time, hopefully, with the technology assisting us, we would publish Government's Exhibit 307?

THE COURT: Okay.

(Video played.)

BY MS. GUZMAN:

Q. Okay. If we could stop it for just a moment. This is Government's Exhibit 307. As we see here, there is a date

also on the bottom?
A. Yes, ma'am.
Q. Reflecting what is being depicted, and a time. What date is shown and what time is depicted?
A. 12/20/2017. It's 10:55 at night.
Q. Is that 10:55 a.m. or 10:55 p.m.?
A. P.m.
Q. This particular portion that's shown here, these doors, what is it that?
A. This is our grocery entrance door.
Q. Are there more than one entry doors to that particular Walmart?
A. We have -- it's two entrances, four doors. Every door has two doors.
Q. Okay. But this is the entry to the grocery section?
A. The grocery section, yes, ma'am.
Q. I had a question on the time frame. You indicated that it was 10:55. Is that 10:55 or 8:55, again, military time, I understand.
A. It's been eight years, but --
Q. You're making the Navy look bad here. So it's 8:55 in the evening; is that correct?
A. Yes, ma'am.
Q. Okay. Let me stop the video right here. This obviously is a different area of the Walmart?

A. Yes, ma'am.
Q. What area is this?
A. It's the restrooms. Front restrooms.
Q. Are the restrooms locate in the front of the store or back of the store?
A. Front of the stores.
Q. And the time depicted, 12:54. Again, that would be 2054, that would be about what?
A. 8:54, 12/20.
Q. Let me stop you there. It appears that a gentleman went into the men's section, is that what you see here?
A. Yes.
Q. And the female, the lady bathrooms are to the left and then the gentleman's bathroom is to the right; correct?
A. Yes.
Q. And we see the gentleman in the hood going to the gentlemen's bathroom?
A. That's correct.
Q. Again, we are referring to the same Walmart, which is the Walmart on Roosevelt where you are involved in surveillance?
A. Where I work, yes.
Q. At this point obviously we don't see anyone going in or out. This gentleman is coming out. Okay. Let me stop right now.

We see a gentleman walking in, and what they wearing?
A. Black shirt and blue jean, light blue jeans, white sneakers.
Q. Looks like shorts. Shorts or pants?
A. Jean shorts.
Q. Okay. And, again, you don't know who this individual is. You can only just tell us that it shows somebody going into the bathroom, correct?
A. Right.
Q. Okay. It looks like it's about 8:57 right now?
A. (*Witness nods head.*)
Q. Right?
A. Yes, ma'am.
Q. Again, that's in the evening. If we could stop it right here. So, we see -- looks like the gentleman in the hoodie that went in, come out, and then the other gentleman that walked in with the shorts. Is that what you see here?
A. Yes, ma'am.
Q. Again, you don't know who these people are. You just know they're reflected in the tape?
A. Two guys.
Q. Now, if I could stop it for just a moment. When they walk out of the bathroom here, and they're going this way, what area of the Walmart is that?

A. They are either going to the exit, toward the grocery exit or they could be going toward produce.
Q. Okay. But we're still in the front. It's just going towards --
A. Front end of the store.
Q. Okay. Are there any surveillance cameras in the bathrooms?
A. No, ma'am.
Q. That's a good thing to know. It's a relief, I guess. Okay. And that's it. That's the end of the tape.
So other than what's depicted within the tapes, you don't have any other information about these individuals or anything else?
A. No, I do not. No, ma'am.
MS. GUZMAN: Thank you very much for your patience.
THE WITNESS: No problem.
MS. GUZMAN: Your Honor, I have no further questions.
THE COURT: Thank you. Any cross-examination for this witness?
MR. MARTIN: No, Your Honor.
THE COURT: Thank you. We will excuse you and thank you for having come in today to testify. You are excused. You'll be led out by the court security officer.

MS. GUZMAN: Your Honor, we are prepared to present another witness if the Court would like to do that.

THE COURT: Do you have a witness?

MS. GUZMAN: We do.

THE COURT: Yes, I think we can go for 15 minutes. Thank you.

MS. GUZMAN: Your Honor, the government would call Dani Kulic.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Dani Kulic, K-u-l-i-c.

