UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Tampa, Florida |
| | ) | |
| Plaintiff, | ) | No. 8:18-cr-236-T-33TGW |
| | ) | |
| | ) | Docket No. 188 |
| vs. | ) | |
| | ) | May 30, 2019 |
| DION GREGORY FISHER, | ) | |
| | ) | |
| Defendant. | ) | Courtroom 14B |
| ______________________________ | ) | |

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

(Vol. III of VII)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

# A P P E A R A N C E S

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Kenneth B. Martin, Esq.**
Law Office of Ken Martin
P.O. Box 10456
Tampa, Florida 33679
(813) 431-3310

**ALSO PRESENT:**

Adam Phelps, DEA Case Agent

Robert Liberto, IRS Case Agent

\- - -

**TABLE OF CONTENTS**

**EXAMINATIONS**


| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DANI KULIC | 15 | 94 | | |
| JOSEPH MINER | 99 | | | |
| RETA NEWMAN | 122 | 132 | 134 | |
| NICHOLAS HAMMACK | 136 | 148 | | |
| KHRISTIAN WALGUARNERY | 151 | | | |
| CORY LIST | 163 | | | |
| SHAWN LIVERNOIS | 171 | | | |
| NICHOLAS FORGIONE | 178 | | | |
| GARY W. CORBETT | 185 | | | |

(Witness Corbett resumed on May 31, 2019.)


**EXHIBITS**


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 100, 102, 103, 104, 105A, 106A, and 107A.................... | 189 | 20 |
| 101, 101A, and 101B..... | 189 | 1 |
| 208 and 208A............ | 202 | 14 |
| 209 and 209A............ | 203 | 15 |
| 210 and 210A............ | 204 | 24 |

**EXHIBIT INDEX (cont'd.)**


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 211, 211A, and B........ | 205 | 21 |
| 213, 213A, and 213B..... | 210 | 25 |
| 214, 214A, and 214B..... | 212 | 17 |
| 215..................... | 215 | 16 |
| 215A and 215B........... | 214 | 16 |
| 216, 216A, and 216B..... | 216 | 15 |
| 217, 217A, 217B......... | 218 | 19 |
| 218 and 218A............ | 221 | 9 |
| 228 and 228A............ | 108 | 20 |
| 229, 229A, and 229C..... | 113 | 15 |
| 230, 230A, 230B, 230C, 230D, 230E........ | 119 | 11 |
| 300A, 300B, 301A, 301B, 302, 302A, 303A, 303B, 305, 305A, 306............... | 33 | 14 |
| 303C, 303D, 303E, and 303F ............... | 78 | 20 |

**P R O C E E D I N G S**

May 30, 2019 9:04 a.m.

- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good morning. We are still waiting for your client to come, Mr. Martin. He's running a little late; is that right?

MR. MARTIN: Yes.

THE COURT: We are still waiting on one juror?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Let me go ahead and call the case. It's United States versus Dion Fisher, Case No. 8:18-cr-236-T-33TGW.

So we have Miss Howard-Allen is here, Miss Guzman, Special Agent Phelps, Special Agent Liberto, and Mr. Martin is here on behalf of Mr. Fisher, who is also present.

Mr. Martin, we're still waiting for one juror, but I know there is something --

MR. MARTIN: Your Honor, I have one objection and, frankly, I concede the law in the Eleventh Circuit is against me, but I would like to make the objection for the record.

With regard to the transcripts.

The transcripts use DF for Dion Fisher as an identifying -- or when Mr. Fisher is allegedly speaking. I would request that they use something else. S for suspect.

I think it's too leading, and that's on all the transcripts, which I think are Government's Exhibit 300B, 301B, 302A, 303B, 305A, 308A, 309A, 310B, and 311A. Also specifically with the 303B transcript of the Walmart meeting on December 14th/15th, the audio on the video is corrupted that a transcript is really not useful.

And any attempt at a transcript however well meaning is misleading. I just don't think the transcript does what it's supposed to do, which is help and aid the jury.

Also, I would request that all the transcripts be demonstrative evidence while it's being given to the jury. I know the law is against me, but it over-emphasizes a very important part of the government's case. Obviously, we don't have transcripts -- I'm not requesting transcripts for every witness, but it makes one witness, the video witnesses more important, I would argue, than the live witnesses or other evidence.

Regarding -- the case law talks about one of the things that the defense can do is use their own transcripts, and here I'm just specifically addressing 303B, not the

transcripts that I haven't brought up as being corrupted.

That's true, but realistically, I picked up the transcript drafts from Miss Howard-Allen on Saturday. We met on a Saturday outside her office. I picked them up on Saturday afternoon, 11 May. I completed them on 15 May.

I sent basically these objections by e-mail, like, please use "suspect" because one of the reasons, if you agree with that, you don't want to bring it up the day of court because you really can't do it, et cetera.

The reason I did not request funding for a transcript, defense transcript for the three government Exhibit 303B would be two-fold. One, I really don't think anybody can do it. Because it's corrupted. And, number two, realistically, based on timing by the time you submit that request, get approval, you know, you would have to ask for a continuance, et cetera. Now, I didn't do that, but that was the thought process.

Thank you, Your Honor.

THE COURT: All right. Thank you. Who's going to address that? Miss Howard-Allen?

MS. HOWARD-ALLEN: I am, Your Honor. I provided the case law to the Court yesterday, and I also provided it to Mr. Martin. And so I'm going to refer to that as well, but significantly as to the fact that it holds out one witness more important than another because of the

transcript, there's really no factual basis to that whatsoever.

Obviously, the transcript goes with a recording as opposed to with a witness. And so we are entitled to have a transcript to aid in the recording, and obviously the recording corroborates what the witness to say. If he were to testify about what happened, that would be a whole host of problems. We have a recording. We're entitled to provide the transcripts.

I will tell you that we spoke about the initial draft. There was still some law enforcement talk in that. I provided him the drafts so that we could have this conversation a week ago. These are -- you know, it just takes a lot of work to get this to be exactly correct. So we did that after I spoke with Mr. Martin, and I don't think that's an issue at all that there's any law enforcement voice in there.

There is one voice of a Wells Fargo employee saying something when they're sitting in the lobby. He spoke about the initials and the identification of the speakers. He had an objection just to initials, and obviously he's requested to list Dion Fisher as a suspect, which we can leave to the Court. I don't think that's appropriate under the law or in any circumstances since every witness who's on this phone is going to say that the person that he's speaking

with and identifying him clearly as Dion Fisher both in court and by voice.

So what each transcript now has is the word "Fisher" and then whether it's Kulic or whether it's McKinney -- it says "Kulic" or "McKinney." So there are no initials. There's just Fisher, Kulic, Fisher, McKinney.

I would also say as to 303B Mr. Martin spoke with me. There are two Walmart recordings. One is on 12/14/15. One is on 12/20. So we agreed after listening to Mr. Martin's objections, which is that a transcript is supposed to aid a jury in understanding what's inaudible.

So clearly the one on 12/20, the transcript if I provided it to Your Honor, it has many -- it's two pages and let's say 75 percent of it is inaudible. So I agreed with Mr. Martin. We're not going to be presenting a transcript for 12/20. We are presenting the video that we showed yesterday and Mr. Kulic's testimony.

THE COURT: What was the exhibit number of that?

MS. HOWARD-ALLEN: The one on 12/20, we did not -- we're not putting in.

THE COURT: So you're not even trying to put that in?

MS. HOWARD-ALLEN: No, but the first Walmart video he was referring to is 303B. So the Court can look at it in the copies that I have. I believe it fully aids the jury.

There's a lot going on in this, because they're in a car, then they're in the bathroom, and then they're walking around the store. So there are some intelligibles [sic]. I can tell you the other one was almost entirely unintelligible.

There are important things here that Mr. Fisher says, Yo, meet me in the bathroom. And Fisher -- and Kulic says, in the what? And Fisher says, in the bathroom. That's important, where they're meeting. There's other things that they're talking about, about the bathroom and going to the bathroom.

And I think that's important, and I think it aids the jury in part because, you know, they're in a Walmart. There's a lot of noise. In the bathroom there's a lot of echo. So when they can make out something, I think it's significant. And finally, Your Honor, as to inadmissibility, we are -- plan to present them demonstratively to the jury with a synced transcript at the bottom of the video.

The video, the disc that goes in, does not have the transcript synced on the bottom. The transcript is identified as a separate exhibit, which is the B of that area.

But I think that both -- I provided the Eleventh Circuit pattern jury instruction which itself cites *Nixon*, which indicates that the transcripts are admissible and the case law that supports that, I handed Your Honor, also United

*States v Green*, which clearly indicates that there, you know -- there's several places on Page 8 of this that says that the government's established the identity of the persons which the witnesses will do, and that they are admissible under there.

When you look at *Nixon*, clearly the key case, it says the transcripts are admissible to assist the jury in identifying speakers. And absent anything more than a generalized claim of prejudice, we will not find error in the transcripts being allowed in the jury room.

And Mr. Martin understandably is seeking, you know, for these to not go back in the jury room because they're prejudicial. But all of the government's evidence is prejudicial. That's the point of evidence. It's just that it's not overly prejudicial because it's an accurate depiction which is what the witnesses who were there will say after reviewing the transcripts that it's an accurate depiction of what occurred and that the speakers are accurately identified. And that's the appropriate foundation.

I also provided the Court with the *United States v Ransom*, which similarly holds that a jury may use transcripts as an aide to understanding the content and meaning of tape recordings. And each side is entitled to present them, which Mr. Martin indicated that he was not going to do.

And then *United States v Onori* I provided the Court as well. That indicates that not only are the use of tape recordings acceptable as long as a proper foundation is laid and that recordings constitute real as opposed to testimonial evidence.

Portions of the tape may be relatively inaudible. Second without the aid of a transcript, it may be difficult to understand the speakers.

And that also similarly holds that those transcripts can be admitted into evidence, and that's what we'll be seeking after we play the videos of Mr. -- when Mr. Kulic comes in for his continued testimony this morning, Your Honor.

THE COURT: I think you're absolutely right, Miss Howard-Allen. I'm happy to read a trial instruction, and I think you proposed that as well, Miss Howard-Allen, that I can read before the transcripts are introduced, which says it's basically an aide. I need to pull them up, but I think you did submit those, didn't you, Miss Howard-Allen?

MS. HOWARD-ALLEN: I did, Your Honor.

THE COURT: If you would like me to read those, Mr. Martin, I will. I don't always read those. Normally, I will read them before the jury goes back and deliberates, but if you'd like me to, I'm most certainly happy to do it. But I think she's absolutely correct.

As you acknowledged, Mr. Martin, the case law's against you, but I understand you're making the argument.

MR. MARTIN: I would request that you give the instruction when the government's offering these. If I could have a quick sidebar just to preserve this objection.

THE COURT: Yes, please.

MR. MARTIN: That's all I will say to preserve my earlier objection.

THE COURT: That's perfect, and that will remind me to turn to the jury instructions. I think that's a great idea.

MR. MARTIN: Thank you, Your Honor.

THE COURT: You're welcome. Are all the jurors here then?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Well, bring them in.

Had you finished with your witness? I don't remember, Miss Guzman.

MS. GUZMAN: No, Your Honor. We are in the middle.

MS. HOWARD-ALLEN: We were just kind of starting the transcripts, really -- I mean the recordings.

THE COURT: Now I remember. Okay. That's right. That's Dani Kulic; is that right?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Bring Dani Kulic in, please.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 9:22 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen. Just verifying that nobody has discussed this case with anybody; correct?

(Unanimous affirmative responses.)

THE COURT: And nobody has done independent research on the internet or any kind of research on this case, the participants, the law, anything like that?

(Unanimous affirmative responses.)

THE COURT: Any issues with anyone getting their personal electronic devices, mifi's, hotspots, anything like that?

(*Unanimous negative responses.*)

THE COURT: Very good. We'll resume with the direct examination of Mr. Kulic.

Mr. Kulic, we placed you under oath yesterday. We're not going to do it again this morning, but you are still under oath. Do you understand that, Mr. Kulic?

THE WITNESS: Yes.

THE COURT: Okay. I need you to speak up. If not, we're going to give you the hand microphone. I have a little bit of trouble understanding you. I want to make

certain the jury can understand you.

THE WITNESS: All right.

THE COURT: I know it's nerve-racking to be in a courtroom. You just need to speak up.

THE WITNESS: All right.

THE COURT: Go ahead, Miss Guzman.

MS. GUZMAN: Thank you, Your Honor.

DANI KULIC,

having been previously duly sworn on May 29, 2019, by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION (resumed)

BY MS. GUZMAN:

Q. If I can proceed, just for purposes of the record, the continued record, you are Dani Kulic; are you not?

A. Yes.

Q. And you are the same Dani Kulic that testified yesterday before this Court?

A. Yes.

Q. Mr. Kulic, when we broke yesterday I had asked you some questions regarding a meeting at Mugs 'N Jugs in Pinellas County. Do you remember that?

A. Yes.

Q. During that meeting at Mugs 'N Jugs, what did you and Mr. Fisher discuss with reference to blues?

A. He gave me a sample of five of them. A sample pack

with five blues, and we just discussed really a lot of stuff at that time.

THE COURT: We're going to give you the hand microphone. I just want to make certain everybody can hear you and understands you. We're going to take off the lavalier mic and give you the hand mic. Please hold it -- got to hold it close to your mouth. That's fine. Okay. Go ahead, Miss Guzman.

MS. GUZMAN: Thank you very much.

BY MS. GUZMAN:

Q. Mr. Kulic, these blues -- just to be clear on the record, what are blues?

A. Oxy 30.

Q. And are they fentanyl?

A. That's what we were thinking. That's what I was thinking, yes.

Q. Now, after you were provided the sample, did you go to a separate location with Mr. Fisher? What happened?

A. You mean after Mugs 'N Jugs?

Q. Yes. After your meeting at Mugs 'N Jugs, did you meet Mr. Fisher later on?

A. At a different time, yeah. Different date.

Q. Where?

A. Walmart.

Q. Do you remember where that Walmart was?

A. Off U.S. 19 and -- off of U.S. 19, I think. In Largo, I think.
Q. Did you go to the Walmart?
A. Yes.
Q. And what happened at the Walmart on December 15th?
A. I got 500 blues off of Mr. Fisher.
Q. If you could explain, where did you get the pills?
A. Inside of the Walmart from Mr. Fisher.
Q. Was there anyone else with you or with Mr. Fisher?
A. Not that I know of. No.
Q. Could you explain for the Court and the jury how you got the 500 pills from Mr. Fisher.
A. Just went into an aisle, and he put it on the shelf and I -- handed it to me.
Q. When you say he put it on the shelf, who put what on what shelf?
A. Mr. Fisher put it on the shelf.
Q. And how were -- were they loose, were they packaged?
A. They were packaged in a plastic bag.
Q. Do you remember if Mr. Fisher was carrying anything else in his hands?
A. I think a drink or something like that.
Q. Do you know what happened to the drink when he placed them on the shelf? If you remember.
A. Pretty sure he took the drink and bought it later on.

Q. Once you received the 500 pills, what happened next?
A. I went to the detective and gave it to them.
Q. Did you leave the Walmart?
A. Yes.
Q. Did you leave the Walmart alone or with Mr. Fisher?
A. Alone.
Q. When you walked out of the Walmart, what was the first thing you did?
A. Went to my car and met up with the detective.
Q. And then what happened at that point?
A. That's when they searched me and took the pills and did whatever they had to do.
Q. When you had first -- and I think I asked this yesterday, but just to be clear. When you first went into the Walmart, were you searched?
A. Yes.
Q. And what were you searched for?
A. Any kind of drugs or anything.
Q. And then as you are now testifying, you were searched a second time, when you exited?
A. Yes.
Q. At that time, what happened with the pills? Who took the pills?
A. The detective.
Q. Did you -- and this was, I believe, December 15th. Was

there another meeting at the Walmart?
A. At a different date, yes.
Q. What happened then?
A. Same thing. 500 pills. Went into the bathroom, and he handed me the pills and I gave it to the detectives afterwards.
Q. Was it the same Walmart?
A. Yes.
Q. Did you go alone to the Walmart?
A. Yes.
Q. Did Mr. Fisher go alone to the Walmart?
A. That I know of, yes.
Q. Just to be clear, where exactly in the Walmart did you meet?
A. In the bathroom.
Q. And whose decision was that?
A. Mr. Fisher.
Q. And when you were in the bathroom of the Walmart, what happened? Tell us exactly what happened inside the bathroom.
A. He handed me the pills, and I handed him the money and that's it.
Q. And how much money did you give him?
A. I gave him $5 apiece. $2500.
Q. And what did you do with the pills?
A. Gave it to the detective.

Q. Do you remember where Mr. Fisher had the pills when he gave them to you?
A. I believe it was in the hoodie.
Q. I'm sorry?
A. I believe it was in the hoodie.
Q. In a hoodie? Is that a jacket? What is a hoodie?
A. It's a jacket.
Q. When you went into the Walmart the second time, were you searched?
A. Yes.
Q. Similar to the first time?
A. Yes.
Q. When you got the pills in the bathroom, what did you do then?
A. Gave it to the detective.
Q. Were you searched at that time?
A. Yes.
Q. Similar to what had happened the first time you had been in the Walmart?
A. Yes.
Q. Did you meet with Mr. Fisher any other times after those two meetings at the Walmart?
A. No.
Q. Did you try to meet with Mr. Fisher?
A. Yes.

Q. And what happened?
A. Nothing. No answer.
Q. No answer?
A. Yeah.
Q. What does that mean?
A. He didn't answer my call.
Q. So you called him?
A. Yeah.
Q. Did you call him at the same number that you had before?
A. Yeah.
Q. And no answer?
A. No.
Q. So the December 20th meeting at the Walmart was your last meeting with Mr. Fisher?
A. Yes.
Q. And you had no other meetings?
A. No.
Q. Now, the pills, if I may for just a moment go back to that. The pills, you said you received 500 pills each time?
A. Yes.
Q. Were they in the same -- given to you in the same manner?
A. The second time they were in a yellow envelope.
Q. In a yellow envelope the second time?

A. Yes.

Q. Were they in one large envelope or divided into other envelopes? Explain to us their condition.

A. One envelope.

Q. Sorry?

A. One envelope.

Q. What color were the pills?

A. Blue.

Q. Were they all blue?

A. Yeah.

Q. And what did you believe those pills to be?

A. Oxy 30.

Q. I'm sorry?

A. Oxy 30.

Q. And is that fentanyl?

A. Well, that's what we believed they were, yeah.

MS. GUZMAN: Your Honor, may I approach the witness at this time?

THE COURT: Yes.

MS. GUZMAN: Your Honor, with leave of court I have several exhibits I'd like to go through with Mr. Kulic. Would the Court mind if I stood here?

THE COURT: Mr. Martin, is that okay with you?

MR. MARTIN: No objection, Your Honor.

THE COURT: Normally we do ask lawyers to be at

the podium, but you as long as you have the microphone so we can hear you, that's fine.

MS. GUZMAN: Thank you, Your Honor. That's why I suggested leave of Court.

THE COURT: That's fine. I appreciate it. Thank you.

BY MS. GUZMAN:

Q. Mr. Kulic, there are several exhibits here that I would like to review with you. I would like to review, first of all, if I may, all of these exhibits are -- well, first of all, what are all of these exhibits?

A. CDs, discs.

Q. I would like to review Government's Exhibit 300.

THE COURT: Miss Guzman, there is that lavalier, if you want to use the lavalier, Miss Guzman. Whatever is easier for you. I don't want to force it on you. Whatever is easier.

BY MS. GUZMAN:

Q. Government's Exhibit 300, Government's Exhibit 300A, Government's Exhibit 301, Government's Exhibit 301A, Government's Exhibit 302, Government's Exhibit 303, Government's Exhibit 303A, Government's Exhibit 305, and Government's Exhibit 306.

I'd like you to please review all of those -- the contents of all of those exhibits and see if you recognize

those discs.
A. Yes, I do.
Q. And how is it that you recognize them?
A. My initials.
Q. Prior to this hearing today, have you had an opportunity to review these discs?
A. Yes.
Q. And whose voices appear on these discs?
A. Mine and Mr. Fisher's.
Q. And do these discs fairly -- when you heard them, do they -- did you hear them in their entirety?
A. Yes.
Q. And did the disc fairly and accurately depict what happened when the recording occurred?
A. Yes.
Q. And are these discs consistent with -- were these discs taken with the instruments and equipment that you were provided for these conversations?
A. Yes.
Q. Is there anything in these discs that has been materially altered or changed or deleted based on your recollection of what occurred?
A. No.
MS. GUZMAN: Your Honor, at this time, the government would seek to introduce all of these exhibits.

THE COURT: Which are? Just so there's no misunderstanding, let's go through them one by one.

MS. GUZMAN: Yes, Your Honor. It is Government's Exhibit 300.

THE COURT: All right. 300.

MS. GUZMAN: Government's Exhibit 300A.

THE COURT: 300A.

MS. GUZMAN: Government's Exhibit 301.

THE COURT: 301. Okay.

MS. GUZMAN: Government's Exhibit 301A.

THE COURT: All right.

MS. GUZMAN: Government's Exhibit 302.

THE COURT: All right.

MS. GUZMAN: Government's Exhibit 303.

THE COURT: Uh-hum.

MS. GUZMAN: Government's Exhibit 303A.

THE COURT: Uh-hum.

MS. GUZMAN: Government's Exhibit 305.

THE COURT: All right.

MS. GUZMAN: Government's Exhibit 306.

THE COURT: All right. So let's make certain I haven't missed any here. 300, 300A, 301, 301A, 302, 303, 303A, 305, 306; is that correct?

MS. GUZMAN: Yes, Your Honor, that is correct.

THE COURT: Okay.

BY MS. GUZMAN:
Q. In addition, Mr. Kulic, if you would, take a look, please, at these exhibits, which are Government's Exhibit 300B, Government's Exhibit 301B.
THE COURT: I'm sorry. You said 300B.
MS. GUZMAN: 301B.
THE COURT: 301B, uh-hum.
MS. GUZMAN: 302A.
THE COURT: All right.
MS. GUZMAN: 303B.
THE COURT: All right.
MS. GUZMAN: And 305A.
THE COURT: All right.
BY MS. GUZMAN:
Q. Mr. Kulic, once again, would you please take a look at these exhibits that I just detailed for the Court.
A. Yes.
Q. Do you recognize these exhibits?
A. Yes.
Q. And what are these exhibits?
A. Me and Mr. Fisher's conversations.
Q. Okay. Are these transcripts of those conversations?
A. Yes.
Q. Prior to this hearing, did you have an opportunity to review these transcripts in their entirety?

A. Yes.
Q. And you've indicated that it's your conversations with Mr. Fisher; correct?
A. Yes.
Q. When you reviewed the transcripts, had they been materially altered, changed, or deleted in any way in this case?
A. No.
Q. Did you have an opportunity to review them and did they fairly and accurately depict your conversations as you recall them on the dates in question?
A. Yes.

MS. GUZMAN: Your Honor, at this time the government would again seek to introduce these exhibits into evidence.

THE COURT: All right. And just so we are clear, can you repeat the numbers of the ones that are exhibits that are transcripts.

MS. GUZMAN: Yes, Your Honor. 300B, 301B, 302A, 303B, 305A.

THE COURT: All right. So the transcripts are 300B, 301B, 302A, 303B, 305A; correct?

MS. GUZMAN: Yes, Your Honor, that is correct.

THE COURT: And are the underlying conversations -- I want to make certain that they are

correct -- for instance, for 300B, would it be 300?

MS. GUZMAN: Yes, Your Honor, that's correct.

THE COURT: For 301B, it would be 301?

MS. GUZMAN: That is correct.

THE COURT: For 302A, it would be 302?

MS. GUZMAN: Correct.

THE COURT: For 303B, it would be 303.

MS. GUZMAN: Correct.

THE COURT: For 305A, it would be 305.

MS. GUZMAN: Yes, Your Honor.

THE COURT: Anything else with -- and you're moving those into evidence now?

MS. GUZMAN: I am, Your Honor. I'm seeking to move all of these exhibits into evidence at this point.

THE COURT: Let me see counsel for a moment at sidebar then.

(The following was held at sidebar:)

THE COURT: Is there an objection you would like to make at this time?

