UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DION GREGORY FISHER, Defendant.

Tampa, Florida
No. 8:18-cr-236-T-33TGW
Docket No. 191
May 31, 2019
Courtroom 14B

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

(Vol. IV of VII)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

A P P E A R A N C E S

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Kenneth B. Martin, Esq.**
Law Office of Ken Martin
P.O. Box 10456
Tampa, Florida 33679
(813) 431-3310

**ALSO PRESENT:**

Adam Phelps, DEA Case Agent

Robert Liberto, IRS Case Agent

- - -

# TABLE OF CONTENTS

## EXAMINATIONS


| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GARY CORBETT | 10 | 12 | | |
| DEXTER MCGEE | 15 | | | |
| PHILIP PIONE | 35 | 72 | 72 | |
| CHRISTOPHER MCKINNEY | 77 | | | |

(Witness McKinney resumed on June 3, 2019.)


## EXHIBITS


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 6........................ | 98 | 23 |
| 146...................... | 141 | 4 |
| 170, 171, 233, 233A, 233B, and 233C.......... | 49 | 21 |
| 172...................... | 56 | 6 |
| 173...................... | 45 | 17 |
| 200, 200A, and 200B...... | 21 | 21 |
| 202, 202A, and 202B...... | 24 | 13 |
| 204, 204A, and 204B...... | 27 | 5 |
| 205, 205A, and 205B...... | 29 | 18 |
| 206, 206A, and 206B...... | 32 | 1 |
| 219 and 219A............. | 11 | 25 |
| 227, 227A, and 227B...... | 67 | 9 |

**EXHIBIT INDEX (cont'd.)**


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 231, 231A, 231B, 232 232A, and 232B........... | 40 | 2 |
| 234, 234A, and 234B...... | 57 | 22 |
| 308 and 308A............. | 107 | 16 |
| 309 and 309A............. | 116 | 24 |
| 310, 310A, and 310B...... | 120 | 10 |
| 311 and 311A............. | 134 | 25 |
| 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 450, 451, 452, 453, 454, 455, 457, 500, 501, 502, 503, 504, 504A, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 526A, 526B, 526C, 526D, 527, 528, 529, 530, 531, 532, 533, 533A, 533B, 533C, 533D, 533E, 533F, 533G, 533H, 533I, 533J, 533K, 534, 535................. | 74 | 1 |

**P R O C E E D I N G S**

May 31, 2019 9:02 a.m.

\- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good morning, everyone.

I think we have all jurors present; is that right?

COURT SECURITY OFFICER: Yes.

THE COURT: All right. We will go ahead and get started. The witness is in the witness box. Thank you.

THE WITNESS: You are welcome.

THE COURT: Before the jurors come in, were there some changes in the exhibit list, so I'm up to speed on what's going on? Miss Howard-Allen, what did you change?

MS. HOWARD-ALLEN: I added -- there was a repeat of 533C. There were two of them on the original list. We had to make the second 533C, 533K. We found that error.

THE COURT: I prefer that these things be on the record so that I understand what's going on.

MS. HOWARD-ALLEN: Absolutely.

THE COURT: It's best to do it on the record and let me know.

MS. HOWARD-ALLEN: I agree, Your Honor.

THE COURT: Because, if I don't know, then I'm clueless as to what's happened.

MS. HOWARD-ALLEN: Absolutely. So the second 533C became 533K.

THE COURT: All right. What did you have -- I need my original one.

THE COURTROOM DEPUTY: That's your original.

MS. HOWARD-ALLEN: If you look, there are two 533C's. There was an error. There were two 533C's, so we just moved the second 533C to 533K.

THE COURT: All right. So what I have in front of me is the original. It's 533C, 533D, 533C. Which 533C did you move in?

MS. HOWARD-ALLEN: That second one became 533K.

THE COURT: Okay. So 533K because you don't have a 533K.

MS. HOWARD-ALLEN: Right. Exactly. So we just had that error. So that got added. And then we had to add two more bank records. So if you look at the original exhibit list, there is a 526A and a 526B.

THE COURT: Yes, I see 526A and B.

MS. HOWARD-ALLEN: So we added two more sets of Hancock Bank statements as 526C and 526D.

THE COURT: I'm going to write it here because I

prefer not to go to a new exhibit list.

MS. HOWARD-ALLEN: Absolutely. I just wanted to provide it to your clerk so she had somewhere to write it was admitted.

THE COURT: She should have it, but I keep my own notes. That way we both have notes and we can double-check each other. So we have a new -- say that again.

MS. HOWARD-ALLEN: 526C and 526D.

THE COURT: All right. So what is the description of 526C?

MS. HOWARD-ALLEN: The description of 526C is the Hancock Bank signature card for Million Dollar Plans.

THE COURT: I'm going to say Hancock Bank signature card is 526C.

MS. HOWARD-ALLEN: Then 526D is Hancock Bank deposit items for Million Dollar Plans.

THE COURT: All right. Got it. So those are the two changes.

MS. HOWARD-ALLEN: Yes, Your Honor. The reason why I did that today, just double-checking last night at the end -- we have -- I think after Agent Corbett we have two more DEA agents bringing in more drug exhibits. After that I am going to admit a long list of business and bank records that have been -- I've talked to Mr. Martin, and they are all listed on the certification, so I will admit them pursuant to

the certifications filed with the Court, and then I'm going to proceed with the next witness after that.

THE COURT: All right. That's fine. I just like everything on the record just so there is no misunderstanding and we just check. Miss Lee and I work together and we just make certain that she checks on me and catches mistakes that I make and vice versa. So we work together as a team. That's why I keep my own.

MS. HOWARD-ALLEN: I know. That's good, and I know there is a lot of evidence in this case and there will continue to be.

The team chatted last night and I think -- the Court shouldn't worry about making up the hour. I think we will be fine continuing through. So I think we are at a good place.

We could potentially -- and I just say this, not to be held to it, but we could potentially close by the end of business possibly on Wednesday. If Mr. Fisher testifies, it would be Thursday and we would still be finished.

THE COURT: That's sort of what I kind of thought might happen. I have some hearings set for Friday. I'm just going to keep them all on Friday and move them all to Friday. And if you don't finish, it's perfectly fine. I'm not holding you to it. We have two weeks blocked, but it's hard when you have all these other things.

MS. HOWARD-ALLEN: I understand. I just -- it was funny that you had thought that, and we came to that place after analyzing where we are and how much more we have to put in.

THE COURT: Very good. Thank you so much. I appreciate it.

We can bring the jurors in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 9:11 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

Just verifying that nobody has done independent research or looked at anything or done anything; right?

(Unanimous negative responses.)

THE COURT: Or have spoken to anybody.

The witness is back in the witness box. Sir, I remind you, you are still under oath. Do you understand that?

THE WITNESS: Yes, Your Honor.

THE COURT: Very good. You may proceed, Miss Howard-Allen.

GARY CORBETT,

having been previously duly sworn on May 30, 2019, by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION (resumed)

BY MS. HOWARD-ALLEN:

Q. Good morning, Agent Corbett.

A. Good morning.

Q. I believe yesterday we were on Government's Exhibit 218 and 218A, if I'm not mistaken.

MS. HOWARD-ALLEN: And, Your Honor, were those admitted yesterday -- I wasn't clear -- at the end of the day?

THE COURT: 218 and 218A, yes, I have those as admitted. Those were admitted.

BY MS. HOWARD-ALLEN:

Q. So if we could place 218A on the screen, please, Agent Phelps. And, then, remind us what that is again, Agent Corbett, before I have you show it to the jurors.

A. Sure. This is the black plastic top to a grinder with powder residue inside of it.

Q. Where had you found this item when we had left off yesterday afternoon after we had viewed the video of your search of the 13791 49th Street residence?

A. This was in the back office with the purple walls and in one of the desk drawers in that office.

Q. All right. Agent Corbett, would you mind removing your microphone and showing this item to the jurors?

A. Not at all.

(Exhibit shown to jurors by the witness.)

BY MS. HOWARD-ALLEN:

Q. Thank you, Agent Corbett.

If you can, look at your final exhibit. I think it's in the box next to you. It's Government's Exhibit 219 and then the photograph of that is Exhibit 219A. I'll ask you the questions that I asked you yesterday when you have an opportunity to review those items.

Do you recognize them as being items that were seized when you completed the search of 13791 49th Street on February 15th, 2018?

A. Yes, I do recognize them.

Q. What is item 219?

A. Item 219A is the clear plastic other part of the grinder, and this was found in the upstairs loft area that I described of the work unit.

Q. Again, why is that in a DEA evidence bag or double bagged?

A. It had residue on it, a powder residue, which we suspected might be fentanyl.

MS. HOWARD-ALLEN: At this time, Your Honor, I would move to admit Government's Exhibit 219 and 219A.

THE COURT: 219 and 219A are received into evidence and may be published to the jury.

(*Government Exhibits 219 and 219A received in*

*evidence*.)

BY MS. HOWARD-ALLEN:

Q. Agent Phelps, would you mind publishing 219A, please.

And you said it's a clear plastic top?

A. Yes, that would go with a grinder.

MS. HOWARD-ALLEN: All right. At this time I would ask that the Agent Corbett be able to show Exhibit 219 to the jury.

THE COURT: Yes.

(Exhibit shown to the jury the witness.)

MS. HOWARD-ALLEN: Your Honor, at this time I have no further questions for Agent Corbett.

THE COURT: Thank you.

Any cross-examination, Mr. Martin?

MR. MARTIN: Yes, Your Honor. Thank you.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. During your search on the 49th Street, did you see any type of protective gear, such as a mask, gloves, footies to protect -- uniforms or anything that might protect someone that's working with fentanyl?

A. I don't recall seeing any protective gear.

Q. Okay. Would that be -- and I know you're searching and some items you see, you notice and -- like if I asked you was

there a tire jack in there, you probably have no idea. You wouldn't recall that. Is that fair to say?

A. Yes, it is.

Q. On the other hand, the type of gear that someone might use to protect themselves, if working with fentanyl, that would be something you would notice and probably seize; correct?

A. Yes. Yes, sir.

Q. Okay. So you didn't notice anything or seize anything in the protective gear category?

A. No, sir.

Q. Do you know if any other members -- and I'll use the word "team." I don't know if that's what the DEA uses, but do you know if anyone else on the team seized or brought to your attention any of those type of protective gear items?

A. My recollection is that we did not seize any protective gear at that location.

MR. MARTIN: Thank you, Your Honor.

THE COURT: All right. Any other redirect for this witness?

MS. HOWARD-ALLEN: No further questions, Your Honor.

THE COURT: All right. I'll excuse the witness. Thank you, sir. We appreciate you coming in today to testify.

THE WITNESS: Thank you, Your Honor.

THE COURT: You can call your next witness.

MS. HOWARD-ALLEN: Your Honor, at this time we call Dexter McGee.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, ma'am, I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Dexter McGee, M-c-G-e-e.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Mr. McGee, you are going to be asked some questions by Assistant United States Attorney Kelley Howard-Allen. If you don't understand the question, please say so so that she can state it another way. In cross-examination, Mr. Martin, who represents Mr. Fisher, may also ask you some questions.

You need to wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you have the tendency to speak quickly, please slow down so we can understand you. We need

you to speak up so we can hear you. All right?

THE WITNESS: Yes, ma'am.

THE COURT: Thank you so much.

DEXTER MCGEE,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good morning, Agent McGee.

A. Good morning.

Q. Can you tell the ladies and gentlemen of the jury where you work.

A. I work for the DEA, Drug Enforcement Administration.

Q. And what do you do there?

A. I'm a special agent.

Q. On what squad?

A. I'm on Task Force 1.

Q. And how long have you been with the DEA?

A. I was hired with DEA in 2004. Approximately 14 years.

Q. And so how long -- how much of that time were you a special agent?

A. Approximately ten years.

Q. What did you do with the DEA before you became a special agent?

A. I was a diversion investigator.

Q. What's a diversion investigator?
A. A diversion investigator is an investigator at DEA which investigates the Food and Drug Administration regulations of illegal drugs, such as Oxycontin and those type drugs.
Q. And they also -- do they also deal with DEA registrants --
A. Yes.
Q. -- and equipment?
A. That is correct.
Q. What did you do, Agent McGee, before you started working for the DEA?
A. I was a special agent for the South Carolina Law Enforcement Division.
Q. I would like to turn your attention to the events of February 15th, 2018. What were you doing that day?
A. I was assisting with a federal search warrant. The execution of a federal search warrant.
Q. And where was that search warrant that you were assisting in the execution of?
A. It was at 10124 Nassau Court.
Q. And what city?
A. Seminole.
Q. And what type of place is that?
A. It's a residence.

Q. Did you know whose residence it was?
A. At the time I did, yes. During the briefing they discussed it as Fisher.
Q. And so what was your role at this 10124 Nassau Court that day?
A. My particular role on that day was the evidence custodian. One of the evidence custodians.
Q. And what type of evidence were you the custodian for?
A. I was the custodian for the drug evidence.
Q. Was there two of you? Or how many of you were drug evidence custodians?
A. There was two of us.
Q. And was there also evidence custodians for the non-drug evidence?
A. Yes, there was.
Q. Do you know who that was?
A. Detective Karl Gwynne with the sheriff's office, I believe.
Q. When you were out there on February 15th, Agent McGee, did you go inside Nassau Court?
A. I did not.
Q. Why not?
A. In order to go inside -- I was not clandestine lab certified with DEA, so I was not allowed to go on the inside.
Q. So, then, where were you physically stationed that day?

A. On the outside of the residence, in the front yard.

Q. So is that normal for a search warrant, that the evidence custodian is out in the yard?

A. Normally we are on the inside of the residence.

Q. So since this was a different-than-normal situation, what was the -- if you can explain in detail, what was the process for evidence collection that day at 10124 Nassau Court?

A. On that particular day, anyone on the inside, first of all, had to be clan lab certified. They had to dress up to a certain level of security to protect themselves from any substance. In this particular case, fentanyl. It was suspected fentanyl.

So once those collectors found anything that they deemed could be possibly drug evidence, it was brought then on the outside to a first station where it was evaluated, aired out for safety. Then it was taken to a second station where it was photographed and then secured so that any particles would not transform to something else.

Q. So was there a sort of -- what was the covering or the background for where stuff was aired out? Was there a tarp laying there or something?

A. Yes. The first location was one tarp where it was evaluated, aired out, and then it went to a second location, which was a tarp, where it was photographed and then secured.

Then the third location was at the table where myself and the other evidence collectors were.
Q. So it was -- at the time that it was being photographed, had it already been in the double-bagged form at that time?
A. That's correct.
Q. So everything was sort of hard to see at that point; is that right?
A. That is correct.
Q. So in terms of when it finally got to you to make -- to do some kind of notations about the evidence collection of drug evidence, what was your system in terms of writing things down and noting where -- how they -- that they came from the inside and where they came from?
Sorry. That was a long question. Go ahead.
A. I think I understand. My system was, basically, each location was given a number, so it was a numeric system. So, therefore, when I got control of a certain -- what we are going to take in evidence, I then retained the location which it was found, and I would make a notation of where it was found. What search location. Where it was found.
Q. How many different locations within 10124 Nassau Court were numbered?
A. There were nine.
Q. And each one had a certain area inside or outside of

the house?
A. That is correct.
Q. So what did you use to keep track of and write down this list and locations?
A. I used a DEA Form 12, which is a receipt return, and I would write down the item number, the chronologic item number, and then a brief description what it was and then the numeric locator as to where it was found.
Q. So the DEA 12 receipt form is in your handwriting?
A. Yes, it is.
Q. Okay. And, then, was there any way that you were able to -- we will take a look at some of this drug evidence that I'm going to present to you and the Court to admit. Was that DEA receipt list somehow notated on the bags we are about to look at?
A. Yes. It should be located on the evidence label, somewhere along the top, near the right corner.
Q. And so, if you have the DEA receipt paperwork, then you would be able to tell the location of where it came from?
A. That is correct.
Q. All right.
MS. HOWARD-ALLEN: At this time, Your Honor, may I approach?
THE COURT: You may.
(Items tendered.)

BY MS. HOWARD-ALLEN
Q. All right. Agent McGee, if you could, take a look at the first piece of evidence. I tried to put those in order for you. If we look at Exhibit 200, and then there is a photograph of the item of 200, 200A, which is a photograph of the exact item, and then a 200B, which is the photograph there on site.
So do you recognize these items as being taken from 10124 Nassau Court on February 15, 2018?
A. Yes, ma'am, I do.
Q. And do they appear to be items that you listed on your DEA receipt and you recognize them being an accurate depiction of what was taken that day?
A. That is correct.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter -- I would move to enter 200, 200A, and 200B into evidence.
THE COURT: All right. Exhibits 200, 200A, and 200B are received into evidence and may be published to the jury.
(Government Exhibits 200, 200A, and 200B received in evidence.)
MS. HOWARD-ALLEN: All right. At this time, if we could place Exhibit 200B on the screen so it would be in front of the jury and also in front -- no, it won't. If we

could look at 200A, please. Let's take a look at this.

BY MS. HOWARD-ALLEN:

Q. What is this item, Agent McGee?

A. This is DEA Exhibit No. 8, and it is a scale, a small digital scale.

Q. And why is DEA Exhibit 8 relevant?

A. Well, throughout my training and experience, most people who conduct this type of activity normally weigh their product out on some sort of scale.

Q. So what's the brand of this digital scale? Can you read the letters?

A. It's AWS.

Q. And, then, if we take a look closely at the evidence lab label that's on this piece of -- on this item, there's a couple of numbers on this evidence tag that I want you to take a look at.

So, first of all, you mentioned the DEA Exhibit No. 8, which is noted on there. Is that for purposes of tracking if something should go to the lab?

