UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Tampa, Florida |
| Plaintiff, | ) | No. 8:18-cr-236-T-33TGW |
| | ) | Docket No. 193 |
| vs. | ) | |
| | ) | June 3, 2019 |
| DION GREGORY FISHER, | ) | |
| Defendant. | ) | Courtroom 14B |

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

(Vol. V of VII)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Kenneth B. Martin, Esq.**
Law Office of Ken Martin
P.O. Box 10456
Tampa, Florida 33679
(813) 431-3310

**ALSO PRESENT:**

Adam Phelps, DEA Case Agent

Robert Liberto, IRS Case Agent

\- - -

## TABLE OF CONTENTS

### EXAMINATIONS


| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHRISTOPHER MCKINNEY | 5 | 22 | 28 | |
| MICHAEL GILBERT | 33 | 55 | | |
| THADDEUS MOSTOWTT | 60 | 75 | 75 | |
| KARL GWYNNE | 83 | | | |
| VICTORIA BROADSTREET | 100 | 107 | | |
| KARL GWYNNE (resumed) | 110 | 183 | | |
| MARSHA COLLINS | 183 | 192 | | |
| IVETTE VALLEJO | 194 | 202 | | |


### EXHIBITS


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 14B...................... | 6 | 13 |
| 145, 145-1, 145A, 145C, 145D, 145E, 145F, 145G, 145H, 145I, 145J, 145K, 145L, 145M, 145N, 145O, 145P, 145Q, 145R, and 145S........... | 115 | 4 |
| 146A, 147, 147A, 148, 148A, 149, 149A, 150, 151, 151A, 152, 153, 153A, 154, 155, 156, 157, 157A, 158, 159, 160, 161, 161A, 162, 163, 163A, 164, 165, 166, 167A, 167B.......... | 147 | 11 |
| 168...................... | 111 | 14 |

**P R O C E E D I N G S**

June 3, 2019 9:00 a.m.

- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good morning, everyone.

Everybody is here and ready. Do you have your witness, Miss Howard-Allen?

MS. HOWARD-ALLEN: Yes, Your Honor. He's here.

THE COURT: And is your witness ready to come in, then?

MS. HOWARD-ALLEN: Yes, he is.

THE COURT: Do you want the jury in first or --

MS. HOWARD-ALLEN: No, I'll have him here. I wanted to make sure we weren't doing anything else before he started. I'll have him come in.

THE COURT: I don't think we have anything.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 9:03 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

Just confirming that nobody has done independent research on this case or posted anything on any social media sites, anything like that.

(Unanimous negative responses.)

THE COURT: Okay, very good. All right, we're resuming with the trial.

I remind the witness, you are still under oath, sir. Do you understand that?

THE WITNESS: Yes.

THE COURT: All right. Very good, Mr. McKinney. We will continue, then, with your testimony as if you've been placed under oath new this morning.

You may proceed, Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor.

CHRISTOPHER MCKINNEY,

having been previously duly sworn on May 31, 2019, by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION (resumed)

BY MS. HOWARD-ALLEN:

Q. Good morning, Mr. McKinney.

A. Good morning.

Q. On Friday we had left off mid-afternoon. And just before that, I had shown you a photograph that had been marked for identification as Government's Exhibit 145B. It's now in front of you. And I think that you identified the

individuals in that photograph on Friday, but would you do so again.

A. Dion Fisher and Sam.

MS. HOWARD-ALLEN: At this time, Your Honor, I'd move to enter into evidence Government's Exhibit 145B.

THE COURT: I'm sorry. That was 145B?

MS. HOWARD-ALLEN: Correct.

THE COURT: Right. It had been identified earlier, but you're moving it into evidence right now?

MS. HOWARD-ALLEN: I am, Your Honor.

THE COURT: Okay. All right. 14B, as in boy, is received into evidence, may be published to the jury.

(*Government Exhibit 14B received in evidence*.)

MS. HOWARD-ALLEN: At this time I'd request if you would just publish it.

BY MS. HOWARD-ALLEN:

Q. And this is the photograph that you identified the two individuals as whom?

A. Dion Fisher and Sam.

Q. All right. We can take that down, and I'm going to resume where we left off on Friday.

Mr. McKinney, we were talking about an individual who you knew as Boston Pete or somebody that you said I think his real name was Phil Morose. Do you remember that?

A. That's correct.

Q. Okay. So I think if we can just start, how did you come across him and what kind of business were you doing with him?
A. I came across Phillip Morose by I met a guy in Tampa, a young college student who was buying pills from me, and he introduced me -- well, he went to tennis camp in Boston, so he knew Phillip. So he introduced Phillip and I, and I was selling Phillip large quantities of the pressed pills.
Q. And I think you indicated the first time that you met him, Mr. Morose flew down here.
A. Correct.
Q. And how many pills did you sell him that first time that he came down here?
A. Approximately 900.
Q. And that time you indicated, I think, that Robbie was present for that initial deal and then no longer after that?
A. Correct.
Q. So what happened -- about how many more times did you see him down here and sell him pills?
A. About three more times, and I probably sold him pills at least 20 more times at least.
Q. So the three times that you -- that Mr. Morose came to Tampa from Boston, did you -- was Dion Fisher present?
A. Only one time for the original meeting with him, and then afterwards we went out with him a few times on I think

three separate occasions.
Q. And what color pills were you selling Mr. Morose?
A. Mostly the white ETH 446 pills, but on I think one occasion, he bought some of the blue A 215 pills.
Q. And on the other occasions he came down here, how many pills did you sell him?
A. Every time he came, it was more. I don't remember the exact quantities, but it increased each time ranging from 900 when he first came to 20,000.
Q. So what were the financial arrangements between you and Dion Fisher when you sold pills to Mr. Morose?
A. The arrangement was once the pills were sold, we split the proceeds 50/50.
Q. And where did you get the fentanyl that was in the white pills that you sold to Mr. Morose?
A. From Dion Fisher.
Q. And at that time, were you still pressing pills together with Mr. Fisher?
A. Yes. At first -- you know, the first three to four meets with Phillip, I was, yeah.
Q. And where were you pressing these pills?
A. We pressed some of them at a storage unit we had on Ulmerton, some of them at his place on 49th Street. I think that's it. I can't really think of any other place.
Q. So, do you remember around what time period this was

that Mr. Morose flew to Tampa?
A. I believe it was 2015. Maybe late 2015, early 2016.
Q. And so you mentioned you sold pills to him maybe 20 times. So if he stopped coming down to Florida, how did you sell pills to -- continue to sell pills to him?
A. Well, I would ship him pills through the U.S. mail and he would send me money through the U.S. mail also.
Q. Can you explain in detail how that worked, Mr. McKinney.
A. Well, I would pretty much press the pills, count them up. And I would count them up by wing then which was approximate, but, you know, close enough for large quantities. And I would vacuum seal the pills, wrap them in carbon paper and then place them in a box sometimes with clothing, sometimes with like a Louis Vuitton bag, and then I would ship them to him. And he would do the same with money. He would vacuum seal it, wrap it in carbon paper and send it to me usually just in packing peanuts.
Q. So where did Mr. Morose send you the money, to what address?
A. He would usually send it to an office I had rented on U.S. 19.
Q. And where did you send the pills? What address did you send the pills to Mr. Morose?
A. He would rotate between three addresses usually.

Q. So did you -- did you send the packages at the same time or did you send one first and followed by another one?
A. We'd usually send them at the same time, but on occasion, there would be a lapse to where like I would send first and he would send or sometimes he would send first and I would send. It would go back and forth.
Q. How much money at a time did Mr. Morose send you by U.S. mail?
A. Well, at first, it was between 50 and a hundred thousand, and in the end, it was 200,000 a package.
Q. So how did you know to -- why did you use carbon paper?
A. The carbon paper was to avoid x-ray detection. It's just something we read on the internet and decided to do.
Q. And how did you -- what other ways did you conceal the packages and the items in the packages?
A. Well, early on, we would pretty much make them look like birthday gifts, so we'd put like a greeting card on the outside, and then like of course use like fake names and whatnot. Especially like the return address would always be like a foreclosed home of some sort.
But other than that, inside the package it would either be a Louis Vuitton bag like with a dust cover wrapped up like it came directly from the store, and the pills would be inside of the bag itself or there would be clothes in the box and the packages would be mixed in.

Q. Did Dion Fisher ever participate in these -- any of the shipping of these packages?
A. No.
Q. So how were you notified when Mr. Morose wanted more pills from you?
A. Early on, he'd notify me through e-mail and then he would just text or call me.
Q. So you said that Dion Fisher wasn't involved in the shipping of the packages. Where did you get the fentanyl for the pills that you sent in those packages?
A. From Dion.
Q. You mentioned that you weighed them rather than counting them out. So how much did they weigh?
A. Well, each pill was supposed to be .1, which would be 100 milligrams, so I would just weigh approximately based on that. I can't remember the exact amount.
Q. So what kind of weights would you send? I mean how many pills were you shipping at a time?
A. I would send approximately 40,000 at a time, and we would try to keep it below 20 pounds if possible.
Q. Why?
A. Well, Phillip in Boston thought that anything over 20 pounds, they would suspect that it was drugs.
Q. So did the -- what financial arrangements did you have with Dion Fisher for the fentanyl that he supplied for as you

continued to ship pills to Mr. Morose?
A. Well, in the beginning, like I said, we split the proceeds down 50/50. But towards the end I would buy -- each 20 grams of fentanyl I would buy would be $25,000.
Q. And so what did you tell Mr. Fisher about your arrangements with Mr. Morose?
A. I told him that arrangements with Mr. Morose had ended. He had found a supplier in Texas. And that I was then dealing with a guy in Canada, which was buying it at a cheaper rate.
Q. Why did you tell him that you stopped selling to Mr. Morose when you still were?
A. So I could make more money myself.
Q. So after you were stopped by law enforcement, what we saw on Friday and went through that evening, what did you do with regard to Phil Morose?
A. Well, I was instructed as far as -- I recorded phone calls with Phil Morose and set up a meet with him to where he thought my cousin was bringing a truck with a stash box with pills in it, and then he was arrested upon walking to the truck.
Q. And how do you know that?
A. Just based on the phone calls because I was on the phone.
Q. So about -- so you continued to communicate. Were all

of those communications recorded?
A. Yes.
Q. And do you know, was Mr. Morose ultimately charged in the fentanyl conspiracy?
A. Yes.
Q. Mr. McKinney, did you ever open any joint bank accounts with Mr. Fisher?
A. Early on we had a joint bank account for a hot dog cart that we had purchased and we ended up not running it together.
Q. What do you mean a hot dog cart? Do you mean literally?
A. Yeah, literally a hot dog cart. It was a hot dog cart we found online. I don't remember how much it cost, but it was fairly reasonable, and we had planned to build it because it wasn't finished. And we opened a joint bank account, and in the end, Dion finished it himself. I couldn't really afford to participate, so Dion finished it himself and sold hot dogs from it.
Q. Do you know how many times?
A. As far as I know, one time.
Q. So what was the name of the account that you opened up jointly?
A. It was Top Dog Hot Dog, LLC.
Q. What happened to that bank -- what bank was that at?

A. That was at Hancock Bank.
Q. What happened to that account?
A. As far as I know, it got closed is what Dion told me, but I don't really -- I never talked to the bank or anything about it.
Q. So did you use that bank account for -- to deposit drug proceeds?
A. I never deposited any of my own money, but I made one deposit for Dion.
Q. Do you know how Dion Fisher used that account?
A. As far -- no, no. He never really explained that to me verbatim.
Q. Were you a signatory on that account?
A. It was a joint account.
Q. So did you ever sell pills to anyone that paid you in Bitcoin?
A. No.
Q. Do you know if Dion Fisher did?
A. As far as I know, yes, he sold pills online on dark web and received proceeds through Bitcoins.
Q. So do you know what Million Dollar Plans is?
A. That was a business that Dion started.
Q. Do you know what kind of business?
A. No.
Q. So do you know other than this one time that he sold

hot dogs from a cart, do you know of any legitimate business that Dion Fisher ran?

A. No.

Q. Do you know of any legitimate business income that Dion Fisher had?

A. No.

Q. Do you know if he ever paid any taxes?

A. No.

MS. HOWARD-ALLEN: Could we pull up Government's Exhibit 407, which I believe is already in evidence. And I think if we could go to the bottom part of that, the last part of the e-mail.

BY MS. HOWARD-ALLEN:

Q. So did you ever know Dion Fisher to be a real estate marketing specialist?

A. No.

MS. HOWARD-ALLEN: All right. We can take that down.

BY MS. HOWARD-ALLEN:

Q. Did you have any legitimate business other -- did you have any legitimate business?

A. Yes, I had a property management business for some time where I rented out basically a few houses for people. Not for a long period of time. And a few vacation rentals.

Q. Did you make any significant money off of those?

A. I don't know -- not really significant.
Q. So was that like your only legitimate business?
A. No. I had a power washing business for some time. It was power washing, mobile detailing. And it was -- I was making a decent salary I guess for approximately three months.
Q. And is that it? All the rest of your income, what was all the rest of your income from?
A. Well, also I did a little bit of ghost writing for a guy in Atlanta I met through a friend there, here and there. And I mean I sold things on eBay here and there. That was about it.
Q. So did you make any significant income from either of those ventures?
A. From the writing, for a second I was making decent money, but that lasted less than a year, of course, and the eBay thing was -- it's pretty much off and on throughout my life.
Q. So did you make any significant money from that, Mr. McKinney?
A. No, not on eBay.
Q. So what was -- did you make any of that 1.4 million from any of that?
A. No.
Q. So did you pay any taxes on any of that income?

A. No.
Q. Mr. McKinney, what cars do you know Dion Fisher to have?
A. I knew him to have an Audi R8, a Porsche Panamera, a Maserati, an Audi truck at one point, a BMW, oh, and a Bentley.
Q. Where do you know about where Dion Fisher got these cars?
A. He told me he got them from Copart, a site where you can buy like broken cars and repair them yourself.
Q. So what is the name of that?
A. It's Copart.
Q. Copart?
A. Yes.
Q. And is that online or do you know where that is?
A. Yeah, it is on -- it's a website as far as I know.
Q. Do you know, could Dion -- could someone just go on there and buy them themselves?
A. I believe there are listings where you can, but most of the listings you have to have a dealer's license.
Q. Do you know who Dion Fisher bought those cars using someone's dealer's license?
A. I believe he used Konrad's dealer license and there was a gentleman who had a unit across from his. I can't remember his name, but he would do body work on vehicles and he had a

dealer's license also I believe.
Q. Do you know if either of them did body work on Mr. Fisher's cars?
A. Yes, the gentleman whose unit was across from his.
Q. Do you know how Mr. Fisher paid the gentleman across from him to do work on his cars?
A. I know he paid him -- sometimes it would be cash, sometimes in pills, because he was a user of pills.
Q. So you had mentioned you were in Atlanta and then you moved to Florida.
A. Correct.
Q. And at the time you moved to Florida, were you spending more time with Dion when you first moved to Florida?
A. Yes.
Q. And what happened? Did you -- at the end, were you spending more time with him or less time?
A. At the end, I was spending less time with him.
Q. Why was that?
A. I just felt that he was drawing a lot of attention with the flashy cars and going out to the club and jewelry and whatnot, and I just kind of wanted to separate myself from that attention.
Q. Did you ever travel with Dion Fisher?
A. Yes.
Q. Where did you go?

A. We went to New Orleans to Mardi Gras a few times, a couple times, and we went to Las Vegas I believe on one occasion and we went to Kentucky once. That's it.
Q. What did you go --
A. Oh, and to Miami once.
Q. What did you go to Las Vegas for?
A. We went out there, I believe his -- one of his family members had a wedding, and my girlfriend and I just kind of tagged along and hung out.
Q. Did you do anything while you were there?
A. Mainly gambled.
Q. What did you go to Kentucky for?
A. We went to Kentucky to try and possibly sell pills.
Q. Was that successful?
A. No.
Q. Have you been to Dion Fisher's house that used to be on Nassau Court, 10124?
A. Yes.
Q. What -- how many times?
A. Maybe two or three times.
Q. And what for? What did you do there?
A. One time I went to pay him for some fentanyl, and I paid him 125,000. Another time I believe I just went there to talk to him and maybe to visit, you know, the third time. I don't remember.

Q. So what -- do you -- what are the nicknames that you know Dion Fisher to use?
A. Just D basically.
Q. Are you familiar with one known as Deeder?
A. Oh, yes, Deeder.
Q. So how much would you estimate over time that you earned selling these Molly pills and these fentanyl pills that you pressed with Dion Fisher?
A. At least -- I'd say at least 2.1 million.
Q. And you mentioned that you sold Mr. Morose a number of pills over probably 20 times. About how many pills do you think that you sold to Dion Fisher over that time -- I mean to Phil Morose over that time period?
A. Roughly, I'd say, approximately 400 to 500,000.
Q. So you mentioned that at some point you told Mr. Fisher that you were not selling to Mr. Morose anymore --
A. Correct.
Q. -- when you were.
A. Correct.
Q. So other than -- and you made up this individual named Canada. Other than Canada, did you make up any other stories to tell Dion Fisher about the amount of money that you had?
A. I told him that I was selling cocaine that I got from another guy from Europe.
Q. So at the time that you were -- over the time period

that you had been pressing pills, did you or you and Dion Fisher ever employ people to work in helping you to press pills?

A. Yes, on a few occasions we did.

Q. Did you have -- did you provide any -- was there any protective gear that they were provided by you?

A. Yes. Usually a dust mask and gloves.

MS. HOWARD-ALLEN: And if we could take a look at Government's Exhibit 172, which is previously provided. 172, which has been previously admitted into evidence.

BY MS. HOWARD-ALLEN:

Q. What is this -- remind the jury what is this location again?

A. That's the front of my storage unit.

Q. And do you know the address of that?

A. Not -- no, I don't off the top.

Q. Do you remember the street name that it was on?

A. I believe it was 50th Way.

Q. So did you have any protective equipment there at 50th Way?

A. Yes.

Q. What did you have?

A. I believe I had full environmental suits and dust masks. They were the type with the pink filter. I also had charcoal masks and just regular dust masks also.

Q. Why?
A. Basically to protect myself so I could breathe when I was in that -- in there, you know, working on the machines and also toward the end when I was cleaning up. I wanted to protect myself.
Q. So, weren't you -- I think the jury heard that you were already addicted to fentanyl at that time period, weren't you?
A. Correct.
Q. So why would you need that?
A. Basically there was so much in the air at one point because I was running a fan that I just wanted to make sure that I could breathe.

MS. HOWARD-ALLEN: May I have a moment, Your Honor?

THE COURT: Yes, you may.

(Brief pause.)

MS. HOWARD-ALLEN: Your Honor, I think I don't have any questions for Mr. McKinney -- any more questions at this time.

THE COURT: Okay, thank you very much.

Any cross-examination, Mr. Martin?

MR. MARTIN: Yes, Your Honor. Thank you.

THE COURT: You may proceed, sir.

CROSS-EXAMINATION

BY MR. MARTIN:
Q. Good morning.
A. Good morning.
Q. January 30th, you recall that's the day you were arrested, correct?
A. I don't recall the exact date.
Q. Does that sound in the ballpark?
A. Sounds approximately, yep.
Q. Now, you were coming from the 49th Street storage area, warehouse that you described as Mr. Fisher's; correct?
A. Correct.
Q. Had you met Mr. Fisher there?
A. Yes.
Q. Did you have a key to that storage area?
A. Yes.
Q. Now, you had some pills in your car when you were arrested and some powder in your car when you were arrested; correct?
A. Correct.
Q. Had you had those prior to going to 49th Street that day or evening?
A. No.
Q. So your testimony is you picked both of those -- both of those, being the pills and the powder, at 49th Street?
A. Yes.

Q. Now, do you recall, once you were arrested, within like two days being in your attorney's office meeting with the prosecutors and the agents in this case?
A. Yes.
Q. Okay. So, basically you were arrested one day, and within one business day, the next day, you're with your attorney and all the agents and the prosecutors are talking to you; correct?
A. I spoke to the agents. I don't remember the prosecutor talking to me within that time frame.
Q. But that was the timing of it; correct?
A. I believe so.
Q. And you met with the agents on several different occasions; is that correct?
A. Yes.
Q. And you met with the prosecutors on several occasions; is that correct?
A. Yes.
Q. And you went over your testimony and everything; correct?
A. Not specifically what I would say, but as far as my testimony --
Q. They asked you questions in those interviews and went over things with you; correct?
A. Yes.

Q. Now, Louis Vuitton, have you ever sold -- or you talked about some of your businesses. Have you ever sold or been in the business of Louis Vuitton bags and Louis Vuitton apparel or equipment?
A. I have. I haven't been in the business officially, but I have sold some of my bags, personal bags.
Q. Didn't you buy quite a bit of it to sell, quite a bit of it being Louis Vuitton gear?
A. Yes. I didn't buy to sell. I bought it for myself.
Q. But you ultimately tried to sell it and you actually got shot -- shut down from selling it because you weren't an official dealer; correct?
A. No, that's incorrect. I didn't get shut down for selling Louis Vuitton. If you're referring to back in like the early 2000's, I was shut down for trying to sell a Hermès Berkin bag.
Q. Okay. Now, let me go with this Phillip Morose and Robbie. Let me go to there. Okay?
A. Okay.
Q. You testified the first time you met with Phillip Morose/Boston Pete, that was through Robbie?
A. Correct.
Q. And you gave Robbie a cut of that, about a thousand dollars?
A. Approximately.

Q. Okay. And after that, Robbie was not involved, according to your testimony; is that correct?
A. Correct.
Q. Okay. Robbie just opted out?
A. No. While Robbie was not in the room the first time I met Boston Pete, I exchanged numbers with him in order not to deal with Robbie any further.
Q. So you kind of cut Robbie out?
A. Correct.
Q. That way you don't have to give him any money?
A. Correct.
Q. And you've already testified, with Phillip Morose/Boston Pete, you did the same thing, according to you, with Mr. Fisher?
A. Correct.
Q. And you also made up a person by the name of Canada, which was totally fictional; correct?
A. Correct.
Q. And you testified -- you said you were dealing cocaine when you weren't dealing cocaine or were you dealing cocaine?
A. I was not dealing cocaine.
Q. And during most of this time, you were addicted to fentanyl?
A. Correct.
Q. And how often did you use fentanyl?

A. Approximately I'd say five to eight times a day.
Q. Because if I understood your story right, the fentanyl pills that were in your car when you were arrested, that was for your personal use; correct?
A. Correct.
Q. And your dealings with Phillip Morose, those were except for one occasion always white pills?
A. Correct.
Q. That you made?
A. Not in the beginning. In the beginning, we were making them mostly together.
Q. Now, did you ever try to develop a source of your own? You said your source for fentanyl, according to your story, was always Mr. Fisher; correct?
A. Correct.
Q. But you never tried to get it from any other source, online or anything?
A. No.
Q. You never Googled buying fentanyl or anything like that?
A. I Googled it to see how it was done, but I never took the steps, never contacted anyone.
Q. You just decided not to do that?
A. Correct.
Q. Now, you testified, if I recall, about one of your pill

presses being seized by customs in the June 2016 time frame; correct?

A. I believe that was the time frame.

Q. Okay. And you also had some pill presses that were seized by customs?

A. Correct.

Q. And was that around the same time frame or a different time frame?

A. That pill press that you're referring to that was seized by customs, well, the one was seized that you mentioned. Other pill presses, I don't -- I didn't order.

Q. But one was seized that you specifically ordered; correct?

A. Correct.

MR. MARTIN: No further questions, Your Honor.

THE COURT: Thank you.

Any redirect for this witness?

MS. HOWARD-ALLEN: Yes, briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Mr. Martin just asked you about some other pill presses that were seized.

