UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Tampa, Florida |
| | No. 8:18-cr-236-T-33TGW |
| | Docket No. 195 |
| vs. | June 5, 2019 |
| DION GREGORY FISHER, Defendant. | Courtroom 14B |

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

(Vol. VII of VII)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

# A P P E A R A N C E S

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Kenneth B. Martin, Esq.**
Law Office of Ken Martin
P.O. Box 10456
Tampa, Florida 33679
(813) 431-3310

**ALSO PRESENT:**

Adam Phelps, DEA Case Agent

Robert Liberto, IRS Case Agent

- - -

# TABLE OF CONTENTS


| | PAGE | LINE |
|---|---|---|
| Government's Closing Argument................. | 5 | 23 |
| Defense Closing Argument...................... | 32 | 1 |
| Government's Rebuttal Closing Argument........ | 48 | 21 |
| Jury Instructions............................. | 55 | 15 |

**P R O C E E D I N G S**

June 5, 2019 9:00 a.m.

- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good morning, everyone.

What we are going to do when we begin -- who is to give closing argument for the government?

MS. HOWARD-ALLEN: I am, Your Honor.

THE COURT: Are you going to do both the first one and rebuttal argument?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: We will let you know when you have five minutes left because, remember, I will not take from this one hour to give to the half hour.

MS. HOWARD-ALLEN: I don't think I'll go -- certainly if Mr. Martin's is short, I'm sure I will not take a half an hour, but I plan to end at 45, but I would appreciate the warning if I go over.

THE COURT: Sometimes it's hard to tell. Let me know when you are ready.

MS. HOWARD-ALLEN: I am ready, Your Honor.

THE COURT: Thank you. We will bring the jury in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 9:04 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

Just verifying that nobody has done any independent research, discussed the case with anybody or with each other; correct?

(Unanimous affirmative responses.)

THE COURT: Very good. We now move to the next part of the proceeding, which is closing argument. I am giving both sides up to 90 minutes for their closing arguments. The government, because it has the burden of proof, has the opportunity to take the part out from that hour-and-a-half up to half an hour for rebuttal closing argument.

So I now ask that you give your attention to Miss Howard-Allen as I recognize her for up to one hour in her first closing argument.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: You are welcome.

MS. HOWARD-ALLEN: Good morning. May it please the Court --

THE COURT: Yes, ma'am.

MS. HOWARD-ALLEN: -- counsel.

I told you last week that I was going to be able to address you again at the closing of evidence after five days of presentation of this case by the government.

As I told you when I spoke with you last week, five, six days ago, this case is all about pills. The blues and money. And that's all you've heard about for five days, and certainly that's all you've seen is that evidence on that table. Evidence of money. Lots of evidence of drugs. Lots of evidence of drugs.

You've heard each and every witness as they have presented that evidence, as you saw. I'm going to summarize now some of the witness testimony that you've heard over the last week.

Now, when I talked to you last week I indicated there are 15 counts against the Defendant Dion Fisher. Those 15 counts involve five drug charges against the defendant involving -- there are seven drug charges against the defendant involving fentanyl, methoxyacetylfentanyl, and pentylone. Those are all controlled substances, the judge will tell you, and then there are eight money laundering transactions.

So all of those transactions, as you heard, involve more than $10,000 in narcotics proceeds. So what we have is one count of conspiracy, and that's a conspiracy to

distribute, to manufacture, and to possess with intent to distribute fentanyl and methoxyacetylfentanyl, and there are six what we call substantive counts. Those are possession with intent to distribute, and those involve fentanyl and one count involves pentylone, and then there are eight counts of money laundering.

Now, all of this evidence that you see here -- you will have back with you an evidence list that will tell you all the numbers we have been talking about all week. And there is a method to all of those numbers so you can quickly find any items you would like to review during your deliberations.

You will see in the 100s the numbers 1 to 100, and through the 100s are all the evidence seized in the search warrant in the three different locations on February 15th, 2018. There are photos of all those items, as well as the actual items that we seized.

The 200s are all of the drugs, all of those bags that we admitted through the seizing agents and that the chemists testified about. They are all listed in the 200s, and each one of them has a photograph that Agent Phelps put on the screen when we were looking at the actual item.

All of the recordings, the videotaped visits, buys, the videotaped calls, the audio recorded calls and all of those transcripts, those are in the 300s.

When you get to the 400s you will find the business records, some of the businesses we talked about. Onyx Automotive, AK Tire and Rims, National Auto Lenders, Worldwide Auto. All of those are items in the 400s. The Publix money orders, the Amscot money orders, the Western Union money orders.

Then, finally, all of those bank records we saw from Mr. Fisher's Hancock Bank accounts and all of Mr. Guzewicz' bank records and his wife's. Those are in the 500s.

Then yesterday, when we heard our financial analyst Diane Knott summarize and present all of those charts, those were 600 through 619. Those are in the 600s.

The seven total drug charges we have against Mr. Fisher, as I indicated to you, involve the overarching conspiracy, which is, as I indicated, intent to distribute, manufacture more than 400 grams of fentanyl and more than 100 grams of methoxyacetylfentanyl.

Those amounts you will be asked to find on the verdict form; and we will get in a moment, beyond a reasonable doubt, to that weight.

I highlighted on the screen here for you some critical words in the Indictment because you may have heard some cross-examination of the chemists about the purity of the fentanyl or some kind of test that might have done that.

But what is charged is that there is 400 grams or more of a mixture or substance containing a detectable amount of fentanyl.

You heard ten forensic chemists sit there and say what is this substance. What is this substance. What are these blue pills, these blue pills that were collected in a number of locations. What are these blue pills? What did the chemists say? Fentanyl. They contain a detectable amount of fentanyl.

Now, the time period that's charged in the conspiracy is a long one. You heard a lot of testimony and saw a lot of documents that it started back in April of 2013 -- started in late 2013 and went through the search warrant on February 15, 2018.

You'll see in the Indictment itself that some of the conspirators are named. For example, Christopher McKinney is named, and you heard from him. Samuel Huffman, you heard from him, and others. Others like Philip Morose. I think there was another individual named on some of the recordings. Somebody by the name of Violator or King. So there are a number of other conspirators.

Conspiracy is very simple. It's really just two people coming to an agreement. Not a formal agreement, not a signed contract. That's certainly not going to happen in this case, but just an agreement that two people came

together and agreed in some way or manner to accomplish an unlawful plan and that the defendant knew the unlawful purpose of the plan. It's really quite basic.

So it's like I said in opening. It's like a partnership in crime, and we heard and saw lots of evidence of that partnership in crime, like the one between Dion Fisher and Sam Huffman and like the one between Dion Fisher and Christopher McKinney, where he left Dion Fisher's work bay with powder and pills in his Louis Vuitton bag, when he was stopped by law enforcement in late January 2018.

Now, the common and unlawful plan, we know what that is. That is blues or whites. Sell as many as you can. Make as much money as you can.

We certainly heard from Christopher McKinney just how much money he made. He made over -- he made about $1.4 million, and we saw just how much money Dion Fisher made because we saw how Dion Fisher spent all that money.

You heard Diane Knott testify that it was a conservative estimate of nearly $800,000, and we saw a lot of those assets, both in the form of assets removed from his house, from his residence on Nassau Court, as well as all of those vehicles.

Now, the weights. The weights, as I mentioned previously, they need to be found -- there is a portion of the verdict form where you have to find that there was 400

grams or more of a mixture or substance containing a detectable amount of fentanyl and a hundred grams or more of a mixture or substance containing methoxyacetylfentanyl.

We heard about all of those substances from those ten forensic chemists as my colleague, Miss Guzman, had them do their arts-and-crafts projects and this fine chart that was kept on this easel next to these chemists as they were able to write the weights. That's going to be a critical piece of evidence for you to look at. You'll be able to look at this exhibit -- may I approach again, Your Honor?

THE COURT: Yes.

MS. HOWARD-ALLEN: You'll be able to look at this exhibit and you'll be able to see these documents on the far right-hand side. Those numbers, as you'll see, are all in the 200s because those are the drugs, where the drug evidence is. And you'll be able to look on the exhibit list and see where some of those items were seized, and there are six pages here in this exhibit. You'll have an opportunity to look at all of -- all six pages when you are back there deliberating.

So I want to take a moment to look at some of those pages. You'll be able to look at 235 itself. And the weights that you'll need to find, the over 400 grams of fentanyl, that's charged in both Count One and in Count Six. So you'll see just from Count Six, as I get to it, is simply

the drugs from the search warrant from February 15th, 2018. It's a specific date in Count Six. It's what we call a substantive count.

The conspiracy is the overarching and that includes all of the drugs, every bit of drugs you see up there. But you'll see in just a moment as we look at just the search warrant locations, there is well over 400 grams just taken from Nassau Court, from Fisher's residence, from Fisher's work bay on 49th Street, and from Huffman's work bay on 66th Street. All the locations that the defendant had access to, provided materials, provided Mr. Huffman with pill presses, with all of the cutting agents. There is nearly 560 grams, you'll see, when you get to add it up for yourself.

As I indicated under the conspiracy, that includes not only the search warrant but we heard the three buys from Dani Kulic, the five pills and the two times 500 pills. So you get to add that weight, which you can add when you get back there, and that's another 91-or-so grams of fentanyl.

Then we get to add his co-conspirators' weight that Mr. McKinney testified about and that a couple of the Pinellas County narcotics detectives testified about, gathered from the car stop that night where he had pills and powder, from both of his houses where he had more fentanyl in his house, and then he had all those white pills in his other residence on Calumet Drive. And then he sent those same

detectives to a work bay location, and that added another 220 grams of fentanyl and over 2500 grams of methoxyacetylfentanyl that was in the work bay location. So you'll have an opportunity to see all that.

I would like to break this down for you.

You heard the forensic chemist Elizabeth Adkins, and she's the one who had to testify out of turn on the first day, and she brought in some of the evidence that was from the house, some of those smaller quantities. They were equaled up on those first four exhibits to 10 grams of fentanyl and some pentylone and some methoxyacetylfentanyl, all in Mr. Fisher's house.

Then you'll recall -- and you'll see when you get to Exhibit 228, that was where Mr. Kulic got a free five-pill sample from Mr. Fisher. Then when you look at the second page, you get to see -- and we will see shortly -- the pictures of the purple powder that was in the back of Mr. McKinney's car that he had taken from Mr. Fisher when he was stopped. That's another 59 grams.

Then there was this large quantity of methoxyacetylfentanyl at the Calumet Drive location, and then all of those items in 234 at the bottom.

Mr. Gilbert, Michael Gilbert, from the Pinellas County Forensic Laboratory was able to testify about a number of exhibits. And you'll recall Miss Guzman went through all

of those items with him, and they were all from the 50th Way and had a large amount of both fentanyl and methoxyacetylfentanyl.

The next page of the exhibit, the top two exhibits are the 500-pill buys that Mr. Kulic made in December of '17; the one on the 14th and 15th, in the wee hours at the Walmart; and the one a week later at the Walmart. Those were both about another 45 grams of fentanyl.

