UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Tampa, Florida |
| Plaintiff, | ) | No. 8:18-cr-236-T-33TGW |
| | ) | Docket No. 249 |
| vs. | ) | |
| | ) | October 31, 2019 |
| DION GREGORY FISHER, | ) | |
| Defendant. | ) | Courtroom 14B |

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Matthew P. Farmer, Esq.**
Farmer & Fitzgerald, PA
400 North Tampa Street, Suite 950
Tampa, Florida 33602
(813) 228-0095

**ALSO PRESENT:**

Christina Hattan,
Probation Officer

Erica Vest, Probation Officer

Adam Phelps,
DEA Task Force Agent

Robert Liberto, IRS Agent

\- - -

**P R O C E E D I N G S**

October 31, 2019 1:33 p.m.

\- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good afternoon.

We are here for the sentencing in United States versus Dion Gregory Fisher, Case No. 8:18-cr-236-T-33TGW.

I'll begin by having counsel state their appearances. Who do we have for the government?

MS. HOWARD-ALLEN: Kelley Howard-Allen on behalf of the United States. With me is my co-counsel Maria Guzman and the two case agents, DEA Task Force Agent Adam Phelps and IRS Agent Robert Liberto.

MR. FARMER: Matthew Farmer for the defendant, Dion Fisher, who is present.

THE COURT: Thank you, Mr. Farmer. Mr. Fisher. And we have Miss Hatten from probation and Miss Vest.

I just wanted to make certain that I had in front of me the memos that have been filed by both sides, both by the United States and by Mr. Farmer. I'm all set on that.

Dion Gregory Fisher, on June 5th, 2019, a jury

found you guilty of Count One of the Indictment, charging you with conspiracy to possess with intent to distribute and manufacture and distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl and 100 grams of methoxyacetylfentanyl, in violation of Title 21, United States Code, Sections 841(B)1(a) and 846;

Count Two, charging you with possession with intent to distribute and distribution of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C);

Counts Three and Four, charging you with possession with intent to distribute and distribution of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)1(B);

Count Five, charging you with possession with intent to distribute 40 grams or more of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)1(B);

Count Six, charging you with possession with intent to distribute 400 grams or more of fentanyl, in violation of Title 21, United States Code Sections 841(a)(1) and 841(B)1(a);

and Counts Nine through Sixteen, charging you with money laundering, in violation of Title 18, United States Code, Sections 1957 and 2.

The Court adjudged you guilty of those offenses. We have now reached the stage in the proceedings where it is my duty to address several questions to you and your attorney and the counsel for the government.

Miss Howard-Allen, have you had the opportunity to read the presentence report?

MS. HOWARD-ALLEN: I have, Your Honor.

THE COURT: Do you have any objections as to the factual accuracy of the report?

MS. HOWARD-ALLEN: No, Your Honor, I do not.

I would just note that we sort of went back and forth on his prior conviction on December 22nd, 2016. So just to paragraph 24, in addition to pretrial diversion, it appears, when the Court looks at his criminal history, which is later in the PSR in paragraph 71, it does appear just added to that -- and it's already noted there -- is that he also got probation for reckless driving.

So he got pretrial diversion, but then it appears he got probation on Count Three, which was reckless driving, reduced from DUI. So I just make that addition. But other than that, there is no other legal or factual objections to the PSR.

THE COURT: Okay. Thank you.

I'll now turn to the defense. Mr. Farmer, have you had the opportunity to read and discuss with Mr. Fisher

the presentence report?

MR. FARMER: Yes, Your Honor.

THE COURT: All right. Any objections as to the factual accuracy?

MR. FARMER: Yes, Your Honor.

THE COURT: Go ahead.

MR. FARMER: Your Honor, as the addendum states, there are some lingering objections that we would like to preserve as to the offense conduct and the calculation of the drug quantity.

Other than not being in a position to concede to the accuracy of the PSR in that regard, I don't have specific comments to make other than the following, and that is to paragraph 27, which is in terms of drug quantity, which is the most meaningful factual objection, and that is on paragraph 27 of the revised PSR.

We have objected to the last sentence in that paragraph, which is to the calculation of over 62 kilograms of fentanyl on the one factor alone of Mr. McKinney's dealings with Mr. Morose.

Our objection to that is that that drug quantity is outside the scope of the jointly undertaken activity by Mr. Fisher, the defendant.

The upshot of that objection, if granted, the base offense level just on drug quantity alone would decrease from

a level 38 to a level 34, because without that 62 kilograms, Mr. Fisher's drug quantity calculation would be slightly over 6 kilograms of fentanyl as opposed to over 66 kilograms.