THE COURT: Thank you, you may be seated. Mr. Kulic, you'll be asked some questions by Maria Guzman, Assistant United States Attorney, and then Mr. Martin, who represents Mr. Fisher may also ask you some questions. If you don't understand it, please say so. Wait until the question is finished before you begin answering.

If you have the tendency to speak quickly, slow down so we can understand you. And you need to speak up so

we can hear you. All right?

THE WITNESS: Yeah.

THE COURT: Okay.

DANI KULIC,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good afternoon.

A. How are you doing?

Q. One thing that is very important is for you to speak up we need you to keep your voice up?

A. Uh-huh.

Q. Because there gentleman is taking do you think what you are saying?

A. All right.

Q. Would you please introduce yourself to the jury and the Court by giving them your name?

A. Dani Kulic.

Q. How do you spell your first name.

A. D-a-n-i.

Q. Last name?

A. K-u-l-i-c.

Q. Mr. Kulic, are you currently pending criminal charges this Pinellas County?

A. Yes.
Q. And are those charges related to drug trafficking in cocaine?
A. Yes.
Q. And you are represented by an attorney?
A. Yes.
Q. When is your next court date?
A. The 7th.
Q. This month?
A. Of next month.
Q. Is your case still pending?
A. Yes.
Q. At some point after your arrest on your pending Pinellas County cases, did you begin to cooperate with law enforcement in Pinellas County?
A. Yes.
Q. Okay. And did you assist them by providing information against individuals?
A. Say again.
Q. Did you assist them in investigations?
A. Yes.
Q. And for -- in order to be direct, are you hoping that that cooperation will help you with your pending charges?
A. Yes.
Q. Now, do you know what your sentence is going to be? In

your Pinellas case?
A. No, not exactly.
Q. When I refer to it as the Pinellas County case, it's a state court matter that's being prosecuted by Pinellas County State Attorney's Office; correct?
A. Yes.
Q. So you do not know what your sentence is going to be?
A. (Witness shakes head).
Q. Have you pled guilty or done anything with reference to your case at this point?
A. No.
Q. But, again, are you hoping that your cooperation with Pinellas County will be looked favorably?
A. Yes.
Q. Now, did you assist law enforcement in relation to an investigation regarding an individual by the name of Dion Fisher?
A. Yes.
Q. And do you know or do you remember when you began -- well, the first time that you met Dion Fisher?
A. Yes.
Q. And when was that?
A. I don't know exactly when. But around a year ago.
Q. And again I need you to speak up.
A. Almost a year ago.

Q. Again, I need you to speak up a little bit. So you said about a year ago?
A. Yes.
Q. And where did you meet Dion Fisher?
A. At a tire shop.
Q. And where was this tire shop located?
A. 66th Street and -- by Pinellas Park. Right around there. 66th Street and --
Q. Well, do you remember the name of the --
A. I think it was AK Tires or something like that.
Q. And did you go to AK tires that day?
A. Yes.
Q. Did you go alone?
A. Me and a friend.
Q. Okay. And was that where you met Dion Fisher?
A. Yes.
Q. And what happened when you met Dion Fisher?
A. Nothing. Just bought some wheels off of him.
Q. You wanted to buy some wheels?
A. I bought -- we bought some wheels off of him.
Q. So you went to that store for what purpose?
A. To buy wheels.
Q. To buy wheels. And that's tires?
A. Yes.
Q. What was Dion Fisher doing at that store?

A. He was selling us the wheels, the tires.
Q. Okay. And did you strike up a conversation with Dion Fisher?
A. Yes.
Q. About what?
A. About jewelry at first and nothing really special. Just jewelry, tires, cars, whatever. Just anything. Just strike up a conversation, I guess.
Q. And when you struck up a conversation, did you ever agree to meet or to talk at a later time?
A. Yeah.
Q. Okay. And explain to us what was going to happen.
A. Nothing. We were just talking about jewelry, and I was supposed to go and buy a piece of jewelry off of him at a later time.
Q. So to be clear, when you met with Dion Fisher at AK Tires, did you have any conversations at that point about drugs, narcotics, or anything of the sort?
A. Not at the time.
Q. Okay. Let me ask you this: Do you see Dion -- this person that you've identified as Dion Fisher, do you see him in the courtroom today?
A. Yes.
Q. And if you do, would you please identify that person by where they are in the courtroom and what they are wearing.