MR. MARTIN: Yes, Your Honor. To Government Exhibits 300B, 301B, 302A, 303B, and 305A, I've already been heard on those, so I'm not going to repeat what I said, but that's the basis of my objection.

THE COURT: And any response in addition to what you said earlier?

MS. HOWARD-ALLEN: No. We would rely on our argument.

THE COURT: It's overruled for the reasons I stated earlier. I will read the instruction.

MS. GUZMAN: Just to clarify, you mentioned that 303B is from 303. Actually it's just plain 303A, which is a clip.

The whole thing has the cops stuff on it. The entire 300 is like the full recording, so it has the cops and stuff on it. We put in a clip that's 303A. So the transcript is from the clip, not from, like, the whole disc.

THE COURT: So that's for 303?

MS. HOWARD-ALLEN: For all of them. So the transcripts are the B, but most of the time they are from the A, which is the clip.

THE COURT: Okay. A is the clip. I see.

MS. HOWARD-ALLEN: The phone calls aren't clipped because they're clean. The videos have the directions from law enforcement.

MS. GUZMAN: They have been edited.

MR. MARTIN: You're not moving in unedited video; are you?

MS. HOWARD-ALLEN: I was moving in just the full one because I think we want the full video in there. If you don't want them in, I have no problem not putting the entire

in.

MR. MARTIN: I don't want the entire video. It has things like the cops saying, good job and stuff like that.

MS. HOWARD-ALLEN: Let me take out -- see, the phone calls don't have that, so let me just get my exhibit list and I'll be able to tell which ones we won't move in in their entirety.

THE COURT: Yes, you need to come back and let me know so there is no misunderstanding.

MS. HOWARD-ALLEN: So certainly 300 has the direction in. So we will just move in 300A.

MR. MARTIN: So 300 is not being moved in.

THE COURT: So let's go through it. I'm going to start with 300. Are you going to move 300 into evidence?

MS. HOWARD-ALLEN: No. Based on Mr. Martin's objection.

THE COURT: Okay. So 300 will not be admitted.

MS. HOWARD-ALLEN: But 300A.

THE COURT: 300A I will admit it in front of the jury and I will read that instruction. So that will be admitted.

MS. HOWARD-ALLEN: 300B is obviously the transcript for 300A.

THE COURT: So that will be admitted, too.

MS. HOWARD-ALLEN: We are not moving in 301.

THE COURT: 301 is not admitted.

MS. HOWARD-ALLEN: And then we will move in 301 and the transcript of 301, which is 301B.

MR. MARTIN: You mean 301A.

MS. HOWARD-ALLEN: Yes.

THE COURT: 301 is not being admitted but 301A is.

MS. HOWARD-ALLEN: Right.

THE COURT: And 301B is.

MS. HOWARD-ALLEN: Yes, which is the transcript of 301A. If we move down to 303, we will not move in 303.

THE COURT: Let's go to 302 first.

MS. HOWARD-ALLEN: That one there is no cop talk on it so that one is fine.

THE COURT: 302 you are moving in.

MS. HOWARD-ALLEN: Yes, 302A is the transcript of 302. 303 we will not move in the entire one which is 303, but we will move in 303A and the transcript of that one, which is 303B.

MS. HOWARD-ALLEN: All the rest are as we said.

THE COURT: Will be admitted.

MS. HOWARD-ALLEN: Yes. Miss Guzman is going to go through the photographs which are 303C, D, E, and F with him and also move those in.

THE COURT: Why don't I move these in first and then we'll go to the photographs. Then I'm going to read

this jury instruction. Let me make certain I have all these right.

What I'm going to say is, Members of the jury, exhibits blank identified as a transcript --

MS. HOWARD-ALLEN: Do you want me to give you the numbers?

THE COURT: Yes, I want to make certain.

MS. HOWARD-ALLEN: 300B.

THE COURT: Is that what she said earlier, 300B, 301B, 302A, 303B and 305A, but there are others, too? Is that what she said earlier.

MS. HOWARD-ALLEN: Yes. The others are going to be with Mr. McKinney.

THE COURT: So this jury instruction is for this.

MS. HOWARD-ALLEN: For this witness, yes.

THE COURT: And for the conversation would be the number without the B, so it would be 300, 301 --

MS. HOWARD-ALLEN: No. 300A.

THE COURT: That's right, because it's the clip. Of course. That's what we talked about.

MS. HOWARD-ALLEN: 301B.

THE COURT: No. The underlying --

MS. HOWARD-ALLEN: 301A. Excuse me. The then the next one is just 302. Then the next one is 303A. And then the next one is 305.

THE COURT: Right. This is like selecting a jury. I hope I don't get confused. Okay. If I say something wrong, correct me on the numbers.

MS. HOWARD-ALLEN: We're moving in 306, but we are not playing it.

THE COURT: All right. Thank you.

(Sidebar ended.)

THE COURT: So the government is moving into evidence a number of exhibits. So I am receiving into evidence Exhibit 300A, 300B, 301A, 301B, 302, 302A, 303A, 303B, 305, 305A, 306. I think that's it. I'm going to read you a short jury instruction in just a moment, ladies and gentlemen.

(*Government Exhibits 300A, 300B, 301A, 301B, 302, 302A, 303A, 303B, 305, 305A, 306 received in evidence*.)

THE COURT: Members of the jury, exhibits 300B, 301B, 302A, 303B, and 305A, have been identified as a typewritten transcript of the oral conversation heard on the tapes, tape recordings, received in evidence as exhibits 300A, 301A, 302, 303A, and 305.

The transcript also purports to identify the speakers engaged in the conversation. I've admitted the transcripts for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the recordings and also to help you identify the speakers.

But you are specifically instructed that whether the transcript correctly reflects the content of the conversation or the identity of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard about the preparation of the transcript and from your own examination of the transcript in relation to hearing the tape-recording itself as the primary evidence of its own contents.

If you determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

All right. So you may proceed, Miss Guzman.

MS. GUZMAN: Thank you, Your Honor.

THE COURT: You're welcome.

BY MS. GUZMAN:

Q. Mr. Kulic, do you still have the microphone?

A. Yes.

MS. GUZMAN: Okay. At this time, Your Honor, the government would seek to publish what has now been introduced as Government's Exhibit 300A.

THE COURT: You may publish them all that have been admitted into evidence. That's fine.

MS. GUZMAN: Thank you, Your Honor.

BY MS. GUZMAN:

Q. Mr. Kulic, you have a screen in front of you?

A. Yes.
Q. Are things coming up on your screen?
A. Yeah.
Q. Mr. Kulic, again you were wearing a recording when you arrived at the Wells Fargo; right?
A. Yes.
(Video played with transcript scrolling simultaneously.)
BY MS. GUZMAN:
Q. Mr. Kulic, it seems that the video gets a little crazy here. Was this because of your wire?
A. Yes.
Q. Okay. Where were you wearing it?
A. In my hand.
Q. In your hand?
A. Yeah.
Q. Okay. Why is it going a little crazy in the video?
A. Because I'm moving.
Q. Because you're moving? Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. Mr. Kulic, just for the jury, is there bad language that's used through some of these recordings?
A. Most likely, yeah.
Q. Is this typical drug-dealer-type talk?

MR. MARTIN: Objection. Relevance. Speculation.
THE COURT: If he knows. Overruled.
THE WITNESS: You can call it that, I guess.
BY MS. GUZMAN:
Q. And there's some profanity?
A. Probably.
Q. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. Mr. Kulic, first of all, is this the Wells Fargo that you previously testified about?
A. Yes.
Q. Is this -- where in the Wells Fargo are you?
A. In the -- the --
Q. Do you remember what part of the Wells Fargo office --
A. Lobby.
Q. -- or the bank it was?
A. Lobby.
Q. Lobby? Okay. And, again, the date is December 14th; is that correct?
A. Yes.
Q. This conversation that you're having with him now about bands, what is this about?
A. About what? Bands?
Q. Yeah. Presidentials and bands, what is that?

A. That's a watch.
Q. Is it jewelry?
A. Yes.
Q. So here's my question to you: The conversation right now, is it about jewelry?
A. Yes.
Q. Okay. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. Mr. Kulic, do you know what a Bentley pendant is?
A. It's a pendant with a B on it, like Bentley.
Q. And what is a Bentley?
A. It's a car.
Q. A car. So it's some jewelry regarding a car?
A. Yes.
Q. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. Mr. Kulic, a couple of questions.
Number one, what are bands?
A. Money, thousands. One band is a thousand.
Q. I'm sorry? Speak up.
A. One band is a thousand.
Q. A band is a thousand?
A. Yes.

Q. So bands are money?
A. Yes.
Q. It's not bands in a watch or anything, is it?
A. No.
Q. Okay. Now, there is a figure reflected in this part of the video. Who is this person?
A. Mr. Fisher.
Q. Okay. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. Mr. Kulic, what is -- when you refer to a trade or a pack or something, what is that?
A. It could be anything, like weed or anything like that. A pack, like a pound, a pack, any kind of trade in the drug trade or anything like that.
Q. So to drugs. You're referring to drugs?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. After you suggest the trade or a pack, what happens next?
A. We go to my car.
Q. And who suggests -- did you decide to go to your car? Who decides to go to your car?

A. Mr. Fisher.
Q. And at this point, do you leave the Wells Fargo?
A. Yes.
Q. And where do you go?
A. My car.
Q. And when you go to your car, are you still wearing a mic?
A. Yes.
(Video resumes.)
BY MS. GUZMAN:
Q. In this portion, as you're walking, it appears that you are asking about blues. What are blues?
A. Oxy 30s.
Q. And at this point what type of conversation are you having with Mr. Fisher? Is it about jewelry or has it changed to another topic?
A. Changed to blues.
Q. And is this the conversation that you're having as you enter into the car?
A. Yes.
(Video resumed.)
BY MS. GUZMAN:
Q. Okay. When you're talking about being real or no bunk, the word that's reflected, what is that about? What does that mean?

A. If they were real or fake, pressed with fentanyl or not.
Q. What did you interpret that to mean? What did you think that meant?
A. That they were pressed with fentanyl or not.
(Video resumed.)
BY MS. GUZMAN:
Q. When Mr. Fisher suggests he's going to give you five for free, what did that mean to you?
A. Sample pack.
Q. Sample pack?
A. Yep.
Q. Of what?
A. Of blues.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. So what did that mean to you, that conversation about they won't want the ones from the pharmacy no more. What did that mean to you?
A. That they're not from the pharmacy.
Q. Okay. And did it give you -- and were they good or bad? Was it good stuff or bad stuff?
A. I mean, if they're not from the pharmacy, they're not real.

Q. Okay.

(Video resumed.)

BY MS. GUZMAN:

Q. Okay. When you're talking about the fentanyl, what are you meaning here? What is it your talking about when you're talking about the fentanyl with him?

A. They are cut with fentanyl.

Q. That they are what?

A. Cut with fentanyl.

Q. Cut with fentanyl. In other words, the pills?

A. Yes.

Q. Okay.

(Video resumed.)

BY MS. GUZMAN:

Q. Okay. So is that the end of that conversation?

A. Yes.

Q. The discussion in the car about blues, was that jewelry?

A. No.

Q. Was that drugs?

A. Yes.

Q. Is that fentanyl?

A. Yeah.

Q. Is there now the next meeting for the sample?

A. In a little bit, yeah.

Q. Was that the same day?
A. Yes.
Q. You talk about a half hour. If you can remember was it about a half hour later?
A. Yes, around there. Half hour, hour.
Q. Okay. If we could go ahead and play that.
(Video played with transcript scrolling simultaneously.)
BY MS. GUZMAN:
Q. The person -- first of all, who is the person with the tattoos?
A. Me.
Q. Are you in the driver's seat?
A. Yes.
Q. The person that comes into your car, who is that?
A. Mr. Fisher.
Q. When Mr. Fisher comes into your car, what happened?
A. He gives me the sample pack.
Q. And in this portion of the video, do we see that happen?
A. He puts it in the cup holder right there.
Q. So does he do it immediately as he comes into the car?
A. Yes.
Q. Okay.
(Video resumed.)

BY MS. GUZMAN:
Q. Okay. Again, some conversation here, if you could explain. A little bit of boy here and there, what does that mean?
A. Heroin.
Q. And when you ask or is it real, the real shit? What are you referring to?
A. If it's cut or not.
Q. Cut with what?
A. Fentanyl.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. When there's the discussion about 500 or a thousand a week, what is that?
A. Blues.
Q. Blues. So 500 or 1,000 a week, we're talking about pills?
A. Yes.
Q. It's note money, it's pills?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. Okay. So when -- this conversation about you can cop

2000 off the rip for that, what does that mean?
A. Basically get them for a better price. Instead of getting them fronted.
THE COURT: Can you hold the microphone so we can understand you, please.
THE WITNESS: Instead of getting them fronted, I can get them for a better price. I don't have to get them fronted at that point.
BY MS. GUZMAN:
Q. At this point, are you still discussing pills?
A. Yeah. Yes.
(Video resumed.)
BY MS. GUZMAN:
Q. Okay. So this information that you are having here about pharmacies and pills, what are you discussing here?
A. I'm just -- we're just discussing that -- can you repeat that question?
Q. Okay. So you say the MF either knows a pharmacy or he must have buddies. What does that mean?
A. Buddies going to get scripts out of the pharmacy.
Q. So it's illegal, you're are talking about --
A. Yeah.
Q. Not going to a pharmacy, but illegal stuff?
A. Yes.
Q. Okay.

(Video resumed.)
BY MS. GUZMAN:
Q. So when Mr. Fisher says, now all of them got like scripts and, again, a bad word, that is obviously up for the jury to see, what is that? What is that conversation about?
A. About blues.
Q. And when Mr. Fisher says, and now all of them got like scripts and shit, what was he saying to you?
MR. MARTIN: Objection. Speculation.
THE COURT: If he knows. I'll go ahead and sustain it. You can lay the foundation.
MS. GUZMAN: Thank you, Your Honor.
BY MS. GUZMAN:
Q. You are having a conversation about scripts. What are scripts?
A. They are scripts of pills that come from pharmacies.
Q. So that would be legitimate?
A. Yes.
Q. When you're talking about not having scripts, is that illegitimate?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. When the discussion is to get them off scripts, what

are we saying here? What were you and Mr. Fisher discussing about getting people off scripts?
A. Trying to get them back to getting the fake ones.
Q. Because if they didn't have scripts, then they could buy the fake ones is that what you are saying?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. When Mr. Fisher is talking about 3,000, I was getting 3,000, but now it's 500, what is he talking about?
A. Blues.
Q. Blues. So it's 3,000 what?
A. Blues.
Q. So it's 3,000 blue tablets?
A. Pills, yeah.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. So this conversation -- the conversation about it being slow, what is that about?
A. Just business is slow.
Q. And what business is that?
A. Just selling drugs -- like selling pills.
Q. Again, this is all conversations about pills?

A. Yes.
Q. Okay. And selling pills?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. When Mr. Fisher is talking about people getting cleaned up, what does that mean?
A. Either not taking blues anymore or stop taking the fake ones.
Q. In other words, they're off the drug?
A. Yes.
Q. Okay. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. When Mr. Fisher says, I'm trying to get somebody to pick up at least a thousand a week, a thousand what?
A. Blues.
Q. Again, we're talking the blue pills?
A. Yes.
Q. The fentanyl?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:

Q. When Mr. Fisher says this shit was booming, what is he referring to?
A. Pills.
Q. And what was booming?
A. The pills.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. Okay. When Mr. Fisher says to you, these are the top, top, top. What did that mean to you?
A. They were the best ones.
Q. The best what?
A. Pills.
Q. And when he says, pulling in like 25 grand, no less, every week, what did that mean to you?
A. Making 25 grand a week.
Q. From selling the pills?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. When he's talking about -- Mr. Fisher's talking about I'm selling for ten and eight, what does that mean?
A. That's what he was charging for them.
Q. And then saying, moving like 3-, 4,000 a week, what did

that mean?
A. How many he was selling.
Q. Sorry?
A. How many he was selling.
Q. So, again, selling for 10 and 8, is that $10, $8? What is 10 and 8?
A. Yes, dollars.
Q. $10, $8 and then 3- or 4,000 a week?
A. Yes.
Q. So if it's 4,000 a week at 10, that's a lot of money? How much is that?
A. 40,000.
Q. 40,000?
A. Yep.
Q. Per week?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. So, he's talking -- Mr. Fisher is talking about eight and ten and now he's going to come back at five. What does that mean?
A. Just lowering the price.
Q. So five is what? Five cents, five dollars, what?
A. Dollars.

Q. What?
A. Dollars.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. When Mr. Fisher says these ain't no bullshit, what is he referring to?
A. Pills.
Q. The pills?
A. Yes.
Q. And what did that mean to you, when these ain't no bullshit, what did that mean to you?
A. That they are going to work.
Q. And how were they going to work?
A. How they're supposed to.
Q. How were they supposed to?
A. Like painkillers.
Q. Okay. And what do painkillers do?
A. Get you high.
Q. Okay. So, again, you thought that they would provide the high?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:

Q. What are beans?
A. MDMA pills.
Q. And what are MDMA pills?
A. A drug.
Q. A drug. Are they like ecstasy?
A. Yes.
Q. Okay. Are they illegal?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN
Q. When Mr. Fisher says I was moving like 500 beans a day, you said beans are what, MDMA, ecstasy?
A. Yes.
Q. And when he says, I was moving like 500 a day, 500 what?
A. Beans.
Q. And do they come in tablets?
A. Yes.
Q. Pills? So we are talking 500 pills of MDMA?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. What is a Molly?

A. A drug.
Q. What kind of drug?
A. Like ecstasy, I guess.
Q. And what does it do? If you take a Molly, what happens? What does it make you feel?
A. Kind of like a bean, I guess.
Q. I'm sorry?
A. Like a bean.
Q. Like a bean?
A. Yes.
Q. So Molly is like a bean, like ecstasy?
A. Yes.
THE COURT: We need to come up with a good breaking point. Is this it?
MS. GUZMAN: I think we're almost through with this, Your Honor.
THE COURT: Please, go ahead.
(Video resumed.)
BY MS. GUZMAN:
Q. So what's a bird, what's a whole bird?
A. Kilo of cocaine.
Q. Okay. And what is the discussion that you and Mr. Fisher are having here about cocaine?
A. Just talking about how much they go for and all.
Q. I'm sorry?

A. Talking about how much they go for.
Q. Okay. How much what goes for?
A. A kilo.
Q. Of cocaine?
A. Yes.
(Video resumed.)
BY MS. GUZMAN:
Q. So just to be clear, what you're discussing here is the cost or price of cocaine?
A. Yes.
Q. Okay.
(Video resumed.)
MS. GUZMAN: Your Honor, we might want to take a break. We have a little bit more, but it probably is another maybe ten minutes. Perhaps a break would be --
THE COURT: I think that might not be a bad idea. Ladies and gentlemen, we will take our morning break. Please remember not to discuss the case or form any opinions until you've heard all the evidence. We'll see you back here in ten minutes.
COURT SECURITY OFFICER: All rise for the jury.
(Jury exits courtroom at 10:45 a.m.)
COURT SECURITY OFFICER: Please be seated.
THE COURT: I'll remind the witness, sir, we will be on break. Please don't discuss your testimony with

anybody. Do you understand that?

THE WITNESS: Yes.

THE COURT: If you run into any of the jurors, please don't talk to them. All right.

THE WITNESS: All right.

THE COURT: We're in recess. Thank you.

(Recess taken from 10:46 a.m. to 11:03 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Are all our jurors ready?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: We will bring them in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 11:03 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

I remind the witness, sir, you are still under opiate. Do you understand that?

THE WITNESS: Yes.

THE COURT: Thank you. Go ahead you may proceed, Miss Guzman.

MS. GUZMAN: Thank you very much, Your Honor.

BY MS. GUZMAN:

Q. Again, for the purposes of the record, you are the same

Dani Kulic that was testifying before the break?
A. Yes.
Q. Mr. Kulic, in this portion of the conversation, before we broke, you say, I can't find it under 30. What are you referring to?
A. A brick of cocaine.
Q. So I think you had testified this was a conversation about cocaine; correct?
A. Yes.
Q. Okay. And it's still a conversation about cocaine at this point?
A. Yes.
Q. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. When you were referring to hitting it, what did that mean to you?
A. Cutting it.
Q. Cutting what?
A. The cocaine.
Q. Okay. What is the point of cutting the cocaine. What was the conversation -- what were you referring to about cutting the cocaine?
A. I wasn't saying that. That was him.
Q. Okay. What was the conversation about?

A. How much he can cut it.

(Video resumed.)

BY MS. GUZMAN:

Q. Okay. When you're talking about presses, what is a press?

A. It's used to press the cocaine back into its form after you cut it.

Q. Is it equipment?

A. Yes.

Q. And how does it work?

A. You cut the cocaine, put it in there and it presses back up into a brick.

Q. And why is a brick -- having a brick a good thing, if you are dealing in cocaine? What is the significance of a brick?

A. Really isn't no significance. Just how it looks.

Q. How it looks, okay.

(Video resumed.)

BY MS. GUZMAN:

Q. When Mr. Fisher says, I'm going to go to Colombia and get my own connect, what did that mean to you?

A. He was just going to go to Colombia and find somebody with cocaine.

Q. And what was the person in Colombia with cocaine going to do, you thought?

A. Sell it. Send it. Sell it to him and send it here.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. So when you are talking here about the conversation is I need a 9, what is a 9?
A. 9 ounces.
Q. Of what?
A. Cocaine.
Q. So is the conversation at this point still about cocaine?
A. Yes.
Q. Okay. You had previously -- a few minutes before in the conversation, the whole thing about Colombia, and I guess I neglected to ask you, why is Colombia important? Why was that important to you what did that mean to you, Colombia, that he was going to go to Colombia?
A. He was just going to go find a source in Colombia.
Q. And why Colombia?
A. That's where it comes from.
Q. I'm sorry?
A. That's where it comes from.
Q. What comes from?
A. Cocaine.
Q. All right.

(Video resumed.)
BY MS. GUZMAN:
Q. Okay. So at this point, are you discussing cocaine or discussing something else?
A. Just how much money is made.
Q. And was it a conversation about cocaine or a conversation about another drug, other drug sales?
A. Other drug sales.
Q. Okay. When you are having this conversation about having to get rid of cars or going to your savings, what are you discussing? What did this conversation mean to you? Let me put it to you this way: Why were you discussing getting rid of cars?
A. I was just making conversation.
Q. Okay. But why would you need to get rid of cars?
A. If money is getting bad or something.
Q. So when Mr. Fisher says, I'll make enough money to do -- to go do whatever I want within a week, what did that mean to you?
A. Enough to go pay whatever he wants to get.
Q. Okay. How did you think his business was going?
A. Good enough.
Q. Okay. All right.
(Video resumed.)
BY MS. GUZMAN:

Q. When you are talking about, again, money, are you talking about drug money or are you talking about a different type of money?
A. Drug money.
Q. Okay. So this conversation that you are having about buying things and making enough money, you're not talking about a job?
A. No.
Q. Okay. Again, it's all drug money?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. Okay. Now, you had talked about bands earlier. I had asked you what a band was. Could you tell us again what a band is?
A. A thousand dollars.
Q. So five bands would be what?
A. 5,000.
Q. So when Mr. Fisher says, I still clear like maybe five bands a week, what did that mean to you?
A. It's $5,000 a week.
Q. Okay. Thank you.
(Video resumed.)
BY MS. GUZMAN:

Q. Okay. When you refer to V's, what are V's?
A. Blues.
Q. Blues? M boxes, what are M boxes?
A. Same thing, blues.
Q. And, again, you are referring to blues, what are you referring to?
A. Oxy 30.
Q. And the oxy 30 are what?
A. Painkillers.
Q. Is that fentanyl is that is that what you believed it to be?
A. Yes.
Q. Okay.

(Video resumed.)

BY MS. GUZMAN:
Q. Okay. These white ones, the white 30's, what did that mean to you? What did these white ones, the white 30's mean to you?
A. White oxy 30's.
Q. And when you say they are white oxy 30's, are these white pills?
A. Yes.
Q. You had been talking about blues and that's why I ask you. Now, here, we are discussing white.
A. Yes.