A. That is correct.

Q. All right. And, then, what is the item number you placed on Government's Exhibit 200?

A. The 6 in the upper right-hand corner of that label.

Q. And on your DEA 12 receipt, will that tell you where it was found?

A. Yes, it would.
Q. So where was this scale found?
A. It was found in location No. 3, which would be a guest bedroom.
Q. All right. Agent McGee, at this time -- let's take a look at 202, and then I'll have you show the jury both of these items.
So, if you could pull up Exhibit 202, 202A, and 202B, do you recognize these items as being found at 10124 Nassau Court and listed on your DEA 12 receipt?
A. Yes, ma'am, I do.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter into evidence Government's Exhibit 200, 200A and 200B.
THE COURT: Exhibits 200, 200A, and 200B. That's fine. They are received into evidence.
(The aforementioned exhibits were previously received into evidence.)
MS. HOWARD-ALLEN: Let's proceed. Agent Phelps, can you put up 200B. See if we have better luck this time. It's 202B. Excuse me.
THE COURT: I'm sorry. You said 200. I had already received those. That's what threw me off.
MS. HOWARD-ALLEN: I'm sorry, 202A, 202B.
THE COURT: That's why I asked.

MS. HOWARD-ALLEN: I'm sorry, Your Honor. I haven't had enough coffee yet.

THE COURT: That's all right. I wanted to make certain.

MS. HOWARD-ALLEN: 202, 202A, and 202B.

THE COURT: Right. 202 I think had previously been identified but had not been moved into evidence; right?

MS. HOWARD-ALLEN: That's correct. Now I'm moving into evidence 202, 202A, and 202B.

THE COURT: All right. Give me one moment here to make my notes accurate here. Exhibits 202, 202A, and 202B are received into evidence and may be published to the jury.

(Government Exhibits 202, 202A, and 202B received in evidence.)

BY MS. HOWARD-ALLEN:

Q. Let's try to show the display, Exhibit 202B. Let's take a look at 202A. And what is this item, Agent McGee?

A. Government's Exhibit 202 is DEA Exhibit No. 14.

Q. And what is the item number that you placed on Government's Exhibit 202?

A. My item number is No. 18.

Q. And on your DEA 12 receipt, will that tell you where Exhibit 202 was found?

A. Yes.

Q. And where was Exhibit 202 found? What location?

A. It was found in location No. 6, the garage.
Q. And, Agent McGee, if you look at this DEA exhibit tag on this, it looks like the bottom is filled out. Are you able to -- what does the bottom mean, the bottom of the evidence tag? Who is that signed by and what does that mean?
A. This would be someone at the lab, an analyst at the lab who opened and examined the exhibit.
Q. And analyzed it?
A. And analyzed it.
Q. And what is her name?
A. Elizabeth Adkins.
Q. Elizabeth Adkins. So, Agent McGee, at this time, before you take your Lavalier off, your mic off, I would like you to see if you see on the chart to your right that's on that easel, if you see Government's Exhibit 202, DEA Exhibit 14, if you see that listed on that summary board.
A. Yes, ma'am, I do.
Q. Could you read what is next to Exhibit 14? What it says. I think you can roll it a little over towards you. You might have a little lead on that.
A. Pentylone, Methylone .0417 grams.
Q. Thank you, Agent McGee. Now, if you could, take with you Government's Exhibit 200 and 202 and display it to the jury.

(Exhibits shown to the jury.)

MS. HOWARD-ALLEN: Thank you, Agent McGee.

Madam Clerk, would you mind if we switch -- I'm going to try to go back and forth again. I apologize.

BY MS. HOWARD-ALLEN:

Q. If we could, take a look at Government's Exhibit 202B, which I believe you just showed the jurors. Is this how the item looked that day? I know it didn't look like that when you showed it to the jurors right now because it appeared to be in more of a powder form. Is this how it was photographed that day?

A. Yes, ma'am.

Q. And if you can see, was that small bag, was that also in Exhibit 202?

A. Yes, ma'am.

Q. What insignia is on that small jewelers bag that's shown in 202B?

A. Small ice cream cones.

Q. If we could, I will move to the next exhibit, and I'm going to put another photograph on there. I would like you to look, if you could, Agent McGee, at Government's Exhibit 204 and then the corresponding 204A and 204B.

Do you recognize those items as being collected by you on February 15th at 10124 Nassau Court?

A. Yes, I do.

MS. HOWARD-ALLEN: At this time, Your Honor, I

would move to enter into evidence Exhibit 204, 204A, and 204B.

THE COURT: All right. Exhibits 204, 204A, and 204B are received into evidence and may be published to the jury.

(Government Exhibits 204, 204A, and 204B received in evidence.)

BY MS. HOWARD-ALLEN:

Q. And I will ask you if this is an accurate photograph of how these items appeared on February 15th when they were collected at 10124 Nassau Court.

A. Yes, ma'am, it was.

Q. All right. Then, if we could go to the computer and we could look at Government's Exhibit 204A, and you can look at the exhibit before you, Agent McGee.

What is the item number that you placed on Government's Exhibit 204?

A. Item No. 25.

Q. And what is the DEA exhibit number?

A. The DEA exhibit number is Exhibit 19.

Q. And if you were to observe your DEA 12 receipt, would that tell you where your item 25 that you placed on there was found?

A. Yes, it would.

Q. And where was this particular item found?

A. Item No. 25 was found in location No. 9.

Q. Which is where?
A. The backyard.
Q. And, Agent McGee, was there also a report written about the acquisition, generally, of all of these exhibits from 10124?
A. Yes, it was.
Q. Do you know if that report had to be corrected as to the location of this exhibit?
A. Yes, it had to be.
Q. Did you author that report?
A. No, I did not.
Q. Do you know why that location was different than what was on your DEA 12 receipt?
A. I do not.
Q. And, Agent McGee, do you also see Government's Exhibit 204, which is DEA Exhibit 19? Do you see that on the board next to you?
A. Yes, ma'am, I do.
Q. And could you also read the items to the right of it.
A. Yes. DEA Exhibit No. 19, which was fentanyl, 4 grams of fentanyl.
Q. Does it say 4 or --
A. 4.00 grams.
Q. Thank you, Agent McGee.

If you could, show the members of the jury this

item, Government's Exhibit 204.

(Exhibit shown to the jury.)

BY MS. HOWARD-ALLEN:

Q. Thank you, Agent McGee.

If we could, turn to Government's Exhibit 205. Do you see that item in front of you and the corresponding 205A and 205B?

A. Yes, ma'am, I do.

Q. Do these appear to be the items and the photographs of those items that were seized on February 15th at 10124 Nassau Court?

A. Yes, ma'am, it is.

MS. HOWARD-ALLEN: At this time, Your Honor, I would ask to move into evidence Government's Exhibit 205, 205A, and 205B.

THE COURT: Exhibits 205, 205A, and 205B are received into evidence and may be published to the jury.

(Government Exhibits 205, 205A, and 205B received in evidence.)

MS. HOWARD-ALLEN: At this time, Madam Clerk, I would ask to publish 205B on the overhead.

BY MS. HOWARD-ALLEN:

Q. Agent McGee, does this appear to be how the item appeared that day, February 15th?

A. Yes, that is correct.

Q. And what is depicted in this picture besides the item that was seized?
A. Above it here is where one of the agents did a field test of the substance on the inside, and that's a field test kit.
Q. What does that appear to show?
A. It appears that the test came back presumptive positive for fentanyl. The presence of fentanyl.
Q. And if you would look to your right, do you see Government's Exhibit 205 listed on that chart?
A. Yes, I do.
Q. And what appears to the right of that? What substance?
A. I'm going to try to get this right. Methoxyacetylfentanyl, 2.17 grams.
Q. All right. Now, if we could go to the computer and take a look at 205A. Agent McGee, what does this -- what does this DEA evidence label show? What is the DEA exhibit number for Government's Exhibit 205?
A. The DEA exhibit number is 21.
Q. And -- go ahead.
A. And my item number is No. 27.
Q. So on your DEA 12 receipt, can you tell where that was found, where 205 was found, with that corresponding item number?
A. Yes, I can. Location No. 4, which was the kitchen and

dining room area.
Q. And was that sort of a large area?
A. Yes. It was a standard kitchen.
Q. If you could, show the jurors Government's Exhibit 205 at this time.
(Exhibit shown to the jury.)
MS. HOWARD-ALLEN: I think the screen may have some red pigmentation. Our screen doesn't look like that. I'm not sure if there is an issue with the screen.
THE COURT: I don't know what's causing that.
MS. HOWARD-ALLEN: Better in black and white than red.
BY MS. HOWARD-ALLEN:
Q. Let's take a look at the final exhibit, Agent McGee. Could we take a look at Government's Exhibit 206 and 206A, and 206B.
Do you recognize these items, Agent McGee, as being items that you processed as drug evidence on February 15th, 2018, at 10124 Nassau Court?
A. Yes, I do.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter into evidence Exhibits 206, 206A, and 206B.
THE COURT: All right. Exhibits 206, 206A, and 206B are received into evidence and may be published to the jury.

(Government Exhibits 206, 206A, and 206B received in evidence.)

MS. HOWARD-ALLEN: At this time, Madam Clerk, I would ask if we could publish Government's Exhibit 206B on the overhead.

BY MS. HOWARD-ALLEN:

Q. Agent McGee, is this how the photograph was photographed on site before it came to you for processing?

A. Yes, it was.

Q. And I know you have the item in front of you. Can you see or tell us what color or what tint the powder appears to be in this Exhibit 206?

A. Looks like a pinkish color.

Q. All right. And if we could go back to the computer, what is the DEA number that is on Government's Exhibit 206?

A. It's DEA Exhibit 22.

Q. And in terms of being able to track that, does that also appear to have gone to the DEA laboratory for testing?

A. Yes, it did.

Q. And who was the chemist that was listed on that label in Government's Exhibit 206?

A. Elizabeth Adkins.

Q. And if you look to the easel to your right, do you see Government's Exhibit 206 with DEA No. 22? Do you see that listed there?

A. Yes, I do.
Q. And what is -- does that appear to have two parts to it?
A. Yes, it does. Exhibit 22.01, 22.02.
Q. So what is 22.01?
A. Fentanyl, 6.40 grams.
Q. That was the larger baggy we saw in 206A?
A. That is correct.
Q. And, then, what was the smaller white bag that we saw also in Government's Exhibit 206B? What is the second part of that? What does that say, 22.02?
A. Pentylone, 1.10 grams.
Q. All right. And looking also at this evidence tag, what is the item number that you placed on Government's Exhibit 206?
A. My item number is No. 51.
Q. And on your DEA 12 receipt, would that tell you where it was found?
A. Yes, ma'am, it will.
Q. And where was it found?
A. Location No. 5, which is the living room area.
Q. And, again, was this location changed in another DEA report that was not authored by you?
A. That is correct.
Q. All right. At this time, Agent McGee, if you could, display Government's Exhibit 206 to the jury.

(Exhibit shown to jury.)

MS. HOWARD-ALLEN: At this time, Your Honor, I don't have any further questions for Agent McGee.

THE COURT: Okay. Thank you very much.

Mr. Martin, do you wish to cross-examine the witness?

MR. MARTIN: No, Your Honor. Thank you.

THE COURT: Thank you, sir. You are excused. We appreciate you coming in today to testify.

The government should call its next witness, please.

MS. HOWARD-ALLEN: Your Honor, the government calls Phil Pione.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Detective Philip Pione, P-i-o-n-e.

THE COURTROOM DEPUTY: Thank you. You may take a seat.

THE COURT: Sir, you will be asked some questions

by Assistant United States Attorney Kelley Howard-Allen and you may be asked some questions in cross-examination by Mr. Martin, who represents Mr. Fisher.

If you don't understand the question, please say so so they can state it another way. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you have the tendency to speak quickly, slow down so we can understand you, and you need to speak up so we can hear you. All right?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Go ahead, Miss Howard-Allen.

PHILIP PIONE,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good morning, Detective Pione.

A. Good morning.

Q. Can you please tell the ladies and gentlemen of the jury where you work.

A. Pinellas County Sheriff's Office.

Q. And what do you do at the Pinellas County Sheriff's Office?

A. I'm a detective.

Q. And in what section?

A. Right now I'm the Crimes Against Children.
Q. And where were you assigned previously?
A. Narcotics Division.
Q. And how long were you in the Narcotics Division?
A. From 2014 until about three months ago.
Q. And before that, where were you assigned at the Pinellas County Sheriff's Office?
A. Patrol Division.
Q. And you've been there since when? When did you start there?
A. 2012.
Q. Detective Pione, I would like to direct your attention to the evening of January 30, 2018. Were you involved in a traffic stop of Christopher McKinney?
A. I was.
Q. And how were you involved in that stop?
A. That day we were conducting a stationary surveillance at Mr. Fisher's storage unit on 49th Street. I believe it was 13791 49th Street, Unit B2.
Q. If I could stop you, I would like to display Government's Exhibit 100, which I believe is already in evidence.
Is this the place you were conducting surveillance on the evening of January 30th, 2018?
A. Yes, ma'am.

Q. And I'll let you continue now. You were conducting surveillance and what happened next?
A. We were conducting surveillance on this storage unit. I observed a black male exit the unit, who I believed to be Christopher McKinney. He entered a brown Mercedes. Then he drove out of there onto 49th Street and started to head northbound.
Q. And were you following him at that time?
A. I was. I was parked directly adjacent to this building. I pulled out pretty much right behind him and followed him all the way up on McMullen Booth Road.
Q. What happened up on McMullen Booth Road?
A. While he was driving I observed Mr. McKinney commit several traffic infractions. The most egregious, he was changing lanes, kind of weaving in and around because it was around 5 or 6 o'clock, rush hour traffic, and he was basically changing lanes without signaling, cutting other cars off and forcing them to slam on their brakes or change lanes to avoid either a collision or near collision.
Q. So what happened next?
A. Detective Douglas, part of our surveillance team, who is also a K9, conducted a traffic stop on the vehicle at McMullen Booth and Mill Ray and made contact with the driver who was positively identified as Christopher McKinney.
Q. Where were you actually located at the time that

Officer Douglas made the stop?

A. I was in the train behind McKinney's vehicle. Once he pulled along the side of road I parked directly adjacent to the roadway. There was a parking lot next to the road from the traffic stop. I was probably about 40 yards away, I would say.

Q. At some point did you approach the car?

A. I did. Detective Douglas indicated to us via the radio that he had located what he suspected to be narcotics, and we approached the vehicle at that time.

Q. And what did you see, Detective Pione, when you first walked up to this brown Mercedes that Christopher McKinney was driving?

A. Detective Douglas directed us to the trunk area where there was a black Louis Vuitton bag, and inside the Louis Vuitton bag were several items that I believed to be narcotics; a purple powder substance and blue pills.

Q. And what at that point happened?

A. At that point -- and also there was cash in there, as well. I think about $36,000. At that point we relocated with Mr. McKinney to our K9 compound to speak with him more about the narcotics in his car.

Q. All right. So let's take a look at these items that you just described as a purple powder and some blue pills.

Were those items seized by law enforcement that

night?
A. They were.
Q. And if I could direct your attention, please, to Government's Exhibit 231B and 232 that are photographs in front of you. Do these look like the items that you saw in the trunk when you walked up that evening?
A. Yes, these are correct.
MS. HOWARD-ALLEN: And may I approach with the narcotics evidence?
THE COURT: You may.
(Items tendered.)
BY MS. HOWARD-ALLEN:
Q. I've handed you what's been marked as Government's Exhibit 231 and 232, and then there is also photographs 231A and 232B. I mean 231A and 232A, which are the exact photographs of the exact Exhibit 231 and 232.
Do you see those, as well?
A. I do.
MS. HOWARD-ALLEN: All right. Then at this time, Your Honor, I would move to enter into evidence 231, 231A, and 232B. Wait. 231, 231A, 231B, 232, 232A, and 232B.
THE COURT: Exhibits 231, 231A, 231B, 232, 232A, and 232B. All right.
MS. HOWARD-ALLEN: Yes, Your Honor.
THE COURT: They are all received into evidence

and may all be published to the jury.

(Government Exhibits 231, 231A, 231B, 232, 232A, and 232B received in evidence.)

BY MS. HOWARD-ALLEN:

Q. All right. If we could look first -- direct your attention to Government's Exhibit 231B, which will appear on the screen in front of you, and you also have the copy. If you could, explain to --

MS. HOWARD-ALLEN: Maybe we could dim the lights.

BY MS. HOWARD-ALLEN:

Q. If you could, explain what we are seeing in Government's Exhibit 231B.

A. Okay. So those are the plastic baggies containing the powder. That's the black Louis Vuitton bag. My partner was holding this and I was taking the pictures.

We opened it up. And when we pulled it out, the baggies were numbered. You can see on the screen the green numbers by Mr. McKinney. We did not number those. And those are the same -- same powders that I have here.

Q. Okay. And when you mentioned that there was some cash, was that -- when you look at this picture overall, was that lower in that Louis Vuitton bag?

A. Yes. I believe there is another picture that had the actual cash, maybe.

Q. Let's take a look at the second page of this exhibit.

Is this just another view of some of the numbers on the powder?
A. Yes. Yes.
Q. All right. Now, let's take a look, please, at Government's Exhibit 231A. Detective Pione, this is the item that was seized -- the powder that was seized, 231, and this is the photograph of it.
Are you familiar with this label that's on this bag?
A. Can you move your mouse to which label you are looking at. There are several.
Q. You can take a look at the item.
A. Yes, that's our Pinellas County drug label in the middle.
Q. What kind of information is on a Pinellas County Sheriff's Office drug submission label?
A. That contains the name of the person that we retrieved this item from and a description of the item below it. The three small plastic bags of purple powder. The date and the case number that all this occurred on and the person that sealed the bag, physically sealed the bag in the heat sealer, and the name of the case agent who was currently investigating where this evidence came from.
Q. Does that appear to then -- does that -- is that submitted to somewhere for analysis?