A. Correct.

Q. Were they coming to you?

A. No, not the other pill presses, I don't believe they

were coming to me.
Q. So what other pill presses did you know that were seized?
A. I know Dion ordered some pill presses and they were seized.
Q. And what address were those sent to?
A. I don't remember.
Q. Did Mr. Fisher ever have them sent to your house?
A. I don't believe they were ever sent to my house. Oh, he actually ordered two presses once, and they were -- after the first ones were seized, he decided to order more, had them shipped through a boat, through freight on a boat. And he bought them, and then I arranged the delivery from the shipping yard to my apartment.
Q. Mr. Martin also asked you, was talking about whether -- that you cut Robbie out after Mr. Morose came down that first time.
A. Correct.
Q. And then he indicated that -- that there was a time that you cut Mr. Fisher out. But was there -- when you were shipping -- initially shipping pills to Mr. Morose, what was your arrangement with Mr. Fisher in terms of payment?
A. Originally, whatever proceeds I made on Phil's I was supposed to split with Mr. Fisher 50/50.
Q. And did you do that the entire time that you were

dealing with Phil Morose?
A. No.
Q. About when did you -- when did you -- if you could, in sort of that time period that you were dealing with him, around what time period did you stop?
A. I know it was approximately after four shipments.
Q. And after those shipments, did you continue to purchase fentanyl from Mr. Fisher?
A. Yes.
Q. And did you continue to give him 50 percent of what you said was being sold to Canada at that time?
A. No.
MS. HOWARD-ALLEN: All right. Nothing further, Your Honor.
THE COURT: All right. Thank you very much.
Anything else from the defense, Mr. Martin?
MR. MARTIN: No, Your Honor.
THE COURT: Okay. Thank you.
All right. The witness is excused. Thank you for having come in today.
The government can call its next witness.
MS. GUZMAN: Your Honor, we are going to be putting on a chemist with many exhibits. Would it be possible to take a very brief five-minute break just to set it up for the jury?

THE COURT: Okay.

MS. GUZMAN: It might go smoother since we have so many exhibits.

THE COURT: Ladies and gentlemen, we're going to take a short recess so the government can bring its exhibits up. Please don't discuss the case or form any opinions. We'll see you back here in five minutes; is that what you need?

MS. GUZMAN: Yes, Your Honor, that would be sufficient to get them all organized.

THE COURT: All right.

COURT SECURITY OFFICER: All rise.

(Jury exits courtroom at 9:38 a.m.)

THE COURT: All right, we will be in recess.

(Recess taken from 9:38 to 9:46 a.m.)

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 9:46 a.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

Miss Guzman, are you ready with your next witness?

MS. GUZMAN: Yes, Your Honor. Thank you so very much. The next witness is Michael Gilbert.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of

perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Michael Gilbert, G-i-l-b-e-r-t.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Mr. Gilbert, you're going to be asked some questions by Assistant United States Attorney Maria Guzman, and Mr. Martin, who represents Mr. Fisher, may ask you some questions in cross-examination.

If you don't understand the question, please say so so they can state it differently. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you have the tendency to speak quickly, please slow down so we can understand you and please speak up so we can hear you. All right?

THE WITNESS: Yes. Thank you.

THE COURT: You're welcome.

Go ahead, Miss Guzman.

MS. GUZMAN: Thank you, Your Honor.

MICHAEL GILBERT,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good morning, sir. How are you?

A. Good. How are you doing?

Q. Would you do me a favor and introduce yourself to the members of the jury and the Court.

A. My name is Michael Gilbert. I am the chief forensic chemist and the assistant lab director for the Pinellas County Forensic Laboratory.

Q. And how long have you been employed with the Pinellas County Forensic Laboratory?

A. I've been with the laboratory for 26 years.

Q. During that time, have you had the opportunity to testify few or many times in court proceedings?

A. Yes, I have.

Q. Have you testified in both state and federal?

A. Yes.

Q. If you would, briefly explain to us your educational qualifications for the position that you hold.

A. I have a bachelor of science degree in forensic science from Michigan State University. That included an internship at the Colorado Bureau of Investigation in Denver.

I went through a training program at the Pinellas County Forensic Laboratory and I've attended various forensic science training seminars including the Drug Enforcement

Administration's forensic chemist training seminar as well as both regional and national forensic association meetings and instrument manufacturer seminars as well.

Q. As part of the position that you currently hold with the Pinellas County Forensic Laboratory, would you briefly tell us what some of your duties and responsibilities are.

A. Yes. I actually supervise the chemistry section. I also act as the lab director in the absence of the laboratory director. And I analyze substances to determine whether or not they are controlled substances and do fire debris analysis.

Q. And the laboratory director that you referred to, is that Reta Newman?

A. Yes, it is.

Q. As you indicated, you also -- part of your duties and responsibilities involve the identification of substances that are provided to you. Does that mean that you provide the actual chemical analysis of those substances?

A. Yes, I do.

Q. Now, currently with the Pinellas County Forensic Laboratory, when you receive a substance, is there a protocol as to how many tests are conducted reference that particular sample?

A. Yes, our laboratory requires that we perform a minimum of three analyses on each substance with the exception of

marked pharmaceutical preparations such as Xanax and Valium. Those we only require two tests. And our tests require that they also include a confirmatory test, which allows us to identify the substance to the exclusion of any other.

MS. GUZMAN: Your Honor, at this time, I would tender Mr. Gilbert as an expert in the field of forensic chemistry, allowing him to render opinions as to substances analyzed.

THE COURT: All right.

Mr. Martin, do you wish to voir dire the witness with respect to his expert qualifications?

MR. MARTIN: No, Your Honor.

THE COURT: I find that the witness, Mr. Michael Gilbert, is qualified to render an expert opinion in the field of forensic chemistry. You may proceed.

MS. GUZMAN: Thank you, Your Honor.

BY MS. GUZMAN:

Q. Mr. Gilbert, referencing an investigation with regards to Dion Fisher and Christopher McKinney, were you provided a series of samples to analyze?

A. Yes, I was.

Q. I know there were several; is that correct?

A. Yes, there were.

Q. So we are going to take them individually to try to organize this as best as possible.

I'd like to refer you -- first, do you have some of those laboratory reports and analysis before you to refresh your recollection?
A. Yes, I do.
Q. And those reports that you have, are they -- they're kept in the normal course of business at the Pinellas County Sheriff's Office for purposes of recollection; is that correct?
A. At the Pinellas County Forensic Laboratory. We are not part of the actual sheriff's office.
Q. I'm sorry. The laboratory itself?
A. Yes.
Q. Now, I'd like to refer you, first, to lab number -- I know that you keep -- these reports have different numbers on them, but for purposes of our discussion today, let's refer to the lab number. Would that assist you?
A. Yes, it would.
Q. Okay. So let's refer to lab No. 18-000810. Do you have that in front of you?
A. Yes, I do.
Q. Okay. And I believe there are several items that are listed under that particular laboratory number; is that correct?
A. Yes, there are.
Q. Okay. So I'd like to refer you, first, to item 2. If

you would explain to the jury what item 2 was that you received in evidence.

A. Item 2 was a heat-sealed evidence bag which contained a coin sized zip bag and 94 whole and several pieces of round blue tablets which were marked A 215.

Q. Now, this particular sample was given to you on what date?

A. The request date was January 31st of 2018.

Q. And was this particular item with reference to an individual by the name of Christopher McKinney?

A. Yes, it was.

Q. Now, were you also provided item number 005?

A. Yes, I was.

Q. And reference -- again, these all reference Christopher McKinney; is that correct?

A. That was the subject that was listed on the submission, yes.

Q. Item 005 was divided into two subparts; correct?

A. Yes, it was.

Q. And why was that?

A. Because there was actually two different zip bags. There were three zip bags in item 5. One simply had residue in it which was not analyzed. The other two had purple crystalline material, so they were analyzed individually.

Q. Okay. Now, 005 or what would be -- we'll just refer to

it as 5A. Were you able to do an analysis of 5A?
A. Yes, I was.
Q. Okay. And were you able to do an analysis of 5B?
A. Yes.
Q. Okay. Let's go back to item No. 2. You indicated that you received a heat-sealed evidence bag; correct?
A. Yes.
Q. And what exactly did that bag contain?
A. As I said, there was a coin size zip bag and 94 whole and several partial round blue tablets with the markings of A 215.
Q. And when you received that particular item, what did you do with that particular item?
A. The first thing I do would be to cut off the top of the heat-sealed evidence bag. I remove the material from the inside of the bag. I obtained a weight of it. I then removed a sample. The remaining material is resealed in the heat-sealed evidence bag, and then I perform my analysis on the sample of that material.
MS. GUZMAN: Your Honor, may I approach the witness?
THE COURT: You may.
(Document tendered.)
BY MS. GUZMAN:
Q. Mr. Gilbert, let me show you what has been previously

marked as Government's Exhibit 231. Do you recognize that particular item?
A. Yes, I do.
Q. What is contained within Government's Exhibit 231?
A. This was the material I analyzed in reference to the previous lab number for items 5A and 5B.
Q. So with reference to item 5A and 5B -- we will get back to item 2 in a moment. But reference 5A and 5B. Did you conduct tests on those two samples?
A. Yes, I did.
Q. And I believe you testified that those were two separate Ziploc bags, correct?
A. Yes, they were.
Q. Now, with reference to Government's Exhibit 231 and your item 5A and 5B, would you explain to the jury what particular tests you conducted on both of those items.
A. Yes. Each of those items were subjected to a series of both chemical and instrumental analyses. These include presumptive tests which will give you an idea what may be present as well as confirmatory tests which allow you to identify the substance to the exclusion of any other.

For these two items in particular, I performed color tests, gas chromatography and thin layer chromatography and then also infrared spectroscopy and mass spectrometry.
Q. And with reference to item 5A in Government's Exhibit

231, what were your findings?
A. For 5A was 43.21 grams which had an uncertainty of plus or minus 0.04 grams, and it contained fentanyl.
Q. And for item 5B?
A. Its weight was 16.58 grams. Also had the uncertainty of 0 plus or minus, 0.4 grams and contained fentanyl.
Q. Okay. Now, because we have a lot of particular substances to review, to your right there is an easel, and it is noted as Government's Exhibit 231, item 5A and 5B. Would you be so kind as to note on the easel for 5A and 5B what the substance was and the weight.
A. Okay.
MS. GUZMAN: Your Honor, may I approach?
BY MS. GUZMAN:
Q. Now, in addition to 5A and 5B, were there any other items that you analyzed under that laboratory number 00810?
A. Yes, there were.
Q. And what other item did you analyze under, again, your laboratory 18-000810? Was there an item 10?
A. Yes, there was.
Q. And as to item 10, what did you analyze? First of all, what was item 10? What was provided to you as part of item 10?
A. Item 10 was a heat-sealed evidence bag which contained another heat-sealed evidence bag. Inside of that was a large

zip bag which contained white powder and there were numerous round white tablets which were marked ETH 446.

Q. And, again, based on the explanation of some of your previous -- of the -- the previous substances and your testing, did you conduct the same type of testing?

A. Yes, I did.

Q. And what were your findings and results as to item 10?

A. The material weighed 1,651.8 grams with an uncertainty of plus or minus 0.4 grams and that it contained methoxyacetylfentanyl.

MS. GUZMAN: If I may have just a moment?

THE COURT: You may.

MS. GUZMAN: Your Honor, again if I may approach the evidence?

THE COURT: Yes, you may.

BY MS. GUZMAN:

Q. Mr. Gilbert, let me show you what's been marked and introduced into evidence as Government's Exhibit 233. Would you take a look at that particular exhibit.

THE COURT: So you did say Exhibit 233? Is that what you said?

MS. GUZMAN: Yes, Your Honor, Government's Exhibit 233.

THE COURT: Thank you.

BY MS. GUZMAN:

Q. And do you recognize that particular item that I have shown you as Government's Exhibit 233?
A. Yes, I do.
Q. And what -- what is that item?
A. This would be the item 10 under laboratory No. 18-000810, which I analyzed.
Q. And I believe that you indicated that your findings were that it was methoxyacetylfentanyl?
A. That's correct, yes.
Q. Again, if you would -- Mr. Gilbert, if you would, likewise, as you had done with Government's Exhibit 231, would you please note under Government's Exhibit 233 your findings as to item 10.
(Witness complies.)
BY MS. GUZMAN:
Q. Now, I'd like to refer you to -- again, under lab number 000810, you have testified as to item 5. I'd like you to take a look at item 4. Were you also provided an item 4?
A. Yes, I was.
Q. And I believe that these items were items recovered from Christopher McKinney's house; is that correct?
MR. MARTIN: Objection. Lack of personal knowledge.
BY MS. GUZMAN:
Q. Do you have --

THE COURT: Hold on a second. Hold on a second. Sustained. You can lay a foundation if you can.

BY MS. GUZMAN:

Q. Well, let me move on.

As to item 4, did item 4 have a series of different bags?

A. Item 4 contained a metal container, there were some bags, a couple weights, and then there was some other material in there as well.

Q. So I'd like to refer you to item 4. Is there an item 4A?

A. Yes, there was.

Q. Is there an item 4B?

A. Yes.

Q. And is there an item 4D?

A. Yes.

Q. Did you, again, take those items and do a particular analysis of 4A, 4B, and 4D?

A. Yes, I did.

Q. And what were your findings as to item 4A, 4B, and 4D?

A. For 4A, it contained 4.64 grams with methoxyacetylfentanyl and fentanyl. For 4B, it was 0.10 gram of fentanyl. And 4D was less than one-tenth of a gram of methoxyacetylfentanyl.

Q. Okay. Again, if you would, under Government's Exhibit

233 -- just a moment.
Again, your findings were that it was -- 4A was methoxyacetylfentanyl, 4B was fentanyl and 4D was methoxyacetylfentanyl; is that correct?
A. Actually 4A was a mixture. It contained both methoxyacetylfentanyl as well as fentanyl was identified.
Q. Let me direct you to, again, under lab number 00810, request 3. I know they are divided into request 2 and 3. So request 3. Do you have that in front of you?
A. Yes, I do.
Q. Let me refer you to items 7, 8, and 9. And are those reflected in that particular report?
A. Yes, they are.
Q. Okay. Now, as to item 7, what was provided to you in item 7?
A. Item 7 was a heat-sealed evidence bag which contained a second heat-sealed evidence bag. And inside there were several other zip bags which I subdivided into 7A through 7F.
Q. Let's specifically refer to A, B, C, D, and E. And are those separately reflected and divided in your report?
A. Yes, they are.
Q. Okay. So with reference to item 7A, what were you provided in 7A?
A. 7A was a zip bag which contained white powder.
Q. And 7B?

A. Was also a zip bag with white powder.
Q. 7C?
A. Was a zip bag containing purple crystalline material.
Q. 7D?
A. Was also a zip bag containing purple crystalline material.
Q. And then 7E?
A. Was a third zip bag containing purple crystalline material.
Q. Now, with reference only to 7A, B, C, D, and E, did you likewise conduct the same type of testing that you previously testified to before this jury on these items?
A. Yes, I did.
Q. Okay. So with regards to item 7A, what were your findings?
A. 7A weighed 448.31 grams and contained methoxyacetylfentanyl.
Q. Item 7B?
A. 7B was 4.70 grams and contained fentanyl.
Q. 7C?
A. 7C was 1.31 grams, contained fentanyl.
Q. 7D?
A. Weighed 0.92 grams and contained fentanyl.
Q. And 7E?
A. 7E weighed 2.91 grams and contained fentanyl.

MS. GUZMAN: Your Honor, may I approach the evidence table again?

THE COURT: Yes.

BY MS. GUZMAN:

Q. Mr. Gilbert, let me have you take a look at what's been previously marked as Government's Exhibit 234. With reference to Exhibit 7 that we have just discussed in terms of your findings, do you find item 7 in Government's Exhibit 234?

A. Yes, it is.

Q. With regards to Government's Exhibit -- it might be the easiest way to do this. Going on to Government's Exhibit 8. What was Government's Exhibit -- I'm sorry, your item 8 in your lab No. 00810?

A. Item 8 was a heat-sealed evidence bag which contained a second heat-sealed evidence bag which contained a zip bag with white powder.

Q. And item 9?

A. Item 9 was a similar item. It was a heat-sealed evidence bag containing a heat-sealed evidence bag containing a zip bag with white powder.

Q. Now, with reference to items 8 and 9, did you conduct the same type of testing that you previously testified to with regards to the other items that you received?

A. Yes, I did.

Q. Okay. So with regards to item 8, what were your findings as to item 8?
A. The weight was 224.63 grams and it contained methoxyacetylfentanyl.
Q. And with regards to item 9?
A. Item 9 weighed 223.07 grams and also contained methoxyacetylfentanyl.
Q. Now, as to Government's Exhibit 234, I had asked you about item 7A through E. Do you see items 8 and 9 also reflected in Government's Exhibit 234?
A. Yes.
Q. And were these the items that were provided to you for further analysis at the Pinellas County Forensic Laboratory?
A. Yes, they are.
Q. Are there any particular markings since there's two separate bags that reflect that you were the chemist that analyzed these substances?
A. Yes. Each of the interior heat-sealed bags have a label with our unique laboratory number, as well as with the item numbers, and my signature and the date appear on those labels.
Q. Once again, I'm going to ask you to go to the easel.
MS. GUZMAN: And may I approach again, Your Honor?
THE COURT: You may.
BY MS. GUZMAN:

Q. Once again, Mr. Gilbert, I need your assistance. As to Government's Exhibit 234, your findings as to 7A, 7B, 7C, 7D, and 7E, if you would be so kind as to note that on the easel separately. 7A, 7B, 7C, 7D, and then we will get to 8 and 9.

(Witness complies.)

BY MS. GUZMAN:

Q. Thank you, Mr. Gilbert.

Did you have an opportunity to illustrate on the easel Government's Exhibit 7A, 7B, 7C, 7D, and 7E?

A. Yes.

Q. Now, with reference to Government's Exhibit 234 item 8, would you please note, again, in a similar fashion the weight and substance.

(Witness complies.)

BY MS. GUZMAN:

Q. And, then, likewise, as to Government's Exhibit 234, item 9.

(Witness complies.)

BY MS. GUZMAN:

Q. Thank you very much. You may take your seat. I appreciate your assistance with this.

Now, I know that you were presented additional items; is that correct?

A. Yes, I was.

Q. So, again, as a reference point, I'm going to use the

laboratory number. So I'd like to refer you to your laboratory No. 17-010161.

Under that particular laboratory number, what item were you provided to analyze?

A. That item was a heat-sealed evidence bag which contained approximately 503 round blue tablets which had markings of A 215.

Q. And that particular laboratory number, what was the number of the item provided to you?

A. It was item 4.

Q. Now, we previously talked about another item 4. Is this a separate, a different item 4?

A. Yes, it was.

Q. And why is that?

A. They came in under two separate laboratory numbers. At the beginning of 2018, we actually changed what we call our LIM system, which is our laboratory information management system, kind of the database of how we track everything.

Prior to 2018, each submission that came in was given a unique -- its own unique laboratory number. After 2018, if submissions were related to each other, they were given the same lab number, but with a different request number.

Q. The items that you have previously testified to this morning, what year were they provided?

A. The ones I've testified to so far came in in 2018.
Q. So this would have been after that change occurred with the laboratory number classifications in the laboratory?
A. Yes.
Q. The exhibit that I am now referring to, what year was that provided?
A. That was submitted in 2017.
Q. So that would be before the change in classification or numerical classifications?
A. Yes.
Q. So with reference to 17-010161, you indicated that you were provided a heat-sealed evidence bag with some tablets; is that correct?
A. Yes, it was.
Q. And what again was the total amount of tablets provided?
A. The number of tablets?
Q. Yes.
A. There's approximately 503.
Q. And you indicated that they had a specific marking. What was that marking?
A. A 215.
Q. Now, I know this was in 2017 and the other ones were in 2018, but was the same type of testing conducted by you with regards to this laboratory number than you did to the other

ones?
A. Yes.
Q. And what were your findings as to item 4 under this laboratory number?
A. That the total weight was 45.24 grams and it contained fentanyl.
Q. Now, in addition, you were also provided around that time period, as I understand it, another item under laboratory No. 17-009979; is that correct?
A. Yes.
Q. And if you would, describe for the members of the jury what was contained within that particular item.
A. It was a heat-sealed evidence bag which contained five empty small zip bags and approximately 498 round blue tablets marked A 215.
Q. And, again, based on the testing that you conducted, again, was it the same type of testing that you have testified to as far as all these other exhibits?
A. Yes.
Q. And what were your findings in terms of laboratory No. 17-009979?
A. That the weight was 45.30 grams and the exhibit contained fentanyl.
MS. GUZMAN: Your Honor, if I may approach the evidence table again?

THE COURT: That would be fine.
BY MS. GUZMAN:
Q. Mr. Gilbert, reference first what has been marked as Government's Exhibit 229. Do you have that in front of you?
A. Yes, I do.
Q. And what is contained within Government's Exhibit 229?
A. That was our laboratory No. 17-009979, item 2, which was approximately 498 round blue tablets.
Q. And Government's Exhibit 230?
A. That was our -- reference our laboratory No. 17-010161, which was approximately 503 round tablets.
Q. And with regards to Government's Exhibit 229 and Government's Exhibit 230, how do you recognize those two exhibits as being the ones that you particularly analyzed?
A. Once again, it has our unique laboratory number on the heat-sealed evidence bag. And my signature and the date when I opened it and sealed it is also present.
Q. I am once again going to ask your assistance with the easel. Mr. Gilbert, if you would step one more time. And I appreciate your assistance with this.
With regards to Government's Exhibit 229, which I believe you indicated was reference your laboratory No. 9979; is that correct?
A. That's correct, yes.
Q. Would you please note again the substance that was

identified by you after testing and the total weight.

(Witness complies.)

BY MS. GUZMAN:

Q. Likewise, with regards to Government's Exhibit 230, which I believe references laboratory No. -- your laboratory No. 10161; is that correct?

A. Yes, it is.

Q. Again, likewise, if you would indicate the substance identified and the total weight.

(Witness complies.)

MS. GUZMAN: Your Honor, may I approach the evidence table one last time?

THE COURT: Yes, you may.

BY MS. GUZMAN:

Q. I'm showing you what has previously been marked as Government's Exhibit 232. Do you recognize that particular exhibit?

A. Yes, I do.

Q. And how do you recognize that particular exhibit?

A. Once again, the inner heat-sealed evidence bag contains a label with our unique laboratory number as well as the item number, my signature and the date.

Q. And what is the item number that is reflected in Government's Exhibit 232?

A. It is actually item 2.

Q. Now, would that reference your laboratory No. 18-0810?
A. Yes, it does.
Q. And item 2 under that particular lab number, what did you receive in that item number -- in that item?
A. It was a heat-sealed evidence bag which contained a coin sized zip bag and 94 whole as well as several partial round blue tablets with markings of A 215.
Q. And again, likewise, did you conduct a similar type testing with reference to item 2 which is in Government's Exhibit 232?
A. Yes, I did.
Q. And what were your findings?
A. That the weight was 8.52 grams and it contained fentanyl.
Q. And, again, Mr. Gilbert, one last time, if you would please note -- well, let me -- if I may approach the easel one last time.
Again, as you have with all these other exhibits, if you would note your findings as to Government's Exhibit 232 with regards to the substance identified and the total weight.
(Witness complies.)
BY MS. GUZMAN:
Q. And since I think that will be the last one that I will ask you to use your creative art skills on, would you

initial -- just place your initials under the findings on 232.

(Witness complies.)

BY MS. GUZMAN:

Q. And for purposes of clarification, since you've identified a number of substances, if you would also initial where it has 231 so that we know where you started and where you ended.