Then there was item 232, the 94 pills that were from the McKinney stop, and then there was the video where Mr. McKinney went to see Mr. Fisher at his 49th Street location and he wore a recording. We saw him leave there, meet up with the agents and give them 1588 blue fentanyl pills, and that's that final item. That is another 143.65 grams of fentanyl. The next page is entirely from the search warrant day.

As you can see, all of those weights, when we get to Count Six, that's charged as 400 grams or more of fentanyl on February 15th.

So we saw fentanyl taken from the 49th Street work bay. Remember Gary Corbett, all dressed in that level-B protective clothing, pulling items out of the back of the Maserati, the same items that we saw Mr. McKinney with about two weeks earlier.

Then we went and saw Brian Zdrojewski, who was

collecting drug evidence from the 66th Street work bay and taking pictures of pills and items they found in the black locker there. There is another 148 grams of fentanyl there.

Then we also found more items in the back of the Maserati, the purple powder, some more pills in the back there. There was a lot of blue pills and then just more that was pulled out of the back of the Maserati. There was brown powder, there was white powder, and then there was more blue pills from Mr. Huffman's 66th Street work bay.

Now, this is what you will be asked to do when you look at the verdict form. There would be a place in the verdict form, which is a lengthy verdict form because it covers each of the 15 counts and for the counts that involve weight, which will be Count One and Count Six, and then there is one other count that involves just one weight determination of more than 40 grams.

So this is what you'll be asked to do. You'll be asked to find whether it's 400 grams or more, or less than 400 but greater than 40, or less than 40. The same for the methoxyacetylfentanyl.

As we have just gone through all these pages in Government's Exhibit 235, all of those, I submit, the government has proven beyond a reasonable doubt by the admission of all of those bags of fentanyl, methoxyacetylfentanyl, and pentylone, that the government has

met its burden on not only the conspiracy charge and that there was possession with intent to distribute, there was distribution and there was manufacturing but, additionally, when you get asked to make this weight determination.

All of these items -- you'll recall we have heard the testimony of each and every one of these seizing agents at these varies locations. We started out with Brian Zdrojewski from the DEA who collected all the evidence from Mr. Huffman's 66th Street work bay.

Then Mr. Gary Corbett was all in the protective suiting at 49th Street. We had Agent McGee come and show you the drug evidence that was collected at Mr. Fisher's residence, and then Detective Carl Gwynne came in and showed us all of that paperwork that was taken out of Mr. Fisher's residence.

Then we had some other Pinellas County sheriff's officers, Joe Miner and Phil Pione. Joe Miner came in talking about meeting up with Dani Kulic after each one of those buys to take the pills after he followed him and didn't let him out of his sight and took the pills from him.

Then Phil Pione was in and was able to talk to you about being there when he saw Mr. McKinney stop and then followed him to his house -- to both of his houses and to his work bay.

Now, specifically, the substantive charges are

broken down and all of Dan Kulic -- right after the conspiracy charge are all of Dani Kulic's charged possessions with intent to distribute and the distribution of fentanyl. Count Two is the five-pill sample that occurred on the 14th of December. Then the other two are the buys at Walmart.

You can clearly remember some of the quotes I provided to you from the videotaped recordings of Dion Fisher, doing what he does best, talking about selling drugs to Dani Kulic.

(Audio played.)

MS. HOWARD-ALLEN: "Are they real? No. They are real, but they are not real. They are pressed. They are no bung shit." Those are Dion Fisher's words, and he was going to prove that by giving him that five-pill sample.

We also heard how many pills does he sell at a time. As I told you in the opening, he only sells a hundred at a time, but that's way down from what he sold previously.

(Audio played.)

MS. HOWARD-ALLEN: Trying to get back to selling 2- to 3,000 a week, because that's what he was selling when he made all that money that we saw him spend that summer of 2015, in June, July, and August, when he provided $35,000 four times to Konrad Guzewicz.

Then we saw them, Dani Kulic and Defendant Dion Fisher, walking through the Walmart late at night and selling

him those pills that were provided to him behind that bottle on that shelf in the produce aisle.

We heard his main customer. Who was Dion Fisher's main customer that he was looking for when he was talking to Dani Kulic? That's right, people who got scripts. People who could go to the pharmacy and get real oxycodone, but he would rather have them buy his fake oxycodone, his oxycodone pills that were made with fentanyl.

(Audio played.)

MS. HOWARD-ALLEN: They don't want the ones from the pharmacy no more. They want the ones with fentanyl so they can buy more pills from Dion Fisher and make more money.

Then we saw the Count Four. That happened on 12-20 at the Walmart. And as you see, Dion Fisher is coming out of the bathroom, right there, with Dani Kulic, who told you, yeah, I had those pills that he gave me in the bathroom. I have them in my pocket.

And what does Dion Fisher have in the pocket of his Wu Tang hoodie in there? He has the $2,500 that Dani Kulic gave him to buy the 500 pills.

Again, there was more talk about what does he really want. If they are not getting the scripts and they've gotten clean, what would he rather have? He would rather have them get addicted again and take more fentanyl pills, become addicted to opiates again.

You heard these forensic chemists and these others testify about how addictive opiates are. You heard Christopher McKinney tell you how he struggled with his addiction and had to go to detox.

(Audio played.)

MS. HOWARD-ALLEN: Yep, get them addicted again so they can buy more fentanyl pills.

Now we go to Count Five. Count Five, as I indicated, is one more count that has a weight requirement on it. This is more than 40 grams, and this is the night -- it's charged on February 2nd, 2018. It's the night that Christopher McKinney left the 49th Street work bay after he had worn a recording, and you saw that video and you heard Christopher McKinney talk about it.

He left with the 1588 pills, and he thought he was going to get 4,000. But what he left with and what they talked about was doing more, and they left with these -- what was about 1600 came out to 1588 pills. It was in that soft Louis Vuitton bag that we saw, and that's still in the drug evidence bag that came from the DEA.

And you saw this recording. That was Mr. McKinney himself, sitting in his office, talking about how -- this is talking amongst two trusted partners in the pill business, and they are talking about how can we adjust the strength. How can we figure out these bags of purple fentanyl. How can

we figure out how to make it stronger. You heard some of that here on the recording.

(Audio played.)

MS. HOWARD-ALLEN: You can make that as strong as you want, because he and Christopher McKinney came up with that recipe. So you heard Christopher McKinney explain three over a hundred, two over a hundred. That was how much diluted fentanyl they would cook and add to the different binding agents, to the magnesium stearate, to the microcrystalline cellulose. That was them talking about how to continue to make more pills.

At that time Mr. McKinney wasn't making more pills. He was there recording Mr. Fisher talking about their drug business. And you heard Mr. McKinney also tell you how they started. They started pressing Molly and Ecstasy pills at first, and how they came up with that recipe and how Dion Fisher came up with the idea that, hey, let's put these stamps on it so it looks like the pharmacy brand oxycodone. So it's stamped with A/215 or ETH 446 on the white ones.

You heard him talk about selling. You heard Mr. McKinney saying he sold hundreds of thousands of the white pills to Phil Morose or to Boston Pete up there. Yet, when Dion Fisher was talking to Dani Kulic, what was he talking about? When they made white pills previously, because he was in a conspiracy with Christopher McKinney.

(Audio played.)

MS. HOWARD-ALLEN: Yep, that was Dion Fisher saying he dealt with the white ones a couple of years ago. They were smaller. They weren't the big ones. They were the smaller ones. We saw those. We saw a whole bucket of those from Mr. McKinney's Calumet Drive.

Then we turn to the final two substantive counts, Counts Six and Seven. These involve, as I previously told you, the search warrant where we found more than -- as I indicated, when you just added that up from this chart, you would be well over 400 grams. And that would be -- I think the figure was about 560 when you added all that up.

Then Count Seven, the same day, is also a pentylone charge, a possession with intent to distribute pentylone, which the judge will tell you, at the time she instructs you, is a controlled substance.

The pentylone was the final exhibit that was testified to by the forensic chemist. It was Exhibit 216, and you heard the chemist testify it was 18.4 grams of pentylone. You can see that was one of the many packages of powder that was taken out of the back of the blue Maserati from the 49th Street work bay. Gary Corbett took a bunch out of the white box, took a bunch out of that yellow Louis Vuitton bag, and this was the chunky brown powder that came out to be pentylone.

I think Mr. McKinney told you just what pentylone is. It's a substance, a Molly-like substance. It's like Ecstasy. It's what they use to make the Molly pills that they spoke about, using whenever they traveled. And almost all of these witnesses and all of the people that Dion Fisher picked as his co-conspirators, they all use drugs. Even Dion Fisher.

You heard him explaining about how some good Molly made him feel. Like a heater when it ran up and down his body, he said in his own words to Christopher McKinney.

You remember this work bay, this 49th Street -- 13791 49th Street North, Unit B, Clearwater. This was the place that we saw the electrical bill in the name of Million Dollar Plans, and it was the address for that service. The bill was sent to Nassau Court and the service was provided here by Dion Fisher.

You saw in that video -- yes, you saw Mr. Fisher hold up that big bag of purple powder, the same purple powder that was brought into court here and is sitting up here, Exhibit 214.

From that video you saw him holding up that purple powder, and that was on February 2nd. And just less than two weeks later, you saw Gary Corbett, in his white suit, pull that out of the same exact location, at the back of the Maserati. The same purple powder that Christopher McKinney

and he spoke about. How can we make it purple again? Is it stronger? What did we do to get it to be purple?

Then we went to the 11788 66th Street North, which was the automotive location that Sam Huffman came in and talked to you about. You remember Sam Huffman. He was what Christopher McKinney referred to as the pressman. He pressed and sold pills for Dion Fisher and he also traveled with him. He also came here and told you about going to a boxing fight with Dion Fisher in Las Vegas.

What you saw at that work bay location, in that black locker that they had to pry open, was just a fentanyl manufacturing locker. It had everything you need in there. And Sam Huffman told you every item in there; how he used it and how it was provided to him by the defendant (indicating), by Dion Fisher; how he would bring the fentanyl, cooked in that Pyrex dish, which is right on the top of that locker; and he would cut it on that giant tray and put it in the grinder and put it in the mortar and pestle, all these items that were brought to him.

Then he would put it in this pill press, this electric pill press. He explained to you how you stuck a drill in and made it work as a motor, because he was the mechanical guy. You can't make these pills without a mechanical guy to make the pill press work because you saw -- you can't get the pill presses. They get stopped. They get

stopped by Customs. There was pill presses coming from China to Dion Fisher and Christopher McKinney, and both of them were seized. Why? Because Brian Zdrojewski from the DEA, from the Diversion Unit, told you they are controlled by the DEA and you need to be registered to get one.

You needed someone to fix these broken pill presses. Who was that? That was Samuel Huffman. You heard him go through each of these items and the recipe; items that were provided by Dion Fisher. In fact, some of these boxes at Huffman's 66th Street bay, what did they have on it? They had the label that's in evidence. It says, to Dion Fisher at Nassau Court. This is at the 66th Street work bay location.

You heard Sam struggle with, "I tried to remember what the recipe is," And on the Exhibit 125, there on the bottom, he had to write "13" himself, and he changed it from 12 because he couldn't remember how much to make the magic combination.

Remember, he didn't even know the names of these. He said one was fluffy, one was shiny, one was white, one was blue. He knew what he needed to do to make it work in that pill press so that the pill came out firm and looked good.