Again, that has a four-level swing alone just on that factual finding. Specifically, we would object to the last sentence in paragraph 27.

Also, I should say I adopt the government's objection as articulated a moment ago to the paragraph dealing with the December 2016 criminal history.

THE COURT: I was just going to ask you about that.

MR. FARMER: Yes, Your Honor.

THE COURT: So let's see. Miss Howard-Allen, I wasn't certain. It sounds like maybe you had come to -- you were okay with it inevitably?

MS. HOWARD-ALLEN: I think technically it should read he accepted pretrial diversion for armed trafficking in cocaine and possession of Alprazaline and probation for reckless driving, reduced from DUI.

MR. FARMER: That's correct. That's accurate. And Miss Hatten provided us the police reports and the court documents that reflected that.

THE COURT: So everybody is okay with that change, then; right?

MR. FARMER: Yes, Your Honor.

THE COURT: We will go ahead and note that change, then.

All right. So let me, though, ask Miss Howard-Allen about the drug amount, if she has a response to that.

Thank you, Mr. Farmer.

MS. HOWARD-ALLEN: Did you want to address the other drug objection you had and then I could just address all the drug weight, or just Morose, the main one?

MR. FARMER: Well, the latter.

Your Honor, again, we persist in our objections to the drug quantity calculation as the addendum reflects, and my only specific objection had to do with the last sentence in 27 as to drug quantity.

I do have some objections to some of the specific offense characteristics that go into the calculation of the base offense level.

THE COURT: Why don't I ask Miss Howard-Allen to respond to that one first. Miss Howard-Allen.

MS. HOWARD-ALLEN: Certainly, Your Honor.

I think that there is also -- and the reason why I asked is it appeared that he also objected to the drug weight for Mr. Huffman, which is paragraph 37, which wasn't included in his calculation. But as to paragraph 27, which is Mr. Morose's quantity, which is a large quantity of fentanyl

and, quite clearly, I think at trial this was proven that this was part of the conspiracy weight.

Specifically, Morose was unquestionably at the tail end. Mr. McKinney, who is Mr. Fisher's co-conspirator, it was his largest customer. And he was shipping pills, as you will recall from the testimony from Christopher McKinney, was shipping them through the mail to Philip Morose, who was in Boston.

Mr. McKinney also testified that all the fentanyl that he bought that he used to make the pills to send to Mr. Morose he bought from Mr. Fisher.

Significantly, he also testified that when he began the arrangement, the customer -- Mr. Morose, being a customer buying these counterfeit pills, that Mr. Morose traveled down from Boston, I think, three times, or something, that he said at trial.

On one of those occasions or two of those occasions, he actually met Mr. Fisher. And throughout the relationship I think he even testified towards late, when we were trying to set up the deal to -- Mr. McKinney was assisting in making undercover telephone calls to Philip Morose in order to get him arrested as part of this conspiracy, I think in one of those calls Mr. Morose even said, hey, how's D? Meaning Dion Fisher.

So unquestionably, I think the testimony and was

proven at trial that what Mr. McKinney did and what he sold he paid Mr. Fisher either through splitting the pills or else paying him for the fentanyl.

So because there is a conspiracy count, I think that is unquestionably a part of the drug weight. And I would note that Mr. McKinney pled to this amount. He pled guilty to this amount of drugs in his plea agreement, and he didn't -- although Mr. Morose didn't testify at trial, I mean, his plea agreement, he swore to that amount and he was sentenced on that amount.

And I think Judge Merryday was his sentencing judge, and he got the 120 years [sic]. He's currently in Boston. He was also charged in Boston with a money laundering indictment, which is still pending, and I understand he may plead guilty to that.

The money laundering is basically that he was laundering the proceeds of selling the fentanyl pills that Mr. McKinney sent him that he bought from Mr. Fisher.

THE COURT: Okay. All right. Mr. Farmer, anything else you would like to say with respect to that? I'll also see if probation wants to add any comments.

Go ahead, Mr. Farmer.

MR. FARMER: Nothing further on the drug quantity, Your Honor.

THE COURT: Anything else from probation?

THE PROBATION OFFICER: No, Your Honor.

THE COURT: Okay. I think that this was correctly scored for the reasons that not only Miss Howard-Allen has said here, but for the reasons that have been outlined in the addendum by probation. So I think that this was correctly scored, appropriately scored. So the objection is noted but overruled.

Go ahead, Mr. Farmer.

MR. FARMER: Yes, Your Honor, my other objection is to the other specific -- the other factors that go into the calculation of the base offense level, and paragraph 60 lays out the drug quantities plus the three factors that probation has found to be warranted in this case. I have objections to two of the three.