A. Right there (indicating) in the jacket, yellow tie.

MS. GUZMAN: Your Honor, may the record reflect that the witness has identified the defendant Dion Fisher.

THE COURT: It will so reflect.

MS. GUZMAN: Thank you, Your Honor.

BY MS. GUZMAN:

Q. Now, after the AK tires meeting, did you make any agreements to meet at a different location?

A. Yes.

Q. And what location was that?

A. At the bank. I think it was Wells Fargo Bank, I believe.

Q. Okay. Now, did you agree to meet with Mr. Fisher on the same date that you were at AK Tires or some future date?

A. Later on. Not that date.

Q. Do you recall whether it was a few days, a few weeks, a few months?

A. Few days to a week or two.

Q. And what was the purpose of meeting at a Wells Fargo?

A. That's where we were meeting up so I can check out the jewelry.

Q. And whose decision was it to meet at a Wells Fargo?

A. Dion's.

Q. And did you go to a Wells Fargo?

A. Yes.

Q. Do you recall that Wells Fargo was located?
A. Not exactly.
Q. Do you recall whether it was in Hillsborough County, in Pinellas County, in Manatee County?
A. I think around more toward like Seminole Largo area, I guess.
Q. Did you say Largo?
A. Yes, around that area. Seminole, Largo, something like that.
Q. Is that in Pinellas County?
A. Yes, I believe so.
Q. As far as you know.
A. Yeah.
Q. Okay. When you agreed to meet at the Wells Fargo, did you go wired?
A. Yes.
Q. And if you would, explain for the Court and the jury when I refer to wired, what does that mean?
A. I had video and audio recording.
Q. And who gave you the audio or video equipment to wear?
A. The detective.
Q. So when you went to the Wells Fargo -- now, you were not wired at AK tires; correct?
A. No.
Q. But you're now stating you were wired when you arrived

at this future meeting at the Wells Fargo in Largo or Seminole; correct?
A. Yes.
Q. Okay. When you arrived at the Wells Fargo, where did you go? First of all, let me ask you this. Did you go by yourself?
A. Yes.
Q. And were you driving, were you walking, did you take a bus?
A. Driving.
Q. What kind of car were you driving?
A. Nissan Ultima, black.
Q. Do you know the year?
A. 2009, '10.
Q. When you arrived at the Wells Fargo, where did you park?
A. The parking lot out front.
Q. Of the bank?
A. Yes.
Q. Did you go inside the bank?
A. Yes.
Q. When you went inside the bank, who was there?
A. Dion.
Q. And when you refer to Dion, are you referring to Dion Fisher, the defendant?

A. Yes.
Q. Was Mr. Fisher at the bank when you arrived, or did he arrive after you?
A. He was at the bank.
Q. Was Mr. Fisher by himself, or was he accompanied by someone else?
A. By himself.
Q. When you walked in -- when you got to the Wells Fargo, did you go inside?
A. Yes.
Q. And to what area of the bank did you go in?
A. The lobby.
Q. And is that where Mr. Fisher was?
A. Yes.
Q. And was Mr. Fisher standing or sitting? What went on when you walked into the lobby?
A. He sat down at the little sofa. The little chairs they have.
Q. And did you have a conversation with Mr. Fisher?
A. Yes.
MS. GUZMAN: If I may have a moment, Your Honor.
(Discussion held off the record.)
BY MS. GUZMAN:
Q. Now, you're in the lobby, and you are having a conversation. What was the conversation about?

A. Started out just about the jewelry at first.
Q. Okay. And did -- was there any jewelry there that you were discussing?
A. Yes.
Q. That you were viewing?
A. Yes.
Q. And who had the jewelry?
A. He did.
Q. And did you buy any jewelry?
A. Not at the time. No.
Q. At some point did the conversation switch from jewelry to something else?
A. Yes.
Q. To what?
A. To pills.
Q. When you say pills, what kind of pills are you referring to?
A. Oxy 30s.
Q. Is that oxycodone?
A. Yes.
Q. And when you refer to oxycodone 30s, what does that mean? What is that? Are they tablets, pills? What are they?
A. Pills. Painkillers.
Q. And had you had experience with oxycodone 30s before?