Q. Are they the same as the blues or are they different?
A. Yes, same.
Q. Same? What makes one white and what makes one blue if you know?
A. I don't know.
Q. But it's the same thing?
A. Yes.
Q. And we are still talking fentanyl?
A. Yes.
(Video resumed.)
BY MS. GUZMAN:
Q. Okay. Let me stop it for just a moment. Because of a couple of things. When Mr. Fisher is talking about getting some decent beans, again, what are these beans?
A. Pills.
Q. What kind of pills?
A. Ecstasy.
Q. So when he says, if I can get some decent beans, I might be able to come back off that, what did that mean to you?
A. Make some money off of them.
Q. Selling them?
A. Yes.
Q. And then you ask, but what do you charge for the boy? Again what is a boy?

A. Heroin.
Q. And when Mr. Fisher responds, probably like 12 an ounce, what did that mean to you?
A. $1200 an ounce.
Q. For what?
A. Heroin.
Q. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. So when you ask, but it's real, it ain't the fentanyl, and Mr. Fisher responds, yeah, what did that mean to you? What did you interpret that to mean?
A. That it's real heroin.
Q. That it's real heroin?
A. Yes.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. You say to him, I really do want the chain. I like it. What were you referring to at that point?
A. The chain.
Q. Okay. Was that the jewelry chain?
A. Yes.
Q. Okay. And when Mr. Fisher says, well, let's make some money first, what did that mean to you?

A. Make some money off the drugs first.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. There are references to a Lamborghini, a Maserati and Aston, what are those?
A. Cars.
Q. And are they nice cars?
A. Yes.
Q. Are they expensive cars?
A. Yes.
Q. Okay. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. Okay. So looks like this is the end.
What happens after you say, all right, I got you, all right, Bro, and Mr. Fisher says, all right?
A. Well, we go our separate ways.
Q. And just to remind us, whose car were you in?
A. My car.
Q. Did you see Mr. Fisher get into his car?
A. Yes.
Q. And what was he driving?
A. The Aston Martin.
Q. Now, this was on 12/14; correct? When is the next time

that you see Mr. Fisher?
A. Maybe like a week, couple of weeks after that.
Q. Okay. And where do you see him?
A. The Walmart.
Q. Do you end up having two meetings with him at a Walmart?
A. Yes.
Q. Were they on the same date or separate dates?
A. Separate.
Q. Now, the five pills -- first of all, how many pills did Mr. Fisher give you during the course of that conversation?
A. Five.
Q. Five. Mr. Fisher leaves in his car. What do you do?
A. I go give the pills to the detective.
Q. And where was the detective?
A. They're in the parking lot watching.
Q. Were they in the same parking lot or a different parking lot?
A. Same.
Q. So you go to where the officers are and what happens? Explain to us what happens. You had the pills. Explain to us what happened.
A. I give them the pills, they search me and my car, and we go our separate ways.
Q. You said that they also searched your car. What did

they do?
A. For any drugs.
Q. And was that it that day?
A. Yes.
Q. Okay. Now, does there come a time that -- there's a phone call between you and Mr. Fisher before the Walmart.
A. Okay.
MS. GUZMAN: At this time, Your Honor, the government would like to publish -- I know the Court already said we could publish -- but specifically, it would be Government's Exhibit 302.
THE COURT: Okay. Which has already been received into evidence.
MS. GUZMAN: Yes, Your Honor. These exhibits have been received. I'm just trying to be specific for the record.
THE COURT: Of course. Thank you so much. That's perfectly fine. Thank you.
(Video played with transcript scrolling simultaneously.)
BY MS. GUZMAN:
Q. Okay. Who are the two people speaking on that phone call?
A. Me and Mr. Fisher.
Q. And when you refer to needing 500, what does that mean?

A. 500 blues.
Q. And did you meet up? Did you go to the Walmart?
A. Yes.
Q. And was this the Walmart on Roosevelt?
A. Yes.
Q. When you got to the Walmart, were you searched by law enforcement?
A. Before, yeah.
Q. And were you given any money?
A. Yes.
Q. How much were you given?
A. 2500.
Q. What was the purpose of the $2500 that law enforcement gave you?
A. For the 500 blues.
Q. Okay. And how much were you going to pay per pill?
A. $5.
Q. So the $2500 would be for 500 pills at $5 a pop?
A. Yes.
Q. Okay. Can we play Government's Exhibit 303A.
(Video played with transcript scrolling simultaneously.)
BY MS. GUZMAN:
Q. Again, the telephone call that we just heard, who were the two people speaking on that phone call?

A. Me and Mr. Fisher.
Q. And where were you when you were having that conversation?
A. In my car.
Q. And was the car moving? Was your car parked or was your car driving?
A. Parked.
Q. Were you already at the Walmart when this conversation occurred?
A. Yes.
Q. And, again, you're wired?
A. Yes.
Q. Mr. Fisher says, the bathroom. What did you think that meant?
A. The Walmart bathroom.
Q. Okay.

(Video resumed.)

BY MS. GUZMAN:
Q. Let me stop it here for just a moment. Where are you? I think it's obvious, but where are you?
A. Walmart bathroom.
Q. Was Mr. Fisher there?
A. No.
Q. If you remember how did you feel about going to the bathroom. What were you thinking?

A. Didn't want to go to the bathroom, but --
Q. Why?
A. Just suspicious. Fishy.
Q. That it was fishy?
A. Yes.
Q. What do you mean by that?
A. Suspicious.
Q. You were suspicious?
A. Yes.
Q. Okay. What else were you feeling?
A. I mean, that's about it.
Q. Okay. Did you stay in the bathroom?
A. No. I went and found him.
Q. Okay. All right.
(Video resumed.)
BY MS. GUZMAN:
Q. I know that we saw the bathroom. What area of the store is this now?
A. By the produce.
Q. And it looks like this is all -- this is out of your own equipment; right?
A. Yes.
Q. And it looks like it's upside down?
A. Yes.
Q. Why was it upside down?

A. Because I had no way of knowing what's right side up with the camera.
Q. Okay. We see someone -- an image coming toward you. Do you know who that is?
A. Mr. Fisher.
Q. Okay. All right. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. I know it's very confusing, but what are you and Mr. Fisher doing?
A. Just --
Q. I'm sorry.
A. We're walking in the aisle.
Q. Okay. And is this still at the Walmart, is it?
A. Yes.
Q. And what happens when you are walking in the aisle?
A. He places it on the -- the pills with his bottle on one of the shelves.
Q. And can you see that on your video?
A. Yes.
Q. Okay. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. Obviously at some point it went black. Why did it go black?

A. I probably put it in my pocket while I was giving him money.
Q. And do you remember where you had put -- was this the $2500?
A. Yes.
Q. Where was the $2500 on your person?
A. In my pocket.
Q. Do you remember -- so at this point the image goes dark. What was going on?
A. I was giving him the money.
Q. Okay.
A. Taking -- putting the pills in my pocket.
Q. You put the pills in your pocket?
A. Yes.
Q. Okay. Thank you.
(Video resumed.)
BY MS. GUZMAN:
Q. At this point, it is no longer black. The image is no longer black. Did you already have the pills?
A. Yes.
Q. And where were the pills?
A. In my pocket.
Q. And who gave you have the pills?
A. Mr. Fisher.
Q. And when you got the pills from Dion Fisher in what

form did you get them to put them in your pocket?
A. In a bag.
Q. Did you take them out of the bag?
A. No.
Q. What did you do with the actual bag?
A. Gave it to detectives.
Q. So, I know that eventually you gave it to the detectives, but at this point that you're walking, where is the bag?
A. In my pocket.
Q. Where is the $2500 that the law enforcement had given you?
A. Dion Fisher.
Q. And do you know where Dion Fisher put it?
A. In his pocket.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. What is going on now?
A. We're just walking around and talking.
Q. And why were you walking around the Walmart?
A. Just following him.
Q. Do you know what area of the Walmart you were in, walking around?
A. Around frozen food and produce.

Q. Okay. What was it again?
A. Frozen food aisle and produce.
Q. Okay. Did you go to any other area of the Walmart other than the frozen food and the produce section?
A. No.
Q. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. There appears to be someone an image, with a white shirt. Who is that, if you know?
A. Mr. Fisher.
Q. Okay. And, again, why is your equipment upside down?
A. Because I don't know what's right side up.
Q. And where was it on your body at that point?
A. In my hand.
Q. In your hand. Okay.
(Video resumed.)
BY MS. GUZMAN:
Q. At some point, did you leave the Walmart?
A. Yes.
Q. Did you leave the Walmart alone, or did you leave with Mr. Fisher?
A. Alone.
Q. And where did you go?
A. My car.

Q. And from your car, where did you go next?
A. Met up with the detective.
Q. And where were the detectives?
A. In the parking lot.
Q. And the parking lot of what?
A. Walmart.
Q. And when you reached the detectives, what happened?
A. I gave them the pills.
Q. And what else happened?
A. They searched me.
Q. And what about your car?
A. My car, too.
Q. After you gave the -- at that point, were the pills still in that bag, that original bag?
A. Yes.
Q. After you gave the bag with the pills to the officers, then what happened?
A. We went our separate ways.
Q. And you went your separate ways?
A. Yes.
Q. And was that the last time that you saw Dion Fisher that day?
A. Yes.
MR. GUZMAN: Okay. If I may have just a moment, Your Honor.

THE COURT: Sure.

MS. GUZMAN: Your Honor, at this time, again, it's already been admitted into evidence but the government would seek to publish Government's Exhibit 304.

THE COURT: Okay. That will be fine. Thank you.

(Video played.)

BY MS. GUZMAN:

Q. Mr. Kulic, do you recognize what's in that video?

A. Yes.

Q. What is it?

A. The produce section at Walmart.

Q. What's the date on that video?

A. 12/15.

Q. If we could stop it for just a moment.

There is an individual that we see in the aisle. Who is that?

A. Mr. Fisher.

Q. At this point, are you in the store?

A. Yes.

Q. You indicated before that you went to the bathroom; is that correct?

A. Yes.

Q. When you first walked into the Walmart, where was the first place that you went?

A. Bathroom.

Q. Okay. All right.

(Video resumed.)

BY MS. GUZMAN:

Q. At this point, are you in the video? Do you see yourself in the video?

A. No.

(Video resumes.)

BY MS. GUZMAN:

Q. Okay. Who is this?

A. Me and Mr. Fisher.

Q. Is this you?

A. Yes.

Q. Appears to be a gentleman in a jacket?

A. Yes.

Q. What are you both doing now?

A. We just met, and now we are walking around.

Q. Okay. Now, you've left the produce area. Where did you go from here?

A. Just walking around.

Q. Just walking around?

A. Uh-huh.

Q. Now, is this you and Mr. Fisher?

A. Yes.

Q. What's going on there?

A. Just walking. Following him.

Q. Do you know what area of the Walmart this is?
A. Just between the aisles somewhere. Like frozen foods or something.
Q. It would appear that you were wearing a jacket. Where did you have the money? Mr. Kulic, do you remember where you had the $2500?
A. One of my pockets.
Q. In your pocket, okay.
Who are these individuals?
A. Me and Mr. Fisher.
Q. What are you doing at this point?
A. Just walking.
Q. Now, it appears -- well, you tell me. What happened there? You were walking up this -- and then what did you do? Where did you go?
A. I went to the aisle where he gave me the pills.
Q. So the record is clear on this video, you're saying that the transaction occurred in an aisle; is that correct?
A. Yes.
Q. Do you know what this part of the Walmart is?
A. By the frozen foods or produce.
Q. Who are these two individuals?
A. Me and Mr. Fisher.
Q. Okay. At this point, do you have the pills?
A. Yes.

Q. And does Mr. Fisher have the money?
A. Yes.
Q. Where do you have the pills?
A. One of my pockets.
Q. Where does Mr. Fisher have the money?
A. Same thing. One of his pockets.
Q. Again, do you recognize this area of the Walmart?
A. Yes.
Q. What is it?
A. The produce section.
Q. Okay. Do you see yourself and Mr. Fisher?
A. Yes.
Q. What's going on here?
A. Just walking down the aisle.
Q. Why were you just walking down the aisles of the Walmart?
A. Just following him.
Q. You were following him?
MS. GUZMAN: Your Honor, may I approach the witness?
THE COURT: You may.
(*Documents tendered.*)
BY MS. GUZMAN:
Q. Mr. Kulic, I've left there for you to review four exhibits. They are 303 -- Government's Exhibit 303C,

Government's Exhibit 303D, 303E, and 303F. Would you please take a look at those.

A. Yes.

Q. And what are they?

A. Pictures of Mr. Fisher.

Q. Okay. And do those photographs fairly and accurately show and depict Mr. Fisher on December 15th, 2017, when you were at the Walmart with him?

A. Yes.

Q. And are all of those four exhibits, is he dressed in the same fashion, and is it at the Walmart?

A. Yes.

MS. GUZMAN: Your Honor, at this time the government would seek to introduce Government's Exhibit 303C, 303D, 303E, and 303F. They have been previously tendered to Mr. Martin for his review and inspection.

THE COURT: All right. Those exhibits are received into evidence and may be published to the jury. 303C, 303D, 303E, and 303F.

(*Government Exhibits 303C, 303D, 303E, and 303F received in evidence.*)

MS. GUZMAN: Thank you, Your Honor. Your Honor, at this time if I could publish Government's Exhibit 303C.

THE COURT: Yes, ma'am, you may.

BY MS. GUZMAN:

Q. Mr. Kulic, who is in this photograph?
A. Mr. Fisher.
Q. And does it appear to you that he has something in his hands?
A. A drink.
Q. When you were with Mr. Fisher at the Walmart, did you notice the drink?
A. Yes.
Q. Was he carrying the drink when you first saw him at the Walmart?
A. Yes.
Q. Let me show you Government's Exhibit 303D. Again, a different -- a closer image, but, again, is this Mr. Fisher and is that the bottle?
A. Yes.
Q. If I could have Government's Exhibit 303E. Actually, if I could have Government's Exhibit 303F first.
Again, what is this?
A. That's the bottle. The drink.
Q. And if I could have Government's Exhibit 303E now. This exhibit, what do we see here in this exhibit?
A. That's the bottle that he put down with the pills.
Q. Okay. Now, is this the bottle?
A. Yes.
Q. Okay. Where did this occur? Where are these shelves?

A. It's one of the aisles in Walmart.
Q. And do you know whose hand this is?
A. Mr. Fisher.
Q. And this bottle, is this the bottle he was holding in the other exhibits that I showed you before?
A. Yes.
Q. Okay. Now, explain for us, where are the drugs?
A. Behind the bottle.
Q. And explain for us how the bottle ended up on the shelf?
A. He put it there.
Q. And where did he put the drugs?
A. Behind the bottle.
Q. And so he puts the bottle, and he puts the drugs. What do you do?
A. Take the pills.
Q. And where did you take the pills from?
A. The shelf.
Q. When you took the pills, was the bottle still in front of the pills? If you remember.
A. I can't remember.
Q. When you took the pills, again, you put them where?
A. In my pocket.
Q. What happened to the bottle?
A. Pretty sure he went and paid for it.

Q. So the bottle did not remain on the shelf?
A. No.
Q. If I understand you then, you have your pills?
A. Uh-huh.
Q. Mr. Fisher, gets his bottle?
A. Yes.
Q. And you've given Mr. Fisher what?
A. Money.
Q. All right. Okay. Let me turn now to Government's Exhibit 305A.

MS. GUZMAN: Again, Your Honor, these all have been previously admitted by the Court. We are publishing them now to the jury for the purposes of the record. It's 305A.

THE COURT: That would be fine. Thank you.

MS. GUZMAN: I'm sorry, 305.

THE COURT: 305, okay.

MS. GUZMAN: Yes.

(Video played with transcript scrolling simultaneously.)

BY MS. GUZMAN:
Q. Okay. This telephone conversation, who are the people that are speaking on the telephone conversation?
A. Me and Mr. Fisher.
Q. And when you suggested that you needed another five,

what were you saying?
A. Another 500 blues.
Q. And when Mr. Fisher suggested to go to the same spot, what did you interpret that to mean?
A. The Walmart.
Q. And was this the same Walmart on Roosevelt?
A. Yes.
Q. So what did you do after this telephone conversation?
A. Went to the Walmart.
Q. This was a different date; correct?
A. Yes.
MS. GUZMAN: Your Honor, at this time, if we could play Government's Exhibit 307.
THE COURT: Okay.
MS. GUZMAN: Your Honor, we are playing Government's Exhibit 307. Again, it's been previously admitted into evidence.
THE COURT: Thank you.
(Video played.)
BY MS. GUZMAN:
Q. Mr. Kulic, do you see the date on this video?
A. 12-20.
Q. And you previously have seen this video, have you not?
A. Yes.
Q. And was this the date of the second transaction? If we

could stop it. Who is this?
A. Mr. Fisher.
Q. And what is Mr. Fisher wearing?
A. Wu-tang hoodie.
Q. I'm sorry?
A. Wu-tang hoodie.
Q. A hoodie.
Okay. Do you know what section of the video of the Walmart this is?
A. The front entrance.
Q. Now, do you know what portion of the Walmart this is or what area of the Walmart?
A. The bathroom.
Q. When you got to the Walmart, where were you going to go directly?
A. To the bathroom.
Q. To the bathroom?
Okay. So do you recognize this individual entering the bathroom?
A. Yes.
Q. Who was that?
A. Mr. Fisher.
Q. And you had indicated that when he entered he was wearing a hoodie. Is he still wearing a hoodie?
A. Yes.

Q. Okay. When Mr. Fisher enters the bathroom, are you already there?
A. No.
Q. Prior to entering the Walmart, had you been given money by law enforcement?
A. Yes.
Q. How much?
A. 2500.
Q. The same amount as the first transaction?
A. Yes.
Q. Had you been searched?
A. Yes.
Q. Had your car been searched?
A. Yes.
Q. Where do you have the money?
A. My pocket.
Q. Where did you park your car?
A. In the parking lot.
Q. Okay. You see an individual entering the bathroom. Who is that?
A. That's me.
Q. What are you wearing?
A. Black shirt and shorts.
Q. And where do you have the money?
A. In one of my pockets.

Q. And that was the $2500 that had been given to you by law enforcement?
A. Yes.
Q. Okay. And where are you going?
A. To the bathroom.
Q. When you walk into the bathroom, what happens? Who is there?
A. Mr. Fisher.
Q. And what happens inside the bathroom?
A. He give me the pills, I give him the money, and we walk out.
Q. Are you in there together for a long period of time?
A. No.
Q. When he gives you the pills, are they in a baggie or loose?
A. They are in an envelope.
Q. And where do you put them?
A. In my pocket.
Q. Okay. And you put them where?
A. One of my pockets.
Q. So who is this?
A. Me and Mr. Fisher.
Q. And where are the pills right now?
A. One of my pockets.
Q. And who is this?

A. What?
Q. Who is this?
A. Mr. Fisher.
Q. And does -- had you given Mr. Fisher the money?
A. Yes.
Q. Do you know where -- did you see where Mr. Fisher put the money?
A. One of his pockets. I'm not sure which one.
Q. Okay. When you say he put it into his pockets, did he put in his pants pocket, did he put it in his jacket pocket, if you remember?
A. I think it was in his hoodie.
Q. You think it was in his hoodie, okay?
A. Yeah.
Q. You're walking out of the bathroom, where do you go next?
A. I went to my car.
Q. You went where, sir?
A. My car.
Q. And do you know where Mr. Fisher went?
A. His car. This is not working.
Q. His car? Do you walk around the Walmart this time?
A. Yes. No. Went straight to my car.
Q. So this time there was no walking around the produce section?

A. No.
Q. Now, when you came out of the Walmart, you had a bag of pills again?
A. Yes.
Q. What did you do when you came out of the Walmart?
A. Met up with the detective and gave it to him.
Q. And where was the detective?
A. Parking lot.
Q. When you gave the detective the pills, were they in a bag or were they loose?
A. Envelope.
Q. They were in an envelope. What kind of envelope?
A. Yellow.
Q. Okay. Was it a small envelope or a large envelope?
A. Small.
Q. And you then gave the envelope to the law enforcement?
A. Yes.
Q. What else happened?
A. They searched me, took the pills, and we went our separate ways.
Q. They searched you physically?
A. My car, me, and they took the pills. And we went our separate way.
Q. So they searched your car as well?
A. Yes.

Q. Same as they had done in previous occasions?
A. Yes.
THE COURT: I need the witness to sit up, please, so we can understand him. Thank you.
MS. GUZMAN: Thank you, Your Honor.
BY MS. GUZMAN:
Q. After you gave the pills to law enforcement, what did you do?
A. That's it.
Q. Did you have any other conversations or meetings with Mr. Fisher after this transaction at the Walmart on December 20th?
A. No.
Q. Did you attempt to have any further conversations or meetings with Mr. Fisher in the future?
A. Yes.
Q. What happened?
A. No answer.
Q. There was no answer?
A. No answer.
MS. GUZMAN: Your Honor, at this time the government does not have any more questions of Mr. Kulic and tenders him for cross-examination.
THE COURT: It's probably a good time to break, then. Thank you, Miss Guzman.

Ladies and gentlemen, we are going to take our lunch break. We'll be in recess for one hour. Please remember not to discuss anything about the case, not to form any opinions until you've heard all the evidence, and please don't do any internet searches or any independent research.

We'll see you back here in one hour.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 12:14 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: All right. Please be seated. We don't have that much longer to go. I know you're tired, but you have got to sit up.

THE WITNESS: I was actually looking around the computer.

THE COURT: It's really hard -- we need to get that microphone back there. It's really hard to understand you. And what you're saying, if the jury can't understand you.

Just speak into that microphone and just when you're slouched over with your head down, maybe you're tired, maybe you didn't get enough sleep last night. I have no idea. But when you are slouched over like that, it's really hard to understand you. All right.

We're in the break now. So please don't discuss your testimony with anybody. Do you understand that, sir.

THE WITNESS: Yeah.

THE COURT: Very good. We will be in break for one hour. Thank you.

(Recess taken from 12:15 p.m. to 1:14 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Miss Howard-Allen, are you moving at a good enough clip because we need to decide what to do with that lady on the end. I can't think of the juror number. The one having the issue with having -- initially she thought she could leave at 5 on Friday, but now she said at the very latest 3. Very latest 3.

MS. HOWARD-ALLEN: Your Honor, we are moving just how we are supposed to be moving. So I certainly wasn't counting on that based on the voir dire. And I don't want to be next Friday have it be my fault, but I can't -- you know, obviously we can't predict if Mr. Fisher is going to testify. And we would be on time depending on what the defense's case is, and if Mr. Fisher testifies, that would add a day, you know, to the mix.

THE COURT: Sure. You don't need to tell me at this very second. Today is Thursday. But I need to tell her by the end of the day. One of two things are going to happen. Number one, we're going to keep her, and we're going to stop at 3 tomorrow.

I don't know if we can fit another sentencing in there from next week, which is what -- another sentencing, so there would probably be a day next week when I'd have to finish --

MS. HOWARD-ALLEN: No chance you can move it to 3 on Friday?

THE COURT: That's what I'm thinking about doing, so it's not a total -- let's see. What do I have? Well, actually, what I have, I've got too many things. I would probably just move everything I have to the following week. I don't think that I could do it.

The only thing I have on the 6th is a Federal Bar lunch that I need at least to go to the lunch. That's on Thursday. I don't need to stay for anything, but I have to go to the lunch.

And then on the 5th, I probably need to end no later than 4:45 on the 5th.

I will not stop for sentencings. I do have a number of them, but there are too many to make it worthwhile. So just think about it until we take our break. We will revisit this at the break. Is everybody ready?

COURT SECURITY OFFICER: Yes.

THE COURT: Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 1:22 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: All right. Welcome back, ladies and gentlemen.

One thing that I wanted you to think about a little bit, during your next break, I know there is one of our jurors needs to break early on Friday; is that right, to go to a child's event. And I think as long as we go until 3, you are okay? I'm trying to get as much in as possible. Would 3 be acceptable to you?

THE JUROR: Yes.

THE COURT: Okay. So one thing that I would like to do is in order to compensate for that or in order to make up the time, and here's what I think we can do: But I don't want to make things too difficult for people, and that would be to start two days at 8:30. Now, you have to understand I'm not a huge fan of starting early, because I do other things in the morning. It's not that I sleep in. I exercise, and it's hard for me to get here in time, but I will, of course, be here.