A. That goes directly into our property-in-evidence section, and that is transferred to the laboratory for analysis.
Q. To the Pinellas County Forensic Laboratory?
A. Yes.
Q. Is it tracked by, in this particular case, the case number? Is that how these items are tracked?
A. Yes.
Q. At this time, Detective Pione, if you could, remove your Lavalier mic and, if you could, take Government's Exhibit 231 and present it just to the jurors so they are able to take a look at the item.
(Exhibit shown to jury.)
BY MS. HOWARD-ALLEN:
Q. Detective Pione, before you sit down, you may leave that up there, if you want to keep it out of the way, and that way we won't get ...
All right. If we take a look at Government's Exhibit 232B on the screen, Detective Pione, what is this item? And is this what you saw that night on January 30th?
A. Yes. That was a small bag containing, I believe, approximately 96 pills. They are marked A/215, which should be, I believe, in the photo.
Q. If you look at the picture overall, where does it appear to -- where do these pills -- if we can go back to the

big picture, where does it appear they were taken from?
A. That small pocket that's on the inside of the Louis Vuitton bag.
Q. And if we take a look at Government's Exhibit 232A, is this how the evidence appears in Government's Exhibit 232 that's in front of you?
A. Yes.
Q. And is that bag similarly filled out for tracking purposes to go to the forensic laboratory?
A. Yes, it contains the same information.
Q. At this time, Agent Pione, I would ask, if you could, display this item to the jurors.
(Exhibit shown to jury.)
BY MS. HOWARD-ALLEN:
Q. So, Detective Pione, you were mentioning earlier that after you seized these items and you saw these items in Mr. McKinney's trunk out on McMullen Booth Road you went somewhere else. Where did you go?
A. Our K9 training compound.
Q. Why did you go there?
A. It contains interview rooms that we can use for interviews.
Q. What happened there?
A. We spoke with Mr. McKinney about the narcotics that were located in his car, and the cash.

Q. And what at that point did he -- what did he decide to do?
A. He disclosed to us that he had larger amounts of cash --
MR. MARTIN: Objection. Hearsay.
THE COURT: The objection is sustained. Go ahead.
BY MS. HOWARD-ALLEN:
Q. Where else were you directed that night?
A. He directed us to his residence.
Q. And where was his residence?
A. I believe the address is 3242 Centerwood Drive in Tarpon Springs.
Q. And did you go there?
A. We did.
Q. And what did you find there?
A. Approximately $1.4 million in cash, and fentanyl.
Q. And what form was the fentanyl that you found there that evening?
A. Powder fentanyl.
Q. Was it a large or small amount?
A. In relation to -- depends on what you consider large and small. To me, I would consider it a medium-ish amount.
Q. And you mentioned that there was a lot of money there.
A. Yes.
Q. And I'm going to ask you to look at Government's

Exhibit 173. Do you recognize that picture?
A. I do.
Q. And how do you recognize it?
A. That was in the closet that I searched. There were, I want to say, maybe 10, approximately, briefcases and a safe. Inside of each of those briefcases was a large amount of cash that looked exactly like this.
Q. In the closet where?
A. In the upstairs bedroom to the left. It was a home office/bedroom.
Q. At the Centerwood residence of Mr. McKinney?
A. Yes, his residence.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter into evidence Government's Exhibit 173.
THE COURT: All right. Government's Exhibit 173 is received into evidence and may be published to the jury.
(Government Exhibit 173 received in evidence.)
BY MS. HOWARD-ALLEN:
Q. Detective Pione, did this stick out in your memory?
A. Yes. Each suitcase had approximately 180- to about $225,000.
Q. Had you ever seen that much money all together at a residence at one time?
A. No.
Q. Let's display what's been marked as Government's

Exhibit 173. It's a three-page exhibit, and you were mentioning that -- were these some of the types of briefcases that were there?
A. Yes.
Q. And you said approximately how many of these were there?
A. I believe there was about ten.
Q. Let's take a look at the second page, and these were all in a closet?
A. Yes. They were all stacked on top of each other.
Q. And did they appear to be in different denominations or primarily in one?
A. The majority of them were 20s. There were a couple that had 50s or hundred bindles, but what you see here is consistent with what most suitcases had.
Q. Did there appear to be any kind of a code as to how much money was there in these briefcases?
A. There was. Each suitcase had the combination custom set to the amount of money that was inside of it. So, for example, if there was $180,000 inside of it, like the left side would be 1-8-0, would be the first combination for the code.
Q. All right. Let's take a look at the final page. And, again, these are just three of the many briefcases?
A. That's correct.

Q. All right. Were these items -- did law enforcement take these items?
A. We did.
Q. And did you have Mr. McKinney's consent to take these items?
A. He did give us consent.
Q. That was also to seize the money as well as the fentanyl you found at his house?
A. Correct. He gave us his permission to go inside and search the residence.
Q. Detective Pione, were you directed anywhere else that evening by Mr. McKinney?
A. I was.
Q. Where were you directed?
A. To a residence in Pasco County. It was 1092 -- 10945 Calumet Drive.
Q. What area of Pinellas County is that in?
A. That was in New Port Richey, Pasco County.
Q. And what did you understand that to be?
A. That was a residence that was purchased by Mr. McKinney using drug proceeds. Cash.
Q. Did it appear to be inhabited?
A. It looked like it was currently under renovations.
Q. And was it a somewhat recent purchase?
A. Yes, within the last few months. He had begun working

on that house and installed new A/C units, put on a new roof. Pretty much decking the whole house out.
Q. So did you go there on that evening and also on another occasion?
A. We did.
Q. And what did you find at that residence on Calumet?
A. In the garage area there was a fentanyl lab inside. Fentanyl manufacturing lab.
Q. What do you mean when you say a fentanyl manufacturing lab?
A. There was four pill presses that were used to turn powder fentanyl into counterfeit pills.
Q. And did these pills look like the blue pills that you saw in the brown Mercedes after it left Mr. Fisher's 49th Street location?
A. These pills were white that I found there. There was a large amount of the products needed for the manufacturing, to include cut fentanyl and all the accessories. Dies. Everything that you would need to run a complete operation.
Q. And you indicated that these pills were white, and did they have some different marking on them?
A. They did.
Q. And what was that marking?
A. I don't recall off the top of my head. I believe it was --

Q. We will take a look when we get to the photographs.
A. Okay.
Q. If you could, take a look, then, at Government's Exhibit 170, 171. Then, if you could also take a look at -- we are going to look at these items, the drug Exhibit 233, and then we are going to look at the corresponding photographs 233A, 233B, and 233C.
Do you recognize those items, Detective Pione?
A. I do. These are the items that we located inside the garage.
Q. And the garage where?
A. At the Calumet Drive in New Port Richey.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move into evidence Government's Exhibit 170, 171, 233, 233A, 233B, and 233C.
THE COURT: All right. So that was 170, 171, 233, 233A, 233B, and 233C.
MS. HOWARD-ALLEN: That's correct.
THE WITNESS: They are all received into evidence and may be published to the jury.
(Government Exhibits 170, 171, 233, 233A, 233B, and 233C received in evidence.)
MS. HOWARD-ALLEN: All right. At this time, let's begin, Agent Phelps, if we can, with taking a look at Government's Exhibit 171.

BY MS. HOWARD-ALLEN:

Q. And what does this picture depict, Detective Pione?

A. Those are three of the presses that I located inside the garage on Calumet. The pill presses are utilized to manufacture counterfeit pills by taking the raw powder that you pour into the top of it and uses hydraulic pressure -- or pressure, to compound the powder into a pill.

Q. Do those look like hand-operated ones or --

A. Those are large-scale machines. They are electric and capable of producing many more thousands of pills than you would ever get by hand.

Q. Look at the second page of this exhibit. What does this picture depict?

A. That was a different angle of one of the same pill presses.

Q. And the next page.

A. That is the fourth pill press that I located.

Q. And I think the next page might be another view of that.

A. Yes.

Q. And the final -- the next page?

A. It appears to be an alternate angle of one of the original three pill presses that we looked at.

Q. The final page. I think you were describing how that might have worked.

A. Yes. If you can see, there is, like, a small hole there where, like, the powder would go into.
Q. And you can see a small green boot to the left. What -- how was this area searched to seize these items?
A. We were wearing full level-B gear due to the hazards that fentanyl presents to both the breathing system and your skin.
Q. And were these items taken also with Mr. McKinney's consent?
A. Yes.
Q. Were these items destroyed or do we still have them?
A. I do not know exactly their location. I know we did take them due to their contamination. They were excessively covered with fentanyl inside and outside. I don't know the process of exactly where they are at right now.
Q. Let's take a look, if we would, the second page. Let's start with the second page of 233B. What does this second page show? Let's go to the second page, if we could, and then come back to that one.
A. There was a large bin that appeared to have been partially manufactured pills. There was pills and powder in the same bin.
Q. We will go to Page 1. The Page 1 of that one. There we go. It got altered in the computer and not in my copy.
What is that we are looking at?

A. This was a large plastic bin that was located next to the pill presses of what appeared to be partially manufactured powder and finished product of pills.
Q. And do these appear to have been sort of inferior quality, not ones that would necessarily appear to be looking like whole tablets?
A. Yes, there were a few there that looked like they could be legit, but a lot of these kind of had rough edges, or they weren't exactly what I would buy at a pharmacy.
Q. Let's look at what is now the second page. Is that how they were gathered to be photographed and to be sent -- to be processed through to the Pinellas County Sheriff's Office property in evidence and through to the forensic lab?
A. Yes. That's after we emptied the bin into the bag for evidence processing.
Q. All right. Let's take a look, then, at 233C. Do you have that in front of you? What does that show?
A. That is a close-up of the pills that were in the bin.
Q. Are you able to see from that close-up what the markings are on the white pills that were at the Calumet residence?
A. I am. ETH 446.
Q. All right. Then, finally, if you could take a look, please, at Government's Exhibit 170. What is the -- what is shown in Government's Exhibit 170?

A. That is the part of the machine that presses the pill into the shape and puts the marking on the pill.
Q. And can you --
A. A die.
Q. It's called what?
A. A die.
Q. And what you can see in this third page of this exhibit, what does that say?
A. ETH. It's reversed because it transposes it once it goes onto the pill.
Q. That makes sense.
So this exhibit just has a number of different shots of the same item. Where did you obtain this pill stamp?
A. That was from inside the garage.
Q. All right. Then, if we could, please, take a look at the Exhibit 233, the actual drug exhibit. I think it might be on the floor behind you.
MS. HOWARD-ALLEN: If we could, show Government's Exhibit 233A, Agent Phelps.
THE WITNESS: There is a bag up here that I don't believe has a label on it. Is this part of 233? It looks like --
MS. HOWARD-ALLEN: That might be 234.
May I approach, Your Honor?

THE COURT: Yes, go ahead.

BY MS. HOWARD-ALLEN:

Q. I think we are looking at Government's Exhibit 233. Is that correct, Detective Pione?

A. Yes.

Q. This is the item that we just saw, a photograph of the bag of the pills and some powder?

A. Yes.

Q. And what does the evidence label on this exhibit show?

A. This shows the same information that would be on all our evidence labels, the case number, the person that's associated with the description of the drugs, the sealing agents, and case agents for the case, in addition to the property control stuff after we submit it.

Q. And because this was ultimately submitted through this process to the Pinellas County Forensic Lab, are you able to see which forensic chemist at the Pinellas County Forensic Laboratory was able to analyze this information?

A. I could, but I can't read the handwriting. M, which I believe would be Mike. I don't know the last name.

Q. But that appears to be where the forensic chemist would sign?

A. Yes. That is our forensic laboratory label and their signature.

Q. At this time, if you could, display Government's

Exhibit 233 to the jury.

(Exhibit shown to jury.)

BY MS. HOWARD-ALLEN:

Q. All right. Thank you, Detective Pione.

If you could, take a look at some other items; but, first, I'll ask you, other than the Calumet residence, were you directed anywhere else by Mr. McKinney?

A. We were.

Q. And where is it that you were directed?

A. To his storage unit, which was directly across the street from Mr. Fisher's unit at -- I believe it was 136th Avenue and 50th Way.

Q. If you could, take a look at Government's Exhibit 172. Do you have that photograph in front of you? Do you recognize the photograph of 172?

A. That is the exterior of Mr. McKinney's storage unit.

Q. And the place you were directed that night by Mr. McKinney?

A. Yes.

Q. And did you go there sometime after that evening to see what was in there?

A. Yes, we did.

Q. Did you do so -- how did you get into this area?

A. He provided us the key.

Q. And what, generally, did you find in there?

A. More fentanyl.

MS. HOWARD-ALLEN: At this time, Your Honor, I would move into evidence Government's Exhibit 172.

THE COURT: All right. Exhibit 172 is received into evidence and may be published to the jury.

(*Government Exhibit 172 received in evidence.*)

BY MS. HOWARD-ALLEN:

Q. Is this the location that you indicated was 50th Way?

A. Yes.

Q. And what kind of a location was this?

A. It was a location where it's a long industrial base with roll-up doors and a normal door next to it where people can come and rent it out for storage or businesses.

Q. Did it appear there was a business operating out of that at the time that you went in there?

A. No. There is just an old car inside.

Q. All right. If you could, take a look, then, at Government's Exhibit 234 and then the photograph of that exhibit, which is 234A, and then there is a large package of photographs that's marked 234B. If you could, tell me if you recognize those items.

A. I do. Those are the items that I took from inside of Mr. McKinney's storage unit at 50th Way.

Q. And are the photographs in 234B how they appeared when the area was searched?

A. Yes.
Q. And then 234A is an accurate picture of Government's Exhibit -- drug Exhibit 234?
A. That's correct.
Q. And when it was initially searched, was it done -- how was it searched? Was there any -- was it just a normal search?
A. He actually told us directly where to go inside the unit. We didn't really have to search too much.
Q. Were individuals dressed in any particular way?
A. Yes. We were dressed in full PE gear, level B, which is appropriate for responding to anything with fentanyl.
Q. What does that kind of gear include?
A. A full suit, mask, full face respirator and mask and protective boots and gloves.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move into evidence Government's Exhibit 234, 234A, and 234B.
THE COURT: All right. Exhibits 234, 234A, and 234B are received into evidence and may be published to the jury.
(*Government Exhibits 234, 234A, and 234B received in evidence.*)
BY MS. HOWARD-ALLEN:
Q. All right. Let's take a look, if we could, Agent

Phelps, at Government's Exhibit 234. And if you could, explain to the jurors what is depicted in 234B.
A. Inside the storage unit, when you walk directly to the back wall, there was a toolbox sitting on a shelf. He directed us to go here. He said he had fentanyl inside. When we went there, we opened it and this is what we saw inside the toolbox.
Q. And let's take a look at the next page, which I think is a little bit of a closer picture. And how did these bags appear to be numbered?
A. They appeared to be numbered the same way the bags from the traffic stop were numbered.
Q. What are the numbers on these bags?
A. Twelve, thirteen, and fourteen.
Q. Let's take a look at the next page. Is this just lifting them out of the --
A. Yes, this is us lifting them out and just to show how full they were when we took them out.
MS. HOWARD-ALLEN: Let's take a look at the next page, Agent Phelps.
And this bag number?
A. Thirteen.
Q. And the next page. What is this bag number?
A. This is bag No. 14.
Q. The next page of Government's Exhibit 234B.

A. This bag is numbered No. 5.
Q. And this was all out of that red toolbox?
A. Yes, all this was together.
Q. And the next page.
A. Bag No. 2.
Q. And what tint does that appear to be, the powder in --
A. Purple.
Q. And let take a look at the next page.
A. Bag No. 3, containing purple powder.
Q. And then, finally, the last page.
A. Bag No. 6, containing purplish-white powder.
Q. Let's take a look at Government's Exhibit 234A. Are these the items that you have in front of you that are 234?
A. Yes.
Q. And how are the evidence tags on this, in this particular case? Is there an item number on this -- on any of these bags? You can take a look at the bags themselves.
A. Yes, these are exhibit numbers -- all the evidence labels are consistent with how we do our evidence submissions with the case number, the person's name, the description of what's inside, the sealing officer, case agent, and the property control information, as well as the drug lab's information. And this is labeled as, I believe, 234.
Q. And before you show those items to the jury --
MS. HOWARD-ALLEN: May I approach again,

Your Honor? I want to make sure the second bag has the 234 bag.

THE COURT: Yes.

(*Brief pause*.)

MS. HOWARD-ALLEN: If you could, display those items to the members of the jury.

(Exhibit shown to jury.)

MS. HOWARD-ALLEN: Your Honor, I'm not sure -- we have some other exhibits to do.

THE COURT: Why don't we break. It's a little bit after 10:30. Ladies and gentlemen, we will take our morning break. Please don't discuss the case or form any opinions until you've heard all the evidence. We will see you back here in ten minutes. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 10:36 a.m.)

THE COURT: We're in recess.

(Recess taken from 10:36 to 10:48 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

MS. HOWARD-ALLEN: Your Honor, could we address a scheduling issue? I don't know if you want Detective Pione to step out while we do so.

THE COURT: Yes, that's fine.

(The witness exits the courtroom.)

THE COURT: Is the jury ready?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Do we need to do it now?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Okay.

MS. HOWARD-ALLEN: Your Honor, I probably have just about 15 more minutes with Detective Pione and our next witness is traveling from Pasco County and is probably running about -- his GPS says he will be here at about 11:30, so I don't know if you wanted to take an early lunch. And that was just about ten minutes ago.

THE COURT: That's what we will do. We will take an early lunch.

MS. HOWARD-ALLEN: I appreciate it. I can do the business records, read those after we finish with Detective Pione, and then we can take an early lunch. And then whatever time that is, if you want to take an hour or hour an 15, that would be fine.

THE COURT: We will take an early lunch today.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: Let's bring the jury back in and the witness in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 10:52 a.m.)

COURT SECURITY OFFICER: Thank you. Please be

seated.

THE COURT: Welcome back, ladies and gentlemen.

I remind the witness, you are still under oath. Do you understand that, sir?

THE WITNESS: Yes, ma'am.

THE COURT: You may proceed, Miss Howard-Allen.

BY MS. HOWARD-ALLEN:

Q. Before our break, Detective Pione, we were just viewing some of the items that you had shown the jury from the location on 50th Way.

A. Yes, ma'am.

Q. You had just shown that to the jury?

A. Yes.

Q. All right. Did law enforcement also return later to that same location and seize additional fentanyl from other areas of that 50th Way?