(Witness complies.)

MS. GUZMAN: Thank you very much, Mr. Gilbert. Thank you for your patience and your assistance.

I tender to counsel for cross-examination, Your Honor.

THE COURT: Thank you so much, Ms. Guzman.

Mr. Martin, do you wish to cross-examine the witness?

MR. MARTIN: Thank you.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good morning.

A. Good morning.

Q. Now, your test is what's called a qualitative analysis; is that correct?

A. That is correct, yes.

Q. Okay. And what that means is that's just identifying

the drug as you testified to; correct?
A. That is correct, yes.
Q. Okay. You're not doing a purity type analysis?
A. No, I'm not.
Q. You can't tell me how much, just that there is some amount of fentanyl and the other drug you testified to; correct?
A. That's correct, yes.
MR. MARTIN: Thank you. No further questions.
THE COURT: All right. Anything else, Miss Guzman?
MS. GUZMAN: No, Your Honor, I have no further questions. Thank you, Mr. Gilbert.
THE COURT: Thank you.
I'll excuse the witness and we appreciate your having come in today to testify.
THE WITNESS: Thank you.
THE COURT: And you can call -- since we took a break a little bit earlier, I think we'll do another witness and then take a break unless you need to take a break now.
MS. GUZMAN: Your Honor, if we could take a break right now. One of our witnesses just arrived from out of town.
THE COURT: Ladies and gentlemen, we're going to take our morning break. Ten minutes. Please don't discuss the case or form any opinions until you've heard all the

evidence. We'll see you back here in ten minutes.

COURT SECURITY OFFICER: All rise.

(Jury exits courtroom at 10:35 a.m.)

THE COURT: We are in recess.

(Recess taken from 10:35 a.m. to 10:48 a.m.)

COURT SECURITY OFFICER: All rise.

This Court is again in session.

MS. GUZMAN: Your Honor, if I may before the jury comes out, I have kind of good news and bad news. The good news is that the way that this case has been moving -- it's been moving so quickly, we think that the government might be in a position to rest tomorrow.

THE COURT: Okay.

MS. GUZMAN: Tomorrow afternoon. So that's the good news.

The potential bad news is we're ready to proceed with our next witness, but we have three chemists flying in to Tampa International that apparently are all delayed.

THE COURT: Okay.

MS. GUZMAN: We have another witness who's scheduled here at 11:30.

And I think that my direct examination of the current chemist who's flown in could last that and then we would have another witness, but I wanted the Court to be aware of the fact that we have three chemists who were

delayed out of Miami and apparently one coming out of Chicago.

THE COURT: Okay.

MS. HOWARD-ALLEN: But it might not get us to 11:30 because we had three more that would have certainly gotten us to 11:30.

THE COURT: That's okay. Sometimes getting from Tampa to Miami or vice versa can be a challenge.

MS. HOWARD-ALLEN: So I'm not sure what you want to do if our next witness isn't arriving. The local one is arriving at 11:30.

THE COURT: Okay. The local one's at -- you know what, let's just finish with this gentleman. And you know what, we'll just see what happens. If we have to take another break, we'll just take another break. It's okay. Everybody understands.

MS. GUZMAN: Thank you, Your Honor.

THE COURT: Okay. The jury is ready?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Okay.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 10:50 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

And the witness.

MS. GUZMAN: Yes, Your Honor. The government would call Thaddeus Mostowtt.

THE COURT: Okay.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Thaddeus Mostowtt, T-h-a-d-d-e-u-s. Mostowtt is M-o-s-t-o-w-t-t.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Thank you, sir. You're going to be asked some questions by Assistant United States Attorney Maria Guzman, and then you may be asked some questions in cross-examination by Mr. Martin, who represents Mr. Fisher.

If you don't understand the question, please say so so they can state it differently. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time. If you have the tendency to speak quickly, slow down so we can understand you and

speak up so we can hear you. All right?

THE WITNESS: Yes, ma'am.

THE COURT: You may proceed, Miss Guzman.

MS. GUZMAN: Thank you very much, Your Honor.

THADDEUS MOSTOWTT,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. It's still morning. Good morning. How are you?

A. Good morning. Doing well, thank you.

Q. Would you please introduce yourself to the members of the jury and to the Court.

A. My name is Thaddeus Mostowtt. I am a forensic chemist with the Drug Enforcement Administration.

Q. Now, are you based in any particular city?

A. The laboratory where I work at is in Miami, Florida.

Q. And does DEA have different laboratories across the country?

A. Yes, we do.

Q. The particular laboratory that you are assigned to you've indicated is in Miami. Does it have a particular name or designation?

A. The Southeast Laboratory.

Q. And what -- in effect, the Southeast Laboratory, what

type of testing does it conduct?
A. We analyze substances for the presence or absence of controlled and noncontrolled substances.
Q. And are there few or many chemists that work out of that particular laboratory?
A. There are many.
Q. Is this particular laboratory essentially the forensic laboratory for the Drug Enforcement Administration?
A. Yes, this is one of them, yes.
Q. If the Drug Enforcement Administration confiscates evidence, does this evidence go to your particular laboratory, along with some of these others nationally?
A. Yes.
Q. How long have you been employed with the Southeast Laboratory?
A. I have been a forensic chemist with the Drug Enforcement Administration for a little bit over two years.
Q. And have you always been assigned to the Southeast Laboratory?
A. After training in Quantico, Virginia, I was assigned to the Southeast Laboratory.
Q. So you indicated that you had training at Quantico, which is an FBI designated facility; is it not?
A. The DEA does have a facility there as well.
Q. And if you would explain to the jurors your educational

background.
A. Sure. I have a bachelor's degree in chemistry from Mount St. Mary's University in Maryland, a master's of forensic science degree in forensic chemistry from the George Washington University in Washington, D.C. and have been working towards my Ph.D. in chemistry at Florida International University.
Q. When you graduated from your last institution of higher learning, was the Southeast Laboratory your first job or did you have employment other than Southeast Laboratory?
A. Other than after graduating from my master's program and entering the Ph.D. program, I was a teaching assistant at Florida International University.
Q. And is that a university in Miami?
A. Yes, ma'am.
Q. Upon joining the Southeast Laboratory, what are some of your duties and responsibilities as a chemist within that unit?
A. So like I stated before, we analyze the substances that we receive for the presence or absence of controlled and noncontrolled substances.
Q. And is this what you do?
A. Yes, ma'am.
Q. And have you had the opportunity to do this type of analysis on many or few occasions?

A. Many occasions.
Q. Have you had the opportunity as a result of your findings to testify in state or federal courts?
A. Yes, ma'am.
Q. On few or many occasions?
A. A few occasions.
Q. Have you ever been with us here in the Middle District of Florida that you recall?
A. I have not been to Tampa, no.
Q. Welcome.
A. Thank you.
Q. In this particular case, were you provided an exhibit? First of all, when you are provided evidence, is it designated as a particular exhibit number?
A. Yes.
Q. And what other reference points do you have in your lab reports? Do you have a case number? Do you have what is called the LIMS number? How do you reference your report?
A. We have the case number, the agency's case number, the agency's exhibit number and then our own laboratory number, which is our LIMS number.
Q. Okay. And LIMS would be L-I-M-S?
A. Yes, ma'am.
Q. And is that a particular number that is assigned to every substance that is provided for analysis?

A. Yes.
Q. Now, in this particular case, were you provided an item labeled Exhibit 6?
A. Yes, I was.
Q. And what is your LIMS number associated with Exhibit 6 in this case?
A. I would need to refer to the laboratory report or the exhibit itself.
Q. Do you have a copy of the laboratory report in front of you?
A. I do.
Q. And what would be the LIMS number that is reflected in your laboratory report?
A. The LIMS number is 2018-SFL4-00579.
Q. And these particular numbers are unique to the Drug Enforcement Administration and your laboratory; is that correct?
A. Yes.
Q. They are not affiliated or the same as they would to any local law enforcement forensic laboratory like Pinellas or Hillsboro or Miami?
A. No. Our laboratory number is unique to our specific laboratory.
Q. Now, in this particular case under the LIMS number that you have testified to, Exhibit 6 is reflected; is that

correct?
A. Yes, ma'am.
Q. And what is Exhibit 6? What was contained in Exhibit 6?
A. I would need to refer to my case notes.
Q. Do you have those available to you?
A. Yes, I do.
Exhibit 6 contained a yellow Louis Vuitton bag that contained 16 Ziploc bags that further contained blue tablets with -- A 215 on one side of the tablet was imprinted.
Q. Now, you indicated that it was contained within a Louis Vuitton bag. Do you actually get the Louis Vuitton bag in an evidence bag?
A. In this case, there was a bag with Louis Vuitton written on it. So, therefore ...
MS. GUZMAN: Your Honor, if I could approach the evidence table.
THE COURT: You may.
BY MS. GUZMAN:
Q. Mr. Mostowtt, I'm showing you what's previously marked and introduced as Government's Exhibit 227. Do you see that in front of you?
A. Yes, I do.
Q. Now, do you recognize Government's Exhibit 227 and the

contents within?
A. Yes. It has my name and initials on the white label here as well as my handwritten name on the bottom white label here.
Q. Now, when you receive this exhibit at your laboratory, in what condition is it received?
A. The seals are completely in contact and everything that is inside the exhibit currently was inside previously.
Q. Once you physically receive the package, what is it that you do in order to initiate your particular testing?
A. Initially, I'll take a gross weight of the exhibit, which is the weight of the outer packaging and everything that's inside.
Q. Is this just a common procedure for all the chemists at the Southeast Laboratory?
A. Yes.
Q. Is there a particular I guess protocol or policy that this is the way that all evidence should be conducted?
A. Yes.
Q. In this particular case, when you remove the contents, explain for the members of the jury what you do with them.
A. Okay. So upon removal of the contents, I initially took the net weight so to determine the weight of all the tablets present in the exhibit. In order to do this, I took the weight of the 16 Ziploc bags full all together, and then

removed all the tablets from the 16 Ziploc bags and then weighed all 16 Ziploc bags empty.
Q. Now, you indicated that your initials or your markings are reflected on that bag; is that correct?
A. Yes, they are reflected on the outside of the self-sealed evidence envelope.
Q. When the exhibit is opened by you, do you make a marking at that point?
A. Yes, I go ahead -- on the white label here, I'll put my signature and handwritten name as well as the date that it was opened.
MS. GUZMAN: Perhaps if we could put Government's Exhibit 227, it might help us a little bit.
BY MS. GUZMAN:
Q. Again, we have been referring to Government's Exhibit 227. Is this Government's Exhibit 227?
A. Yes.
Q. You had indicated, of course, that your name appears on it. And, again, that would be Thaddeus Mostowtt; is that correct?
A. Yes, ma'am.
Q. You've indicated the contents of the bag upon your opening it and your testing. Now, I'd like to just go a little bit more in depth as to your testing.
What type of tests are actually performed of those

materials?
A. Okay. So I did two tests. The first test was a GC FID and the second test was a GC/MS test.
Q. For purposes of us lay people, what is a GC or a GC/MS test?
A. Okay. So the GC FID test stands for gas chromatography flame ionization detection. It's a two-part test. The sample gets introduced to the instrument, then it passes through a column where it separates out into multiple components, hits a flame, and then the flame detects the compound, which we see in our printouts.
Q. And the second test?
A. The second test is the gas chromatography/mass spectrometry test, also known as the GC/MS. That one is also a two-part test. The first part, it passes through the column to separate out the multiple components, and the second part looks at the fragmental pattern of those various components that are separated to make an identification.
Q. Now, is there any type of protocol for the amount of tests that have to be performed on any given sample?
A. Yes.
Q. And what is the protocol for the Southeast Laboratory?
A. So, we'll do two tests in our initial screening test, then we will form a composite and then do any additional testing.

Q. And why? Why is there the need for two? I think you said your initial testing and then your -- the two separate testings. Why is that?
A. The two initial testings are to initially identify any compounds. The testing after the composite is to do further tests to make sure no other compounds could be identified.
Q. Now, again, referring to Government's Exhibit 227, it appears that there are some markings on this plastic bag. There is an orange label. What is that?
A. That is a biohazard label.
Q. And who places that on that bag?
A. It could be the agents that could place it on the bag.
Q. But it's not you?
A. No, I do not place the biohazard label on the bag.
Q. So when you received that particular exhibit for your analysis, that particular orange label was already affixed to the exhibit?
A. Yes, ma'am.
Q. Now, there's another smaller label right on top of it. It looks like a skull for lack of a better word. What is that?
A. That is a skull and crossbones label. We use that to -- if after analyzing an exhibit, if it contains any fentanyl, we put that on there so, therefore, the evidence specialists know how to handle the exhibit.

Q. So if I understand you correctly, the orange biohazard is -- when you receive the exhibit, it's already on it; correct?
A. Yes, ma'am.
Q. But the smaller red and white skull-type tag, that's placed by you?
A. Yes.
Q. Now, you indicated the tests that were performed on the particular exhibit that you were provided. What were your findings?
A. It was determined that the exhibit contained fentanyl.
Q. And were you able to determine the weight of the fentanyl?
A. I was able to determine the weight of the tablets, yes.
Q. And again, if you need to refresh your recollection by your lab report or your notes, what was the weight that you determined Exhibit 6 --
A. Exhibit 6 weighed 143.65 grams.
Q. Now, after you -- now, there's -- as you indicated, there were certain additional items other than the tablets in Exhibit 6. Do you see the Louis Vuitton-type bag reflected in the envelope?
A. That would be the yellow bag reflected in the image.
Q. When you received the bag, were the tablets inside of the Louis Vuitton bag or were they just separate in the bag?

A. They were inside the bag.
Q. Did you do any type of analysis or any of these two type of tests on the bag itself?
A. No, I did not.
Q. Now, after determining that the contents of Exhibit 6 contained fentanyl, what was the next step?
A. So, then I took a reserve weight, so that would be the weight of the remainder of the tablets that were tested as well as those tablets that were not tested.
Q. And I guess I haven't asked this question before, but how long does this test -- these tests take? I mean from the time that you receive the exhibit, you open it, you conduct the tests, what kind of a time frame are we discussing?
A. Depending upon the exhibit, in this case, a couple of days.
Q. A couple of days?
A. Yeah, like one to two days I believe.
Q. And why does it take a couple of days? For example, for this particular exhibit that contained -- do you know how many pills or tablets were reflected in that exhibit?
A. Yes. I extrapolated the count on the number of tablets in the exhibit.
Q. And what was that quantity?
A. The extrapolated count was 1,588 tablets.
Q. And why would it take two days to conduct these tests?

A. So the sample prep takes a little bit of time and then it takes a while for the samples to run. They'll run continuously over a long period of time. And then it takes me a while to go ahead and do my analysis of the testing.

Q. And once the analysis is complete and you've determined the substance you believe it to be and the weight, what do you do with the actual contents?

A. So once all the testing is done, I take a reserve weight of all the tablets that were tested, not tested, place them back into the self-sealed evidence envelope, seal that up with the white label at the bottom, and then take a gross weight after analysis.

Q. And do you then provide additional initials or signature indicating that you have now sealed the exhibit?

A. Yes. At the very bottom of the large white label, I will go ahead, I signed it, and wrote my name as well as the date that it was sealed and then the gross weight after analysis that was recorded.

Q. And it appears on Government's Exhibit 227 that the date that it was resealed was February 9th, 2018. Does that sound correct?

A. Yes, ma'am.

Q. And the date that it was opened was 2-7, 2018?

A. Yes.

Q. And that would account for the two-day period that you

explained to the jury takes to actually analyze the contents?
A. Yes.
Q. Now, once you've actually sealed it -- you've done your testing, you've sealed it, you've affixed your signature or your initials, where does it go then?
A. So then it gets submitted back into our main evidence vault and gets handed over to the evidence specialist.
Q. And do you have any other contact with this exhibit once it goes back into the vault?
A. No, I do not.
Q. Obviously you've identified it this morning. Is this the first time you've seen it since you conducted your testing?
A. Yes.
Q. Now, the exhibit notes suspected fentanyl. Was this written by you or was this written by someone else?
A. This was already written on the self-sealed evidence envelope.
Q. So along with the biohazard orange label, this particular writing was already reflected in the exhibit when you received it?
A. Yes.
Q. And, again, you are one of many chemists with the Southeast Laboratory?
A. Yes, ma'am.

Q. Would this be the type of analysis and determination that's made by other chemists in your unit as well?
A. Yes.
Q. Now, just one last question. When you affixed the skull tag on the plastic bag, do you do that with every drug that you are provided with -- or with every sample that you are provided with?
A. No, I do not.
Q. Why did you feel it necessary to affix it to this particular exhibit?
A. It's lab policy.
Q. And why is it a lab policy?
A. It's lab policy for those exhibits that contain fentanyl or any fentanyl analogues.
Q. And do you know why that is?
A. Just so therefore people could be aware of what is contained within the self-sealed evidence envelope.
Q. And is fentanyl considered a dangerous drug?
A. Yes.
MS. GUZMAN: Your Honor, I have no further questions at this time.
Thank you very much, Mr. Mostowtt.
THE COURT: Thank you.
Any cross-examination for this witness?
MR. MARTIN: Yes, Your Honor.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Your analysis that you talked about is what's called a qualitative analysis; correct?

A. Yes, sir.

Q. Okay. You're just determining -- you're just identifying the drug; correct?

A. Yes, sir.

Q. You're not determining the purity or how much drug is in there; is that correct?

A. No, I did not determine the purity of the substance.

Q. Just that there is some amount of fentanyl in there; correct?

A. Yes, sir.

MR. MARTIN: Thank you. No further questions.

MS. GUZMAN: Your Honor, just briefly on redirect. Could I approach the easel?

THE COURT: You may.

REDIRECT EXAMINATION

BY MS. GUZMAN:

Q. Mr. Mostowtt, on last thing. In Government's Exhibit 227 would you assist me in writing down on the easel the substance that you identified and the weight.

A. Sure.

Q. And then put your initials somewhere after that.

(Witness complies.)

BY MS. GUZMAN:

Q. And, actually, also the exhibit number, which I believe in your laboratory report in your LIMS number was Exhibit 6.

(Witness complies.)

MS. GUZMAN: Thank you very much, Mr. Mostowtt.

THE COURT: All right. Anything else, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: May I excuse this witness?

MS. GUZMAN: Yes, Your Honor.

THE COURT: Thank you. We appreciate your having come in today to testify. You are excused. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Do you have another witness ready?

MS. GUZMAN: Your Honor, I believe that we will in about 10 or 15 minutes. As I indicated, some are delayed.

THE COURT: Okay. So we have two options. One is to break right now for lunch, 11:15 to 12:15 or 11:20 to 12:20. The other option is -- you think they should be here in about 10 minutes or 15?

MS. GUZMAN: That is our approximate. We believe that by 11:30 we will have a witness to present to the Court in order to expedite this matter, but I don't think we'll have it before 11:30.

THE COURT: Okay. I mean if they're really going to be here at 11:30, I'd just as soon tell the jury just, you know, take a short break and we'll resume at 11:30. Do we know? Were you able to find out by phone if they're on their way?

MS. GUZMAN: This particular witness, Your Honor, is local and on their way from Pinellas County, so I would think 11:30.

THE COURT: Well, that's what we'll do.

So ladies and gentlemen, we're going to take another short break. We'll resume at 11:30. Please don't discuss the case or form any opinions until you've heard all the evidence. We'll see you back here then.

COURT SECURITY OFFICER: All rise.

(Jury exits courtroom at 11:18 a.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: All right. While we're waiting for that, Miss Guzman, and, Miss Howard-Allen, take a look at your proposed verdict form. And I don't intend this to be a charge conference. I know we'll do that later.

But there seems to be an issue with the verdict form on whether it was in the correct order or not. So, for instance, in the Indictment, Count Five talks about 40 grams for more of fentanyl and Count Six deals with 400 grams or more of fentanyl. But in the proposed verdict form,

Count Five discusses 400 grams of fentanyl and Count Six discusses 40 grams of fentanyl. So it sounds as if the counts were inverted in the verdict form. Looks that way to me.

MS. HOWARD-ALLEN: It sounds like that, Your Honor. If it was, it was inadvertent, but you may -- I'm sure you're right.

THE COURT: Okay.

MS. HOWARD-ALLEN: Yes, Count Five is 40, so we would probably just flip the weights from Count Six into Count Five and the ones from Count Five into Count Six. So we'll take care of that and refile it.

THE COURT: Okay. I just wanted to double-check on that --

MS. HOWARD-ALLEN: Thank you.

THE COURT: -- as we are getting ready to move forward. So let's just see time-wise. So hopefully around 11:30, 11:35, that other witness will be available.

And, you know, I don't know why I forgot this or I didn't see it on my calendar. At 4:30 I think I have an oral argument in a criminal case. Is that right? 4:30; is that right?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: So we're going to have to break today --

MS. HOWARD-ALLEN: That's fine.

THE COURT: -- at 4:30 so I can do that oral argument. And so how far do you think you'll get today?

MS. HOWARD-ALLEN: I think that we -- the one witness that we have that's coming at 11:30 is approximately two to three hours.

THE COURT: Oh, wow.

MS. HOWARD-ALLEN: Then we have four chemists -- well, two to three to four, depending on when they fly in this afternoon that will be just as short as Mr. Mostowtt. So, you know, we could put some of them on today and there will be some more tomorrow morning. They're all super short.

And then we have just two more witnesses tomorrow. One is shorter, you know, one might be an hour and then Miss Knott, who is our financial analyst. She's probably two or three hours. So I suspect we'll be done, you know, depending on how things go tomorrow afternoon.

THE COURT: Okay. The person that you're awaiting now, who is that?

MS. HOWARD-ALLEN: His name is Karl Gwynne. He's a detective. And then we have -- so we've done -- we have ten forensic chemists, so we've done four -- three, four?

MS. GUZMAN: We've done six -- we've done four.

MS. HOWARD-ALLEN: All right. So we have six more

to go. Those are all as short as Mr. Mostowtt. And then we have Konrad Gusewicz and Diane Knott.

THE COURT: Okay.

MS. HOWARD-ALLEN: And then we'll be resting. Oh, and Roman Hernandez who is shorter than any witness we've had from the IRS. He should be probably five minutes.

THE COURT: Okay. So sounds like tomorrow is a pretty good bet.

MS. HOWARD-ALLEN: Yes, tomorrow afternoon. It could be even mid-afternoon, Your Honor.

THE COURT: Okay. All right.

So, Mr. Martin, I don't expect you to tell me now, but at some point, I will need to -- I'm happy to inquire of your client as to whether he'll be testifying or not.

And Mr. Fisher, you don't need to say anything, but that's a decision that you need to reach after talking to your lawyer as to whether you're going to testify.

And Mr. Martin, I'm happy to make inquiry of him at the appropriate time, but I'm not going to do that now. I think it's too early. But at some point, I'll need to know because it impacts on the jury instructions, and, you know, that takes a little bit of time to get all those ready.

So I think that it looks like this would go to the jury on Wednesday, then, correct, Wednesday morning, maybe?

MS. HOWARD-ALLEN: Yes, after closing -- if we

were to close on Wednesday morning --

THE COURT: Okay. Right.

MS. HOWARD-ALLEN: -- if Mr. Fisher doesn't testify, yes. And then we have the charge conference I guess on Tuesday afternoon.

THE COURT: That's right. That's right. So we will have -- that's what I'm looking at, having the charge conference tomorrow afternoon after the close of testimony. Or, for instance, if it's just Mr. Fisher, I'm told yes, Mr. Fisher will testify -- well, I'll just cross that bridge when I get there. Let's put it that way. That's the fairest way to proceed. I'll cross that bridge when I get there.