These were the pills that we found there at Huffman's work bay location. These were Dion Fisher's pills. And you'll see -- when you look on Government's Exhibit 235,

the forensic chemist's arts-and-crafts project, you'll see on 221 that fentanyl that Sam had pressed, that Dion Fisher had access to because he had a key to the work bay and he had a key to the locker and he had the combination to the little tan safe inside where these pills were waiting for Dion Fisher to pick them up to sell. To sell to more addicts, to sell to more people who were getting scripts, to sell them for 5- or $10 a pill. Because why? Because selling pills made Dion Fisher a lot of money.

That brings us to the eight money laundering charges, and you'll see them in a chart format when you look at the Indictment. There are headings across. The money laundering transactions are, first, the counts, which would be Nine through Sixteen, and those will have the deposit date, because there has to be a transaction amount over $10,000, and then they will have what is the transaction, what was bought. Was there a check. Was there a wire transfer.

We went through those money laundering charges with Diane Knott. We also went through them with -- first went through them with Konrad Guzewicz because four of those counts -- and they were numbered. They are numbered in order, so that's why you don't see them right in a row because there were so many money laundering transactions over the summer that these checks were sort of disbursed among all

the assets, amongst buying the Maserati, Bentley, and the Audi R8 and the piece of property.

So what you have is Counts Ten, Eleven, Thirteen, and Sixteen are the $30,000 checks that Dion Fisher deposited after he took $35,000 in fentanyl proceeds. $35,000 in cash that he made from selling fentanyl and didn't want to take that bag of cash to the bank and try to put that in. It was a lot easier to put in a $30,000 cashier's check or $30,000 personal check because it might look like he was doing real business as opposed to narcotics, selling fentanyl.

Those four dates, June 19th was the first check you heard Konrad Guzewicz and Diane Knott testify about; July 17th, Count Eleven; and then just a mere ten days later, Konrad Guzewicz got a whopping $70,000 of cash in about a week's time at the end of July and then again at the end of August.

And you'll remember the chart that Diane Knott did to kind of summarize these checks, with the checks that Mr. Guzewicz wrote. And you can see, not surprisingly, they were from four separate accounts because that made it easier to hide. He had four accounts to choose from. He sent one from each of his personal accounts and one from each of his business accounts.

Mr. Guzewicz also was able to talk to you about Count 15, which was when Dion Fisher purchased a $22,000

check that he had to provide to Onyx in order for Onyx Automotive to pay $42,000. So maybe these salvage cars are cheaper, but $42,000 is not a cheap car to buy in cash.

You heard Mr. Guzewicz say that he had to provide the funds for that because it was an online auction. And why did Dion Fisher pick Konrad Guzewicz? Because he had a dealer license. You can't buy these cars. You can only buy them when you have a dealer license.

But, yet, Mr. Guzewicz also told you, I had to make sure I had that money because I don't have $42,000. I need the cash from Dion Fisher. Once I sit with him and I agree to maximize the bid, I agree that we won that bid, and then I have to come up with the money.

And so how did he come up with the money? That was when you saw a Hancock Bank receipt that Miss Knott told you that sometimes they write who is this check going to. It's going to Onyx Automotive. And whose signature is that? Dion Fisher's, from that account that she went through and showed you all that money in, the Hancock Bank account ending in 9814 and the $22,000 check.

What did Mr. Guzewicz also tell you? He told you about counts that aren't even in the money laundering charges. He told you he bought Porsche Panamara from him for 27-, $28,000. In addition to the Audi R8, there was a BMW, and he also told you about the Aston Martin. He bought the

Aston Martin from him for another 27-, $28,000 in '16. That Aston Martin, he told you he had actually sold him rims because the previous rims, they were sold to Dani Kulic's friend, and Konrad Guzewicz said -- he remembered somebody coming to buy the Aston Martin rims and him putting new rims on it.

So in addition to selling him all those cars and getting all that cash, he also got the $140,000 to launder in return for those clean checks. Out of that 140,000, he was able to clear 20,000. He got $5,000 for writing a check.

All of those were -- all of those Konrad Guzewicz transactions were placed on here. And what was the -- in addition to the dealer license, why else did Dion Fisher pick Konrad Guzewicz? We saw some of his paperwork. We saw it didn't really matter if the purchaser was there. It didn't matter because he would just put it on his brother, get his driver's license, put some inflated trade-ins on. It was to his advantage.

Then we also saw Count Nine, which was the wire transfer that Miss Knott spoke about and showed us this chart where he purchased this Maserati, the one on the right that Konrad Guzewicz told you was a chrome wrap where he wrapped the car in plastic gold. And then we also saw it after it was emptied out of all the fentanyl when it came out of the 49th Street location.

This was the summary of the chart of how he took the money, the cash, into the bank to write the cashier's check to do a wire transfer of $22,950 to pay for this 2008 Maserati GranTurismo. I think you heard him talk about it when Dani Kulic and him were bragging about Lamborghinis and high-end cars. He said, yeah, I got a Maserati GT.

Then you'll see Count Fourteen. That was the $30,000 check to pay off the silver chrome wrapped Bentley that you see in front of the AK Tires. That was a check that Miss Knott explained to you was a payoff of the Bentley because the Bentley was nearly $70,000, and he had made a $30,000 down payment, in cash, that Miss Knott included in the cash transactions in that over $800,000 figure.

Then he paid it off with National Auto Lenders by writing a $30,000 check that conveniently was a $30,000 check he had just gotten from Konrad Guzewicz a couple of days earlier. So that enabled him to pay off the Bentley. We saw this transaction also charted out by Miss Knott and also including this $30,000 check with the remitter of Dion Fisher.

You'll see right there that portion of the pay off (indicating). There is a $30,000 down payment, but what's Count Fourteen is the actual $30,000 payoff check.

Then the last money laundering transaction that Miss Knott spoke about was the piece of property. Again, having gotten $30,000 from Mr. Guzewicz in a check after he

gave him $35,000, he was able to send a wire transfer to Stewart Title to buy a piece of property in Zolfo Springs on July 21, 2015. That's Count Twelve. And this is a portion of how the chart's listed when you see Nine through Sixteen in the Indictment.

This chart was the chart that Miss Knott explained to you with the settlement paperwork for the $30,000 wire transfer, which is Count Twelve.

Then we found all those assets that Detective Gwynne detailed through the Dion Fisher residence. What did we see there? All those high-expense items. The plane tickets, the boxing fight, the expensive jewelry, the $20,000 appraised Bentley diamond pendant, the $10,000 Mayweather-McGregor fights. And you'll remember when Mr. Kulic was talking about what he would like to use his money for and how he needed to go --

(Audio played over attorney's statement.)

MS. HOWARD-ALLEN: That's what Dion Fisher used the fentanyl proceeds for, to live, but also to buy all these high-end items. Go to Gucci, go to Louis Vuitton. We saw all those expensive items.

We heard Diane Knott. Where did all of Dion Fisher's drug money go? High-end cars, jewelry, travel, all that high-end retail. And then we also saw that he, obviously, had to continue to buy more fentanyl. And we saw

some of that when we saw the money transfers to all those names and the travel to China.

So, ladies and gentlemen of the jury, after these five days and all of this evidence and all of the witness testimony that you heard, I submit that the evidence -- when you have an opportunity to look at this evidence yourself, I submit that the United States has met its burden in proving beyond a reasonable doubt that this defendant, Dion Fisher, is guilty of all 15 charges.

He's guilty of the distribution and manufacturing conspiracy, all seven substantive counts, the three counts of distributing fentanyl pills to Dani Kulic, the one count of distributing the fentanyl pills to Mr. McKinney, and the two counts of fentanyl more than 400 grams at his house, and then the eight counts of money laundering transactions.

Now, Mr. Martin will have an opportunity to speak to you again, and I will speak to you after that and be asking you again to find that the defendant is guilty beyond a reasonable doubt based on the evidence presented by the United States.

Thank you.

THE COURT: All right. Thank you, Miss Howard-Allen.

I now recognize Mr. Martin for his closing argument. Mr. Martin, you may proceed, sir.

MR. MARTIN: Thank you, Your Honor.

Good morning. May it please the Court, Counsel.

When I first talked to you briefly when this started, I asked you to keep -- I pointed out three things. One of them was to keep an open mind. It still applies because you really haven't gotten the most important part of the trial, which is the judge's instructions on the law.

Basically, you are the fact-finder. You decide what the facts are and then you apply those facts to the law that the judge gives you. So believe it or not, that still applies.

I also talked to you about evaluating witnesses, and the defense kind of looks at closing argument as it's not really an argument. It's just an opportunity for me to provide some assistance in your evaluation of the evidence, because what the defense thinks the evidence is really doesn't matter. What the government thinks the evidence is doesn't really matter. It's what you decide the evidence is.

I said one of the things you will have to do is evaluate witnesses. In this case you had lots of witnesses, and they kind of go from the scale of a witness who I would say doesn't have a dog in the fight, and the only example of that I could come up with was Roman Hernandez. He's the IRS agent. He's a government guy, but he doesn't have a real dog in who wins this case, one way or the other, and all the way

to Christopher McKinney, who probably has the biggest look at, hey, what can I do to help myself with the result of this case?

You have everybody in between. Agents who put time into this. The chemists were kind of unique in that all of them have worked, basically, at the Pinellas County lab or the DEA lab their whole professional careers.

You had a financial analyst that works for the government's office. Not anybody independent but works for the U.S. Attorney's Office, the actual prosecutor.

But you are going to have to look -- you have people under the influence of drugs, so you are going to have to evaluate all the witnesses and determine what you can believe and what you can't believe from the witnesses like Christopher McKinney, Sam Huffman, Mr. Guzewicz -- and I'm not butchering his name on purpose -- who clearly have motive after motive to lie.

I also ask you to look at, okay, does the science fit the government's overall theory; and the government's overall theory, particularly with the conspiracy, is this has been going on a long time. For years.

Fentanyl is dangerous. I'm not going to go too much more into that because it was pretty obvious from the evidence. It's dangerous. Look at all of the precautions. You suit you. You're in a closed -- almost a biological-type

suit, to touch it. The chemists put a skull and crossbones on it. It's, obviously, a dangerous substance.

And then you look at the government's theory of what's been going on, and perhaps the best example of that is Mr. Huffman. And you decide who to believe or not believe. But if you believe what he said, he would have had -- he wasn't real clear on dates -- either for a year or two years, two or three nights a week, in a closed-type environment, high as a kite on cocaine, with no protective gear whatsoever, powder probably flying everywhere, around the stuff.

It couldn't happen. He wouldn't have been walking in here. It just couldn't have happened. No protective gear anywhere. So this couldn't happen.

The government's overall arching theory scientifically could not have happened. The only person ever -- and there was no protective gear anywhere in any of these sites searched. The only person that talked about protective gear is Mr. McKinney, who, on his own, in his own fentanyl lab, his own pill-making business, testified, hey, I use a mask, et cetera.

Now, the government, of course, actually sent Mr. McKinney into one of these dangerous things on February 2nd.

Now, the videos, the judge is going to instruct

you on the videos and audios. The judge is going to instruct you that you decide who is on the video and audios. Okay? And that's up to you. I'm not going to tell you that Dion Fisher was or was not on those videos or audios. That's up to you.