THE COURT: Go ahead, Mr. Farmer.

MR. FARMER: Yes, Your Honor.

The first is to the gun enhancement. The first of the three specific offense characteristics, specifically, the objection, as we articulate, is Mr. Fisher objects to the conclusion that the Tech-9 firearm and the AR-22 rifle were found during the traffic stop in December of 2016.

Also, that the AK-47 rifle that was found later was in proximity to personal use quantities of narcotics, not the specific narcotic involved in this case, the fentanyl. The firearm was found in proximity to personal use quantities

of cocaine and Xanax.

For that reason we would object to the enhancement for the firearm, and we object as well to the third of the three specific offense characteristics, which essentially is based on the aggravating role enhancement.

So if you cross-reference that specific offense characteristic is paragraph 60 with paragraph 63, which is the aggravating role adjustment, essentially Mr. Fisher is receiving a four-level bump based on the aggravating role of organizer/leader.

The way that works is that if Your Honor finds an aggravated role and, in addition, finds that there was an importation of narcotics from China, that not only would Mr. Fisher receive the two levels for aggravated role but also an additional two levels.

So we would object to a finding that Mr. Fisher should receive an aggravating role adjustment because of the gentleman who was involved in the money laundering part of the case was a willing participant. He was not recruited by Mr. Fisher. He essentially volunteered to provide those services, and essentially the other individuals in the conspiracy were on equal footing as Mr. Fisher.

He did not have a managerial role over those individuals; and, therefore, we believe that the aggravated role enhancement should not apply either as a specific

offense characteristic or an adjusted role. That would be, again, paragraph 63.

THE COURT: Okay. I'll hear a response from the government. Go ahead.

MS. HOWARD-ALLEN: Well, Your Honor, as to the firearms, there was firearms -- I believe the enhancement was both for the firearm that was found in the car as well as the firearms found in the house.

So as you look to the car, that was on December 22nd, 2016, paragraph 24, that was smack dab in the middle of the fentanyl conspiracy. And unquestionably, although he was just carrying some -- it looked like powder cocaine. I think it turned out to be cut, which is likely to be used in his fentanyl, but it was in the middle of the drug conspiracy.

So carrying a gun could also be -- he was going between the places where we located a lot of the fentanyl, and so I think that in connection with the guns found in his home, there was fentanyl found there.

Mr. Fisher -- I mean, Mr. Farmer characterizes it as personal use, but I think that the fact of the matter is there was fentanyl there. There was assets there. There was money there. I think Mr. McKinney, again, testified about going over there and previously having dealt with him and gone over and meet him there, and I think that that's a warranted enhancement for the firearms.

As to the role enhancement, I think that although one of the possibilities for under the -- where probation has indicated an aggravating roll under 3B1.1, they have specified that it is 3B1(C), the defendant was directly involved in the importation of a controlled substance, increase by two levels. So I think that's appropriate.

Not only was there testimony from the DEA about intercepting pill presses that were from China. There were packaging labels from China found at Mr. Fisher's house. There was evidence of Western Unions and other money -- other ways that money was paid by other co-conspirators, by Huffman and other cohorts of Huffman's who sent Western Unions to China to pay for fentanyl that was sent here.

Mr. McKinney talked about Mr. Fisher's dealings with importing the fentanyl from China. So I think unquestionably that particular enhancement, which is in paragraph 60, is appropriate because this fentanyl was unquestionably -- and the pill presses and some of the other cut material was unquestionably imported from China.

As you turn to the adjustment for the role in the offense under 3B1.1, this is a place in the sentencing guidelines where you can go anywhere from two to three to four depending on the aggravating role and the number of people in the conspiracy.

In this case, this is the sort of lowest

aggravating role, this plus two, because there was others that were more equal or customers which would not fall in. But unquestionably, Mr. Guzewicz and Mr. Huffman, who you heard from at trial, unquestionably were recruited.

Huffman was recruited by Mr. Fisher to press pills for him. We heard detailed testimony about how he did that and his mechanical abilities and the recipe that he used. I mean, he was recruited and supplied all those materials by Mr. Fisher.

As for Mr. Guzewicz doing this, like, on his own, just deciding he was going to launder money for Mr. Fisher, I'm not saying it wasn't to his benefit, but clearly he was induced and recruited by Mr. Fisher to say, hey, I can buy luxury cars from you. I can give you Western Unions from it. We can fudge on the -- I can give you some cash for it. I can pay you with Western Unions. You can give me a check. We can laundering money through my four accounts.