A. Yes.
Q. In what capacity? In what way?
A. Just on the street, I guess.
Q. When the -- now, you've indicate there was a conversation about pills. Did you have this conversation in the lobby of the Wells Fargo, or did you go somewhere else?
A. No. We went to the car at that point.
Q. So when you say that we went to the car, whose car did you go to?
A. My car.
Q. And your car was still parked outside?
A. Uh-huh.
Q. Who went with you?
A. Mr. Fisher.
Q. Okay. Again, are you still referring to Dion Fisher?
A. Yes.
Q. Anyone else go into your car?
A. No.
Q. Were you still wired?
A. Yes.
Q. When you went into the car, what happened?
A. Just we started -- sparked up a conversation about the pills, and I was going to get a sample of them. Check them out.
Q. Who began -- this is very important, Mr. Kulic. Who

began the conversation about the pills?
A. Mr. Fisher.
Q. And what is your memory of what he told you?
A. That, I mean, he has them, as many as I need, and he was going to give me a sample of them later on that day.
Q. How long do you think you were in the car?
A. A few minutes. Not too long.
Q. When Mr. Fisher said that he was going to give you a sample of the pills, did he tell you what kind of pills he was going to give you samples of?
A. Yeah. Oxy 30.
Q. And at some point did you understand that to be fentanyl pills?
A. Yes.
Q. And when he said he was going to give you a sample, do you recall whether he indicated the amount of pills he was going to give you as part of that sample?
A. Couple of them, five of them.
Q. And how much, if you are aware, does a pill generally cost?
A. I don't know. Anywhere from five to thirty dollars.
Q. Now, did Mr. Fisher give you the sample at that time in the car in the parking lot of the Wells Fargo, or did you agree to meet at a later time?
A. Different area.

Q. I'm sorry?
A. Different area, later time.
Q. Did you agree to meet that date or some other date?
A. That day.
Q. And did you agree on a location?
A. Yeah.
Q. What was that location?
A. Mugs 'N Jugs.
Q. I'm sorry. Could you please repeat that.
A. Mugs 'N Jugs.
Q. And what is that?
A. It's a sports bar.
Q. And is that in Pinellas County?
A. Yes.
Q. And at some point did you go to Mugs 'N Jugs and meet with Mr. Fisher?
A. Yes.
Q. Now, who suggested that the meeting occur at the Mugs 'N Jugs?
A. Mr. Fisher.
Q. And when -- after Mr. Fisher suggested that you meet at the Mugs 'N Jugs, what happened? Did you all stay in the car? Did you go your separate ways? What happened?
A. We went our separate ways at first, and then we met back up later on. Maybe like an hour after.

Q. Were you able to see what kind of a car Mr. Fisher had driven to the Wells Fargo?
A. Yes.
Q. What kind of car was it?
A. I think it was an Aston Martin.
Q. An Aston Martin?
A. Yes.
Q. Did you see Mr. Fisher get into the Aston Martin and leave?
A. Yes.
Q. And at what point in the day did you meet up again?
A. Maybe like an hour later.
Q. Now, in between the time that you were with Mr. Fisher and you met with him later on, what communications did you have with law enforcement?
A. I had to meet up with them so they can search me and the vehicle. And then we went -- then I went to Mugs 'N Jugs after that.
Q. Okay. So let's go part by part. When you're at the Wells Fargo, and Mr. Fisher leaves in his Aston Martin, do you meet with law enforcement in the parking lot of the Wells Fargo?
A. No. I meet up with them at a different location.
Q. At that location, was that before or after you were supposed to meet at the Mugs 'N Jugs?

A. After.
Q. Okay. Did you meet with them before you had to go to the -- before you went to the Mugs 'N Jugs?
A. Yes.
Q. Okay. And when you met with police officers before your meeting, what happened there?
A. They searched me and searched my car and wired me up.
Q. And do you know why they did that?
A. So I don't have anything on me.
Q. Did they give you something?
A. No.
Q. Did they give you any money? Did they give you anything at that point?
A. The first time they gave me money to -- if I needed to buy the jewelry.
Q. Okay. Was that money returned to law enforcement?
A. Yes.
Q. Okay. When you went to the Mugs 'N Jugs, no money was given to you by law enforcement?
A. No.
Q. Is this because it was supposed to be a sample?
A. Yeah.
Q. When you went to the Mugs 'N Jugs, did you drive your Nissan?
A. Yes.