I don't want it to be too challenging for you. I know you don't live in South Tampa like I do. You live --some of you live far away. So if it's not possible, it's not possible. So please do not worry about it. But those -- I would like to make up that hour by doing two days at 8:30

and one possibility is to do Friday at 8:30 and then maybe Monday or Tuesday or any other day.

What I will do is, I will move the other things that I have, I will move them so that they don't interfere. I will tell you there are only two days that I have issues.

One is on June 5th, I can't move what I have, and I probably need to break no later than 4:30, quarter to five at the very, very latest. And on the 6th I have a Bar luncheon that is sponsored by the Federal Bar Association. I am not going to stay for the program, but I at least have to show up for the luncheon.

It's hard to make it to the Tampa Club or University Club, wherever it is, and back here all in under an hour. Just so you know, that's all that I have.

So I would like to try to make up that hour, but I don't want to make it horrible for anybody. So if you've kids you have to drop off in the morning -- I know -- I can't remember, was the gentleman selected for the jury who has children in Lakeland?

THE JUROR: Yes.

THE COURT: What is your schedule like, sir?

THE JUROR: 8:30 would be fine.

THE COURT: 8:30 would be okay. The rest of you think about it. Again, I don't want to inconvenience anybody, but at least tomorrow we would be finished at 3. So

that would be the good news.

Don't worry. One way or the other we'll be finished at 3. That will not be a problem for you. It's just how we make it up, if at all possible.

Okay. All right. That's what we have. Like I said, don't worry. My other things I will take care of one way or the other. Okay?

So I'm going to remind the witness, you are still under oath. Do you understand that, sir?

THE WITNESS: Yes, ma'am.

THE COURT: I need you to speak up, and I need you to speak either into that lavalier or into the handheld mic because if the jury can't hear what you are saying, it loses the impact of what you're saying. All right. So you've got to speak clearly and enunciate.

THE WITNESS: Yes, ma'am.

THE COURT: If you sit up straight, it's easier to hear you.

All right. Cross-examination. Mr. Martin, do you wish to cross-examine the witness?

MR. MARTIN: Yes. Thank you, Your Honor.

THE COURT: You made proceed, sir.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good afternoon.

A. Good afternoon.
Q. My understanding from your direct testimony is you started working with the law enforcement as a result of arrest for trafficking in cocaine; correct?
A. Yes.
Q. I did not get the time period of that arrest. When did you kind of get arrested and kind of start working with law enforcement?
A. I got arrested about two years ago.
Q. So 2017 time frame?
A. I believe so.
Q. Okay. And so you've been working with law enforcement for a couple of years?
A. I mean, I worked maybe with them maybe the first year, yeah.
Q. It's not an everyday thing, I understand.
A. Yeah.
Q. And you still have those charges pending?
A. Yes.
Q. And obviously you hope the charges maybe go away or at least to mitigate, to lessen any punishment you're going to receive?
A. Yes.
Q. And the prosecutor and the judge and those people aren't here, so you're kind of depending on the prosecutors

and the agents that are here to relay what you've done and et cetera; correct?

A. Yes.

Q. Now, you, by my count, I'm just talking about -- let me ask you, the first time you were wired for this case, was when you were headed to Mugs 'N Jugs; is that correct?

A. No. To Wells Fargo.

Q. To Wells Fargo. Excuse me. You're correct.

Was that the first time you'd been wired in any case?

A. Yes.

Q. Now, as I understand it, when you went to Wells Fargo, you weren't searched or anything like that by law enforcement; is that correct?

A. When I went -- yes, I was.

Q. You were searched before you went to Wells Fargo?

A. Yes.

Q. So if my math is correct, you would have been searched by law enforcement eight times. Going to Wells Fargo would be one, coming back after Wells Fargo would be two. Before you went to Mugs 'N Jugs would be three, after Mugs 'N Jugs would be four, then at Walmart would be five, after Walmart would be six. Then at Walmart would be seven, back from Walmart would be eight. Is that your math, too?

A. Yes.

Q. Okay. Now, I'm going to kind of preface this question -- I'm interested in the searches. One way to do that is to go through each and every search eight times, or were they all fairly similar?
A. I mean, every time they would go in my trunk, under my seats, behind them. They went underneath my dash. They're pretty thorough with it.
Q. So is it fair to say that the searches were done in a similar fashion each time?
A. Yes.
Q. Okay. So if we kind of talk about the search in general, that would be kind of fair in covering what happened the eight times, recognizing each time is a little bit different?
A. Yeah.
Q. Did normally one or two or three law enforcement personnel search your car?
A. There would usually be about three of them with me.
Q. How many would be involved in the search? All of them?
A. At least two.
Q. At least two.
And your estimate time-wise when they were searching your car, how long did that normally take?
A. A few minutes. Five minutes or so.
Q. So five minutes is fair? It could be four, could be

six, but five minutes is a good estimate?

A. Yes.

MR. MARTIN: No further questions, Your Honor.

THE COURT: Okay. Thank you. Any redirect for this witness?

MS. GUZMAN: No, Your Honor. We have no further questions. Thank you so much.

THE COURT: All right. Thank you. So I won't pester you anymore about speaking up. I appreciate your having come in today to testify.

THE WITNESS: No problem.

THE COURT: The government should be ready with its next witness, please.

MS. HOWARD-ALLEN: Your Honor, the United States calls Joe Miner.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, ma'am.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Joseph Miner, M-i-n-e-r.

THE COURTROOM DEPUTY: You may take the witness

stand.

THE COURT: Mr. Miner, you will be asked some questions by Kelley Howard-Allen, Assistant United States Attorney. Then Mr. Martin, who represents Mr. Fisher, may ask you some questions as well in cross-examination.

If you don't understand the question, please say so so they can state it another way. Wait until the question is finished before you begin answering because if two people are speaking at the same time, nobody knows what's being said. If you have the tendency to speak quickly, slow down so we can understand you. And you need to speak up so we can hear you. All right.

THE WITNESS: Yes, ma'am.

THE COURT: Go ahead, Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor. May I approach to retrieve exhibits?

THE COURT: Yes.

JOSEPH MINER,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good afternoon, Corporal Miner.

A. Good afternoon.

Q. Could you tell the ladies and gentlemen of the jury

where you work.
A. I currently work at the Pinellas County Sheriff's Office for 15 years.
Q. And what do you do there?
A. Currently I'm assigned the narcotics division for just under seven years.
Q. And what did you do before you were assigned to the narcotics division?
A. I was assigned to the Patrol Operations Bureau, a couple of other little smaller bureaus within.
Q. Corporal Miner, I would direct your attention to your involvement in three undercover pill transactions involving Dion Fisher?
A. Yes, ma'am.
Q. And I'll ask you, do you -- are you familiar or do you know -- have you seen Mr. Fisher before?
A. Yes, ma'am.
Q. Do you see him here in the courtroom?
A. He's sitting right here with the black jacket, white shirt.
MS. HOWARD-ALLEN: Let the record reflect that Corporal Miner has identified the defendant.
THE COURT: It will so reflect. Thank you.
BY MS. HOWARD-ALLEN:
Q. So, on those three occasions that we are speaking

about, are you -- who was acting in the undercover capacity?
A. Mr. Kulic.
Q. So what were the dates of these transactions?
A. The very first one was on 12/14, probably late afternoon.
Q. Of what year?
A. Of 2016 -- '17, I'm sorry.
Q. The others?
A. Then it was later that evening on 12/14, just before midnight it started. And then went into just after midnight of 12/15.
Q. Corporal Miner, what was your role in these transactions?
A. I was tasked with assisting Detective Phelps with controlling the informant, pre and post, both or all three of these transactions.
Q. Corporal Miner, what does it mean generally to control an informant?
A. What we will do is before the calls or text messages that are sent to the suspected suspect at the time, we will sit and monitor everything that he's doing or phone calls or text messages going out. And then once we have that agreed location or whatever it's going to be given by that target, we will end up searching that informant and also the vehicle he's going to be using to make sure anything isn't present

illegal, or contraband or guns or anything else.

Q. So on the initial date of 12/14/17, December 14th, 2017, what was supposed to happen that day the first time?

A. The very first initial meet was a meet over -- Mr. Kulic meeting with Mr. Fisher over the purchase of some jewelry.

Q. And where was that supposed to take place?

A. That was at Mr. Fisher's request to meet him at a Wells Fargo off of Walsingham Road.

Q. What did you do before this meet at Wells Fargo?

A. Before we left Wells Fargo, again, he was searched. There were three detectives that were there to include me, the informant was searched, his vehicle was searched. And once we had the agreed location, which was what Mr. Fisher wanted at the Wells Fargo, we instructed the informant Mr. Kulic that he had to follow me.

And then he was actually followed by another detective to that meet location. So at that point he was never lost in sight.

Q. And what did the search -- how did you search him?

A. We searched his person, everything, all his pockets, anything that would be on him or could be on him, concealed, and then also the vehicle as well.

Q. How extensive was that search?

A. Very extensive. There was nothing found. No illegal

contraband.
Q. The car, how extensive was that search?
A. That was pretty extensive as well. We looked at everything from glove comfort to center console, under the seats where anything could be concealed and nothing was found.
Q. So, where did this take place, was this right at -- this obviously wasn't right at the Wells Fargo?
A. This was not. This was actually at Bardmoor Country Club at Starkey and Bryan Dairy.
Q. Is that nearby?
A. Couple of miles.
Q. So what happened after he was searched at that location?
A. Then once we had that -- the search was done on both him and his vehicle, he was given instructions to follow me. We told him what route we were going to take. Then followed by Detective Phelps and Corporal Hammack, and then we headed in that direction.
Q. At that time, is his recording device initiated at that time?
A. Yes, ma'am.
Q. So what happens -- so then where are you when this meet is going on at the Wells Fargo?
A. I ended up, not as what they call a rescue element in

case something were to go bad; I was there merely to help Detective Phelps controlling the informant while it was going on. So I did monitor it the whole entire time. I just wasn't in visual contact of the bank itself but in the area listening.

Q. And how's it monitoring?

A. Through electronic controlling device.

Q. And so that's like realtime like you hear what's going on?

A. Correct. You can actually hear exactly what is being said.

Q. Why is that important?

A. Well, it's important for a lot of reasons. Most important reason is for his safety and everyone else's, so we can see what is going on and what's being said.

Q. So at that time -- what happened after that?

A. So they had met inside the bank for a short time. And then Mr. Fisher requested Mr. Kulic to go out to his vehicle. And then there was another meet inside the vehicle. And then they sat and talked about getting a five pill front.

Q. And what happened after that?

A. Once that was done, Mr. Fisher left. He was surveilled. The location of Pinellas Park. Then myself and Detective Phelps instructed the informant Mr. Kulic to follow us to another location where we never lost sight of them, and

at that point we conducted another search just to make sure something wasn't handed to him. And we searched his vehicle and his person.

Q. And so what did you understand from monitoring what was going on was going to happen after the Wells Fargo meet?

A. If I remember correctly, it was about a 30 or 45 minute request on Mr. Fisher that he would be able to meet at the Mugs 'N Jugs on Ulmerton Road at the ICOT Center, so we were just waiting on that time of what he requested from the Wells Fargo.

And waiting for them, the surveillance teams that were telling us exactly where he was the entire time, and that being Mr. Fisher.

Q. So, where did you go after that?

A. The second -- after the Wells Fargo, myself and Detective Phelps met at 102nd and Seminole Boulevard. There was a Little Caesar's. And we were behind that building over there.

Q. And what was going to happen there?

A. So we were just waiting on our surveillance units that were following Mr. Fisher to let us know that obviously he went to the storage facility. And then we're waiting on that time frame to go meet up at Mr. Fisher's request to meet back at the Mugs 'N Jugs.

Q. So what time was that around?

A. Mid-afternoon. I don't know the exact time.
Q. So what happened? When did that take place? Did the Mugs 'N Jugs meet --
A. We had that time and we knew Mr. Fisher was headed that way. Mr. Kulic was asked to follow me as well, gave him the exact directions which way we were going to go. And then he followed me into the Mugs 'N Jugs, ended up parking in the parking lot.
And then we had a cover people and some surveillance units that were in the parking lot that were able to watch him exit the car and get into Mr. Kulic's vehicle.
Q. So in all cases you are with the confidential informant, but there is another team of surveillance officers who are there?
A. That's correct.
Q. So he was searched before the Mugs 'N Jugs, and then what happened when he was in the parking lot there? Did you have -- was he --
A. I did not physically see him and Mr. Kulic in the car together. Again, I was in the area so I could monitor the entire conversation, everything that was going on, until the transaction was complete.
Q. And then what happened?
A. Then Mr. Kulic was advised by Detective Phelps for him

to follow us to another location. And again he followed me to P-Tech which was at 62nd and Roosevelt. There's a school there, and we met at that school and met with Mr. Kulic.

Q. What did you do when you met with him at that location?

A. Mr. Kulic exited his car and then handed us the small little baggie with five blue pills in them suspected to be oxycodone.

Q. What did you do at that time with those?

A. We took possession of those, myself and Detective Phelps. And then again Mr. Kulic was searched just to make sure there was nothing else on him or in his vehicle.

Q. Then what did you do with the pills that you received from Mr. Kulic?

A. Once that was done, and Mr. Kulic had left, it was me, Detective Phelps. Detective Phelps asked me if I could take those immediately to the lab to get those tested to see if they showed the presence of fentanyl.

MS. HOWARD-ALLEN: May I approach, Your Honor?

THE COURT: You may.

(*Document tendered.*)

BY MS. HOWARD-ALLEN:

Q. Corporal Miner, I'm handing what has been marked as Government's Exhibit 228 and 228A. Do you recognize those items?

A. Yes.

Q. What are they?
A. Those are -- it's a little two-inch baggie with ice cream cones on it, and at the time I suspected A 215s, which are oxycodone 30 milligrams normally, inside that bag.
Q. And is the photograph that's marked as 228A, is that an exact picture at the exhibit that's in your hands there?
A. It is.
MS. HOWARD-ALLEN: At this time, Your Honor, I would ask to admit 228 and 228A, and publish the photograph at 228A.
THE COURT: 228 and 228A. That's fine. They're received into evidence and may be published to the jury. Are you going to show the pictures -- what are you going to do first?
MS. HOWARD-ALLEN: I'll show the picture and then I'll ask Corporal Miner if he could show the ladies and gentlemen of the jury the pills.
THE COURT: I think that's the appropriate way to proceed. Thank you.
(*Government Exhibit 228 and 228A received in evidence.*)
BY MS. HOWARD-ALLEN:
Q. I don't think -- I think you'll have to take -- is there a hand mic that he could -- I guess he doesn't need it. He can just walk there.

So this is the item that you received, and who gave it to you that day?
A. Mr. Kulic did.
Q. And from monitoring the conversation, who did those pills come from?
A. Mr. Kulic. Well, they came from Dion, and then handed to Mr. Kulic, and then to myself and Detective Phelps.
MS. HOWARD-ALLEN: At this time, Your Honor, I would ask Corporal Miner if he could show the back of the exhibit to the ladies and gentlemen of the jury.
THE COURT: That would be fine. Thank you very much.
(Exhibit shown to the jury.)
THE COURT: You may proceed, Miss Howard-Allen.
MS. HOWARD-ALLEN: Thank you, Your Honor.
BY MS. HOWARD-ALLEN:
Q. Was there another undercover operation that day?
A. There was.
Q. December 14th, 2017?
A. Yes, ma'am.
Q. And what time was that?
A. I think we met with Mr. Kulic right around shortly after 11 o'clock that night at 102nd and 66th Street.
Q. What was supposed to happen for that transaction?
A. That was for a purchase of 500 of the same suspected

oxycodone blue pills, A 215 for $2500.

Q. So what was your -- what was your contact with Mr. Kulic? What and where did that happen?

A. Again, that happened at 102nd and 66th Street. There's a Winn-Dixie. We again met with Mr. Kulic, monitored any kind of phone conversations, text messages. And myself and Detective Phelps, again, searched his person thoroughly and then the vehicle again. His vehicle.

Q. And, again, was that similar in terms of all pockets?

A. Yes.

Q. All parts of the car?

A. Yes.

Q. Was that a lengthy search?

A. Couple of minutes.

Q. And so what happened after -- was that also near the location? Where did that take place?

A. Yes, that took place at 102nd and 66th Street, and then we were advised by Mr. Fisher that he would like us to meet him at the Walmart at Roosevelt and 19.

Q. And were you monitoring this the entire time?

A. Yes, ma'am.

Q. All right. So as a result of that call, what did you provide Mr. Kulic with when you met with him?

A. So before we left for the Walmart location, Mr. Kulic was provided $2500 worth of department funds, which he took.

And then he was given specific instructions again in what direction we were going to drive there and to follow me specifically into that location.
Q. Was there ever a time that Mr. Kulic was out of your site on the way to that Walmart location on Roosevelt?
A. No, ma'am.
Q. And once he went into the Walmart, was the transaction monitored?
A. It was.
Q. So what happened during that transaction?
A. Mr. Kulic met Mr. Fisher inside. Of course, I did not see that. I was out in the parking lot. Then once Mr. Kulic completed the transaction with Mr. Fisher, Mr. Kulic was contacted by Detective Phelps and instructed again to follow my vehicle to P-Tech, which is maybe a quarter mile from there on Roosevelt and 62nd, Roosevelt Boulevard, where we met with him again.
Q. And what did you do when you met with him there?
A. He then handed us the bag of suspected -- 500 suspected oxycodone, A 215s, and we took possession of those. And then we repeated that process again where he was thoroughly searched, his person, and the vehicle.
Q. And what did you find?
A. Found nothing on his person as far as any illegal contraband.

Q. What did he give you?
A. Suspected 500 oxycodone pills, A 215s.
MS. HOWARD-ALLEN: Your Honor, may I approach?
THE COURT: Yes.
BY MS. HOWARD-ALLEN:
Q. I'm handing you what's been marked as Government's Exhibit 229 and then two photographs which are 229A and 229C.
THE COURT: 229A, 229C. Okay.
BY MS. HOWARD-ALLEN:
Q. Do you recognize those items?
A. I do, ma'am.
Q. What are they?
A. One is a bag of -- ended up being 499 blue suspected oxycodone pills marked A 215. And then two pictures of the bags, and there are actually five individual bags with Spiderman logos on the bags that these were in.
Q. How do you know that's 499?
A. Once we completed it that night, myself and Detective Pione returned to our building and we actually individually counted each one of these. And there were suspected to be a hundred in each bag, but one of the bags had 99.
Q. So what did you do with them after you counted them?
A. We conducted a presumptive test which showed -- revealed at that point, in our building, that it had the presence of fentanyl.

Q. And then did they go somewhere else for other testing?
A. They did. They were submitted to property evidence and then later were submitted to the Pinellas County Forensic Laboratory where they were tested by Reta Newman.
Q. What's the photograph of 229B? What is that? I mean, of 229C?
A. That's a photograph of individual -- I'd say they are one, one-and-a-half-inch Ziploc baggies with Spiderman on the outside of them.
MS. HOWARD-ALLEN: At this time, Your Honor, I would ask if the government would admit 229 and 229A and 229C, not 229B.
THE COURT: 229, 229A, and 229C are received into evidence and may be published to the jury.
(Government Exhibits 229, 229A, and 229C received in evidence.)
MS. HOWARD-ALLEN: At this time could we publish 229A, please. Is that the item in your hand?
THE WITNESS: It is.
BY MS. HOWARD-ALLEN:
Q. I'll have you show that to the jury in a moment. Do you recognize the handwriting on the bag there?
A. Yes. Detective Pione's.
Q. And could we look at 229C. And were these the Spiderman bags?

A. Yes, ma'am.
Q. Why are they placed in a separate bag when they're tested; do you know?
A. Yeah, when we took these out to obviously individually count them to see exactly how many pills were inside of them, and this is normally our standard protocol with stuff like this, we'll separate the bags from the suspected illegal contraband or illegal substance.
Q. All right. Corporal Miner, would you mind taking those pills around, and if you could just -- let me ask you before you go ahead, were you able to look at them? What was the imprint on them?
A. A 215.
Q. And what color are they?
A. They are light blue in color, which is normally what an oxycodone 30 milligram.
Q. Did they look the same as the five pill sample we just admitted as Government's Exhibit 228?
A. They do.
Q. If you could at this time make sure they can see each of the pills.
(Shown to jury by the witness.)
THE COURT: You may proceed.
MS. HOWARD-ALLEN: Thank you, Your Honor.
BY MS. HOWARD-ALLEN:

Q. Corporal Miner, was there a final transaction that you acted in the same role in terms of controlling Mr. Kulic who was in this case the confidential informant?
A. Yes, ma'am.
Q. And when was that?
A. That was on 12/20.
Q. And what was that transaction supposed to be?
A. For 500 of the same blue suspected oxycodone pills with A 215 printed on them.
Q. Where was that supposed to take place?
A. At the request of Mr. Fisher it was at the same Walmart location at Roosevelt and 19.
Q. What did you do in preparation for Mr. Kulic going into the Walmart to meet Mr. Fisher on December 20th, 2017?
A. Myself and Detective Phelps meant and Detective Pione met with Mr. Kulic at the exact same Winn-Dixie, 102nd and 66th, and we completed the exact same things over again.
Q. What are those if you could go into detail about them?
A. Again, we monitored any phone conversations, text message that would have went on between Mr. Kulic and Mr. Fisher. Mr. Fisher requested, I believe, at that time it was like 45 minutes it would take him to get to that location.

We again -- we stayed with Mr. Kulic. He was thoroughly searched again, his person and his vehicle as

well, and nothing was found.
Q. And what was he provided with after you searched him?
A. $2500.
Q. And what was that for?
A. That was for the purchase of the suspected oxycodone pills that evening.
Q. Do you know how that translated in terms of price?
A. What do you mean?
Q. In terms of what was the $2500 for?
A. For the 500 suspected pills.
Q. And what was the price of those supposed to be?
A. Of each pill?
Q. Yes.
A. Whatever that --
Q. I was testing your math. All right. Corporal Miner, when he -- when Mr. Kulic went into the Walmart on December 20th, 2017, you were monitoring the conversation?
A. I was. Before we left that Winn Dixie, again, Mr. Kulic was given the specific instructions on what way we were going and to follow me as well, followed by Detective Phelps. And then once he got into the parking lot again I took a position not to see -- didn't get to see him exit the vehicle where Mr. Fisher arrived, but I was in the parking lot monitoring through electronic controlling device.
Q. And what happened after Mr. Kulic left the Walmart?

A. He, again, was instructed by Detective Phelps to follow us to the same P-Tech location at 62nd and Roosevelt Boulevard.
Q. What did he do when he got there?
A. He handed us -- and Detective Pione, as well -- a manila envelope, a shipping envelope, and in that were the suspected oxycodone pills.
Q. What did you do with those pills that Mr. Kulic gave you?
A. After the fact?
Q. What did you do after he gave them to you?
A. We actually looked at them, and then again Mr. Kulic -- we searched him again and his vehicle, and he was debriefed.
Q. Then did you take these pills that I'm about to hand you, did you take them somewhere?
A. They went right to our building in the narcotics division.
Q. What did you do?
A. Detective Pione and I again opened up those pills and we counted them individually again, which came up with 499 pills.
Q. And were they -- did you do any kind of a test on them?
A. We did. There was a presumptive test for heroin, fentanyl that showed -- it showed the presence of fentanyl.
Q. And then were they submitted to some other place for

additional testing?
A. Yeah. Just like the second one, they were submitted through our property evidence and then went to the forensic laboratory at a later date.
Q. And the forensic laboratory, what is the name, is that with --
A. That would be the forensic laboratory where we test all of our dope that we are submitting, or any submissions that we have, and that would have been done by Reta Newman's staff.
Q. But is it the Pinellas County Forensic Laboratory?
A. Yes, ma'am.
MS. HOWARD-ALLEN: Your Honor, may I approach at this time with Government's Exhibits 230A, 230B, 230C, 230D and 230E?
THE COURT: You may.
BY MS. HOWARD-ALLEN:
Q. Do you recognize these items, Corporal Miner?
A. Yes, ma'am.
Q. And what are they?
A. One is a five by five manila kind of envelopes, shipping label or shipping envelope. Then there is a bag full of the same, one-and-a-half inch Ziploc baggies with Spiderman logos on them. And the other bag is the suspected oxycodone pills of 499.