A. We did. At the initial visit we did not have our entire clandestine laboratory team, the people with the equipment to properly process it. So we returned at a later time with the full team.

Q. And you seized additional amounts of items that looked similar to the items that you seized?

A. Yes, there were larger amounts of powders and pill press and whatnot.

Q. Similar to some of the powders we saw from the red

toolbox?
A. That is correct.
Q. And that was just in other areas of that 50th Way location?
A. Correct.
Q. So after Christopher McKinney showed you some of these other locations where he stored fentanyl, what else did he do to participate with law enforcement?
A. Mr. McKinney agreed to introduce us or --
MR. MARTIN: Objection. Relevance.
THE COURT: Overruled.
THE WITNESS: Mr. McKinney agreed to participate in our investigation with showing us, basically, who his source of supply was.
BY MS. HOWARD-ALLEN:
Q. And did he agree to wear a recording device to do so?
A. He did.
Q. And who did he agree to wear a recording device with?
A. His source of supply he identified as Dion Fisher.
Q. And did he -- was there recorded -- when was this going to -- this opportunity for him to speak with Dion Fisher, wearing a recording device, when was that supposed to take place?
A. Supposed to take place on February 2nd.
Q. And so this -- and remind the jury again when you

initially came upon Mr. McKinney.
A. It was January 30th. So this would have been approximately three days-ish after we first met him.
Q. And I neglected to ask you, about what time do you think that you came upon Mr. McKinney after you saw those traffic violations on the night of January 30th? Was it early or late?
A. It was around rush-hour traffic, which would be around 5 or 6 p.m.
Q. Did, in fact, Mr. McKinney wear a recording device and meet with Mr. Fisher?
A. He did.
Q. And do you recognize Mr. Fisher? Do you see Dion Fisher here in the courtroom?
A. I do.
Q. And where? If you could, tell us an article of clothing he's wearing.
A. He's wearing a blue-and-white striped shirt, sitting to my left.
MS. HOWARD-ALLEN: Let the record reflect that Detective Pione has identified the Defendant Dion Fisher.
THE COURT: It will so reflect.
BY MS. HOWARD-ALLEN:
Q. Did you participate in this when Mr. McKinney wore the recording device on February 2nd?

A. I did.
Q. And how did you participate?
A. My role that day was to be with Mr. McKinney before and after he met with Mr. Fisher. I initially met with Mr. McKinney. He conducted a phone call, which we listened to, to set up a meeting with Mr. Fisher. I then searched Mr. McKinney and his vehicle to make sure that he had no contraband prior to meeting with Mr. Fisher. Then I again searched him and his vehicle after he met with Mr. Fisher to make sure that there was no additional contraband other than the narcotics he received from Mr. Fisher.
Q. And where was this meeting supposed to take place?
A. At Mr. Fisher's storage unit on 49th Street.
Q. And I think that was the place that you had indicated you had initially done surveillance before Mr. McKinney was stopped?
A. Correct.
Q. So that was that location that we viewed, which was Government's Exhibit 100, which is previously in evidence?
A. Yes.
Q. So where had you met with Mr. McKinney before he went in to meet with Mr. Fisher?
A. It was in a parking lot that was several blocks away from Mr. Fisher's storage unit.
Q. And did you find anything when you searched Mr. McKinney?

A. No, I did not.
Q. And so what happened after you searched him?
A. He made a phone call to Mr. Fisher, set up an appointment to meet with Mr. Fisher for the purpose of purchasing narcotics -- fentanyl specifically -- then went and met with Mr. Fisher, came back to the same location.
We conducted surveillance. The entire time he was in our eyesight, so we know he didn't stop along the way and meet with anybody else. After he met with Mr. Fisher, he returned to the prior location and met with me and provided me the pills that he purchased from Mr. Fisher.
Q. Were you able to monitor the conversation that Mr. McKinney was having with Mr. Fisher at the 49th Street location?
A. I was.
Q. So let me direct your attention to Government's Exhibit -- the drug exhibit is 227, the photograph of that drug exhibit is 227A, and there is also another photograph, Government's Exhibit 227B. Do you recognize those items?
A. I do.
Q. What are they?
A. Those are the pills that Mr. McKinney gave to me after he met with Mr. Fisher.
Q. Do they appear to be true and accurate pictures of what you received after Christopher McKinney met with Dion Fisher

on February 2nd at the 49th Street location, Government's Exhibit 100?

A. That is correct.

MS. HOWARD-ALLEN: At this time, Your Honor, I would move to admit Government's Exhibit 227, 227A, and 227B.

THE COURT: All right. Exhibits 227, 227A, and 227B are received into evidence and may be published to the jury.

(*Government Exhibits 227, 227A, and 227B received in evidence*.)

BY MS. HOWARD-ALLEN:

Q. All right. If we could, take a look first at Government's Exhibit 227B; and, if you can, tell the ladies and gentlemen of the jury what this is.

A. So this is a -- the yellow thing is a cloth bag that you would normally get when you purchase an item of Louis Vuitton. It comes in a protective bag. That's what that is. That's what he used to store the plastic bags containing blue pills that he received from Mr. Fisher.

Q. Did you know approximately how many pills were in that Louis Vuitton bag?

A. I believe they negotiated for 1600 pills that day, and the lab counts came back at around 1588 approximately.

Q. And are you -- are you able to recognize any insignia or what those pills appear to be or the color of them?

A. Those appear to be the blue counterfeit oxycodone A/215.

Q. Let's take a look at the second page. What is this item?

A. The second page is the exterior of that yellow bag that contained the blue pills.

Q. So we are looking at -- this is the outside and the first page of this exhibit was the inside showing those pills?

A. That is correct.

Q. Let's take a look at Government's Exhibit 227A. This is the photograph of Government's Exhibit 227. Does this contain -- is this a Pinellas County Sheriff's Office evidence bag?

A. This appears to be a DEA bag, which would be consistent, because after the transaction I provided the pills to DEA for submission for testing.

Q. And previously, when we had looked at some of the sheriff's office bags -- how does the Pinellas County Sheriff's Office -- how do they seal their bags when they have drug evidence?

A. We seal them with a heat sealer for an airtight seal.

Q. And is there a requirement with the Pinellas County Sheriff's Office that they be double bagged?

A. For fentanyl? Not that I know of. No.

Q. In those other instances the bags look different

because the top of them wasn't sealed just because they were Pinellas County laboratory bags?

A. Correct. Our procedures are slightly different than DEA procedures.

Q. And then at this time -- so what is the DEA -- if you can make it out on the actual item itself -- you are welcome to look at that. What is the DEA exhibit number that is on Government's Exhibit 227? I think it's the second number down.

A. This would be Exhibit No. 6 for DEA evidence.

Q. And do you see a signature at the bottom of the laboratory -- are you able to observe who might have been able to analyze that item for the DEA laboratory use only?

A. Thaddeus Mostowtt.

Q. Thank you. So at this time, I would ask, Detective Pione, if you could take these items and have the jury view them.

(Exhibit shown to jury.)

MS. HOWARD-ALLEN: At this time, Your Honor, I don't have any further questions for Detective Pione.

THE COURT: Thank you.

Any cross-examination, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: Go ahead, sir.

CROSS-EXAMINATION

BY MR. MARTIN:
Q. Good morning.
A. Good morning.
Q. Let me take you where you started, at January 30th. I believe you're surveilling the 49th Street B2 storage area. Are you with me there?
A. Yes, sir.
Q. Before you saw Mr. McKinney, how long had you been there?
A. I was not on scene when he was originally there.
Q. Okay.
A. Originally arrived.
Q. So you came on scene when he left?
A. I came on scene when he was present, correct.
Q. I'm sorry, I didn't hear you.
A. I came on scene while he was there and then when he left.
Q. Okay. Now, on scene, could you actually see the door, B2 door?
A. No. I was utilizing electronic surveillance.
Q. You didn't actually see him come out of B2?
A. I did see him on electronic surveillance.
Q. Okay. So you knew he was in the 49th Street B2 storage/office area; correct?
A. That is correct.

Q. Did you see Mr. Fisher that evening?
A. I didn't.
Q. After Mr. McKinney was pulled over, you ultimately searched a couple of residences, a storage area. How many places did you search related to Mr. McKinney?
A. The Tarpon Springs address, the Pasco address, and the storage unit address.
Q. Okay. Did you see anything with Mr. Fisher's name in any of those locations, like a label or anything?
A. I did not.
Q. Okay. Would that have been something that you would have noticed?
A. I would hope so.
Q. Now, let's go to -- I think it's February 2nd, when Mr. McKinney made a purchase that you believe was from Mr. Fisher.
A. Yes.
Q. Okay. Did you provide Mr. McKinney with funds that day?
A. I did not.
Q. Okay. And you searched him?
A. I did.
Q. So did he have funds of his own that day?
A. Any personal funds that he would have had we take off of him.
Q. Okay. When he went into that storage area, he wouldn't

have had any money on him?
A. Not any of his personal funds, no.
Q. And he didn't have any of your funds?
A. I did not give him any funds.
MR. MARTIN: Thank you. No further questions.
THE COURT: Anything else for this witness?
MS. HOWARD-ALLEN: Just briefly.

REDIRECT EXAMINATION

BY MS. HOWARD-ALLEN:
Q. Detective Pione, Mr. Martin asked you about whether there was cash provided to Mr. McKinney that evening.
A. Yes.
Q. Did you understand them to have a prior course of conduct and prior financial arrangements?
A. Mr. McKinney and Mr. Fisher?
Q. Yes.
A. Yes, they had a running tab type of relationship.
MS. HOWARD-ALLEN: No further questions, Your Honor.
THE COURT: Okay. Thank you.
Anything else, Mr. Martin?
MR. MARTIN: No, Your Honor.
THE COURT: Okay. I'll excuse the witness. Thank you, sir. We appreciate you coming in today.
THE WITNESS: Thank you.

MS. HOWARD-ALLEN: Your Honor, at this time the United States would like to admit a number of business records into evidence.

THE COURT: All right.

MS. HOWARD-ALLEN: I'll read them slowly so that we are sure to get them all. We would admit Government Exhibits 400 through 413. We would admit Government's Exhibit 450 through 455, Government's Exhibit 457, Government's Exhibit 500 through 504, 504A, 505 through 526, Government's Exhibit 526A, 526B, 526C, 526D, Government Exhibits 527 through 533, Government Exhibits 533A through 533K, Government Exhibits 534 and 535.

THE COURT: Is that it?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: All right. I'll make certain I have them all. We have 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 450, 451, 452, 453, 454, 455, 457, 500, 501, 502, 503, 504, 504A, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 526A, 526B, 526C, 526D, 527, 528, 529, 530, 531, 532, 533, 533A, 533B, 533C, 533D, 533E, 533F, 533G, 533H, 533I, 533J, 533K, 534, 535. Is that it?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Those exhibits are received into evidence and may be published to the jury.

*(Government Exhibits 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 450, 451, 452, 453, 454, 455, 457, 500, 501, 502, 503, 504, 504A, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 526A, 526B, 526C, 526D, 527, 528, 529, 530, 531, 532, 533, 533A, 533B, 533C, 533D, 533E, 533F, 533G, 533H, 533I, 533J, 533K, 534, 535 received in evidence.)*

THE COURT: Are you going to do that now or later?

MS. HOWARD-ALLEN: I will do that later, Your Honor.

THE COURT: Okay. Anything else? Is your witness ready?

MS. HOWARD-ALLEN: He's not.

THE COURT: Okay. All right. So we are going to have to take an early lunch, ladies and gentlemen. We will begin as soon as the witness is here, which probably will be at 12 or 12:15?

MS. HOWARD-ALLEN: That's fine, Your Honor.

THE COURT: I don't know if he's on his way, if you think he's coming. Otherwise, we will just wait until after lunch. We'll take an early lunch. Is that okay, then?

MS. HOWARD-ALLEN: Yes, that's fine.

THE COURT: Ladies and gentlemen, sometimes these things happen, that people are a little delayed in getting here, and that's what happened today. We will take an early

lunch. We will take lunch from 11:15 to 12:15, and we will resume at 12:15. Please don't discuss the case or form any opinions until you've heard all the evidence. We will see you back here at 12:15. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 11:14 a.m.)

COURT SECURITY OFFICER: Please be seated.

MS. HOWARD-ALLEN: Your Honor, I appreciate you accommodating us. He's expected here in about 15 minutes.

THE COURT: That's fine.

(Recess taken from 11:15 a.m. to 12:22 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Did the witness arrive from Pasco County?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: All our jurors are present?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: We will bring them in. You can go ahead and bring your witness in.

MS. HOWARD-ALLEN: I'll announce him, if that's okay, since he hasn't been here.

THE COURT: Sure, of course.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 12:22 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

Is the government ready with its next witness?

MS. HOWARD-ALLEN: We are, Your Honor. The United States would call Christopher McKinney.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Christopher W. McKinney, M-c-K-i-n-n-e-y.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Mr. McKinney, you are going to be asked some questions by Assistant United States Attorney Kelley Howard-Allen, and Mr. Martin, who represents Mr. Fisher, may also ask you some questions in cross-examination.

If you don't understand the question, please say so so they can state it a different way. Wait until the

question is finished before you begin answering so we don't have two people speaking at the same time. You need to speak up so that we can hear you and you've got the microphone right there. So we hope that you can do that. Okay?

THE WITNESS: Okay.

THE COURT: Go ahead, Miss Howard-Allen.

CHRISTOPHER MCKINNEY,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good afternoon, Mr. McKinney.
A. Good afternoon.
Q. Could you just say your name again for the jury.
A. Christopher McKinney.
Q. And, Mr. McKinney, what city do you live in?
A. I currently live in New Port Richey, Florida.
Q. Mr. McKinney, do you know Dion Fisher?
A. I do.
Q. How do you know him?
A. We grew up together in Battle Creek, Michigan.
Q. Mr. McKinney, do you see Dion Fisher here in the courtroom?
A. I do.
Q. Could you say an article of clothing that he's wearing?

A. Striped button-down shirt.
MS. HOWARD-ALLEN: Thank you. Let the record reflect that Mr. McKinney has identified Dion Fisher.
THE COURT: It will so reflect.
BY MS. HOWARD-ALLEN:
Q. Mr. McKinney, were you in business with Dion Fisher?
A. I was.
Q. What kind of business?
A. I was in a drug dealing business.
Q. What kind of drugs?
A. Mainly fentanyl, but also MDMA, or Methylone, Ethylone.
Q. And what is -- or let me ask you, what kind of fentanyl? Like was it -- what kind of -- what did you do in the business in fentanyl?
A. It was in powder form and we pressed it into pills to look like 30-milligram Oxycontin pills.
Q. How did you make it look like 30-milligram oxycodone pills?
A. We mixed it with magnesium stearate and microcrystalline cellulose and ran through a press.
Q. Was there a special way that made it look like oxycodone 30 milligram, like the brand of them?
A. The stamps in the press, they have the imprints. So when it was pressed, it would come out looking just like the pills.

Q. What are the imprints?
A. The one imprint on the white pills was ETH 446, ETH on the front, 446 on the back. The other one was A, a line, and 215.
Q. Whose idea was it to get these stamps to look like the pharmacy brand of oxycodone 30 milligram?
A. Dion's.
Q. Now, where did you get the fentanyl to put in these counterfeit oxycodone 30-milligram pills that had the ETH 446 and A/215?
A. From Dion.
Q. And do you know where Dion got the fentanyl?
A. From China.
Q. How do you know that?
A. That's what he told me.
Q. Now, you said something like you also made Molly or you said some other name. What is that?
A. Ethylone and Methylone are pretty much like MDMA, as far as we know, and we also ran that through a pill press to make what would be known as Ecstasy pills.
Q. And did those have a stamp on them?
A. Yes. They had a shoe and Air Force One. Nike shoe.
Q. A Nike shoe?
A. Correct.
Q. What was the other thing you said?

A. That was it.
Q. You said Nike shoe and something about Air Force?
A. Air Force One is the Nike shoe.
Q. I get it now. Okay. So why -- was there any significance to that?
A. Not necessarily.
Q. And how did you know this chemical name? You said it was MDMA but you also said a chemical name. How did you know that name?
A. Well, I pretty much looked them up online, but Dion also told me, you know, this is Methylone and this is Ethylone, and it's made to react the same way as MDMA, for the most part.
Q. And where did you get this chemical Methylone Ethylone or MDMA?
A. From Dion.
Q. And do you know where Dion got that?
A. He told me from China.
Q. Did you ever buy the fentanyl or purchase the fentanyl that was used in the counterfeit oxycodone pills that you and Dion Fisher produced?
A. Only from Dion.
Q. Did you ever buy the MDMA or the Methylone or Ethylone that was used in pressing the Ecstasy or Molly pills?
A. Only from Dion.

Q. Mr. McKinney, were you arrested as a result of the buying and making fentanyl pills or counterfeit oxycodone pills made with fentanyl with Dion Fisher?
A. Yes.
Q. When?
A. I was arrested early last year.
Q. And do you recall the date?
A. I do not recall the exact date.
Q. And where were you leaving when you got arrested?
A. I was leaving Dion Fisher's storage facility.
Q. And where is that?
A. It's on 49th Street in Clearwater, near the intersection of Ulmerton and 49th Street.
Q. And had you been to that location on a number of occasions?
A. Yes.
Q. And what were you doing there that day before you got arrested?
A. I was there to pick up some fentanyl. That's the whole reason I was there.
Q. And did you pay for that fentanyl that you had that night when you got stopped, the stuff that was in your car?
A. Not at that time, but I had paid for some. Like we had kind of a credit system. Like I would owe him some money or he would owe me some fentanyl or whatnot.

Q. Okay. Let's take a look at Government's Exhibit 213B. It should pop up on the screen in front of you, Mr. McKinney.

MS. HOWARD-ALLEN: One moment, Your Honor.

(*Brief pause.*)

MS. HOWARD-ALLEN: Your Honor, it's 231B, not 213B. I apologize.