But it'll either be Tuesday at the end of the day or Wednesday morning we'll have a charge conference because it takes us time to print up 14 copies of jury instructions. So we need to have a good -- almost a good hour to get that done. I don't think we have anything else.

We'll be in recess, then, until the witness gets here.

(Recess taken from 11:24 a.m. to 11:45 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Do you want to go ahead and bring the witness in and we will bring in the jury.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 11:46 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

As you can see, it's 10 to 12:00, but I think we will go until about 12:15 or so and then break for lunch from maybe 12:20. Anybody needs to stop before that, they get hungry, just let me know. Otherwise we will go for about a half an hour.

Please call your witness.

MS. HOWARD-ALLEN: The United States calls Karl Gwynne.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, madam.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Karl Gwynne; K-a-r-l, G-w-y-n-n-e.

THE COURT: Thank you, sir. You're going to be asked some questions by Kelley Howard-Allen, Assistant U.S. Attorney, and then Ken Martin, defense attorney who represents Mr. Fisher, may ask you some questions in

cross-examination.

If you don't understand the question, please say so. Wait until the question is finished before you begin answering so two people aren't speaking at the same time. You need to speak slowly so we can understand you and you need to speak up so we can hear you. All right?

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead, Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor.

KARL GWYNNE,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good morning, Detective Gwynne. Can you tell the ladies and gentlemen of the jury where you work.

A. Good morning. My name is Karl Gwynne. I'm a detective in the narcotics division of the Pinellas County Sheriff's Office.

Q. Detective Gwynne, how long have you been a -- how long have you worked for the Pinellas County Sheriff's Office?

A. Since January 2005.

Q. And what did you do before then?

A. I practiced law as an attorney in Pennsylvania, New Jersey and Florida.

THE COURT: I need to see counsel for a moment at sidebar.

(The following was held at sidebar:)

THE COURT: I don't see his name on the list.

MR. MARTIN: I didn't either.

MS. HOWARD-ALLEN: I don't know why it didn't appear. I didn't check to see that he was on there.

THE COURT: This is the one I have from May 24th. I don't know if there's --

MS. HOWARD-ALLEN: No, we only filed one. I'm just saying we always had him on there. It must have gotten knocked off.

THE COURT: Did you know about him, Mr. Martin?

MR. MARTIN: No. I went by the witness list. Now, I'm not saying he's not somewhere in this massive discovery because there's hundreds of people. So I'm not saying that I might not have read his name somewhere, because there is a massive amount of discovery which the government's provided to me.

MS. HOWARD-ALLEN: May I orally move to amend it to add him? It's K-a-r-l, G-w-y-n-n-e.

THE COURT: What's his first name?

MS. HOWARD-ALLEN: Karl, K-a-r-l.

THE COURT: How do you feel about that?

MR. MARTIN: I'm going to object.

THE COURT: For the time being, we will move forward, but if you don't know about him, Mr. Martin, maybe -- I don't know if we ought to take a break before we hear any testimony. I mean I think I better excuse the jury and I think I better hear about this.

MR. MARTIN: And the way I'm saying I don't know about him, there is no way I can represent to the Court that I never saw his name --

THE COURT: Yes, I know.

MR. MARTIN: -- because there's a massive amount of stuff.

THE COURT: Of course.

MR. MARTIN: I could have read his report for all I know.

MS. HOWARD-ALLEN: He has been provided with his report in discovery.

THE COURT: He has?

MS. HOWARD-ALLEN: Yes. It was just the report of the acquisition of the non-drug evidence from 10124 Nassau Court.

THE COURT: Okay. So you did provide it to him.

MS. HOWARD-ALLEN: It was in the initial discovery.

THE COURT: In discovery. And you think it just got inadvertently not included on the list?

MS. HOWARD-ALLEN: It was a hundred percent inadvertently not on the list. That's why I'm moving for an oral motion to amend it.

THE COURT: Okay.

MS. HOWARD-ALLEN: But it was -- you know, there's -- you know, the Pinellas County Sheriff's Office's report is like I think 500 pages in terms of the supplements. And I understand Mr. Martin's position, but it's been provided since the -- you know, to his previous lawyer.

MR. MARTIN: I'm not alleging bad faith.

THE COURT: Of course.

MR. MARTIN: I am objecting. And I'm not -- as an officer of the Court, I honestly cannot recall reading his report, but that by no means I don't have it. I believe that I probably have it because I have everything.

THE COURT: I'll tell you what, it's five to 12:00. We're going to break for lunch and we're going to take this up right now.

MS. HOWARD-ALLEN: Okay.

THE COURT: Okay?

MS. HOWARD-ALLEN: Your Honor, it may not have been his report, because all of these people have like the list of the thousands of people that were there. And I don't know who authored the report, but he was listed as, you know, being an evidence custodian.

MR. MARTIN: I've read so many reports. I am not alleging that I have not read something. I'm sure I have.

MS. HOWARD-ALLEN: I understand. Absolutely.

THE COURT: Okay.

(Sidebar ended.)

THE COURT: Ladies and gentlemen, we're going to take our lunch break. It's five to 12:00. We will resume at 1 o'clock. Please don't discuss the case or form any opinions until you've heard all the evidence. We will see you back here at 1 o'clock.

COURT SECURITY OFFICER: All rise.

(Jury exits courtroom at 11:54 a.m.)

THE COURT: Please be seated. I don't know if you want the witness in here or not.

MS. HOWARD-ALLEN: I wouldn't think so for our discussion.

THE COURT: Okay.

You're excused. I ask you to please come back at five to 1:00. All right?

THE WITNESS: Yes, Your Honor.

THE COURT: You're excused. Thank you.

(Witness exits the courtroom.)

THE COURT: Okay. So I was looking at my government's witness list because I check these things off plus indicate the day that they testify. I didn't see

Mr. Gwynne's name on the list, and so that's what prompted the inquiry at sidebar.

So let's see, Mr. Martin has -- well, the government has orally moved to add Mr. Gwynne's name to the list and Mr. Martin has objected to that. So I think what I'm going to do now is I'll hear argument on it. I mean really what we care about or what I care about is that Mr. Martin's got notice of it. It's one thing to leave a name off, you know, the day -- this was given to me the day of trial or whenever it was. 5-24 is when this was filed. So that would have been -- I guess we started this trial on the 28th, so it was the Friday before.

But let me hear argument. I mean the main thing is I want to make certain that Mr. Martin got it, that he's not blindsided. So if you want to take a moment to gather your thoughts, that's fine.

(Brief pause.)

MS. HOWARD-ALLEN: Your Honor, I'm ready to address the Court.

THE COURT: Okay. Thank you. Could you come up to the podium. The acoustics are not great in here.

MS. HOWARD-ALLEN: So, Your Honor, I know that just logistically, I know that we had 30 witnesses on the list as it went towards filing it, and so I'm not -- I know we struck one of them and I'm not sure. It was clearly

inadvertent.

But I will tell you, so what Mr. Gwynne, Detective Gwynne did and primarily what he would be using is this PCSO evidence log that he authored as he gathered all the non-drug evidence from 10128 Nassau Court.

THE COURT: Okay.

MS. HOWARD-ALLEN: It's a ten-page handwritten inventory. It was provided -- you know, I think we've given them a thousand PCSO documents. This is 128, so it was early in the production. That production was initially provided to Mark Rodriguez who is Mr. Fisher's initial attorney, so it was the initial discovery production.

And then the agent just located -- as I indicated, there's a PCSO, a Pinellas County Sheriff's Office report with this case that has, I don't know, some couple hundred supplements which are how each report is numbered. And it appears that he authored in terms of the assistance and the evidence custodian, he authored a report which is supplement 90. And it's just a very short, you know, three-sentence report that says, you know, I was at that residence, I began surveillance and then I assumed my role as non-drug evidence custodian. So I really only have this report and the evidence log.

Every single item that was seized from Mr. Fisher's home as well -- besides the drugs, but all of

this documentary evidence that was taken from his home was -- everything was photographed and everything was -- all of those photographs were with the initial discovery.

The admission of those items was, you know, the same as the -- because this is a money case, those were all going to be admitted the same as the drugs. He's had all those items. He's had -- in each discovery production, he's always had the opportunity to come view the evidence. It's been in the Pinellas County evidence locker until we took it out and marked it for trial about two weeks ago.

So we have always been intending to bring it in. We went over to the evidence locker to take it out and mark which ones we have. There's more evidence there. It was always available to him to look at. It's just paper.

And so I just think there is no -- absolutely no prejudice by the government's inadvertence in leaving him off there. He's had all of the reports. There is literally no substance to his testimony other than how he gathered the evidence, and his name is on every evidence bag. It says Gwynne. And so he's just going to say, I got this out of that black binder and I -- and when the people finished searching the house, they came out and handed me this record.

And then we're going to admit those records and publish them to the jury. And that's the sum and substance. It's just a lot of records.

THE COURT: Okay.

MS. HOWARD-ALLEN: So I don't believe there's any prejudice and I believe we should be able to amend the witness list to add him at this time because there's just simply no prejudice.

THE COURT: Okay.

MS. HOWARD-ALLEN: He'll be available for cross-examination.

THE COURT: Okay. Thank you.

Mr. Martin, could you come up to the podium and give your response, please.

MR. MARTIN: Your Honor, the discovery in this case was massive and I believe I got everything from Mr. Rodriguez. I wrote him a check for the hard drive. So I mean I do believe I got it. As Miss Kelley Howard-Allen said, the reports were numerous. So I'm not alleging that I didn't get his report or a supplement that listed him as something.

Now, with that said, once I got the government's witness list, I mean in this case, if you tried to figure out everyone that the government may or may not call, you know, you would spend hours and days trying to figure that out. So once I got the witness list, I of course went through it and determined -- and I'm going to use the term if I knew these people, okay. In other words, okay, this is -- you know,

because the names, most -- a large majority of the names I didn't necessarily recognize even though I had probably read them before. So I determined who's on the government's witness list, et cetera.

And Mr. Gwynne was not on there. Mr. Gwynne was not a witness where as an officer of the Court that I would recognize would be missing. I mean in other words, if Christopher -- for instance, if Christopher McKinney was not listed on the witness list, I would have noticed that. So these other witnesses that I -- I looked at them as I saw them and made sure I would be prepared for them.

And the government's had plenty of time to get their witness list correct. They have plenty of assets. I'm sure everybody and his brother reviewed the witness list. So I'm objecting, not alleging bad faith, but the government should have listed the witnesses on the witness list and should be prohibited from calling them.

THE COURT: I will have a follow-up question for Miss Howard-Allen, but my question to you is, let's just assume you got it all, Mr. Martin, you got it through Mr. Rodriguez at the report. And I absolutely take at face value what Miss Howard-Allen said. No reason to doubt the correctness of it. That she gave it to Mr. Rodriguez and let's just assume Mr. Rodriguez gave it to you. All right? So let's just assume all that is true as I would suspect it

is.

I mean I have no reason to doubt it. Let me put it that way. So I believe -- absolutely believe what she's saying.

How are you prejudiced or harmed by not having had his name on a list a week ago Friday? On May 24th when this was filed, how are you harmed by not having had that knowledge on May 25th -- or 24th, excuse me?

MR. MARTIN: You're asking me?

THE COURT: Yes, yes.

MR. MARTIN: Specifically, I don't know. I mean, you always like to know which witnesses are being called. If, in fact, which I have no reason to doubt he's just going to list items that were taken out of Nassau Court or wherever, at this point I can't in my mind point to specific prejudice as I stand here right now. I can't do that.

However, with that said, I still object. I still think the Court was very clear, if you don't list them on the witness list, you may -- and I forget the term you used. But I mean, I certainly noted that you would be in dire probability of not being able to call that witness if they were not listed. And the government certainly had the assets to make sure the witness list was correct.

THE COURT: All right. Thank you, Mr. Martin.

Miss Howard-Allen, the reason you're calling this

gentleman, he's basically a records custodian, is that what he is or he seized these assets or this property, this evidence? That's the word, he seized this evidence at the residence, is that it?

MS. HOWARD-ALLEN: Yes, Your Honor. I mean, it's quite clearly his report just says, I then assumed my role as the evidence of non-drug -- as role as custodian of non-drug evidence. Detectives that found non-drug evidence would first present said items to an analyst to be photographed. These detectives would then present the respective items of evidence to me for documentation and collection.

The non-drug items of evidence include U.S. currency, a firearm which we're not going to address, ammunition, an iPad with cell phones which we're not going to address. Various vehicles and other keys we're not going to address. Fisher's passport, a fake Rhode Island driver's license which we're not going to address. Shipping labels, miscellaneous paperwork, receipts, plane tickets, a CD case which we're not going to address. Ziploc baggies, pieces of mail, laptop computers, electronic devices, a thumb drive, and a memory card. And we're not getting into any electronic device.

All non-drug evidence was collected by Dexter McGee and Dan Rivera. And that's sort of the sum and substance of the little report. And then there was a, you

know, whatever, ten-page evidence log that just handwrote which items and which numbers they were that correspond with the numbers on the bags. So it's just a straight custodian evidence.

I can -- you know, I'm sure that's why Mr. Martin is struggling with any prejudice because I could understand if there was someone who was going to talk about something that they knew about Dion Fisher, you know, and had some knowledge, that he would want to prepare and read a report or do an investigation, but this is not that type of witness, Your Honor.

THE COURT: Okay. Do you have another witness that could testify to that who's on this list or is this your only witness that's in that category?

MS. HOWARD-ALLEN: No, there was two Pinellas County detectives who acted in that role. I believe it was Detective Gwynne and then Detective Papamichael much like --

THE COURT: Detective Gwynne?

MS. HOWARD-ALLEN: Papamichael now -- Dexter McGee and Dan Rivera were the drug custodians which we presented, and there was two Pinellas County sheriff's officers who were the non-drug evidence custodians.

So, no, they are not -- it was Detective Gwynne that we had always intended to call. And, again, not to beat a dead horse, but that was inadvertent, and I just don't

think there's prejudice at this time, Your Honor.

THE COURT: All right. So there isn't somebody else that you could call in theory who could also take on the role that this gentleman did? In other words, you would have a break in the chain of custody if you didn't call him, is that what it is?

MS. HOWARD-ALLEN: That's correct, Your Honor.

THE COURT: And there isn't anybody else that can fit into that role?

MS. HOWARD-ALLEN: No. It's just straight chain of custody, and those are the only two people who could testify to it.

THE COURT: Well, I'll think about it a little bit. I'm not certain what the prejudice is, Mr. Martin. I mean, I don't even think you can come up with any. This could have been John Smith there. It could have been any one of these individuals. It doesn't sound like the name is what's important. It's the role that he played. So I'm inclined to let him testify. That's my ruling. I'm going to let him testify. But it's been addressed and he'll be permitted to proceed.

MS. HOWARD-ALLEN: Your Honor, I'm happy to have -- you know, if your deputy clerk could just make copies of these, I'm happy to give them to him so he has -- I understand that he might not have pulled them, but they're

just straight out evidence logs and I can provide a copy of them.

THE COURT: Let's do that. Let's do that. Thank you. We'll make a copy of that right now and get that to you, Mr. Martin, so you'll have it in the next three to five minutes. All right.

Okay. Anything else?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: All right. Thank you very much. We're in recess.

(Recess taken from 12:10 p.m. to 1:01 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Is everybody here?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Okay. We'll bring them in.

MS. HOWARD-ALLEN: Your Honor, just a moment, if we could. I just wanted -- we have a chemist that's here and I know that you swore Detective Gwynne in. I'd like to bring her in just because she will be five minutes if that's okay, and we'd start with her since we haven't started with Detective Gwynne.

And I only want to just say on the record as well, Your Honor, just that there's about probably 20, 30, 40 or 50 items on the exhibit list that Detective Gwynne was bringing

in. And I had given Mr. Martin the exhibit list a little early, like on Wednesday of that week rather than Friday, a draft form. So I would just say as well as that for the previous reasons Your Honor stated, that he had had notice of the exact items that someone had to bring in.

THE COURT: Okay. All right. Well, I'm glad you put that on the record. Thank you.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT. All right. We'll bring the jury in. And bring in your other witness.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 1:05 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

We're going to take some witnesses out of order. So I know we just swore in a gentleman. Just kind of forget about that for a little bit. And now we're going to turn to another witness.

Miss Guzman.

MS. GUZMAN: Yes, Your Honor. The government will call Victoria Broadstreet.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of

perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Victoria Broadstreet, B-r-o-a-d-s-t-r-e-e-t.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Ma'am, you're going to be asked some questions by Maria Guzman, Assistant U.S. Attorney, and then Ken Martin, who represents Mr. Fisher, may also ask you some questions in cross-examination.

If you don't understand the question, please say so so they can state it differently. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time.

If you speak quickly, you need to slow down so we can understand you and you need to speak up so we can hear you. All right?

Go ahead, Miss Guzman.

MS. GUZMAN: Thank you very much, Your Honor.

VICTORIA BROADSTREET,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good afternoon. Would you please introduce yourself to the jury and to the Court.

A. My name is Victoria Broadstreet. I am employed as a senior forensic chemist for the Drug Enforcement Administration Southeast Laboratory in Miami, Florida.

Q. And are you employed at that unit also with someone by the name of Thaddeus Mostowtt?

A. Yes.

Q. As part of the forensic chemistry personnel at Southeast Laboratory, what are some of your particular duties?

A. I analyze evidence submitted to the laboratory for the presence or absence of controlled substances and then testify to my findings in court.

Q. Have you done that on few or many occasions?

A. Yes.

Q. If you would, just briefly detail for the members of the jury and the Court your educational qualifications for that position.

A. I hold a bachelor of science degree in chemistry from the University of North Florida in Jacksonville, Florida.

Q. During the time as you've indicated, previously you have testified in federal or state court on numerous

occasions. Have you had the opportunity to test and analyze controlled substances that were provided to you on few or many occasions?

A. Yes.

Q. Let me refer to you specifically -- we now know that there is something called a LIMS number, which is a laboratory number that is assigned to every sample that's provided to you; is that correct?

A. That's correct.

Q. And in this particular case, you were involved in the analysis of an exhibit that fell under LIMS number 01640; is that correct?

A. Yes.

Q. And I believe that the exhibit that is referenced in that laboratory report or laboratory number is Exhibit 66.01 and 66.02.

A. That's correct, yes.

Q. Okay. So what I'd like to ask you -- well, before I do that, I don't think I've actually qualified you for purposes of rendering an opinion.

MS. GUZMAN: Your Honor, based on Miss Broadstreet's testimony as to her qualification, her training and experience in the analysis of controlled substances, we would tender her as an expert in the area of forensic chemistry in order to render an opinion.

THE COURT: Do you wish to voir dire?

MR. MARTIN: No, Your Honor.

THE COURT: All right. I find that the witness is qualified to serve as an expert witness and render expert testimony in the field of forensic chemistry. And you may proceed.

MS. GUZMAN: Thank you very much.

BY MS. GUZMAN:

Q. With reference to Exhibit 66.01, what exactly were you provided in that exhibit to analyze?

A. Well, to clarify, 66.01 and 66.02 was submitted as one exhibit. Upon opening the exhibit, I separated the two into two separate exhibits. 66.01 were the intact tablets I found in the exhibit. 66.02 were tablet fragments and powder.

Q. Let me -- it would be a good time to do this.

MS. GUZMAN: Your Honor, if I could just approach the evidence materials.

THE COURT: Yes, you may.

MS GUZMAN: And may I approach the witness?

THE COURT: Yes.

BY MS. GUZMAN:

Q. Miss Broadstreet, I have provided you what has been previously marked and admitted as Government's Exhibit 213. Do you have that in front of you?

A. Yes, I do.

Q. Reference your testimony about the one exhibit that you were provided and then essentially divided into the two separate exhibits, do you recognize Government's Exhibit 213?
A. Yes, I do.
Q. And how do you recognize Government's Exhibit 213?
A. I recognize it by the evidence label and my evidence sticker that I placed over my seal that has my markings and signature on it.
Q. And when you had previously testified in front of the jury about this Exhibit 66 that you received, is that it?
A. Yes, it is.
Q. And does it detail when you would have opened the sealed envelope and when you would have resealed it after your analysis?
A. Yes.
Q. And what date did you initially open it?
A. I initially opened it on August -- I mean, excuse me, April 11th, 2018.
Q. And when was it sealed back after your analysis?
A. It was sealed -- the final seal was placed on it on June 14th, 2018.
Q. Now, you indicated that you divided these two -- you divided the contents of the envelope into two exhibits, one 66.01 and the other 66.02?
A. Correct, yes.

Q. So let's reference 66.01. What did you analyze and what were your conclusions as to what the substance was?

A. After I sorted through the tablets and counted them, I counted 533 intact tablets for 66.01. I randomly selected 28 of those 533 tablets and tested them and performed two different tests on those tablets, and I concluded that the tablets contained fentanyl.

Q. And with regards to Exhibit 66.02, what did you analyze?

A. I analyzed the tablet fragments and the powder as a whole. I formed a composite which means I ground, mixed and sieved the entire exhibit. And then I performed two instrumental tests on that exhibit, and I concluded that that portion contained fentanyl.

Q. Now, the tests that you performed on both of these exhibits to reach your final conclusion, what type of tests did you perform? Do they have specific names?

A. Yes. For the first, 66.01, I performed a color test, I performed a gas chromatograph test and I also performed a gas chromatograph/mass spectrometry test.

Q. And for 66.02?

A. 66.02 I performed a gas chromatograph test and a gas chromatograph/mass spectrometry test.

Q. And are these standard tests subjected to the protocol of the DEA laboratory in Miami?

A. Yes.
Q. Once you determined that the particular substances were fentanyl, what, if anything, did you do after finishing up your testing?
A. At the conclusion of my testing, I resealed the evidence and I produced a report that stated my conclusions.
Q. I'm going to ask you, if you may, there is an easel to your right. And I'm going to mark the government exhibit, and then I'm going to ask you to please note under 66.01 and 66.02 what your findings were in terms of the substance and the weight. Could you assist me with doing that?
A. Yes.
Q. Okay.
MS. GUZMAN: Your Honor, if I could approach the easel.
BY MS. GUZMAN:
Q. If you would be so kind as to provide that information on the easel and then initial it.
(Witness complies.)
BY MS. GUZMAN:
Q. Miss Broadstreet, you had indicated that when you did the analysis of 66.01, that you had been provided approximately 533 tablets; is that correct?
A. Yes, that's what I counted.
Q. But you also stated that in furtherance of your

analysis, you essentially randomly performed the tests on 28; is that correct?

A. Yes.

Q. Could you please explain to the members of the jury why if there are 533 you performed the test on only 28.

A. At the Drug Enforcement Administration we use a statistical sampling plan which uses a statistical formula that tells us how many -- if we have a certain number of units, how many units we need to sample to meet a certain statistical amount. So for a 95 percent confidence level that I can say at least 90 percent of the population contained fentanyl, I would need to sample 28.

Q. So do you feel comfortable in your assessment that although you analyzed 28, that the compound -- or the substance involved was, in fact, fentanyl?

A. Yes, I am sure that the 28 contained fentanyl. And based on my statistical sampling, I can say at least 90 percent of the population also contained fentanyl.

Q. And this testing that you performed according to DEA policy or regulations, your testing of these particular pills, was it in conformity with that particular policy of DEA?

A. Yes.

MS. GUZMAN: I have no further question, Your Honor.

THE COURT: Thank you.
Any cross-examination?
MR. MARTIN: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. MARTIN:
Q. What was the gram weight of 66.01?
A. It was 48.7357 grams.
Q. And 66.02?
A. 3.7996 grams.
Q. And the tests you ran, they were what's called qualitative analysis; is that correct?
A. Yes.
Q. In other words, that allows you to identify that there's a detectable amount of fentanyl in there; correct?
A. Yes, correct.
Q. But you don't know how much or how pure or anything like that, do you?
A. No, I did no purity analysis on the tablets.
MR. MARTIN: Thank you. No further questions.
THE COURT: Anything else from the government?
MS. GUZMAN: No, Your Honor, I have no further questions. Thank you.
THE COURT: Okay. All right. Thank you.
I'll excuse the witness. We appreciate your coming in today.