But I'm going to talk to you as if he was because, frankly, if you go back there and independently decide he wasn't, I really don't need to be addressing you about any of those things. I'm going to talk to you as if he was.

Let's talk about the Dani Kulic counts, Counts Two through Four. Okay? And Dani Kulic is probably an example of a witness that has something to gain with this, who is doing a heck of a job with the system. He's a cocaine trafficker, caught back in 2016, and nothing has happened to him. He's pretty good at it. McKinney, Huffman, Guzewicz, they are striving to be as good as him. Kulic mastered it.

Now, you decide what you see. I'm just going to point out a couple of things to help you in your evaluation. You never see Mr. Fisher hand anything to Mr. Kulic. Now, the quality of the video and audios, because the judge will instruct you and the government has already told you, they have to prove each and every count beyond a reasonable doubt. That's a heavy burden. The heaviest burden in law.

The defendant is presumed innocent and doesn't have to present any evidence. It's the government's show.

Now, the quality of the videos and audios, with Kulic, the first one, the audio sounds pretty good but the video you can't really tell. I mean, these are professional DEA narcotics investigators with years and years of experience and they can't bring you a video that shows anything.

The Walmart, 15th and 20th. No DNA or fingerprints on any of those things that Mr. Fisher allegedly handed to Mr. Kulic. Okay?

The government talked to you earlier and played you several snippets of what is allegedly Mr. Fisher talking. The one thing I would caution you -- and it's, again, up to you to decide who is talking or not talking on that video. But one thing I would caution you in each of these things is you can't take what's being said on any of those audios as the truth.

Let's start on one side. We know it's not the truth, okay, whoever the government is sending there. Dani Kulic is not being truthful. Christopher McKinney is not being truthful. They are actually told, you know act -- so you take one side and it's not him. If that was Mr. Fisher talking to Dan Kulic, I would suggest the conversation is more, whatever you say, I can top it.

If Mr. Fisher was talking to Mr. Kulic -- one of the best examples of that is when they are talking about

cocaine. Now, unbeknownst, allegedly, to Mr. Fisher, Dani Kulic is very familiar with selling and prices of cocaine. That's what he does. He's a cocaine trafficker. So to say, I can get it for 17 and Kulic saying, well, I can only get it for 30, that's an example of whatever you say, I can top it. There is no evidence Mr. Fisher was involved in cocaine in any way.

So take the -- the government will want you to say that everything Fisher says is the gospel truth on that. He says he was dealing a lot of pills earlier. He was dealing a lot of pills earlier. That is, can I top whatever you are going to say? So take that with a grain of salt.

Take the count of McKinney. I'm talking about the Count Five where McKinney is working for law enforcement to save his soul. Keep in mind, McKinney had a key to this B2. If the government would have wanted to, they could have completely videotaped and audiotaped that whole thing. You could be seeing whatever went down in there. Both sides of it.

You could be seeing McKinney; you could be watching a movie. And with the amount of investigators involved in this case, it should have been an Academy Award quality. You never see McKinney hand anything. And, again, McKinney had access to this area. No forensics done. No fingerprints or DNA.

Let's talk about the searches a little bit. I will address McKinney in particular a little bit later. Huffman, the 66th Street storage area, basically Huffman gets caught and his reaction is that everything bad belongs to Fisher, not me. I'm just the littlest guy that could be.

And Fisher has a key. Well, you know, we know everything that might have belonged to Mr. Fisher was searched thoroughly by law enforcement. Where is the key? Where is the key that he had? Well, if he had one, guess who would have it. It would be right there on the table.

Huffman has a deal. And I'm not going to get into all these guys' drug habits. He's a coke head. So you have to take everything he says with a grain of salt.

He has a deal. He's trying his best. His model ought to be Kulic. So I'll point the finger at Fisher. The only thing that can possibly directly connect it to Fisher is Government's Exhibit 27, which Huffman says was factory sealed when he got it and comes from Wish.com, a clothing and apparel thing. Nothing to do with drugs, even according to Mr. Huffman.

No forensics done at 66th Street to connect Fisher to it. If Fisher was in there, day in and day out, there would be forensics there. You wouldn't have to take Mr. Huffman's word. You would know.

Now, 49th Street, whose place is it? Fisher or

McKinney. McKinney had just as much access to it. Nassau Court, what you find there, I would submit, are user type of amounts, not traffic-type amounts of drugs. Some of it is even found in the back yard. No evidence other than Mr. Fisher, who is in and out of there, et cetera.

The amount of drugs? The government went through that. That's up for you to decide. The qualitative analysis was done. All the chemists said there's -- I'm just going to use the word fentanyl. I'm not trying to be misleading. There were other drugs identified. I'm just going to use fentanyl. Okay?

No way in any of this is the -- what I'm trying to discuss with evaluating the evidence is -- the defense is not trying to be misleading. I'm going to use fentanyl. You really want to know why? Those things are hard to pronounce. I didn't learn them, so I'm not trying to be misleading there.

The illegal money transactions, the defense will concede that's a lot of money. More than I've got. I hope not more than you've got, but I would bet it is, if I had to bet. But I hope I'm wrong on that.

Now, with that said -- remember, the judge will instruct you that it's a heavy burden of proof. The government has to show you that came from illegal drug-type transactions. Not a presumption that someone like Mr. Fisher

can't earn the money selling jewelry, real estate, tires and rims, et cetera. You alone can decide that.

Konrad Guzewicz, another one trying to do what he can for himself, and a little different. He's also probably protecting his wife, another coke head. And it was kind of interesting when he was asked, you know, at first, what did you understand the money to be coming from? Real estate-type transactions or something like that? And then the government said, well, later did you learn it was drugs? Yes. Never really describes how and never when, when later was. Was later three years from now when the prosecutor started looking into it and told you? So you don't know when that was.

So the evidence that Guzewicz -- and I wasn't clear from the government for sure whether he was a member of the conspiracy. At the time there is no evidence that Mr. Guzewicz knew about drugs; but if the government needed him to testify that he got the money from drug sales, he'll do that.

Mr. Guzewicz is shady. He's shady. I kind of got tired listening to him testify about falsifying paperwork from anywhere from false registrations to inflating or deflating vehicle values, et cetera. It sounded like he's still working on his taxes, because every time the government discovers something he did wrong, he has to amend them. He

is shady. You know, put Fisher's name on money orders that weren't from Fisher.

There is money going between him and Fisher. No question about that. But you can't really believe a word he says. And him saying, I got 35,000 and I gave a check for 30, is not proof beyond a reasonable doubt. It's proof enough for the U.S. Attorney's financial analyst. You know, Mr. Fisher gave him 30,000. Can you tell that from the bank accounts? No.

Well, the defense would agree that probably you might not be able to tell it from the bank accounts, especially with a guy like Mr. Guzewicz, who, you know, in spite of what he says, moves around money all the time, apparently. But it's not proof that it happened. It's not proof that it happened, and the defense is not required to prove it didn't happen. So all you really have is Guzewicz's word.

Diane Knott works directly for the prosecution. Some of her testimony is very helpful; some of it is based on assumptions. You have to decide what the true facts are and what's been shown beyond a reasonable doubt.

The defense will say it might have been helpful to have somebody a little more independent testify about that type of stuff.

It's just an assumption that someone like

Mr. Fisher could not make money other than selling drugs. And the fact that he did not file his income taxes, although that's a crime -- that's a crime -- he's not charged with it. Okay? If he was charged with that, the defense would say convict him because he didn't file.

So you've got to consider -- you are allowed to consider that somewhat, but the judge will instruct you even on these offenses, if you decide he's guilty of one count, that doesn't mean he's guilty of another.

Let's talk about the conspiracy, this over-arching thing. I'm not going to redo the "science doesn't make sense," but that's a role in that.

What is a conspiracy? Well, the judge will tell you what a conspiracy is, what the law is. Anything that I say that conflicts with the judge -- she's the boss, not me, and it's not intentional. I'm trying to sum it up. I agree with the government. It's an agreement. It can be informal and oftentimes is. It's kind of like a partnership. Kind of like a partnership.

So the government kind of threw out in their opening argument that maybe Phil Morose is a conspirator with Mr. Fisher. I'll briefly touch on that. If he is, maybe it would have been helpful for him to testify. And remember who has the burden of proof. All you heard about was one time Mr. -- and you are getting this from Mr. McKinney, who I will

talk about in a minute. But that's all you have, is McKinney saying, yeah, Fisher was with me one time when I met him and went clubbing with us a couple of times -- or once.

Nothing to indicate there was some type of partnership between Mr. Fisher and Mr. Morose. Violator, I heard. The defense heard the name. I don't know where that directly comes from as far as the partnership, what the direct evidence or circumstantial evidence is of that.

Again, if he is involved and a conspirator with Mr. Fisher, it might have been helpful for you to see and hear from him.

Okay. Let's talk a little bit about conspiracy. I've talked about Mr. Huffman a little bit and Mr. McKinney a little bit. But, again, both of them have plea agreements and are trying to point the finger at Mr. Fisher to stay out of jail and make their own involvement look better.

With Mr. Huffman, what was the agreement or, more importantly, what was the kind of partnership with Mr. Huffman?

If you believe him -- if you believe him, he got around $250 a night to work all night pressing pills, using dangerous chemicals without any protection, in a closed environment. No. 1, there are signs it didn't happen, but if you believe that -- and, again, you know, the defense would ask you to consider everything we say. If you disagree with

some things, you know, consider the other things I say. But if you believe that, that "ain't" a kind of a partnership. That's indentured servitude or slavery. That "ain't" two kinds of partners. That's not a conspiracy. Just because someone, if you find it, worked for someone, that doesn't mean they are in a conspiracy. A conspiracy is a little more. It's an agreement and it's a kind of partnership.

Now, let's talk about Mr. McKinney. I would suggest Mr. McKinney is Mr. Smooth. This guy -- and the best example the defense can point to that is the phone call from drug rehab. Not rehab. Detox. He's seriously in detox, allegedly coming off a serious addiction. How smooth does he sound on that phone call? The defendant believed he was in Texas. The guy is very smooth.

And if you believe the government's kind of theory -- the defense would concede these two knew each other. He is so smooth. Even somebody that knows him or somebody that knows him well would not have any idea when he was lying. Okay?

If you think for a second that your evaluation of him -- and this is the only time that I'll be this strong, because you are the evaluator of evidence, but I would suggest, if you think for a second that by meeting him for two hours on that witness stand you can tell when he's telling the truth or when he's telling a lie, you are wrong.

That guy is smooth. You cannot believe a word he says.

Now, conspiracy, again, kind of a partnership. Let's look at McKinney. McKinney cannot -- the defense would suggest, cannot be partners with anybody. He can't be in a kind of partnership with anybody. You can't trust him as far as you can throw him.

There's plenty of examples. Look at -- let me see if I wrote down the name. The kid from USF who introduced him to Morose. I think it's Robbie. I could be wrong on that. I'm not trying to be misleading if I'm wrong. I'm getting old. I'm not as sharp as I used to be.