I mean, these two -- Mr. Guzewicz was unquestionably recruited by him, as well. So the two-level adjustment as to his role being what we would refer to as either the organizer, the leader, the manager, or the supervisor, I think the testimony was really borne out at trial that he was a leader or organizer of this pill -- counterfeit pill producing operation.

He's appropriately scored both for the aggravating

role for having Mr. Guzewicz and Mr. Huffman recruited and enrolled in this conspiracy, both the money laundering and the drugs.

He's appropriate rescored for an aggravating -- under the term "aggravating role," but for the importation of the fentanyl from China and the pill presses. And then he's appropriately scored for using a firearm in connection with drug trafficking; and that enhancement is also appropriate, Your Honor, in coming to his guideline calculation.

THE COURT: Okay. Anything else from probation on that?

THE PROBATION OFFICER: No, Your Honor.

THE COURT: I'll note your objection, again, Mr. Farmer, but it's overruled, in essence, for the reasons Miss Howard-Allen said, as well as what probation said in his report.

I participated in the trial, and I think that Miss Howard-Allen is absolutely correct with respect to your client's role that he played. I think that this is correctly scored and your objection is noted but overruled.

Anything else, Mr. Farmer?

MR. FARMER: Yes, Your Honor. If I could just refer to my notes for a second. I know there were some very specific factual objections. Let me review my notes for a moment.

THE COURT: Sure.

MR. FARMER: I believe the addendum addressed those satisfactorily, but let me confirm that.

Your Honor, this has no effect on the calculation of the guidelines, but I did object to the reference in the guidelines in terms of Mr. Fisher's apparent unwillingness to agree to a probation interview with trial counsel.

I can just chalk it up to a miscommunication in that, in my experience with Mr. Fisher, he was immediately willing to speak with probation. In fact, he did give a lengthy interview. I thought that -- that adverse suggestion of lack of cooperation, I would object to the inclusion in the presentence report to that.

THE COURT: Thank you, Mr. Farmer.

MR. FARMER: Yes, Your Honor. That's the completion of my objections.

THE COURT: Okay. What is your response to that, Miss Howard-Allen?

MS. HOWARD-ALLEN: I think that on both of those probation did accurately respond and just that they were factual. Those events occurred. They interviewed the defendant's father and wrote what he said. And they tried to interview him with his prior counsel and he refused. So I think they are just factual inclusions that probation has responded, as such, in the addendum.

THE COURT: Okay. I agree with her. It's a true statement. So I understand what you say or what you've said, Mr. Farmer, but the statement was true as written, and I don't draw any additional or negative implication as a result of that. So the objection is noted but overruled.

Anything else, Mr. Farmer?

MR. FARMER: No, Your Honor.

THE COURT: Okay.

MR. FARMER: I was not challenging the veracity of the statement, just the relevance.

THE COURT: I understand.

MR. FARMER: Thank you, Your Honor.

THE COURT: Okay. So other than the one objection with respect to the prior criminal history, which we have already talked about that you are going to go ahead and add that, I adopt the undisputed factual statements and guideline applications contained in the presentence report, other than the one we have just mentioned.

As to the controverted factual statements and guideline applications, the Court adopts the position of the probation office as stated in the addendum.

Therefore, the Court determines that the advisory guidelines are:

Total Offense Level 43; Criminal History Category I; life imprisonment; Counts One to Six, five years;

Count Two, three to five years; Counts Three, Four, and Five, four to five years; Counts Nine to Sixteen, up to three years' supervised release; restitution is not applicable; $50,000 to a $36 million fine; and a $1,400 special assessment.

Miss Howard-Allen, do you know of any reason why this Court should not now proceed with imposition of sentence?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: This is your opportunity to make a statement with respect to what an appropriate sentence for Mr. Fisher would be.

As you come forward, Miss Howard-Allen, you asked in your brief for a sentence of life. I have imposed life sentences. I have reserved those for, to me, what are the most dangerous criminals. Usually I do it when it's somebody who has done something horrible to a child, and those people I think really do deserve to spend the rest of their lives in prison, when you do something that life-altering to a child.

I have sentenced people to a life sentence maybe 12, 13, 14 years ago. I've done that in a situation not too different from Mr. Fisher's. I mean, it really wasn't a life sentence. It's just that it was a lengthy sentence that really ultimately might as well have been a life sentence.

I think in the last probably ten years or so, I

think there's been a bit of a shift in the way that a number of judges have sentenced just because studies have shown that maybe it's not necessary to send somebody to prison for such a significant period of time. You can still make an impact.

You look at a whole lot of other factors. I'll just say, I know I don't sentence quite as harshly as I did, I'll say, just 15 years ago, when I first became a District Court Judge. I've definitely seen a difference in my sentencing habits.