Q. When you've got to that location, was Mr. Fisher there or did you get there first?
A. I think I got there first.
Q. And where did you go?
A. Just the parking lot.
Q. Now, the Mugs 'N Jugs, is it in a commercial building area?
A. Yes.
Q. Where did you park in relation to the business?
A. Just out front.
Q. Did you ever go into the Mugs 'N Jugs?
A. No.
Q. At some point did you see Mr. Fisher?
A. Yes.
Q. And if you recall, was it before or after you got there?
A. After I got there.
Q. And what happened when you saw Mr. Fisher?
A. He just came in my car.
Q. So, I want to make this clear. You're in your car. Mr. Fisher arrives. Is it your testimony that Mr. Fisher then gets in your car?
A. Yes.
Q. Okay. And what happens next?
A. Just gives me the sample pack as soon as he gets in.

Q. Okay. Explain this: What is a sample pack?
A. Just a sample of the pills that he was giving me.
Q. How many pills did he give you?
A. Five.
Q. And do you remember whether they were loose pills, whether they were packaged in any way? Do you remember?
A. They're in a little bag.
Q. And what was the conversation? He gives you the pills. And what happens?
A. Just have a hour-long conversation after that about everything. All drugs related and all.
Q. During the time that you're having this hour-long conversation at the Mugs 'N Jugs, are you wired?
A. Yes.

MS. GUZMAN: Your Honor, this might be a good time to break.

THE COURT: Time to break? I was just going to say that. Okay. Ladies and gentlemen, we're going to take our break for the afternoon. Tomorrow I think is a regular day. Tomorrow is Thursday. So I don't believe that I have anything at all.

So we would go from nine to five tomorrow. Let me just double-check. Yes, nine to five tomorrow. So I'm going to remind you, please not to discuss anything with anybody. Not to form any opinions until you've heard all the evidence.

Please remember not to do any private internet searches.

All right. I will excuse you, and we will see you back here at 9 a.m. tomorrow morning. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 4:05 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Thank you. I'm going to remind the witness, we are in the middle of your testimony. So please don't discuss it with anybody. You need to be back here tomorrow morning at five to nine. So that we can get started promptly at 9 o'clock. Okay.

THE WITNESS: Five to nine?

THE COURT: Five to nine? Five minutes to nine o'clock. Five minutes to 9 a.m. tomorrow morning.

THE WITNESS: Okay.

THE COURT: I have a hard time understanding you. And I'm here. I'm sure the jury does, too. I know it's hard to project, particularly when you're nervous, you're in a courtroom. You've got to do that. You've got to just speak clearly, and you have to project.

MS. HOWARD-ALLEN: Maybe we can use the hand mic with him tomorrow.

THE COURT: I think we're going to have to do it because honestly about half of what you said I had trouble understanding. So we're going to give you a hand microphone

tomorrow, but you have got to speak up and you've got to enunciate your words.

THE WITNESS: Okay.

THE COURT: All right. Anything else before we recess?

MS. HOWARD-ALLEN: No, Your Honor.

MR. MARTIN: No, Your Honor.

THE COURT: You're excused. We'll see you back here five minutes to 9 o'clock.

(Witness exits.)

MS. HOWARD-ALLEN: Your Honor, I provided some case law to Mr. Martin. I'm sorry. You just said is there anything else.

THE COURT: That's okay.

MS. HOWARD-ALLEN: On transcripts because we plan to admit transcripts with Mr. Kulic's calls. I will speak with Mr. Martin. We just spoke yesterday, and they'll just be demonstratives. We think they'll be admissible, so I'm happy to hand them to you in advance.

THE COURT: Thank you.

(*Document tendered.*)

(Proceedings adjourned at 4:08 p.m. and reconvened on May 30, 2019.)

\- - -

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 211), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ *Scott N. Gamertsfelder*, RMR, FCRR

Official Court Reporter

Date: January 20, 2020