Q. And are the photographs that are there, are they the true and accurate pictures of one is of the pills, one is of the Spiderman bags, and one is of at the manila envelope?
A. Yes, ma'am.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to admit into evidence and publish Government's Exhibit 230, 230A, 230B, 230C, 230D, 230E.
THE COURT: All right. 230, 230A, 230B, 230C, 230D, and 230E are received into evidence and may be published to the jury.
(Government Exhibits 230, 230A, 230B, 230C, 230D, 230E received in evidence.)
MS. HOWARD-ALLEN: Also, just 230, Your Honor, as well.
THE COURT: So 230, as well.
MS. HOWARD-ALLEN: Yes.
THE COURT: That's fine. Thank you. They are all received into evidence and may all be published to the jury.
MS. HOWARD-ALLEN: Thank you, Your Honor.
If you could show, please, Agent Phelps, Government's Exhibit 230A.
BY MS. HOWARD-ALLEN:
Q. Is that a picture of the pills that I'll have you show the jury in just a moment?
A. Yes, ma'am.

Q. Again, do you recognize the writing on the bag?
A. I do.
Q. And what -- those blue pills, what was the insignia on them?
A. A 215.
Q. Are they the same -- do they appear to you to be the same as the ones on the two sets on 12/14, the 499 that you got, after the Walmart and then the five after the Mugs 'N Jugs?
A. Yes, ma'am.
Q. Again, you recognize them -- your name on that label?
A. I do.
Q. And then let's take a look at Government's Exhibit 230 B. What is that?
A. It's D as in delta?
Q. Sorry. 230C, which is just the -- that's the -- what is that?
A. That's going to be individually Ziploc baggies of Spiderman logo.
Q. Did they look like the exact same ones you got from Mr. Kulic on December 14th, 2017?
A. Yes, ma'am.
Q. And finally if we could just look at Government's Exhibit 230E. And what is this?
A. Manila envelope, shipping envelope.

Q. And what was -- how was it packed? How were these items packaged?
A. The Spiderman logo that you had just presented. These Ziploc baggies were in this manila envelope.
Q. And then the pills were where?
A. Were inside the Spiderman logos or Ziploc bags.
Q. Corporal Miner, would you mind showing them the items, the pills?
A. Absolutely.

(Shown to jury by the witness.)

MS. HOWARD-ALLEN: Thank you, Your Honor. I don't have any further questions for Corporal Miner at this time.

THE COURT: Okay. Any cross-examination, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: Okay. I'll excuse the witness. Thank you. We appreciate you having come in today to testify.

THE WITNESS: Thank you very much.

MS. GUZMAN: The government is ready to proceed with its next witness, and that would be Reta Newman.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: My name is Reta, R-e-t-a, Newman, N-e-w-m-a-n.

THE COURT: Please have a seat. Miss Newman, Assistant United States Attorney Maria Guzman is going to be asking you some questions, and then Mr. Martin, who represents Mr. Fisher, may also ask you some questions. If you don't understand the question, please let us know so that they can restate it.

Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you have a tendency to speak quickly, please slow down so we can understand you and please speak up so we can hear you. All right?

THE WITNESS: Yes, ma'am.

THE COURT: Very good. Go ahead.

MS. GUZMAN: Thank you, Your Honor. May I proceed?

THE COURT: Yes, ma'am.

RETA NEWMAN,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:
Q. Good afternoon. Would you please introduce yourself again to the jury and the Court.
A. My name is Reta Newman. I'm the director of the Pinellas County Forensic Lab at the District 6 Medical Examiner's Office.
Q. How long have you been the director at the Pinellas County crime lab?
A. I've been with laboratory for 30 years. I've been the director for 20 years.
Q. You indicated that you also oversee the toxicology department; is that correct?
A. The Pinellas County Forensic Lab is made up of three units. There's a chemistry unit that does seized drug analysis and fire debris analysis, a toxicology unit that does post-mortem toxicology, and law enforcement or DUI toxicology and a DNA unit. I manage all of those units.
Q. And the toxicology unit, in particular -- well, actually, let me go first to the forensic chemistry department. You've indicated that, obviously, that particular department is involved in analyzing substances that are provided to the chemists there for further determination of substances; is that correct?
A. Yes, ma'am.
Q. And I understand that you've been the director of that

particular department or 20 years; is that correct?
A. That's correct.
Q. Just for purposes of the jury and the Court, talk to us a little bit about your educational qualifications.
A. I have a Bachelor's of Science in chemistry from Southwest Missouri State University. Now it's called Missouri State University. I have a master's degree in management from the University of Phoenix.
I have had training from the Drug Enforcement Administration, the FBI, the Bureau of Alcohol, Tobacco and Firearms, from various instrument manufacturers and from various forensic organizations, the analysis of controlled substances, as well as the analysis of fire debris.
Q. And in addition to your educational background on the issuing of forensic chemistry, do you have any particular background in the issue of toxicology?
A. I manage the toxicology unit. I manage their caseload and their analytical processes. I review all of their case work before it's released to the medical examiner's office.
Q. Have you had the opportunity in the past to testify in either federal or state court regarding substances that were identified through analysis by yourself?
A. I have.
Q. On many or few occasions?
A. I'm sorry?

Q. On many or few occasions?
A. I have testified in state and federal court in excess of 200 times.
Q. Have you personally had the opportunity to analyze substances on few or many occasions?
A. I have analyzed more than 10,000 items for the presence of controlled substances.
MS. GUZMAN: Your Honor, at this time I would tender Miss Newman as an expert in the field of both forensic chemistry and toxicology based on her educational and also employment qualifications. Number one, on her educational background, and also on her expertise, based on being the director of that department for over 20 years.
THE COURT: Okay. Thank you. Mr. Martin, do you wish to voir dire the witness as to this?
MR. MARTIN: No, Your Honor.
THE COURT: I find that the witness is qualified to testify as an expert witness and to render expert testimony in the fields of forensic chemistry and as a toxicologist.
You may proceed, Miss Guzman.
MS. GUZMAN: Thank you, Your Honor.
BY MS. GUZMAN:
Q. Miss Newman, do you have before you an exhibit?
A. I do.

Q. And I believe that exhibit has been introduced into evidence as Exhibit 228.
A. Yes, ma'am.
Q. Do you recognize that exhibit?
A. I do.
Q. And if you would, tell us what that exhibit is.
A. All the evidence that comes into our laboratory comes in heat sealed evidence bags, and on those bags the agency must put a label that identifies their information. And when we do the analysis, we actually sign and date that we have done the analysis.
You'll see my signature in blue, and my signature is also in the heat seal of this evidence so this was an item of evidence that was submitted by Joe Miner from the Pinellas County Sheriff's Office to my laboratory for analysis.
Q. And do you have a date noted as to when it was submitted to you?
A. December 14th, 2017.
Q. And let me ask you this: You indicated that your signature appears or your -- twice in that particular exhibit; is that correct?
A. Yes, my signature appears twice. I'm sorry, my signature appears three times on this exhibit and once in the heat seal.
Q. And one of those would be because it was submitted to

you, and you obviously opened it for purposes of further analysis; is that correct?

A. That's right. The first signature is because I received the evidence directly from the detective so it's my signature recognizing that I received it. Then the next signature was the date that I opened the evidence, and the following signature was the date that I sealed the evidence. In this case, it's the same date for all three of those signatures.

Q. And that would be 12/14?

A. That is correct.

Q. If you would, briefly explain to the members of the jury, and, of course, the Court, what test you conducted in order to further analyze the exhibit that was provided to you.

A. The first thing I did with this exhibit is to write a brief description of it and then to perform -- I'm sorry, to take a weight of the evidence outside of the packaging so just the wait of the tablets. This item contained five round blue tablets with a label A 215 imprinted on them.

Once I got the weight of that item, then I took three different samples for analysis to do three different analytical tests. The first test I did was called a color test. It is a presumptive test. It is a test that gives us an idea of what may be present, but it is by no means

conclusive.

The results of that test was that it turned orange in one of our reagents. There are many drugs that turn orange in that reagent, but one of those is fentanyl. So we knew from that initial testing that I wanted to do some testing to determine whether a fentanyl or fentanyl analogue was present. The other two tests I did are confirmatory tests.

Confirmatory tests are tests that allow me to evaluate the chemical structure of a molecule. So these tests allow us to confirm the identity of a chemical to the exclusion of all others. One was called gas chromatography mass spectroscopy. The other one was called gas chromatography infrared spectroscopy.

Q. Now, you've indicated to the Court and the jury that you conducted three particular tests. Or three individual tests. Why are three individual tests conducted?

A. Well, the industry standard is actually two, one presumptive and one confirmatory test. Our laboratory does three as a quality control issue. So there was not actually an industry requirement for three, but we do three. But it's to make sure that we identify the drug to the exclusion of any other drugs or any other substance.

Q. So as I understand you, it's just for lack of a better word, for better accuracy?

A. For more confidence in the results, yes.
Q. After conducting these three different types of tests, what were your findings in terms of the substance identified?
A. This substance contained fentanyl.
Q. And were you able to also determine a weight?
A. Yes. It contains 0.53 grams of fentanyl.
Q. Now, you've also have been qualified as an expert in the area of toxicology. Are you familiar with fentanyl as a controlled substance?
A. Yes.
Q. And are you able to render an opinion as to whether it is an addictive or dangerous drug?
A. It is.
Q. Now, hypothetically speaking, if you had a fentanyl sample that was stronger than another sample, for example, because it had been somewhat diluted, would it still be an addictive narcotic?
A. Fentanyl itself is an addictive narcotic. The concentration could affect the effects on the person, how potent and how deadly it is, but in either case fentanyl is an addictive drug.
Q. If you would assist me, Miss Newman, in -- there is an easel. I'm going to ask you to write something on the easel.
MS. GUZMAN: Your Honor, may I approach the easel?
THE COURT: You may.

BY MS. GUZMAN:
Q. Now, we have referenced Government's Exhibit 228.
A. Yes, ma'am.
Q. If you would be so kind, Miss Newman, to indicate here the substance that was identified and the weight and then initial it.
(Witness complies.)
BY MS. GUZMAN:
Q. Now, to be clear, and I think you had already testified to this, but the packet when it was submitted to you, it was submitted to you with five round blue tablets; is that correct?
A. That's correct.
Q. And that was the analysis that you conducted, was of those five round blue tablets?
A. Correct. Sampling from those five, yes.
Q. Correct. Correct. Now, since you're the director of the Pinellas County Forensic Laboratory, you've told us a little bit about the tests that are performed for efficiency and accuracy as part of the forensic chemistry unit of the Pinellas County Forensic Laboratory.
Is the Pinellas County Forensic Laboratory subjected to any type of accreditation or continued requirements?
A. Well, in the United States and in the State of Florida,

at least in state court, I'm not completely sure with federal courts, accreditation is voluntary, however, our laboratory was the first laboratory in Florida to become accredited in 1989. And then in 2004, I believe, we came accredited to the international standard, ISO 7025.

And that is a standard that has been established by experts in the analytical world on what a laboratory must be in compliance with to do quality work.

Q. What are some of the things that it is required to be in compliance with?

A. There are about 600 different criteria in the standard. There's actually ISO 17025 and there's a supplemental document specific to forensic science. But the standard addresses employee educational requirements in training. It evaluates all of our test methods. It evaluates five cases every cycle per analyst to make sure that the analytical processes that we use and the analysis themselves are compliant with industry standards and are -- and produce quality results.

Q. And, of course, at the time that Government's Exhibit 228 which contained the five blue tablets was analyzed by you as a director of the Pinellas County Forensic Laboratory, was the laboratory itself in compliance with all of those requirements?

A. Yes, it was.

Q. I have no further questions at this time. Thank you very much.

THE COURT: Thank you. Any cross-examination, Mr. Martin?

MR. MARTIN: Yes, Your Honor. Thank you.

THE COURT: You may proceed, sir.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good afternoon.

A. Hello.

Q. The tests that you ran, is it fair to say it is what's called a qualitative analysis?

A. That is correct.

Q. Okay. What that means, and feel free to correct me, you're just identifying the drug; correct?

A. That's correct. We are not determining the amount of drug present in it. We are identifying if any drug is present in it.

Q. Okay. And you're not determining the purity?

A. That is correct.

Q. Okay. Now, fentanyl is an opiate; is that correct?

A. It's an opioid.

Q. Is cocaine an opioid?

A. No. Cocaine is a stimulant.

Q. Based on your experience, would you consider fentanyl

dangerous to be around or touch?
A. You have to use precautions when you handle fentanyl. So, yes, it's dangerous to be around, but if you use precaution, it's safe to touch. I'm sorry, I don't think I understand what you meant with your question.
Q. Different drugs -- well, would you consider are all drugs to some degree dangerous, all illegal substances to some degree dangerous?
A. Yes.
Q. But some are more dangerous to be around and breathe, touch?
A. You mean environmental exposure?
Q. Correct.
A. Yes. The opioids, specifically the fentanyl-related opioids, have more danger in environmental exposure than a lot of the other drugs.
Q. And environmental exposure is being around, breathing, touching, et cetera; correct?
A. Exactly.
Q. Now, you're the director at the lab, and you may have been asked this and I just missed it. How many people do you supervise? How many people work in the lab?
A. There's 31 between all the units and the administrative staff.
Q. And your lab, as I understand it, like you mention your

several sections that you're -- you supervise the whole thing but I guess you more closely supervise -- one was DNA?

A. I supervise all of them equally, yes. One is DNA.

Q. Okay. So you all have the DNA, fingerprint analysis, all that stuff?

A. We don't do fingerprint analysis. We do DNA, chemistry, and toxicology.

MR. MARTIN: Thank you. No further questions.

THE COURT: Anything else, Miss Guzman?

MS. GUZMAN: Yes, Your Honor. Very briefly.

REDIRECT EXAMINATION

BY MS. GUZMAN:

Q. Director Newman, Mr. Martin asked you about the dangerous effects of environmental conditions. And I believe that you said that, yes, of course that would be dangerous?

A. It can be.

Q. But what would be more dangerous, the exposure or ingesting it?

A. Ingesting it, by far.

Q. And why would that be?

A. Because in order for pretty much any drug to act on the body it has to get in the bloodstream. The most inefficient way to get into the bloodstream would be through the skin. To breathe it in, you would need a significant amount, say walking into a cloud of dust, which I don't think you're

going to typically see in environmental conditions. But if you're going to ingest it or inject it, it's going to be much faster and much more potent.

MS. GUZMAN: Thank you very much.

THE COURT: Anything else for this witness?

MR. MARTIN: No, Your Honor.

THE COURT: I'll excuse her then. Thank you very much. We appreciate you having come in today to testify.

You can call your next witness, please.

MS. GUZMAN: Your Honor, at this time the government is ready to call its next witness, which would be Nicholas Hammack.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, madam.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Nicholas Hammack, H-a-m-m-a-c-k.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Mr. Hammack, you're going to be asked some questions by Marie Guzman, Assistant United States

Attorney, and then Mr. Martin, who represents Mr. Fisher, may also ask you some questions. If you don't understand the question, please say so so it can be stated another way.

If you have the tendency to speak quickly, slow down so we can understand you. You need to speak up and you need to wait until the question is furnish before you begin answering so we don't have two people speaking at the same time.

THE WITNESS: Yes, ma'am.

THE COURT: Go ahead, Miss Guzman.

MS. GUZMAN: Thank you, Your Honor.

NICHOLAS HAMMACK,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Officer, would you please state your name again and introduce yourself to the Court and the jury.

A. Yes, ma'am. My name is Corporal Nicholas Hammack with the Pinellas County Sheriff's Office.

Q. And how long have you been employed with the Pinellas County Sheriff's Office?

A. Just over five years.

Q. During that time, have you been assigned to any particular unit or division within that office?

A. Yes, ma'am. With the Pinellas County Narcotics Division.
Q. Let me direct your attention to an investigation regarding an individual by the name of Dion Fisher. Were you involved in that group investigation by the Pinellas County Sheriff's Office?
A. Yes, ma'am.
Q. I'd like to direct you specifically to December 14th, 2017. And specifically to a location at a Wells Fargo Bank. Were you positioned as an officer at the Wells Fargo Bank in Pinellas County on that date?
A. Yes, ma'am.
Q. And if you would, explain for the jury what it was that you were doing at the Wells Fargo.
A. Yes, ma'am. Our intention that day was to have our confidential informant meet Dion Fisher at the Wells Fargo Bank. My role in that endeavor was to ensure the safety of the confidential informant, via monitoring audio devices and to also monitor visually the bank itself.
Q. Now, when you arrived at the Wells Fargo Bank, was the confidential informant -- had he arrived already or Mr. Fisher?
A. No, ma'am. The confidential informant had not. While I was in the position monitoring the Wells Fargo Bank, I observed Mr. Fisher arrive.

Q. Do you recall what kind of vehicle, if you recall, he was driving?
A. Yes, ma'am. It was a black Aston Martin with a Michigan license plate.
Q. And I assume that you were in undercover clothing?
A. Yes, ma'am.
Q. And unmarked vehicle?
A. Yes, ma'am.
Q. Where were you parked?
A. I was across the street, the road that the bank is on is Walsingham Road. Across the street from the bank is a CVS. I was parked at the CVS facing to the north.
Q. And parked at the CVS, did you still have a good view of the Wells Fargo Bank and its entrance?
A. Yes, ma'am.
Q. At some point, did you see the confidential informant, who's been identified as Mr. Kulic, arrive at the Wells Fargo?
A. Yes, ma'am.
Q. Did you have any interactions with either Mr. Fisher or Mr. Kulic before they entered the Wells Fargo?
A. That particular day?
Q. Yes.
A. Yes, ma'am.
Q. And what interaction did you have with Mr. Kulic?

A. On that particular day, I assisted Agent Phelps and Corporal Miner with the search of the confidential informant. His person and his vehicle.
Q. And was this done before he went into the Wells Fargo or after he departed?
A. I was present for the search prior to him arriving to the Wells Fargo.
Q. And if you would explain for the jury what the search consisted of.
A. Yes, ma'am. The purpose and the basis of conducting a search prior to any narcotics transaction involving an informant is to ensure that the informant is not bringing any weapons, any currency, or any drugs with them.
So that way we can testify and say that we know based on our observations and our search that that individual had none of those items prior to conducting a transaction on our behalf.
Q. And after conducting that particular search, were any narcotics or any amount of currency found on Mr. Kulic?
A. On that particular day, no, ma'am.
Q. Now, you've indicated that you observed them both going into the Wells Fargo. Did you observe them coming out of the Wells Fargo?
A. Yes, ma'am.
Q. Where did they go?

A. They went to Dani Kulic's vehicle.
Q. And during the time that they were in Mr. Kulic's vehicle, did you remain at the CVS surveilling the scene?
A. Yes, ma'am.
Q. Did you see Mr. Fisher come out of Dani Kulic's car?
A. Yes, ma'am.
Q. And what happened next?
A. I observed Mr. Fisher enter his black Aston Martin and shortly thereafter, Mr. Kulic and Mr. Fisher left eastbound on Walsingham Road.
Q. Were you involved in the search and any type of search of Mr. Kulic after he finished his meeting with Mr. Fisher?
A. No, ma'am.
Q. Now, again, referring to the same day, which is 12/14, did you remain at the Wells Fargo, or did you go to a different location?
A. No, ma'am. Based on the information, the conversation that happened between Dani Kulic and Mr. Fisher, at that Wells Fargo inside of Mr. Kulic's vehicle, a location of the Mugs 'N Jugs on Ulmerton Road was arranged to be the next meeting location.
While we are gathering the information and figuring out our next game plan for lack of a better term I went ahead and went straight to the Mugs 'N Jugs to get -- establish myself in the parking lot.

Q. So explain for us this Mugs 'N Jugs that we've heard about. What exactly is it?
A. It's a restaurant, a bar-restaurant.
Q. And is it located in a commercial area or residential area?
A. It's a commercial area, ma'am, in a shopping center.
Q. As part of that shopping center is there a parking lot adjacent to the stores?
A. Yes, ma'am.
Q. This is where you went?
A. Yes, ma'am.
Q. Where did you position yourself within the parking lot?
A. Middle of the parking lot. The shopping center is in a U shape, and I felt it best to just find myself in the middle of it and at that particular time, I was parked facing east.
Q. At some point did you see Mr. Fisher arrive at the Mugs 'N Jugs?
A. Yes, ma'am.
Q. And, again, do you recall what vehicle he was driving?
A. Yes, ma'am. The same vehicle that I observed at the Wells Fargo, the black Aston Martin.
Q. At some point did you observe Mr. Kulic arrive at the Mugs 'N Jugs?
A. Yes, ma'am.
Q. Did you have any type of interaction in terms of any

type of search, of his car or of his person with regard to Mr. Kulic at the Mugs 'N Jugs?
A. No, ma'am.
Q. When Mr. Fisher arrived at the Mugs 'N Jugs, where did he go? Did he go inside the business or where did he go?
A. No, ma'am. As I observed Mr. Fisher pull in, I had a very clear vantage point because the way I was parked in the parking lot, Mr. Fisher parked facing me one space over. So it was very clear and evident I was able to identify him and identify the vehicle.
Subsequently, after Mr. Fisher arrived, Dani Kulic arrived, approximately just a couple of minutes later, and parked also within eye shot of myself. Not as close as Mr. Fisher, but I could also still see everything.
Q. So it was just a coincidence that they parked close to you?
A. Pure coincidence.
Q. Having observed them arrive at the parking lot, what was the next thing you saw happen?
A. I observed Mr. Fisher exit his vehicle, walk immediately making no stops anywhere in between, directly to Dani Kulic's vehicle, and entering the front passenger seat.
Q. Now, were you -- did you have access to any type of recording device that would have allowed you to hear what was going on in Mr. Kulic's car?

A. Yes, ma'am.
Q. And approximately how long do you think that Mr. Fisher remained in Mr. Kulic's car at the parking lot of Mugs 'N Jugs?
A. I would say approximately 30 minutes, 40 minutes. It seemed like quite some time.
Q. After Mr. -- well, at some point did Mr. Fisher exit Mr. Kulic's car?
A. Yes, ma'am.
Q. And where did he go?
A. Directly to his vehicle again.
Q. Did you have any interactions with Mr. Kulic there at the scene after Mr. Fisher left?
A. No, ma'am.
Q. Did you have anything else to do with the investigation or with the subjects that day at the Mugs 'N Jugs?
A. No, ma'am.
Q. Did you have an opportunity to become involved further in this investigation sometime in the future in February of 2018?
A. Yes, ma'am.
Q. And how was it that you became involved in the investigation again in -- February 15th, specifically of 2018?
A. Yes, ma'am. I am certified in clandestine laboratory

investigations and the dismantling of those laboratories that are -- that possess and contain chemical hazards. It was determined that the search warrant that was to be affected on Mr. Fisher's residence would be deemed based in part on the fentanyl that was related to the investigation, that it would be deemed a hazardous site for lack of a better term.

And our clandestine laboratory team assisted in the entry and removal of property from with Mr. Fisher's residence.

Q. Now, when we hear about this clandestine group that's responsible for these type of searches, if you would explain for the jury what type of clothing you have to wear.

A. Yes, ma'am. Depending on the threat, if it's a liquid form we have different levels, A through D. D can be just as simple as wearing a gas mask, a special gas mask, all the way to A, where we are in a self-enclosed suit where no outside air touches your body or touches yourself and you're on an air tank.