BY MS. HOWARD-ALLEN:

Q. Let's look at 231B, which is already in evidence today. Mr. McKinney, what is pictured on the screen here?

A. That is a picture of my Louis Vuitton bag inside of my trunk that contained plastic bags full of fentanyl.

Q. And where did you get that fentanyl that's in this picture in 231B?

A. From Dion.

Q. And whose Louis Vuitton bag is that?

A. That's mine.

Q. So why do the bags have numbers on them?

A. That was a way I kept track of which bag was which in case, for example, a bad batch came out, I could try and track it.

Q. What were you going to do with this fentanyl in these bags?

A. I was going to take it -- I was going to take it with me and eventually cook it. When we cook it, we pretty much are diluting it and spreading it out and making it more, and

then I was going to mix it and run it through -- try to run it through a pill press.
Q. So when you say that you diluted it, what do you dilute it with?
A. We diluted it with inositol and water.
Q. And can you explain the cooking procedure further.
A. Well, the cooking procedure, we pretty much take the fentanyl, it would go into a vial, and because it was supposed to be water soluble, we dissolve it. And then in a baking dish we would put the amount of inositol that we were trying to make it into total. So if we were trying to make it into 300 grams, it would be 300 grams of inositol and then we would add water to -- no specific level, just to cover the inositol. Then we dump the dissolved fentanyl into the mixture, mix it up, put it in the oven for approximately 22 hours and it would come out in a crystalized form that we could then crush up and turn into powder.
Q. So what was the purpose of cooking it?
A. The purpose of cooking it was to, for example, take 1 gram and turn it into 50 grams.
Q. And does that ultimately mean a lot more money?
A. Yes.
Q. And does it also mean that the fentanyl is not as powerful as it was just in raw form?
A. Yes.

Q. How did you learn to cook fentanyl in the way you just described?
A. I learned from Dion.
Q. Let's take a look at the second page of this exhibit. Is this more fentanyl that was in your bag?
A. Yes. Yep.
Q. And where did you get that bag that's marked No. 9?
A. From Dion.
Q. And you had mentioned there was some money in the bag. About how much money was in the bag?
A. I think roughly 24- to $30,000.
Q. And what were you going to do with that?
A. I was going to hold onto it and maybe deposit some to the bank. Use it for expenditures.
Q. Was that money and this fentanyl seized by the law enforcement that night?
A. Yes.
Q. Was there also fentanyl pills in the bag?
A. Yes.
Q. Let's take a look at Government's Exhibit 232B. What does this show?
A. That shows a bag full of A/215 blue fentanyl pills.
Q. And who did you get those blue fentanyl pills from?
A. From Dion.
Q. And what were you going to do with those?

A. Probably use them myself.
Q. Why was that?
A. Because I was a heavy user of the fentanyl myself.
Q. Did you buy those pills from Dion Fisher?
A. No.
Q. What was the arrangement for you leaving with those pills that night?
A. I told him that one of my -- one of the people who worked for me may have wanted to try some, so he gave me them to give as a sample.
Q. And what do you mean a person that worked for you?
A. I just -- I told him it was someone who bought fentanyl from me in bulk and they might want some of the A/215 pills.
Q. Who was that?
A. That was a fictitious person named Canada that I pretty much told him was buying the fentanyl from me.
Q. Why did you come up with a fictitious person named Canada that you told Dion Fisher you were buying fentanyl for?
A. I told him it was a fictitious name Canada because I didn't want him to know I was still selling them to a guy in Boston who was paying a lot more for them.
Q. And why would you not want to tell him about someone that you were selling pills to in Boston?
A. So that I can make more money.
Q. And how did that work?

A. It worked out well.
Q. I guess what I would say, how did it work -- what was the financial arrangement that made you say that making up another person would be different than telling him that you were still selling pills to Boston?
A. Well, the difference in the arrangement was instead of him thinking I was selling pills and splitting the amount for each pill, which they was supposed to be $10 each, and he was supposed to get $5 off each pill.
Instead, I told him Canada was buying the fentanyl in bulk, which would be directly after the cooked process of changing 1 gram of fentanyl into 50 grams. So the 50 grams of powder that I wound up with after cooking, that's what I told him Canada was purchasing from me, and it was then cheaper.
Canada was paying a way lower rate. Therefore, it was less money that I had to pay him because our arrangement was me splitting my proceeds with him.
Q. So your arrangement was whenever you got any kind of fentanyl from him, what you told him you sold it for, you would give him 50 percent?
A. Correct.
Q. And why was he entitled to 50 percent if you had a customer?
A. Because I was getting the fentanyl from him.

Q. And so, then, is it safe to say your testimony is you would sell the powder for less than you would sell the pills for?
A. Correct.
Q. And as a result, you would have to split less money than splitting more money?
A. Correct.
Q. So when you sold these pills, what was the price that you normally sold them for?
A. Normally $10 a pill for people who bought less; but if somebody bought bulk amounts, it would vary.
Q. All right. Well, we will get into some of that later.
So after you were stopped and law enforcement seized these pills that we see in Government's Exhibit 232 and seized the fentanyl that we saw in 231 and the money that you told us about, what did you decide to do?
A. I decided to cooperate with law enforcement.
Q. How did you do that?
A. By assisting. Well, pretty much giving all the information I had on the drug operation and assisting them in arresting Dion Fisher.
Q. And others?
A. And the gentleman in Boston.
Q. So when you told them about the drug operation, when was this?

A. This was within a few hours of me getting arrested.
Q. And did you go to a police station?
A. Yes.
Q. At that time had you taken some fentanyl pills?
A. Yes. I'm sorry. As in consumed myself?
Q. Yes, yourself.
A. Yes.
Q. Do you have a clear memory of what you told law enforcement that night about the drug operation?
A. Yes.
Q. Where else did you take law enforcement that night?
A. Well, first we went to my home in Tarpon Springs.
Q. What did you do there?
A. There, law enforcement took what fentanyl I had in the home and what money I also had in the home.
Q. And what fentanyl did you have at your house?
A. I don't remember the exact amount, but it was fentanyl that I was using in various places throughout the house.
Q. And so this various forms of fentanyl powder that you had through the house that you were using, was it in pure form or was it in some kind of diluted form?
A. It was in the diluted form, after the cooking process I explained.
Q. And so I think you said when you cooked it before it was kind of like crystal. How was it -- did you do something

to it after it was crystalized in the pan?
A. Yes. After it was crystalized in the pan I took a tool and broke it out of the pan, and then I run it through a coffee grinder and turned it into powder.
Q. And how did you take the fentanyl that was in your house?
A. I snorted it.
Q. When you took law enforcement to your house that night, did they have a search warrant?
A. No.
Q. How did they get in, then?
A. I permitted their entry.
Q. And did you let them search your house?
A. Yes.
Q. And so would you say at that time that you had the fentanyl in the house that you were snorting, you were addicted to fentanyl?
A. Yes.
Q. For how long had you been addicted to fentanyl?
A. Roughly, I would say -- at that point, a little over two-and-a-half years, approximately.
Q. So, Mr. McKinney, where did you get the powder, the fentanyl powder that you said was at your house?
A. Originally from Dion Fisher.
Q. So you mentioned that you also had money at the house.

What kind of money did you have at your house?
A. The amount? Well, it was money from drug proceeds.
Q. And where did you store it?
A. Most of it -- I believe all of it was in my closet, in briefcases.
Q. And how did you have it organized?
A. It was organized to where it was 100,000 per briefcase; but briefcases with all hundreds could hold more, so it might be 200,000. I had a couple with 150,000 and I had 300,000 in my safe.
Q. And where had you gotten this money?
A. From drug proceeds.
Q. And over what period of time do you think you accumulated that money?
A. It was over approximately three years.
Q. And about how much was it?
A. It was approximately $1.4 million.
Q. And let's take a look at Government's Exhibit 173, which has already been admitted into evidence.
What is this, Mr. McKinney?
A. That's one of my briefcases full of money.
Q. And where would you have indicated how much money you had in that briefcase?
A. I indicated the amounts on the locks. So when I shut it, I closed it and then I put either 200, 100, 150 on the

lock on the right side, I believe, so I would know how much was in each one.

Q. So, Mr. McKinney, are you indicating sort of right there on that lock -- if you look up on the screen, I have a red pointer. Is that around where you would put the amount of money (indicating)?

A. That's correct.

Q. Okay. Let's go to the second page of this exhibit. What is this?

A. Looks like another briefcase I had in my closet.

Q. Were they just -- how were they positioned in your closet?

A. They were stacked neatly.

Q. And let's look at the next page. What is this one?

A. That's another briefcase full of money.

Q. What happened to this money?

A. It was confiscated by law enforcement.

Q. And did you consent to that confiscation?

A. I did.

Q. So that night, where else did you go after the law enforcement officers came to your house?

A. After leaving my house, we went to another house I owned in New Port Richey on Calumet Drive.

Q. Do you recall the address?

A. I believe 10945 Calumet Drive.

Q. And when did you purchase the house on Calumet Drive, Mr. McKinney?
A. I think it was September of 2017.
Q. So if this was in early '18, you hadn't had the house for more than a couple of months; is that right?
A. Correct.
Q. So how much -- do you recall how much you paid for that house?
A. Roughly 350,000. Approximately.
Q. And did you take a mortgage?
A. No.
Q. How did you pay for the house?
A. I paid for it in cash.
Q. And what were you going to do with the house?
A. I was going to fix it up and live in it.
Q. So where did you make all the money that you paid to buy that house in cash? I mean, to buy that house in full without a mortgage.
A. It was all drug proceeds.
Q. So that house on Calumet Drive, what ultimately happened to that house?
A. That house was seized by law enforcement.
Q. Was there anything else that was seized by law enforcement other than what we have talked about already?
A. Two vehicles that I had. It was an H2 Hummer and a

Polaris Slingshot was also seized.

Q. Any other real property? Any other houses or property?

A. Oh, and another house that I had in -- I can't remember if it was Port Richey or New Port Richey, but another house that I had in that area was seized.

Q. So the house on Calumet Drive, was anyone living there at the time?

A. No.

Q. So what sort of items did you have in the Calumet Drive house?

A. I didn't have much of anything in the house itself. I might have had a TV in there. I just replaced air-conditioners, so there was new thermostats and just nothing much other than that. But in the garage I had a couple of golf carts, two golf carts, a commercial lawn mower, and I had a few pill presses hidden underneath a work bench, and I had a container full of the fentanyl powder mixture, which is the mixture that we were running through the pill press, which contained the microcrystalline cellulose and magnesium stearate. I had, like, various tools that I would use in the process of making pills, like coffee grinders and a few fans and maybe some outlets, power strips.

Q. All right. Let's take a look at Government's Exhibit 171, which is already in evidence.

Do you recognize this picture, Mr. McKinney?

A. Yes.
Q. And what are those?
A. Those are the pill presses that I purchased.
Q. And where did you purchase them from?
A. I purchased them from a guy on Ebay.
Q. Do you recall how much you paid for any of them?
A. I do not recall.
Q. Were they in working condition?
A. No, they were not working properly. They would turn on and run, but they would not properly press pills.
Q. All right. Let's take a look at the second page. What is that?
A. Well, in the middle is one of the pill presses. That's the rear view, and the containers is just the various tools I used in the process of making pills.
Q. And they appear to be covered with powder. Do you know what that was?
A. That is some of the fentanyl powder.
Q. Would that have been dangerous for somebody to enter that and touch that?
A. Yes.
Q. Let's take a look at the next page. What is that?
A. That's another pill press that I purchased.
Q. What is that, an electric pill press?
A. Yes.

Q. How many pills would that press at a time?
A. I believe that one would press approximately 5,000 an hour.
Q. And was that working?
A. No.
Q. Was that expensive; do you recall?
A. Not as expensive as the other presses.
Q. Would you have been registered in any way to obtain the pill press?
A. No.
Q. Let's take a look at the next picture. Again, another view of the same one?
A. Yes, same one.
Q. What is the next picture? Is that the last page?
All right. Let's take a look, then, at Government's Exhibit 233B. What is that, Mr. McKinney?
A. That's some of the pills that I was attempting to press with these broken pill presses, and they were coming out really soft and lopsided.
Q. So what were you going to do with that bin of --
A. I was going to grind that up and run it back through the presses until I could get them working right.
Q. And so in the meantime, was this -- what were those pills stamped with?
A. They were stamped with ETH on one side, 446 on the

other.
Q. And let's look at the next picture. I think they are all bagged. Let's look at 233C. Do you recognize these?
A. Yes.
Q. What are they?
A. Those are some of the pills I was making, the ETH 446s.
Q. Did you make the blue A/215 bills?
A. In the beginning, a little bit, but those were mostly Dion's product.
Q. And when you were making the A/215 pills, did you ever make them by yourself or did you make them just with Dion Fisher?
A. I can't exactly remember that to tell you the truth. Most of the time I would make them with Dion Fisher.
Q. And how about the white ETH 446 pills?
A. In the beginning we made those together, but in the end I made them myself.
Q. And why in the end did you make them yourself?
A. I made them myself mainly because he didn't know I was making them, so ...
Q. And why did you need to make ETH 446 white counterfeit oxycodone pills?
A. I'm sorry. Can you repeat?
Q. Who were you selling these white ETH 446 pills to?
A. I was selling them to a guy in Boston.

Q. All right. And what was his name?
A. Pete.
Q. Do you know his real name ultimately?
A. I had my suspicions as to what his real name was, which was Philip Morose.
Q. Why did you have those suspicions?
A. Because he sent me an e-mail early on in our relationship that had his real name, and I don't think he meant to use that e-mail.
Q. So you knew him as what?
A. As Pete.
Q. Okay. So let's take a look at Government's Exhibit 170. It's already been previously admitted. Let's take a look at -- I think the third page is probably the clearest.
Do you recognize this?
A. Yes, that's one of the dies for my pill presses.
Q. And where was that located?
A. Well, when the press was running, it would go inside of the press and it would press down and leave that imprint on the pills.
Q. And did you provide that to law enforcement or did they locate it?
A. This particular stamp, I'm not a hundred percent sure.
Q. All right. Let's take a look at --
MS. HOWARD-ALLEN: May I approach the witness,

Your Honor?

THE COURT: You may.

(*Document tendered.*)

BY MS. HOWARD-ALLEN:

Q. Mr. McKinney, I've just given you a photograph that's been marked as Government's Exhibit 6. Do you recognize this photograph?

A. Yes.

Q. And how do you recognize it?

A. That's a press that I attempted to order from China and was held by Customs.

Q. And how did you figure out how to order this particular pill press that's in Government's Exhibit 6? How did you figure out how to order that?

A. I just searched on Ebay and found it. They sold a lot of them on there.

Q. How much money did you pay for it?

A. It was over 6 grand.

MS. HOWARD-ALLEN: Your Honor, at this time I would move to enter into evidence Government's Exhibit 6.

THE COURT: All right. Exhibit 6 is received into evidence and may be published to the jury.

(*Government Exhibit 6 received in evidence.*)

BY MS. HOWARD-ALLEN:

Q. At this time, if you could, pull up Government's

Exhibit 6. And so you said this was several grand?
A. Yes. It was over 6-, but less than 7-.
Q. And did you receive any kind of notice that this item was seized?
A. Yes. I received a letter from Customs.
Q. And did you do anything about that?
A. No.
Q. And how many pills did you say that this could make?
A. I don't remember to be exact, but I know it was a lot more than the other ones.
MS. HOWARD-ALLEN: All right. We can take that down now.
BY MS. HOWARD-ALLEN:
Q. You had indicated that you had taken the law enforcement officers to your house to Calumet Drive and that you were attempting to cooperate.
Did you at some point obtain a lawyer?
A. Yes.
Q. And did you get what is commonly referred to -- did you sign a proffer letter?
A. Yes.
Q. Did you ultimately agree to pleading guilty? Did you ultimately agree to plead guilty?
A. Yes.
Q. To what charges?

A. To drug trafficking.
Q. With who?
A. With Dion Fisher.
Q. And what kind of drugs?
A. Fentanyl.
Q. And did you plead guilty to a certain quantity?
A. I can't remember the exact quantity.
Q. But it was a written agreement?
A. Yes.
Q. Are have you been sentenced yet in that case?
A. No.
Q. So that night, after you took them to these locations, was there another location that you provided access to law enforcement?
A. Yes, to my storage unit.
Q. And how did you provide them access to that unit?
A. I told them where it was and gave them a key.
Q. Let's take a look at Government's Exhibit 172 that's been already admitted into evidence. Is this -- what is this?
A. That's the front of the storage unit.
Q. And is that your business that's listed under that No. 24 in Government's Exhibit 172?
A. No.
Q. What is it?

A. That's a gentleman's business -- that's the gentleman who subleased the unit to me.
Q. And what did he sublease it to you for?
A. Well, he subleased it to me because he no longer was running his business at this location and could not afford to keep paying for the unit. I don't remember the price that I paid.
Q. And what did you -- do you recall around when you got that, when you subleased that unit?
A. I don't remember exactly when it was.
Q. What did you -- at the time you subleased it, what did you sublease it to do?
A. I subleased it to store vehicles, store -- well, I had a power washing and mobile detailing business and I wanted to store a lot of the equipment there, and also I planned to use part of it for drug production.
Q. So is that what you used it for?
A. Yes.
Q. And did you use it at any time for this mobile car washing?
A. Yes.
Q. About how long did you do that before it became just a drug operation, fentanyl operation?
A. Roughly four to five months.
Q. Let me ask you, at this location where you were

producing some fentanyl, did you actually -- well, let's take a look at some photographs from there. Let's look at -- I'll get the number correct this time.

Let's look at Government's Exhibit 234B, which previously has been admitted into evidence.

What does this picture show, Mr. McKinney?

A. That's showing the fentanyl in pure form, which is before it gets cooked or anything.

Q. And what are the numbers on the bag? What's the significance of those?

A. The numbers are for personal purposes where I try and track the bags in case I had a bad batch or whatnot.

Q. And when you gave the keys to the law enforcement officers, did you -- what did you tell them about the -- specifically about this red toolbox?