THE WITNESS: Thank you.

THE COURT: You can call your next witness, please.

MS. HOWARD-ALLEN: At this time I call Detective Gwynne. May he just resume the witness stand, Your Honor, since he's already been sworn?

THE COURT: Yes, that would be fine.

Sir, I just want to remind you you're still under oath. You were placed under oath before and you understand you're still under oath?

THE WITNESS: Yes, Your Honor.

THE COURT. Okay. Go ahead.

MS. HOWARD-ALLEN: Thank you, Your Honor.

KARL GWYNNE,

having been previously duly sworn on Page 82 by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION (resumed)

BY MS. HOWARD-ALLEN:

Q. Detective Gwynne, I think previously we had gone through your background as a detective with the Pinellas County Sheriff's Office. So I wanted to turn your attention to February 15th, 2018 and ask where you were that day?

A. I was assigned as the evidence custodian with respect to service of the search warrant at a residence in Seminole, Florida, 10124 Nassau Court.

Q. And just briefly, is 10124 Nassau Court, is that in Pinellas County?
A. Yes, ma'am.
Q. And is Pinellas County within the Middle District of Florida?
A. Yes, ma'am.
Q. So was there a specific type of evidence you were assigned to collect that day, Detective Gwynne?
A. Yes, ma'am. I was assigned to collect what was dubbed non-drug evidence.
Q. And does that include? What type of items does that include?
A. Labels, receipts for jewelry, things like that.
Q. What was the process for collecting -- was this just sort of a normal search warrant where you might be inside collecting evidence?
A. No, ma'am. Because of the potential toxicity of the environment due to the presence -- potential presence of narcotics, search detectives who were assigned to conduct the search were suited up in a protective suit. They would go into the residence. They would typically be assigned to a particular room. They would search that room. If they found things of evidentiary value, they would remove it from the house. It would be placed on a tarp to air out, to decontaminate. The detective, as well, would be

decontaminated. Once that occurred, the evidence would be presented to me.

Q. And was there a time when it was -- after the decontamination process, what happened next before it came to you? Was it ever photographed?

A. Yes.

Q. And did you take the photographs, Detective Gwynne?

A. No, ma'am.

Q. Who was there doing that?

A. That would have been forensic specialist Rhonda Kline.

Q. And when you collected the evidence, how did you keep track of the evidence generally?

A. I prepared an evidence log.

Q. And what type of information is on that?

A. The evidence log would describe the particular item of evidence that was found and being presented to me. It would list the name of the search detective that found the item. It would also list or indicate the particular part of the residence in which that evidence was found.

Q. And was that information relayed to you by the searching officer who was dressed in the level B contamination outfit?

A. Yes, ma'am.

Q. Detective Gwynne, can you take a look at the photograph that's in front of you. Do you recognize that photograph?

A. Yes.
Q. What is it?
A. That is a photo of the residence at --
Q. Before you hold it up, let me just ask if you recognize it?
A. Yes.
Q. And what is it?
A. It's a photograph of the residence that was searched that day, 10124 Nassau Court in Seminole.
MS. HOWARD-ALLEN: Your Honor, at this time I'd ask to admit Government's Exhibit 168.
THE COURT: Exhibit 168 is received into evidence and may be published to the jury.
(*Government Exhibit 168 received in evidence.*)
MS. HOWARD-ALLEN: At this time, Agent Phelps, could you pull up Government's Exhibit 168.
BY MS. HOWARD-ALLEN:
Q. And so as your position as non-drug evidence custodian, were you somewhere in the front of that residence?
A. Yes, ma'am. I was located in the driveway. As you're looking at the photo, I would have been on the left-hand side of the driveway facing the right-hand side of the photo.
Q. All right. Detective Gwynne, could you -- I placed some exhibits on the table there. Let me point to this for you. You're just saying you were set up right here in this

area where the red marker is on the screen?
A. Correct.
Q. So if you could take a look at the evidence next to you, and if you could first pull up that large black bag with the bag on top of it. And I want you to look at the evidence bag as well. So let me ask you, first, you're looking at the bag. Do you recognize that bag?
A. Yes, ma'am.
Q. And how do you recognize it?
A. It is the evidence bag that bears my signature at the bottom, as well as my initials. I believe they should be somewhere at the top here.
Q. And were all of these items that we're going to look at today, were they in a similar bag before they were prepared as exhibits today?
A. Yes, ma'am.
Q. And so on the front of that, it's identified -- you're identified by name on that?
A. Yes, ma'am.
Q. All right. So let's take a look at the large plastic file folder that's in front of you. That's been marked as Government's Exhibit 145. Can you tell me about that item and how it came to you that day.
A. Yes, ma'am. This item of evidence was removed from the residence by a search detective and was presented to me as an

item of non-drug evidence.
Q. And when you first obtained that and took it out of evidence, were there a lot of items that were inside? If you can flip open the lid, were there separations and was there a lot of paper inside Government's Exhibit 145?
A. Yes, ma'am.
Q. And so the items that are marked with the preface of 145, were they items that were found in that plastic file folder?
A. Yes, ma'am.
Q. And there's a photograph, just sort of a big photograph that's marked as 145-1. Is that a photograph of that plastic file folder that was in there?
A. Yes, it is.
Q. And then, if you'd look at -- take a look at the Redweld, the large Redweld that's next to you that's marked with a number of items that begin with 145. And can you take a look at those and see if you recognize them as items that were inside that black plastic file folder.
A. Yes, ma'am, they are.
MS. HOWARD-ALLEN: Your Honor, at this time I would ask to admit into evidence the following exhibit numbers: 145, 145-1, 145A. 145B has been previously admitted, although I'm going to show it again to Detective Gwynne.

THE COURT: Okay.

MS. HOWARD-ALLEN: 145C, 145D, 145E, 145F, 145G, 145H, 145I, 145J, 145K, 145L, 145M, 145N, 145O, 145P, 145Q, 145R, and 145S.

THE COURT: All right. So that's 145, 145-1, 145A. 145B has already been received. 145C, 145D, 145E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S. Is that it?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Any objection?

MR. MARTIN: Could we have a quick sidebar, Your Honor?

THE COURT: Okay.

(The following was held at sidebar:)

MR. MARTIN: Just for record purposes, I've already been heard, I'm going to object to any evidence coming in through this witness who is not on the list.

THE COURT: Okay. All right. Your objection is noted, but overruled for the reasons we talked about.

MR. MARTIN: She's going to present other evidence through this witness. I have the same objection. I won't ask for another sidebar, but I do have that objection. I understand your ruling.

THE COURT: Okay.

MS. HOWARD-ALLEN: Same response. Thank you.

THE COURT: All right. Thank you.

(Sidebar ended.)

THE COURT: Those exhibits are received into evidence and may be published to the jury.

(*Government Exhibits 145, 145-1, 145A, 145C, 145D, 145E, 145F, 145G, 145H, 145I, 145J, 145K, 145L, 145M, 145N, 145O, 145P, 145Q, 145R, and 145S received in evidence.*)

BY MS. HOWARD-ALLEN:

Q. All right. Detective Gwynne, let's take a look at Government's Exhibit 145A. What does this item appear to be, Detective Gwynne?

A. This is an Onyx Automotive invoice dated April 25, 2016, with respect to a 2010 Audi Q5 SUV.

Q. And what was the selling price for this?

A. It was $9,995.

Q. All right. Does the -- what -- does the rest of the package contain other sales items?

A. Yes, ma'am.

Q. And who does it appear that was buying the car if we look at the third page?

A. The buyer is Lavonte David Jermaine Fisher.

Q. And who is the seller?

A. The seller is Onyx Automotive, LLC.

Q. And what city and state is Lavone David Jermaine Fisher?

A. Battle Creek, Michigan.

Q. All right. If we could turn, please, Detective Gwynne, to 145B. What is this item?
A. 145B is a photograph of the defendant Dion Fisher on the left-hand side wearing a white jacket, long-sleeved jacket.
Q. And is this item, is this just a plain photograph by itself or how is it packaged?
A. It's a photograph in a cardboard frame.
Q. Okay. Let's take a look, please, at 145C. What is 145C?
A. 145C is a composite exhibit comprised of Gold N' Diamonds of Tampa sales receipts and custom design orders.
Q. All right. Let's look through those and start with the first one. Who is the customer?
A. The first item is a sales receipt. The customer indicated is Dion Fisher.
Q. And what is the items that appear to be purchased?
A. A 10-carat yellow gold diamond key charm. There are three items that appear on the sales receipt, the first of which is as I described a 10-carat yellow gold diamond key charm. The second item is a 10-carat yellow gold and white gold assorted Franco links chains, and the third item is a 10-carat yellow gold solid 6 bottom grillz.
Q. How was this item paid for and how much?
A. These items were paid for in cash in the amount of

$1,177.
Q. And what's the date of this invoice?
A. The date of this invoice is August 3rd, 2016.
Q. All right. Let's look at the second page of 145C. Again, who is the customer?
A. The customer is Dion Fisher.
Q. And what is the date?
A. The date is February 22, 2017.
Q. And what is the item purchased in this exhibit?
A. The item purchased is an 18-carat yellow gold diamond dangle bracelet.
Q. And how was it paid for?
A. This item was paid for in cash.
Q. And what was the amount?
A. $4,950.
Q. All right. Let's take a look at the third page of Government's Exhibit 145C. What is this item?
A. This is also a Gold N' Diamonds of Tampa sales receipt for the customer indicated as Dion Fisher.
Q. What is the item purchased?
A. The item purchased is a 10-carat yellow gold diamond special bracelet.
Q. And how much was this item?
A. This item was $2,900 and was paid for in cash.
Q. All right. Let's look at the fourth page. What does

the fourth page indicate was sold?
A. The fourth page indicates two items were sold to the customer Dion Fisher. The first item was a custom 8-carat diamond Bentley charm. The second item was a 10-carat white gold 38-inch solid Franco chain.
Q. What was the price for these two items?
A. The total price for those two items was $7,000.
Q. And how was it paid?
A. The $7,000 was paid in cash.
Q. All right. Let's turn to the next page. What was purchased in this invoice? What is this? Is this an invoice or --
A. This is a custom design order from Gold N' Diamonds Tampa for the customer Dion Fisher.
Q. And what does it indicate the custom design was?
A. The item requested was one custom Audi key chain charm.
Q. And what does it indicate the price of the charm was?
A. It indicates the price was $5,500.
Q. And what was paid on this particular document?
A. On this document, of that amount, $3,000 in cash was paid on the same date.
Q. And let's look at the next and last page of Government's Exhibit 145C. What is this?
A. This is a Gold N' Diamonds of Tampa sales receipt for Dion Fisher dated October 24, 2016.

Q. And what indicates is sold here?
A. One custom Audi key chain charm.
Q. Was this the one that we previously saw the custom design order for?
A. Yes, ma'am.
Q. It appears to be. And what does it show in terms of the payment for this item?
A. It shows that of the overall price of $5,500 for the key chain charm, the balance of $2,500 was paid in cash on this date.
Q. And the date again was?
A. October 24, 2016.
Q. All right. Let's take a look at the next item, Government's Exhibit 145D. What is this item, Detective Gwynne?
A. This is a Florida dealer registration issued in the name of Million Dollar Plans, LLC.
Q. What does a dealer registration mean?
A. A dealer registration is a registration tag for a vehicle that a dealer involved in the sale or purchase of automobiles can affix to an automobile to transport that automobile on the streets for purposes of sale or purchase.
Q. And are these tags only issued to dealers, car dealers?
A. Yes, ma'am.
Q. All right. Let's take a look at Government's Exhibit

145E. So if you could hold that up. I know we're just looking at black and white paper, but what are these?
A. These are Louis Vuitton receipts and envelopes.
Q. And is each receipt contained inside one of those brown envelopes?
A. Essentially so. I believe the first two came from the same envelope.
Q. And what do the brown envelopes say, Detective Gwynne?
A. The brown envelopes say Louis Vuitton on one side and Louis Vuitton on the other side.
Q. Let's take a look at each one of these invoices in order. What is the first invoice?
A. Just to clarify, it appears some of the envelopes do not say it on both sides, but Louis Vuitton on one side, just for clarification.
Q. Thank you, Detective Gwynne. Let's look at the first one. I think it would be dated September 24, 2016. And what does this show?
A. This is a sales receipt for Dion Fisher dated September 24, 2016, for Louis Vuitton merchandise.
Q. And how does it appear that this item was paid for?
A. This item was paid for in cash.
Q. And how much cash?
A. $1,000.45.
Q. And were you able to -- how were you -- did you know

that it was Dion Fisher that purchased this?
A. It indicates Dion Fisher toward the bottom left-hand side of the sales receipt.
Q. And when we looked up at the description of the item, were you able to tell from that description what it was?
A. Yes, ma'am.
Q. What was this item?
A. It was a $1,000.45 pair of Fuel Power sneakers.
Q. All right. Let's take a look at the second page -- second receipt. This is dated May 24th, 2016. Do you have that receipt in front of you, Detective Gwynne?
A. Yes, ma'am.
Q. And what does this receipt show was purchased?
A. This is a Louis Vuitton receipt for -- showing that two items were purchased. One is a Cobalt Regatta backpack and the second item is a Frontrow pair of sneakers.
Q. And how much were these items in total?
A. The backpack and the pair of sneakers were a total receipt of $3,006.70.
Q. And how was that paid?
A. Cash.
Q. And again, who was the customer noted on this receipt?
A. Dion Fisher.
Q. All right. If we could turn to the next invoice on here, it's dated April 6, 2016. What is this item?

A. This is a Louis Vuitton invoice for Dion Fisher.
Q. What does it appear was purchased?
A. One Frontrow pair of sneakers for $700.85.
Q. How does it show that this was paid for?
A. This was paid via Mastercard.
Q. And at the bottom, what do we see in terms of who this was obtained by?
A. It was obtained by Mr. Dion Fisher.
Q. And does it appear -- how was it obtained?
A. Via Mastercard to be shipped to Dion Fisher at the International Mall, 2223 Northwest Shore Boulevard, Tampa.
Q. And that is the -- the Northwest Shore address is the address of what?
A. 2223 Northwest Shore Boulevard, Tampa, Florida.
Q. Is the address of what?
A. Is the address of the West Shore Mall -- International Mall. I'm sorry.
Q. All right. Let's take a look at the next page. What does it show of that -- of that same receipt, what does it show? Does it show that that was -- is this some particular kind of receipt, the second page of that item?
A. This is a Louis Vuitton gift receipt.
Q. And is that for the same item that we just looked at?
A. Yes, ma'am.
Q. All right. Now we can turn to the next receipt and

what's in Government's Exhibit 145E. And it's a receipt dated October 23rd, 2016. What is this item?
A. This is a Louis Vuitton receipt for Dion Fisher dated October 23rd, 2016.
Q. What does it show was purchased?
A. One Pagase 55 Legere, L-e-g-e-r-e, rolling suitcase.
Q. And the total amount paid for that?
A. The total amount paid was $4,066.
Q. And then how was that paid?
A. That was paid for in cash.
Q. All right. Let's take a look at the next item, the next receipt. What is the date of the next receipt?
A. It's a Louis Vuitton receipt dated November 5, 2015.
Q. For what item?
A. It is for Louis Vuitton Twister merchandise.
Q. And were you able to tell from that description what it is?
A. This one I was not, no.
Q. And what is -- how was it -- how does it appear that the payment was made?
A. It appears that Mr. Fisher, whose name is indicated on the bottom of the receipt, redeemed a deposit in the amount of $765.05.
Q. All right. Let's take a look at the next page. What is the next receipt that you have in front of you?

A. It is a Louis Vuitton credit dated November 3rd, 2015, for Dion Fisher.
Q. And what does this document show happened?
A. It appears that Mr. Fisher received a credit of $3,798.50 with respect to this item of Louis Vuitton merchandise, which is a backpack.
Q. Was this item signed by Mr. Fisher?
A. Yes, this item of evidence is signed by Dion Fisher at the bottom.
Q. All right. Let's take a look at the next item in Government's Exhibit 145E. What is the next item you have?
A. This is a Louis Vuitton June 14th, 2015, receipt for Dion Fisher for Louis Vuitton merchandise, two items.
Q. And what are those items, if you know?
A. The first item is for Louis Vuitton Twister merchandise, and the second item is for Louis Vuitton Genesis sneakers.
Q. And how much was paid for the -- in full for these items?
A. For these items, a total amount paid was $1,444.50.
Q. And how was it paid?
A. It was paid in cash.
Q. And is this receipt also signed?
A. Yes, it is.
Q. All right. Turn to the next receipt. What happened on

this June 28th, 2015, receipt?
A. This is a Louis Vuitton receipt issued to Dion Fisher on June 28th, 2015, for two items of Louis Vuitton merchandise. The first is a Genesis pair of sneakers, and the second item is a Gom-Dom (phon.) car. Research indicates it was a -- I believe this was a backpack.
Q. So what was the total amount paid for this particular -- for this June 28th, 2015, receipt?
A. For these two items, cash was paid in the amount of $1,440.10.
Q. And was there some change received from that?
A. Yes, there was. $17 change.
Q. Is this receipt also signed?
A. Yes, it is.
Q. And who -- again, who purchased these items?
A. Dion Fisher.
Q. Let's look at the next receipt. What is the date of the next receipt in Government's Exhibit 145E, Detective Gwynne?
A. The next receipt is a Louis Vuitton receipt dated August 8th, 2016.
Q. And what are the items purchased in this -- appear to be purchased in this receipt?
A. The items in this receipt are one pair of Passenger sandals and one C-e-r-e-v-e reversible belt.

Q. And what was the total amount paid for these items?
A. The total amount paid for these items was $1,342.85.
Q. And how was that paid?
A. Of that amount, $1,000 was paid in cash and the balance of $342.85 was paid through -- or on a Visa credit card.
Q. And what are the last four digits of the Visa credit card that was used on this receipt?
A. The last four digits of that credit card are 1810.
Q. And who purchased these items?
A. Dion Fisher.
Q. All right. And then let's look at the last page of Government's Exhibit 145E. What is the date of this receipt?
A. This is a Louis Vuitton receipt dated August 8th, 2016.
Q. And what appears to be purchased in this particular receipt?
A. It appears that Mr. Fisher purchased a different size reversible belt and exchanged a previously purchased reversible belt.
Q. And what was the total for that transaction?
A. $575.
Q. All right. Thank you, Detective Gwynne. Can we turn to Government's Exhibit 145F.
Detective Gwynne, what is Government's Exhibit 145F?
A. This is a Johnson Jewelers jewelry appraisal dated

December 18th, 2016.
Q. And who is it for?
A. This jewelry appraisal was prepared for Dion Fisher.
Q. And what is being appraised in Government's Exhibit 145F?
A. It appears two items, jewelry items were appraised, the first of which was a gentleman's stainless steel Patek Philippe watch, Neptune Moonphase.
Q. And what was the appraised -- the appraisal value of this Patek Philippe watch?
A. That watch was appraised at $20,100.
Q. What's the second item being appraised?
A. The second item is a men's stainless steel vintage Rolex watch.
Q. And what is the appraised value for the Rolex watch for Mr. Fisher?
A. The Rolex watch was appraised at $1,200.
Q. And is there a second page to this exhibit?
A. Yes.
Q. And what is that?
A. It is a Johnson Jewelers invoice dated December 14th, 2016.
Q. And that appears to be just a couple days before the appraisal?
A. Yes, ma'am.

Q. And what is in the December 14th invoice from Johnson Jewelers?
A. A gentleman's Patek Philippe Grand Complication.
Q. And how much does it appear was paid for that?
A. $12,500.
Q. What's the second item on this?
A. The second item on the Johnson Jewelers invoice is a gentleman's eight-inch tennis bracelet.
Q. And what is the value of that?
A. The bracelet is valued at 6,000 -- or was purchased for $6,200.
Q. What was the total paid on this invoice?
A. $18,700.
Q. And who purchased these items?
A. The signature at the bottom is for Dion Fisher as the buyer.
Q. And what does it say it was sold to on the top?
A. It says it was sold to Dion Fisher.
Q. And what is the phone number listed there?
A. The phone number listed for Dion Fisher is (813) 526-9932.
Q. All right. Detective Gwynne, let's turn to Government's Exhibit 145G. What is this item or items?
A. This appears to be a composite exhibit comprised of various Johnson Jewelers appraisals for various items of

jewelry prepared for Dion Fisher.

Q. It appears that you have a number of envelopes in front of you. Are each of these appraisals -- separate appraisals in an envelope?

A. Yes.

Q. And who are the envelopes addressed to, Detective Gwynne?

A. Three are addressed to Dion Fisher, one is addressed to Dion.

Q. And, again, all of these items were located in that large plastic file folder that we found as Government's Exhibit 145?

A. Correct.

Q. All right. Let's take a look at the first one. What is being appraised on the first page?

A. The first item being appraised is a men's 14-carat white gold diamond cross containing 30 round brilliant-cut diamonds.

Q. What is the appraised value for this?

A. The appraised value for this item is $4,200.

Q. All right. And what is the date of this appraisal?

A. September 27, 2016.

Q. All right. Let's take a look at the next appraisal. What is being appraised here?

A. Being appraised here is a men's 14-carat white gold

diamond cross containing 30 round brilliant-cut diamonds.
Q. And what is the appraised value for this item?
A. The appraised value for this item is $4,125.
Q. And again, who is this being appraised for?
A. This is being appraised for Dion Fisher.
Q. All right. If you could turn to the next appraisal.
A. Yes.
Q. What item is being appraised in the next appraisal in Government's Exhibit 145G?
A. Pursuant to the appraisal dated January 5, 2017, the item being appraised is one ten-carat white gold and diamond pendent that spells Louis Vuitton in script letters that is five-and-a-half inches long and two inches tall.
Q. And does this appear to have diamonds?
A. Yes, the pendant is set with round brilliant-cut diamonds according to the appraisal.
Q. And what is the retail replacement value listed for this particular Louis Vuitton pendant?
A. $6,500.
Q. And what is the second item being appraised in the same appraisal?
A. It is one 14-carat white gold necklace pendant -- with a pendant modelled after an Audi car key fob which measures approximately three-and-a-quarter inches tall, an inch and three-quarter inches wide and a half-inch deep.

Q. And how is this item engraved?
A. The item is set with round brilliant-cut black coated diamonds and it is engraved Deeder and Audi King 2016.
Q. And also the chain?
A. The chain is 30 inches long, and there are round brilliant-cut black coated diamonds set in the chain.
Q. What is the retail replacement value of this Audi key fob pendant and necklace?
A. $16,050.
Q. All right. Let's take a look at the next page of -- or the next appraisal in Government's Exhibit 145E. What is the date of this appraisal?
A. This appraisal is dated April 1st, 2017, for Dion Fisher.
Q. And what is being appraised here?
A. A men's Tiffany & Company watch, stainless steel, with 20 jewels and a black leather strap.
Q. What is the appraised value?
A. $1,500.
Q. All right. And let's look at the last page of this exhibit. What is being appraised?
A. Pursuant to this appraisal dated January 19th, 2017, this item appraised for Dion Fisher is one men's 14-carat white gold and diamond four-prong tennis bracelet containing 56 diamonds.