What does he do with Robbie? Were they in a conspiracy, him and Robbie? You might think so. Robbie might have thought he had an agreement. Robbie might have thought he had a partnership. Guess what? He didn't. The minute Mr. McKinney had a chance to cut him out, he did.

They weren't in a kind of partnership because you can't be in a kind of partnership with someone like Christopher McKinney. If you look -- if you believe what Mr. McKinney is saying, look at his relationship with Mr. Fisher.

Boston Pete, Phil Morose, whatever name you want to use. What happens there? Basically the minute he can cut Mr. Fisher out of it, he cuts him out.

Mr. McKinney can do everything, but he's not going

to admit to having the ability to get fentanyl. That guy is pretty smart, but I can't do that, because that's bad. Maybe the government might not give me as much of a break.

Okay. What's he do with Mr. Fisher, if you believe him? He creates a fictional guy named Canada. Not only can Mr. Fisher not be in a criminal conspiracy with Mr. McKinney, nobody can. You cannot be in an agreement with Mr. McKinney, unless the agreement terms that you want to be in, whether formally or informally, is, I agree, Mr. McKinney, to let you rip me off as much as possible.

That's the only type of agreement you can get in with that guy. You cannot be in a kind of partnership with that guy because, again, the only kind of partnership is Mr. McKinney, I agree -- I partner with you for you to try to take advantage of me at every opportunity and turn. Just can't happen.

Okay. Another example about this is when he gets arrested on January 30th. If you look at Government's Exhibit 231B, he says, I just got all that stuff from Mr. Fisher. I've just been to 49th Street, and apparently he had been there; but if you look at 231B, you'll see that he already had the number labeled on it. Remember when we saw everything at McKinney's house? He had numbers on them. Anything seized from 49th Street didn't have numbers on them. McKinney didn't put a number on it leaving 49th Street. He

didn't have a Sharpie in his car. That was his stuff.

The defense doesn't get an opportunity to talk to you again because the government bears a heavy, heavy burden of proof. Beyond a reasonable doubt. So a notion of fairness, the law says, hey, since you've got all the proving today, you get to go twice.

The defense hopes what I tried to accomplish was accomplished. It's really not so much argument, although it's hard for lawyers not to do that, and I always slip into it, but really the attempt is just to give you some things that may help you analyze the evidence.

The defense is confident and Mr. Fisher is confident that once you do that and follow the law that you will come back with a verdict of not guilty.

Thank you.

THE COURT: All right. Thank you very much. We can either take a break now, Miss Howard-Allen or --

THE JUROR: Yes.

THE COURT: -- take a break.

Ladies and gentlemen, we will take a ten-minute break. Please don't discuss the case or form any opinions yet. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 10:24 a.m.)

THE COURT: So we will resume in ten minutes with

your rebuttal closing argument.

(Recess taken from 10:25 a.m. to 10:38 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: You are ready with your rebuttal closing argument as soon as I bring the jury in?

MS. HOWARD-ALLEN: I am, Your Honor.

THE COURT: All right. We will bring them in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 10:39 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Miss Howard-Allen, are you ready with your rebuttal closing argument?

MS. HOWARD-ALLEN: I am, Your Honor.

THE COURT: You have up to 30 minutes with your rebuttal closing arguments. When she finishes, we will go straight into jury instructions. If at any point anyone needs to take a break, let me know. That's fine.

Go ahead, Miss Howard-Allen.

MS. HOWARD-ALLEN: Mr. Martin and the defense has conceded there was lots of money. How about that? But there was no evidence that the money was anything that came from anything but Dion Fisher selling fentanyl pills; that is, unless that one record that said that he was employed by his

own company, Top Dog Hot Dog, where you saw a lot of the fentanyl proceeds, I guess that would be evidence of some employment by himself, but we saw Bitcoin and other kinds of drug money in there, or maybe an e-mail where he signed as a real estate marketing specialist.

What the evidence shows is the proceeds and all the money in the 98106 account was fentanyl proceeds. And what you will be instructed with when the judge instructs you on the money laundering transactions is that transaction -- the elements involved that transaction and that it involved some proceeds of some criminal activity and was more than $10,000 and that the property was, in fact, proceeds and that the transaction took place in America.

So what we saw was that money in those accounts was fentanyl proceeds, and we saw Bitcoin from when the defendant sold Molly and sold fentanyl on Silk Road, and also all the money that he deposited in there that was drug proceeds that he gave to Konrad Guzewicz when he gave him those checks.

And Miss Knott, independent or not -- independent or not, Miss Knott, she was looking at bank records and business records. Those are independent. Those are items that a bank and a business keeps, and those records don't lie.

Now, Mr. Martin would have you question the videos and somehow think that they should be professional quality.

Well, did you see the DEA present in any of those video transactions? They were inside areas that it was only the Defendant Dion Fisher handing pills to Dani Kulic or Christopher McKinney. Only the two of them were there, and they aren't professional DEA agents.

They deal drugs. They are not used to going, let me record this; let me record this perfectly. And even Mr. Martin is going to ask you to take what Mr. Kulic said in this witness stand with a grain of salt.

And you can, because the evidence of what Dani Kulic did is in those bags. It's the pills that he brought out of there and gave to the DEA agents, and they were tested by the chemists who said that's fentanyl.

The evidence is the videos that are in evidence, and there was no one else in those cars but Dion Fisher and Dani Kulic and in that Walmart.

On those tapes you heard him say those small acknowledgments of him putting the pills in the cup beside him, saying I don't have to give you nothing for these, for these pills. I don't have to give you anything because that was a five-pill sample.

You'll be told to treat their testimony with caution, but not the evidence. Not the evidence that was gained from them. And he wants to wonder about fingerprinting. Well, if these items that you've seen up

here were so dangerous that they had to be double bagged, I dare say we are not going to get fingerprints off an item that's double bagged. But if we did, you would certainly have seen his fingerprints. On that video you saw him holding up that fentanyl purple powder in his hand on a video.

Now, Mr. Martin talked to you about Sam Huffman. You heard in some of those videos -- you heard just what Dion Fisher thought of Samuel Huffman. You heard what he called him and how he made fun of him. You heard Sam Huffman, in fact, tell you himself that Dion Fisher yelled at him and screamed at him and cursed at him when he got things wrong, when he got the recipe wrong, or when he made the money order payment wrong when he was paying money to China, that Dion Fisher was having him send because he could no longer send money on money orders.

So much for him being a paid servant. That's exactly how he treated him. And he also indicated -- Mr. Huffman also said he didn't just get paid that paltry amount of money. He also sometimes sold pills. And who did he pay to sell the pills? If he was selling pills himself, he paid Dion Fisher for those pills that he pressed.

And you also heard him say, does Sam Huffman look like the kind of guy who is going to go to a $10,000 boxing fight and buy a ticket? No, because Dion Fisher was taking

him there. He was partying with him. He was buying -- like partying. He was taking him on trips. He paid for his own plane ticket, but he didn't pay for his boxing fight ticket and all the partying that went on there.

Then what you saw at Mr. Huffman's 66th Street bay. That was that label on that box with Wish.com that had binding agents in there. They might sell that as well, but it wasn't addressed to Samuel Huffman. There was no clothes. He told you there was no clothes there.

What was there was binding agents. Magnesium sulfate, microcrystalline cellulose, and a press, is what was in those boxes. There was no clothes. There wasn't any evidence that Wish.com had anything but those drug-producing items that Dion Fisher gave to Sam Huffman to produce the pills.

The notion that that messy shop we saw -- and Mr. Huffman said he just pressed the pills right there. Well, what did Reta Newman tell you when she testified? She's the senior director for the Pinellas County Forensic Laboratory. When asked by Miss Guzman what was the difference between ingesting fentanyl or exposure to fentanyl in a bigger space, she told you it was really deadly to ingest it. And that's not what he was doing. He was flicking diluted powder that Mr. Fisher brought him. Mr. Fisher was dealing with the actual fentanyl itself. He

was crushing it up and mixing all that other stuff to make those pills.

This evidence of these other individuals that were dealing with both Christopher McKinney and Dion Fisher, the judge will instruct you about the prosecution not being required to produce all witnesses and all evidence. That's another red herring.

Now, let's talk about Christopher McKinney. Mr. Martin did say he did know him his entire life, but Mr. McKinney told you he got all the fentanyl from Dion Fisher. Whether he was smart enough to get it or not, what he said is he got it from Dion Fisher. And why not? They started it together. I mean, it's always been that way.

He tells you he is not hanging out with him at the end, but he's still giving him half of his proceeds. Whether he's lying about how much those proceeds are, or not, that's a partnership. That's not, here, give me the fentanyl. See you later. He's still splitting his proceeds, no matter what he's telling him about it.

And those numbered items, that's all fentanyl. Whether it came from him that night or previously, all that fentanyl that was numbered in that red toolbox, that all came from Dion Fisher. That's what Christopher McKinney told you.

When you are instructed by the judge, you are going to be instructed about credibility of witnesses and

that's for your determination. You are going to get asked some questions, like, you know, did that witness -- could he accurately observe the things he testified about?

Well, Mr. McKinney was part of -- the person who came up with the recipe and how you cooked it. You are going to be asked, does this witness impress you as someone who was telling the truth? That's questions that you are going to ask yourself, whether it strikes you as someone who tells the truth.

And, ladies and gentlemen, I would certainly agree with Mr. Martin that Konrad Guzewicz is shady. But who picked Konrad Guzewicz? Who thought that was the person -- the perfect person to launder his funds? It was the defendant, Dion Fisher. He picked all of these cooperating witnesses who testified. Of course, these kind of drug dealers lie and these drug dealers are under the influence of cocaine and fentanyl.

Ladies and gentlemen of the jury, when you cast a play in hell, there are no angels in starring roles. None of those are angels because the defendant casted this play, this fentanyl pill/money laundering play.

I submit that the testimony that we have presented to you and the evidence admitted is sufficient to prove and go above and beyond proving beyond a reasonable doubt that the defendant, this defendant, Dion Fisher (indicating), is

guilty of seven counts of possession with intent to distribute fentanyl, methoxyacetylfentanyl, and pentylone and eight counts of money laundering.

Thank you.

THE COURT: All right. Thank you, Miss Howard-Allen.

We will now go ahead and distribute the instructions to the jury. Ladies and gentlemen, you each have a copy of the jury instructions. I ask that you please follow along as I read them.

You will see later on there are some names of different substances. I'm going to do my best to pronounce them, but I will mispronounce them. So I ask for your indulgence when we get to that.

Jury instructions to the jury.

Members of the jury, it's my duty to instruct you on the rules of law that you must use in deciding this case. After I've completed these instructions, you will go to the jury room and begin your discussions, what we call your deliberations. You must decide whether the government has proven the specific facts necessary to find the defendant guilty beyond a reasonable doubt.

Jury Instruction No. 1.

Your decision must be based only on the evidence presented during the trial. You must not be influenced

either way by either sympathy for or prejudice against the defendant or the government. You must follow the law as I explain it, even if you do not agree with the law, and you must follow all of my instructions as a whole. You must not single out or disregard any of the Court's instructions on the law.

The Indictment, or formal charge against a defendant, isn't evidence of guilt. The law presumes every defendant is innocent. The defendant does not have to prove his innocence or produce any evidence at all. A defendant does not have to testify; and if the defendant choses not to testify, you cannot consider that in any way while making your decision. The government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the defendant not guilty.