Mr. Fisher most certainly has his issues. There is no doubt about that, but I'm not so certain he deserves for the rest of his life to go to prison.

Do I compare him to the pedophiles that I have sent to prison for the rest of their lives? Mr. Fisher, although I don't like what he did, he's not in what I will just call a horrible human being kind of category. He's just not. I'm not certain he deserves to spend the rest of his life in prison.

He deserves a significant sentence. No doubt about that. But I'm not so certain the rest of his life is what's called for. So I know you kind of gave me your backup plan, maybe recognizing or thinking that I wouldn't think that a lifetime sentence was warranted. So I'm certainly happy to hear whatever you would like to propose, but I'll begin by saying that I don't think a lifetime is warranted

here.

MS. HOWARD-ALLEN: Thank you, Your Honor.

As I noted sort of at the end of my sentencing memo that -- and for not so much anticipating what you've seen as much as my experience has also guided me in terms of asking for a sentence of time period -- a significant time period of sentence for a lot of reasons that I'll get to of between 30 and 40 years.

I, too, having done this for 16 years and being in narcotics for the first eight of those, a lot of those times mandatory minimums were in force, as were the enhancements that were applicable.

And those -- my only -- in my experience, the only time someone went to life was a mandatory minimum and he was then released because he had just two priors and got life. And Judge Castagna was very uncomfortable with that even ten years ago. So I can certainly appreciate that.

And that was a similar case for me because that individual had two prior marijuana convictions in state court which he never even went to jail for.

Mr. Fisher's criminal history is less -- is less than that. But that being said and the reasons -- for the reasons in adopting a lot of my reasoning in the sentencing memo, I think this is a very serious offense and should receive a very serious sentence.

So I leave that in the Court's discretion and understanding about their reticence to impose life, but I think a substantial of over 30 years is warranted in this case. And I'll tell you a couple of reasons why.

Clearly, first and foremost, as Your Honor heard throughout this trial, this involves fentanyl, and this is a deadly, deadly drug.

You heard the forensic chemists testify about how likely it was that someone could die from fentanyl and that the contamination of fentanyl in itself could be deadly. You heard four or five, six DEA agents testify about having to wear clan lab gear to go in due to the possible contamination of fentanyl everywhere.

So I think there is a serious need to reflect the seriousness of this crime in the punishment and deterrence and to protect the community and respect -- and make respect for the law.

I mean, the notion that this is an aberration in his life is just not really founded in the facts. I think the jury believed Mr. McKinney. I think Mr. McKinney spoke about a long-standing pill operation that they were involved in that started with Molly and passing Molly pills, which was sort of the amphetamine kind of Molly pills and moving on to this fentanyl because it was more lucrative.

I don't think that was at all an aberration in his

life. And I think that there is a serious need. I don't think that they found he was lying. I don't think they found any of the cooperating defendants were lying. So I think that that's a serious offense that requires serious time.

You know, if we were just to look at the objections that were posed by defense counsel and just -- if you went with his 34 as opposed to a 38 on the weight, which I know Your Honor overruled that objection -- even if we went with that lower amount, the other objections, which I think are not in good faith -- his role was firmly established at trial. The guns were found.

If you adjust those enhancements that I think are truly applicable -- maintaining a drug premises, money laundering -- and you add that to the 34, you still come up at a level, I think, of 41, which is 324 months to 405 months, which is 27 to 33.75 years.

To me, the 405 is the highest number in the guidelines. Everything else is 360 to life. Clearly 405 is in that range, and that's technically on the sort of low end of that range, if you went 360 to life. And to get to 360 to life you have to go down a level from his base offense level, which is 43. You technically have to go down five levels because his real base offense level was 47, which is off the charts, and so you have to go to 43.

So I think the guidelines have to inform the

Court's decision. And the notion that he's at a 47, so then he's at a 43, and even to go down to get in the range of 360 to life, you have to go down another further. So I think that's sort of the range that you find him in if you even discounted any of Mr. Farmer's objections as to weight, not as to role and money laundering and those kinds of things.

So taking just, again, the largest number that's sort of the middle of the low range of the, you know, 360 to life, again, dropping down for no reason a level to form an advisory guideline range.

I just really think -- when I said 30 to 40 years, I meant, I think, 35 years. I think the notion that Mr. Farmer's memorandum says, well, gosh, that would be like four times Mr. Morose's sentence, the highest sentence of all of those defendants. But Mr. Morose was a customer. I don't think it's outrageous to say that the biggest customer, leader, the person who produced it and sold it and earned all the money from it, was four times that sentence.