Q. And were you the only person in that unit, or were there many people in a that unit conducting the search that day?

A. Dozens.

Q. When you went into, first of all, Mr. Fisher's residence, was it an apartment, was it a home? What was it?

A. It was a home located on Nassau Court, I believe.

Q. If you would detail for the members of the jury, you're in your outfit; correct?
A. Yes, ma'am.
Q. And you are wearing a mask, I believe?
A. Yes, ma'am. For that specific event we were wearing what we would see firefighters wear going into a fire, a full face mask with an air tank on your back.
Q. Was this for your own protection?
A. Yes, ma'am.
Q. Were you wearing gloves?
A. Absolutely.
Q. When you went into this location, what did you find? Describe the scene for us.
A. Yes, ma'am. Being a member of the entry element that made initial entry into the residence and also searching it, subsequently, it was a well-lived-in home. There was furniture, clothing, a TV, DVDs, some random dishes on the sink, bedroom, that had a bed, dresser. It was a residence that was clearly lived in.
Q. During the time that you were involved in the execution of the search warrant, did you note any evidence of narcotic activity?
A. I did recover some narcotics myself. I also recovered a firearm that was located in the living room. So to answer your question, yes, I did locate narcotics, and I located a

firearm from within the residence.
Q. You indicated that the search warrant occurred at Mr. Fisher's residence; is that correct?
A. Yes, ma'am.
Q. And that this was at Nassau Court?
A. Yes, ma'am.
Q. And this is a location in Pinellas County?
A. Yes, ma'am.
Q. Let me ask for Government's Exhibit 127. If we can maybe dim the lights just a little. Do you have that exhibit in your monitor?
A. Yes, ma'am.
Q. Okay. This has been previously introduced as Government's Exhibit 127. It is a box that has a label. Would you please take a look at that label.
A. Yes, ma'am.
Q. And the address that is reflected in that particular label, what is that address?
A. 10124 Nassau Court, Seminole, Florida 33776.
Q. How is that particular address familiar to you?
A. It's familiar to me because that is the location of where we executed the search warrant.
Q. You indicated you had impounded some potential narcotics at the Nassau Court residence; correct?
A. Yes, ma'am.

Q. If you can detail for us how was the evidence being selected there at the scene?
A. Very methodically. Because of the nature of how we -- what we were wearing and how we had to search the residence, we were only allowed to go in at 20-minute intervals. Because of the heat, because of the wear and tear on the body that -- that wearing that suit and doing physical activity, bending over, searching, you know, methodically looking, it wears you down pretty good.
So we had set ourselves up on a 20-minute rotation in teams of two. We have people set up on the outside of the residence with Narcan in case we have an accidental exposure. Paramedics are on standby.
And what we do is once we go inside in our team of two, your partner, if you will, you have an assigned room. You don't finish that room until it's done and then you move on to something else.
If me and somebody else went to the master bedroom, nobody else would search that, but myself and my partner. So that way there was no confusion or overlap or as to who searched what prior.
Q. Who was your partner that day; do you recall?
A. I do not recall, ma'am. As we were searching, as we searched we located items, so that way we did not bring out items that could potentially expose those on the outside of

the residence.

We would collect the items in a laundry basket, identify where they were, photograph where they were located, and then we would take them outside to a staging area so we could determine if it was a narcotics item that needed to be tested away from others, or if it was something as simple as mail or billing statements, or money.

And we would separate it all so that way we could safely handle it and pass it on to the next person.

Q. And how approximately how long do you think that you were at that residence that day collecting evidence and conducting the search, if you recall?

A. Approximately five hours.

Q. Thank you very much, Detective Hammack.

A. Yes, ma'am.

THE COURT: Any cross-examination for this witness?

MR. MARTIN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. You mentioned something, Narcan.

A. Narcan, yes, sir.

Q. What is that?

A. Narcan is the drug that reverses the effects of heroin and fentanyl on the body.

Q. And you mentioned that basically the protective gear you may wear ranges from A to D, depending on the situation?
A. Yes, sir.
Q. And you were in A this --
A. At the Nassau Court location we were in level B.
Q. B?
A. B.
Q. As in boy?
A. As in boy. B, as in boy.
Q. Okay. Now, at least -- I know team search, so you didn't search any area of the house, but the area had the house that you searched and what you noticed may be getting to that areas that you searched, did you ever notice any type of protective gear such as like a gas mask or anything like that?
A. No, sir, I do not recall.
Q. Protective clothing, gloves or protective gloves or anything like that?
A. I don't recall. I don't recall if I saw protective mask, gas mask, or any sort of protective clothing.
Q. Okay. Now, you say you don't recall. Like a gas mask, is that something you would normally see at a house that you are searching?
A. I've seen them before, sir. If it was of evidentiary value, if we determined it to be, we would have photographed

it and taken it and in this particular incident, I did not come across a gas mask or any protective clothing.

Q. So. Because at first you said you don't recall. That would be something that you would probably recall?

A. Perhaps. There was quite a bit of evidence that day, sir.

Q. Thank you. No further questions?

A. Yes, sir.

THE COURT: Anything else?

MS. GUZMAN: No, Your Honor.

THE COURT: Okay. All right. I'll excuse the witness. Thank you, sir. We appreciate you coming in today to testify.

THE WITNESS: Yes, ma'am.

THE COURT: Do you have another witness ready or want to take a break? What would you prefer to do?

MS. GUZMAN: I do have a witness ready, Your Honor. I don't think it will take that long.

THE COURT: That will be fine. We will call that witness, then.

MS. GUZMAN: The government would call Officer Khristian Walguarnery.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of

perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Khristian, K-h-r-i-s-t-i-a-n, Walguarnery, W-a-l-g-u-a-r-n-e-r-y.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Mr. Walguarnery, you're going to be asked some questions by Assistant United States Attorney Maria Guzman. And then Mr. Martin, who represents Mr. Fisher may also ask you some questions. If you don't understand the question, please say so. Wait until the question is finished before you begin answering. You need to speak up so we can hear you. And if you have the tendency to speak quickly, you need to slow down. All right.

THE WITNESS: Yes, ma'am.

THE COURT: Go ahead, Miss Guzman.

MS. GUZMAN: Thank you, Your Honor.

KHRISTIAN WALGUARNERY,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good afternoon, Officer Walguarnery.
A. Good afternoon.
Q. Would you be kind enough to spell your last name?
A. W-a-l-g-u-a-r-n-e-r-y.
Q. Officer Walguarnery, how are you employed?
A. I'm a detective with the City of Tarpon Springs Police Department, and I'm currently assigned to the Pinellas County Sheriff's Office Narcotics Task Force.
Q. How long have you been assigned to the Pinellas County narcotics group?
A. Since 2003.
Q. Were you involved in an investigation regarding an individual by the name of Dion Fisher?
A. Yes, I was.
Q. I would like to specifically direct your attention to a date and time December 14th, 2017, and that was at the Wells Fargo Bank?
A. Yes, ma'am.
Q. Do you recall that incident?
A. Yes, I do.
Q. Or that event?
A. Yes, ma'am.
Q. Would you please tell us how you came to be at the Wells Fargo.
A. I was assigned to the surveillance team and then --

from Detective Phelps and assisted him with surveillance in this investigation.
Q. When you -- you were at the Wells Fargo, where adjacent to the Wells Fargo were you located?
A. I was positioned directly to the south of Wells Fargo.
Q. Were you in an unmarked patrol vehicle?
A. Yes, ma'am.
Q. And did you see the individuals that went into the Wells Fargo namely Dani Kulic loves a confidential informant, being used and also Dion Fisher?
A. Yes, I did.
Q. Were you in a position where you could actually see them walk in the front door of the Wells Fargo?
A. Yes.
Q. Were you in a position to be able to so them come out of the Wells Fargo?
A. Yes, I was.
Q. Would you explain for us what you observed when they came out of the Wells Fargo?
A. When they came of the Wells Fargo, they walked toward the vehicles and ended up both getting -- they both got into the vehicle and started a conversation in there.
Q. Once that conversation ended, were you responsible for any type of additional surveillance of either the individuals or their vehicles?

A. Yes. I was instructed to continue following the defendant in this case to wherever he was going, which ended up being a storage unit on 49th Street.
Q. Do you recall what type of vehicle Mr. Fisher would have been driving?
A. Yes, it was a black Aston Martin.
Q. Now, when you say that you followed him, you've indicated that you had been in an unmarked vehicle; is that correct?
A. Yes.
Q. Describe for us this 49th Street location that you've just testified to.
A. It is a storage unit which is on 49th Street, it is north of Ulmerton Road on the east side of the road.
Q. And is it a storage facility used by only one person or does it appear to be a storage facility where a lot of people would have access?
A. It seemed like a storage facility where a lot of people would have access. It's a driveway with adjacent garages.
Q. Did you park in the general vicinity of the 49th Street storage unit?
A. I parked actually on 49th Street away from the area so I wasn't able to actually see the defendant go into the unit, but I was in the area for when the defendant left that area and to continue surveillance from there.

Q. So if I understand correctly, you were parked in the vicinity, you had followed Mr. Fisher to the 49th Street unit; is that correct?
A. That's correct.
Q. Did you see him go into the unit?
A. I did not.
Q. Okay. Did you see him come out of the unit?
A. I did not.
Q. At some point what was the next thing you observed Mr. Fisher do?
A. I observed the vehicle, the Aston Martin, coming back out to 49th Street, proceeded north, made a U-turn, to come back to the Ulmerton Road and proceeded to the Mugs 'N Jugs on Ulmerton Road.
Q. Now, when Mr. Fisher left the 49th Street storage unit, did you follow his vehicle?
A. I did.
Q. Again, you were in your unmarked vehicle?
A. Yes, ma'am.
Q. And you indicated that he departed and arrived at a location called the Mugs 'N Jugs?
A. That's correct.
Q. What is the Mugs 'N Jugs?
A. It's a restaurant, sports bar. Apparently this is where a transaction was to occur.

Q. Did you park your vehicle in the vicinity of the Mugs 'N Jugs?
A. I was in the parking lot to the west of the Mugs 'N Jugs, not in the position to witness the transaction but I was in the area of surveillance that was needed.
Q. After -- were you in a position where you were able to see Mr. Fisher and Mr. Kulic depart the Mugs 'N Jugs?
A. I was not.
Q. At some point, did your surveillance of both Mr. Fisher and, of course, the confidential informant end that night?
A. Yes, it did.
Q. Now, were you further involved specifically in this investigation on December 20th?
A. Yes, ma'am.
Q. And explain for us what your role was on December 20th with regard to the investigation and specifically Mr. Fisher.
A. This was a meet that was to happen at the Walmart at U.S. 19 and Roosevelt. My job was to get out of my vehicle and then try to get surveillance of the individuals inside the Walmart.
Q. So you actually went inside?
A. Yes, ma'am.
Q. Were you inside with another officer, or were you are inside on your own?
A. I believe there was another officer, but I know for

sure it was myself.
Q. Were you in just regular clothing?
A. Yes, ma'am.
Q. When you went inside the Walmart, did you go to any specific location within the Walmart itself?
A. I just kind of milled around the front of the Walmart, waited for the defendant to walk in, along with Mr. Kulic, and observed where they were going and what they were planning on doing.
Q. So you were in the Walmart before either Mr. Fisher or Mr. Kulic arrived?
A. Correct.
Q. Did you actually witness Mr. Fisher arrive or enter the Walmart?
A. Yes, I did.
Q. And what happened? Where did he go?
A. I saw him walk in the store, kind of looked around a little bit and went towards the men's bathroom in front of the business.
Q. Where did you position yourself when you saw Mr. Fisher go into the men's bathroom?
A. I just kind of stayed up fronted, up by the cash register area. And I was just kind of milling around, acting as if I was shopping.
Q. Is the cashier area close to the men's bathroom?

A. Yes, ma'am.
Q. Did there come a point that you saw Mr. Kulic enter the Walmart?
A. Yes.
Q. Did you actually witness him come through the front as well?
A. I believe I caught him as he was already in the store and then I saw him go into the men's bathroom as well.
Q. During the time that Mr. Fisher and Mr. Kulic were in the men's bathroom, did you remain inside the Walmart?
A. Yes, I did.
Q. Did you have an opportunity to be see them come out of the Walmart bathroom?
A. Yes, I did.
Q. And when they came out, what happened?
A. They came out, Mr. Fisher was -- walked out first, Mr. Kulic walked out behind him, and then they proceeded to the exits.
Q. Did you see them actually leave the store?
A. I saw them walk towards the door and just kind of notified the others out there that they were coming out.
Q. And there were other, of course, police officers or law enforcement in the parking lot area positioned in different locations; correct?
A. Yes, ma'am.

Q. Let me ask you this, Officer Walguarnery. Do you see Dion Fisher in the courtroom today?
A. Yes, I do.
Q. If you would, would you please identify Mr. Fisher by where he would be located and an article of his clothing?
A. He's sitting right here to my left. Black gentleman, black jacket with a white shirt.
MS. GUZMAN: Your Honor, I would ask the record to reflect that Officer Walguarnery has identified the defendant Dion Fisher.
THE COURT: Yes, it will so reflect.
BY MS. GUZMAN:
Q. Did you have any role on December 20th in searching Dani Kulic?
A. No, I did not.
Q. Was that left up to other people in your unit?
A. Yes, ma'am.
MS. GUZMAN: I have no further question. Thank you, Your Honor.
THE COURT: Thank you. Any cross-examination for this gentleman?
MR. MARTIN: No, Your Honor.
THE COURT: All right. I'll excuse the witness. Thank you, sir. We appreciate you coming in today to testify.

THE WITNESS: Thank you.

THE COURT: Why don't we go -- it's close enough to 3 o'clock. Let's go ahead and take our afternoon break. Ladies and gentlemen, we are going to take a ten-minute afternoon break. Please don't discuss the case or form any opinion until you've had the chance to hear all the evidence. And then when we resume, you can let me know if you're okay with making up that hour. You know, whether it's tomorrow we can start at 8:30 and Monday. I'd just as soon we do it Friday and Monday and be done with it, if that's okay with you, but I don't want to inconvenience anybody.

So that's that. We'll see you back here in ten minutes.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 2:52 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Miss Howard-Allen, you seem to be moving at a pretty good clip -- Miss Guzman. But we'll still make up to that hour, and so we'll end at 3 tomorrow and we'll try to move our hearing up half an hour if we can, Miss Lee, that 4 o'clock one. Let's see if we can set it for 3:30, or 3 even.

And that will be that. We're in recess. Thank you.

(Recess taken from 2:53 p.m. to 3:06 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: The jurors apparently cannot do 8:30. There's a juror that has an issue with 8:30. We're just going to do 9 o'clock, and I won't be able to make up that time. Okay. We'll bring the jury in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 3:15 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

And that's quite all right. I understand that 8:30 isn't going to work, so please don't worry about it. We're fine with 9 o'clock, and they'll try to move as quickly as they're able to. Please don't give it a second thought.

I think a half hour for lunch is just too -- it's just too hard, and people need to take a break. So I appreciate your willingness there, but we will just move forward.

Miss Howard-Allen, are you ready with your next witness?

MS. GUZMAN: Yes, Your Honor. The government will be calling Officer Cory List.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Cory List. C-o-r-y, L-i-s-t.

THE COURTROOM DEPUTY: You may take the witness stand.

THE COURT: Sir, you will be asked some questions by Assistant United States Attorney Maria Guzman and then Mr. Martin, who represents Mr. Fisher may ask you some questions, as well.

If you don't understand the question, please say so so they can state it differently. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you are soft-spoken, please speak up so that we can hear you. And if you have the tendency to speak quickly, please slow down so we can understand you. All right?

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead, Miss Guzman.

MS. GUZMAN: Thank you, Your Honor.

CORY LIST,

having been first duly sworn by the Courtroom Deputy,

testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Officer, would you introduce yourself to the jury and the Court.

A. My name is Detective Cory List with the Pinellas County Sheriff's Office.

Q. And, Officer List, how long have you been with the Pinellas County Sheriff's Office?

A. Since May of 2013.

Q. Are you assigned to any specific division?

A. I am. I'm assigned to the narcotics unit.

Q. How long have you been with narcotics?

A. Since 2016.

Q. Prior to being in narcotics, what division were you assigned to?

A. Patrol.

Q. Now, let me direct your attention to a particular investigation. Have you been assigned as part of the investigative team with the Pinellas County Sheriff's Office reference a subject by the name of Dion Fisher?

A. Yes, ma'am.

Q. Let me direct you specifically to the date a couple of years ago of December 14th, 2017. Were you working for the Pinellas County Sheriff's Office at that time as part of the

investigative unit?
A. Yes, I was.
Q. So let me direct you specifically on that date. What role did you have as part of the unit and Dion Fisher that particular day?
A. I was assisting in the surveillance portion of that operation that day.
Q. Now, when you say that you were part of the surveillance portion, were you working in undercover clothing?
A. Yes, ma'am.
Q. Were you driving an unmarked vehicle?
A. Yes, ma'am.
Q. Where exactly were you conducting your surveillance?
A. I started my surveillance off of 49th Street at an associate address of Mr. Fisher.
Q. When you say that you began your surveillance, this 49th Street location, what was it?
A. I don't recall the numerical, but it was a storage unit.
Q. Now, were you parked near or adjacent to the storage unit?
A. Yes, I was parked in a manner where I could see the driveway to access that storage unit and which direction it would take a vehicle north or southbound on 49th Street

should it leave.

Q. Now, when we talk about 49th Street, is this a location in -- in what city in Pinellas County?

A. Clearwater.

Q. Did there come a point that you saw an individual that you later knew to be Dion Fisher arriving at this storage unit?

A. I saw him leaving.

Q. And when you -- so explain this for us a little bit. So you're doing surveillance at 49th Street. Do you have a clear view of the storage unit?

A. I have a clear view of the driveway, yes, ma'am.

Q. Explain to us how it is that you saw Dion Fisher exit the 49th Street storage unit?

A. So I was informed of the pending purchase and tasked to stand by in a surveillance fashion at the 49th Street storage unit in anticipation of someone leaving after the narcotics were ordered.

So I positioned my undercover vehicle in a way that I could see a northbound or southbound exit from the driveway in my undercover vehicle and follow behind in traffic.

Q. Had you been involved in any other surveillance earlier in the day?

A. Not that day.

Q. Okay. When you saw the vehicle exit the 49th Street storage unit, what did you do?
A. I began following the vehicle, obtained the vehicle tag and description.
Q. Do you recall what kind of a car it was?
A. It was a black Aston Martin.
Q. Could you tell us where that vehicle went?
A. It went northbound from the 49th Street storage unit address, went northbound on 49th Street from there. I can tell you it ultimately ended up at a Walmart off of Roosevelt Boulevard, and I stayed with the vehicle through traffic the entire time.
Q. Now, were you in your vehicle by yourself or were you working with a partner that night?
A. I don't recall.
Q. When you arrived at the Walmart parking lot, what did you specifically do?
A. I followed Mr. Fisher into the Walmart, who was going to meet with Mr. Kulic, to conduct the purchase.
Q. Now, so you parked your vehicle; correct?
A. Yes, ma'am.
Q. And did you see Mr. Kulic and Mr. Fisher enter the Walmart?
A. I did see them enter the Walmart and meet by the produce section, towards the entrance of that Walmart.

Q. And upon viewing them in the produce section -- did you go in after them?
A. I followed them into the Walmart itself, and then once contact was made between Mr. Fisher and Mr. Kulic, I posed as a customer for the duration of Mr. Kulic's time in Walmart. I didn't get too close to make anything uncomfortable. When I saw Mr. Kulic starts to exit Walmart, I followed Mr. Kulic out of Walmart.
Q. Okay. Now, when you were inside the Walmart -- I understand that you were posing as a customer -- did you follow them as they proceeded down these different aisles?
A. I did not.
Q. Were you within earshot range of what they were discussing?
A. No, ma'am.
Q. When Mr. Kulic left the Walmart, did you live at that point?
A. I did.
Q. What did you do when you left the Walmart?
A. I followed Mr. Kulic out to maintain the integrity of whatever he may have purchased inside the Walmart until he was in the visual sight of other surveillance units who were controlling him at that moment, and at that point in time I got back in my undercover vehicle.
Q. So, as I understand your testimony, you were

responsible for essentially keeping sight of Mr. Kulic as he left the Walmart?
A. Yes.
Q. And then as soon as he reached other law enforcement officers, that was it for you?
A. Yes.
Q. Were you involved in any way in his -- in his search after exiting the Walmart?
A. No, ma'am.
Q. Now, when you were at the Walmart, it was late in the evening, was it not?
A. It was close to midnight.
Q. And were there a lot of people streaming around the Walmart at that time?
A. I don't recall it being particularly crowded.
Q. Let me ask you this: Did you -- today do you see Mr. Fisher in the courtroom?
A. I do.
Q. And could you identify Mr. Fisher by where he would be located and an article of his clothing?
A. He's over here, wearing a black jacket and white shirt with no tie.
MS. GUZMAN: Your Honor, we would ask that the record reflect that Officer List has identified the defendant Dion Fisher.

THE COURT: The record will so reflect. Thank you.
BY MS. GUZMAN:
Q. Is Dion Fisher, whom you've identified, the same individual that you observed at the Walmart on 12/14 with Dani Kulic?
A. Yes.
Q. The storage unit -- very briefly, the storage unit on 49th, you didn't go into the storage unit; did you?
A. No.
Q. When you saw Mr. Fisher exit the storage unit, did -- had you seen him go into the storage unit?
A. No.
Q. Per se?
A. No.
Q. Okay. So your testimony is you just observed him driving out of the storage unit; is that correct?
A. Correct.
Q. I have no further questions.
MS. GUZMAN: Thank you very much, Your Honor. Thank you, Officer List.
THE COURT: Mr. Martin, any cross-examination for this witness?
MR. MARTIN: No, Your Honor. Thank you.
THE COURT: Thank you. I will excuse the witness.

We appreciate you coming in today to testify.

And will you call your next witness, please.

MS. GUZMAN: Yes, Your Honor. At this time the government would call Officer Shawn Livernois.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, ma'am, I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Deputy Shawn Livernois. S-h-a-w-n, L-i-v, as in Victor, e-r-n-o-i-s.

THE COURT: Sir, you are going to be asked some questions by Assistant United States Attorney Maria Guzman, and then Mr. Martin, who represents Mr. Fisher, may also ask you some questions.

If you don't understand the question, please say so so they can word it differently. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you speak quickly, slow down so we can understand you and speak up so we can hear you. All right?

THE WITNESS: Yes, ma'am.

THE COURT: Go ahead, Miss Guzman.

SHAWN LIVERNOIS,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Officer, would you please introduce yourself to the jury and to the Court.

A. I'm Deputy Shawn Livernois. I work with the Pinellas County Sheriff's Office.

Q. And how do you spell your last name, Officer Livernois?

A. L-i-v, as in Victor, e-r-n-o-i-s.

Q. How long have you been employed with the Pinellas County Sheriff's Office?

A. Seven years.

Q. And during the time that you've been with the Pinellas County Sheriff's Office, have you been assigned to any particular units?

A. Yes, ma'am. Started at in patrol, I was in narcotics for four years and I'm currently with the violent crimes task force.

Q. Okay. Back in 2017, were you assigned to -- still assigned to the drug task force?

A. Yes, ma'am.

Q. Let me ask you, were you part of the investigative

group assigned to investigate a subject by the name of Dion Fisher?

A. Yes, ma'am.

Q. And that unit was comprised of several officers from the sheriff's office; is that not correct?

A. Yes, ma'am.

Q. I would like to direct your attention specifically to an event on December 20th, 2017. Do you recall being involved in any type of surveillance on December 20th, 2017, with relation to the Dion Fisher investigation?

A. Yes, ma'am, I do.

Q. And if you would detail for us what your surveillance was on that date.

A. Yes. I was assigned as a stationary surveillance on a storage unit on 49th Street. It was unit B, as in Bravo, 2. My main directive was to observe -- I was given a photo of the defendant as well as a vehicle he was driving, and my goal was to see him arrive at this unit, go inside, come back out and leave. And I was to stay stationary the entire time.

Q. Now, when you use the word "stationary," does that mean you were parked at a location adjacent?

A. Yes, ma'am. I was parked in an area close to the unit.

Q. And were you able to have an actual view from your vehicle of the storage unit?

A. Yes, ma'am, it was clear and unobstructed.

Q. Did you see someone arrive to that storage unit and go into it on that date?
A. Yes, ma'am.
Q. And who was that?
A. The defendant Mr. Fisher.
Q. And would you explain to the members of the jury what it was that you observed.
A. Prior to me getting on site I was given the car he was driving. I saw the car. It had the exact same Michigan tag that I was given. Defendant got out of the driver's seat, walked over to Bravo 2, which is the unit. He unlocked the door with the key, opened it.

I remember the door was an out-swing door. He walked inside. He was in there for a little bit of time.
Q. How long do you think he was in there?
A. Five, maybe ten minutes. After that, he comes back outside, closed the door, locked it, gets back in the Aston Martin and leaves.
Q. Now, when he went in and came out, were you able to observe what, if anything, he took out of the storage unit?
A. No, ma'am.
Q. Did you see any of his hands at that particular time?
A. Just the keys.
Q. Was he alone, or was he accompanied by someone?
A. He was by himself.