A. I told them that if there was any pure fentanyl, it would more than likely be inside of the red toolbox.

Q. Where did you get all of this fentanyl that was in this toolbox?

A. From Dion.

Q. Did you purchase any of it on your own from any other source?

A. No.

Q. Did you ever buy fentanyl from anyone --

A. No.

Q. -- but Dion Fisher?
A. Except Dion Fisher, yes.
Q. Let's look at each one of these. Each bag is lifted out. Let's look at a closer picture. About how much fentanyl do you think that is, looking at it, or do you know?
A. Roughly -- I would -- I really don't know, to tell you the truth, but I would assume it's probably around a thousand grams.
Q. And if you purchased that from Dion Fisher, how much would you purchase it for?
A. Let's see. I believe for a hundred grams I was paying 125,000, I believe. For every 20 grams I was paying -- yes, every 20 grams I paid 25,000. So if that was a thousand grams, I mean, you know --
Q. Was that something that you stored up over time?
A. Yes.
Q. Let's take a look at the next bag, and this is part of your numbering system?
A. Yes.
Q. Did you have that written down or kept track of that in any way, shape, or form?
A. Yes, I had it written on a dry erase board that was in that same storage unit.
Q. And let's take a look at the next one, item 14, and the next page. And, again, the next page. Why is this a

different color, this bag marked No. 2?
A. We never really determined why it was turning purple.
Q. What was the issue with it being purple?
A. Well, the problem is I was -- I could not make white pills with purple fentanyl.
Q. And was there anything about the strength of the fentanyl that was purple?
A. Not to my knowledge.
Q. Let's look at the next one. What color is that?
A. That's purple.
Q. So if you couldn't make white pills with it, what did you think you were going to do with purple fentanyl?
A. I was going to give it back to Dion.
Q. Why?
A. Because I got it from him in the first place, and to avoid having to pay him or owing him money for it, I figured I would return it.
Q. All right. Let's look at the next picture. Is that a smaller amount?
A. Yes.
Q. And let's look at the next picture. Is that it? Okay.
Mr. McKinney, after you agreed to cooperate and took law enforcement to these other locations, what else did you do as part of cooperating with law enforcement?
A. I recorded phone calls with Dion, and then I

participated in a meet-up with Dion to get more fentanyl.
Q. And where did that meet take place?
A. That meeting took place on Ulmerton at his -- excuse me. 49th Street storage unit.
Q. When you called him on the phone and made a recorded conversation, how did you know how to contact him in terms of calling a certain number?
A. I had his number saved from previous conversations.
Q. And what -- did you have it saved under anything in particular on your phone?
A. Well, he had several different numbers, so it might have been saved under D, just the letter D, which is what I believe his main number was saved under. But there were others saved under various names. Usually close to D or Dion.
Q. And why did you -- if you know, did numbers change from time to time for Dion Fisher?
A. I knew that he switched phones from time to time.
Q. So when you agreed to make recorded calls, was that soon after you were arrested?
A. Yes.
Q. All right. If you can, take a look in front of you. I have some copies of CD disks and transcripts. I want you to take a look, first, at Government's Exhibit 308, 308A, and 308B.

Do you recognize those disks in any particular way?
A. Yes.
Q. How?
A. I've watched the contents of this disk and then I signed it -- or with my initials.
Q. And if you look at Government's Exhibit 308A and 308B, is that an accurate transcript of the conversation that took place with you and Dion Fisher on that particular date?
A. Yes.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter Government's Exhibit 308, 308A, and 308B into evidence.
MR. MARTIN: Your Honor, can we have a quick sidebar?
THE COURT: Yes.
MR. MARTIN: Thank you.
(The following was held at sidebar:)
MS. HOWARD-ALLEN: This one has just one transcript, but we can address these further because I know Mr. Martin wants to bring up something.
MR. MARTIN: It's the same objection with regard to 308A. Also, she hasn't brought them up yet, but while you are here, 309B, which is a transcript, 310B and 311A that you previously ruled on, but I'm noting it for the record.
THE COURT: That's fine. Your objection is noted

but overruled for the same reasons. I'll read the limiting instruction to the jury.

MR. MARTIN: But I don't need to come back up when she offers it.

THE COURT: That okay with you?

MS. HOWARD-ALLEN: That's fine. We will note the same objection, and I'll clarify those as 308A and 308B.

THE COURT: Okay.

(Sidebar ended.)

THE COURT: You've moved into evidence 308 and 308A.

MS. HOWARD-ALLEN: I will clarify. I'm moving in 308 and 308A, which is the transcript.

THE COURT: Okay. Exhibits 308 and 308A are received into evidence and may be published to the jury.

(Government Exhibits 308 and 308A received in evidence.)

THE COURT: And, ladies and gentlemen of the jury, because it's a transcript, I'm going to read to you the same instruction that I read to you earlier.

Exhibit 308A --

MS. HOWARD-ALLEN: I don't mean to interrupt, Your Honor. I will go through a number of them, if you would like to. I'm going to move to enter 309A, 310B.

THE COURT: Let's see, 309 and 309A?

MS. HOWARD-ALLEN: Yes, but just the transcript for the purpose of you reading the instruction. The transcript will be 309A, the transcript 310B, the --

THE COURT: But you're not going to move it in right now?

MS. HOWARD-ALLEN: No.

THE COURT: But I will read the instruction as to all of them.

MS. HOWARD-ALLEN: 310B and 311A.

THE COURT: Okay. Members of the jury, Exhibit 308A has been identified as a typewritten transcript of the oral conversation heard on the tape-recording received in evidence as Exhibit 308.

I've admitted the transcript for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the tape-recording and, if the speakers have been identified, to also help you identify the speakers.

But you are specifically instructed that whether the transcript correctly reflects the content of the conversation or the identity of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard and from your own examination of the transcript in relation to hearing the tape-recording itself as the primary evidence of its contents. If you determine

that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Later on, ladies and gentlemen, when I do receive 309A, 310B, and 311A, I will read to you the similar instruction.

Go ahead, Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:

Q. So these exhibits have been admitted. So at this time I'm going --

THE COURT: All I've admitted right now is 308 and 308A.

BY MS. HOWARD-ALLEN:

Q. I will publish those. They have been synced to the transcript, and the screen in this case will be a black screen because it's a phone call. And I'm going to stop it at certain times and ask you questions about this telephone conversation.

What date did this telephone conversation take place?

A. January 31, 2018.

Q. All right. Let's play Government's Exhibit 308.

(Recording played.)

BY MS. HOWARD-ALLEN:

Q. Okay. So, first of all, whose voices are on this

telephone call?
A. That's Dion Fisher's voice and my voice.
Q. And when he's asking you what color that stuff turned out, what stuff is he talking about?
A. He's talking about the fentanyl that was turning purple.
Q. And when he asks if he can get some smile from you -- from that guy, what is smile? What does that mean?
A. Smile is MDMA or Methylone or Ethylone. Any of the above.
Q. And do you know who he was referring to as that guy, as to who he was going to get the MDMA from or who you could get it from?
A. I believe he was asking if I could get some from my fictitious character Canada.
Q. Let's continue on.
(Recording resumed.)
BY MS. HOWARD-ALLEN:
Q. What is he referring to, he's paying 25 for eight? Eight of what?
A. He's talking about MDMA or Ethylone or Methylone pills.
Q. And did you know Dion Fisher to use them?
A. Yes.
Q. And did you ever use them?
A. Yes.
Q. And on what occasion -- did you ever use them with Dion

Fisher?
A. Yes.
Q. What was, generally, the occasion if there was one?
A. It was usually if we were going out, like, to a nightclub or traveling and going out mainly.
Q. What was the effect of it?
A. The effect of it was mainly euphoric and energizing.
Q. All right. Let's continue.
(Recording resumed.)
BY MS. HOWARD-ALLEN:
Q. So what does he mean when he says they almost seemed like Air Force Ones?
A. He's referring to the original MDMA or Methylone pills that we used to make because they were good, and he was saying that he found some that were decently similar.
Q. And how did he -- how do you -- how did you know they were good?
A. Basically by the effects.
Q. All right. Let's continue.
(Recording resumed.)
BY MS. HOWARD-ALLEN:
Q. So what are you turning the conversation to now?
A. I was turning it back to the fentanyl.
Q. And what were you asking there about this person that you said is a fictitious person Canada?

A. I was asking when he could get more fentanyl for Canada for me to give to Canada.

Q. Was that something that you were going to pay for at some point?

A. Yes.

Q. And when would you have paid for it?

A. Once -- when I told him I got paid is when I would pay him.

Q. And how much would you pay him?

A. It would be 125,000 for every 100 grams.

Q. So what made you think that? Why would you have a deal that you would rely on somebody else selling pills and giving you half when they sold them? What would that relationship be based on?

A. Well, it was based on -- I didn't know where to get fentanyl from, myself. So ...

Q. Let's continue on this phone call.

(Recording resumed.)

BY MS. HOWARD-ALLEN:

Q. What does he mean when he says that he got mad at him because it was real bad? What does that mean?

A. He was talking about some fentanyl that we received was not good.

Q. And so who do you think that Mr. Fisher was mad at when he said that?

A. Whatever person in China sold it to him.
Q. All right. Let's continue on.
(Recording resumed.)
BY MS. HOWARD-ALLEN:
Q. What are you referring to the color changing stuff?
A. I'm referring to the fentanyl that was turning purple.
Q. Was that some of what we saw in that picture from the 50th Way place?
A. Yes.
Q. Let's continue on.
(Recording resumed.)
BY MS. HOWARD-ALLEN:
Q. Let's stop there. What are you asking about? What's Gatorade?
A. Gatorade was our code for the blue fentanyl pills.
Q. And did you always use that code?
A. Yes.
Q. And did Mr. Fisher know what that meant?
A. Yes.
Q. Let's continue.
(Recording resumed.)
BY MS. HOWARD-ALLEN:
Q. What is he referring to that he says he has right now?
A. The blue fentanyl pills.
Q. And how did you know how Mr. Fisher had 4,000 pills?

Did he press the 4,000 pills?
A. As far as I knew he had his accomplice Sam pressing the pills for him.
Q. All right. Let's keep going.
(Recording resumed.)
BY MS. HOWARD-ALLEN:
Q. Who is he referring to when you say -- when you asked him if Sam was still doing those?
A. He's referring to Sam. That was the guy that he had pressing the fentanyl pills for him.
Q. Did you know Sam?
A. Yes.
Q. How did you know him?
A. I met him through Dion.
Q. And did Sam ever press pills for you?
A. No.
Q. Did you ever employ other people to press pills for you?
A. No.
Q. All right.
A. I'm sorry. On a couple of occasions we had a younger guy pressing pills for us, but that was back when we had the hand crank pill press.
Q. We will get to that later. Let's continue on with this telephone call.

(Recording resumed.)

BY MS. HOWARD-ALLEN:

Q. Who is Dion Fisher talking about?

A. Still talking about Sam.

Q. All right. Let's continue.

(Recording resumed.)

BY MS. HOWARD-ALLEN:

Q. Let's stop there. Who is Violator?

A. Violator is one of Dion's accomplices.

Q. Did you know his name?

A. I knew his name as Keene.

Q. Okay. Did he also know -- let's keep going.

(Recording resumed.)

BY MS. HOWARD-ALLEN:

Q. Let's stop for a minute. Who is Marquis and what are you referring to?

A. Marquis is his little brother, and I was referring to having him replace -- or do some work for me at the house I purchased.

Q. And how did you know Marquis?

A. We all grew up in the same neighborhood.

Q. Why was Marquis in Florida?

A. I believe he was here visiting.

Q. All right. Let's continue.

(Recording resumed.)

BY MS. HOWARD-ALLEN:
Q. All right. So, Mr. McKinney, again, you are still talking about Canada, which was this person who you told Dion Fisher that you sold powder to, and that was a cover for what? For selling pills?
A. It was a cover for Pete in Boston who I was selling pills to.
Q. So after you hung up on this phone call on the evening of January 31, what happened next? Was there another call before you went over there?
A. I believe there was another call before. So, yeah.
Q. Let's look at Government's Exhibit 309, which is on a disk in front of you, and a transcript, which is 309A.
Do you recognize those two items?
A. Yes.
Q. And how do you recognize them?
A. I listened to the contents of the disk and signed my initials on the front of it.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter into evidence Government's Exhibit 309 and 309A.
THE COURT: Exhibits 309 and 309A are both received into evidence and may be published to the jury.
(Government Exhibits 309 and 309A received in evidence.)

THE COURT: I'll read you the same instruction.

Exhibit 309A has been identified as a typewritten transcript of the oral conversation heard on the tape-recording received in evidence as Exhibit 309. I've identified the transcript for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the tape-recording.

I've admitted the transcript for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the tape-recording and also to help you identify the speakers.

But you are specifically instructed that whether the transcript correctly reflects the content of the conversation or the identity of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard and from your own examination of the transcript in relation to hearing the tape-recording itself as the primary evidence of its contents. If you determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Go ahead, please.

MS. HOWARD-ALLEN: All right. Let's take a listen.

(Recording played.)

BY MS. HOWARD-ALLEN:

Q. Do you know when this phone call in Government's Exhibit 309 took place?
A. February 2nd, 2018.
Q. And, again, this was shortly after you -- just within a couple of days of you being arrested with the fentanyl that you purchased from Dion Fisher?
A. That's correct.
Q. All right. Let's listen to this phone call 309 that has the transcript placed at the bottom.

(Recording played.)

BY MS. HOWARD-ALLEN

Q. So, Mr. McKinney, what did you understand was going to happen after this?
A. I was going to meet up with him at his storage unit on 49th Street and get some fentanyl pills.
Q. And at that time, had you -- was law enforcement present for this call?
A. I can't remember if they were present or if I had -- if they had me record it.
Q. Then when you met with him next -- what happened before you met with Mr. Fisher at his 49th Street location?
A. When I met with him next, they wired me up, and I was wearing, like, a microphone and had, like, a phone in my pocket that was on and I had a camera on my key chain. So it was all equipped.

Q. Did they meet up with you in a certain location before that to provide that material to you?

A. Yes. They met up with me at a location that was -- it was really close to his storage unit.

Q. And what else did they do when they met with you before you went to see Mr. Fisher at 49th Street?

A. What else did we do? Well, they just gave me, like, instructions on what to do or not to do. Like a safe word and that sort of thing. That was about it.

Q. Did they look through your vehicle or your person?

A. Yeah, yeah, they searched my vehicle.

Q. And did they search you, as well?

A. Yes.

Q. And to make sure that you didn't have anything on you, any pills on you?

A. Correct.

Q. All right. So at this time I would like you to take a look at Government's Exhibit 310, 310A, and 310B. Do you recognize those items that are in front of you?

A. Yes.

Q. And what are they?

A. Let's see. These are both of these disks I watched, the video, and I signed my initials on the front.

Q. And, then, do you recognize the transcript that goes with this on 310B?

A. Yes. That's the transcript from my going to his storage unit.
Q. And what was the date that you went to the storage unit?
A. It was February 2nd, 2018.
MS. HOWARD-ALLEN: At this time, Your Honor, I would ask to admit Government's Exhibit 310, 310A, and 310B.
THE COURT: Exhibit 310, 310A, and 310B are received into evidence.
(Government Exhibits 310, 310A, and 310B received in evidence.)
THE COURT: And I think 310A is the clip. Is that the one you'll be playing.
MS. HOWARD-ALLEN: We will be playing 310A, which is the clip, and then the transcript for that 310A is 310B.
THE COURT: Exhibit 310B has been identified as the typewritten transcript of the oral conversation heard on the tape-recording received in evidence as Exhibit 310A. The transcript may also identify the speakers engaged in the conversation.
I've admitted the transcript for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the tape-recording and also to help you identify the speakers.
But you are specifically instructed that whether

the transcript correctly reflects the content of the conversation or the identity of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard and from your own examination of the transcript in relation to hearing the tape-recording itself as the primary evidence of its contents. If you determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Go ahead.

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:

Q. Mr. McKinney, is this both audio and video on this recording?

A. Correct.

Q. And at the time this particular clip begins, which door are you entering when you go into the 49th Street -- let me put that up. I think it's Government's Exhibit 100.

Where do you go in when you meet Mr. Fisher?

A. It's the door on the left, the smaller of the two doors.

Q. And was that open or did Mr. Fisher have to unlock it for you to go in?

A. It was open.

Q. And so when you go in, what do you walk into when you go in there?

A. I walk into his storage unit where he keeps cars.

Q. And that particular day when you walked in there, what car was in there?
A. I remember the Maserati was there.
Q. And where was Mr. Fisher when you walked into the storage unit that day?
A. I believe he was back in his office.
Q. And so you were familiar with how to get to his office from having been there previously?
A. Yes.
Q. All right. So let's play 310A that is synced with the transcript of 310B.
(Video played.)
BY MS. HOWARD-ALLEN:
Q. What rooms are you talking about?
A. I was referring to rooms on one of the present vehicles of his.
Q. And I think he mentions to you somebody by the name of Konrad. Who is that?
A. Konrad is the guy who he buys his rims from.
Q. Did you know Konrad?
A. I've met him a few times.
Q. And where?
A. He had a shop where he sold rims for cars.
Q. And did you buy rims from him?
A. Yes. On one occasion.

Q. And do you know the name of his shop or his last name?
A. No, I do not.
Q. Did you ever buy cars from Konrad?
A. No.
Q. And what did you know about Konrad and Dion Fisher's relationship?
A. Well, I knew that he would buy rims from him and also Konrad would launder his money.
MR. MARTIN: Objection. Lack of personal knowledge, speculation.
THE COURT: It's overruled.
BY MS. HOWARD-ALLEN:
Q. How did you know this, Mr. McKinney?
A. Because Dion told me.
Q. So in this transcript that you see right up here, there is a word -- a name Galena. Who would that be?
A. That was my girlfriend.
Q. Let's continue on.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What are you talking about there, the clothing and the jacket and the shoes?
A. We are talking about a pair of shoes that I was wearing that he said looked cool and he was letting me know there was also a matching jacket available.