Q. And what is the retail replacement value for this four-prong tennis bracelet?
A. $8,900.
Q. All right. Let's take a look then, if you could, at Government's Exhibit 145H. What is 145H?
A. 145H is a Highline Custom Jewelry sales receipt dated June 20th, 2016, for the customer Dion Fisher.
Q. And what is the item description?
A. It is a new men's round-cut diamond 10-carat yellow gold plug design pendant.
Q. How much is it?
A. $608.
Q. And what would a plug design pendant symbolize, if you know?
A. A plug in the narcotics business is a source of supply of narcotics.
Q. Detective Gwynne, if we could turn to Government's Exhibit 145I. What is Government's Exhibit 145I?
A. 145I is a composite exhibit consisting of two Coach New York orders.
Q. And how are they packaged, what you're looking at?
A. These -- each of them are packaged in a Coach New York envelope.
Q. And so what do they show -- who purchased these items or who were they sold to?

A. These items were sold to Dion Fisher.
Q. And what was purchased?
A. On the order number R106304500 dated June 17th, 2016, there were two items purchased, it appears. One T-shirt -- it appears clothing was purchased along with a gift box.
Q. So how much was the T-shirt?
A. $75.
Q. And let's take a look at the second one.
A. The second one customer order number R657569901 dated May 19, 2016, is for two items for Dion Fisher.
Q. And where were these items -- where did they appear to be shipped to?
A. The ship -- they are being shipped to Dion Fisher at 2223 North Westshore Boulevard, Tampa, Florida.
Q. What is that address?
A. That is the International Mall in Tampa.
Q. All right. Let's take a look at Government's Exhibit 145J. And what is Government's Exhibit 145J, Detective Gwynne?
A. 145J is a composite exhibit consisting of tickets to high-profile sporting events, specifically boxing matches.
Q. Now, you're paging through a page, but are those -- is this exhibit pieces of paper or are they actual tickets?
A. Actual tickets are included in the exhibit as well as photocopies of the actual exhibits.

Q. And so let's take a look -- if you could hold that up, is that ticket just paper or is it packaged in a certain way?
A. This particular ticket for the Mayweather-McGregor fight of August 26, 2017, is packaged in a protective plastic sleeve.
Q. And what's attached to it?
A. Attached to it is --
Q. Is there a lanyard attached to it like you'd wear around your neck?
A. Yes.
Q. And what does the lanyard say?
A. StubHub.
Q. And so what -- you said the date was August 26, 2017?
A. Yes, ma'am.
Q. And does that ticket show how much it was or is there a value on that particular boxing fight lanyard and ticket that you have?
A. Yes, ma'am, there is.
Q. What is it?
A. The Mayweather-McGregor ticket here cost $10,000.
Q. And what was the row and seat number for that?
A. Row N, as in Nancy, seat 10.
Q. All right. Is there another lanyard and ticket contained in plastic in that Government's Exhibit 145J?
A. Yes.

Q. And what is that one?
A. This is a ticket to the September 16th, 2017, boxing match between Canelo Alvarez and his opponent Golovkin.
Q. And let's see, what is the date of that?
A. September 16th, 2017.
Q. And what is that one, the date of it?
A. September 16th, 2017, Canelo-Golovkin.
Q. All right. And how much was that ticket?
A. This ticket was for $300.
Q. And can you hold that up so the jury can see. That one didn't get photographed. That's also in a lanyard with a StubHub -- I mean in a plastic container with a StubHub lanyard?
A. Yes, ma'am.
Q. All right. Let's take a look at the -- are there more tickets in Government's Exhibit 145J?
A. Yes, ma'am.
Q. And what form are those in?
A. This one is a hard plastic ticket to the Mayweather -- Floyd Mayweather-Manny Pacquiao fight of May 2nd, 2015.
Q. And where does it say that took place?
A. At the MGM Grand, which is in Las Vegas.
Q. And what is the seat? Where was -- what was this ticket for?
A. This was for row A, seat two.

Q. And what was the price that's printed on the ticket for the Mayweather-Pacquiao ticket fight that was found at Dion Fisher's house?
A. $3,500.
Q. All right. Are there more boxing fight tickets as part of 145J?
A. Yes, ma'am.
Q. And what is the next one?
A. The next one is a ticket for a Floyd Mayweather-Canelo Alvarez fight.
Q. And when was this held?
A. September 14th, 2013.
Q. And where?
A. At the MGM Grand.
Q. And where does it show that this ticket was for, what seat?
A. Section 216, row K, seat 7.
Q. And how much was this ticket?
A. This ticket was $600.
Q. All right. And is there one more boxing fight ticket in Government's Exhibit 145J?
A. Yes, ma'am.
Q. And what was that for?
A. This ticket was to the Floyd Mayweather fight against Maidana. It appears to be their second fight dated September

13th, 2014.
Q. And, again, where were the seats?
A. The seat is for section 218, row Q, seat 4.
Q. And what is the price of this Mayweather-Maidana fight?
A. This ticket was $350.
Q. All right. Is that all of 145J, Detective Gwynne?
A. Yes, ma'am.
Q. All right. Let's take a look then at 145K. What is this item?
A. 145K is a State of Michigan certificate of title for a 2008 Maserati GranTurismo two-door.
Q. And who is the owner listed on this?
A. Dion Gregory Fisher.
Q. At what address?
A. 50 Broadway Boulevard, Battle Creek, Michigan.
Q. And what type or brand legend of this vehicle does it say on the upper right?
A. It's a salvage vehicle.
Q. Do you know what that means, Detective Gwynne?
A. I do not specifically know.
Q. And what does it say just above the title assignment by seller?
A. Not to be registered for highway use.
Q. And is there a signature -- is there a signature of the seller of this vehicle?

A. Yes.
Q. And who is that?
A. Lavone Fisher.
Q. Selling it to who?
A. The purchaser, Dion Fisher.
Q. All right. Let's take a look at Government's Exhibit 145L. What is 145L?
A. 145L is comprised of a State of Michigan certificate of title for a 2010 Audi Q5 station wagon.
Q. And who is the owner name and address on this particular title?
A. The owner is Lavone David Jermaine Fisher at 122 South Lindow Drive in Battle Creek, Michigan.
Q. And what does it indicate -- does it indicate any secured interest on this record?
A. No, the certificate of title indicates no secured interest on record.
Q. All right. Let's take a look at Government's Exhibit 145M. What is document 145M, Detective Gwynne?
A. 145M, as in Mary, consists of automotive repair paperwork for Dion Fisher.
Q. And on the very first page, what is the address listed for Mr. Fisher?
A. 10124 Nassau Court, Seminole, Florida.
Q. And who is repairing this vehicle in this particular --

the first page of this exhibit?
A. Dimmitt Automotive Group.
Q. And what car is Dion Fisher -- does this invoice show that Dion Fisher submitted to the Dimmitt Automotive Group?
A. A 2005 Bentley GT.
Q. And what color is it?
A. It indicates chrome.
Q. And does the rest of the invoice consist -- the rest of the exhibit consist of other automotive invoices?
A. Yes, ma'am.
Q. Let's look at the last page. How does it indicate that the work done on November 16 of 2016, how does it indicate that that was paid for?
A. Cash.
Q. And how much was it?
A. The total was $8,640.67.
Q. All right. Let's take a look at the next exhibit, Government's Exhibit 145N. What is 145N?
A. 145N is a composite exhibit comprised of wire transfer paperwork.
Q. And who is making the wire transfer?
A. Dion Fisher.
Q. And what is the business trust or state name?
A. Million Dollar Plans, LLC.
Q. And how much is being wired?

A. The amount being wired pursuant to this wire transfer request dated October 14, 2016, is $5,000.
Q. And what bank is this being -- this wire transfer being done through?
A. This is being done through --
Q. In the upper right.
A. Wells Fargo.
Q. All right. Let's take a look at Government's Exhibit 145O. What is Government's Exhibit 145O?
A. This is a Florida residential lease agreement.
Q. Between who?
A. It is between Vernon Wunsch, as the landlord, and Dion Fisher, as the tenant.
Q. For what address?
A. It is for the address of 10124 Nassau Court, Seminole, Florida.
Q. And what is the monthly rent for this property?
A. $2,000 per month.
Q. All right. Let's take a look at Government's Exhibit 145P, Detective Gwynne. What is 145P?
A. 145P is an independent Gemological Services appraisal dated --
Q. Of what item?
A. Of the item 1 stamp 14-carat -- 10 -- 1 stamp 10 to 14-carat white gold custom made diamond pendant and chain 28

inches long, heavy squared wheat with a lobster claw clasp with a high polish finish.

Q. And what does it -- you indicated -- what is the date of this?

A. The date is September 16th, 2016.

Q. Does this appraisal tell you the total weight of the diamonds?

A. Yes, it does. 712 stones equaling 8 carats.

Q. And what is the retail replacement value of this custom made gold pendant and chain?

A. $18,815 not including tax.

Q. And if you include the tax, what is the total?

A. The total is $20,132.05.

Q. All right. Let's take a look at Government's Exhibit 145Q. And what does 145Q appear to you to be a composite exhibit of?

A. It appears to be a composite exhibit of Onyx Automotive purchase package with respect to a 2011 Porsche Panamera sports car.

Q. And who is purchasing that item?

A. The purchaser is Dion Fisher.

Q. And let's take a look at the Onyx rebuilt statement page if you have that in front of you.

A. I do.

Q. And what is the date of this particular purchase?

A. The date of this purchase is June 22, 2015.
Q. And who is it being purchased by?
A. Dion Fisher.
Q. And at what address?
A. 50 Broadway Boulevard, Battle Creek, Michigan.
Q. And who is purchasing it?
A. Dion Fisher.
Q. All right. Let's take a look at two pages later at the invoice for this particular purchase. Do you have that in front of you?
A. Yes.
Q. What is the invoice date, Detective Gwynne?
A. June 22, 2015.
Q. And, again, what is the make and model of the vehicle?
A. The make is a Porsche, the model is a Panamera.
Q. And what was the total -- what was the selling price and the total amount?
A. $28,300.
Q. And does it appear that there was a balance due?
A. The balance due is zero.
Q. And on the next page, who is it signed by?
A. Dion Fisher.
Q. Are there photographs as part of this exhibit?
A. Yes.
Q. Black and white?

A. Yes.
Q. And let's take a look at those. Is this the -- is this a number of pictures at the tail end of this exhibit?
A. Yes.
Q. And is that the entire vehicle?
A. Yes, it is.
Q. And the next one, also another entire vehicle?
A. Yes.
Q. The next one from the back?
A. Yes.
Q. And the next?
A. Yes.
Q. And what does the next picture show?
A. The next picture shows the interior of the vehicle.
Q. All right. And if we keep going?
A. The next one also shows the interior of the vehicle, the backseat. The engine would be the next photo, that one, and the odometer.
Q. Then finally, another sort of interior roof shot or something?
A. Correct.
Q. All right. Let's take a look at Government's Exhibit 146. Oh, let's not take a look at 146. Let's actually put all those back and let's take a look at the next set. If you can put those back. And there's another Redweld of some

other items. Does that complete all of the items that were part of the black plastic file folder that was Government's Exhibit 145?

A. No. We have 145R and 145S.

Q. Oh, well, let's take a look at 145R. What does 145R show?

A. This is a personal money order issued to the Hardee tax collector for $914.10.

Q. And who is the remitter?

A. The remitter who made the payment is Dion Fisher.

Q. And what is the payee address memo listed as this Hardee tax collector money order?

A. The payee address memo indicates that the payment is for 2015 taxes for property at 2476 Greenleaf Road.

Q. And where was this personal money -- what bank was this personal money order issued from?

A. Wells Fargo Bank.

Q. All right. Then let's take a look at 145S. Detective Gwynne, what is 145S?

A. 145S is paperwork concerning cash deposits into two separate Wells Fargo bank accounts.

Q. And are these the actual, you know, skinny receipts that you would get out of a -- sort of out of a bank machine?

A. Yes, they are.

Q. And what is the first one? What is it for?

A. The first one is dated December 16th, 2016, and it is for a deposit of $1,500 into the account ending 0405.
Q. And what about the next one?
A. The second one is dated -- also dated December 16th, 2016, for a deposit of $1,165 into the account ending 1543.
Q. And is that the same date?
A. Yes.
Q. All right. Does that complete the items that were obtained in the black personal file folder that was Government's Exhibit 145?
A. Yes.
Q. All right. When you've completed that, if you could pull up the next Redweld on the table to your right. So these items appear to be marked like 146 through approximately 167. Do you recognize all of those items as being collected by you as an evidence custody -- non-drug evidence custodian from -- that were taken out of the residence at 101 -- at Dion Fisher's residence at 10124 Nassau Court on February 15th, 2018?
A. Yes, ma'am.
MS. HOWARD-ALLEN: Your Honor, at this time I would ask to admit the following Government's Exhibits into evidence: 146, which has previously has been identified, but I'd ask that it now be admitted.
THE COURT: 146 was previously -- 146 without

anything after it?

MS. HOWARD-ALLEN: Well, I believe that 146A was -- 146 was previously identified. I'd ask 146, 146A --

THE COURT: I thought 146 was admitted on --

MS. HOWARD-ALLEN: Apparently it was.

THE COURT: -- May 31st. That's what I have.

MS. HOWARD-ALLEN: Apparently it was. So I'm asking for 146A, 147, 147A, 148, 148A, 149, 149A, 150, 151, 151A, 152, 153, 153A, 154, 154A, 155, 156, 156A, 157, 157A, 158, 159, 160, 160B, 161, 161A, 162, 163, 163A, 164, 165, 166, 167A, 167B.

THE COURT: Okay. So you've left out just to make certain I have this correct, 150A. I didn't hear you say that.

MS. HOWARD-ALLEN: I did not. And, actually, Your Honor, may I amend at this time. I noticed some others. I am not seeking the admission of 154A.

THE COURT: No 154A.

MS. HOWARD-ALLEN: And no 156A.

THE COURT: Okay.

MS. HOWARD-ALLEN: And no 160B. I made those amendments.

THE COURT: Okay. Not 160B, not 156A, not 154A. And you did not say 150A.

MS. HOWARD-ALLEN: Correct.

THE COURT: All right. And previously I had 146, but if I did not admit it before, I'm admitting it now. But I thought I had that. Otherwise, whether it's been admitted or not, 146 either back on May 31st or today, 146A, 147, 147A, 148, 148A, 149, 149A, 150, 151, 151A, 152, 153, 153A, 154, 155, 156, 157, 157A, 158, 159, 160, 161, 161A, 162, 163, 163A, 164, 165, 166, 167A, 167B. Is that correct?

MS. HOWARD-ALLEN: Correct.

THE COURT: All right. Those are received into evidence and may be published to the jury.

(Government Exhibits 146A, 147, 147A, 148, 148A, 149, 149A, 150, 151, 151A, 152, 153, 153A, 154, 155, 156, 157, 157A, 158, 159, 160, 161, 161A, 162, 163, 163A, 164, 165, 166, 167A, 167B received in evidence.)

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: You're welcome.

BY MS. HOWARD-ALLEN:

Q. Let's take a look again at Government's Exhibit 146. What is that item, Detective Gwynne?

A. This is a TraxNYC folder containing jewelry appraisals.

Q. And what jewelry appraisals does it contain?

A. It contains four jewelry appraisals for a diamond skull ring.

Q. And are the four appraisals, are they all the same?

A. Yes.

Q. And what is the appraisal value for this diamond scull ring?
A. The appraisal value is $2,600.
Q. And what is the date of this appraisal?
A. January 19th, 2017.
Q. And then is this -- was this contained in some kind of a folder?
A. Yes.
Q. And if you could go through to the end of this exhibit, then you I think will have photographs of the folder. You can hold it up. Is that the front of the folder?
A. Yes.
Q. And what's on the back of the folder?
(Witness indicating.)
BY MS. HOWARD-ALLEN:
Q. Now, Detective Gwynne, you had mentioned earlier that the process for the items coming out of the house was to go to a decontamination center. And what generally was that set up on?
A. A black tarp.
Q. And were some of these items that you have put in front of us today, like this Government's Exhibit 146, were they actually photographed on site?
A. Yes.
Q. So let's take a look at Government's 146A. What is

that?
A. This is a photograph of the Government's Exhibit 146 which is the TraxNYC folder. This was taken at the scene on the black decontamination tarp.
Q. And then is it -- a couple of these photographs, are they, you know, opened up and shown all open like that one?
A. Yes.
Q. The second page?
A. Yes, ma'am.
Q. And that was on site on February 15th, 2018 --
A. Yes, ma'am.
Q. -- in front of where you showed on that garage part of the 10124 Nassau Court?
A. Correct.
Q. All right. Let's take a look at Government's Exhibit 147. What is Government's Exhibit 147?
A. This is a composite exhibit of Delta Airlines plane tickets.
Q. All right. So which one do you have first in front of you? Are they the actual individual tickets or receipts or boarding passes or something?
A. Yes, they appear to be.
Q. And what is the first one?
A. The first one is a Delta flight dated June 6, 2017, from Detroit to Shanghai.

Q. And who is the passenger that is listed in this particular Delta boarding pass?
A. Dion Fisher.
Q. All right. And what is the next one that you see?
A. The next plane ticket is a Delta plane ticket for a flight from Shanghai, China to Los Angeles, California dated June 16th.
Q. Does that appear to possibly be the return of that flight?
A. Yes.
Q. And, again, who is the passenger?
A. Dion Fisher.
Q. And what is the date again?
A. June 16th, 2017.
Q. All right. And what is the last -- are there just three tickets there?
A. Yes, ma'am.
Q. And what is the third one?
A. The third ticket is a Delta ticket for a flight from Los Angeles, California to Atlanta, Georgia dated June 16th, 2017.
Q. Who is the passenger on this ticket?
A. Dion Fisher.
Q. And, again, Detective Gwynne, were these items photographed on site that day?

A. Yes, ma'am.
Q. Let's take a look at Government's Exhibit 147A. Is this a photograph on February 15th in front of the residence at 10124 Nassau Court?
A. Yes, ma'am.
Q. And does it contain a photograph of each of the three items that you just presented as Government's Exhibit 147?
A. Yes, ma'am.
Q. And what is the background that these are being photographed on?
A. The black decontamination tarp.
Q. All right. Let's take a look at Government's Exhibit 148. What is Government's Exhibit 148?
A. 148 is an order confirmation for a Chinese visa.
Q. And who is the name of the applicant for this Chinese visa?
A. Dion Gregory Fisher.
Q. And what does it indicate what type of visa he's getting?
A. It indicates he is getting a tourist visa.
Q. And what is the price for this particular Chinese visa?
A. $448.
Q. And how was it paid?
A. That fee was paid for in cash.
Q. And who is the -- who appears to have signed for this

Chinese visa?
A. It appears Dion Fisher signed for this on May 24th, 2017.
Q. And again, was this item photographed at the scene on February 15th, 2018?
A. Yes, it was.
Q. And let's take a look at Government's Exhibit 148A. What does that show?
A. This is a photograph of the order confirmation for the Chinese visa that we had just discussed.
Q. All right. Let's take a look at Government's Exhibit 149. What is Government's Exhibit 149?
A. 149 is Dion Fisher's passport.
Q. And when you take a look at this item, does it appear to have a number of stamps?
A. Yes, it does.
Q. And does it appear that Mr. Fisher travels often?
A. Yes.
Q. And where to?
A. Some of the stamps in here are for the Dominican Republic, Thailand, China.
Q. Did you find the Chinese visa in this passport?
A. Yes, ma'am.
Q. Was that on page 18?
A. Yes, ma'am.

Q. And what does it indicate was the travel dates for this Chinese visa?
A. It indicates that Mr. Fisher -- that the Chinese visa was issued May 25th, 2017, that he must enter before May 25th, 2027, and that the visa is valid for 60 days after entry.
Q. And then the stamps on the opposite page appear to be the actual travel?
A. Correct.
Q. And those dates are in June of 2016?
A. Yes, ma'am. June of 2017.
Q. Thank you. June of 2017.
Was this passport photographed on the scene that day?
A. Yes.
Q. And let's look at 149A. Was each page opened in those photographs?
A. It appears pages of significance were photoed, if not all of them.
Q. And again, that was in front of the location on February 15th, 2018?
A. Yes, ma'am.
Q. Let's take a look at Government's Exhibit 150. What is Government's Exhibit 150, Detective Gwynne?
A. 150 is a composite exhibit comprised of airplane

tickets in the name of Dion Fisher.

Q. And what is the first one that you have to look at?

A. The first one is a Spirit Airlines flight from Tampa to New Orleans dated February 11, 2018.

Q. And Detective Gwynne, what happens in February -- in early February in New Orleans?

A. Mardi Gras celebration.

Q. Let's take a look at the other tickets or boarding passes that comprise Government's Exhibit 150. What is the next item that you are looking at?

A. The next item is a Southwest Airlines boarding pass for Dion Fisher dated August 24th, 2017.

Q. And again, these are each individual item you have, the actual, you know, in this case, boarding pass; right?

A. Correct.

Q. And who is this for?

A. Dion Fisher.

Q. And what's the dates of travel?

A. The dates of travel are -- appear to be August 24th, 2017, from Tampa International to Las Vegas.

Q. And when we just looked at some of those boxing fight tickets, does this boarding pass coincide with any of those tickets that we saw?

A. Yes.

Q. What is that?

A. It appears to be two days before the -- I believe it was the Floyd Mayweather-Conor McGregor fight two days later on August 26, 2017.
Q. All right. Let's take a look at the last ticket in Government's Exhibit 150. Where is this plane ticket to or from?
A. This American Airlines ticket dated January 4th, 2018, is for a flight for Dion Fisher from Puerto Plata, Dominican Republic to Miami, Florida.
Q. All right. And were you able to locate the date for that?
A. The date for this is January 4th, 2018.
Q. All right. Let's take a look at Government's Exhibit 151, Detective Gwynne. And what is this composite Exhibit 151?
A. 151 is a composite exhibit comprised of hotel receipts in the name of Dion Fisher.
Q. And about how many of these hotel receipts do you have?
A. Four.
Q. All right. And of those, let's start with the first one. Where is -- who is this for?
A. The first ticket that I have is for Westin Hotels & Resorts for Dion Fisher.
Q. And where is the -- which Westin?
A. This Westin is in New Orleans, Louisiana.

Q. And what is the total cost for this?
A. $207.88.
Q. And how does it appear it was paid?
A. This appears to have been paid for by debit card, Visa debit.
Q. And it was in -- what was the date?
A. The arrival date is February 11, 2018, and the departure date is February 14, 2018.
Q. All right. Is the second page, is that -- of this exhibit, there's -- that's a two-page hotel bill?
A. The Westin Hotels & Resorts bill is two pages, yes.
Q. All right. Let's take a look at the next one.
A. The next one in the exhibit is Sheraton Hotels & Resorts invoice No. 310229 for Dion Fisher.
Q. And which Sheraton does this appear to be?
A. This is for a Sheraton in Tampa, Florida.
Q. Whereabouts?
A. 4400 West Cypress Street.
Q. And what are the dates of this invoice?
A. The arrival date indicates February 16, 2019, and the departure date indicates February 16, 2020. I think I'm reading those dates wrong. I think it's February 19th, 2016, is the arrival date and February 20, 2016, is the departure date.
Q. And how does this bill appear to have been paid?