Jury Instruction No. 2.

The government's burden of proof is heavy, but it doesn't have to prove a defendant's guilt beyond all possible doubt. The government's proof only has to exclude any reasonable doubt concerning the defendant's guilt. A reasonable doubt is a real doubt, based on your reasoning and common sense after you've carefully and impartially considered all the evidence in the case.

Proof beyond a reasonable doubt is proof so convincing that you would be willing to rely and act on it

without hesitation in the most important of your own affairs. If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

Jury Instruction No. 3.

As I said before, you must consider only the evidence that I have admitted in this case. Evidence includes the testimony of witnesses and the exhibits admitted, but anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters. In considering the evidence, you may use reasoning and common sense to make deductions and reach conclusions.

You shouldn't be concerned about whether the evidence is direct or circumstantial. Direct evidence is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There is no legal

difference in the weight you may give to either direct or circumstantial evidence.

Jury Instruction No. 4.

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say and how important that testimony was. In making that decision, you may believe or disbelieve any witness in whole or in part.

The number of witnesses testifying concerning a particular point doesn't necessarily matter. To decide whether you believe any witness, I suggest that you ask yourself a few questions.

Did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to accurately observe the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

Jury Instruction No. 5.

You should also ask yourself whether there was

evidence that a witness testified falsely about an important fact and ask whether there was evidence at some other time a witness said or did something or didn't say or do something that was different from the testimony the witness gave during this trial.

To decide whether you believe a witness, you may consider the fact that the witness has been convicted of a felony or a crime involving dishonesty or a false statement.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately.

So if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

Jury Instruction No. 6.

You must consider some witnesses' testimony with more caution than others. For example, witnesses who hope to gain more favorable treatment in their own cases may have a reason to make a false statement in order to strike a good bargain with the government. Additionally, a witness may testify about events that occurred during the time when the witness was using addictive drugs and so the witness may have

an impaired memory of those events. So while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

Jury Instruction No. 7.

Again, you must consider some witness's testimony with more caution than others. In this case, the government has made a plea agreement with a co-defendant in exchange for his testimony. Such plea bargaining, as it's called, provides for the possibility of a lesser sentence than the co-defendant would normally face. Plea bargaining is lawful and proper and the rules of this Court expressly provide for it. But a witness who hopes to gain more favorable treatment may have a reason to make a false statement in order to strike a good bargain with the government.

So while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses. The fact that a witness has pleaded guilty to an offense isn't evidence of the guilt of any other person.

Jury Instruction No. 8.

The law does not require the prosecution to call as witnesses all persons who may have been present at any time or place involved in the case or who may appear to have some knowledge of the matter in issue at this trial, nor does

the law require the prosecution to produce as exhibits all papers and things mentioned in the evidence.

Jury Instruction No. 9.

When scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter, but that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

Jury Instruction No. 10.

Certain exhibits in the form of charts, summaries, calculations, and the like, have been received in evidence. Such exhibits are received in evidence where voluminous writings, documents, and records are involved. These exhibits are available for your assistance and convenience in considering the evidence.

Jury Instruction No. 11.

Exhibits 300B, 301B, 302A, 303B, 305A, 308A, 309A, 310B, and 311A have been identified as typewritten transcripts of the oral conversations heard on the tape recordings received in evidence as Exhibits 300A, 301A, 302, 303A, 305, 308, 309, 310A, and 311. The transcripts also purport to identify the speakers engaged in the conversations.

I've admitted the transcripts for the limited and secondary purpose of helping you follow the content of the conversations as you listen to the recordings and also to help you identify the speakers.

But you are specifically instructed that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard about the preparation of the transcripts and from your own examination of the transcripts in relation to hearing the tape-recording themselves as the primary evidence of their own contents. If you determine that the transcripts are in any respect incorrect or unreliable, you should disregard them to that extent.

Jury Instruction No. 12.

You'll see that the Indictment charges that a crime was committed on or about a certain date. The government doesn't have to prove that the crime occurred on an exact date. The government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means an act was done voluntarily and intentionally and not because of a mistake or by accident. The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do

something the law forbids; that is, with a bad purpose to disobey or disregard the law.

While a person must have acted with the intent to do something the law forbids, before you can find that the person acted willfully, the person need not be aware of the specific law or rule that his conduct may have been violating.

Jury Instruction No. 13.

Each count of the Indictment charges a separate crime. You must consider each crime and the evidence relating to it separately. If you find the defendant guilty or not guilty of one crime, that must not affect your verdict for any other crime.

I caution you that the defendant is on trial only for the specific crimes charged in the Indictment. You are here to determine from the evidence in this case whether the defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide whether the defendant is guilty. If you find the defendant guilty, the punishment is for the judge alone to decide later.

Jury Instruction No. 14.

The law recognizes several kinds of possession. A person may have actual possession, constructive possession, sole possession, or joint possession.

Actual possession of a thing occurs if a person

knowingly has direct physical control of it. Constructive possession of a thing occurs if a person doesn't have actual possession of it but has both the power and the intention to take control over it later.

Sole possession of a thing occurs if a person is the only one to possess it. Joint possession of a thing occurs if two or more people share possession of it. The term "possession" includes actual, constructive, sole, and joint possession.

Jury Instruction No. 15.

It's possible to prove the defendant guilty of a crime even without evidence that the defendant personally performed every act charged. Ordinarily any act a person can do may be done by directing another person or agent or it may be done by acting with or under the direction of others.

A defendant aids and abets a person if the defendant intentionally joins with the person to commit a crime. A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person.

A defendant is also responsible if the defendant willfully directs or authorizes the acts of an agent, employee, or other associate. But finding a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated

with or participated in the crime, not just proof that the defendant was simply present at the scene of a crime or knew it.

In other words, you must find beyond a reasonable doubt that the defendant was a willful participant and not merely a knowing spectator.

Jury Instruction No. 16.

In these charges, the Court has reviewed the pertinent parts of federal and state statutes or laws which are alleged to have been violated. Where a statute specifies several alternative ways in which an offense may be committed, the Indictment may allege the several ways in the conjunctive; that is, by using the word "and." Therefore, if only one of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction so long as the jury agrees unanimously as to at least one of the alternatives.

Jury Instruction Number 17.

The Indictment charges 15 separate crimes, called counts, against the defendant. Each count has a number. You'll be given a copy of the Indictment to refer to during your deliberations.

Count One charges that the defendant knowingly and willfully conspired to possess with intent to distribute and to manufacture and distribute controlled substances. Counts Two to Seven and Counts Nine to Sixteen charge that

defendant committed what are called substantive offenses. Specifically, in Counts Two through Four, the defendant is charged with possession with intent to distribute and distribution of a controlled substance.

Counts Five through Seven charge the defendant with possession with intent to distribute a controlled substance. Counts Nine through Sixteen charge separate money laundering transactions using criminally derived property in excess of $10,000.

But first note that the defendant is not charged in Count One with committing a substantive offense. He is charged with conspiring to commit that offense. I will also give you specific instructions on conspiracy.

Jury Instruction No. 18.

It's a separate federal crime for anyone to conspire to possess with intent to distribute and conspire to knowingly possess with intent to distribute or manufacture and distribute a controlled substance.

Title 21, United States Code, Section 841(A)(1) makes it a crime for anyone to knowingly possess a controlled substance with intent to distribute it and to manufacture and distribute it.

Fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl] propanamide, is a Schedule II controlled substance. Methoxyacetylfentanyl, 2-methoxy-N-

(1-phenethylpiperidin phenylacetamide-4-yl)-N-phenylacetamide, is a Schedule I controlled substance.

A conspiracy is an agreement by two or more persons to commit an unlawful act. In other words, it is a kind of partnership for criminal purposes. Every member of the conspiracy becomes the agent or partner of every other member.

The government does not have to prove that all of the people named in the Indictment were members of the plan or that those who were members made any kind of formal agreement.

The heart of a conspiracy is the making of the unlawful plan itself, so the government does not have to prove that the conspirators succeeded in carrying out the plan.

The defendant can be found guilty only if all of the following facts are proved beyond a reasonable doubt:

One, two or more people in some way agreed to try to accomplish a shared and unlawful plan to possess with intent to distribute or to manufacture and distribute a controlled substance; and

Two, the defendant knew the unlawful purpose of the plan and willfully joined in it.

A person may be a conspirator even without knowing all of the details of the unlawful plan or the names and

identities of all the other alleged conspirators.

If the defendant played only a minor role in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion, that's sufficient for you to find the defendant guilty.

Simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof of a conspiracy. Also, a person who doesn't know about a conspiracy but happens to act in a way that advances some purpose of one doesn't automatically become a conspirator.

In Count One, the defendant is charged with conspiracy to possess with intent to distribute and to manufacture and distribute at least 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, and 100 grams or more of a mixture and substance containing a detectable amount of methoxyacetylfentanyl, 2-methoxy-N-(1-phenethylpiperidin-4-yl)-N-phenylacetamide, a Schedule I controlled substance. But you may find the defendant guilty of the crime even if the amount of controlled substances for which he should be held responsible is less than the threshold amount.

So if you find the defendant guilty in Count One, you must also unanimously agree on the weight of controlled substance the defendant possessed and specify the amount on the verdict form.

Jury Instruction Number 19.

It's a federal crime for anyone to possess a controlled substance with intent to distribute it. Fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl) propanamide, is a Schedule II controlled substance. Pentylone is a Schedule I controlled substance.

The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

One, the defendant knowingly possessed a controlled substance; and

Two, the defendant intended to distribute the controlled substance.

The defendant knowingly possessed the controlled substance if, one, the defendant knew he possessed a substance listed on the federal schedules of controlled substances, even if the defendant did not know the identity of the substance, or, two, the defendant knew the identity of the substance he possessed, even if the defendant did not know the substance was listed on the federal schedules of controlled substances.

To intend to distribute is to plan to deliver a controlled substance to someone else, even if nothing of value is exchanged.

In Counts Two through Four, the defendant is charged with intent to distribute and distributing a mixture and substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl) propanamide, a Schedule II controlled substance.

In Count Five, the defendant is charged with possessing with intent to distribute and distributing at least 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl) propanamide, a Schedule II controlled substance.

In Count Six, the defendant is charged with possessing with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl) propanamide, a Schedule II controlled substance.

In Counts Five and Six, you may find the defendant guilty of the crime even if the amount of the controlled substances for which he should be held responsible is less than the threshold amounts.

So if you find the defendant guilty in Counts Five and Six, you must unanimously agree on the weight of the

controlled substance involved in the conduct alleged in Counts Five and Six and specify the amount on the verdict form.

In Count Seven, the defendant is charged with possessing with intent to distribute a mixture or substance containing a detectable amount of pentylone, a Schedule I controlled substance.

Jury Instruction No. 12.

It's a federal crime for anyone to engage in certain kinds of financial transactions commonly known as money laundering. The defendant can be found guilty of this offense only if all the following are proved beyond a reasonable doubt:

One, the defendant knowingly engaged or attempted to engage in a monetary transaction; two, the defendant knew the transaction involved property or funds that were the proceeds of some criminal activity; three, the property had a value of more than $10,000; four, the property was, in fact, proceeds of conspiracy, possession with intent to distribute and manufacture and distribution of controlled substances, in violation of 21, United States Code, Sections 846 and 841, as alleged in the Indictment; and, five, the transaction took place in the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, and exchange of funds or a monetary

instrument by, through, or to a financial institution in a way that affects interstate commerce.