Three times, it's not even a stretch for me. And so I know he was using that because it was the highest of the customers. And I mentioned in my sentencing memorandum, the obvious issue of disparity that, again, Mr. Farmer just raised, but I think, you know, that the co-defendants are so vastly disparate, both in their roles and then in their cooperation and the way that they pled guilty or the way that

they assisted or the assets Mr. McKinney turned over, $1.4 million in cash and a bunch of assets and --

THE COURT: And you are also rewarded. You come in and you plead guilty, there's got to be a reward for it. You forfeit your money, there is going to be a reward for it.

MS. HOWARD-ALLEN: He did, obviously, even more than that. He made two recorded phone calls. He made -- with Mr. Fisher, he went over there, picked up the pills, sort of toured Mr. Fisher's storage unit, drug-producing premises. He went ahead and made literally dozens of phone calls to Mr. Morose and with law enforcement, all dealing with his fentanyl addiction that he had.

And so he was uniquely situated. Whether I agree with his sentence or not, he was uniquely situated, but I think that to me that for all other reasons, both that I've mentioned today, the Court has taken into assessment, I just really feel something in the middle of the 30 to 40 range is what's appropriate in light of all this serious drugs, the serious offense, the length of it, how long it went on.

And just the pure motivation unquestionably came out in every witness that dealt with him and in every piece of evidence that we put on at trial. This was just about greed. It was just about, you know, going to boxing fights, earning money, driving fancy cars, flying to Vegas. It was just having fancy clothes. It was pure, unadulterated greed,

that didn't care that he was selling drugs, fentanyl pills to someone who was saying, I would rather have them not go to a doctor and get the drugs and buy my fentanyl pills because it's cheaper and easier and sort of laughing about it with the CI.

I mentioned that in my sentencing memo. At trial, his defense attorney implicated that was an exaggeration in his closing, that it couldn't be believed, but that was him talking in realtime to a drug trafficker who -- he was like, oh, will you buy some pills from me?

Let's talk about all the drug dealing we do and fancy cars we have. That was him in his true nature of how he was -- why he was in the drug business, what he was expecting to get out of it and his disregard for the people who bought it.

So that's the reason why he should have a serious sentence, Your Honor, that should reflect the seriousness, that should punish him and that should protect the community. So that's my recommendation, Your Honor.

THE COURT: Okay. All right. Thank you very much. I appreciate it.

Mr. Farmer, do you know of any reason why this Court should not now proceed with imposition of sentence?

MR. FARMER: I do not, Your Honor.

May I comment just briefly in support of our

motion?

THE COURT: My goodness, of course. This is absolutely your opportunity to make a statement, present any information in mitigation of the sentence.

And, Mr. Fisher, you have the right to address the Court directly. You don't have to, but I wanted to make certain that you understand that you have that right.

Do you understand that, Mr. Fisher?

THE DEFENDANT: Yes.

THE COURT: Okay. And any witnesses you wish to put on, Mr. Farmer, most certainly. It's however you would like to proceed with your presentation in mitigation of the sentence is fine.

MR. FARMER: Yes, Your Honor.

THE COURT: I'll just tell you, as I began with Miss Howard-Allen, I would not sentence Mr. Fisher to life in prison. I do think he deserves a significant sentence. The government is asking for something in the 30-to-40-year range. That's significant. For your client, that would basically be the majority of his life in prison. So that's most certainly a significant sentence.

As I said, I don't take what he did lightly. So don't interpret any of my comments to mean that he ought to get a little slap on the wrist, because he's not going to. He's going to get a significant sentence. It's just what is

that significant sentence.

So, go ahead, Mr. Farmer.

MR. FARMER: Yes, Your Honor. Thank you.

We will not present any witnesses. I think Mr. Fisher would like to address the Court very briefly.

But just very briefly as to comments on disparity, if you were to sentence Mr. Fisher to the kind of sentence that the government is requesting, and that is that it's understandable that Mr. Huffman and Mr. McKinney received vast benefits for doing the right thing and doing it early, doing it quickly, without hesitation.

But at the same time, the moral culpability of the three men -- Mr. Fisher and those two -- really are -- and Mr. Morose, the fourth man -- really are almost indistinguishable.

THE COURT: I understand that's your position, Mr. Farmer.

MR. FARMER: Yes, Your Honor.

THE COURT: I think there are some differences. There are some differences for sure between them. I don't think they are completely, evenly situated, but I just continue to believe there has to be a big benefit to pleading guilty. Otherwise, I would just roll the dice and see if you can convince one of the 12 that you're not guilty.