Q. Now, do you recall approximately what time you saw him go into the storage unit on 49th?
A. I believe it was right around 8:40 p.m.
Q. I think you've already addressed the fact that he was driving an Aston Martin?
A. Yes, ma'am.
Q. When he -- did you see him get into the Aston Martin?
A. Yes.
Q. And when he got into the Aston Martin, were you involved in following the Aston Martin?
A. No, ma'am. I stayed on site.
Q. Do you know if there were other officers that had that particular role of following the vehicle from 49th Street?
A. Yes, ma'am.
Q. Do you know particularly who it was?
A. No, I do not.
Q. Okay. So at that point you maintained your stationary position on 49th?
A. Yes, ma'am.
Q. Did you go to any other location other than that 49th Street storage on December 20th, 2017?
A. No, ma'am.
Q. Were you involved in surveillance on any other locations on that date?
A. No, ma'am.

Q. Were you involved in any type of surveillance involved in this case on December 14th?
A. I believe so, yes.
Q. And on December 14th and 15th, where were you assigned?
A. I was just a mobile surveillance.
Q. And what does that generally mean?
A. Follow the target.
Q. Okay. Did you follow Dion Fisher to any location on 12/14, 12/15?
A. I don't believe so. I think I might have -- I might have lost him. I don't think I was ever directly behind him. I know other units were.
Q. Do you today see in this courtroom Dion Fisher?
A. Yes, ma'am.
Q. If you do, would you please identify him by where he would be located and an article of clothing that he might be wearing?
A. Seated to my left with the black jacket and a white shirt.
MS. GUZMAN: Your Honor, the government would ask that the record reflect that the witness has identified the defendant Dion Fisher.
THE COURT: The record will so reflect.
BY MS. GUZMAN:
Q. Is Dion Fisher the individual you observed on

12/20/2017 coming out of that storage unit on 49th Street?
A. Yes, ma'am.
Q. Is he the individual that you observed getting into the Aston Martin?
A. Yes, ma'am.
Q. Is he the individual that you observed going into the actual unit which I think you said it was what, unit 2?
A. Bravo 2. B2.
Q. Unit Bravo 2 in that storage unit?
A. Yes, ma'am.
Q. Is he the same individual that you saw coming out of that same storage unit, Bravo unit?
A. Yes, ma'am.
MS. GUZMAN: Your Honor, I have no further questions. Thank you.
THE COURT: Thank you. Any cross-examination, Mr. Martin?
MR. MARTIN: No, Your Honor.
THE COURT: All right. Thank you. I will excuse the witness. We appreciate your having come in today to testify.
You can call your next witness, please.
MS. GUZMAN: Your Honor, the government would call Officer Nicholas Forgione.
THE COURTROOM DEPUTY: Please raise your right

hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Nicholas Forgione, F-o-r-g-i-o-n-e.

THE COURTROOM DEPUTY: You may take the witness stand.

THE COURT: Sir, you are going to be asked some questions by Assistant United States Attorney Maria Guzman, and then Mr. Martin, who represents Mr. Fisher, may ask you some questions in cross-examination.

If you don't understand the question, please say so so they can state it another way. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you have the tendency to speak quickly, slow down so we can understand you and speak up so we can hear you. All right?

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead, Miss Guzman.

NICHOLAS FORGIONE,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Officer Forgione, would you please introduce yourself to the Court and the members of the jury.

A. Nicholas Forgione.

Q. And, again, I think you've spelled your name for us, but why don't you do it one more time.

A. Last name is spelled F-o-r-g-i-o-n-e.

Q. And, Officer Forgione, where are you currently employed?

A. With the Pinellas County Sheriff's Office.

Q. And how long have you been employed with that agency?

A. June of 2012.

Q. During the time that you've been with the Pinellas County Sheriff's Office, have you been assigned to any particular unit or division?

A. Assigned to the narcotics division.

Q. Have you been assigned always to the narcotics unit?

A. No. I was assigned to patrol operations when I was hired.

Q. So how long have you been with narcotics?

A. I was with narcotics for three years.

Q. Now, let me ask you this: Were you part of an investigative group assigned a subject investigation reference a person by the name of Dion Fisher?

A. Yes, I was.
Q. And were you are the only person assigned to that investigation, or were there various people in your unit assigned as well?
A. There were multiple people.
Q. I would like to direct your attention specifically back to a date and time of December 20th, 2017. Were you part of that investigative unit on that date?
A. I was.
Q. Were you assigned any particular role as one of the members of that unit that day?
A. I was assigned to maintain the surveillance log.
Q. Now, when you say that you were assigned to maintain a surveillance log, would you please explain for the members of the jury what that entailed.
A. There was a surveillance to be initiated. Any events in the surveillance that occurred, I was to document them with who observed those incidents.
Q. So as I understand your testimony, in essence, you were the person compiling all of the information to include in a report at some point in the future?
A. Yes, ma'am.
Q. And that would mean, I would assume, that other officers were providing you information of what it is they had observed?

A. Yes, ma'am.
Q. Now, in addition to that particular role of compiling and maintaining that information, were you assigned any specific surveillance duty yourself?
A. I was assigned as part of the surveillance team.
Q. So explain to us with specificity of December 20th, 2017, what you actually observed.
A. I observed the defendant pull into a parking a lot off of Roosevelt Boulevard.
Q. Okay. Let me ask you this: When did your surveillance begin?
A. I would have to refer to the report for the exact time. But it was in the evening hours.
Q. Was it at a particular location?
A. Yes. It was in a storage unit warehouse off of 49th Street.
Q. And were you located in that unit in an unmarked vehicle?
A. Yes, I was in an unmarked vehicle.
Q. Did you leave that -- well, did you see Mr. Fisher, the subject Mr. Fisher, at that storage unit that day?
A. I did not. No.
Q. Did there come a point that you departed that storage unit and went to another location?
A. Yes.

Q. Where did you go?
A. The final location we went to was the Walmart on Roosevelt Boulevard and U.S. 19.
Q. Prior to a living at the Walmart, do you go another location in between the 49th Street storage and the Walmart?
A. Yes, a brief location off Roosevelt Boulevard.
Q. And explain to us what that location was and what you observed.
A. It was an empty parking lot. The vehicle which was an Aston Martin pulled in there for several minutes and then pulled back out. Never saw a subject exit the vehicle or a subject go to the vehicle.
Q. Now, you indicated that there were -- it was a dark parking lot, is that it?
A. Yes, yes.
Q. There were no other cars?
A. No.
Q. Based on your training and experience, what did you -- what were your beliefs as to why that car was in that parking lot?
MR. MARTIN: Objection. Speculation.
THE COURT: Sustained. You can lay a foundation.
BY MS. GUZMAN:
Q. During your time with the Pinellas County Sheriff's Office, have you had the opportunity to conduct few or many

surveillance operations?
A. I've conducted many surveillances.
Q. And during -- I'm sorry?
A. I've conducted many surveillances.
Q. And during those surveillance operations have you had the opportunity to follow many or few individuals?
A. Yes, ma'am.
Q. And during the time that you've had an opportunity to follow or trail these individuals, have you been able to -- how should I say it? Track illegal activity as a result of that surveillance?
A. Yes, ma'am.
Q. In this particular case, you've indicated that this particular vehicle stopped at a dark parking lot; is that correct?
A. Yes, ma'am.
Q. Do you have an opinion based on that training, experience, and fieldwork as to why that vehicle would have parked in a dark location?
MR. MARTIN: Objection. Speculation.
THE COURT: Overruled.
THE WITNESS: It's believed to me that that's a common tactic used to check yourself, make sure you don't have a surveillance following you. A tail.
BY MS. GUZMAN:

Q. And once that vehicle stopped at that parking lot, you say it was for a few minutes?
A. Yes.
Q. Did it -- where did it go from there?
A. To the Walmart parking lot.
Q. When the vehicle -- this is the Walmart parking lot I think you said it was on Roosevelt?
A. Roosevelt and U.S. 19 cross.
Q. Were you continuing your surveillance at that point?
A. The surveillance did continue, yes.
Q. When the vehicle arrived at the Walmart parking lot, what did you -- what did you do?
A. I just collected any data that was provided to me of where the vehicle parked and the subject that exited the vehicle.
Q. Did you yourself and your vehicle park at the Walmart parking lot?
A. Yes.
Q. What were your personal observations while you were parked at the Walmart parking lot?
A. I was in the north side of the parking lot. I didn't observe anything.
Q. So you were not able to see any of the individuals go into the Walmart?
A. No, ma'am.

Q. You were not able to see any of the individuals coming out of the Walmart?
A. No, ma'am.
Q. You were not involved in any type of a search of any individual that would have gone in or out of the Walmart?
A. No, ma'am.
Q. At this point was your role, once you reached the Walmart parking lot, simply, again, to compile the notes of other individuals that had observed things related to this event?
A. Yes, ma'am.
MS. GUZMAN: I have no further questions. Thank you, Your Honor.
THE COURT: Thank you.
Any cross-examination, Mr. Martin?
MR. MARTIN: No, Your Honor. Thank you.
THE COURT: All right. Thank you, sir. We appreciate you having come in today to testify. You're excused.
And you can call your next witness, please.
MS. HOWARD-ALLEN: The United States calls Gary Corbett.
THE COURTROOM DEPUTY: Please raise your right hand.
Do you solemnly swear or affirm under penalty of

perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Gary W. Corbett, C-o-r-b-e-t-t.

THE COURT: Mr. Corbett, you can be seated, please. Mr. Corbett, you're going to be asked some questions by Assistant United States Attorney Kelley Howard-Allen and then Mr. Martin, who represents Mr. Fisher, may ask you some questions as well.

If you don't understand it, please say so so they can state it another way. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you have a tendency to speak quickly, slow down so we can understand you. And if you are soft-spoken, please speak up so we can hear you.

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead, Miss Howard-Allen.

GARY W. CORBETT,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good afternoon, Agent Corbett. Can you tell the ladies

and gentlemen of the jury where you work?
A. I'm a specialty agent with the Drug Enforcement Administration assigned to the Tampa District Office.
Q. And how long have you been a DEA agent?
A. A little over 15 years now.
Q. And what did you do before you were a DEA special agent?
A. I was a police officer in Newbury, Massachusetts, for a little less than four years.
Q. I guess that explains the accent.
A. I will try to curb that.
Q. Agent Corbett, what kind of training and experience do you have in dealing with fentanyl?
A. In 2008 I went through the basic clandestine laboratory school that DEA puts on, a 40-hour course. Since that time, I've also attended two additional classes that were approximately 40 hours, what we call clan lab level A and then site safety, which both involved or discussed fentanyl.
Q. What kind of training do you have for clan labs?
A. The 40-hour basic course which is how to use the equipment, dangers to look for, how to process labs, and then a 40-hour tactical entry under clan lab conditions.
Q. Did you execute a search on February 15th, 2018, in that clan -- that was designated a clan lab site?
A. Yes, I did.

Q. What was the address where you executed the search on February 15th, 2018?
A. That was 13791 49th Street. I think it was unit B2 in Clearwater, Florida.
Q. What was this address?
A. It was a -- like it was a multi-unit complex that had kind of work bays, multiple work bays.
Q. So was it just like a garage door? How many rooms were there?
A. Within each work unit, there was the main bay. There was an office area. There was a bathroom, and then there was an upstairs almost like a loft area.
Q. So what was your role at 13791 49th Street that day?
A. I had two roles. The initial role was to do the tactical entry into the facility, and then once that was complete and the site was declared safe, I then assisted in conducting the search of the premises.
Q. And how were you dressed? What did you prepare to do to execute that search and tactical entry?
A. I wore what we call clandestine lab level B. I had what's called a Tychem suit. It's kind of like a plastic suit with booties. Regular nitro gloves, and then a self-contained breathing apparatus or SCBA, kind of like what firefighters wear when they're going into a smoke-filled building.

Q. So once you made entry, were there other agents with you that made entry on the site?
A. Yes, there were.
Q. Did one of the entry agents videotape the entry into the premises?
A. Not the initial tactical entry, but once we made the tactical entry, yes.
Q. Then what did they videotape?
A. They videotaped the condition of the work bay after we had done the entry, and then they also videotaped as we conducted the search.
Q. Now, I'm going to ask you to look in front of you at Government's Exhibit 101, 101A and 101B. Do you recognize those discs?
A. I do.
Q. And what are they?
A. They are DVDs showing the video or portions of the video from the search at 103791 49th Street.
Q. How do you actually recognize the discs, Agent Corbett?
A. After viewing these, I initialed and dated both DVDs.
MS. HOWARD-ALLEN: And at this time, I would ask to admit Government's Exhibit 101A, 101 -- 101, 101A, and 101B?
THE COURT: They're received in evidence and may be published to the jury.

(Government Exhibits 101, 101A, and 101B received in evidence.)

BY MS. HOWARD-ALLEN:

Q. Agent Corbett, did you also -- were items photographed that day at the 49th Street location?

A. Yes, they were.

Q. I'm going to ask you to look at Government Exhibits 100 through 107A and ask you if you recognize those items from being photographed that day that you executed the search at 13791 49th Street.

A. Yes, I do recognize them.

Q. And they're an accurate depiction of what you saw that day?

A. Yes, they are.

MS. HOWARD-ALLEN: I'll ask at this time to admit Government Exhibits 100, 102, 103, 104, 105A, 106A, and 107A.

THE COURT: I'm sorry. 106A and 107? Those exhibits are received into evidence and may be published to the jury.

(Government Exhibits 100, 102, 103, 104, 105A, 106A, and 107A received in evidence.)

MS. HOWARD-ALLEN: All right. At this time, Agent Phelps, could you pull up Government's Exhibit 100.

BY MS. HOWARD-ALLEN:

Q. What is this photograph, Agent Corbett? Maybe we can

dim the lights so we can see better.
A. This is the outside of unit B2 which is the one we did the tactical entry and the search of.
Q. And is this before or after the search?
A. This is after the search.
Q. And how can you tell that?
A. Because of the red placards put on both the garage bay door and exterior door.
Q. All right. Now, let's take a look at the video. And there is no sound with this video, so I'm going to ask you some questions while we're viewing Government's Exhibit, I believe, 101A.
What do we see here? Let's just freeze that for a moment. If you can just tell me where you are and what you're doing?
A. Sure. So this is inside the work bay of unit B-2. To be more clear, there was a Maserati parked in the work bay and this right now is showing a view of the trunk of the Maserati and the contents in the trunk.
Q. And was this just as soon as you walked into the work bay?
A. Yes.
Q. And do you know who this Maserati belonged to?
A. I don't recall.
Q. All right. Let's continue this video. What are you

seeing in this trunk so far?
A. So there's a bag and boxes, and you can see powder material, chunky material. As soon as I looked in, we saw the Louis Vuitton bag. You could see a postal box and some packaging material.
So you can see that's actually my hand reaching in, pulling out the first bag. You can sign the large white/grayish chunky material in a plastic bag in a fairly good quantity.
Q. Nothing had been disturbed up until this point; is that right?
A. That is correct. This is the first time those items are being moved. Just now we're seeing just another bag. I'm trying to hold it up to the camera so they can get a look of the condition of each item as I pull it out.
Q. Go ahead. Keep going.
A. So this is coming out of that postal box. This is a black AWS digital scale with some powder residue on it. Now, once again, I'm going in the box, trying to be careful not to cut myself. This is more powder material, almost in a pill form, kind of broken up. I'm just trying to make sure the camera can see the condition of the box before we move anything.
There's like a silver plastic package inside the box, and now we're showing the back of the trunk. You can

see, if you look closely, what appears to be -- and you'll see them eventually. Individual jewelers type bags that are open and kind of spread out. They're a fairly good amount of them.

Q. Before we continue on, Agent Corbett, it seems like this is a really cloudy picture. Is there a reason for that?

A. Yes. Because we believed that this was -- involved fentanyl, we took a video camera and put it inside the plastic bag and sealed that bag so that the powder wouldn't contaminate the camera, making the camera -- putting it in a condition we couldn't use in the future. You can't wash off a camera.

Q. Let's continue with the videotape.

A. So now I'm starting to go into the Louis Vuitton bag. It's a white --

Q. Freeze that. What does that appear to be?

A. It's a whitish-grayish powder.

Q. All right. Continue, please.

A. Okay. This is one of the silver packages. There was another one in the box. It was similar to what they would receive material -- what someone would receive material in. That's an Amazon box.

And here I'm just examining, trying to see if there's a label of any kind or any kind of packaging material. Now, this is a baggie with a greenish, like almost

like crushed up pills that had kind of fallen apart. So they're partially pills and partially powder.
Q. What is this item if we can freeze it for a moment. More white powder?
A. This is more of that whitish-grayish chunked up powder in a gallon size bag.
Q. We can continue. What is that?
A. This is more of the same. This is a little bit more solid so it wasn't broken down into as many chunks. Brownish powder.
Q. Does that appear --
A. That is a gallon-size bag with a powder residue inside of it. Now, I'm picking up like a cloth-style bag. You see the way I'm opening it? I'm just trying to make sure -- because it involved fentanyl and sometimes needles can be involved, I'm trying to peel the bags back in such a way as to not stick myself if there were needles. And now I'm just holding up the item to the camera.
Another gallon size -- approximately gallon-size bag with the whitish-grayish powder in it. Now, here's another Louis Vuitton bag, more of a cloth bag, and I'm going to do the same thing just to examine what's inside of it.
So I'm peeling back the bag, trying to keep my fingers from getting punctured. Here you can see multiple baggies with bluish pills, and there's multiple bags with

multiple pills inside of it.
Q. Why are you putting all these items on the ground?
A. I'm just trying to not -- in case there's powder on them, I'm trying to put them in a position where they're not disturbed much, and it just gives me the ability to let the camera watch as I spread them out.
Q. Let's freeze it for a moment. About how many of those bags were there that you counted? Was there a number of them?
A. My recollection is it was about four or five. I think here you can see three immediately that are blue. One on the cement floor. That would be four. And then there are several other baggies off to the side.
Q. We will look at these in a moment. They were all seized, weren't they, Agent Corbett?
A. They were. It's another one of those silver packages coming out of the bag. Okay. So this is a purple colored powdered, chunked up powder material once again in what I would call like a gallon-sized plastic bag.

This is another baggie with powder residue inside the bag. Just going to end up removing all the items. So here's a bag with more of a whitish powder inside of it. There was a second bag that I think just had powder residue in it.

You can see one of my co-workers off to the side

kind of spreading things out so we can process them one at a time. So there's a baggie with a reddish powder. It's a little chunky inside, one of the plastic bags, and then you can see additional plastic bags that I picked up at the same time.

Now, I'm just ensuring that the bag is empty. I'm going to pull it out so I can see what's underneath it in the trunk. The person with the camera is just trying to make sure they get a good video showing the entire trunk so that we're not missing anything.

There is an additional -- I mentioned on the right side of the trunk where there were those jeweler bags and I just pulled one out from the driver's side of the trunk.

So here's the AWS digital scale along with a gallon-size bag containing that brownish grayish chunked up powder. These are items that we talked about -- I'm sorry. So what I pulled up there is like a postal envelope, brown manila postal envelope, and then a gallon bag of the same chunked up powder that we've talked about previously.

Then out of that manila envelope I pulled this bag with the apple on it that has the blue powder/pills in it. So that was in the back of the trunk. It's like a black brown plastic bag, and I'm just dumping the contents out so we can see what's inside.

You can see that what this appears they have

primarily -- well, what I'm pulling up now is just some paperwork that was in the bag. And then you can see a bunch of the -- like the jeweler style plastic bags. I pulled out another one of the AWS black digital scales. Some paperwork that was in the trunk.

I'm examining it to see if it has any identifiers on it. In this case it has like if you mail something, it gives you the identifier so you can track a package. Like a tracking number. Now, I'm pulling the quantity of the small plastic jeweler's type bags out of the trunk. That's just more of the same.

So now the person with the camera has moved around to the side of the Maserati, and what he's going to do is get an overall picture of the Maserati before we disturb it to try to open like center consoles or anything else. So that's just the overall condition of the car as we first found it. Although I should point out we did open the doors.

Q. All right. Agent Corbett, now that we've just done the first part of this video, can you -- can we put up Government's Exhibit 103, please.

And what is Government's Exhibit 103?

A. So 103 is -- it's a DEA evidence bag with the white box that we took from the trunk of the Maserati.

Q. Let's look at the second page of that. What does that show?

A. That shows the label that was on the front of the box.
Q. And what does that say?
A. It has the name -- priority mail has the name Dion Fisher, with the address of 10124 Nassau in Seminole, Florida.
Q. Was that entire large white box, do we still have that today, or was that destroyed?
A. I believe we destroyed that box.
Q. And have we maintained the label that we'll see later that was believed to be contaminated?
A. Yes, we cut off the label. We cut out the label and just kept the label.
Q. Let's look at Government's Exhibit 104. And what is 104?
A. 104 is the Louis Vuitton bag that was in the trunk of the Maserati.
Q. And that was photographed in the evidence bag. Was that maintained once it was emptied?
A. It was not maintained.
Q. Let's take a look at Government's Exhibit 105A, which is a two-page exhibit, and what does that show?
A. This shows the quantity of jeweler's bags that I found in the trunk of the Maserati.
Q. Can you see if there's any signed of insignia on those?
A. There is. There is the Batman logo on each of the

bags.
Q. Let's take a look at the second page of this. Were these -- where were these -- both of these bags that we are looking at right now in 105A, where were they located?
A. One again they were located in the trunk of the Maserati.
Q. What insignia or design is on these bags on the second page of Government's Exhibit 105A?
A. These are -- they look like ice cream cones.
Q. All right. Let's take a look lastly at 106A. What is -- what does that show?
A. This is an AWS black digital scale.
Q. Where was that removed from?
A. The trunk of the Maserati found in the work bay.
Q. All right. Let's take a look at Government's Exhibit 102. What does this show?
A. That is the Maserati after it was backed out of the work bay.
Q. And what color is it?
A. It's blue.
Q. And so that was where all the items that we just viewed in the video were removed?
A. Yes, that's correct. In the trunk of this vehicle.
Q. All right. Let's take a look at Government's Exhibit 110B, and we'll just start it and then you can tell me where

you are. 110B is, I think, the rest of the video?

(Video played.)

A. Is it possible that's 101B?

Q. Yes. Okay. Let's stop there. Where are you in relation to the end of the video that we just watched?

A. Okay. So this is now at the back of the work bay. There was an office -- so kind of the back as you're walking in the work bay, the back right corner of the entire work bay was an office.

So if you looked in front of the nose of the vehicle, that was an office area. And this is myself and the person with the camera going into that office.

Q. And what color are the walls of that office?

A. They are a deep purple.

Q. Let's go solely through this video, and you can tell us what you are doing in the office.

A. So like anything we are trying to get videotape of the office as it existed when we did the entry, and then we're going to go through each section to see if there's anything of evidentiary value.

Q. Let's freeze there. What is that?

A. This is a black bowl with a pretty fair amount of powder residue that was part of a grinder.

Q. All right. Let's keep going.

A. So now I'm just examining -- there was a desk in there

so I'm going through to see if once again there is anything of evidentiary value, which could be ledgers.

Q. What was that that you just took out, some keys?

A. I believe it was keys.

Q. Okay.

A. So that is a registration.

Q. What does it say?

A. It shows a plate, and it comes back to Million Dollar Plans, LLC, in Largo, Florida.

Q. Okay. Can you make out the address?

A. Yes, the street address is 10600 109th Lane, Largo, Florida 33778.

Q. And do you know if that coincided with the plate on the Maserati, or was there not one?

A. I don't recall seeing a plate on the vehicle, and I know when we showed the picture of it there was no license plate on the back.