Q. Was that a specific brand?
A. It was Louis Vuitton.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. So where are you seated?
A. I'm seated on a couch in the office which is in Dion Fisher's storage facility on 49th Street.
Q. And all the noise in the background, what is that from?
A. I believe my keys.
Q. And there are a couple of times that you can see -- who do you see in this video? Who are you talking to?
A. I was talking to Dion Fisher.
Q. Now, right now it appears that you are talking about some kind of purple stuff. What is the purple stuff that you are talking about?
A. We are talking about the fentanyl that turned purple.
Q. All right. Let's continue on.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. So why does Mr. Fisher say that you can send it back to him?
A. He's referring to some fentanyl that we received that we believed was no good, that he was -- he believed that Canada had and that he wanted him to send it back to us.

Q. And was that the fentanyl that you still had?
A. Yes.
Q. And where did you obtain that fentanyl?
A. From Dion Fisher.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What was that that you just -- that yellow thing that we just saw go across the screen?
A. I believe it was a Louis Vuitton dust bag that contained the fentanyl pills that Dion was giving me at that time.
Q. And what's he telling you about how many are in there?
A. He said that it was roughly 1600.
Q. And was that how many you were expecting or were you expecting more?
A. I was expecting around 4,000.
Q. So do you know what happened?
A. I believe he said -- as far as I know, he just ran out, got low.
Q. Let's keep going.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. Where are you going now?
A. We are going out to the area of his storage unit where

his cars are located.
Q. And why is that?
A. Because he said he still had some of the fentanyl left that he was retrieving.
Q. And what color was the fentanyl that he said he still had some of it left?
A. Some of the purple fentanyl.
Q. Let's continue on.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What was he holding up?
A. A bag of the purple fentanyl.
Q. And where are you -- where is Mr. Fisher standing right now?
A. He's standing inside of his storage unit on 49th Street.
Q. And the car that he's going into, what was that?
A. I believe it's the Maserati.
Q. Had you seen that Maserati before?
A. Yes.
Q. And had it always been blue, Mr. McKinney?
A. No, it was -- previously he had it wrapped in reflective gold.
Q. What does wrapped mean?
A. Wrapped is -- it's a method of changing a car's color and look with a film. They put a film on the outside and

wrap the car in a film.
Q. What color was the wrap that this Maserati previously was?
A. It was a reflective gold.
Q. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What did you understand Mr. Fisher to be saying about the purple fentanyl?
A. He was saying that people were saying the purple was really strong.
Q. And did you agree with that?
A. I really didn't know to tell you the truth. I have never used the purple myself.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. So who is he talking about now again?
A. He's talking about Sam.
Q. And you had met Sam; right?
A. Yes.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. So what did that mean, that he gave him a thousand

dollars for 1300 pills?
A. Pretty much it was underpaying him.
Q. And what did you understand as far as who was buying pills from who?
A. Sam was buying pills from Dion.
Q. Would they have been pills that he had pressed for Dion?
A. Yes.
MR. MARTIN: Objection.
THE COURT: The objection is sustained. You can go ahead and lay the foundation.
BY MS. HOWARD-ALLEN:
Q. You indicated that you believed that he was -- that Sam was paying Dion a thousand dollars for 1300 pills?
A. Correct.
Q. Do you know where those 1300 pills would have come from?
A. They would have came from Sam, who was pressing them.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. Do you know who Zach is, Mr. McKinney?
A. No.
Q. Okay.
A. I heard his name, but I don't really know him.
Q. Let's continue.

(Video resumed.)

BY MS. HOWARD-ALLEN:

Q. What house are you referring to when you ask Mr. Fisher about that?

A. I was referring to the house he told me he owned, one of which was in Wauchula, I believe it was, and another in Pinellas County somewhere.

Q. All right. Let's continue.

(Video resumed.)

BY MS. HOWARD-ALLEN:

Q. What are you talking about when -- what do you understand Mr. Fisher to be saying when he uses the word beans?

A. Beans was in reference to Molly or MDMA, Ethylone.

Q. All right. Let's continue.

THE COURT: Let me ask the jury if they need to take a break. We will end today at 3 o'clock. It's five after two. We can keep on going or take a very short break. Do we need a short break?

(Unanimous negative responses.)

THE COURT: If you need to, please let me know. Otherwise, we will keep on going until 3. And if any of the lawyers need to take a break, please let me know, as well. Witness, anybody, and we will take a short break.

Keep on going.

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:
Q. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. All right. Mr. McKinney, what happens after you leave? Is that the end of the meeting?
A. Yes, I believe so.
Q. And what happens after you leave that meeting? Where do you go?
A. After I left that meeting I went and met up with the law enforcement, which was in the vicinity.
Q. And what happened when you met with law enforcement?
A. They confiscated the pills that I received from Dion.
Q. And did they also -- what else did they do?
A. They also took the electrical equipment off of me, like the video recorder, the sound recorder, the phone that was on. All that sort of stuff.
Q. Did they search you, as well?
A. Yes.
Q. All right. Let's take a look at Government's Exhibit 227B. Mr. McKinney, do you recognize the photograph that's up on the screen in front of you, which is Government's Exhibit 227B, which has previously been admitted?
A. Yes.
Q. What is it?

A. Those are the pills I received from Dion at that meeting.
Q. And how are they packaged?
A. They are in, like, individual small bags.
Q. And had you received materials like that before from Mr. Fisher?
A. One other time I received some in a small bag of that nature.
Q. And those kind of bags, do you see any special imprint on them?
A. It's, like, alien heads.
Q. And let's look at the second page. Do you recognize that bag shown in the second page of 227B?
A. Yes.
Q. And what is that?
A. That's the Louis Vuitton dust cover that he had the pills in that he gave me at that meeting.
Q. And when you had -- is that common, that he uses those materials with the fentanyl, the Louis Vuitton?
A. Not always, no.
Q. So before we move to -- did you follow up with Dion Fisher with the telephone call sometime after these pills?
A. Yes.
Q. And what was -- why did you do that?
A. Under direction of law enforcement.

Q. And were you trying to follow up for additional pills or additional fentanyl?
A. I believe we thought that he had more fentanyl coming in and wasn't sure when.
Q. All right. Before we proceed to that recorded conversation, I would like to show you what's been marked for just identification as Government's Exhibit 145B.
MS. HOWARD-ALLEN: May I approach, Your Honor?
THE COURT: Yes, you may.
(*Document tendered.*)
BY MS. HOWARD-ALLEN:
Q. Mr. Fisher, I would -- Mr. McKinney, I would like to ask you if you recognize the individuals in that photograph that I've marked for identification.
A. Yes, I do.
Q. And who are they?
A. On the left is Dion Fisher and the right is Sam.
Q. Sam, is that the individual who they were discussing pressed the pills for Mr. Fisher?
A. Yes.
Q. All right. Now, at this time you followed up with Mr. Fisher on the telephone. Where were you at the time that you made the follow-up phone call with Mr. Fisher?
A. I believe during the follow-up phone call I was in the detox facility.

Q. And what was that for?
A. It was for fentanyl use.
Q. What did that involve?
A. It involved detoxing and pretty much getting off fentanyl altogether.
Q. What type of a facility was it?
A. It's like a rehab clinic, but they don't call it a rehab clinic because they only do detox. It's pretty much a medical staff monitors you while you are detoxing.
Q. And why did you need a medical staff to monitor you doing detox?
A. For risk of possible seizures. My BP got really high, that sort of thing.
Q. What were you detoxing from?
A. From fentanyl.
Q. And how long were you in detox?
A. Roughly, it was between five and eight days, somewhere in there.
Q. Mr. McKinney, did that work?
A. Yes.
Q. Mr. McKinney, had you tried that previously?
A. Yes, I had.
Q. And how did that work on the previous occasions?
A. It didn't work out so well because I would pretty much come home and just relapse.

Q. And it worked this time in February -- since February of last year?
A. Yes.
Q. So how were you able to record a telephone conversation while you were at a medical facility, Mr. McKinney?
A. Well, I had a recording device that law enforcement gave me.
Q. And while you were in detox, did Mr. Fisher attempt to call you?
A. I don't remember, to tell you the truth.
Q. Did Mr. Fisher know that you were in a detox facility?
A. No.
Q. So let me have you take a look at Government's Exhibit 311 and 311A. Do you recognize those items?
A. Yes.
Q. And how do you recognize them, Mr. McKinney?
A. This disk I listened to and signed my initials on the front and this is the transcript to it.

MS. HOWARD-ALLEN: Your Honor, at this time I'm going to move to enter into evidence Government's Exhibit 311 and 311A and request to publish them together.

THE COURT: Okay. I will receive those into evidence, and I will read this limiting instruction or explanatory instruction to the jury.

(*Government Exhibits 311 and 311A received in*

*evidence.*)

THE COURT: Ladies and gentlemen, 311A has been identified as a typewritten transcript of the oral conversation heard on the tape-recording received in evidence as Exhibit 311. The transcript also purports to identify the speakers engaged in the conversation. I've admitted the transcript for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the tape-recording and also to help you identify the speakers.

But you are specifically instructed that whether the transcript correctly reflects the content of the conversation or the identity of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard and from your own examination of the transcript in relation to hearing the tape-recording itself as the primary evidence of its own contents.

If you determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Please proceed.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: You are welcome.

MS. HOWARD-ALLEN: At this time, if we could, play Government's Exhibit 311.

(Video played.)

BY MS. HOWARD-ALLEN:
Q. Why did you say that you were in Texas, Mr. McKinney?
A. To conceal the fact I was in a detox facility.
Q. And you were not in Texas; right?
A. No.
Q. So at some point, do you tell him what you are doing in Texas?
A. I believe I had told him I was at an auto auction.
Q. And why did you tell him that?
A. The auto auction specifically, because I know they have a lot of auctions there.
Q. And, obviously, that wasn't true?
A. Correct.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What is a Jason mask pendant?
A. I believe it's a piece of jewelry.
Q. All right. Did he ever give you jewelry before?
A. Yes.
Q. What kind of jewelry?
A. He gave me, like, a skull ring that had diamonds in it and there was a necklace with a skull and crossbones behind it.
Q. Let's continue.

(Video resumed.)

BY MS. HOWARD-ALLEN:

Q. And what are you talking about, Mr. McKinney?

A. We are talking about fentanyl pills and purple fentanyl.

Q. All right. Let's continue.

(Video resumed.)

BY MS. HOWARD-ALLEN:

Q. So what is he talking about when he talks about the old stuff again?

A. We are talking about fentanyl that we had originally.

Q. And how long ago do you think that was?

A. At least a few years ago.

Q. All right. Let's keep going.

(Video resumed.)

BY MS. HOWARD-ALLEN:

Q. All right. Can you explain that, Mr. McKinney.

A. The 3 over a hundred instead of 2 would have been like -- well, let me see. It would be, like, 3 grams of fentanyl over 100 grams of inositol. So 3 grams of fentanyl would turn into 100 grams, which would make it stronger because it would be 3 grams of fentanyl versus only 2, which was the normal recipe; 2 grams of fentanyl to 100 grams of inositol.

Q. And so why would you -- why would Mr. Fisher want to make it stronger?

A. To compare it to the original fentanyl we used to get, which we were talking about and saying was better.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What do you mean by there's a lot of different types of fentanyl out there?
A. There is just a lot of different fentanyl. I don't know if it's cut with different stuff or what makes it different, but it has different names.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What do you mean -- what did you understand Mr. Fisher to mean when he said he got so mad at the lady?
A. He was referring to the lady who he purchased the fentanyl from.
Q. Do you know where this lady was?
A. As far as I know, in China.
Q. And how would you know that?
A. That's what Dion always told me.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What does he mean -- what do you understand him to mean

when he asked do you still have the half?
A. Usually half was in reference to 500 grams of fentanyl.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What do you understand him to mean when he says he only has a hundred of the cut stuff left?
A. The cut stuff is in reference to the fentanyl after it goes through the cooking process, so it's not pure anymore. So he's saying he has roughly a hundred grams of that left.
Q. And that substance is actually fentanyl?
A. Yes.
Q. It's just diluted with the inositol, but it still contains fentanyl?
A. Yes.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. What does he mean when he's referring to not having any beans?
A. He's referring to not having any Molly or Methylone or MDMA pills.
Q. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:

Q. What does he mean that you will swap out that stuff when you get back?
A. He was talking about swapping out the stuff that I was telling him was bad, the bad fentanyl, for some good fentanyl that he would give me.
Q. And where would he get that fentanyl?
A. From China.
Q. All right. Let's continue.
(Video resumed.)
BY MS. HOWARD-ALLEN:
Q. Mr. McKinney, did you make any other recorded conversations with Dion Fisher?
A. I do not believe so.
Q. All right.
MS. HOWARD-ALLEN: Your Honor, may I approach?
THE COURT: Yes, you may.
(*Document tendered.*)
BY MS. HOWARD-ALLEN:
Q. Showing you what's been marked as Government's Exhibit 146, do you recognize the ring in that picture on the bottom left?
A. Yes. That is the ring that he gave me.
Q. That's a picture of the ring that he gave you?
A. Yes.
MS. HOWARD-ALLEN: Your Honor, at this time I

would like to admit Government's Exhibit 146.

THE COURT: All right. Exhibit 146 is received into evidence and may be published to the jury.

(*Government Exhibit 146 received in evidence.*)

BY MS. HOWARD-ALLEN:

Q. If we could go to the bottom section, is this the ring that you were referring to that Mr. Fisher provided to you?

A. Yes.

MS. HOWARD-ALLEN: We can take that down at this time.

BY MS. HOWARD-ALLEN:

Q. Mr. McKinney, you had mentioned at the beginning of my direct examination that you and Mr. Fisher grew up in Michigan?

A. Correct.

Q. Did you know Dion Fisher's family?

A. Yes.

Q. What age do you think you were when you started -- when you began to know Dion Fisher?

A. I'm not sure. Roughly -- well, I believe I was in elementary school, so maybe like six or seven. Somewhere around there.

Q. So it's been a long time?

A. A long time.

Q. When did Dion Fisher leave Michigan?

A. He left Michigan shortly after I did. I don't really remember the year.
Q. When did you leave Michigan, Mr. McKinney?
A. I believe I left in 2013.
Q. And where did you go?
A. I moved to Atlanta, or to be more specific, Smyrna, Georgia.
Q. And shortly thereafter, where did Mr. McKinney move?
A. Shortly after I moved --
Q. Sorry. Where did Mr. Fisher move shortly after that?
A. He moved to Florida.
Q. Do you know where in Florida he moved to?
A. Somewhere in the Seminole area.
Q. And while you were in Atlanta, did you visit Mr. Fisher?
A. Yes.
Q. Did Mr. Fisher visit you?
A. Yes.
Q. Now, before you left Michigan, had you gotten in any trouble with the law in Michigan?
A. Yes, I had gotten in trouble with the law in Michigan. I believe it was in 2007.
Q. What happened?
A. I was selling -- I was trying to sell a handbag on Ebay and I just hadn't received the handbag yet, and the people who bought the handbag sent me a personal check. Their check

was waiting to clear, which took 14 business days. During that period -- I was at work. I worked in a factory at the time. I received a phone call from these people, claiming that other Ebay sellers were telling them that my bag was more than likely fake and they wanted their money back.

Of course, I could not return their money until their check cleared, so I was going to wait until it cleared to send it back. However, before that happened, the police came to my apartment and came in with a search warrant and they found a firearm that I had in the apartment and it came up to be a stolen firearm.

Q. So what did you end up -- how did you resolve that?

A. I ended up pleading no contest and they threw out the charges involving anything except for the gun and I took a possession of a stolen firearm charge.

Q. What punishment did you get?

A. I got three years' probation.

Q. Now, you mentioned that you were working at a factory. Where were you working?

A. I was working at Denzco Manufacturing in Michigan.

Q. Is that how you were earning a living in Michigan?

A. Yes.

Q. And when you moved to Atlanta, how were you earning a living?

A. Well, when I moved to Atlanta -- just prior to

moving -- actually, when I still lived in Michigan, for some time I was pretty much doing -- it was, like, an insurance scam through my mortgage company where I would -- should I explain it?

Q. You can explain it.

A. It was pretty much to where I had an escrow account set up for this mortgage I had on a house that I purchased. My first house that I purchased, so they set an escrow account because they wanted to make sure I had homeowner's insurance, and they would pay the homeowner's insurance in full out of the escrow account, so I didn't pay. And then they would take that amount and add it to my payment, so I would, in turn, pay it but over time.

So what I would do is I would get homeowner's insurance, they would pay it in full, I would switch to a new homeowner's insurance company and the last homeowner's insurance would send me a refund check in my name and I would keep the check.

Every time I did this, of course, my mortgage payments went up. But at that point I was no longer concerned with keeping the house.

Q. Why was that? What happened to the house?

A. The house foreclosed and I just didn't really have the means to keep it up, take care of it, not to mention what I was doing made the mortgage go up.

Q. And at that time that that was happening, were you living in Atlanta?
A. Toward the end. When I first started doing that I was still living in Michigan, but then I moved to Atlanta while still doing that.
Q. And did that provide you money to live on in Atlanta?
A. Yes.
Q. What else did you do for a living in Atlanta?
A. I wrote for a few, like, local rappers here and there. I started a pest control business for a short time.
Q. At this time, were you still talking to Dion Fisher?
A. Yes.
Q. And what was Dion Fisher doing?
A. Oh, he was starting to sell pills online at that point.
Q. What kind of pills?
A. He was selling pressed MDMA pills.
Q. And how did you know that?
A. He told me.
Q. And did you at some point start joining that business?
A. I did, yes. I started to participate. I visited him in Florida. He showed me the process of how to make the pills, which we were using a hash press, which would press the pills out, of course, after we ground down the -- I believe it was Methylone at the time, and we ground it down, mixed it with microcrystalline cellulose.

I think at that time we just used magnesium stearate, but we would mix it down and put it in a hash stamp with an Air Force One shoe. They would slide in there and come out these cylindrical wafer-type pills, and that was the process.