A. This bill appears to have been paid by Visa.
Q. And what is the ending four digits of the Visa it was paid for?
A. 1285.
Q. What's the next hotel bill in Government's Composite Exhibit 151?
A. It is a Hampton Inn invoice for Dion Fisher.
Q. And what are the dates of this invoice?
A. The arrival date is February 20th, 2016. The departure date is February 23rd, 2016.
Q. And how does it appear that this was paid?
A. This trip to the Hampton in Battle Creek was paid for by --
Q. I think it's four down.
A. Cash.
Q. For how much?
A. $689.31.
Q. All right. And it appears perhaps there is a cash refund at the bottom of 172.
A. Yes.
Q. All right. Let's take a look at the next hotel receipt. What is this for?
A. This is an invoice from the Quality Inn & Suites in Clearwater, Florida for Dion Fisher.
Q. And where does it indicate -- I mean what are the

dates?
A. This invoice indicates the arrival date is April 18, 2015, and the departure date is April 21, 2015.
Q. And how was this bill paid, Detective Gwynne?
A. This bill was paid for it appears partially in cash and partially by Mastercard.
Q. And what are the last four of the Mastercard?
A. 3332.
Q. Detective Gwynne, were these -- some of these items photographed on site at that tarp decontamination site in front of 10124 Nassau Court?
A. Yes, ma'am.
Q. And is that Government's Exhibit 151A?
A. Yes, ma'am.
Q. All right. Is that a two-page exhibit, 151A?
A. 151A is three pages.
Q. All right. Let's take a look at Government's Exhibit 152. What is Government's Exhibit 152?
A. 152 is a -- is an as-is residential contract for sale and purchase.
Q. So what is -- who is the seller?
A. The document indicates the seller is Dion Fisher.
Q. What is the property street address?
A. 2476 Greenleaf Road in Zolfo Springs, Florida.
Q. And what is the price?

A. The price is -- the purchase price is $55,000.
Q. And what is the closing date indicating on this sales contract?
A. The closing date is January 31st, 2018.
Q. All right. And this is obviously a standard multiple page contract?
A. Yes, ma'am.
Q. All right. Let's take a look at Government's Exhibit 153. What is Government's Exhibit 153, Detective Gwynne?
A. Exhibit 153 is a Florida vehicle registration for a black 2005 Bentley automobile.
Q. And who is it being -- whose vehicle registration is it?
A. The vehicle is registered to Dion Fisher.
Q. And what's the address?
A. It's registered to Dion Fisher at 9019 Par Court. And there's an H at the end. I don't know if that's to indicate unit H or if it's a typo. Hudson, Florida.
Q. And is Government's Exhibit 153, is it one or two pages?
A. It's two pages.
Q. And what does the second one appear to be?
A. The second page appears to be an identical copy of the first page.
Q. All right. And was this item photographed on site that

day?
A. Yes, ma'am.
Q. And is that -- let's take a look at Government's Exhibit 153A. Does that show the form of the two titles that were found that day?
A. Yes, ma'am.
Q. The one on a full page and then the second page was just the smaller actual title?
A. It was folded in the second smaller image.
Q. All right. Let's take a look -- turn to Government's Exhibit 154. What is Government's Exhibit 154?
A. 154 is a Florida vehicle registration for a 2005 white Aston Martin two-door sports car.
Q. And who is this vehicle -- this 2005 Aston Martin, who is it registered to?
A. Dion Gregory Fisher.
Q. And what is the address for that?
A. It's -- the address indicated is a P.O. Box 4814, Clearwater, Florida.
Q. And when did this -- when was the plate -- when does this tag, this vehicle registration, when did it expire?
A. The expiration date is May 30th, 2018.
Q. All right. Let's take a look at Government's Exhibit 155. What is Government's Exhibit 155, Detective Gwynne?
A. This is a notice of balance due from Duke Energy

addressed to Million Dollar Plans, LLC.
Q. What is the street address of Million Dollar Plans, LLC?
A. The street address of the customer Million Dollar Plans is 10124 Nassau Court, Seminole, Florida.
Q. And is that the site where you collected this, the residence of Dion Fisher?
A. Yes, ma'am.
Q. And what is this Duke Energy customer, what is the service address for the energy being supplied in this document?
A. 13791, 49th Street North, Suite 2B, Clearwater, Florida.
Q. And the date of this particular bill?
A. The bill indicates a date when the payment is delinquent of January 17, 2018. I'm sorry, the notice, the notice of balance due is dated January 9th, 2018.
Q. All right. Thank you. Let's take a look at Government's Exhibit 156. What is Government's Exhibit 156, Detective?
A. 156 is a composite exhibit comprised of a Gold N' Diamonds of Tampa custom design order and a Gold N' Diamonds of Tampa sales receipt.
Q. And where is Gold N' Diamonds located in Tampa?
A. All the Gold N' Diamond receipts which I discussed today, all of them are from the Gold N' Diamonds of Tampa at

1715 East Fowler Avenue in Tampa.
Q. And what does this custom design order -- first of all, what's the date of this custom design order?
A. January 27, 2018.
Q. And what is the item description?
A. The item described is a Deeder, De-e-d-e-r, bubble letters like JPV in white gold and included is to be a 22-inch tennis chain.
Q. And what is the price for this custom order designed listed on this page?
A. This price is $13,500.
Q. And what's the next -- second page of Government's Exhibit 156, what does it show?
A. In addition to the custom design order for Dion Fisher that we just discussed, there is a sales receipt for Dion Fisher dated January 27, 2018, from Gold N' Diamonds Tampa.
Q. And what is it for?
A. That is for a 10-carat yellow gold diamond Hamsa charm.
Q. And what is the price for that charm?
A. That charm is $1,553.
Q. And what were the payments received noted on this bill?
A. Cash.
Q. For how much?
A. For $950.
Q. And, again, who is the customer in these two Gold N'

Diamonds paperwork in Government's Exhibit 156?
A. Dion Fisher.
Q. All right. Let's turn to Government's Exhibit 157. Now, I have some -- I'll wait until you get to it. Now, I have some paper copies of Government's Exhibit 157, but what actually is Government's Exhibit 157, Detective Gwynne?
A. Government's Exhibit 157 is comprised of a number of Hancock Bank checks and starter checks for Dion Fisher and -- in an account ending 9814 and for Top Dog Hot Dog ending in the account No. 9806.
Q. And what is the rest of the exhibit?
A. 157 also includes -- appears to be photocopies of the checkbook.
Q. But when you hold it up, there's a number of items just in the book itself?
A. Yes.
Q. That are actually attached to it. The loose ones we've seen, but the other ones are attached to that?
A. Yes, ma'am.
Q. All right.
A. And these are for Dion Fisher and this one is for Top Dog Hot Dog.
Q. And all the ones that are attached there for Dion Fisher, what is the ending four accounts of -- the ending four numbers of the Hancock bank account that's in the big

checkbook?
A. For Dion Fisher the ones that are attached to the book, to the envelope, that account ends 9814.
Q. And again, it's all -- all of these items are from Hancock Bank?
A. Yes.
Q. All right. Let's take a look at Government's Exhibit 158. Detective Gwynne, what does this look like? Does this look like some more banking records to you?
A. Yes, ma'am.
Q. And in this particular exhibit, which bank do these records appear to be from?
A. Wells Fargo.
Q. And for whom?
A. Dion Fisher.
Q. All right. Let's just take a look, if you will, then, at the third page that's entitled consumer account application. Who is the consumer account -- who is it -- who is the application -- who is the customer?
A. Dion Fisher.
Q. And what are the account numbers ending in?
A. The account numbers end in 9225 and 3514.
Q. And does Dion Fisher appear to be the sole owner of this account?
A. Yes, ma'am.

Q. All right. And then if you go through, the next page looks like some more opening paperwork.
A. Correct.
Q. Standard kind of automatic deposits and other kind of paperwork. And then if we go to the page that appears to be headed with a secured card to Visa, what does that page appear to be?
A. This appears to be a credit card statement for a Visa card account number ending 1810 for the billing period from May 7th, 2016, through June 6th, 2016.
Q. And when you look at the bottom of this, does it tell who this account statement is being sent to?
A. Yes. Dion Fisher.
Q. What's the address?
A. 2481 Northeast Coachman Road, Apartment 107, Clearwater, Florida.
Q. And on this particular statement, it appears that a payment was made sort of in the middle of the page. What does that show?
A. It indicates that a $4,000 cash payment was made on May 6th, 2017 -- 2016.
Q. All right. Let's take a look at the rest of this statement on the next page. What are some of the items that you see in terms of the purchases made on this Wells Fargo debit card ending in 1810?

A. It appears to indicate there are payments or expenses incurred for Enterprise Rental Car, Spirit Airlines, Delta Airlines, Lyft rides.
Q. Does there appear to be a fair amount of travel listed as expenses on this Visa?
A. The expenses would suggest there is a fair amount of travel, yes.
Q. All right. And then if we can take a look at the next page, it appears to be another Wells Fargo secured account statement. And what is the ending four digits of this credit card statement?
A. 2790.
Q. And the date of this particular statement?
A. This statement covers the billing period from October 7, 2017, to November 6, 2017.
Q. And if you go down, again, who is this statement addressed to?
A. It's addressed to Dion Fisher at 10124 Nassau Court in Seminole, Florida.
Q. Does it appear that there were payments made on this Wells Fargo Visa card ending in 2790?
A. Yes, ma'am.
Q. What's being paid?
A. On October 23rd, there appears to be a cash payment of $1,110 at a branch, at a Wells Fargo branch. On November

3rd, 2017, there appears to be another payment of $1,000 at another Wells Fargo branch.

Q. For a total payment at least in cash of?

A. $2,110.

Q. I think it might be a three. No, I guess you're right. It's a one.

All right. So let's look at the next page and some of the purchases that were made on this card ending in 2790. What kind of items do you see generally on this page? Do you see more travel?

A. I do. I see more travel related expenses such as Enterprise Rent-a-Car, American Airlines, Grand Rapids, Charlotte, Nashville, Chicago.

Q. Do these tickets appear to be for Dion Fisher?

A. They appear to be possibly for other people.

Q. Okay. Let's take a look at the next page, which is a Wells Fargo Everyday Checking. What is this statement for, the account ending in what numbers?

A. 1543.

Q. And, again, who is this -- who is the owner of this checking account?

A. Dion Fisher of 10124 Nassau Court, Seminole, Florida.

Q. And are there also a number of pages of debits and credits and deposits and withdrawals from this account?

A. Yes, ma'am.

Q. Then if we look at the next statement for that from November 10th to December 11th, what were the total deposits made in the top of that page if we keep going through?
A. $6,451.55.
Q. In deposits?
A. Deposits and additions, yes, $6,451.55.
Q. And what were the withdrawals?
A. The withdrawals were $7,506.28.
Q. And what's the last page of this exhibit, Detective Gwynne?
A. The very last page of the exhibit appears to be an overdraft protection available.
Q. Is there a receipt also in there?
A. Yes, I'm sorry. There is a receipt, a Wells Fargo Bank receipt for a --
Q. What does it show happened in that receipt?
A. It shows a cash deposit into the account ending 1543. That cash deposit was for $2,100, and the transaction occurred on June 5, 2017.
Q. All right. Detective Gwynne, let's return that exhibit to its folder and take a look at Government's Exhibit 159. What is Government's Exhibit 159?
A. It appears to be a Regions Bank account package for nonpersonal checking and/or savings services for an entity known as Million Dollar Plans.

Q. What's the address for the Million Dollar Plans?
A. That entity's address is 10124 Nassau Court in Seminole, Florida.
Q. And what type of account would this be?
A. This would be for a LifeGreen business checking account.
Q. And what's the date -- the opening date for this particular account?
A. The opening date for this account is February 8th, 2018.
Q. And again, does this exhibit appear to be copies of a bunch of what appears to be regular Regions statements, account opening documents?
A. It appears to be, yes.
Q. All right. Let's pull up the next exhibit that you've got in your Redweld over there, Government's Exhibit 160. Detective Gwynne, what is Government's Exhibit 160?
A. This is a T-Mobile receipt issued to customer Million Dollar Plans on October 7, 2016.
Q. And does it appear to have a telephone connected with this Million Dollar Plans customer?
A. Yes.
Q. What is it?
A. (813) 526-9932.
Q. And was there -- how was this T-Mobile receipt, how was

it paid for?
A. This receipt appears to have been paid for by a Visa card ending in the last four digits of 1810.
Q. And who has signed this for what's listed as a cardholder signature at the bottom?
A. Dion Fisher.
Q. But the customer is Million Dollar Plans?
A. Correct.
Q. Detective Gwynne, was this an item of significance that was photographed at the day of the search warrant on February 15, 2018, at 10124 Nassau Court?
A. I believe so, but I don't have any specific recollection. I believe that was one we --
Q. Let's just take a look at -- all right. Let's move on. Let's take a look at Government's Exhibit 161. What is Government's Exhibit 161?
A. 161 is a FedEx invoice dated April 26, 2013.
Q. And what does this FedEx invoice -- what does it show?
A. It shows that an importer of record, FedEx Trade Network -- FedEx Trade Networks, imported a drill machine.
Q. And where was the exporting country?
A. The exporting country was China.
Q. And if we look at the next page, does it show who was the supplier and who was the consignee for this particular drill machine?

A. Yes, ma'am. The consignee was Dion Fisher of the Fisher Company, 1912 Hammock Pine Boulevard, Clearwater, Florida.
Q. And where was it exported from?
A. The shipper was Ms. Li, L-i, from Shanghai Siyi, S-i-y-i, Industrial Company, Limited in Shanghai, China.
Q. And when you go down for the country of manufacture and field description, what does it say?
A. Country of manufacture is China, and a full description of the goods is a drill machine.
Q. And was there a value associated with the drill machine?
A. Yes. The unit value was $500.
Q. And does this appear to be a heavy item?
A. Yes, ma'am.
Q. How much?
A. 22 kilograms.
Q. Which is -- do you know roughly how much that is in our --
A. One kilogram is 2.2 pounds.
Q. So it would be about what? I'm testing your math.
A. About 44 or 50 pounds.
Q. All right. So when we take a look at the next page, is that the payment, how much is required to be paid?
A. Indicates amount due of $37.50.

Q. And that would be paid by whom?
A. That is remittance advice to Dion Fisher.
Q. And that -- the next page shows the same invoiced amount to Mr. Fisher?
A. Yes, ma'am.
Q. And are there additional tracking items as part of this package?
A. Yes.
Q. And again, if we look at Government's Exhibit 161A, was this an item of significance that was photographed at the residence on that day?
A. Yes, ma'am.
Q. And does this contain almost every page of the item that we just looked at, Government's Exhibit 161?
A. Yes, ma'am.
Q. All right. Detective Gwynne, let's take a look at Government's Exhibit 162. What is Government's Exhibit 162?
A. It's a composite exhibit comprised of two separate transactions.
Q. Are they the actual receipts, the kind of skinny receipts again?
A. Yes, they are.
Q. And where do they appear to take place?
A. The first one appears to take place at Publix at 7880 113th Street in Seminole, Florida.

Q. What is the date of that transaction at Publix?
A. This is dated October 4, 2015.
Q. And who is the sender?
A. The sender is Dion Fisher from 10600 109th Lane in Largo, Florida.
Q. And who is the receiver?
A. The receiver is Yung Fen Wang.
Q. And where is the receiver located?
A. China.
Q. And how much money is being transferred?
A. $385.
Q. And so that's -- there's a transfer amount and some transfer fees. And then the total is, again, how much?
A. $385.
Q. Does it appear to indicate how much the receiver would receive from that in some corresponding denomination?
A. It's hard to read. It appears to be 6. -- 6.3550 Chinese yen.
Q. Okay. And is the final page the actual receipt for this money transfer?
A. Yes, for this -- with respect to this Publix wire transfer, yes, or money transaction, yes.
Q. Are you able to make out the -- is it all for the same transaction or are there two?
A. There is a separate transaction here in this receipt.

Q. Does it also appear to be -- can you make out the same receiver?
A. Yes, ma'am. The same sender is Dion Fisher. The same receiver is Yung Fen wang from China.
Q. All right. Let's take a look at Government's Exhibit 163. What is this item?
A. If I can just go back to your question about the equivalent between the U.S. dollars and the Chinese yen, this receipt is clearer. And it appears to be -- the $385 U.S. dollars appears to equate to 2,351.39 Chinese yen.
Q. Okay. Well, thanks for that clarification, Detective Gwynne.
THE COURT: We're going to need to take a break. All right?
MS. HOWARD-ALLEN: That's fine, Your Honor.
THE COURT: Ladies and gentlemen, we're going to take our afternoon break. Please don't discuss the case or form any opinions until you've heard all the evidence. We'll see you back here in ten minutes.
COURT SECURITY OFFICER: All rise for the jury.
(Jury exits courtroom at 3:15 p.m.)
THE COURT: Please be seated. One of the jurors had to use the restroom, so that's why I cut you off in the middle of a sentence.
MS. HOWARD-ALLEN: That's fine, Your Honor.

THE COURT: So as I said, I need to break today at 4:30 because I have an oral argument on a motion. It's 3:15. We'll be back in ten minutes. How much longer do you anticipate you'll be with this witness?

MS. HOWARD-ALLEN: That's fine, Your Honor. I think that I just have a couple more exhibits with him, and then Miss Guzman indicated that two of the chemists arrived. So depending on cross, we should be probably finishing right after 4:000.

THE COURT: Okay.

MS. HOWARD-ALLEN: And that would be a good stopping point because the next witness might be a little longer.

THE COURT: Okay. Perfect. All right. I'm going to bring in right now so that you have them the draft jury instructions as well as the draft verdict form so you can look at them. And we can study them and tomorrow we can discuss them. That way you can look at them overnight.

MS. HOWARD-ALLEN: Okay. I believe that my secretary might have filed an amended verdict form.

THE COURT: She did.

MS. HOWARD-ALLEN: Because I tried to correct that over the lunch hour. I appreciate Your Honor finding that.

THE COURT: I have it, so we're all set on that. Okay. Very good. We'll see you in a few minutes. Thank

you.

MS. HOWARD-ALLEN: May the witness also go to the restroom?

THE COURT: Yes, of course. But just don't talk to any jurors if you happen to see them or anybody about your testimony because we are in the middle of your examination.

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

(Recess taken from 3:17 p.m. to 3:25 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Is the jury ready?

COURT SECURITY OFFICER: Yes, ma'am.

THE COURT: And will you bring the witness in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 3:28 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

I'll remind the witness you're still under oath. Do you understand that, sir?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Very good. You may proceed.

MS. HOWARD-ALLEN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:
Q. Detective Gwynne, I think just before our much needed afternoon break, we were looking at Government's Exhibit 163. So can you take a look at that for me. What is Government's Exhibit 163?
A. 163 is a composite exhibit comprised of a shipping -- EMS shipping label from China to Dion Fisher with respect to Louis Vuitton merchandise, Fendi merchandise as well.
Q. And so the original one, which is your original exhibit label, which is a little more colorful than our copy, it just says that there's a description of contents and it says clothes on the front of it, on the front label.
A. Correct. Clothes, number of pieces, one.
Q. And then these other items that you were talking about, are those kind of receipts that were along with those, the Fendi's and the other type of things?
A. Yes, ma'am, the Fendi and Louis Vuitton.
Q. When you look at that Fendi thing, what does it say, this customer copy sales memo?
A. The Fendi sales memo indicates merchandise quantity one, total $6,800 which appears to be HKD.
Q. And what do you think HKD is?
A. Perhaps Hong Kong dollars.
Q. Are there also other sales memos similarly indescript [sic] from other companies?

A. Yes. The Fendi receipt does indicate Hong Kong flagship store, but, yes, there are other records in here from Louis Vuitton.
Q. And that indicates how much for the Louis Vuitton items that were listed in there?
A. 6,800 Hong Kong dollars, HKD.
Q. Is there any kind of date on these sales memos or receipts?
A. There does not appear to be. Some of the copies are hard to read. The ink is not very distinct.
Q. You don't see a date? I don't see a date. Were these items that you're looking through, this kind of composite exhibit of EMS items from China and receipts, was that photographed on site that day? If we want to look at Government's Exhibit 163A, some of these were photographed there?
A. Yes.
Q. Spread out on that tarp again?
A. Yes, ma'am.
Q. And the next page?
A. Yes, ma'am.
Q. All right. Let's move to Government's Exhibit 164.
A. Just if we could go back with respect to the EMS shipping document from Beijing, China to Dion Fisher, there is a date of January 15, 2018.

Q. On that initial document?
A. Yes.
Q. Thank you, Detective Gwynne.
Let's take a look at Government's Exhibit 164. What is Government's Exhibit 164? It looks like something very small in your hands.
A. 164 is comprised of two Amscot purchaser receipts. The first one is dated May 3rd, 2017, for $829.25. The second is dated July 1st, 2017, for the same amount, $829.25.
Q. And those are quite literally what you're holding is those small receipts?
A. Yes.
Q. All right. Let's move to Government's Exhibit 165. And what is -- now, I've got, again, what looks like a paper exhibit, but what are you holding in your hands, Detective Gwynne?
A. These are labels that were removed from items found inside Dion Fisher's residence at 10124 Nassau Court in Seminole, Florida.
Q. And what do you think was done with the other items that they were removed from?
A. I think they were just left at the residence.
Q. And what are these labels? Where are these labels from?
A. They are from China.

Q. And can you make out some of the dates on some of these?
A. Some of them are dated June 2017 and I believe one of them is dated July 2017.
Q. And they are all from China?
A. Correct.
Q. All right. Let's take a look then at Government's Exhibit 166. What is Government's 166?
A. 166 is an evidence bag that I signed at the bottom and that I placed my initials in when it was sealed.
Q. And what's inside of that evidence bag?
A. There are four Ziploc baggies imprinted with ice cream cone images.
Q. And these were taken out of the residence -- Dion Fisher's residence at 10124 Nassau Court?
A. Yes, ma'am.
Q. And then we'll take a look at what is our final exhibit, Detective Gwynne. What is 167A and B? I guess it's a two-part exhibit. What's 167A and B?
A. 167A is a photograph taken at the scene at the time the search warrant was served. It's a photograph of $3,720 that was found inside the residence.
Q. And what is 167B, Detective Gwynne?
A. Exhibit 167B is a photograph of another sum of money, $1,281, which was also found during service of the search

warrant at another location inside the residence.

Q. Were these items shown in Government's Exhibit 167A and B, were they seized by law enforcement?

A. Yes.

MS. HOWARD-ALLEN: All right. At this time, I don't have any other additional questions for Detective Gwynne.

THE COURT: Okay. Thank you very much.

Any cross-examination, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: You may proceed, sir.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good afternoon.

A. Good afternoon, sir.

Q. How long have you been working at the Pinellas County Sheriff's Office?

A. Since January 2005.

Q. Okay. So during all this time of this investigation, you were employed at the sheriff's office; correct?

A. Yes, sir.

Q. Have you ever had any part-time employment while you were at the sheriff's office?

A. No, sir.

Q. Okay. So all these companies you testified about

earlier, the jewelry companies, the banks, the airlines, et cetera, you don't work for any of them, do you?
A. No, sir, I don't.
MR. MARTIN: Thank you.
THE COURT: All right. Anything else, Miss Howard-Allen?
MS. HOWARD-ALLEN: Nothing further, Your Honor.
THE COURT: Okay. I will excuse the witness. Thank you, sir. We appreciate your coming in today.
And you can call your next witness, please.
MS. GUZMAN: Yes, Your Honor. The government will call Marsha Collins.
THE COURTROOM DEPUTY: Please raise your right hand.
Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.
THE COURTROOM DEPUTY: Please state and spell your name for the record.
THE WITNESS: Marsha Collins, C-o-l-l-i-n-s.
THE COURTROOM DEPUTY: Thank you. You may take the witness stand.
THE COURT: Ma'am, you're going to be asked some questions by Assistant United States Attorney Maria Guzman,

and then Ken Martin, who represents Mr. Fisher, may also ask you some questions in cross-examination.

If you don't understand the question, please say so so it can be worded differently. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time.

If you have the tendency to speak quickly, please slow down so we can understand you. And if you're soft-spoken, please speak up so we can hear you, all right?

THE WITNESS: Yes.

THE COURT: Very good.

You may proceed, Miss Guzman.