A "financial institution" means a commercial bank or trust company, credit union, thrift institution, loan or finance company, business engaged in vehicle sales, and persons involved in real estate closings and settlements.

The term "proceeds" means any property derived from or obtained or retained directly or indirectly through some form of unlawful activity, including the gross receipts of the activity.

It doesn't matter whether the defendant knew the precise nature of the crime or that the property came from committing a conspiracy, possession with intent to distribute and the manufacture and distribution of controlled substances. But the government must prove that the defendant knew the property involved in the monetary transaction was obtained or derived from committing some crime.

Also, it don't matter whether all property involved was derived from a crime. The government only has to prove that $10,000 worth of the property was obtained or derived from committing a crime.

Jury Instruction Number 21.

You've been permitted to take notes during the trial. Most of you, perhaps all of you, have taken advantage of that opportunity. You must use your notes only as a

memory aid during deliberations. You must not give your notes priority over your independent recollection of the evidence and you must not allow yourself to be unduly influenced by the notes of other jurors. I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

Jury Instruction No. 22.

Your verdict, whether guilty or not guilty, must be unanimous. In other words, you must all agree. Your deliberations are secret and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you are discussing the case, don't hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges, judges of the facts. Your only interest is to seek the truth from the evidence in the case.

Jury Instruction No. 23.

When you get to the jury room, choose one of your

members to act as foreperson. The foreperson will direct your deliberations and will speak for you in court.

A verdict form has been prepared for your convenience. Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it, date it and carry it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the marshal. The marshal will bring it to me and I'll respond as promptly as possible, either in writing or by talking to you in the courtroom. But I caution you not to tell me how many jurors have voted one way or the other at that time.

All right. I'm now going to hand out the verdict form, and I ask that you follow along as I read it.

Verdict.

Count One of the Indictment. As to the offense of conspiracy to possess with intent to distribute and to manufacture and distribute a controlled substance, in violation of Title 21, United States Code, Section 846, we, the jury, find the Defendant, Dion Fisher, and there is a place for you to indicate, as appropriate, either guilty or not guilty.

If you find the defendant not guilty as charged in Count One, you need not consider the paragraphs below but

should instead proceed to consider the next count.

If you find the defendant guilty of Count One, you need to determine which controlled substances were involved in the conspiracy and the weight of the controlled substances involved.

The conspiracy involved the following controlled substances. Check all that apply. There is a place for you to indicate as appropriate or if appropriate.

A mixture or substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl) propanamide, a Schedule II controlled substance; and/or, and a place to indicate, if appropriate, a mixture and substance containing a detectable amount of methoxyacetylfentanyl, 2-methoxy-N-(1-phenethylpiperidin-4-yl-N-phenylacetamide, a Schedule I controlled substance.

If you find the defendant conspired to possess with intent to distribute and manufacture and distribute methoxyacetylfentanyl, you must determine the weight involved. Check only one. So, 400 grams or more. Less than 400 grams but greater than 40 grams. Less than 40 grams.

Just so you all know -- and I've had to go back to 6th grade math so I remember if it's less than or greater than. I think it's got to be less than; correct? Did I make a mistake on that? It's less than?

MS. HOWARD-ALLEN: Yes.

THE COURT: Everybody is in agreement with that?

MS. HOWARD-ALLEN: Yes.

MR. MARTIN: Yes.

THE COURT: If you find the defendant conspired to possess with intent to distribute and manufacture and distribute methoxyacetylfentanyl, you must determine the weight involved. Check only one. A hundred grams or more. Less than a hundred grams but greater than 10 grams. Less than 10 grams.

Count Two of the Indictment.

As to the offense of possession with intent to distribute and distribution of a mixture or substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl) propanamide a Schedule II controlled substance, in violation of Title 21, United States Code, Subsection 841(a)(1), we, the jury, find the defendant, Dion Fisher, and there is a place to indicate guilty or not guilty.

Count Three of the Indictment.

As to the offense of possession with intent to distribute and distribution of a mixture or substance containing a detectible amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the

defendant, Dion Fisher, and there is a place for you to indicate either guilty or not guilty.

Count Four of the Indictment.

As to the offense of possession with intent to distribute and distribution of a mixture or substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate guilty or not guilty as appropriate.

Count Five of the Indictment.

As to the offense of possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl -- I guess it is of a mixture. Let me read that again.

As to the offense of possession with intent to distribute of a mixture or substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate either guilty or not guilty.

If you find the defendant not guilty as charged in

Count Five, you need not consider the paragraph below but should instead proceed to consider the next count. If you find the defendant guilty of Count Five, you must determine the weight of the fentanyl involved. Check only one. 40 grams or more. Less than 40 grams.

Count Six of the Indictment.

As to the offense of possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the defendant, Dion Fisher, guilty or not guilty as appropriate. You should so indicate.

If you find the defendant not guilty as charged in Count Six, you need not consider the paragraph below but should instead proceed to consider the next count.

If you find the defendant guilty of Count Six, you must determine the weight of the fentanyl involved. Check only one. 400 grams or more. Less than 400 grams but greater than 40 grams. Less than 40 grams.

Count Seven of the Indictment.

As to the offense of possession with intent to distribute a mixture or substance containing a detectable amount of pentylone, a Schedule I controlled substance, in

violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate guilty or not guilty as appropriate.

Count Nine of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate guilty or not guilty.

Count Ten of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate either guilty or not guilty.

Count Eleven of the Indictment.

As to the offense of engaging in an illegal monitor transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate either guilty or not guilty.

Count Twelve of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States

Code, Section 1957, we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate either guilty or not guilty.

Count Thirteen of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, guilty or not guilty.

Count Fourteen of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, either guilty or not guilty as appropriate.

Count 15 of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate either guilty or not guilty as appropriate.

And Count Sixteen of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, and there is a place for you to indicate either guilty or not guilty.

It needs to be signed and dated by the foreperson and today is the 5th day of June. That's the verdict form for you to take back with you.

As I said, all of the exhibits, other than the contraband, will be sent back. It will take us a few minutes to gather everything, but you'll have all that back there. If you want to review the tapes, that's also possible. So if you need to do that, we will have that set up for you. I think the food is on its way.

Has it been delivered?

THE COURTROOM DEPUTY: Yes.

THE COURT: The food has been delivered already. So if you would like to begin by taking a break and eating, that's certainly fine. Remember what I said. Please not to have your electronic devices during your deliberations. I don't know if you were able to lock it up downstairs.

Does anybody still have an electronic device with them? Please put it on the third floor. Please do not keep it in here, even if you have it turned off. It is not to go into the jury deliberations room while you are deliberating.

Does everybody understand that?

(Unanimous affirmative responses.)

THE COURT: Because even as recently as three or four years ago, jurors were not allowed to have those in the courthouse, but I know how challenging it is to not have it.

So that's why I permit you to do it.

All right. Somebody alluded to this earlier and I will now address it. Alternates, we always seat alternates because, unfortunately, sometimes we have people who have personal emergencies or they can't continue with the deliberations. There are two alternates that have been seated because this trial has taken over a week.

Our two alternates are the two last individuals. So the lady in the gray and the gentleman next to her, those are our two alternates.

I'm going to ask you to please not discuss this with anybody. We have had jurors who have become sick or have had family emergencies and I've had to replace them, a sick juror with an alternate. So please continue to maintain that because that has happened to me at least two or three times.

So I thank you. I know it's really challenging to hear evidence for a week and not be able to deliberate, but it's something that we need to do. If you would like to take a sandwich, we do have enough food. So please feel free to take a sandwich and take it with you, but we need to have your phone number, so we will call you if we need you. We will also call you as soon as we have a verdict and we are adjourned and we will let you know.

All right. So please don't begin your

deliberations when these two alternates are still in the room getting their food. Either put your phones up or do whatever you need to do, and then you can come back and begin your deliberations.

Anything from counsel?

MS. HOWARD-ALLEN: Just briefly at sidebar for a moment.

THE COURT: Okay.

(The following was held at sidebar:)

MS. HOWARD-ALLEN: Your Honor, because they now don't have their cell phones, the government would request they have access to some kind of a calculator if the Court has one.

THE COURT: Okay.

MS. HOWARD-ALLEN: Normally everybody uses their phone for their calculator, and I want them to have that.

THE COURT: I actually have one right here. I have a calculator right here. Are you okay with that?

MR. MARTIN: Yes, I don't have an objection.

For the record, I will renew my objection on jury instructions 8 and 16 that you've already ruled on. I don't need to be heard.

MS. HOWARD-ALLEN: The best witnesses. And what was the other one?

MR. MARTIN: Conjunctive.

THE COURT: Your objections are noted but overruled. I will note that those jury instructions have been a part of the Middle District of Florida I think at least from the Nineties.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: Do you want me to hand this to them? Or maybe I'll have the courtroom deputy or the court security officer do it. I think that's better.

MR. MARTIN: Judge, since we are up here, I reviewed the exhibit list. I don't have any objection to the way it's done, but I will just renew my objection to the exhibit list going back.

THE COURT: Okay. Anything you would like to say in response to that?

MS. HOWARD-ALLEN: No. I just made all the requested changes to the descriptions that we discussed last night.

THE COURT: All right. The objection is noted but overruled. As I said, I'll give them my own calculator that I have here. I will send it back.

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: Thank you.

(Sidebar ended.)

THE COURT: I'm going to give you a calculator in case, for whatever reason, you need it, but don't read

anything into that I'm giving you a calculator. It doesn't mean anything. It's just that since your phones -- since you won't have your phone back there and that's what a lot of people use as a calculator today, you do have it.

I don't think I have anything else before you adjourn. If you need anything, please reach out to Nona and she will reach out to me. But remember, she can't answer anything other than things having to do with your comfort and with your safety. And for some reason somebody needs to step out for whatever reasons, please let us know.

I think that's all that I have. It will take a few moments to gather together the exhibits. You'll have an exhibit list that we will send back with you. It's going to take us a good 15 minutes or so to get that organized and back to you.

All right. I thank you very much for your patience. And as soon as the two alternates are excused and leave, you can then begin your deliberations.

Thank you. We are in recess.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 11:39 a.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: I want to make certain that what we send back should be sent back, and I just want to make certain we are all on the same sheet of music with respect to

reviewing the video. Remind me -- I just need the courtroom deputy to remind me because this has changed. Do we have a machine back there?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: There is a machine back there for them to review the video if they want to, or the CD, whatever they are called these days. The CDs if they want to do that.

MS. HOWARD-ALLEN: That's fine, Your Honor. And we would have the computer here if they wanted to see the demonstrative, but the transcript and the actual disks are back there, just not the one that we presented in court.

THE COURT: All right. But it's a court computer or viewer as opposed to one from the U.S. Attorney's Office.

MS. HOWARD-ALLEN: That's good.

THE COURT: I know in the past when the Court didn't have it, they had to use the U.S. Attorney's Office one, which I didn't think was a particularly good idea.