There's got to be a huge benefit to pleading

guilty. Otherwise, why would anybody do it?

MR. FARMER: That's absolutely true. And what we are asking, though, is recognition that those two gentlemen -- McKinney -- Mr. McKinney and Mr. Huffman -- have been sentenced to 24 months and 33 months, respectively. And they deserve that. They cooperated. There are factors that led to that result.

But at the same time, if you sentence Mr. Fisher to the kind of three decades in prison that the government is requesting, it would just -- the disparity would be quite glaring.

And when we talk about Mr. Morose being sentenced now to ten years, that is, I think, the level of culpability that would not be excessive, that would be more than sufficient to punish Mr. Fisher in this case, and to honor those factors in 3553(a) in terms of just punishment, in terms of safety to the community, in terms of punishment for not acknowledging responsibility and not agreeing to cooperate with the government and insisting on his right to trial. So we would ask for a sentence close to Mr. Morose's sentence.

THE COURT: All right. Okay. Thank you, Mr. Farmer.

Anything you would like to say, Mr. Fisher? I'm happy to hear you at this time.

THE DEFENDANT: Yes. I would like to first apologize to my family, my mom and dad, my wife and kids, and I would like to say I've used this time to really find out who I am and really learn to control my emotions and my feelings and things of that nature over the last 18 months to the point that I can't even recognize the person I was 18 months ago.

And I would like to thank everybody in this room for helping me. And even though some people think this might be a disservice, I feel it's a service to me to help me be a better person. Thank you.

THE COURT: All right. If there is nothing else, I'll move forward with sentencing.

The Court has asked the defendant why judgment should not now be pronounced, and after hearing the defendant's response the Court has found no cause to the contrary. The parties have made statements on their behalf or have waived the opportunity to do so, and the Court has reviewed the presentence report.

Pursuant to Title 18, United States Code, Sections 3551 and 3553, it is the judgment of the Court that the Defendant, Dion Gregory Fisher, is hereby committed to the custody of the Bureau of Prisons to be in prison for a term of 360 months.

Let's see, that would be 360 months as to Counts

One and Six, 240 months as to Count Two, 360 months as to Counts Three, Four, and Five, and 120 months as to Counts 9 through 16, all such terms to run concurrently.

So I hope, Miss Hatten, I've got that correct. I want the total to be 30 years.

THE PROBATION OFFICER: You did, Your Honor.

THE COURT: Thank you.

Upon release from imprisonment you shall serve a five-year term of supervised release. This term consists of the five-year term as to Counts One through Six and a three-year term as to Counts Nine through Sixteen, all such terms to run concurrently.

While on supervised release you shall comply with the mandatory and standard conditions adopted by the Court in the Middle District of Florida. In addition, you shall comply with the following special conditions:

One, you shall participate in a substance abuse program, outpatient and/or inpatient, and follow the probation officer's instructions regarding the implementation of this Court directive.

Further, you shall contribute to the cost of these services, not to exceed an amount determined reasonable by the probation office's sliding scale for substance abuse treatment services.

During and upon the completion of this program,

you are directed to submit to random drug testing. Having been convicted of a qualifying felony, you must cooperate in the collection of DNA as directed by the probation officer. You must refrain from any unlawful use of controlled substance. You must submit to one drug test within 15 days of placement on supervision and at least two periodic drug tests thereafter as directed by the probation officer.

You must submit to random drug testing, not to exceed 104 tests per year. Based on the financial status of the defendant the Court waives imposition of a fine.

Are there any forfeiture matters to consider?

MS. HOWARD-ALLEN: Yes, Your Honor. At docket 239, we have filed an Order of Forfeiture and Preliminary Order of Forfeiture for direct assets. So we would ask that that be part of the -- that it be made final as part of the PSR -- I mean, as part of the judgment.

THE COURT: That's made a final order today. That Order of Forfeiture is made final today and will be made part of the judgment.

It's further ordered that the defendant shall pay to the United States special assessments totaling $1,400, which shall be due immediately.

After considering the Advisory Sentencing Guidelines and all the factors identified in Title 18, United States Code, Sections 3553(a)(1) through (7), the Court finds

that the sentence imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

So, Mr. Fisher, I've had the opportunity to study the memos that have been submitted here by your lawyer, as well as the memo that was submitted by the government, as well as the arguments that were made here.

Indeed, you were the organizer and the manager in this drug conspiracy and the money laundering components of this case. You recruited and you managed individuals within the conspiracy. So you really are not similarly situated to the other gentlemen who have been sentenced either by me or by other judges. So you deserve a harsher penalty just based on that.