Q. Let's keep going. Is that the end of the video?

A. I believe that's the end of the video.

Q. All right. Let's take a look at Government's Exhibit 107A. What is that?

A. This is an invoice for a customs declaration, excuse me.

Q. What does it say?

A. It gives quite a bit of information, but it shows in

the "from" it shows this is coming from Dion Fisher of 2481 Northeast Coachman, Apartment 107, in Clearwater, Florida 33765. And it is going to an individual in China, Jia Ling.
Q. What does it contain?
A. It has -- sorry. It states that it's sending seat switches.
Q. All right. Agent Corbett, what was done with some of the controlled substances that we see that either we saw in here throughout the office and the back of the Maserati?
A. So the drug exhibits or anything that we believed was possibly contaminated with fentanyl was double-bagged so we put them inside of a self-sealing evidence envelope and then take that bag after it receives some markings, put in another bag.
Those were brought back to the Tampa District Office where they were processed, and ultimately they're delivered to the Southeast Regional Lab.
Q. All right. I'm going to -- there's a number of items next to you on the ground in a box, as well as the photographs of each and every exhibit inside that box that's marked as the A portion of that.
So I'd just like you to take a look of them and see if you recognize them. They are as follows: 208 and 208A. And I don't know if the boxes, whatever is easiest for you to put them. They should be in numerical order.

A. I do recognize both the photograph and the individual item.
Q. And I think perhaps we can do it one by one, but it might be easy if you take a look at them, and then we'll move them all in together.
A. Sure.
MS. HOWARD-ALLEN: Let's just start with 208 and 208A, and I'll move to admit them at this time, Your Honor. And then we'll do it one at a time.
THE COURT: That would be fine.
MS. HOWARD-ALLEN: I'd move to enter 208 and 208A.
THE COURT: 208 and 208A are received into evidence and may be published to the jury.
(Government Exhibits 208 and 208A received in evidence.)
BY MS. HOWARD-ALLEN:
Q. All right. Let's publish the photograph 208A. And what are those items?
A. These are the baggies that were recovered from the trunk of the Maserati.
Q. All right. And why were those -- are those in a sealed evidence bag that was submitted to DEA?
A. Okay. So we seize them as evidence because they're typically -- these baggies would be used when you are selling your products, you're going to put a portion of your product

in here and used to sell. They're in the double bag because we believed they were contaminated with fentanyl.
Q. Let's take a look at Government's Exhibit 209 and 209A. Do you recognize those?
A. I do.
Q. What are they?
A. This is the label on the box, the white box that you saw in the trunk of the Maserati, that I told you we cut off and we got rid of the box. And then 209A is the photograph of the same item.
MS. HOWARD-ALLEN: At this time I would move to enter into evidence 209 and 209A.
THE COURT: All right. 209 and 209A are received into evidence and may be published to the jury.
(*Government Exhibits 209 and 209A received in evidence*.)
BY MS. HOWARD-ALLEN:
Q. Let's publish 209A first, please, Agent Phelps. And why, again, is that in a double bagged, sealed evidence bag?
A. Same, the same answer, which is we believe that these items were contaminated with fentanyl, and it's not something that we want anybody accidentally coming into contact with.
MS. HOWARD-ALLEN: At this time, Your Honor, since we have two exhibits, I would ask if Agent Corbett could show those items to the jury.

THE COURT: Yes, that would be fine. I'd just ask that you please walk over there and show the members of the jury.

THE WITNESS: Yes, Your Honor.

MS. HOWARD-ALLEN: I believe you can do both Agent Corbett. 208 the small plastic baggies and 209, the postal label.

(Witness complies.)

BY MS. HOWARD-ALLEN:

Q. Thank you, Agent Corbett.

Could you take a look at Government's Exhibit 210 and 210A.

A. Of course. I recognize them both.

Q. And what are they?

A. One is the actual AWS black digital scale and the other is the picture of the same.

Q. Do you recognize those as being taken from the 49th Street work bay on February 15th, 2018?

A. Yes, these came out of the trunk of the Maserati.

MS. HOWARD-ALLEN: I would ask that Government's Exhibit 210 and 210A be admitted into evidence.

THE COURT: All right. 210 and 210A are received into evidence and may be published to the jury.

(Government Exhibits 210 and 210A received in evidence.)

BY MS. HOWARD-ALLEN:
Q. All right. At this time, if you could put 210A -- and again why would this be in a sealed evidence bag?
A. For possible exposure to fentanyl.
Q. All right. Could you take a look, Agent Corbett, at Government's Exhibit 211 and 211A.
A. I recognize them.
Q. How do you recognize those?
A. The 211 is an exhibit that came out of the trunk of the Maserati. It's one of the brownish grayish chunked up powder, and then 211A would be the photograph of that item.
Q. Could you take a look also, Agent Corbett, at 211B. Is that also a photograph of the same item that was taken at the premises that day?
A. Yes, I do recognize it.
Q. All right.
MS. HOWARD-ALLEN: At this time, Your Honor, I would ask to enter into evidence 211, 211A, and 211B.
THE COURT: 211, 211A, and B, all right. They are received into evidence and may be published to the jury.
(Government Exhibits 211, 211A, and B received in evidence.)
BY MS. HOWARD-ALLEN:
Q. Let's start with Government's Exhibit 211B. Let's look at 211A. What was this item when you were -- what does it

appear to be?

A. This is the brownish powder from the trunk of the Maserati.

MS. HOWARD-ALLEN: Your Honor, may we momentarily go to the ELMO and see if I can show this photograph on here?

THE COURT: Sure. Of course.

BY MS. HOWARD-ALLEN:

Q. All right. Let me ask you, this is 211B. What is this, Agent Corbett?

A. This is a picture of the back of the evidence bag and this shows the condition of 211 on the day we found it. It's loosened up quite a bit and become not as chunky, but on that day that's what it looked like.

Q. What's this sort of background that we see in 211B?

A. That is the, for lack of a better term, driveway in front of unit B2. We would process items. They'd be brought outside in the double bag, and then someone outside who is not in the protective gear would take the photo.

Q. Okay. Thank you. I appreciate it, Miss Clerk. If we could go back to the computer and pull up 211A. Agent Corbett, when you look at this evidence label in its entirety, can you sort of explain what's on this bag in terms of what that means and how the DEA evidence label is used in tracking items.

A. Of course. So in the center of the bag, we have the

white label which designates it as evidence. At the beginning for our tracking purposes, we use case numbers. So that's at the top of the form. Below that would be an exhibit number.

So we have an electronic system that we use to assign exhibit numbers and kind of -- that becomes its identifier, and that's how we keep track of what happens to it.

Q. What number is this?

A. This is DEA Exhibit No. 63 under case number G6170066.

Q. Where does it say that it came from?

A. So right below that, date acquired, location acquired, it lists the location acquired as 13791 49th Street North, B2, Clearwater, Florida.

Q. Are there signatures below that?

A. There are. There's an acquired by, which is the agent in charge of the scene or in charge of the evidence. The two more significant are sealed by and witnessed by. So using that you know exactly who sealed the bag, and then who witnessed them doing that.

Q. So there's one on the top and one on the bottom?

A. Correct. So there's a sealed by and then there's the witness, and those will correspond to the top of the bag where the actual -- that kind of red seal, that's the self-sealing part. The same two agents, the sealing and the

witness, will also sign up here so they can tell if the bag has been manipulated or opened.
Q. And are you familiar with those from those individuals from that day?
A. Yes, I am.
Q. So then there's some more signatures on the bottom of the bag.
A. Yes. So on the -- a couple of significant things here on the bottom half of the white label would be the information from the chemists or the people at the Southeast Regional Lab. Those are the like the chemists who are going to end up testing the material to figure out what it is.
They'll annotate both who -- who opened it and then kind of the weight afterwards so they can use it to track what was removed from the package, what's still in the package, and finally at the bottom when they reseal the bag instead of opening the top, they not only seal it but put a sticker on it and initials so we can track who did that work and the fact that the seal hasn't been disturbed.
Q. And so is that -- is the bag sort of cut twice or something? Like cut at the top by the seizing agents and at the bottom by the chemist?
A. So when we get the bags they're already preopened. They have like a sticky material with like a label. What you'll do is you'll peel the protective layer off and stick

it to itself.

The chemists don't want to -- or the people working on the bag or whatever evidence it is, don't want to disturb that, so they cut at the bottom. And then they use a basic heat sealer with the label so that the bag is now still -- has its integrity.

Q. Do you know from your 15 years experience at DEA, is this the system that they use there? Are you familiar with it?

A. Yes.

Q. And are you familiar, does the laboratory have different numbers that they use on the yellow labels but maintaining the integrity of the DEA number?

A. Yes. Yes, to all those. The lab does create its own numbers, but they are directly linked to what you see on the white label here, exhibit number. So if we call up, we can start tracking the package by the same exhibit number, but that said, for their lab reports they do have different numbers.

Q. So is the DEA number, in this particular case 63, does that correspond directly to where the item was seized through DEA's tracking and case reporting process?

Do we know that 63 came from -- aside from the label, we know it came from 13791 49th Street?

A. Yes. When somebody who has access to our system is

entering the item for the first time, they enter that information, and it is directly tied to that exhibit number.

Q. At this time, I'd ask if Agent Corbett could display Item 211 to the members of the jury?

THE COURT: That would be fine.

(Witness complies.)

BY MS. HOWARD-ALLEN:

Q. Agent Corbett, when you return and get mic'd up again, can you take a look at 213, please, and 213A and 213B.

Agent Corbett, I'll ask you the same questions. Do you recognize Government's Exhibit 213 as taken from the 49th Street and the photograph at 213A being the exact photograph of what you're looking at and 213B being the item photographed on the site?

A. Yes, I do recognize them.

Q. And are they -- do they appear to be the same true and accurate depictions of what you took and what you seized from that -- from 11791 -- I'm sorry, 13791 49th Street on February 15, 2018?

A. They do.

MS. HOWARD-ALLEN: At this time, Your Honor, I'd ask to admit Government's Exhibit 213, 213A, and 213B.

THE COURT: 213, 213A, and 213B are received into evidence and may be published to the jury.

(Government Exhibits 213, 213A, and 213B received

in evidence.)

MS. HOWARD-ALLEN: All right. And let's start again, Agent Phelps, if you would, with Government's Exhibit 213B. And let's go back to the ELMO for these.

BY MS. HOWARD-ALLEN:

Q. Agency Corbett, what do you see here in this Government's Exhibit 213B?

A. So I see the yellow cloth kind of bag that came out of the Maserati, and then what had been in that bag which you can see, the multiple bags of the blue pills.

Q. All right. Now, if we could move back to Government's Exhibit 213A and place that on the large screen, Madam Clerk. Thank you. When we look at 213A, this is the -- how it appears when it's in the double evidence bag?

A. That's correct.

Q. And were you able to look and see what the pills looked like or how they looked and what the insignias are on them when you viewed them?

A. I was -- at the time I did not look at the stamp and they have since turned to powder. So I'm unable to see the label on them.

Q. Because this is the smaller version of the pills?

A. Yes.

Q. All right. Let's take a look -- before I have you go over there again, let's take a look at Government's Exhibit

214 and 214A and 214B.
A. I recognize them.
Q. And do those look like the items that were seized from the 49th Street that day?
A. Yes, they do.
Q. And what's unique about these exhibits, 214 and 214A?
A. The big thing that stood out to me was the purple color. Their dark or deeper purple color.
Q. What kind of substance does it look like? Is it powdery?
A. It's mostly powder with -- you can see it's a little bit chunked up, but most of it is loose powder.
Q. All right. At this time, I would ask to admit Government's Exhibit 214, 214A and 214B.
THE COURT: Okay. 214, 214A, and 214B are received into evidence and may be published to the jury.
(Government Exhibits 214, 214A, and 214B received in evidence.)
BY MS. HOWARD-ALLEN:
Q. All right. And let me take a look, if we could, at 214B on the on-site before we go back to the computer, Madam Clerk. Thank you. And if you hold up the exhibit, is this the item that we're looking at as it was photographed that day? This is Government's Exhibit 214B.
A. Yes. That's a picture of what it looked like the day

we seized it.
Q. And that is just after it was taken out of the back of the Maserati?
A. Correct. And doubled bagged, yes.
Q. And does that -- was that item inside a -- where was that, if you recall, in the Maserati? Which item out of the back of the trunk was that taken out of? Was that taken out of the yellow Louis Vuitton bag?
A. My recollection is it came out to have that big yellow Louis Vuitton bag, yes. The bag that we ultimately destroyed.
Q. Let's go back to Government's Exhibit 214A on the screen, and this is a picture -- you don't see the purple as well. You can see when you're holding it up what you can see; right?
A. Yes, correct.
Q. And are you able to make out the chemist that analyzed lived that particular item?
A. Looks like the chemist was Collins.
Q. All right.
MS. HOWARD-ALLEN: And at this time, Your Honor, I would ask if Agent Corbett could take Government's Exhibit 213 and 214 to the jury for viewing.
THE COURT: That would be fine. He may do so.
(Witness complies.)

BY MS. HOWARD-ALLEN:

Q. Agency Corbett, I direct you to Government's Exhibit 215, 215A and 215B. What do those items appear to be?

A. This appears to be a bag which had some white grayish powder in it that came out of the trunk of the Maserati.

Q. All right. Are you able to see that they are accurate and true -- the photographs are accurate and true depictions of the items as seen from the day of the seizure as well as the -- in the evidence bag?

A. Yes, I am.

MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter into evidence Government's Exhibit 215A and 215B.

THE COURT: All right. 215A and 215B are received into evidence and may be published to the jury.

(Government Exhibits 215A and 215B received in evidence.)

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:

Q. Let's put up Government's Exhibit 215A. And so without -- we have a photograph of the back but if you hold it up, are you able to see -- are they able to see the white powder in it?

A. It's difficult because it's a tiny corner. Right at the very front you can see some of the powder, but it's very

difficult.

Q. Difficult because it's bagged, double-bagged?

A. Yes.

MS. HOWARD-ALLEN: All right. At this time, Your Honor, I would ask -- I neglected to have Agent Corbett take the scale, which is Government's Exhibit 210, so maybe he could take Government's Exhibit 215 and 210 over to have the jury view it.

THE COURT: Okay. Did you move 215 into evidence? I thought I heard 215A and 215B.

MS. HOWARD-ALLEN: And 215 is the actual item. I apologize if I didn't.

THE COURT: I may have missed it myself. 215.

MS. HOWARD-ALLEN: 215A and 215B.

THE COURT: And 215 also received into evidence.

(*Government Exhibit 215 received in evidence.*)

MS. HOWARD-ALLEN: If you could take to the jury for viewing 210 and 215. 210 is the AWS digital scale and 215 you identified as containing some small powder.

THE COURT: That would be great. Thank you.

(Witness complies.)

BY MS. HOWARD-ALLEN:

Q. Agency Corbett, could you take a look at the next Government's Exhibit, 216. The photograph and the exhibit bag of 216A and the photograph from the site of 216B. Do you

recognize those items, Agent Corbett?
A. I do.
Q. Are they the same items that you seized from 49th Street on February 15th, 2018?
A. Yes. Once again these came out of the trunk of the Maserati.
Q. And do they appear to be the same -- the true and accurate depictions of the photographs?
A. Yes.
MS. HOWARD-ALLEN: All right. At this time I'd would move to enter into evidence Government's Exhibit 216, 216A, and 216B.
THE COURT: All right. 216, 216A, and B are received into evidence and may be published to the jury.
(*Government Exhibits 216, 216A, and 216B received in evidence*.)
MS. HOWARD-ALLEN: Thank you, Your Honor.
THE COURT: You're welcome.
MS. HOWARD-ALLEN: Madam Clerk, could we go here first to the tabletop display item.
BY MS. HOWARD-ALLEN:
Q. Agent Corbett, I would like you to look at 216B and tell me what you see here.
A. That's some of that grayish brownish chunked up substance that we pulled out of the trunk of the Maserati.

Q. All right. And if we could now go back to the overhead display and look at Government's Exhibit 216A. Are you able to make out the chemist who would have analyzed this brown chunky item from this display?
A. Yes. It looks like Kaufman.
Q. And what is the DEA number on this item?
A. So the case exhibit number is 67.
Q. And, Agent Corbett, in your experience as a DEA agent are you familiar with a controlled substance known as pentylone?
A. Not well, but, yes.
Q. And what do you know about it, if anything?
A. It's a substance that's used for what on the street is referred to as Molly or Molly-like.
MS. HOWARD-ALLEN: At this time, Your Honor, I would ask if Agent Corbett could display Government's Exhibit 216 to the jury.
THE COURT: Okay. That would be fine. He may do so.
BY MS. HOWARD-ALLEN:
Q. Agent Corbett, I think we have three more items that you removed from that -- from that 49th Street, and let's take a look at Government's Exhibit 217, 217A, and 217B. Do you recognize these items?
A. I do. Once again they came out of the Maserati.

Q. And what's distinct about these items that you recognize, Agent Corbett?
A. They are pressed into pills, blue pills.
Q. And are you able to make out any of the insignias on the pills that are in Government's Exhibit 217?
A. Unfortunately with this lighting, no.
Q. What is the color of them?
A. They are -- they are small round blue pills.
Q. All right. And perhaps when you get into better light you can take a look. Are the photographs in 217A and 217B, are they accurate depictions of how you found the items the day of the search, February 15th, 2018, and then the exact replica of the item in the bag?
A. Yes, they are.
MS. HOWARD-ALLEN: At this time I would move into evidence Government's Exhibit 217, 217A and 217B, Your Honor.
THE COURT: All right. 217, 217A, 217B are received into evidence and may be published to the jury.
(*Government Exhibits 217, 217A, 217B received in evidence.*)
BY MS. HOWARD-ALLEN:
Q. If we could take a look, these photographs from the scene don't appear to be on the computer. If we could take a look at Government's Exhibit 217B on the overhead.
Thank you. All right. What do you see here on

Government's Exhibit 217B?

A. Okay. I can see four of those jeweler-style baggies full of the blue pills. You can also see on the top upper right of the picture now, you can see the small one with the Spiderman logo, which matched what we took out of the trunk, or the empty baggies out of the trunk.

And then just kind of below and to the left of the Spiderman baggie, you can see an additional one with a stamp on it, which also matched some of the baggies we took -- or empty baggies we took out of the trunk.

Q. Can you make out what any of that is? The insignia on the green bag? Either on the screen or looking at the 217 itself.

A. I'm sorry, I can't.

Q. That's okay. It's sometimes difficult to look through two double bags. If we could go back to the main projector and look at Government's Exhibit 217A, and can you tell me the DEA number for this Government's Exhibit 217?

A. The DEA exhibit number is 50.

Q. And then is there -- was there any lab who -- a lab -- a forensic chemist from the lab who was also -- was able to look at this?

A. Uh-huh. That would be Vallejo.

MS. HOWARD-ALLEN: And at this time, Your Honor, I would ask if Agent Corbett could display Government's Exhibit

217 to the jury?

THE COURT: He may do so.

(Witness complies.)

BY MS. HOWARD-ALLEN:

Q. Agent Corbett, while you're walking are you able to ascertain any of the insignia while the light is better.

A. I believe the number on the bottom is 82. And I still can't read the --

Q. Can you read any of it? Are you clear about the 82, or you can't see it? There you go.

If you can't see it, that's fine, Agent Corbett.

A. Look likes it's 215 on the bottom.

Q. That's 215 you indicated?

A. Yes, 215 and then 8 on the top.

Q. Are you able to see that clearly? I'll let you just take it and have it looked at by the members of the jury.

(Witness complies.)

BY MS. HOWARD-ALLEN:

Q. Agent Corbett, could you take a look, once you get seated, and look at Government's Exhibit -- next one in the box should be Government's Exhibit 218 and 218A, the photograph of the item in the exhibits.

A. I recognize them.

Q. And what's unique about that and how do you recognize it?

A. This is the black plastic top with powder residue that came out of the office area of the storage unit -- of the work bay.

MS. HOWARD-ALLEN: All right. At this time, Your Honor, I would move to enter Government's Exhibit 218 and 218A into evidence.

THE COURT: All right. 218 and 218A are received into evidence and may be published to the jury.

(*Government Exhibits 218 and 218A received in evidence.*)

BY MS. HOWARD-ALLEN:

Q. All right. If we could pull up Government's Exhibit 218A, and I think we can make out a better picture of what it is than some of the other bags. Does this appear to be the same bowl that you took out of that purple office at the back of 13791 49th Street?

A. It does.

Q. Was that an item that you found sort of in that desk drawer?

A. Yes.

Q. Okay. Are you able to see what color the residue that was in it was, or do you recall from having taken it out? I know you had masks on that day.

THE COURT: Hold on one second, Miss Howard-Allen. One of the jurors has to use the restroom. So why don't we

go ahead and end for the day.

MS. HOWARD-ALLEN: That's fine. I just have one more exhibit in the morning.

THE COURT: That would be fine. We will break for the day. Please don't discuss the case or form any opinions until you've heard all the evidence. Please don't do any internet research. We will see you back here tomorrow morning at 9 a.m.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 4:50 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: I take it seriously when somebody says they have to go to the bathroom. I didn't want to delay them. I'm sorry to stop you in the middle of a sentence there, Miss Howard-Allen.

MS. HOWARD-ALLEN: That's fine, Your Honor.

THE COURT: You can go ahead and resume tomorrow morning.

So I'll just remind the witness, even though you're a DEA agent, we're in the middle of your testimony, you're not the case agent per se on this case. So you should not discuss your testimony with anybody.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. So I ask you to please be back here a little bit before 9 o'clock so that we can start

promptly at 9 o'clock. Maybe at five to nine, ten to nine, something like that, so we'll be ready to go.

THE WITNESS: Yes, Your Honor.

THE COURT: I ask that you -- it's okay to come in and to be seated so that we don't have to bring you in. So you should just come in and sit down so that we can start as close to nine as possible.

THE WITNESS: Yes, Your Honor.

(The witness exits the courtroom.)

THE COURT: All right. Anything else we need to take up? I think you're moving at a good clip, I have to say.

MS. HOWARD-ALLEN: We are, Your Honor. That's what we are attempting to do again, get through the evidence.

THE COURT: All right. So anything that we need to make up today?

MR. MARTIN: Not that I'm aware of, Your Honor.

MS. HOWARD-ALLEN: I don't believe so, Your Honor.

THE COURT: So we're going to go tomorrow from 9 to 3 p.m. Here's what I plan on doing. I'm not going to take an afternoon break. I'm just going to go from one to 3 p.m., and that's without an afternoon break. So we'll take a lunch break from 12 to 1, 1 to 3.

And we'll begin at 9. I think there's one juror that has trouble getting here at 9. I don't know who it is.

But routinely there's somebody who's about ten minutes late. I mean, there's not a whole lot I can do about it.

MS. HOWARD-ALLEN: I think some of them have long drives.

THE COURT: It's horrible. I know.

MS. HOWARD-ALLEN: Big district.

THE COURT: I neglected to ask if any of them were from more than whatever it is. Seventy miles they get to spend the night here. I don't think any of them were that far away.

MS. HOWARD-ALLEN: I know one was Sarasota. I'm not sure how far that is.

THE COURT: Normally it's got to be a little -- is it 70? I always get confused. Sixty?

THE COURTROOM DEPUTY: Sixty.

THE COURT: So is anybody more than 60 miles?

Tamecika, do you know? Can you ask if anybody is more than 60 miles, so they don't have to drive. Maybe some of those Sarasota people.

Normally Sarasota is not quite far enough. You've got to be the next city, like Port -- not Port Charlotte, like one of those.

MS. HOWARD-ALLEN: Parrish. I think there's one from Parrish.

THE COURTROOM DEPUTY: They're all gone now.

THE COURT: You can call that person. We have that person's cell phone and why don't you call that person. Because if they're more than 60 miles that should be offered to them as an option. Maybe they don't want to do it tomorrow, but they may want to do it next week.

But we have to find out if they are more than 60 -- what is it? From their door to the courthouse?

THE COURTROOM DEPUTY: Yes.

THE COURT: Would you mind reaching out and let them know if it's more than 60 miles, we offer that to them. Which seat is that person in?

THE COURTROOM DEPUTY: No. 12.

THE COURT: Do we know who's having trouble getting in on time? Is it the same person, or is it a different person?

THE COURTROOM DEPUTY: That's a different guy.

THE COURT: It was a different person last time. Okay. Well, sometimes when you live further away, you leave earlier. Make certain that you're on time.

That's fine. I understand the traffic is challenging. Okay. Well, that's it. If you don't mind, let that person know we can provide a hotel for them.

Okay. Thank you. We are in recess.

(Proceedings adjourned at 4:55 p.m. and reconvened on May 31, 2019.)

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 225), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ *Scott N. Gamertsfelder*, *RMR, FCRR*

*Official Court Reporter*

Date: January 20, 2020