Q. So what did you call it, a hash press?

A. Yes.

Q. What is a hash press?

A. I believe a hash press is used for crushing weed into cylindrical rolls. I have never used it for that purpose. I'm not sure.

Q. About how big is it?

A. Roughly three inches, approximately, long. It's about as big around as a nickel, and there was, like, two -- what would you say? Two cylindrical pieces of metal that slid into either slide. You slide the bottom on first, screw on a cap, and you put the drugs inside. Then you put the top cylindrical metal piece in the top and screw on the other side and screw them together and it would just -- the force would form a pill.

Q. And where was the first time that you saw this process that you just described to make a pill out of MDMA?

A. It was in Florida in a hotel room with Dion Fisher.

Q. And do you know where in Florida?

A. I don't remember exactly.

Q. And do you know -- do you know -- how did you know Dion was selling these pills online?
A. He told me.
Q. Do you know how or through what place he was selling them online?
A. As far as I knew -- he told me he was selling them through the Silk Road, which is an online dark web drug site.
Q. Did you know Mr. Fisher to be doing any legitimate business at that time that you visited him in Florida?
A. Not that I know of.
Q. And did you know -- when you knew Mr. Fisher in Michigan, did you know him to be -- what business was he in when you knew him in Michigan?
A. In Michigan, well, the first business I remember him doing is he was selling clothes that he was getting from China. They were pretty much like knock-offs of, like, designer clothing that he would resell.
After that, I remember him -- he worked at the factory I worked at, which was Denzco Manufacturing. He worked at a grocery store for a while also. In the end -- I mean, towards us moving, he started getting, like, pills and whatnot. So I do remember him having some pills up there at some point.
Q. All right. So when you visited -- after you visited Mr. Fisher and saw this hash pill process to produce MDMA

pills, what happened next? How did you get involved?
A. Well, what happened next was he pretty much offered or told me that I could join him in this venture, and he said that he would order me a press if I paid him for one and pretty much charged me -- I think he charged me, like, 350 or 400 bucks for a press, maybe more, but immediately afterward I found they were on eBay for 20 bucks, you know.
Q. So that didn't start off on the truthful foot; did it?
A. Not at all.
Q. So what did you do with this press that you paid 3 -- who did you pay 350 or $400 to?
A. Dion.
Q. And why did you need a press?
A. I needed the press so I could make these MDMA or Molly pills on my own back in Atlanta.
Q. And why were you going to make them on your own back in Atlanta?
A. Well, I was going to make them so I could try to sell them. But, also, he was selling them online, so I would make them and then send them to the person once the person ordered and paid for pills from him.
Q. And how did that work in terms of you getting the information about who to send pills to?
A. I believe he would e-mail me the information or text or just tell me in various ways, you know.

Q. And how did the payment go?

A. If I remember correctly, I got paid a dollar for each one that I made, and I don't remember what he was making off of them. Roughly around $5, if I remember correctly. So he would pay me a dollar a pill, and he would pay me various ways. I believe he had paid me a lot like through Green Dot, which was a reloadable prepaid card.

Q. So about how many of these Molly pills would you press on the hash press?

A. As many as were needed. I can't remember an exact count of how many I did.

Q. It was a time-consuming process?

A. Very time consuming.

Q. So tell me how many you could make in a certain amount of time.

A. It would probably take -- it would take me roughly, like, two-and-a-half minutes or three minutes to make each one. But I came up with a process to make it quicker where we would lay out playing cards and have the mixture on each one because we could only do one at a time. So it would take longer, and the longer I worked the longer it would take because my hand would get tired.

Q. So how long did you continue doing this pressing of these pills and then shipping them for Dion Fisher?

A. It was for roughly a year, I believe.

Q. So did you make -- did you also have your own customers as you were pressing these pills in Atlanta?
A. Yes, I had one customer in Atlanta.
Q. And what were you selling him?
A. I was selling him the same pills as what we are selling to people online -- what he was selling to people online.
Q. And where did you get the MDMA to press these pills?
A. From Dion.
Q. And how would he send it to you?
A. Through the mail.
Q. So how was -- do you know how Dion Fisher was paid for the pills that you sent out for him?
A. As far as I knew, from what he told me, through Bitcoins.
Q. Do you know what Bitcoin is?
A. Yes.
Q. What is it?
A. It's an online cryptocurrency.
Q. Did you also make money in any other ways while you were in Atlanta besides pressing pills and getting these checks from the foreclosed house and the pest control and the rapping? Was there any other way you spent money or earned money?
A. Just from selling the pills on the side to the guy I had in the area.

Q. Did you gamble at any point, Mr. McKinney?
A. Yes, I was also an avid gambler.
Q. What do you mean by avid gambler?
A. It's something that I did a lot of. And, you know, I felt I was, roughly, good at it, so I continued to do it.
Q. And where did you gamble? Where have you gambled?
A. I've gambled pretty much everywhere I've gone. In Vegas. A lot in our hometown in Battle Creek. They opened a casino there. When I lived in Georgia, I gambled in the nearest state, which I don't remember where exactly. It was north, but there was a casino there that I used to go to.
Q. Now, when you moved to Florida, did you gamble then?
A. Yes. I would gamble at Hard Rock Casino and I've gambled at the one in Miami and I gambled in Vegas when I went out there after I moved here.
Q. When you say you were good at it, what do you mean?
A. I was making money. I was making good money in the end, so I was up more than I was down.
Q. Did you make some large bets when you had a lot of money?
A. Yes. I mean, I would mostly use something called the Martingale strategy where I doubled my bet every time I lost, which worked for me because I came in with a large amount, but I would make an occasional large bet.
Q. At some point, Mr. McKinney, did you move to Florida?

A. Yes.
Q. And when was that?
A. I moved to Florida in 2014.
Q. And how did you come to move to Florida?
A. Well, my mother, she met a guy from Ocala. The three of us decided to go in three ways on a house in Spring Hill.
Q. And were you still in the pill business with Dion Fisher when you moved to Florida?
A. Yes.
Q. And so what was your relationship like with Mr. Fisher when you moved closer?
A. We had a good relationship.
Q. Did you stay in business and grow the business when you moved here?
A. Yes. Yep.
Q. When you moved here, were you still selling to the individual -- that customer that you had in Atlanta?
A. I was still selling to him for a brief period of time, until, what I assumed happened, he got caught. He said his house got raided, called me, and immediately upon saying that I told him I would call him back, and I broke the phone in half.
Q. Why did you do that?
A. I assumed he was trying to trap me.
Q. And when you moved to Florida, did you continue to

press pills?
A. Yes. Yep.
Q. Did you use this hash press that you explained you were using in Atlanta?
A. We used a hash press at first here, but very quickly he upgraded to a mechanical hand-crank press.
Q. And how does the hand-crank press work?
A. It works the same. It kicks out pills quickly. Every time you turn the crank it kicks out a pill and has a hopper that I fill with the drug mixture, which would be mixed with the drugs and then binding agents like microcrystalline stearate or magnesium stearate, usually both, and everything would go in the hopper. You would turn the press and it kicks out pill after pill.
Q. So the pills that you were pressing, did they look different between the hash press and the hand-crank press?
A. Yes, they looked smaller. They were tighter and they looked more professional.
Q. And so did you increase the production of these -- were they still MDMA pills?
A. Yes, they were the same thing. We were able to increase production.
Q. So who were you selling to once you moved to Spring Hill?
A. Let me see. Once I moved to Spring Hill, I was just

trying to sell to the locals and whatnot. I had people in Spring Hill that were helping me sell them, but I wasn't -- I wasn't doing really well with them, I would say. I wasn't selling a lot of them.

Q. And what was Dion Fisher doing with regards to those pills that you produced on the hand-crank press?

A. He was selling them also. We were also taking them ourselves.

Q. And so how -- was Mr. Fisher still selling the pills online?

A. Yes.

Q. And did he continue to do so?

A. Yes, he continued to do so.

Q. And at some point did that stop?

A. Yes. That site got shut down at some point, and I'm not sure how or whatever, but I know all of his Bitcoins that were stored on that site were taken from him.

Q. And how do you know that?

A. He told me.

Q. And, Mr. McKinney, at some point did you change from MDMA to these fentanyl pills?

A. Yes.

Q. When was that? How did that come about?

A. I don't remember what year it was exactly.

Q. How did it come about?

A. It came about because he had the fentanyl. He was selling to people already online. And he came up with the idea, you know, to turn them into pills because, like, he was saying the pills so many people are using these days is an opioid pill, and fentanyl was also an opioid. So he would say they are the same thing, so we can make these pills out of them.
Q. So what was -- what did you understand him to be selling online with regards to fentanyl? How did you know? Was he selling just -- what was he selling on --
A. As far as I knew, he was selling straight fentanyl to some people, but I never seen his listings on the site itself. I had never seen those.
Q. And how did you come up with this way to put the fentanyl into the pills?
A. We did it through experimentation. We started out just using the straight cooked fentanyl and putting that into a pill, and it was too solvent. We tried to take those and put them in the oven, in the microwave.
We tried a lot of different things to get them to be hard and solid. Finally we came up with the idea of mixing it with microcrystalline cellulose and magnesium stearate prior to running them through the press.
Q. And where were you living at the time that this came together?

A. I was living in Spring Hill, Florida.
Q. And how about Mr. Fisher, where was he living?
A. He was living in an apartment in Clearwater.
Q. So where were you actually doing this experimentation? What locations?
A. Usually at his apartment in Clearwater.
Q. And when you -- first time when you came up with this recipe, how did it work? Was it successful the first time you tried to cook a batch of fentanyl and sell it?
A. The cooking process was successful. As far as the pills go, it was not, because I had -- or he had actually switched over to a different ingredient for a while which he believed was Oxycontin.
So instead of putting it in the fentanyl pills, we put that in the pills. I sold to a guy roughly $2,000 worth. I can't remember the quantity of the pills; but he, in turn, said his throat and everyone else who took one's throat was hurting and he didn't buy any more.
Q. What did you do? What did you and Mr. Fisher do to adjust that?
A. We stopped using what he thought was Oxycontin powder and started using the fentanyl.
Q. Why did Mr. Fisher think it was Oxycontin powder?
A. I believe that's what he attempted to order from China.
Q. And so what did he end up ordering? What did

Mr. Fisher end up ordering from China?
A. Instead, he ended up ordering the fentanyl.
Q. And who came up with this recipe and some of these items that you added, the magnesium stearate and the microcrystalline cellulose?
A. Through experimentation. We came up with lots of it together.
Q. And what was the money arrangement at that time in terms of when either of you sold pills that you pressed?
A. The money arrangement was, whatever I sold I split down the middle with him, whatever I made. And whatever he sold he kept, you know. Like, I wasn't cut into his part because he was the one who ordered the stuff.
Q. Where at that time were you and Dion Fisher pressing the pills?
A. We were pressing them at his apartment in Hammock Pine. It's in Clearwater, and we continued to press them at a house he moved to from there on Park Court.
Q. And at the time, were you able to expand who you were selling fentanyl pills to?
A. Yes.
Q. And how about Dion Fisher? Who was Dion Fisher selling fentanyl pills to?
A. I know he was selling them to various locals. I believe he started selling them to Sam around that time and

then to Keene.
Q. So who did you expand your selling fentanyl pills to?
A. I was selling them to a girl named Daisy, a girl named Erin, and eventually to Pete in Boston.
Q. And how did that come around that you were able to sell them to Pete in Boston?
A. I was able to sell them to Pete in Boston because a young guy who went to USF who went to tennis camp in Boston, he used the pills himself. So I was selling them to him. And he told me about a guy in Boston who could buy a lot of these from me. I will introduce you guys. And, of course, the first meeting he took a cut.
Q. So where was the first meeting?
A. First meeting -- and the kid's name was Robbie. The first meeting was at Robbie's apartment.
Q. Where did Robbie live?
A. He lived in some apartments close to USF.
Q. And so how -- was Pete or Phil Morose there at that meeting?
A. Yes.
Q. Do you know how he traveled here?
A. He flew down.
Q. What happened at the first meeting when you met with Robbie --
A. Well --

Q. -- and Pete?
A. Well, I drove. I had Robbie in the car. We picked up Pete at the airport and we drove back to Robbie's apartment and we proceeded to spread out the pills on the table.
Well, before we get to the apartment, he tasted one of the pills and said he could taste that there was something good in it. So we continued on to the apartment, got there, and he proceeded to count the pills on the table, and I believe he purchased approximately 900 his first time.
Q. And when you say he tasted the pills, who was that?
A. Philip.
Q. And was Mr. Fisher with you?
A. No.
Q. And so what happened after you went to Robbie's apartment? How many pills did Pete buy?
A. Approximately 900.
Q. For about how much money?
A. Roughly $10 apiece, but Robbie took a cut of the money, so it was lower than what I paid for the pills.
Q. How did you split the money?
A. Well, Robbie took his cut, and then I was told a price, which was, of course, less than $10 a pill, which would have been 9,000. So I think I got approximately $8,000, and after that I split the money with Dion.
Q. And was that a large sale for you and Mr. Fisher at the

time?
A. Yes, that was our largest thus far.
Q. So what kind of pills did you sell Phil Morose, did you sell Pete?
A. They were the white ETH 446 fentanyl pills.
Q. And at that time -- were you also pressing the blues at that time?
A. We were, yes.
Q. And why did Pete want the white ones?
A. He had gotten some of the blue ones at one point, just a small quantity to try out, and people did not like them in Boston because they were actually turning people's mouths blue. That was his exact words.
Q. So how many more times did you meet with Boston Pete or Phil Morose here in Florida?
A. At least three more times.
Q. What happened on those occasions?
A. On one occasion, Dion and I went to his hotel room and did an exchange, gave him money -- or excuse me, gave him pills and received money and left.
On the occasion after that, I believe it was, we went out to clubs after the drug transaction was completed, of course. That night we went out to some nightclubs and met Pete at a strip club, I believe one was, and the rest were, like, various dance clubs.

Then the last time he came down, that I remember, Dion and I met him at another club that we had went to or maybe we -- we went to two clubs, and we went in and got tables at these clubs. And that was pretty much the experience.

Q. And how much did Mr. Morose buy each time he came down there?

A. Each time he came it was a little bit more.

MS. HOWARD-ALLEN: Your Honor, this may be a good stopping point for the weekend.

THE COURT: All right. Ladies and gentlemen of the jury, we will go ahead and take our break today. Please remember, we will meet again Monday at 9 a.m.

Please don't discuss the case, please don't form any opinions, and please don't do any internet research on any of the participants.

Do I have everybody's word on that?

(Unanimous affirmative responses.)

THE COURT: Thank you very much.

Anybody have any issues that they need to bring up to me with respect to just logistics or notes to employers? I'll tell you, the case is moving at a good clip. So as best I can tell, although it's always a guess, we will be finished either on time or earlier. So we will either be finished Friday or perhaps before, but not after Friday. We will be

finished by Friday.

Okay. Anything else? All right. Thank you, ladies and gentlemen. We will see you Monday at 9 a.m.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 2:57 p.m.)

THE COURT: Please be seated. I just have a couple of questions here.

I think I can excuse the witness. We don't need the witness here?

MS. HOWARD-ALLEN: No, I don't think so.

THE COURT: Sir, you are excused for the weekend. Unfortunately, we had to break early because one juror needed to leave. So we are going to break. I ask you to please be back here a little bit before 9 o'clock on Monday morning and to please not discuss your testimony with anybody.

If you run into the jurors on your way out of the courtroom or the courthouse, please do not talk to them. You're not to engage them in any kind of conversation. If you see them getting on the elevator, just please wait. I mean, that's what we do -- we lawyers and judges do. So I ask you to please do that so that you don't accidentally interact with them. Okay?

THE WITNESS: Understood.

THE COURT: Very good. You are excused, sir.

MS. HOWARD-ALLEN: Your Honor, I don't know, but

he could talk to his lawyer obviously.

THE COURT: Of course. I saw him. Gosh, yes. That to me is so -- it's obvious to us lawyers, but it may not be obvious to you. Of course, you may talk to Mr. Brunvand, and I saw him here in the courtroom, or any other lawyers you happen to have. This does not apply to the lawyers.

It applies to these lawyers, but not to any other lawyers. So it applies to Miss Howard-Allen, Miss Guzman, and Mr. Martin. You're not to talk to them. You're not to talk to the case agents, but you are most certainly free to talk to your lawyer.

THE WITNESS: Okay.

THE COURT: Thank you.

(The witness exits the courtroom.)

THE COURT: So anything that I need to take up with respect to the trial?

(No responses.)

THE COURT: As I've gone through this, I really do think you've made tremendous progress. I think you have left about ten witnesses or so, give or take.

MS. HOWARD-ALLEN: Yes, there is no question we have made great progress this week, Your Honor. A lot of the remaining ones are chemists whose testimony would be, except for one of them, very short. And then the other ones are

financial witnesses, have to do with financials. There is another cooperating defendant; but, yes, we are making good progress.

THE COURT: I was going to ask you when you were going to be asking the financial experts to testify with respect to the money laundering charges. Okay.

MS. HOWARD-ALLEN: Yes, there's primarily three we have, a custodian who will bring in the documentary evidence from Mr. Fisher's house, we have the individual who laundered the money and sold him the cars, and then the financial analyst and an IRS witness.

THE COURT: Okay. All right. I don't think I have anything else for today. I think it looks real good.

Anything else you would like to call to my attention, Miss Howard-Allen, Miss Guzman? Anything at all?

MS. HOWARD-ALLEN: No, Your Honor.

MS. GUZMAN: No, Your Honor.

THE COURT: How about you, Mr. Martin? Anything you would like to call to my attention?

MR. MARTIN: No, Your Honor.

THE COURT: Very good. Have a nice weekend. We will see you Monday at 9 a.m. We are in recess.

(Proceedings adjourned at 3:01 p.m. and reconvened on June 3, 2019.)

- - -

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 164), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ *Scott N. Gamertsfelder*, *RMR, FCRR*

*Official Court Reporter*

Date: January 20, 2020