MS. GUZMAN. Thank you very much, Your Honor.

MARSHA COLLINS,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good afternoon. Would you please introduce yourself to the Court and the members of the jury.

A. Hello. My name is Marsha Collins, C-o-l-l-i-n-s, and I am a supervisory chemist with the Drug Enforcement Administration.

Q. And are you assigned to any particular unit or office in the United States?

A. I'm assigned to the Chicago laboratory.
Q. And how long have you been with the Chicago unit?
A. Approximately one year.
Q. And is the weather cooler in Chicago now?
A. Yes, it is.
Q. Good. Prior to working at the Chicago laboratory, were you employed with another laboratory here in Florida?
A. I was employed also with the Drug Enforcement Administration, but at the Miami laboratory.
Q. Now, at the Miami laboratory, how long were you employed with that particular office?
A. More than seven years.
Q. And during the time that you worked with the Miami office -- was that the Southeast Laboratory?
A. Yes.
Q. With the Southeast Laboratory, what were some of your responsibilities or tasks as a chemist?
A. I analyzed evidence for the presence of controlled and noncontrolled substances. I instructed other chemists and law enforcement officers in drugs, analysis and laboratories, and I assisted law enforcement in the field, and I testified as to my findings in court.
Q. And did you testify on few or many occasions?
A. Approximately 15 occasions.
Q. And did you analyze substances on few or many occasions

during that time period?
A. I analyzed approximately 30 exhibits per month.
Q. Per month?
A. Yes.
Q. Now, you indicated that in your current position in Chicago, you are a supervisory chemist?
A. Yes.
Q. During the time that you were in Miami, were you also a supervisory chemist?
A. No, I was not.
Q. So Chicago was a promotion?
A. Yes.
Q. If you would explain to the jury some of your just -- briefly your educational background that qualified you to work at the Southeast Laboratory.
A. I have a bachelor's degree in chemistry, a master's degree in surface chemistry, a Ph.D. in physical chemistry. I completed post-doctoral studies. And then when hired by the Drug Enforcement Administration, I received seven months of in-house training at the DEA laboratory in Miami and then I received a month of training in forensic science at Quantico laboratory in Virginia, and then I received ongoing training since then.
Q. Was your employment at the DEA -- with the U.S. Department of Justice DEA, was that your first employment as

a chemist?
A. I worked for one year at a printing company as a chemist.
MS. GUZMAN: Your Honor, at this time, I would tender the witness as an expert in the field of forensic chemistry in order for her to be able to render an opinion in that area.
THE COURT: Do you wish to voir dire the witness?
MR. MARTIN: No, Your Honor.
THE COURT: All right. I find that the witness is qualified to testify as an expert witness and provide expert testimony in the field of forensic chemistry. And you may proceed.
MS. GUZMAN: Thank you, Your Honor.
BY MS. GUZMAN:
Q. Miss Collins, in this particular case, there were certain laboratory reports that were prepared. One of them if I could direct your attention would be what we now know as a LIMS number, which is a laboratory number, correct, and it would be 01607. Were you the chemist that did that analysis?
THE WITNESS: Your Honor, may I refer to my notes?
MS. GUZMAN: Your Honor?
THE COURT: Yes.
MS. GUZMAN: Your Honor, she -- Miss Collins asked whether the Court would allow her leave to --

THE COURT: No, it's fine. You know, just as long as if she's using her notes, then Mr. Martin is entitled to look at those notes if he wants to for his cross-examination. So as long as she understands that, it's fine.

MS. GUZMAN: Thank you, Your Honor.

THE COURT: All right.

THE WITNESS: Would you please repeat the LIMS number?

BY MS. GUZMAN:

Q. Yes. The LIMS or laboratory number would be 01607.

A. Yes.

Q. And reflected in that laboratory report is an exhibit number, which I believe would be Exhibit 33; is that correct?

A. Yes.

Q. Now, if you could detail for the Court and the members of the jury, what was Exhibit 33? What were you provided in Exhibit 33?

A. I was provided multiple bags of tablets.

Q. And when you received the bag with the multiple tablets, what did you do? First of all, do you know when you would have received it?

A. Yes.

MS. GUZMAN: Your Honor, if I could approach the evidence.

THE COURT: You most certainly can approach.

MS. GUZMAN: Thank you.

BY MS. GUZMAN:

Q. Let me show you what has been marked as Government's Exhibit 221, Miss Collins. Do you recognize Government's Exhibit 221?

A. Yes.

Q. And what is depicted in Government's Exhibit 221?

A. I'm sorry. Could you rephrase the question, please.

Q. Yes. What is -- first of all, how is it that you recognize Government's Exhibit 221?

A. I recognize my signature on this label as well as down here on the seal where I sealed the evidence. And the numbers on the labels of the evidence correspond with that in my laboratory report.

Q. Okay. And again, is your name reflected on the exhibit itself?

A. Yes. It is where it says opened by and down below where it says resealed by.

Q. Now, once you opened the sealed envelope, what test did you perform?

A. After I opened it, I determined the net weight of the contents. Then I analyzed it using gas chromatography, as well as gas chromatography paired with mass spectrometry.

Q. And what were your findings after performing those two tests?

A. I found that the exhibit contains fentanyl.
Q. Now, again, that would be Exhibit 33?
A. Yes.
Q. And were you able to determine a weight?
A. Yes.
Q. And what was the weight?
A. 148.6 grams.
Q. In addition to Exhibit 33, did you also have an opportunity to do an analysis on an Exhibit 49?
A. Yes.
Q. And is Exhibit 49 also contained within Government's Exhibit 221?
A. No, that should be in a different bag.
Q. Okay. Well, let me ask you this: With respect to Government's Exhibit 49, what do your reports indicate to you you received?
A. I received an evidence envelope containing a Ziploc plastic bag containing powder.
Q. And upon receiving that particular exhibit, again, did you conduct the same tests?
A. Yes.
Q. And what were your findings after -- again, in the prior exhibit, you had indicated that you had conducted two different tests; correct?
A. Yes.

Q. With reference to Exhibit 49, again, were the two same tests performed by you on the substances?
A. Yes.
Q. And, again, what were your findings?
A. I found that Exhibit 49 contained fentanyl.
Q. And were you able to determine a weight?
A. Yes.
Q. And what was that weight?
A. 102.4 grams.
MS. GUZMAN: Your Honor, may I approach the evidence again?
THE COURT: Yes, you may.
MS. GUZMAN: Your Honor, may I approach the witness?
THE COURT: Yes, you may.
BY MS. GUZMAN:
Q. Can I show you what's been previously marked and introduced as Government's Exhibit 214?
A. Yes.
Q. Do you recognize the contents of Government's Exhibit 214?
A. Yes.
Q. And how do you recognize the contents of Government's Exhibit 214?
A. I see my name on this label as well as my signature. I

see my signature on the seal I used when I sealed the envelope, and the numbers on the labels of this envelope correspond with that in my report.

MS. GUZMAN: Your Honor, if I can approach the easel.

THE COURT: Yes.

BY MS. GUZMAN:

Q. Miss Collins, if you would assist me, I'm going to ask you to approach the easel. In approaching the easel, you will note that there's Government's Exhibit 221 which corresponds to Exhibit 33. If you would be so kind as to write down the substance that you identified and the weight.

(Witness complies.)

BY MS. GUZMAN:

Q. Likewise as to DEA Exhibit 49 which is Government's Exhibit 214, if you would likewise include the substance that you identified and the weight.

(Witness complies.)

BY MS. GUZMAN:

Q. And then will you just initial the last one.

(Witness complies.)

BY MS. GUZMAN:

Q. Thank you very much, Miss Collins. You can return to your seat. And thank you for your assistance with the easel.

THE COURT: Is that it? Okay. Anything else,

Miss Guzman?

MS. GUZMAN: No, Your Honor.

THE COURT: Okay. Thank you.

Mr. Martin, any cross-examination?

MR. MARTIN: Thank you.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good afternoon.

A. Good afternoon.

Q. The tests you ran were a qualitative analysis; correct?

A. Yes.

Q. That just allows you to identify the drug; is that correct?

A. Yes.

Q. It doesn't allow you to know the purity or how much drug is throughout the sample; is that correct?

A. It does not allow me to know the purity, correct.

MR. MARTIN: Thank you.

THE COURT: Okay. Anything else, Miss Guzman?

MS. GUZMAN: No, Your Honor. Thank you.

THE COURT: I'll excuse the witness. Thank you for having come in today to testify. You're excused.

You can call your next witness, please.

MS. GUZMAN: Yes, Your Honor. The government would call Ivette Vallejo.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: My name is Ivette Vallejo. First name is I-v-e-t-t-e. Last name V-a-l-l-e-j-o.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Thank you, Miss Vallejo. You're going to be asked some questions by Maria Guzman, Assistant U.S. Attorney, and then Ken Martin, who represents Mr. Fisher, may also ask you some questions in cross-examination.

If you don't understand the question, please say so so they can state it another way. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time.

If you have the tendency to speak quickly, please slow down so we can understand you. And if you're soft-spoken, please speak up so we can hear you. All right?

THE WITNESS: Yes, Your Honor.

THE COURT: You may proceed, Miss Guzman.
MS. GUZMAN: Thank you, Your Honor.

IVETTE VALLEJO,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:
Q. Good afternoon, Miss Vallejo.
A. Good afternoon.
Q. Would you please again state your name for the Court and the members of the jury.
A. My name is Ivette Vallejo, and it's spelled I-v-e-t-t-e. Last name is V-a-l-l-e-j-o.
Q. And where are you currently employed?
A. I'm employed by the Southeast Laboratory in Miami, Florida, part of the Drug Enforcement Administration.
Q. And in what capacity are you employed with the Southeast Laboratory?
A. I'm employed by the Southeast Laboratory as a forensic chemist, actually a senior forensic chemist.
Q. And what exactly is a senior forensic chemist versus just a forensic chemist?
A. A senior forensic chemist is somebody who has much more experience than a chemist. I have tenure there. I've been working for the Drug Enforcement Administration since August

19th, '76.
Q. That's a long time.
A. Yes, ma'am.
Q. And have you always been employed at the Southeast Laboratory?
A. Yes, ma'am.
Q. During your time as a chemist and now a senior forensic chemist at that laboratory, have you had the opportunity to analyze few or many controlled substances?
A. Many controlled substances, ma'am.
Q. Have you had an opportunity to testify in court as an expert witness in the area of forensic chemistry on few or many occasions?
A. On 200 times. I've testified in federal court as well as state and local. I've also testified in the Commonwealth of Puerto Rico and the islands of Antigua and St. Lucia. Also in court martials and in Edmonton, Canada.
Q. As a senior forensic chemist, are you also responsible for training other chemists in your unit?
A. Presently, that's what I'm doing. I'm training the new chemists that come into the lab. Usually we have a period of time after they come from the academy in Quantico, Virginia. They come to the lab, and I'm the one in charge of doing their training before they step onto the bench.
Q. Excellent. Miss Vallejo, in connection with this case,

I know that the laboratories, the DEA laboratories have certain laboratory numbers; is that correct?

A. Yes, ma'am.

Q. With relation to laboratory number 01624, were you provided a DEA exhibit to do further analysis?

A. Yes, ma'am.

Q. And I know that the exhibit is divided into two parts. 50.01 and 50.02. Did you just receive an Exhibit 50 and then you divided it? How did that happen?

A. Yes, ma'am. When there is an exhibit, a sub exhibit, if you start with a number, an X number, if you divide it in more portions, then you'll be subdividing it in .01, .02. In this case it was Exhibit 50, and it became 50.01 and 50.02.

Q. And what exactly did you receive in Exhibit 50?

A. In Exhibit 50, I received tablets and tablet portions and powder.

Q. So let's talk about the tablets first. Would that be 50.01?

A. Yes, ma'am.

Q. And how many tablets did you receive for further analysis?

A. In that case, if I recall correctly, because I did not memorize all the numbers, there were 474 tablets received, which I counted and they were counted.

Q. Now, when you say that they were counted, do you

basically count every tablet or does it go through a machine? How do you count?
A. In this case, I counted one by one, because there was a count there. And so I counted them, 474. And there were five bags, and I have the count for each bag, but the total amount is 474 tablets.
Q. Now, with regards to 50.02, I think you indicated there was some powder. Is that what was contained within 50.02?
A. 50.02 was tablet portions and powder.
Q. Let me --
MS. GUZMAN: Your Honor, may I approach the evidence?
THE COURT: Yes, you may do so.
MS. GUZMAN: And may I now approach the witness?
THE COURT: Yes.
BY MS. GUZMAN:
Q. Miss Vallejo, let me show you what's been marked as Government's Exhibit 217. Do you recognize that particular packet?
A. Yes, ma'am. I'm holding Government's Exhibit No. 217. And I recognize it because this is -- and I'm going -- I'm flipping this bag over which is a clear plastic bag. And here you see that it has a case number, D6170016, which is the DEA case number is Exhibit 50 under that case number, and it has what we call a Laboratory Information Management

System, LIMS case number. It's like an inventory number that was given when it got to the lab, which is 2018-SFL4, which represents my laboratory in Miami, -01624.

Q. Now, that particular exhibit and that particular plastic bag, is that how you received it when it was provided to you at the laboratory?

A. Yes, ma'am. This has got the original signatures of the agents that submitted it with the witness, and then I proceeded to fill the bottom part of the label on the front part of this bag.

Q. I see that the Government's Exhibit 217 that you have has some labels, some skull labels on it.

A. Yes. And then if you want, I'll show you what everything means. The yellow label on the top is what's given on the front -- the opposite part of what you're seeing on the screen. This is the part that you're showing on the screen, which has the Government Exhibit No. 217.

And then I'm turning the bag over. And then all the information I gave you before about Exhibit 50, the case number and so forth, it's on the front white label. The yellow label like I said before, that's placed by the laboratory as an inventory number with the initials of the person that received it.

The diamond-shaped label is the skull and bones, is to show to be careful with this type of evidence. And

then you have my initials and everything over here.
Q. The skull labels, who places those on that bag?
A. I place these on the bag.
Q. And is that before or after you do your analysis?
A. It could be during because I make sure that I put them on. And it's being labeled on -- it's for taking precautions for handling this piece of evidence.
Q. Let me ask you, then -- thank you very much for identifying that.
Exhibit 50.01, were you able to make an identification as to a controlled substance?
A. Yes, ma'am.
Q. And what was your finding?
A. My finding on Exhibit 50.01 is that it contained fentanyl.
Q. And were you able to determine a weight?
A. Yes, ma'am.
Q. And what was that weight?
A. I did not put it to memory. If I can see the DEA's report.
Q. Yes. Do you have a copy with you?
A. I do. If I may look at it?
Q. Sure.
A. I am going to be reading from the DEA form 113, which is a report of what my findings were. And in reference to

your question of Exhibit 50.01, it contained fentanyl, and the net weight that was received was 41.699 grams plus or minus .004 grams.

Q. And with reference to Exhibit 50.02, what were your findings?

A. Exhibit 50.02 also contained fentanyl, and the weight -- the net weight of this was 1.442 grams with a plus or minus of 0.003 grams.

Q. And to be clear, you've indicated that with 50.01, you were provided tablets?

A. Yes, ma'am.

Q. And with 50.02, it was more of a powdery substance; is that correct?

A. Powder and -- yes, ma'am.

Q. Now, what type of tests did you conduct and were they different since you were dealing with tablets and powder?

A. They were basically the same thing. The only thing is how -- the only difference in this report is how I reported it. 50.01 I reported as tablets, so I have a report of how many I received, which were 474 tablets. And I returned 401 tablets. And the analysis for both of them were the same. I did a determination of the weight. I then determined the -- I did a gas chromatograph/mass spectrometer analysis. I also did a gas chromatograph analysis on it. And based on those tests, I arrived to my conclusion.

And then at the end, I did a net weight returned, determining the tablets returned on the first Exhibit 50.01. And on the other one, I did a -- just a weight of the powder returned.

Q. And you indicated the two tests that you performed on both 50.01 and 50.02. Are those the standard protocol tests that are done at the DEA laboratory?

A. Yes, ma'am.

Q. And based on your previous testimony about your experience, I would assume that you've done these tests many, many times?

A. Yes, ma'am.

Q. If you would assist me with the easel.

MS. GUZMAN: Your Honor, if I could approach the easel.

BY MS. GUZMAN:

Q. I'll need your assistance here.

A. May I stand?

Q. Yes. Now, I have marked on that easel Government's Exhibit 217, if you can see that. What I would ask you to do, if you can, is to write down 50.01 and what your findings were as to 50.01 and the weight and then likewise for 50.02.

(Witness complies.)

BY MS. GUZMAN:

Q. Thank you very much. If you would take your seat.

Thank you.
A. Excuse me, ma'am. Do you want me to initial this?
Q. Yes, actually. Thank you very much.
Now, your findings as to both 50.01 and 50.02 were fentanyl. As a senior forensic chemist, is fentanyl a dangerous drug?
A. Yes, ma'am.
Q. Is fentanyl an addictive drug?
A. It may be, yes, ma'am.
Q. Because of the danger or dangerousness of fentanyl, is that why you noted the skull labels on your exhibit?
A. Yes, ma'am.
MS. GUZMAN: Thank you very much. I have no further questions. I would tender Miss Vallejo to Mr. Martin for cross-examination.
THE COURT: Thank you.
Mr. Martin, do you wish to cross-examine the witness?
MR. MARTIN: Yes, Your Honor. Thank you.
THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. MARTIN:
Q. Good afternoon.
A. Good afternoon, sir.
Q. The examinations that you talked about are what's

called qualitative examinations; correct?
A. Yes, sir.
Q. That allows you to identify that there is a certain drug in whatever you're testing; correct?
A. Yes, sir.
Q. It doesn't allow you to determine the purity or how much there is; is that also correct?
A. No, sir.
Q. I asked if that was -- does it allow you to determine the purity?
A. Well, I rather do the analysis to make sure how much is present.
Q. I'm sorry. I didn't hear you.
A. I rather do the analysis specifically for purity to give you an answer as to the purity of the sample.
Q. Correct. That's another test?
A. Right.
Q. Which you didn't run because you weren't asked to run it; correct?
A. You're correct, sir.
MS. GUZMAN: Thank you. No further questions.
THE COURT: Anything else, Miss Guzman?
MS. GUZMAN: No, Your Honor. Thank you very much. Thank you, Miss Vallejo.
THE COURT: I'll excuse the witness. Thank you.

We appreciate your having come in today.

THE WITNESS: Thank you, Your Honor.

THE COURT: Do you have another witness ready to go?

MS. GUZMAN: I do not, Your Honor. I do not have any additional short witnesses this afternoon. The next witness would be a very long witness.

THE COURT: Okay. So we'll just break for the day, then.

MS. HOWARD-ALLEN: That witness will be available in the morning. We'll just bring him back at 9:00.

THE COURT: Okay. All right.

So ladies and gentlemen, we're going to break for the day. As you can see, we're going at a good clip, and I think that by Wednesday this case will go to you for deliberations. So I think I had earlier said by Friday, but it's going to be earlier than that. It will be by Wednesday. All right.

So I ask you, again, please not to discuss the case or form any opinions until you've heard all the evidence and not to do any independent research. And we'll see you back here tomorrow morning at 9 a.m.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 4:15 p.m.)

THE COURT: Please be seated.

I wanted you to take a chance to look at the jury instructions and verdict forms. Do both of you have it? If you could just look at it tonight. I think we handed them out.

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Okay. Do you have it, Miss Howard-Allen?

MS. HOWARD-ALLEN: Yes, we do. And we appreciate we've gotten two copies.

MR. MARTIN: Yes, I do.

MS. HOWARD-ALLEN: We appreciate that.

THE COURT: All right. Very good. So please take a look at it tonight, and then we will discuss it sometime tomorrow.

So let's just see, Miss Howard-Allen, you still have to call Mr. Carlos Diaz?

MS. HOWARD-ALLEN: Yes. I think that all three chemists I understand are arriving tonight and we'll probably just call them first to get through. So those are leap quick. It's Diaz, Kaufman, and Rodriguez.

THE COURT: Okay. Diaz, Kaufman, and Rodriguez. Those are your chemists. Okay.

MS. HOWARD-ALLEN: Then we'll call Konrad Gusewicz.

THE COURT: Okay. Hold on. Konrad Gusewicz.

MS. HOWARD-ALLEN: He could be an hour, you know, possibly longer than an hour.

THE COURT: Is he who you're calling first tomorrow morning?

MS. HOWARD-ALLEN: Well, I think Miss Guzman wanted to get the chemists out of the way if they were here. I was going to call him. He was here now, but he could be easily over an hour.

THE COURT: And what's his position?

MS. HOWARD-ALLEN: He is the individual who did five of the money laundering transactions with -- directly with Mr. Fisher.

THE COURT: Okay.

MS. HOWARD-ALLEN: And then we will have Roman Hernandez who would be five minutes tops as an IRS witness because there was no tax records found for Mr. Fisher. And then we will finish with Diane Knott, and I expect her to take over two hours.

THE COURT: And what is her position?

MS. HOWARD-ALLEN: She is the financial analyst from the U.S. Attorney's Office, and she will be presenting the summary charts which are Government's Exhibits 600 through 619.

THE COURT: Okay. So that will take us a good portion of the day tomorrow.

MS. HOWARD-ALLEN: I suspect that we'll be done mid-afternoon depending on cross, of course.

THE COURT: Okay. Then after that, I'll turn to you, Mr. Martin, and you can let me know if your client wishes to testify, if you wish me to inquire outside the presence of the jury. But just so that you can plan, that will come tomorrow afternoon.

And we'll have to look and see at what time it is, but if you think mid-afternoon, I doubt we'll be able to do closing arguments tomorrow, then.

MS. HOWARD-ALLEN: I wouldn't think. I mean, I would think -- I'd rather if we were done mid-afternoon, I would like to start with them Wednesday morning, Your Honor.

THE COURT: Yes. So that's what we'll do, then. It sounds like that's what we're looking at. So what we would do Tuesday afternoon is do the charge conference, and then we would begin at 9 o'clock on Wednesday morning with closing arguments. How long would you need for yours, Miss Howard-Allen?

MS. HOWARD-ALLEN: I would ask for at least an hour, you know, maybe with another half hour on rebuttal. So maybe --

THE COURT: Oh, you're asking for an hour-and-a-half total?

MS. HOWARD-ALLEN: I would, because I would want

some rebuttal time.

THE COURT: And Mr. Martin, how long would you like?

MR. MARTIN: I'll be much -- I would be much shorter than that.

THE COURT: Okay. Well, I'll give you whatever I give her. I'll see. I'll see. It will either be an hour in total or an hour-and-a-half, one or the other. You think you need -- well, it has been a week long trial. Let's see, a week -- over a week, so I'd probably give you an hour-and-a-half, then. So we would then go to jury instructions. So if it's an hour-and-a-half and -- what do you think you would take, a half an hour, 45 minutes, something like that?

MR. MARTIN: 45 minutes tops, probably more like a half an hour.

THE COURT: Yeah, I'm just kind of guessing here. We may order lunch for them if they go straight into deliberations. So I'll see what time it's at, what time we break, and I'll kind of calculate the time.

Okay. Anything else that we need to cover today?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: Okay. Thank you.

MR. MARTIN: Just for preparation, we're not going to argue until Wednesday morning?

THE COURT: We're not going to argue until Wednesday morning.

MR. MARTIN: Thank you.

THE COURT: Okay. Anything else?

All right. Thank you. Have a nice evening. We'll see you tomorrow morning.

(Proceedings adjourned at 4:20 p.m. and reconvened on June 4, 2019.)

\- - -

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 209), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ Scott N. Gamertsfelder, RMR, FCRR

*Official Court Reporter*

Date: January 20, 2020