MS. HOWARD-ALLEN: I'm glad they finally have done that.

THE COURT: Finally got the money to buy one.

Anyway, that's what's back there and that's what they are using.

If they have any questions, I will just tell you, it is my practice to call both of you in here. I will not talk to them without telling you first or bringing them in

here unless it's where can I get a Coke or whatever, a sandwich, something like that. So please don't go too far away. Please give us your cell phone numbers if you are going to go more than five or ten minutes away. It might be better to stay to be on the safe side. I appreciate that.

MS. HOWARD-ALLEN: The agent can stay in the courtroom with the drugs or they can be packed up. And if they want to see them, they can bring them back. I'm not sure what's the Court's preference because I know the Court security, they need to lock up the courtroom, and I think previously he's taken them out when they have locked the courtroom.

THE COURT: I think that's okay. I'm trying to think when it was an issue once before where I didn't have the drugs in here and we had to deal with it. It took a long time. We did have that once where they went back into the locker and it look a really long time to get it back here.

MS. HOWARD-ALLEN: Exactly. I think he's fine either way.

THE AGENT: I have my lunch, Your Honor. I'll stay here.

THE COURT: Okay. You brown bagged it. I'm going to ask you, as much as a pain that is -- last time I don't know how long we waited. It took a long time to get those drugs back here. I think that's going to be better.

Okay. Anything else? All right. Just please check what goes back there. I don't want there to be an error, and it's very easy to make mistakes. Let's just check each other and make certain what goes back there really should go back there.

Thank you very much. Again, don't go far away, and stay by your cell phones so we can reach you.

(Recess taken from 11:44 a.m. to 2:38 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Good afternoon. I've been informed we have a verdict. What I'm going to do is we will bring the jury in and we will then read the verdict. I ask that everybody please remain seated and quiet when the verdict is read.

After the verdict is read, I will poll the jury, which is what I do in all of my cases, and I'll call them by their seat number. Then after that is done, I will excuse the jury. I will go out and I will thank them, but I ask that everybody please remain in the courtroom at that time.

All right. Very good. We will bring the jury in. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 2:40 p.m.)

COURT SECURITY OFFICER: Thank you. Please be

seated.

THE COURT: Welcome back, ladies and gentlemen. I understand you've reached a verdict; is that correct?

THE FOREPERSON: Yes.

THE COURT: Will the jury foreperson please hand the verdict to the court security officer.

(Document tendered.)

THE COURT: Thank you very much.

I'm going to ask the courtroom deputy to please publish the verdict. I just ask that everybody please stay seated and remain seated quietly while the verdict is published.

THE COURTROOM DEPUTY: Case No. 8:18-cr-236-T-33TGW, United States of America versus Dion Fisher.

As to the offense of conspiracy to possess with intent to distribute and to manufacture and distribute a controlled substance, in violation of Title 21, United States Code, Section 846, we, the jury, find the defendant, Dion Fisher, guilty.

The conspiracy involved the following controlled substance: A mixture or substance containing a detectable amount of fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance; and/or a mixture and substance containing a

detectable amount of methoxyacetylfentanyl, 2-methoxy-N-(1-phenethylpiperidin-4-yl)-N-phenylacetamide, a Schedule I controlled substance. 40 [sic] grams or more.

If you find the defendant conspired to possess with the intent to distribute and manufacture and distribute methoxyacetylfentanyl, you must determine the weight. 100 grams or more.

Count Two of the Indictment

As to the offense of possession with intent to distribute and distribution of a mixture or substance containing a detectable amount of fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the defendant, Dion Fisher, guilty.

Count Three of the Indictment.

As to the offense of possession with intent to distribute and distribution of a mixture or substance containing a detectable amount of fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance in violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the defendant, Dion Fisher, guilty.

Count Four of the Indictment.

As to the offense of possession with intent to

distribute and distribution of a mixture or substance containing a detectable amount of fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of Title 21, United States Code, 841(a)(1), we, the jury, find the defendant, Dion Fisher, guilty.

Count Five of the Indictment.

As to the offense of possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), we, the jury, find the defendant, Dion Fisher, guilty.

If you find the defendant guilty of Count Five, you must determine the weight of the fentanyl involved. 40 grams or more.

Count Six of the Indictment.

As to the offense of possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II controlled substance, in violation of Title 21, United States Code, 841(a)(1), we, the jury, find the defendant, Dion Fisher, guilty.

If you find the defendant guilty of Count Six, you must determine the weight of the fentanyl involved. 40 [sic] grams or more.

Count Seven of the Indictment.

As to the offense of possession of the intent to distribute a mixture or substance containing a detectable amount of pentylone, a Schedule I controlled substance, in violation of Title 21, United States Code, 841(a)(1), we, the jury, find the defendant, Dion Fisher, not guilty.

Count Nine in the Indictment.

As to the offense of engaging in illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, guilty.

Count Ten of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, guilty.

Count Eleven of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, guilty.

Count Twelve of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, 1957, we, the jury, find the defendant, Dion Fisher, guilty.

Count Thirteen of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, 1957, we, the jury, find the defendant, Dion Fisher, guilty.

Count Fourteen of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, guilty.

Count Fifteen of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, guilty.

Count Sixteen of the Indictment.

As to the offense of engaging in an illegal monetary transaction, in violation of Title 18, United States Code, Section 1957, we, the jury, find the defendant, Dion Fisher, guilty.

So say we all, this 5th day of June, 2019.

Foreperson, Donna Ward.

THE COURT: Thank you. I will now poll the jury, and I'll poll you by your seat number, and I do this in all trials, just to make certain that is indeed your verdict.

MS. HOWARD-ALLEN: Your Honor, before we poll, may we approach?

THE COURT: Yes.

(The following was held at sidebar:)

MS. HOWARD-ALLEN: When your clerk read the verdict, on Counts One and Six, she said 40 grams or more.

THE COURT: And she should have said 400.

MS. HOWARD-ALLEN: I don't know what was checked, but that would be the only choice. Before you poll them, I want to make sure that's clear on the record.

THE COURT: Can I see the verdict form for a second. Thank you.

MS. HOWARD-ALLEN: It was Counts One and Six. She said 40 grams. And then, also, at the same time, Count Six, that's the only option for Six, 400 grams or more. She said 40 grams or more.

THE COURT: It should have been 400.

MS. HOWARD-ALLEN: Did you hear that, Ken?

MR. MARTIN: Yes, I heard that.

(End of sidebar.)

THE COURT: Just to verify, ladies and gentlemen,

on Count Six of the Indictment -- and we will go there when I poll you, it was the defendant was found guilty, and according to your verdict, the weight of the fentanyl involved was 400 grams or more, and same for Count One of the indictment, 400 grams or more. Okay. Just so the record is clear. Thank you.

So I will now poll the jury with those stipulations that I've just said that it was 400 grams or more with respect to Count One, 400 grams or more with respect to Count Six. Just verifying that.

The juror in seat No. 1, is that your verdict, sir?

JUROR NO. 1: Yes, ma'am.

THE COURT: The juror in seat No. 2, is that your verdict?

JUROR NO. 2: Yes.

THE COURT: Juror in seat 3, is that your verdict?

JUROR NO. 3: Yes, ma'am.

THE COURT: Juror in seat 4, is that your verdict?

JUROR NO. 4: Yes, ma'am.

THE COURT: Juror in seat 5, is that your verdict?

JUROR NO. 5: Yes.

THE COURT: Juror in seat 6, is that your verdict?

JUROR NO. 6: Yes, ma'am.

THE COURT: Juror in seat 7, is that your verdict?

JUROR NO. 7: Yes, ma'am.

THE COURT: Juror in seat 8, is that your verdict?

JUROR NO. 8: Yes, ma'am.

THE COURT: Juror in seat 9, is that your verdict?

JUROR NO. 9: Yes.

THE COURT: Juror in seat 10, is that your verdict?

JUROR NO. 10: Yes.

THE COURT: Juror in seat 11, is that your verdict?

JUROR NO. 11: Yes.

THE COURT: Juror in seat 12, is that your verdict?

JUROR NO. 12: Yes, ma'am.

THE COURT: I want to thank you for your service. I will step out now to see if you have any questions you would like me to answer. So the jury is excused. I ask that everybody else remain in the courtroom.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 2:55 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: I have discharged the jury.

Miss Howard-Allen, since this is a drug conviction, Mr. Fisher needs to be taken into custody today; does he not?

MS. GUZMAN: Yes, Your Honor, pursuant to Title 18, 3143 and 3142, it would be a mandatory count.

THE COURT: Okay. So, Mr. Fisher, in light of that, you need to be taken into custody today.

Mr. Martin, is there anything that you would like to say with respect to that, or anything at all at this juncture, sir?

MR. MARTIN: I understand the law. I would point out that he's complied with all his pretrial restrictions and conditions to my knowledge. Full compliance.

THE COURT: And nobody doubts that. It's just that when somebody is found guilty after trial of a drug charge, it is pretty standard that they are taken into custody. Miss Guzman.

MS. GUZMAN: Yes, Your Honor. Just so the record is clear, under Title 18, 3143(a)(2), it indicates that the judicial officer shall order that a person who has been found guilty of an offense described in Subsection (f)(1) of 3142, must be taken into custody. And going back to 18, 3143(f)(1) Subsection (B) and (C), he would qualify. So he is a mandatory remand at this point.

THE COURT: Thank you. That's what the U.S. Attorney's Office tells me every time when I question whether they really need to be taken into custody or not. I don't have the discretion. It's a mandatory, being taken into custody.

So I have the verdict form here if you would like to examine it before it's made part of the record. Why don't the lawyers take a quick look at it. Mr. Martin and

Miss Howard-Allen.

MR. MARTIN: Thank you.

(Brief pause.)

MS. HOWARD-ALLEN: Thank you, Your Honor.

THE COURT: Okay. Anything else that we need to do today? I'll just make certain. Let's see, Agent Phelps, you still have custody of the drugs, then; is that right?

AGENT PHELPS: I do, Your Honor.

THE COURT: Those will be put back into the evidence vault, or whatever it is, wherever it is you store them?

AGENT PHELPS: Yes, Your Honor.

THE COURT: Anything else we need to take care of today?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: Thank you, Miss Howard-Allen. Thank you, Miss Guzman. Thank you, Mr. Phelps, Mr. Liberto. Mr. Martin, thank you.

Mr. Fisher, we will set your sentencing for about 75 to 90 days from now. This is June 5th. Probably towards the end of August or beginning of September, something like that, we will have the sentencing. You'll be hearing from a probation officer who will be conducting the background check on you.

Mr. Martin, you will stay on as his lawyer,

obviously, through sentencing. And then at that point, please let me know if we need to appoint a different appellate counsel or if you will be representing him.

MR. MARTIN: I'll talk to Mr. Fisher about it.

THE COURT: You'll talk to him about that, but I'm happy either way after sentencing, to do whatever is necessary. Okay. Thank you, everybody.

We are in recess.

(Proceedings adjourned at 3:10 p.m.)

- - -

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 99), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ *Scott N. Gamertsfelder*, RMR, FCRR

*Official Court Reporter*

Date: January 20, 2020