Miss Howard-Allen has talked about fentanyl. Of course, one of the most dangerous drugs out there and so there needs to be a consequence for that. It doesn't appear to me that you've had some of the challenges in your early life that other people have had. You had loving parents. Sometimes I see defendants that have had really rough childhoods, but you haven't had any of that.

So when I look at all these factors in terms what's a fair and what's an appropriate sentence, we want to discourage people from engaging in this kind of activity. On the other hand, I don't want to be overly harsh with you.

I've ultimately concluded that a sentence of 30

years seems fair and appropriate. The guidelines call for a life sentence, but I've utilized my discretion to depart downward to try to come up with a sentence that's fair and that's appropriate but that punishes you for what you did. That's the bottom line.

So that's why I've sentenced you as I have. I think 30 years -- I'm sure it's difficult for you, but I think that is the appropriate and fair sentence.

The Court having pronounced sentence, does counsel for the defendant or government have any objections to the sentence or to the manner in which the Court pronounced sentence other than those previously stated for the record?

Miss Howard-Allen?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: Thank you.

Mr. Farmer?

MR. FARMER: No, Your Honor.

THE COURT: The defendant is remanded to the custody of the United States Marshal to await designation by the Bureau of Prisons.

You have a right to appeal from the judgment and sentence within 14 days from the entry of the judgment. Failure to appeal within the 14-day period shall be a waiver of your right to appeal. The government may file an appeal from this sentence.

You are also advised that you are entitled to assistance of counsel in taking an appeal; and if you are unable to afford a lawyer, one will be provided for you. If you are unable to afford the filing fee, the Clerk of the Court will be directed to accept the Notice of Appeal without such fee.

Mr. Farmer, where should I recommend that your client be housed? Where would he like to go?

MR. FARMER: Your Honor, would you recommend Rochester, Minnesota? It's a prison hospital. Mr. Fisher has been in the infirmary at Pinellas County Jail for at least the last two months or so. He does have some health challenges.

In the alternative, if the BOP does not designate him as a medically needy inmate, would you recommend a prison close to Michigan -- in Michigan or close to?

THE COURT: Okay. Does he wish to tell me what his medical issues are so I can put it on the J and C? If he doesn't wish to, I will just say that he has some health challenges.

MR. FARMER: Could you just indicate that he's been housed at the infirmary at Pinellas County Jail? Is that too vague, Your Honor?

THE COURT: I don't know, but I'll put on there that he's been housed in the infirmary at Pinellas County

Jail. I mean, I don't know, they will evaluate him and see if the fact that he's been in an infirmary is enough. I don't know.

MR. FARMER: Yes, Your Honor. I think it's primarily he has a CPAP machine that is medically required, and that's the reason that he's been housed at the infirmary.

THE COURT: You mean for like when you have sleep apnea and things like that?

MR. FARMER: Yes, Your Honor.

THE COURT: And what was the second choice? Michigan?

MR. FARMER: Yes, Your Honor. I did not investigate which prisons are located in Michigan, but that's where his mother resides.

THE COURT: Okay. I'll put in there Michigan.

MR. FARMER: Thank you, Your Honor.

THE COURT: All right.

MR. FARMER: And also, Your Honor, would you recommend the RDAP, the drug treatment program?

THE COURT: Okay.

MR. FARMER: Thank you.

THE COURT: So the RDAP.

Probation, did you see a need for RDAP based on what he said?

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: Okay. All right. So I recommend that he be housed in the medical facility in Rochester in light of the fact that he's been housed in the infirmary of Pinellas County Jail.

If he doesn't qualify for the Rochester, Minnesota, medical facility, that he be housed somewhere in Michigan, near where his family and friends reside, that he be evaluated for admission to the RDAP program so that he can get drug treatment.

How about educational or vocational training? What would he like?

MR. FARMER: Your Honor, Mr. Fisher is open to anything and everything. He does have an interest in business finance.

THE COURT: Okay. So I will recommend to the Bureau of Prisons that they evaluate him for any educational or vocational training, but specifically in the area of business finance.

MR. FARMER: Thank you, Your Honor.

THE COURT: All right. Anything else that you can think of? Anything from the government? Anything else you would like me to add or say?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: Thank you, Miss Howard-Allen. And thank you to your team.

How about you, Mr. Farmer?

MR. FARMER: No, Your Honor. Thank you.

THE COURT: Thank you, Mr. Farmer. And thank you to probation. Good luck to you, Mr. Fisher.

We are in recess. Thank you.

(Proceedings concluded at 2:26 p.m.)

- - -

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 38), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ Scott N. Gamertsfelder, RMR, FCRR

*Official Court Reporter*

Date: January 20, 2019