UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Tampa, Florida |
| | No. 8:18-cr-236-T-33TGW |
| vs. | Docket No. 194 |
| | June 4, 2019 |
| DION GREGORY FISHER, Defendant. | Courtroom 14B |

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

(Vol. VI of VII)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

## APPEARANCES

**GOVERNMENT COUNSEL:**

**Kelley Howard-Allen, Assistant U.S. Attorney**
**Maria Guzman, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**Kenneth B. Martin, Esq.**
Law Office of Ken Martin
P.O. Box 10456
Tampa, Florida 33679
(813) 431-3310

**ALSO PRESENT:**

Adam Phelps, DEA Case Agent

Robert Liberto, IRS Case Agent

\- - -

**TABLE OF CONTENTS**

**EXAMINATIONS**


| GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WALTER RODRIGUEZ | 17 | 28 | | |
| CARLOS DIAZ | 30 | 36 | | |
| LINDSAY KAUFMAN | 38 | 45 | | |
| KONRAD GUZEWICZ | 49 | 103 | 108 | |
| ROMAN HERNANDEZ | 110 | | | |
| DIANE KNOTT | 130 | | | |


**EXHIBITS**


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 137 and 138............. | 101 | 16 |
| 140 and 141............. | 100 | 7 |
| 142 and 143............. | 77 | 13 |
| 255..................... | 47 | 23 |
| 416, 417, 418, and 419..................... | 62 | 13 |
| 420, 421, 422, and 456..................... | 77 | 19 |
| 423 and 424............. | 80 | 14 |
| 431, 432, 433, 434, 435, 436, and 436A...... | 92 | 15 |
| 600 through 615, 616A through 619........ | 134 | 22 |
| 616..................... | 60 | 24 |

## ADDITIONAL INDEXING


| | PAGE | LINE |
|---|---|---|
| Government rests Case-in-Chief................ | 188 | 14 |
| Defense Rule 29 Motion........................ | 189 | 4 |
| Jury Charge Conference........................ | 199 | 12 |

**P R O C E E D I N G S**

June 4, 2019 9:02 a.m.

- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Virginia M. Hernandez Covington presiding.

Please be seated.

THE COURT: Good morning, everyone.

I don't know. Did we get everybody back? Is everybody there?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: Okay. Very good.

Yes, Mr. Martin. Go ahead, sir.

MR. MARTIN: Excuse me. I have one issue that I'd like to bring to the attention of the Court.

THE COURT: Of course.

MR. MARTIN: Should I just --

THE COURT: Yes, that would be better. Thank you, Mr. Martin.

MR. MARTIN: What it regards is the testimony of Detective Gwynne and Government's Exhibit 145H. The Court will remember, Detective Gwynne was the witness that wasn't on the list.

THE COURT: Yes. Detective Gwynne. Right.

MR. MARTIN: Right. Basically, he testified -- I was not noticed in any way that he would be testifying as an expert. And, actually, as I recall our discussions regarding whether he --

THE COURT: Well, but wait. You did get -- I don't mean to cut you off. I just want to make certain that I understand it.

It says you were not notified or noticed that he would be testifying as an expert. You did know -- you did get copies of the report that he had, right, as Miss Howard-Allen told you, or maybe his police reports, or did you not -- were there not -- I thought for some reason there was something that she had turned over.

MR. MARTIN: Correct.

THE COURT: Okay.

MR. MARTIN: Correct. But I wasn't noticed in any way that he would be testifying as an expert. And when we talked about his testimony, he was -- the government represented he would be testifying basically as a chain of custody witness, which is 99 percent of his testimony.

THE COURT: Okay. I was going to say, what expert testimony did he give?

MR. MARTIN: With regard to 145H, which was a pendant, you know, a piece of jewelry, he testified that that -- the design of the pendant itself was worn by a source

of supply, that that signified the wearer was a source of supply. I heard it yesterday. I thought about asking for a sidebar immediately. Tactically, I did not. I did not want to highlight it.

THE COURT: Sure.

MR. MARTIN: Frankly, after thinking about that, that was probably a mistake. With that said, that evidence has little probative value. I mean, the fact that there was a pendant, the fact that it costs whatever it costs and, frankly, I didn't note the price of that particular piece of jewelry.

The government has lots of evidence about jewelry, lots of evidence about money that's unexplained. So its probative value as a piece of jewelry that cost X amount and, therefore, Mr. Fisher must be a drug dealer because he has unexplained income is very little probative value.

The prejudicial value that his opinion is that it could be a -- that it's worn by a source of supply is very, very prejudicial. I was not noticed that he would be testifying as an expert or to that. The remedy that I would ask for -- I certainly don't -- and I know he works for the narcotics division and has for a while. So I'm not contesting that he could probably be called in and qualified as an expert. I assume he could be.

But with that said, based on he wasn't in the

witness list, I wasn't noticed that he was an expert, it's highly prejudicial with little probative value, what I would ask for is that that one item, Government's Exhibit 145H, be -- basically a motion to strike, be removed from evidence, the jury be told not to consider 140 -- it not go back with them, to be told that they're not to consider 145H or to speculate why it's no longer in evidence or any testimony surrounding it. That's the remedy that I would ask for.

THE COURT: Okay. Well, let me hear from Miss Howard-Allen. Thank you.

MS. HOWARD-ALLEN: Your Honor, I would certainly not agree in any way, shape, or form that that's expert testimony, nor would Detective Gwynne be qualified. I don't even know if he would be qualified as an expert.

But, certainly, the fact that he has been in the narcotics section, had Mr. Martin objected, either contemporaneously or while Detective Gwynne was on the stand, I merely would have set a foundation and said, in your experience, as a detective in the narcotics section of the Pinellas County Sheriff's Office, you know, what does this plug design mean to you on the -- which was one of the descriptive -- one of the descriptions of one of the pieces of jewelry.

And I feel the foundation would have been laid because I think it's common knowledge, I think, with Agent

McGee, with Agent Zdrojewski, with Agent Corbett, all seasoned, sort of custodians of record agents for the DEA on the drug evidence. I'm sure I asked them questions saying, in your experiences as a DEA agent, you know, blah, blah, blah. And then they responded about whatever something was in their experience. And so Detective Gwynne responded the same way.

So a motion to strike is an extreme remedy that doesn't really have any basis in the facts or the law. And should the Court be inclined, I can certainly have Detective Gwynne come over and I can ask him in his experience as a detective in the narcotics section of the Pinellas County Sheriff's Office what would this mean. Because I think I said to him, what's the significance of this and, you know, a plug is necessarily a source -- I mean, just the definition probably from, you know, a Webster's dictionary is it's a source of power.

So it's not an extreme stretch to go, well, it's the source of drugs. So I don't think it's even close to an expert testimony issue. And I would ask that you deny the defendant's motion to strike that exhibit.

THE COURT: Well, I am -- I will either -- I'm just trying to gather my thoughts here.

Miss Howard-Allen, I tend to agree with you. The only thing that would make me evaluate this a little bit

differently where the gentleman should come back and testify as to that fact, Detective Gwynne would come back and testify, is the fact that it just so happens that his name was left off the list. And I understand it's just inadvertence and accidental. But I did recall the statement that you made that he's basically a records custodian -- not a records custodian, he's really a chain of custody is what he is. He is somebody who gathered evidence.

I don't think this is truly expert testimony, not in the sense of a chemist, but, you know, it's a criminal trial where we're required to cross every T and dot every I. So there is still time to do it.

And I understand where Mr. Martin is coming from. Sometimes when you object to things, it's worse, you know, it's worse because you draw attention to it, and it's a really tough tactical decision to make, particularly when you have to do it on such a short, you know, timeline.

And his complaint is that -- I mean, I'm kind of speaking for him, but if you put everything together, is that he didn't realize that this gentleman was going to testify as an expert.

So I'm going to offer two options. I'm going to either just overrule your objection, Mr. Martin, and let it in and not draw anymore attention to it, or to call the detective back so that they can lay a foundation. You don't

need to tell me this -- well, if you know, tell me.

MR. MARTIN: I know. I would rather have the objection overruled.

THE COURT: Okay. That's kind of what I thought.

MR. MARTIN: That's why I let it slide to begin with and struggled with letting it slide. I do not want to highlight it.

THE COURT: Okay. And I most certainly understand that, and the dilemma that you were in yesterday and the difficulty in terms of deciding whether to object or not. So the objection is noted but overruled because, to me, it really is not expert testimony. And the objection was not made contemporaneously. And I'm offering you an alternative to try to remedy it.

MS. HOWARD-ALLEN: And I would agree with the Court. And the only other possible alternative that I could offer to the Court is that you leave the exhibit in, obviously, for the value of, you know, it was collected at his house and this is the price of the piece of jewelry. And if the Court were so inclined or Mr. Martin would suggest, you could strike the comment about it being a source of supply. And then you would not strike the exhibit and it would still be in there. So I leave that to Mr. Martin, as well.

THE COURT: Gosh, that's a pretty good concession

there, Mr. Martin. Is that something you would like or do you want to think about it?

MR. MARTIN: Well, I would like that, unless we're going to get another witness to come in to highlight it again.

THE COURT: Well, no. Well --

MS. HOWARD-ALLEN: I do not have another witness who's going to address it.

THE COURT: Okay. So what is the language that you propose exactly, Miss Howard-Allen?

MS. HOWARD-ALLEN: I don't know if the Court reporter could just go to 145 -- what is it, P, is that P?

MR. MARTIN: I think it's H.

MS. HOWARD-ALLEN: And say that whatever -- whatever the words were that the detective said, that the plug is a source of -- that the plug -- I think I said, what does the plug design symbolize, something like that, and he said, it symbolizes the source of supply.

THE COURT: Symbolizes the source of supply.

MS. HOWARD-ALLEN: Or just -- you could say Detective Gwynne's description of Government's Exhibit 145H is stricken. I think you could say that, so then it covers what his description is.

THE COURT: I think I'm going to do that. The description of 145H is stricken. The exhibit is still coming

in. You can still -- it's still going back to -- we had a picture of it; right?

MS. HOWARD-ALLEN: Yes. It's just a yellow invoice, and it says, like, you know, a 16-inch plug design pendant, or whatever it says, and then the price of it.

THE COURT: Okay. But we didn't have the actual pendant; did we?

MS. HOWARD-ALLEN: No, we didn't.

THE COURT: Just the picture is what I thought. Okay. So I'll let them know that, that the description is stricken from the record, they shouldn't consider it, but that the actual exhibit itself is coming in, or has come in and will remain in.

MS. HOWARD-ALLEN: Yes.

THE COURT: Okay. How does that sound, Mr. Martin?

MR. MARTIN: That's good, Your Honor.

THE COURT: All right. Very good.

MR. MARTIN: I have one other issue regarding a witness that's coming later.

THE COURT: Yes, of course.

MR. MARTIN: I don't know if I should bring it up now or wait. It's --

THE COURT: Why don't we do it at the morning break, because it's 9:15 already, Mr. Martin, if that's okay.

MR. MARTIN: That's fine. Yes, ma'am. Thank you, Judge.

THE COURT: Thank you very much. Or do you think you need to know, Miss Howard-Allen?

MS. HOWARD-ALLEN: What was the other issue?

MR. MARTIN: What I told you about Miss Knott.

MS. HOWARD-ALLEN: Oh, okay. Yes. We can do that -- we can do that before. We're going to do three chemists and Mr. Gusewicz, and then we're going to address the objection he has on our final summary witness.

THE COURT: All right. Very good. We'll bring in the jury, then. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 9:14 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

Just verifying that nobody has done any independent research or discussed the case with anybody?

(Unanimous negative responses.)

THE COURT: All right. Very good.

Yesterday, you may recall a witness by the name of Detective Carl Gwynne, and we received a number of exhibits with Detective Gwynne, ladies and gentlemen. During the receipt of one of the exhibits -- and it was Exhibit 145H,

and, let's see, that was -- it was a photograph of a piece of jewelry and a sales receipt which was dated June 20th, 2016.

That exhibit has been received into evidence and you may certainly consider it in your deliberations. However, I'm going to strike from the record and ask you to please not consider the detective's description of 145H. He talked about certain items with respect to the design or maybe the symbol, words to that effect.

So that is stricken from the record. And please don't consider it when you begin your deliberations or during your deliberations. All right. It's a little bit hard to -- you know, sometimes when the bell is rung, it's hard to unring it. But I'm just asking you to please do that and not consider that.

Does everybody understand?

(Unanimous affirmative responses.)

THE COURT: But the exhibit is in, and you may certainly look at that during your deliberations and consider it.

All right. Miss Howard-Allen, are you ready with your next witness?

MS. GUZMAN: Yes, Your Honor. Good morning. The government would call Walter Rodriguez.

THE COURT: Okay.

THE COURTROOM DEPUTY: Please raise your right

hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Walter Rodriguez; spelled R-o-d-r-i-g-u-e-z.

THE COURTROOM DEPUTY: You may take the witness stand.

THE COURT: Mr. Rodriguez, you're going to be asked some questions by Assistant U.S. Attorney Maria Guzman. And then Ken Martin, who represents Mr. Fisher, may also ask you some questions in cross-examination.

If you don't understand the question, please say so so they can state it differently. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time.

If you have the tendency to speak quickly, slow down so we can understand you. And if you're soft-spoken, please speak up so we can hear you. All right?

THE WITNESS: Yes.

THE COURT: Okay.

Go ahead, Miss Guzman.

MS. GUZMAN: Thank you very much, Your Honor.

WALTER RODRIGUEZ,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good morning.

A. Good morning.

Q. Would you please introduce yourself to the members of the jury and to the Court?

A. My name is Walter Rodriguez. I'm a senior forensic chemist with the Drug Enforcement Administration in Miami, Florida.

Q. And how long have you been so employed?

A. For over 22 years now.

Q. Have you always been assigned to the Southeast Laboratory in Miami?

A. With the Drug Enforcement Administration, yes.

Q. Prior to joining the Drug Enforcement Administration, were you employed as a chemist for any other organizations?

A. Yes, I was. I was a crime laboratory analyst with the Florida Department of Law Enforcement here in Tampa and Fort Myers laboratories.

Q. Now, you indicated that you are a senior forensic chemist; is that correct?

A. That is correct.
Q. And what is the difference between a senior forensic chemist and a forensic chemist?
A. The duties are the same. It just involves a little bit more time on the job, as you can tell, and the level of expertise, as well. They don't hand out senior forensic chemists routinely. But when you put in the time, it's pretty much rewarded in that respect.
Q. As part of your duties as a senior forensic chemist, do you have the opportunity to train the younger members of your office?
A. On occasion, yes.
Q. Very briefly, what are your educational qualifications for the position that you hold with the Drug Enforcement Administration?
A. I have a bachelor's of science degree in chemistry from Eckerd College, and a master's of science degree in chemistry from the University of South Florida in Tampa.
Q. During the time that you have been with the Drug Enforcement Administration, have you had the opportunity to testify in few or many trials regarding your -- the results of your analysis?
A. Yes, quite a few.
Q. During the time with the Drug Enforcement Administration, have you had the opportunity to test or

analyze few or many controlled substances?
A. Yes.
Q. Prior to your designation as a senior forensic chemist, did you also serve with the Southeast Laboratory as what is called a quality systems specialist or a quality assurance specialist?
A. Yes, to both.
Q. And what exactly does that title designation require you to do?
A. As the quality assurance specialist, I was the key technical advisor to the associate laboratory director, and assisted in managing the quality system for the laboratory, as well as providing recommendations for policy with regard to the quality system, as well.
Q. Now, with regards to the designation as a quality systems specialist, if you would, does that also include any type of checks or repairs to equipment or anything that is used within the laboratory itself?
A. Yes.
Q. What about verification of calibrations and things of that nature with regards to the equipment?
A. That was part of my duties as quality systems specialist.
Q. With regards to your designation as a quality assurance specialist, what is the difference, if any, between being a

quality assurance specialist and a quality systems specialist?

A. The quality assurance specialist was more on the policy side and oversight side; whereas, the quality systems specialist was pretty much heavily hands-on with instrument checks and repairs and maintenance.

Q. Now, obviously, the Southeast Laboratory is a laboratory and it has equipment that is used by the chemists; correct?

A. Yes.

Q. Are there certain requirements or accreditations that that laboratory must have in order to allow for these chemists to use these instruments?

A. There is. Yes, there is.

Q. And if you would, briefly just detail for the jury some of the accreditation that is necessary in order for those chemists to conduct their work at that laboratory.

A. On the local level, the chemists must complete a training program, which is currently held at Quantico for 16 weeks, as well as additional training when they return from that training period to the laboratory, where they are more oriented to the laboratory equipment, its location, and the more specifics of its operation.

The laboratory director then signs off on their authorization or acknowledgment of their training that allows

them to perform this type of training.

At the laboratory level, the laboratory is accredited by an outside body, and there are periodic inspections to maintain a certain level of criteria that must be met by the laboratory.

Q. And when you testify that it has to be -- there are periodic checks by an outside body, generally, what is that outside body?

A. Currently, it is the ANAB Organization, which is the ANSI, A-N-S-I, National Accreditation Board.

Q. And to your knowledge at this point in time, is the Southeast Laboratory in compliance with all necessary requirements?

A. Yes. We are fully accredited.

Q. Let me refer you, and specific to this case, as we know now, there are laboratory numbers assigned by the department, the Drug Enforcement Administration, once a controlled substance has been acquired and presented to the lab.

I'd like to direct you to laboratory number 01637. Did you conduct, you yourself conduct an analysis of that substance?

A. Yes, I did.

Q. And I know, also, we know now, that there is a reference exhibit, which is a DEA exhibit, and in this case, it would be Exhibit 63.

A. That is correct.
Q. Now, first of all, as to --
MS. GUZMAN: Well, before we go into the actual analysis, Your Honor, I would like to tender at this time Mr. Rodriguez, based on his qualifications, based on his training and experience, as an expert in the area of forensic chemistry, which would allow him to render an opinion as to an issue in that field.
THE COURT: Okay. Thank you, Miss Guzman.
Mr. Martin, do you wish to voir dire the witness with respect to his qualifications to render expert testimony in the field of forensic chemistry?
MR. MARTIN: No, Your Honor. Thank you.
THE COURT: Thank you.
I find that Mr. Rodriguez is qualified as an expert witness, and may render an opinion in the area of his expertise, forensic chemistry.
You may proceed, Miss Guzman.
MS. GUZMAN: Thank you, Your Honor.
BY MS. GUZMAN:
Q. Again, reference Exhibit 63, which is referenced by your lab or LIMS number 01637. What exactly were you provided with regards to Exhibit 63?
A. This material was contained in what we label a self-sealing evidence envelope. It was located inside of a

Ziploc bag that was sealed inside of said container.
Q. And what was inside of that sealed envelope that you analyzed?
A. It was a light brown, chunky and crystalline material.
MS. GUZMAN: Your Honor, may I approach the evidence table?
THE COURT: Yes, you may.
BY MS. GUZMAN:
Q. Mr. Rodriguez, I have provided you what has been previously marked and introduced into evidence as Government's Exhibit 211. Do you recognize that particular exhibit?
A. Yes, I do.
Q. And how do you recognize that particular exhibit?
A. On the evidence label itself in my handwriting is my signature and my printed name, as well as the date I opened and closed it. And at the bottom of the envelope is my seal, again, in my handwriting.
Q. And does the exhibit indicate the date on which you would have unsealed it, and also the date on which you would have resealed it?
A. Yes, it does.
Q. What was the date on which you unsealed it?
A. April 13th, 2018.
Q. And the date that you sealed it back?

A. Same day. April 13th, 2018.
Q. There are certain -- and again, you've indicated that your markings or your name appear on that exhibit. I would have you look at the screen in front of you. Does that exhibit reflect a signature that is yours?
A. Yes, it does.
Q. If we could have the full -- there are some tags that are attached to that exhibit. I refer you first to a yellow rectangular tag that is exhibited on the top or reflected on the top of that exhibit.
What exactly is that yellow tag?
A. That is the evidence label that is affixed by our evidence technician upon entering this exhibit into our laboratory information management system.
Q. Now, right below it, there is a triangle that looks like a skull-type figure. It is white and red. What is that?
A. That is a danger label that we apply to exhibits that may contain hazardous materials. And in many cases, we started using this for biohazardous materials that may have come from an internal body carry or, in some cases, fentanyl.
Q. Does that -- who affixes that red triangle label to these plastic bags? Is it the chemist or is it someone else?
A. Sometimes both. Sometimes if the evidence comes in and on the paperwork that is submitted it is submitted as

suspected fentanyl, the evidence specialist will place this triangle on the evidence label. Typically, if it comes in as an unknown, and we, as chemists, discover that it contains fentanyl of any type and in any quantity, we would affix the label to the envelope.

Q. Is fentanyl considered -- based on your testimony, is it considered a dangerous drug?

A. Yes, it is.

Q. Now, with regards to your testing of Exhibit 63, again, is Exhibit 63 within the contents of Government's Exhibit 211?

A. Yes, it is.

Q. Now, you indicated that you -- the substance that you were provided with was a chunky substance, I think that's how you referred to it; is that correct?

A. A combination of chunky and crystalline material.

Q. Now, what testing did you perform on this chunky substance or chunky material in order to determine what it was?

A. Well, the first thing I do as a matter of recourse is to obtain the net weight of the material before I do any type of sampling or analysis.

Following obtaining a net weight, I create what is called a composite, which is a representative sample of the entire exhibit. Once I create the composite, I sample

portions of the composite for instrumental analysis, that is, I dissolve some material into a solution that I then inject into the instrument and obtain data from the instrument.
Q. And is that what you did in this particular case?
A. Yes, I did.
Q. Based on your testing, were you able to come to a determination of what substance -- or if a substance was identified in this chunky material?
A. Yes.
Q. And what was that?
A. The substance contained fentanyl.
Q. And were you able to determine again the weight?
A. Yes.
Q. And what was the weight?
A. 106.1 grams.
Q. Now, once you determined the weight, you determined the substance, is it at that point that you resealed the envelope?
A. Not exactly.
Q. Okay. What happens next after you make that determination?
A. There was -- I needed to remove an exemplar of this substance for a special signature program that is conducted at our special testing and research laboratory. So I removed a portion to submit to that laboratory for in-depth analysis.

Q. And why did you do that?
A. It was a matter of policy.
Q. Once that was done, was the next step in the process the resealing of the exhibit?
A. Yes, it was.
Q. Once the exhibit is resealed, you have signed your name to it and affixed it, where does the exhibit go?
A. It stays in my possession until I return it to the evidence section.
Q. And is that what happened here?
A. Yes, it did.
Q. Mr. Rodriguez, I'm going to ask your artistic assistance here. If you would, see next to you there is an easel with some paper. If you would, take the black marker, it's actually on that board right on the bottom. I think it's a brown one.
MS. GUZMAN: Your Honor, may I approach?
THE WITNESS: It is.
THE COURT: Yes.
BY MS. GUZMAN:
Q. If you would, take that particular black marker and reference Government's Exhibit 211, would you just indicate in writing what substance you identified and the weight.
A. Yes. (Witness complies.)
Q. And if you would, just initial it so we know it's you.

A. (Witness complies.)

MS. GUZMAN: Thank you very much, Mr. Rodriguez. I have no further questions.

THE WITNESS: You're welcome.

THE COURT: Thank you. Any cross-examination of this witness, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: You may proceed, sir.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good morning, sir.

A. Good morning.

Q. The analysis you did is what's called a qualitative analysis; is that correct?

A. That is correct.

Q. That allows you to identify that a drug is in whatever sample you're testing; correct?

A. Yes. It allows me to determine what is there.

Q. Okay. It doesn't allow you to determine the purity or how much or anything like that; does it?

A. Not in this case, no.

MR. MARTIN: Okay. Thank you. No further questions.

THE COURT: Anything else, Miss Guzman?

MS. GUZMAN: No, Your Honor. Thank you very much,

Mr. Rodriguez.

THE COURT: I'll excuse the witness. Thank you, Mr. Rodriguez. We appreciate your having come in today to testify.

THE WITNESS: You're welcome.

THE COURT: And you can call your next witness, please.

MS. GUZMAN: Yes, Your Honor. The government would call Carlos Diaz.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Carlos J. Diaz; C-a-r-l-o-s, J, D-i-a-z.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Mr. Diaz, you're going to be asked some questions by Miss Guzman, Assistant United States Attorney. And then Mr. Martin, who represents Mr. Fisher, may also ask you some questions in cross-examination.

If you don't understand it, please say so so they can state it another way. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time.

If you have the tendency to speak quickly, please slow down so we can understand you. And if you're soft-spoken, please speak up so we can hear you. All right?

THE WITNESS: Yes.

THE COURT: All right. Go ahead, Miss Guzman.

MS. GUZMAN: Thank you very much.

CARLOS DIAZ,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good morning, Mr. Diaz.

Would you please introduce yourself to the members of the jury and the Court?

A. My name is senior forensic chemist Carlos J. Diaz.

Q. And are you assigned -- well, first of all, where are you currently employed?

A. I'm currently employed with the Drug Enforcement Administration, Southeast Lab.

Q. And is the Southeast Laboratory located in Miami, Florida?

A. Yes.
Q. And how long have you been employed with the Southeast Laboratory?
A. Approximately 15-and-a-half years.
Q. Are you designated as a senior forensic chemist?
A. Yes.
Q. Have you always been employed as a chemist at the -- with the Drug Enforcement Administration, or have you ever been --
A. Yes.
Q. Yes. The answer is yes.
What are your educational -- what is your educational background?
A. I have a bachelor's of science degree in criminal justice and a bachelor's of science degree in chemistry.
Q. And from what institutions do you have those?
A. Florida International University.
Q. And that's in Miami?
A. Miami.
Q. During your 15 years with the Drug Enforcement Administration, have you always worked at Southeast Laboratory?
A. Yes.
Q. Have you had the opportunity to test few or many controlled substances and performed analyses?

A. Yes.

Q. During the time that you've been with the Southeast Laboratory in conjunction with those analyses, have you had the opportunity to testify in federal and/or state courts?

A. Yes.

Q. And during those court appearances, have you testified and rendered opinions about controlled substances that you've analyzed?

A. Yes.

MS. GUZMAN: Your Honor, at this time the government would tender Carlos Diaz, a senior forensic chemist with the Southeast Laboratory, as an expert witness in the area of forensic chemistry based on his educational background and his training and experience.

THE COURT: All right. Thank you.

Do you wish to voir dire the witness, Mr. Martin?

MR. MARTIN: No, Your Honor. Thank you.

THE COURT: All right. Thank you.

I find that Mr. Diaz is, indeed, qualified as an expert, and may render expert testimony in the field of forensic chemistry. You may proceed.

MS. GUZMAN: Thank you, Your Honor.

BY MS. GUZMAN:

Q. In conjunction with this case, Mr. Diaz, did you -- were you asked to perform an analysis of an exhibit provided

to you which was DEA Exhibit 28?
A. Yes.
Q. And does DEA Exhibit 28 conform to a laboratory number of 01602?
A. Yes.
MS. GUZMAN: Your Honor, if I may approach again the evidence table.
THE COURT: Let us know if you need some help.
MS. GUZMAN: Thank you, Your Honor.
BY MS. GUZMAN:
Q. Mr. Diaz, I have provided you what has previously been marked and introduced into evidence as Government's Exhibit 222. Do you have that in front of you?
A. Yes.
Q. And do you recognize that exhibit?
A. Yes.
Q. And what is that exhibit?
A. This is a heat-sealed evidence envelope with my seal on the bottom and my information in the middle seal, middle label.
Q. And the fact that your name appears on that exhibit, what does that mean?
A. This is an exhibit that I worked on.
Q. Now, with reference to that particular exhibit, and in particular as to DEA Exhibit 28.01, did you conduct tests as

to 28.01 DEA exhibit?
A. Yes.
Q. And what tests did you perform?
A. I performed gas chromatography and also gas chromatography-mass spectometry.
Q. Now, what exactly was 28.01? What were you provided for purposes of testing?
A. 28.01 were eight tablets.
Q. I'm sorry. That was eight tablets?
A. Correct.
Q. And what did you do with those eight tablets in your testing?
A. I analyzed each of the eight.
Q. And what type of tests did you perform on the eight tablets?
A. Both the GC, gas chromatography, and GCMS, gas chromatography and mass spectrometry.
Q. And are those the two tests that are performed subject to protocol and policy at the Southeast Laboratory?
A. Yes.
Q. And as a result of the testing that you performed, were you able to determine a substance -- identify a substance in those tablets?
A. Yes.
Q. And what was that?

A. DEA Exhibit 28.01 contained fentanyl.
Q. And were you able to determine a weight?
A. Yes.
Q. And what was that weight?
A. 0.7761 grams.
Q. If I may ask your assistance, there is an easel to your right. There is a paper attached to that easel. It indicates Government's Exhibit 222. If you would, just indicate the exhibit number which is 28.01, what your findings were in terms of the substance and then the weight, and just initial it.
A. Write it down?
Q. Yes. Just write it down right there on that paper.
A. I might have to take the mic off.
Q. And write as big as you can. We've got plenty of paper.
A. (Witness complies.)
Q. And if you would, just initial it so we know that that's your writing.
A. (Witness complies.)
Q. Thank you very much, Mr. Diaz.
MS. GUZMAN: I have no further questions, and I would tender the witness to Mr. Martin.
THE COURT: Thank you. Any cross-examination for this witness?

MR. MARTIN: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good morning.

A. Good morning.

Q. The test you did is what's called a qualitative analysis; correct?

A. Correct.

Q. And that allows you to determine -- in this case you determined fentanyl, the type of drug that was in there; correct?

A. Correct.

Q. It is not a test that allows you to determine the purity, et cetera; is that fair to say?

A. Correct.

Q. Thank you.

MR. MARTIN: No further questions.

THE COURT: All right. Anything else, Miss Guzman, for this witness?

MS. GUZMAN: No, Your Honor. Thank you, Mr. Diaz.

THE COURT: I'll excuse the witness. Thank you, Mr. Diaz. We appreciate your coming up today to testify.

THE WITNESS: Thank you.

THE COURT: You can call your next witness, please.

MS. GUZMAN: Yes, Your Honor. The government would call Lindsay McHale Kaufman, our last chemist.

THE COURT: Okay.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Lindsay McHale Kaufman; L-i-n-d-s-a-y, K-a-u-f-m-a-n.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: You're going to be asked some questions, Miss Kaufman, by Miss Guzman, Assistant United States Attorney. And then Mr. Martin, who represents Mr. Fisher, the defendant, may ask you some questions, as well.

If you don't understand the question, please say so so it can be stated a different way. Wait until the question is finished before you begin answering so we don't have two people speaking at the same time.

If you have the tendency to speak quickly, please

slow down so we can understand you. And if you're soft-spoken, please speak up so we can hear you. All right?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Go ahead, Miss Guzman.

MS. GUZMAN: Thank you very much.

LINDSAY KAUFMAN,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. Good morning.

A. Good morning.

Q. Would you please introduce yourself to the members of the jury and to the Court?

A. My name is Lindsay McHale Kaufman. And I am a forensic chemist with the Drug Enforcement Administration.

Q. And are you assigned to any particular laboratory in the United States?

A. I work in the Southeast Laboratory in Miami, Florida.

Q. And how long have you worked for the Southeast Laboratory?

A. Just over three years.

Q. Prior to your employment at the Southeast Laboratory in Miami, did you work at any other laboratory or organization?

A. I was a student intern at the Southeast Laboratory

before I was actually employed there. And I was an intern at Florida International University as well as Miami-Dade College.

Q. During the three years that you've been at the Southeast Laboratory, have you had few or many occasions to analyze controlled substances?

A. Yes, I have.

Q. During the time that you have been with the Drug Enforcement Administration, specifically the Southeast Laboratory, have you had an opportunity to testify in court regarding some of the analyses of those controlled substances?

A. Yes, I have.

Q. Now, you indicated that you conducted your studies at Florida International University; is that correct?

A. Yes, it is.

Q. As part of the Southeast Laboratory, do you also receive additional training as a member of that particular unit?

A. That's correct.

Q. And what type of training do you receive from your employer in this case, which would be the Drug Enforcement Administration?

A. When I first was employed with the Drug Enforcement Administration, or the DEA, I had to do a four-month course

at Quantico, Virginia. And upon completion of that, I did approximately two months of on-the-job training as well as we have to do 20 years of training -- not 20 years, excuse me, 20 hours of training each year to maintain our expertise.

MS. GUZMAN: Your Honor, at this time, I would tender Miss Kaufman as an expert in the field of forensic chemistry based on her educational qualifications as well as her training and experience working at the Southeast Laboratory for the Drug Enforcement Administration.

THE COURT: All right. Do you wish to voir dire, Mr. Martin?

MR. MARTIN: No, Your Honor. Thank you.

THE COURT: I find that Miss Kaufman is qualified as an expert witness, and may render expert testimony in the field of forensic chemistry. You may proceed.

MS. GUZMAN: Thank you, Your Honor.

BY MS. GUZMAN:

Q. Miss Kaufman, with regards to this particular case, I'd like to direct you to -- specifically to two laboratory reports that I believe were completed by you.

So let's take them individually. First of all, it would be laboratory report 01639, corresponding to a DEA Exhibit 65.02. Were you the chemist that analyzed that particular substance?

A. Yes, ma'am.

MS. GUZMAN: Your Honor, if I could, once again, approach the evidence table?

THE COURT: You may. Yes.

BY MS. GUZMAN:

Q. Miss Kaufman, I have provided you what has previously been marked and introduced into evidence as Government's Exhibit 215. Do you have that in front of you?

A. Yes, ma'am, I do.

Q. And are there any markings on that particular exhibit that make it familiar to you?

A. Yes, there are.

Q. And what are those markings?

A. On the top, there is a yellow label that bears my initials because I'm the one that actually attached the label to it. It also has my signature on the evidence seal here (indicating). As well as inside, this has been double bagged because of the nature of the material inside.

There is also a seal here. And then I have information of when I opened it and when I sealed the inner packaging, as well.

Q. Why is it important that the bag be double bagged because of the substance?

A. This exhibit contains fentanyl, which is potentially very dangerous for anybody handling it. And so as a safety precaution, I double bagged it to make sure that whoever is

handling it without gloves isn't at risk.
Q. And in Government's Exhibit 215, which I believe you have the exhibit and then there's also a photograph on the monitor there, there appears some labels. There is one on the bottom, one on the top. They are white and red. What is the significance of those labels?
A. This is used to indicate that there is fentanyl or some fentanyl derivative in the exhibit.
Q. Now, with regards to Government's Exhibit 215, and in particular, to Exhibit 65.02, what type of tests did you conduct to determine what that was?
A. May I consult my notes?
Q. Of course.
A. I analyzed the contents of this exhibit, and all of the subject exhibits inside using gas chromatography and gas chromatography, mass spectrometry.
Q. And what exactly was 65.02?
A. 65.02 contained 96 grams of fentanyl.
Q. Was it a tablet, was it powder? What exactly was the substance, if you recall?
A. This substance was powder.
Q. And, again, I think you probably stated it, but I missed it. What was the total weight?
A. It was 96 grams.
Q. If you would, do me a tremendous favor. There is a

piece of paper to your right. It says Government's Exhibit 215. If you would -- I guess you'll have to remove your mic. Just go to the piece of paper on the easel, and where it says Government's Exhibit 215, just simply note the substance that you identified, the weight, and then your initials.

A. (Witness complies.)

Q. There are a couple more things. Your initials, and also, just the exhibit number, which I've labeled as 65.02.

A. (Witness complies.)

Q. Now, in addition to Government's Exhibit 215, you also, I believe, were asked to conduct a separate test reference DEA Exhibit 67; is that correct?

A. Yes, ma'am.

Q. And DEA Exhibit 67, I believe, had a different laboratory number of 01641; is that correct?

A. Yes, ma'am.

MS. GUZMAN: Your Honor, may I, once again, approach the exhibit table?

THE COURT: Yes, you may.

BY MS. GUZMAN:

Q. Miss Kaufman, I have provided you what has previously been marked as Government's Exhibit 216. Do you have that in front of you?

A. Yes, ma'am, I do.

Q. Again, similar questions. Do you recognize your

markings on Government's Exhibit 216?
A. Yes, ma'am, I do.
Q. And again, why would that particular exhibit have your markings on it?
A. This is all the information that I put on the exhibit when I open it, and then after I analyze it and seal it.
Q. Now, with reference to Government's Exhibit 216, specifically DEA 67, did you conduct tests as to that substance?
A. Yes, ma'am, I did.
Q. And, again, what substance was provided to you for analysis?
A. This exhibit contained 18.4 grams of pentylone.
Q. Now, what is pentylone?
A. Pentylone is a substituted cathinone, and it is a Schedule I hallucinogenic.
Q. Now, again, the weight that you determined, I think you indicated was 18.4 grams?
A. Yes, ma'am.
Q. Now, do you recall whether the pentylone that was provided to you, or the material that was provided that you determined to be pentylone, was this powder, were these tablets? What exactly was in the exhibit bag that was given to you?
A. The form of this one was also powder.

Q. I, once again, am going to ask you to go back to art school. If you would, go back to the easel and the piece of paper there where it notes Government's Exhibit 216.

A. (Witness complies.)

Q. And very good. You've got it all. So this would be Exhibit 67, pentylone, and 18.4 grams. Very good.

Thank you so very much, Miss Kaufman. I have no further questions. I at this time would tender your testimony to Mr. Martin for cross-examination.

MS. GUZMAN: Thank you, Your Honor.

THE COURT: All right. Thank you, Miss Guzman. Mr. Martin, do you wish to cross-examine?

MR. MARTIN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good morning.

A. Good morning.

Q. The tests that you ran are what's called qualitative tests; is that correct?

A. That's correct.

Q. In other words, they allow you to identify a drug is in that substance that you're testing?

A. That's correct.

Q. They don't allow you to identify the purity or how much is in there; correct?

A. That is correct.

MR. MARTIN: Thank you.

THE COURT: Anything else, Miss Guzman?

MS. GUZMAN: No, Your Honor, not as to Miss Kaufman.

THE COURT: Okay. Thank you, Miss Kaufman. You are excused. We appreciate your having come up today to testify.

THE WITNESS: Thank you, ma'am.

THE COURT: You can call your next witness, please.

MS. GUZMAN: Your Honor, may I approach the podium?

THE COURT: Yes.

MS. GUZMAN: Your Honor, before the government calls any additional witnesses, we would seek at this time, since Miss Kaufman, as I indicated, is the last chemist, to introduce the paperwork that has been used in the summaries by the ten chemists that have testified. We would like to introduce that entire exhibit.

THE COURT: Are you talking about the flip chart or are you talking about something else?

MS. GUZMAN: The flip charts. All the flip charts. I believe this is the second one that we used today, because we've run out of paper on the larger. But the larger

paper and this one, this flip pad, as well, we would introduce all of it as Government's Exhibit 235 as a necessary summary. I believe under the Federal Rules of Procedure, I think it's 1006, it would be appropriate at this time.

THE COURT: Okay. Is it on your list or was it added? I've got your 5-28, I have your list here. Is that a new addition or --

MS. HOWARD-ALLEN: It's a new addition, Your Honor.

THE COURT: 238?

MS. GUZMAN: Your Honor, it is a new addition, because, of course, it had not yet been completed. So at this time, we would move to introduce it. I think it would be Government's Exhibit 235.

THE COURT: 235. Okay. Sorry. 235. Okay.

MS. GUZMAN: And the title would be something along the lines of summary of drug exhibits that have been provided in a summary form by DEA exhibit number, substance, and then, of course, weight.

THE COURT: All right. 235 is received into evidence.

(Government Exhibit 255 received in evidence.)

THE COURT: It's already been published to the jury, but that's something the jury, of course, can take back

during its deliberations.

MS. GUZMAN: Yes. Thank you very much. And again, I noted this before, but it would be the larger flip pad in conjunction with the smaller flip pad that we're using today.

THE COURT: Okay. There are two flip pads or flip charts, however we wish to refer to them. Thank you.

MS. GUZMAN: Thank you very much, Your Honor.

THE COURT: All right. Are you ready with your next witness?

MS. HOWARD-ALLEN: Yes, Your Honor. The United States calls Konrad Guzewicz.

THE COURT: All right.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Konrad Guzewicz; K-o-n-r-a-d, last name is G-u-z-e-w-i-c-z.

THE COURT: You may have a seat in the witness chair, right over here.

Mr. Guzewicz, you're going to receive or hear some questions from Kelley Howard-Allen, who is the Assistant United States Attorney in the case, standing right over there. And then in cross-examination, you may be asked some questions by Mr. Ken Martin, who represents Mr. Fisher.

If you don't understand the questions, you need to tell us so that they can state it differently. You need to wait until the question is finished before you begin answering so two people aren't speaking at the same time.

If you have the tendency to speak quickly, please slow down. And if you're soft-spoken, you need to speak up because we need to hear you. Do you understand that?

THE WITNESS: Yes. Yes.

THE COURT: Okay. Go ahead, Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor.

KONRAD GUZEWICZ,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good morning, Mr. Guzewicz.

A. Good morning.

Q. Where are you from, Mr. Guzewicz?

A. Holland.

Q. And how long have you been in the United States?

A. About 22 years.
Q. Where do you currently live?
A. Clearwater, Florida.
Q. Are you married, Mr. Guzewicz?
A. Yes, I am.
Q. Who are you married to?
A. Anna Wolfe.
Q. What do you --

THE COURT: Let me get the spelling of the lady's name. What is her name?

THE WITNESS: Anna, A-n-n-a. And then the last name is W-o-l-f-e.

THE COURT: Thank you.

BY MS. HOWARD-ALLEN:

Q. What do you do for a living, Mr. Guzewicz?
A. Me and my wife, we have a tire shop and a dealership. So we sell cars, tires, rims, and car repair.
Q. What are the names of those businesses?
A. AK Tires & Rims, and the dealership is Onyx Automotive.
Q. Where is Onyx Automotive located?
A. It's in Largo. Do you want the address?
Q. Do you have it?
A. Yeah. 11455 66th Street, Largo.
Q. Where is AK Tires?
A. Same location.

Q. How much of the business at Onyx and AK Tires is cash?
A. About 50 percent.
Q. When did you start Onyx Automotive?
A. About 2010.
Q. And when did you open AK Tires?
A. First time was 2006.
Q. How many people do you employ at AK Tires?
A. Including me, it would be four.
Q. And how many people do you employ -- do you and your wife employ at Onyx Automotive?
A. It's my wife, and I also help her, too. So two together.
Q. And in terms of how you run the financial part of your business, what bank accounts do you have for these businesses?
A. We use Bank of America account.
Q. And how many accounts at Bank of America?
A. One of each. One of each. Each business, yeah.
Q. One for Onyx and one for AK Tires?
A. Yes.
Q. Who can sign on those accounts at Bank of America?
A. Me and my wife.
Q. Do you -- how many personal accounts do you and your wife have?
A. We have right now two. We had three before. Pinellas

County Credit Union. It was three.
Q. What are the banks where you have your personal accounts?
A. We have Suncoast Credit Union and we have SunTrust.
Q. And did you have a previous?
A. Yes, the Pinellas Federal Credit Union.
Q. Mr. Guzewicz, do you know Dion Fisher?
A. Yes, I do.
Q. How do you know him?
A. We met through my business, basically. We became friends.
Q. How did you meet at your business, through your business?
A. Through his father.
Q. And how did that happen? What happened?
A. He -- first he came to buy some rims for his Bentley.
Q. Mr. Guzewicz, do you see Dion Fisher here in the courtroom?
A. Yes, I do.
Q. Can you tell me an article of clothing that he's wearing?
A. I'm sorry. Say that --
Q. Can you point him out or tell me what he's wearing?
A. Black suit here (indicating).
MS. HOWARD-ALLEN: Let the record reflect that

Mr. Guzewicz has identified the defendant.

THE COURT: The record will so reflect.

BY MS. HOWARD-ALLEN:

Q. How many cars did Dion Fisher buy from you and Onyx Automotive?

A. I believe five. Yeah.

Q. What type of cars, generally?

A. It would be luxury cars.

Q. So how many tires and rims did he buy from you and your wife's business?

A. He bought about five sets of rims and about 30 tires.

Q. So in terms of picking out these cars, how did Dion Fisher choose the cars that he wanted to purchase from Onyx Automotive?

A. We used online auctions, like Coport or insurance auctions. It's cheaper, you know. Yeah.

Q. What is an online auction?

A. The ones we used was salvage auctions, like Coport, and insurance auto auctions. Any specific question you have?

Q. Well, first of all, what is a salvage car or salvage title?

A. A salvage car, you can buy when the car gets totaled by insurance company at like a discounted rate. And then it's two categories of titles. You have rebuildable title or parts only, COD title. Yeah.

Q. Okay. So what's a build -- the parts --
A. Rebuildable?
Q. Yes, rebuildable.
A. Rebuildable is you can fix the car, have all the receipts, and then take it to a state inspection to get a regular title for the vehicle so you can register it back on the road. Yeah.
Q. So let me understand. If you buy it, are you allowed to drive it before it gets those repair bills?
A. Only to repair facility and back home.
Q. And what is a parts only salvage?
A. Parts only title will be -- in most states it will be a parts-only car.
Q. So --
A. Parts only. Yeah. Uh-huh.
Q. And would the cars that you mentioned that Dion Fisher bought, were all of these cars those types?
A. Not all of them. Most of them, yes.
Q. So around -- what was this time period that Mr. Fisher bought these cars and tires and rims from you and your wife's business?
A. From 2015 all the way through '17. Yeah.
Q. Did you ever sell any tires or rims to Christopher McKinney?
A. Yes, one time. Yes.

Q. For what vehicle?
A. It was a Mercedes.
Q. During this time period that we were just discussing about the -- when he bought these cars and rims, how would you describe your relationship with Dion Fisher when he was buying these cars?
A. We became friends. Yeah.
Q. Was that also with your wife?
A. Yes. That's correct.
Q. What kind of -- how were you friends? What kind of things did you do?
A. We used to go to restaurants together or cook.
Q. Cook what?
A. Food at each other's houses.
Q. So what else did do you for Dion Fisher?
A. Ask a more specific question. I'm sorry. Yeah.
Q. Did you write checks to Dion Fisher?
A. Yes.
Q. What for?
A. The -- which one, the 30,000 checks?
Q. What did you write him checks for?
A. Yeah. We did four checks for 30,000 each. Yeah.
Q. What did you write him checks for $30,000 for?
A. Oh, he gave me $35,000 cash, and I would give him a $30,000 check.

Q. And what was he -- was there anything -- was he buying anything?
A. No.
Q. What was the purpose of you giving him $30,000 when he gave you $35,000?
A. Yes. He -- to launder the money.
Q. And how much money did you make when you wrote him a check?
A. Five thousand each.
Q. So what did -- what, if anything -- what did Dion Fisher tell you this money was from?
A. He told me he was a real estate investor and also import electronics from China.
Q. Did you believe that Dion Fisher was in that business?
A. In the beginning, yes.
Q. Did you come to find out what business he was in?
A. Later on, yes.
Q. What business?
A. I found out through his neighbor, James White, that he was passing pills.
MR. MARTIN: Objection.
THE COURT: Hold on. The objection is sustained.
BY MS. HOWARD-ALLEN:
Q. I don't want you to tell -- to say anything that anyone but Dion Fisher has said to you.

A. Okay. I understand.
Q. So did you at some point find out later what business Dion Fisher was in?
A. Yes.
Q. And what business was it?
A. Drug dealing.
Q. So, Mr. Guzewicz, do you have any experience in real estate?
A. Yes.
Q. And do you deal with such large amounts of cash in real estate?
A. Rarely.
Q. What's that?
A. Not really, no.
Q. So at the time that you got this $35,000 in cash from Dion Fisher, I think you said on four occasions, what did you do with the $35,000?
A. Well, 30 would go to him, and I would keep the 5,000 for myself.
Q. But when you got the stack of $35,000 cash --
A. Oh, now I understand.
Q. -- what did you do with it?
A. I would distribute it in different bank accounts to write the check for 30,000.
Q. And what else did you -- what did you do with the rest

of it if that was -- if you had that -- if you didn't need it all to cover that check?
A. I would just use it for myself, you know, different --
Q. All right. Let's take a look, if you would, please -- I'm going to put it up on the screen in front of you because it's already in evidence. Government's Exhibit 504A. So maybe we could darken the lights.
And if you could, look at the check on the second one on the left, Agent Phelps.
Do you recognize this check or can you make out the check on the top?
A. Yes, I -- yes, I do.
Q. What is it, what check, what kind of check?
A. It's the bank check from Pinellas Credit Union.
Q. And what kind of check is this?
A. It's official check, bank check, yeah. Like a money order, yeah.
Q. So it's not a check that you write out; right?
A. No, no. It was from the credit union.
Q. Let's just make the top check larger, if we could, Agent Phelps.
So let me ask you, who bought this official check?
A. I think I sent my wife to buy the check. Yeah.
Q. What does it say when it says, pay to the order of? Who is that? What does it say?

A. Dion Fisher.
Q. And what does it say below that?
A. Anna Wolfe and Konrad Guzewicz.
Q. Is that you and your wife?
A. Yes.
Q. And what's the date of this check?
A. 6-18-15.
Q. And what did you write this check for?
A. What's that?
Q. What did you write this check to Dion Fisher for?
A. The 30,000 was for the payment of 35,000 that he gave me.
Q. So before you wrote this check, what happened?
A. He gave me 35,000. Yeah.
Q. All right. If we could then pull up Government's Exhibit 510, which I believe is already in evidence.
And if you can, look at the top of this particular exhibit. Whose account is this?
A. It's me and my wife's. Yeah.
Q. All right. And let's take a look at the date of that check in the middle of the statement, around September -- I mean, June 19th. So what does that show?
A. That's when we purchased the check from the bank. Yeah.
Q. And so what does it look like needed to be done before

that check could be --
A. We deposited $9,000 cash.
Q. And what's right after it?
A. Then we withdrew the $30,000.
Q. And then what's right after that?
A. The $2,000 deposit cash.
Q. So where did the money for that $9,000 deposit come from?
A. From Dion.
Q. All right. If you could, take a look. I've put an exhibit in front of you. It's a timeline. It's marked Government's Exhibit 616. And I want to ask you on the last page that you were looking at, is each and every page of that an accurate description of the transactions that you did with Mr. Dion Fisher from June, the date of this check, June 19th, through the end of '16?
A. Yes. Looks correct, yes.
MS. HOWARD-ALLEN: Your Honor, at this time, I would ask to admit Government's Exhibit 616, which is a timeline summary exhibit of the transactions that Mr. Guzewicz conducted with Dion Fisher.
THE COURT: All right. 616. All right. 616 is received into evidence, and may be published to the jury.
(Government Exhibit 616 received in evidence.)
BY MS. HOWARD-ALLEN:

Q. All right. Let's -- now that we've looked at that first check on 616, let's put this on the timeline. Is that the transaction that we just discussed?
A. Yes.
Q. The Pinellas County check for $30,000?
A. Yes, it is.
Q. All right. Now, if you'll look in front of you, I've placed some Government's Exhibits, specifically 416, 417, 418, and 419. I would like you to take a look at those and tell me if you recognize them, 416, 417, 418, and 419. Have you found them? Do you need me to show them to you?
A. I don't see 416.
Q. All four of those.
A. Okay. Yes, I do recognize them, yes.
Q. What do Government's Exhibits 416, 417, 418, and 419 relate to?
A. The sale of the Porsche Panamera 2011.
Q. So at Onyx Automotive, Mr. Guzewicz, do you keep records of car sales?
A. Yes, we do.
Q. And are those records kept at or near the time of the sale or the time the paperwork was prepared?
A. Yes.
Q. Are they generally kept by someone with knowledge of the sales and these types of documents?

A. Yes.
Q. Are these records generally kept in the course of your regularly conducted activity at Onyx Automotive?
A. Yes.
Q. And is making those records a regular practice at Onyx Automotive, those records of car sales?
A. Yes, it is.
MS. HOWARD-ALLEN: At this time, Your Honor, I would move to enter into evidence Government's Exhibits 416, 417, 418, and 419.
THE COURT: All right. 416, 417, 418, and 419 are received into evidence, and may be published to the jury.
(Government Exhibits 416, 417, 418, and 419 received in evidence.)
BY MS. HOWARD-ALLEN:
Q. At this time, Agent Phelps, could you please pull up Government's Exhibit 417.
What is this document, 417?
A. It's a bill of sale for the 2011 Porsche Panamera.
Q. And what's the date?
A. 6-22-15.
Q. What kind of car is being discussed in this invoice?
A. 2011 Porsche Panamera.
Q. Who purchased it?
A. Dion Fisher.

Q. And how much was the car? How much -- what was the selling price?
A. 28,300.
Q. How much?
A. $28,300.
Q. And how did Dion Fisher come to purchase this car from Onyx Automotive?
A. Cash.
Q. But how did he pick it out? Was it sitting on the lot?
A. No. We went on the Coport website, and we found this car together.
Q. Okay. So how does that work? You're on the website and then what happens? Do you just click a button and pay for it?
A. You have to wait for the auction date. And I usually take deposit from the customer, and then he tells me the maximum price. And after the auction is finished and complete, has to pay the car in full after the auction. Same day or next day.
Q. Can anybody just go on that website and just buy a car?
A. That's a dealer's site. So you have to have a dealer license.
Q. Do you have a dealer license?
A. Yes.
Q. So when -- the time that you get this bid and you win

the auction for that price, who's responsible to pay the price that you bid on the online auction?
A. The responsibility falls on the dealer, but, yeah, uh-huh.
Q. All right. So how, then, did you -- so this $28,300, who paid that for the Porsche Panamera?
A. To the auction or -- be more specific.
Q. Yes, to the auction.
A. Well, we had to -- we had to buy the bank check or cashier's check to the auction, so the dealership pays for it first, yes.
Q. So where did you get the money to buy a cashier's check to buy the 2011 Porsche Panamera for $28,300?
A. Dion Fisher prepaid for the car.
Q. In what form?
A. Cash.
Q. All right. So let's take a look at Government's Exhibit 14.
What is this document? Sorry, 418. I'm sorry. What is this document?
A. That's a rebuilt statement for the same 2011 Porsche Panamera.
Q. And remind us again, what's a rebuilt statement?
A. Anytime there's a rebuilt title or a certificate of destruction title, the customer has to know that they're

buying a rebuilt car. So they have to sign this statement. It's a salvage title or, you know, not a clean title car.

Q. Who filled out this document?

A. Looks like my wife. Yeah.

Q. All right. And who signed at the bottom of it?

A. It's my signature, but I think my wife signed it for me.

Q. And so who -- so did this car just get driven out on the street, is that how that worked? How did that work?

A. After the auction?

Q. Yes.

A. We -- this is out of state, so we will hire a transport company to bring the car to the dealership. Yeah.

Q. And who took the car off the lot?

A. I remember, I was there when the car came to the dealership, yeah.

Q. And did Dion Fisher pick up the car?

A. Yes, same day. He pick up the car same day, yes.

Q. And do you know if he -- if the car was tagged or how he drove it off the lot with this rebuilt title?

A. I don't remember exactly how, no.

Q. Let's look at Government's Exhibit 419. What is this document, 419?

A. A declaration affidavit for a motor vehicle which will be titled and registered in another state. So basically the

car's supposed to go to a different state for registration or inspection. Yeah.

Q. Do you know if Dion Fisher had this Porsche Panamera, was it state inspected or titled?

A. No. Never made to inspection, as far as I know. No.

Q. How do you know that?

A. I know he driven it a little bit and it went to a mechanic shop. It's been there for a long time, actually. Never been finished completely.

Q. All right. I think if you look in that folder in front of you, in the manila folder, there is a record that's already previously been admitted into evidence, Government's Exhibit 145Q. Can you tell me what that is.

A. The first page?

Q. Just what is the whole package, 145? Are you familiar with it?

A. That is the business records for the sale. Yeah.

Q. Of what?

A. Of the 2011 Porsche Panamera.

Q. All right. Let's take a look at Government's Exhibit 145Q. Is this the kind of package that you would have gotten from the -- through the online auction?

A. Some of it, and some we prepare in the dealership at the time of sale.

Q. Do you see some of the same documents that we just

looked at in there?
A. Yes.
Q. The invoice and the certificate of destruction?
A. Right. Yeah.
Q. Are there photographs that are part of this exhibit?
A. Yes. There are some photographs here, yeah. Uh-huh.
Q. Is this the -- these pictures, when we get to them at the end, are those the pictures that came along with the car? Are these the pictures of how the car appeared on the day that it was delivered to Onyx?
A. Yes. Same as that way, yes.
Q. Is that the Porsche -- the 2011 Porsche Panamera?
A. Yes. That's the vehicle, yes.
Q. And are there a number of pictures there?
THE COURT: I just need you to let her finish the question.
THE WITNESS: I'm sorry. Yes. Okay. I'm sorry.
THE COURT: That's all right. Go ahead.
BY MS. HOWARD-ALLEN:
Q. Are there a number of pictures there?
A. Yes.
Q. All right. Thank you.
So you indicated that Mr. Fisher brought you over $28,000 to purchase this Porsche 2011 that we see here in this picture?

A. Yes.
Q. So what did you do with all that money?
A. I bought some money orders, and the rest I put cash. Yeah.
Q. All right. Let's take a look at Government's Exhibit 514 that's already been admitted into evidence.
So do you recognize this particular deposit ticket?
A. Yes.
Q. What is it for?
A. It was 4,000 cash and 8,000 in money orders, yes. A total of $12,000.
Q. And what account is that?
A. That's the Bank of America Onyx Automotive account. Yeah.
Q. All right. Let's take a look. Is that your handwriting on that original? Do you recognize the handwriting?
A. Probably not if it's clerks, so my wife's. Maybe my wife.
Q. All right. So let's go look at the next page, the following page after this. So are these some of the money orders that you bought?
A. Yes.
Q. Okay. So what do they say?

A. It's Onyx Automotive.
Q. And who does it say purchased this money order?
A. Dion Fisher.
Q. And how many of them are here? Eight?
A. Yes.
Q. And did they all look the same?
A. Yes.
Q. So did Dion Fisher buy these money orders and give them to you?
A. No.
Q. Who bought them?
A. I did.
Q. Who wrote -- who filled out what we're looking at in Government's Exhibit 514?
A. I think my wife did. Yeah.
Q. And why did you buy money orders with the money that Dion Fisher gave you for the Porsche Panamera?
A. I had to pay for the car, and then I just got all this cash. I kind of freaked out, what am I going to do with all this money. So I just tried to hide it and bought money orders.
Q. All right. What are you supposed to do when you receive so much cash at one time?
A. Supposed to send a form to IRS to report over $10,000.
Q. Did you do that?

A. No.
Q. Why didn't you do that?
A. I'm not really used to this kind of -- that much cash at one time, so I didn't think about it, you know.
Q. What's your business practice now, Mr. Guzewicz?
A. Yeah. We do them now, yes.
Q. All right. Let's take a look at -- if we go back to the second page of Government's Exhibit 416. It will appear on the screen in front of you, Mr. Guzewicz. Is this -- I want to put this transaction we just discussed with the Porsche Panamera on the timeline. Is that correct?
A. Yes.
Q. All right. Now, let's look at Government's Exhibit 512. What is Government's Exhibit 512? It should appear on the screen in front of you. It's already in evidence. You can stop looking. Just what is this? What is Government's Exhibit 512?
A. That's a check from Onyx Automotive to Dion Fisher in the amount of $30,000.
Q. Was this the same account that we just saw those money orders deposited to?
A. Yes.
Q. All right. What's this check for?
A. That's the -- he gave me the 35,000 cash and I wrote him a $30,000 check.

Q. He gave you how much cash?
A. Thirty-five.
Q. Who wrote out this check?
A. Looks like my handwriting. Yeah. It's mine.
Q. What did you do with the $35,000 when you received it from Mr. Guzewicz [sic.]?
A. So I went to deposit the cash, different accounts, to make the $30,000 check to clear.
Q. All right. Was this check in repayment for a loan from Dion Fisher?
A. No.
Q. Then why does it say loan right there in the memo line?
A. It was to hide it better.
Q. Mr. Guzewicz, did you ever take a loan from Dion Fisher?
A. Yes. Later, yeah.
Q. When later?
A. I believe it was in '16 sometime. 2016. My wife asked him for I think it was about 13,000 or so.
Q. Around $13,000?
A. Yes.
Q. What was that loan for?
A. She need help with -- to pay some of the real estate taxes. Yeah.
Q. So did you end up in 2016 repaying that loan in full?

A. No. Ended up agreeing to give him the Audi Q5 for that. Yeah.
Q. All right. So is this $30,000 check that we're looking at in Government's Exhibit 512, is that to repay that loan, that $14,000 loan?
A. No, no.
Q. Mr. Guzewicz, when did you recall that you took a loan from Mr. Fisher for $14,000?
A. Just recently. I had to go to files and talk to my wife, so I just --
Q. You just remembered it?
A. Yes. Yeah.
Q. So what's wrong with your memory that you just remembered this?
A. I mean, I'm very, very busy person. And then I was -- at that time I was using drugs, you know. Yeah.
Q. What kind of drugs were you using?
A. Most -- cocaine.
Q. Like how much cocaine and how regularly?
A. Almost daily.
Q. At the time of -- when was that?
A. That was through this whole time, basically. I was -- yeah. About 2014 all the way to '18. Yeah.
Q. Is that when this case started for you?
A. Yes.

Q. Mr. Guzewicz, let's take a look at Government's Exhibit 515, which is already in evidence, so that will appear up in front of you. Do you recognize this deposit ticket?
A. Yeah. Yes, it's two money orders.
Q. And whose handwriting is that?
A. Probably my wife or clerk.
Q. All right. So if you look at the next two pages of this, are these -- what is this? Who is this payable to?
A. Payable to Onyx Automotive.
Q. And from who?
A. Dion Fisher.
Q. Did Dion Fisher give you this money order?
A. No.
Q. How did it come to be written?
A. It's the same money from the Panamera, Porsche Panamera.
Q. And who wrote -- who filled out that?
A. The handwriting, probably my wife.
Q. All right. Let's go -- on the screen in front of you will appear the third page of Government's Exhibit 616, to put this transaction, this second check that we just discussed on the timeline.
So does this accurately describe this second $30,000 check that was dated July 15th, 2015?
A. Yes, it does.

Q. All right. Let's take a look at Government's Exhibit 519, which will appear on the screen in front of you. What is this check?
A. That's another transaction that we did where he gave me 35,000 cash and he received a check for 30,000.
Q. That who is we that did?
A. Me and my wife, she helped me.
Q. But who gave you -- what is this check for? Who gave you money?
A. Oh, Dion. Yeah.
Q. Gave you what?
A. The $35,000 cash.
Q. And whose handwriting is on this?
A. That looks like my wife's. Yeah.
Q. What account is this written on?
A. The AK Tires & Rims business account.
Q. And where is that account?
A. Bank of America.
Q. What's the date of this check?
A. July 24, 2015.
Q. So the check that we just looked at was July 15; right?
A. Uh-huh. Yes.
Q. So over -- in a two-week period, how much money did you get from Dion Fisher?
A. 70,000.

Q. So what did you do with $70,000 in cash?
A. Distribute in different bank accounts to hide it in.
Q. Did you ever keep any of it?
A. Yes.
Q. Where would you keep a large amount of money like that?
A. In my safe or so.
Q. Had you ever gotten large, like $70,000, that large of cash payments from other customers?
A. No.
Q. So how much -- you mentioned that like 50 percent of the business of AK Tires is in cash. How much does generally a rim job cost?
A. Average about $1,500. Yeah.
Q. And how are rims usually paid for?
A. People pay -- some will pay cash, some will pay credit cards, checks. Depends.
Q. All right. And so let's just take a look. What does the memo line say right on the bottom of that check?
A. Loan payment.
Q. So was this check in repayment for a loan from Dion Fisher?
A. No, it wasn't.
Q. Was it repayment for this loan that you testified about, the 14,000 in 2016?
A. No.

Q. Let's take a look at the fourth page of Government's Exhibit 616, which will appear up on the screen. This is the fourth transaction with Mr. Fisher. Does that accurately -- does that accurately depict the one we just talked about, the 7-24 check?
A. Yes.
Q. All right. I want you to look in front of you. There is another package of records that I would direct your attention to that's Government's Exhibits 142 and 143. It's Government's Exhibits 420, 422, 421, and 456. So do you recognize those records?
A. Yes.
Q. What do they pertain to?
A. That's for a 2009 Audi R8 purchase.
Q. And so do you recognize the photographs in 142 and 143?
A. Yes, I do.
Q. And what are those photographs of?
A. The 2009 Audi R8.
Q. And I want to ask you the same set of questions about the records pertaining to the sale of this Audi R8. Do you generally keep records of car sales at Onyx Automotive?
A. Yes.
Q. And do you do so at or near the time of the sale?
A. Yes.
Q. And do you -- are they generally kept in the course of

your regularly conducted activity at Onyx?
A. Yes.
Q. And is it the regular practice of Onyx to keep such records?
A. Yes.
MS. HOWARD-ALLEN: At this time, Your Honor, I would ask to admit Government's Exhibits 142 and 143 in evidence.
THE COURT: 142 and 143?
MS. HOWARD-ALLEN: Yes, Your Honor.
THE COURT: They are received into evidence, and may be published to the jury, 142 and 143.
(Government Exhibits 142 and 143 received in evidence.)
MS. HOWARD-ALLEN: I would also ask to admit Government's Exhibits 420, 421, 422, and 456.
THE COURT: So 420, 421, 422, and 456 are received into evidence, and may be published to the jury.
(Government Exhibits 420, 421, 422, and 456 received in evidence.)
MS. HOWARD-ALLEN: Thank you, Your Honor.
THE COURT: We're going to need to take a break. I just realized it's time.
MS. HOWARD-ALLEN: Sure.
THE COURT: So ladies and gentlemen, we're going

to take our morning break. Please don't discuss the case or form any opinions until you've heard all the evidence. We'll see you back here at five to 11:00.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 10:44 a.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Thank you. Anything we need to take up before the break?

MS. HOWARD-ALLEN: No.

THE COURT: I should say before the jury comes back, during the break. Okay.

I'll remind the witness, we're in the middle of your testimony. Please don't discuss it with anybody. If you go out to get a drink of water or go to the bathroom or something and you run into the jurors, please don't talk to them. Do you understand that?

THE WITNESS: Yes.

THE COURT: All right. Thank you. We're in recess.

(Recess taken from 10:45 a.m. to 11:01 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Do we have all our jurors ready?

COURT SECURITY OFFICER: Yes.

MS. HOWARD-ALLEN: Your Honor, may I clarify? I

don't think I said Government's Exhibit 423 and 424.

THE COURT: You did not.

MS. HOWARD-ALLEN: Okay. Then I will address that when the jurors come in.

THE COURT: Okay. Sounds good. Thank you. I try to keep good notes because it's really easy to make mistakes on these things. So we kind of check everybody out.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 11:04 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

I'll remind the witness, you are still under oath. Do you understand that, sir?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Very good.

You may proceed, Miss Howard-Allen.

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:

Q. At this time, could we publish Government's -- I believe Government's Exhibit 142 has been admitted into evidence just before the break. So if you could, tell me what this is a picture of.

A. That's the 2009 Audi R8.

Q. All right. And when we discussed some of these

business records that I asked you about earlier, and that was 421, 422 -- 420, 421, and 422, I also would like to include at this time Government's Exhibit 423 and 424, which are two checks involved in the sale.

Do you recognize those checks? One is from Suncoast Federal Credit Union, and one is a cashier's check to Copart from Bank of America.

A. Yes.

MS. HOWARD-ALLEN: So as part of those business records I previously admitted, I would also ask to admit Government's Exhibits 423 and 424 at this time.

THE COURT: All right. So 423 and 424 are received into evidence, and may be published to the jury.

(Government Exhibits 423 and 424 received in evidence.)

MS. HOWARD-ALLEN: All right. Agent Phelps, can we pull up Government's Exhibit 143.

BY MS. HOWARD-ALLEN:

Q. What is this photograph, Mr. Guzewicz?

A. Same vehicle, 2009 Audi R8.

Q. And what kind of tag is that?

A. That's a transporter plate.

Q. And what is a transporter plate?

A. A transporter plate is issued for bringing vehicles back and forth for repairs and back to a facility.

Q. Can anyone just go get a transporter tag or register their car as a transporter tag?
A. No.
Q. Who registers cars as transporter tags?
A. A business that has a license and for repairs of automotive vehicles. Yeah.
Q. All right. How did -- so where did Dion Fisher buy this car?
A. He bought it from Onyx Automotive through Copart.
Q. So how did Dion Fisher pick out this car?
A. Same way we did the other ones. We found it on online listings on Copart.com, and he gave me a deposit. And at the end of the auction, same day or next day, he paid in full.
Q. All right. So let's take a look at this Copart sales receipt, bill of sale, which is Government's Exhibit 420.
So can you explain what this record shows or what it indicates to you?
A. Yes. It's the sales receipt from Copart to Onyx Automotive.
Q. So Copart, is that just a Florida thing, or where does Copart -- is it --
A. It's nationwide.
Q. Okay. All right. So let's take a look at the bottom there, the part that has all the charges and payments in the center.

What does this show this transaction involved?
A. The -- that's for the 2009 Audi R8 in the amount of 40,969.
Q. So was that the -- what was the bid price, the sales price?
A. 40,000.
Q. And then what is the next -- what's the buyer fee right under that?
A. That's the buyer auction fee, $2,000. Then we got a special membership through Copart. We got a $1200 discount fee from the buyer's fee. And then they charge internet bid fee of 79, and then the gate, which is a loading fee of $30, a mailing fee for the title is $10, and there was a late payment of $50. Yeah.
Q. So what did -- what of these charges here did Dion Fisher pay?
A. He paid -- it was about 42-something on the vehicle. I have to look at the invoice on the -- to see exact price.
Q. So that discount, that $1200 discount, did you pass that to Dion Fisher?
A. I kept that.
Q. Okay. So let's take a look, then, if you would, at Government's Exhibit 422. What does this exhibit show?
A. That's for -- a statement for either a parts vehicle or certificate of destruction statement.

Q. And who does it say the purchaser was?
A. Lavonte Fisher.
Q. So who is that?
A. That's Dion's brother.
Q. Is that who bought the car from you?
A. Not really, no.
Q. Do you know Lavonte David Jermaine Fisher?
A. No. I spoke to him on the phone.
Q. Do you know why the car was -- why Lavonte David Fisher was listed as the purchaser?
A. Probably to hide the car better, I think.
Q. All right. So when you bought this car from Copart, which we saw on Government's Exhibit 420, who had to provide the funds to Copart?
A. A dealership is responsible first to pay for the vehicle. But essentially, the customer paid for the vehicle in full.
Q. So let's take a look at Government's Exhibit 423. What is that?
A. That's one of the payments for the R8. Yes. Partial payment for the R8.
Q. So who is the remitter on this check?
A. Onyx Automotive.
Q. Where did Onyx Automotive, you and your wife get the money to buy this $34,000 cashier's check?

A. We got it from Dion.
Q. All right. So let's take a look at Government's Exhibit 424. And what is this check for?
A. That's the remainder balance for the Audi, for the auction. Yeah.
Q. And so who purchased this cashier's check?
A. Suncoast, probably my wife. She bought it. Yeah.
Q. And so if you add these, roughly 7,000 and 34,000, is that the price of the Audi R8?
A. Yes.
Q. All right. Let's take a look at Government's Exhibit 531, which is already in evidence. Oh, no. Strike that for a minute.
Let's take a look at -- back on Government's Exhibit 422, that certificate of destruction in Lavonte Fisher's name. So who filled out this document?
A. That looks like my signature, yeah, on the seller. Yeah.
Q. So the date of this is -- what is the date of this record?
A. 10-19-2015.
Q. And do you recall when the purchase of the Audi R8 was, the date?
A. Yeah, I do.
Q. What was it?

A. The purchase date?
Q. Yes. We can go back to Government's Exhibit --
A. It was a little bit before that, obviously.
Q. Let's look on Government's Exhibit 420 and see the sale date to Copart.
A. Yeah. That's going to be 8-4-15.
Q. 8-4-15 is the sales date up where the vehicle is listed?
A. Yes.
Q. So the certificate of destruction to Lavonte Fisher was dated over two months later?
A. Yes.
Q. And what's the delay?
A. If I remember right --
Q. I don't want you to guess. Let's take a look at Government's Exhibit 421. So if you look at the second page of 421 -- well, what is this, first of all?
A. That's the Texas title for the vehicle.
Q. For which vehicle?
A. 2009 Audi R8.
Q. Let's look at the second page, and let's look at the last two entries. So what date does the -- is the title in the name of Onyx Automotive?
A. The date, 10-19-15. Oh, we bought it 8-4-15. Yeah.
Q. Okay. So until 10-19, who is the car titled in?

A. Onyx Automotive.
Q. So are you -- who's driving the car between that time?
A. Dion Fisher.
Q. So what is the significance of that?
A. The title doesn't transfer. The last owner is responsible for any liabilities, if any accidents or whatever can arise from that.
Q. So was that -- did you find that to be a good business decision?
A. No.
Q. All right. Let's take a look finally at Government's Exhibit 456. What is Government's Exhibit 456?
A. Lavonte's driver license.
Q. Why do you need Lavonte's driver's license for this Audi R8 purchase?
A. To finish the transaction and put titles on somebody's name. So get off the liability.
Q. Did you ever see Lavonte Fisher driving the Audi R8?
A. No.
Q. All right. So how did you -- let's look at the top line, kind of the top headline of this particular exhibit. And I'm going to ask you how you got this copy of Lavonte David Fisher's driver's license.
A. He mailed to us, yes.
Q. All right. Let's take a look, then, maybe at the --

I'm not sure if we're on the fourth page or fifth page of Government's Exhibit 616. And I want to place this Audi R8 transaction that we just went through on here. Does that accurately depict the Audi purchase that we just went through?
A. Yes.
Q. All right. So let's take a look, finally, at the last check.
MS. HOWARD-ALLEN: If you could, pull up what's already been admitted into evidence, Agent Phelps, as Government's Exhibit 523.
BY MS. HOWARD-ALLEN:
Q. So what is this check that's up on the -- that's being published to the jury for Government's Exhibit 523?
A. This is another check we wrote for $30,000 that we received $35,000 cash from Dion.
Q. And what account is this $30,000 check written from?
A. That's me and my wife's personal Suncoast Credit Union account.
Q. What's the date of this check?
A. 8-24-15.
Q. And what does it say on the memo line?
A. Loan payment.
Q. Was this for a loan payment?
A. No.

Q. Was this in repayment of that smaller 14 -- 13 or $14,000 loan you said you got in 2016?
A. No.
Q. So do you know of anyone else who Dion Fisher gave $35,000 in cash to, any $30,000 check was written?
A. Yes.
MR. MARTIN: Objection. Lack of personal knowledge. Hearsay.
THE COURT: All right. Sustained. I'll let you establish that.
BY MS. HOWARD-ALLEN:
Q. Are you personally aware of another instance when Dion Fisher provided $35,000 in cash to someone that you know?
A. Yes.
Q. And how do you know that?
A. The person told me.
MR. MARTIN: Objection. Hearsay.
THE COURT: Yes. Sustained as to what he was told.
MR. MARTIN: And move to strike the previous question and answer because it's based on lack of personal knowledge and hearsay.
THE COURT: Well, no, because he didn't say what the other person told him, and the jury can decide what weight to give it. So I'm not going to strike it. But with

respect to what somebody else said, that is an appropriate objection. So you can go ahead and rephrase it or ask another question, Miss Howard-Allen.
BY MS. HOWARD-ALLEN:
Q. Mr. Guzewicz, did you observe anyone -- Dion Fisher give anyone $35,000?
A. No.
Q. All right. So is this the last check that you wrote to Dion Fisher?
A. There was four of them. I believe that's the last one, yes.
Q. So Mr. Guzewicz, if this is the fourth time -- well, let's just go back to the timeline, and we'll place this exhibit on the next page of Government's Exhibit 616, the timeline.
This was dated August 24th?
A. Yes. That's the last one, yes.
Q. All right. So there's been four of these checks, then, that you have written to Dion Fisher in return for him giving you $35,000?
A. Yes.
Q. And you -- so how much money did you make for writing four checks to Dion Fisher?
A. 20,000.
Q. Did you put this money on your -- do you file taxes?

A. Yes.
Q. Did you put that money on those taxes?
A. Yeah. We did an amendment and we did file for those, yes.
Q. You did an amendment?
A. Yes.
Q. Are you planning any further amendments?
A. Yes.
Q. For what?
A. Some of the tires and rim sales.
Q. Mr. Guzewicz, were you charged with these four money laundering transactions here in this Court?
A. Yes.
Q. And did you plead guilty --
A. Yes.
Q. -- to these four checks with Dion Fisher?
A. Yes.
Q. Was your wife charged?
A. No.
Q. Have you been sentenced yet?
A. Not yet.
Q. Did you ultimately -- when you pled guilty, did you sign a plea agreement?
A. Yes.
Q. A written plea agreement?

A. Yes, I did.
Q. At the time that you pled guilty, did you remember or recall or talk about this $14,000 check that you received --
A. I don't remember.
Q. -- from Mr. Fisher?
A. No.
THE COURT: Remember, you need to wait until the question is finished. All right?
THE WITNESS: Yes, Your Honor.
BY MS. HOWARD-ALLEN:
Q. Mr. Guzewicz, I would like to take you to look at the last set of business records that I'm going to propose that you -- for admission. If you'd look, please, at Government's Exhibits -- in front of you -- 431, 432, 433, 434, 435, 436, and 436B. Do you recognize these documents?
A. Yes, I do.
Q. What car sale does it relate to?
A. A 2005 Aston Martin.
Q. And I'll ask you the same set of questions. If you keep -- generally keep these records of car sales in the course of your regularly conducted business at Onyx Automotive?
A. Yes, I do.
Q. And is making these -- keeping these kind of business records a regular practice for Onyx Automotive?

A. Yes.

MS. HOWARD-ALLEN: All right. At this time, Your Honor, I would move to enter into evidence 431.

THE COURT: Hold on a second. I don't have 436B. I have 436A. Did you mean 436A?

MS. HOWARD-ALLEN: I did, Your Honor. Thank you. Miss Guzman also reminded me of the same thing. I think I'm letter challenged today. So it's 431, 432, 433, 434, 435, 436, and 436B.

THE COURT: No, 436A.

MS. HOWARD-ALLEN: 436A. I'm looking at it. 436A.

THE COURT: All right. Those items are received into evidence, and may be published to the jury.

(Government Exhibits 431, 432, 433, 434, 435, 436, and 436A received in evidence.)

MS. HOWARD-ALLEN: Thank you, Your Honor. And thank you for all those corrections that I needed.

BY MS. HOWARD-ALLEN:

Q. So, Mr. Guzewicz, who bought the Aston Martin that is reflected in these records?

A. Dion Fisher.

Q. So let's take a look at -- how did he buy this car?

A. We found this also online at insurance auction.

Q. All right. So is that a different online auction?

A. Yeah. It's similar to Copart, just a different company. Yes. Very similar.
Q. All right. Let's pull up, if we could, Government's Exhibit 436B.
THE JUROR: A.
MS. HOWARD-ALLEN: 436A.
BY MS. HOWARD-ALLEN:
Q. What is this exhibit?
A. This is bill of sale from Insurance Auto Auction to Onyx Automotive.
Q. All right. And what is the date of this buyer receipt for the Aston Martin in 436A?
A. September 30th of 2016.
Q. All right. And who does it show the buyer is?
A. Onyx Automotive.
Q. All right. So let's go to the center section and look at the details of this transaction.
Who does it show is going -- on the left-hand side of this is going to pay for this particular -- the 2005 Aston Martin?
A. Onyx Automotive.
Q. And how do they pay?
A. There's a company check for 5855, and then the remainder of certified check of 20,000.
Q. Where did you get the money to pay for that company

check and the certified check that's noted in this exhibit?
A. We got it from Dion Fisher.
Q. In what form?
A. Cash.
Q. All right. So the price -- let's look at the prices next to it. What is the actual bid amount here?
A. The total price with fees, 25,855.
Q. All right. Let's take a look at the Onyx Automotive paperwork. Let's take a look at Government's Exhibit 432. What is this exhibit?
A. Bill of sale for the 2005 Aston Martin to Dion Fisher.
Q. All right. So let's take a look at the pricing of it on the right-hand side.
A. So vehicle price listed for $27,000. Dealer fee, 195. Sales tax, 541.70. Title fee, 77. Total $27,813.70.
Q. All right. So I think when we just looked at the other one, it was 25,000. Why did it go to 27,000?
A. That's the profit, yeah.
Q. What profit? Who gets the profit?
A. The dealership. Yeah.
Q. Who is the dealer?
A. Me.
Q. All right. So when we looked at the buyer receipt in 436A from the Online Auction Company, what was the date of that sale?

A. September 30th, 2016.
Q. And what is the date of this Onyx Automotive paperwork here?
A. December 19th, 2016.
Q. So that's about two-and-a-half months or something?
A. Yes.
Q. So why -- explain what happened in this document, Government's Exhibit 432, why is it written up this way?
A. The -- you ask why the trade-in or the dates we receive?
Q. Just why did you fill out this form the way that you did on December -- did you fill out this form? Is that your signature at the bottom?
A. That one looks like my wife, but we went over the numbers together.
Q. So why was this Onyx business record filled out this way on this date?
A. So we show the -- his BMW for trade-in for 19,000.
Q. Okay. So what do you know about this 2012 BMW that's listed as trade-in information on here?
A. Dion purchased from us earlier that vehicle.
Q. So who owned that vehicle, the BMW?
A. That was -- before he bought it, it was our personal vehicle. Me and my wife's personal vehicle.
Q. And so what did you sell it to him for?

A. Back then, it was -- we list it for about $20,000.
Q. Did he pay for it in cash or was there a trade-in for that?
A. He did trade his Audi Q5 at that time. Yes.
Q. Is that the one you previously mentioned you gave back to him to pay the loan?
A. Yes, same vehicle.
Q. All right. So was -- so that's listed. How much is that listed? When you look on this document, how much is the trade-in that is allowed on this?
A. 19,000.
Q. Was that an accurate value?
A. It's probably -- probably not. No.
Q. Did you actually get the BMW?
A. We did sell it, yes, later for Dion. Yes.
Q. What do you think you sold it for?
A. It was around 10,000.
Q. And so why did you -- so what did you do with that 10,000?
A. We split it with Dion. We have gave him some money and the rest I kept. Yeah.
Q. Why did you give him some money?
A. It was part of his money in the vehicle.
Q. So why is this written over two months later?
A. He tried to sell that vehicle. He wasn't sure about

keeping that particular vehicle, so we did try to sell the vehicle on the lot.

Q. This particular vehicle?

A. That was for a couple of -- yeah, for a couple of months. He was driving it, as well. But it was also parked on our lot, as well, at some point. Yeah. Uh-huh.

Q. So Onyx was possibly going to sell this Aston Martin?

A. Yes.

Q. Okay. So did you -- let's take a look at Government's Exhibit 436. What is this record, 436? It's called a pricing recap. What is this?

A. That's basically the same thing we have just seen. The Aston Martin sold for the 27,000, and he traded in the 2012 BMW.

Q. That's down on the lower left, the sales pricing we were just talking about?

A. Yes. It's pretty much the same thing as the previous picture. Yeah.

Q. So why did -- why did this -- why was this title -- why was this put in Dion's name as the buyer? Well, let's look at the title on Government's Exhibit 431. Let's look at the second page of this -- I think it's a Georgia -- no. What state is this title?

A. That's Florida, yeah.

Q. All right. So at the bottom -- at the bottom of the

first page -- sorry, Agent Phelps. Is that the date of the purchase at the bottom that we had just looked at, the insurance paperwork? So who is the title -- in this part of the vehicle title, who is it assigned to?
A. Onyx Automotive.
Q. And what's the date of that assignment?
A. September 29th, '16.
Q. And then if you look at the next page, there is a title. What's the date of that title?
A. 12-19-16.
Q. And so why did that take so long to do?
A. I think he wanted to try to use the BMW as a trade-in to save taxes.
Q. All right. So did you ever put any rims on Dion Fisher's Aston Martin?
A. Yes.
Q. Do you remember when?
A. I believe it was -- it was '17, 2017 sometime.
Q. So why did you have to put rims -- were there rims on the Aston Martin when you bought it?
A. Yes.
Q. So why did you have to put the rims on it?
A. His original rims were leaking air, so he sold those to somebody else and we put a used set of rims on it.
Q. Do you know who he sold them to?

A. I don't know the name, but I've seen the person, yes.
Q. Did he -- did that take -- where did that change of the rims and the selling of the rims --
A. The tire store, yeah.
Q. What --
A. At my tire shop, yeah.
Q. All right. I have just a couple more exhibits. If you could take a look, please, at Government's Exhibits 140 and 141. There are some photographs that I think are in front of you.
MS. HOWARD-ALLEN: May I approach, Your Honor?
THE COURT: Yes.
THE WITNESS: 140? Okay.
BY MS. HOWARD-ALLEN:
Q. Can you take a look at Government's Exhibits 140 and 141. And I'll ask you if you recognize those.
A. Yes.
Q. So how do you recognize them?
A. That's Dion's Maserati.
Q. And why do you recognize Dion Fisher's Maserati?
A. First of all, the pictures are at my tire store and, I mean, I've seen the car quite a bit.
Q. Did you work on any of Dion Fisher's cars?
A. Yeah. I worked on that car, as well, yes.
Q. What other cars did you work on?

A. The Bentley, the Porsche Panamera, the Audi R8.

MS. HOWARD-ALLEN: All right. At this time, Your Honor, I would move to enter into evidence Government's Exhibit 140 and 141.

THE COURT: 140 and 141 are received and may be published to the jury.

(Government Exhibits 140 and 141 received in evidence.)

MS. HOWARD-ALLEN: All right. Agent Phelps, if you could, pull up Government's Exhibit 141, please.

BY MS. HOWARD-ALLEN:

Q. All right. So what does this picture show?

A. That's Dion's Maserati.

Q. And where is it?

A. That's at the -- at my tire store.

Q. Why is this Maserati gold?

A. He decided to vinyl wrap it in gold. Yeah.

Q. What does wrap it in gold mean?

A. Instead of painting, you put a plastic shield on the panels to change the color of the vehicle.

Q. And then if you look at Government's Exhibit 140, is this the same vehicle?

A. Yes.

Q. And does that appear to be also that same kind of tag that we saw earlier, a transporter tag?

A. Yes.
Q. All right. Can you look at Government's Exhibits 137 and 138 that are in front of you. And I'll ask you if you recognize those items.
A. Yes, I do.
Q. What are they?
A. That's Dion's Bentley.
Q. And that was the one you said you previously worked on?
A. Correct.
Q. All right. Let's take a look at 137. And --
MS. HOWARD-ALLEN: Oh, I'm sorry. At this time, Your Honor, I would ask to admit Government's Exhibits 137 and 138, and publish them to the jury.
THE COURT: All right. 137 and 138 are received, and may be published to the jury.
(Government Exhibits 137 and 138 received in evidence.)
MS. HOWARD-ALLEN: All right. If you could, pull up Government's Exhibit 137, Agent Phelps.
BY MS. HOWARD-ALLEN:
Q. What does this show?
A. It's my previous location of the tire shop. Yeah.
Q. And what's the car on the right?
A. That's Dion's Bentley.
Q. Let's take a -- there are two pages, should be two

pages in this exhibit. Let's take a look at the second page. Is that the same location, same car?

A. Yes.

Q. All right. And then let's take a look at Government's Exhibit 138. And what does this show?

A. It's the same vehicle at the new location.

Q. At your new location?

A. Yes, my new location.

Q. And why is this car silver?

A. It has the same wrap like the Maserati. It's a chrome wrap, vinyl wrap.

MS. HOWARD-ALLEN: May I have a moment, Your Honor?

THE COURT: You may.

BY MS. HOWARD-ALLEN:

Q. All right. If we could just turn to the last page of Government's Exhibit 616, and we could place this particular Aston Martin purchase on the timeline.

Is that an accurate description of the -- of that transaction that we just discussed with regards to the Aston Martin?

A. Yes.

MS. HOWARD-ALLEN: I don't have any further questions for Mr. Guzewicz at this time.

THE COURT: All right. Thank you. Any

cross-examination of this witness, Mr. Martin?

MR. MARTIN: Yes, Your Honor. Briefly.

THE COURT: You may proceed, sir.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Good morning.

A. Good morning.

Q. Now, the auctions that you were talking about, you said the cars are from insurance companies?

A. Most of them, yes.

Q. The bulk of them; correct?

A. Yes.

Q. So that would tell me, and I'm not in your business, that they've been in an accident or something like that; is that fair to say?

A. Correct, yes.

Q. So, for instance -- and I'll take a particular car, like a Porsche. You're not buying a brand-new Porsche like if you went to a Porsche dealer; are you?

A. No.

Q. You're buying a Porsche that's been -- most likely been in an accident and needs some type of repair?

A. Correct.

Q. So I would assume that price would be cheaper; is that fair to say?

A. Absolutely.
Q. Now, as I understand your testimony, on the purchase of all these cars, you're saying Mr. Fisher was with you, I assume, sitting at a computer, you and him?
A. Yeah. To look at the vehicles, yes.
Q. Okay. And that's what happened on -- every time you purchased these vehicles?
A. Most of them.
Q. Okay. Well, how many of them happened like that?
A. Those from the auction, we had three.
Q. Thirty?
A. Three, three vehicles from the auction. Yeah. Just three.
Q. Three from the auction?
A. Yes. Uh-huh.
Q. Okay. So three cars were purchased from the auction site?
A. Yes.
Q. And I'm including both auction sites.
A. Correct.
Q. Okay. How were the other cars purchased?
A. Like the BMW was already -- it was my private vehicle. So he bought it from --
Q. Okay. So some were in-house deals?
A. Yes. Uh-huh.

Q. Let me ask you this: Did you and Mr. Fisher ever look on the auction site and think about purchasing a vehicle and then not purchase it for whatever reason, price, et cetera?
A. Yes.
Q. Did that happen often?
A. Quite a few times.
Q. And Mr. Fisher would give you the money before the purchases; correct?
A. Down payment first, yes.
Q. Because, obviously, your company is on the hook for it because you're actually the purchaser as far as the auction site is concerned?
A. That's correct.
Q. Now, as I understood your -- your story, you testified that you're doing some amendments to your taxes; is that correct?
A. That's correct.
Q. Because there were errors in your taxes?
A. We could call it that, yes. Those transactions that was not reported, yes.
Q. Okay. They weren't actually errors, you chose specifically not to report them so you didn't have to pay taxes; correct?
A. At that time, yes.
Q. Okay. And let's just take your 2015 taxes, for

example. You've -- as result of this case, you've already recognized your error and found -- and filed one amendment already; correct?
A. Yes.
Q. And then as this case went on and agents and stuff looked at your stuff, you're going to file another amendment; correct?
A. Yes.
Q. So you're going back and correcting all your tax returns during these time periods because, basically, you were cheating on your taxes; fair to say?
A. At that time, yes.
Q. Now, your taxes are also you and your wife's taxes; correct? Do you file jointly?
A. Yes.
Q. And your wife is not pending any charges, hasn't been arrested or anything like that?
A. No.
Q. Correct? And you love your wife; right?
A. Yes.
Q. Now, as you testified earlier, you're awaiting sentencing in your case; correct?
A. Correct.
Q. And that's before another judge; correct?
A. Yes.

Q. So you're going to depend on, of course, the prosecutors to provide information about how you did in your cooperation; correct?
A. Yes.
Q. And your hope is to get no sentence or as low a sentence as possible; correct?
A. Yes, possibly. Yeah.
Q. Now, one of the things you said about your handling some cash, you said you're unused to handling large amounts of cash; correct?
A. Yes.
Q. And you didn't know quite how to handle them; correct? That's how I understood your testimony.
A. It's an unusual amount. Yeah, unusually large amount at that time. Yes. I was not used to that. Yes. Uh-huh.
Q. But it seemed from your testimony you knew to probably deposit under 10,000; correct?
A. Yes.
Q. Why was that?
A. To hide the money better. Yeah.
Q. Does that 10,000 or more have to be reported?
A. Yes.
Q. So you were confused, but you knew how to hide money?
A. I tried.
MR. MARTIN: Thank you. No further questions.

THE COURT: Any redirect for this witness?

MS. HOWARD-ALLEN: Only briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. When Mr. Martin asked you about the reporting and not reporting any payments larger than 10,000, who would that benefit?

A. More Dion Fisher. Yeah.

Q. And who else?

A. The dealership a little bit, but not really that much, you know. We're still reporting the sale for the amount.

MS. HOWARD-ALLEN: Nothing further, Your Honor.

THE COURT: Okay. Anything else?

MR. MARTIN: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. You are excused from testifying. Thank you very much for having come in.

THE WITNESS: Thank you, Your Honor.

THE COURT: And you can call your next witness, Miss Howard-Allen.

MS. GUZMAN: Yes, Your Honor. The government would call Roman Hernandez.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will

be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Roman Hernandez, R-o-m-a-n, H-e-r-n-a-n-d-e-z.

THE COURTROOM DEPUTY: Thank you. You may take the witness stand.

THE COURT: Mr. Hernandez, you're going to be asked some questions by Assistant United States Attorney Maria Guzman. And then in cross-examination, Ken Martin, who represents Mr. Fisher, may also ask you some questions.

If you don't understand the question, please say so so that they can state it another way. Please wait until the question is finished before you begin answering so we don't have two people speaking at the same time.

If you have the tendency to speak quickly, slow down so we can understand you. And if you're soft-spoken, please speak up so we can hear you. All right?

THE WITNESS: Yes, Judge.

THE COURT: You may go ahead, Miss Guzman.

MS. GUZMAN: Thank you very much, Your Honor.

ROMAN HERNANDEZ,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. GUZMAN:

Q. It's almost good afternoon.

Could you please identify yourself, and introduce yourself to the jury and to the Court.

A. Sure. My name is Roman Hernandez. I work for IRS out of Austin, Texas. And my title is court witness coordinator.

Q. And as a court witness coordinator for IRS, which, of course, is the Internal Revenue Service; correct?

A. It is, yes.

Q. What are some of your duties and responsibilities?

A. When I'm in the office, I review income tax returns and transcripts. I also prepare IRS records to be used as exhibits at trial. And when I appear at trial, I represent the commissioner of IRS in his role as custodian of records.

Q. Now, obviously the ability to review, audit tax returns, this is not a responsibility that all IRS workers can do; is that correct?

A. That's correct.

Q. And explain that for the jury. Who actually has the authority or the ability to review tax returns for an individual or for a company?

A. Well, generally speaking, IRS employees don't choose -- don't get to choose what returns they're going to inspect or look at. It's assigned to us as part of our job duties.

Like so, for instance, an audit -- an audit happens when -- it's usually an automated process where certain indicators on the return show that it might be good for audit. So that return gets selected, put in the system, it's assigned to an auditor. That's generally the way it works, goes in the IRS.
Q. And how long have you been employed with the Internal Revenue Service?
A. For 17-and-a-half years.
Q. And specifically as a court witness coordinator, how long have you held that position?
A. For seven-and-a-half years.
Q. And as part of that -- well, based on the position that you currently hold as court witness coordinator, do you have the ability, if requested, to do searches as to tax returns that would have been filed?
A. I do. Yes.
Q. Now, in this particular case, were you requested to do that type of a search regarding an individual by the name of Dion Gregory Fisher?
A. Yes, I was.
Q. And as part of that search, were you provided a taxpayer identification number?
A. I was, yes.
Q. And with regards to Dion Fisher and the taxpayer identification number that you were provided, did you conduct

a search of potential income tax returns filed?
A. I did.
Q. And what were your findings?
A. For the years requested, I found that there were no returns filed with the IRS.
Q. And would that have been the years of 2013 to 2018?
A. Yes, it was.
Q. Now, when you're requested to do that type of a search, is it just a name search and a taxpayer ID search? Explain for the jury what it is you do.
A. Sure. It's not just the tax ID number or social security number for a person. I also search using their name and the tax ID number. We have search by year and by form type.

So for a person, it's usually going to be a form 1040 or something in that family. It's similar for a business. We need the business name, the employer identification number. We look for certain forms that businesses file, and we search within a year range.
Q. So with regards to just the individual by the name of Dion Gregory Fisher, your testimony is that from 2013 to 2018, you found absolutely nothing?
A. That's correct.
Q. And would that include, as you indicated, individual 1040s, what everyone files as part of the tax season?

A. It does include that, yes.
Q. And you found nothing?
A. I found nothing.
Q. Now, I'd like to refer you to companies. Companies also would file returns, is that correct, in the normal course of business?
A. That's correct.
Q. As part of what was requested of you in this case, let me, first of all, go to an exhibit that's already been marked into evidence. So I'm going to use that which is Government's Exhibit 155. And if I could dim the lights just a bit.
Government's Exhibit 155 looks to be a Duke Energy bill. And there is a name reflected on that Duke Energy bill of Million Dollar Plans, LLC. Do you see that on your screen?
A. I do see that, yes.
Q. And if I could just take a look at Government's Exhibit 155 without the label. Can we do a little bit of a close-up as to what that bill was for?
And it appears that the bill was for a location of 13791 49th Street North, Suite 2B, in Clearwater, Florida.
Now, the company that I have -- that is noted on that bill, Million Dollar Plans, LLC, it also has an address. Do you see that address?

A. I do see that address, yes.
Q. And I believe that the address reflected -- and, again, this is Government's Exhibit 155, is 10124 Nassau Court, Seminole, Florida. Do you see that in that bill?
A. Yes, I see that.
Q. Now, with regards to Million Dollar Plans, LLC, were you requested to also do a tax search on that business?
A. Yes, I was.
Q. And, again, was it for a certain period of time?
A. Yes, it was.
Q. And was it from 2015 through 2018?
A. Yes.
Q. And, again, what were your findings in terms of any type of tax returns filed for that company?
A. I found that there were no tax returns filed with the IRS for those years.
Q. Let me show you what's been previously introduced into evidence as Government's Exhibit 159. Do you have that in front of you on the screen, Mr. Hernandez?
A. I do, yes.
Q. And it appears to be, again, the same company we had referred to, Million Dollar Plans?
A. Correct.
Q. LLC?
A. Yes.

Q. And, again, the same address of 10124 Nassau Court, Seminole, Florida?
A. That is correct.
Q. And this is, again, the same company that you did the search on?
A. It is the same company, yes.
Q. And, again, we see what appears to be a Regions Bank record?
A. Yes.
Q. But, again, despite the fact there's a -- I guess a checking account or some kind of a bank account, there was no IRS return filed?
A. That is correct.
Q. Now, I would like to bring up Government's Exhibit 157. And do you have that in front of you?
A. Yes.
Q. Now, Government's Exhibit 157 appears to be a check issued out of Hancock Bank. And do you see the name of the company that's listed on that check?
A. Yes, I do. The company name is Top Dog Hot Dog, LLC.
Q. Now, with regards to Top Dog Hot Dog, LLC, that's a mouthful, were you also asked to do a tax search of any income tax records filed by that company?
A. Yes, I was.
Q. And was it during the period between 2013 to 2018?

A. Yes, it was.
Q. And, again, what are your findings in terms of any type of tax returns filed by Top Dog Hot Dog?
A. I found that there were no business returns filed with the IRS during that period.
Q. And, again, you had indicated with regards to an individual's tax return the type of search that is done, which is not only the social security number or the taxpayer ID, if it is different from the social security number, but also the person's name and so forth.
With regards to companies, which in this case would be Million Dollar Plans, LLC, and Top Dog Hot Dog, what did your search entail?
A. It entails the same elements. We have to have the name, the tax ID number for the company. For companies we search the business master file. There's two parts to the IRS database. One's for individual, one's for businesses. So, of course, for businesses, I searched the business side, and also looked at the tax years involved.
Q. And, again, your results were?
A. I found that there were no returns filed for those two businesses during those tax periods.
MS. GUZMAN: Thank you very much, Mr. Hernandez.
THE COURT: Okay. Any cross-examination for this witness, Mr. Martin?

MR. MARTIN: No, Your Honor. Thank you.

THE COURT: Okay. Anything else? May I excuse him? All right. Thank you for having come in today to testify. You are excused. Thank you.

Do you have a short witness that you can put on? It's noon.

MS. HOWARD-ALLEN: No, Your Honor. Our last witness will be a little bit longer, possibly two hours or so.

THE COURT: Okay. So we're going to go ahead and take our lunch break. It's noon. We're going to resume at 1 o'clock. But you've heard, ladies and gentlemen, the government has just a couple more witnesses; is that right, Miss Howard-Allen, maybe one or two?

MS. HOWARD-ALLEN: Just one, Your Honor.

THE COURT: Just one more witness. So we're going at a pretty good clip here. All right. So I still fully anticipate this case will go to you tomorrow. This case will go to you tomorrow for resolution. So I think we're moving at a good clip.

So please remember, don't discuss the case, don't form any opinions until you've heard all the evidence. We'll see you back here at 1 p.m. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 12:00 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: So let's see. I see also your next witness is going to be Diane Knott; is that right?

MS. HOWARD-ALLEN: That is, Your Honor.

THE COURT: So Phil Morose, did I just forget to check him off or is he not testifying?

MS. HOWARD-ALLEN: At this time, Your Honor, we're not expecting to call him.

THE COURT: Okay.

MS. HOWARD-ALLEN: Subject to, obviously, rebuttal should Mr. --

THE COURT: If it should become necessary, okay. I just didn't want to miss one. All right. So how long do you anticipate that you will be with Miss Knott?

MS. HOWARD-ALLEN: I would say at least two hours.

THE COURT: Okay. So 1:00 to 3:00-ish. And then you'll do your cross-examination, however long that is.

MR. MARTIN: It will be short.

THE COURT: Okay. And then after that the government will rest its case. So I'm going to have to -- I'll excuse the jury.

And then, Mr. Martin, do you know at that point if you want me to inquire of Mr. Fisher? I have done it both ways for lawyers. Some lawyers like me to make an inquiry on the record and to tell the client that they have the right to

testify, what would they like to do, and to just put it all on the record. Other lawyers are perfectly fine with nothing going on the record. So what would you like me to do?

MR. MARTIN: I would prefer the inquiry.

THE COURT: All right.

MR. MARTIN: My client's prepared for that. I think he's already made his decision.

THE COURT: Okay. Well, I'll wait. I think in all fairness, Mr. Fisher, you don't need to tell me right now. You can tell me when I make the inquiry. And so what I'll do is when the government rests its case, I'll excuse the jury for about 15 minutes, and then we'll come back in here.

Normally, I'll hear a motion from Mr. Martin. Normally, the defense makes a motion or moves, I should say, moves to dismiss the indictment, saying that the government hasn't made its appropriate showing. And rather than whispering at sidebar, I'll do that in the open court.

And I'll hear the argument. And then I will rule on that. And then we'll turn to the inquiry as to whether you wish to testify or not. And I will do that in open court. If you wish to maintain your constitutional right not to testify, then what I'll do is I'll ask you questions so that you are able to explain that that's your decision; that after consulting with your lawyer, you've decided to take

advantage of your constitutional right.

And as you know, I've already instructed the jury that they can't hold that against you, nor can they draw a negative inference from the fact that you are electing to take advantage of your constitutional rights.

If you do decide to testify, what I will do is, likewise, recall for you the fact that you do not have to testify, that's your decision that you've made in consultation with your lawyer.

All right. So depending on what happens, then, if you do not testify, then you'll rest your case. And then I'll -- I doubt the government will have any rebuttal. Probably wouldn't be any, since there is no evidence that you're putting on. Would you have any other witnesses, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: Okay. If you do testify, then they have the right to put on rebuttal witnesses. But we'll do all that this afternoon.

So what I would do is, if you don't testify, you would rest in front of the jury. And then I'll tell the jury they can go home a little bit early. And then we'll then do -- go over the jury instructions for the rest of the afternoon, however long that takes. We'll finalize all that.

When we resume at 9 a.m. on Thursday morning --

I'm sorry, Wednesday morning. Today is Tuesday. When we resume at 9 a.m. on Wednesday morning, we'll resume with opening statements. You said you wanted an hour and a half; is that right?

MS. HOWARD-ALLEN: I certainly hope they're closing statements and not opening, Your Honor.

THE COURT: Did I say openings?

MS. HOWARD-ALLEN: That's correct.

THE COURT: Yeah, it is closing. I guess I'm ready for lunch, too, huh? Yes, closing arguments, closing arguments. You would like an hour-and-a-half for closing argument; is that right?

MS. HOWARD-ALLEN: Yes, with a half hour for rebuttal.

THE COURT: So I will give you that. I'm going to do it this way. Since that's a fairly lengthy closing argument, I will give you up to one hour for your first closing argument, up to one hour for your first closing argument. And then, you know, really, you have an hour and a half. I'm sure you won't take it, Mr. Martin, for your closing argument. And then you can take up to half an hour for your rebuttal closing argument, Miss Howard-Allen. Right?

MS. HOWARD-ALLEN: Yes. I'm not sure I'll take all of that, but I --

THE COURT: Well, what you don't use the first go-round, you can't transfer to the second go-round. It's a little different than what I normally do, but I'm giving you a long time.

MS. HOWARD-ALLEN: That's fine, Your Honor.

THE COURT: All right. And, Mr. Fisher, the reason your lawyer does not have a rebuttal closing argument is because the government has the burden of proof, and that's why they get it.

We will then go -- depending on what time it is, we'll either go straight into jury instructions or we will take a short break. I'll probably have to take a short break, and then the jury will begin its deliberations. If I calculate it correctly, and I've got to see. So let's see. I'll just say 9:00 to 10:30 for your entire argument. 10:30 to 11:00-ish for yours, and then probably half an hour of reading jury instructions. Because I've got to order the food in advance, I'm probably, Tamecika, going to order the food for them.

THE COURTROOM DEPUTY: Yes, ma'am.

THE COURT: Okay. So that way, they can have sandwiches before they begin their deliberations. Because I think it's too close. And what I will do is I will tell them today that we will order sandwiches for them. So nobody brings in their food accidentally or without knowing.

So that's the agenda for tomorrow. Does that sound okay with everybody? Am I missing anything?

MS. HOWARD-ALLEN: No. Just depending on what Mr. Fisher's decision is. Obviously, there will be cross, then, if that's the case.

THE COURT: Of course. Of course. But regardless, I don't anticipate any of that, one way or the other taking more than this afternoon. You never know, but I don't anticipate it.

Okay. Let's see, what else? Mr. Martin?

MR. MARTIN: Your Honor, I wanted to be heard briefly on Diane Knott.

THE COURT: Okay. This is your opportunity. Please, come up to the podium.

MR. MARTIN: My understanding of the law is basically the Court has total discretion on this type witness.

I certainly do not find a case that said, no, there are cases that allow summary witnesses. There is no doubt about that. But the Court is supposed to be a gatekeeper on that.

First of all, Miss Knott is a -- and I may have it a little bit wrong, but my understanding is she's a contract employee with the U.S. Attorney's Office. But that's -- really, her job is with the U.S. Attorney's Office. It's not

a contract employee that works one hour a month for them. Before that, I assume she retired. It was 20 years as an IRS agent in their Criminal Investigation Division. So she's -- the defense position is she's a law enforcement agent. That's what she is.

THE COURT: No. She really isn't anymore. She's a retired law enforcement officer is what she is. If she was CID, she could arrest and carry a gun. But she is no longer a law enforcement officer.

MR. MARTIN: Correct. I agree, she doesn't carry a gun and arrest. Her background is law enforcement. And I would suggest working as a contract employee at the U.S. Attorney's Office, a lot of that is a criminal-type law enforcement, professional-type background.

The subject matter she's testifying to, which is bank records, mainly, is certainly not beyond an average juror. I mean, I would assume everybody on the jury has a bank account, et cetera.

In reality, what it's providing is the government with an additional summation by having a, quote, expert interpret the evidence. And, again, the case law does caution when it's a government-type agent, an independent -- you know, in this case, it would be an independent financial analyst, that the jury may give undue weight to their testimony, and that increases.

So what the defense is arguing is what we have is a low probative value because it's something that an average juror can do themselves with a high risk of prejudice.

Thank you, Your Honor.

THE COURT: All right. Let me hear from the government. What's your response to that?

MS. HOWARD-ALLEN: Thank you, Your Honor.

As Mr. Martin noted, the Rules of Evidence certainly provide for this type of witness.

Miss Knott, as the Court correctly noted, is not law enforcement. And I provided her CV to Mr. Martin. And I don't believe that it -- sort of in abundance of caution, I don't necessarily think that she's an expert. What she did is prepare these summary charts, and review all of the bank records and business records that were admitted largely by certification, but also some that were submitted that were just previously admitted as business records through Onyx Automotive.

Under Federal Rules of Evidence 1006, it provides that the contents of voluminous writings which cannot be conveniently examined in court may be presented in the form of a chart or summary.

And so that is what we are choosing to do. And there's a number of business records that are listed on the exhibit list. For example, I think some of them are -- the

latter parts of the 500 that are the entire bank records of multiple accounts, Onyx Automotive, AK Tires, two business accounts, multiple business accounts belonging to Dion Hoffman -- I mean, to Dion Fisher. And so our position is, and I think that Miss Knott will testify that these were voluminous.

And I think, clearly, there is a case that -- and I don't have the case in front of me, but I jotted down the notation under Eleventh Circuit called the *United States V Harmos*, H-a-r-m-o-s, at 974 F.2d 1266, which just primarily says the practical test for the admissibility of summary evidence is whether it's helpful to the jury's understanding of the case.

And it's not necessarily that even all of the exhibits that are listed on Miss Knott's summary charts, which have been provided to -- well in advance to Mr. Martin, are in evidence. And it's not that the underlying document's already in evidence. It doesn't mean that those can't be -- it just means they can't be conveniently examined in court, which is the case here. And it doesn't require that it's literally impossible, it's just that it not be convenient. All of those records have always been provided to defense counsel, since Mr. Fisher's previous defense counsel.

And, obviously, we would lay the foundation for the admission of these summary charts through the testimony

of Miss Knott, who supervised the preparation and did the preparation of all of those.

And I think Mr. Martin correctly assessed that these matters are within the Court's discretion. Clearly, under Federal Rule of Evidence 611(a), that allows for the -- obviously, for the Court to control the Court, and make the interrogation and the presentation effective for the ascertainment of the truth.

And that's what we would do. There are eight money laundering charges. There is a lot of documentary evidence that indicates cash spent by Mr. Fisher. And to assess and summarize all of that evidence conveniently on these voluminous writings, we intend to present the summary charts that are noted in Government's Exhibits 600 through 619 through Miss Knott.

THE COURT: Okay. I think it's appropriate to have her testify. I mean, your objection is noted there, Mr. Martin, but it's overruled. Indeed, this is within the Court's discretion. I think it's very helpful to have a witness such as Miss Knott testify about these things.

And, Mr. Martin, you'll have the opportunity to cross-examine her about her credentials, her background, her employment, her prejudices or lack thereof. So you'll have ample opportunity.

MR. MARTIN: Your Honor, can I make one other

request?

THE COURT: Of course.

MR. MARTIN: It's a short one. Through her Government's Exhibits -- I anticipate Government Exhibits 600 through 615, and 617 through 619, will be admitted. I plan on objecting for the same reasons. If I could just have a -- for the record, a quick sidebar before those go in to make my objection for the record.

THE COURT: I think that's fair enough. Are you okay with that, Miss Howard-Allen?

MS. HOWARD-ALLEN: That's fine, Your Honor. Just on the same basis, that we just argued?

MR. MARTIN: Correct. Unless something appears to me. You know, I'm not expecting any additional basis, but I'm going to listen to her testimony, obviously.

THE COURT: Okay. Fair enough. All right. If there is nothing else, then we're in recess. I'll see you back here a little bit after 1:00. Thank you.

(Recess taken from 12:16 p.m. to 1:08 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Do we have all the jurors back?

COURT SECURITY OFFICER: Yes, ma'am.

THE COURT: Everybody ready to go? Do we have our witness?

MS. HOWARD-ALLEN: Yes, ma'am.

THE COURT: All right. We'll bring the jury in. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 1:08 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: All right. Welcome back, ladies and gentlemen.

I think the government is ready with its next witness. Do you want to go ahead and proceed?

MS. HOWARD-ALLEN: Yes. The United States calls Diane Knott.

THE COURT: Okay. Please come forward to be sworn in.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Diane Knott, K-n-o-t-t.

THE COURTROOM DEPUTY: Thank you. You can take

the witness stand.

THE COURT: All right. Miss Knott, you're going to be asked some questions by Kelly Howard-Allen. And then Ken Martin, who represents Mr. Fisher, may ask you some questions in cross-examination.

If you don't understand the question, you should say so. You need to wait until the question is finished before you begin answering.

If you have the tendency to speak quickly, please slow down so we can understand you. And if you're soft-spoken, please speak up so we can hear you. All right?

THE WITNESS: Yes.

THE COURT: You may proceed.

MS. HOWARD-ALLEN: Thank you, Your Honor.

DIANE KNOTT,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MS. HOWARD-ALLEN:

Q. Good afternoon, Miss Knott.

A. Good afternoon.

Q. Miss Knott, what is your educational background?

A. I have a bachelor's degree in criminal justice with an emphasis in accounting from the George Washington University. I also have a combined probably over years of training at the

Federal Law Enforcement Training Center.
Q. Do you hold any certifications?
A. I'm a certified fraud examiner.
Q. Where do you currently work, Miss Knott?
A. I currently work at the United States Attorney's Office as a contractor.
Q. What type of contract work do you do?
A. My title is senior civil investigator. I do financial analysis in criminal cases.
Q. How long have you been in that position?
A. Over two years.
Q. What did you do before you came to work as a contractor doing financial analysis at the U.S. Attorney's Office?
A. I was a uniformed division officer with the United States Secret Service at the Whitehouse during the Reagan Administration for about two years. And then after that, for the next 29 years, I was a federal law enforcement officer of the special agent with IRS Criminal Investigation Division.
Q. And during the time that you were with IRS Criminal Investigations, what type of positions did you hold?
A. I was a special agent. And then the last six years of my career, I was a supervisory special agent.
Q. So what kind of things did you do as a special agent and a supervisory agent at the IRS Criminal Investigations?

A. As a special agent, I conducted financial investigations in criminal cases involving criminal violations of Title 18, 26, and 31, which involved crimes such as tax evasion, bank fraud, money laundering, investment fraud, terrorism financing. Just about anything that had a financial aspect to it.
Q. Did you retire from the IRS and then start at the U.S. Attorney's Office?
A. I did. I retired in December of 2016. And then two months later, began working at the U.S. Attorney's Office.
Q. So in your current position as a senior civil investigator at the U.S. Attorney's Office, do you conduct the same -- what you would say is the same kind of financial investigations that you did for 29 years when you were with IRS Criminal Investigations?
A. Yes. Just not in the law enforcement capacity.
MS. HOWARD-ALLEN: At this time, I would tender -- I would ask if there is any voir dire as to Miss Knott's background and experience.
THE COURT: And what specialty do you want her -- or what area do you want her qualified as an expert in?
MS. HOWARD-ALLEN: I just ask -- I'm just asking about her financial analysis. I just ask if Mr. Martin would like to voir dire anything about her background before we move on.

THE COURT: Well, so you don't want her qualified as an expert with respect to her financial analysis, background accounting, anything like that?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: Just with respect to her background. Okay. That's fine. Do you wish to inquire, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: Okay. You may proceed, then.

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:

Q. Miss Knott, did you have an opportunity to conduct those kind of financial analyses you were describing in this particular case?

A. Yes, I did.

Q. So what type of records did you review to make a financial analysis in this case?

A. I reviewed bank records, third-party business records, and search warrant records.

Q. So, Miss Knott, would you consider, at least -- especially in terms of the bank records -- well, actually in terms of all those records, would you consider those to be voluminous?

A. Yes. They were very voluminous.

Q. And did you prepare charts that allows you to sort of conveniently or summarize this voluminous evidence in a way

that can aid the jury in understanding some of that evidence?
A. Yes, I did.
Q. And in preparing those charts, are the exhibits that you have cited in those charts, are those exhibits that have been presented here?
A. Yes.
Q. Did you also prepare different spreadsheets and schedules and summaries of these charts based on your financial analysis?
A. Yes.
Q. Miss Knott, I would ask you to take a look at Government's Exhibits 600 through 619, and ask if you recognize these items.
A. Yes. These are the exhibits that I prepared.

MS. HOWARD-ALLEN: At this time, Your Honor, I would ask to admit into evidence those exhibits. They would be 600 through 615, then 616A, because 616 has already been admitted, and then 617, 617A, 618 and 619.

THE COURT: Okay. So 600 through 615, 616A through 619 are received into evidence, and may be published to the jury.

(Government Exhibits 600 through 615, 616A through 619 received in evidence.)

MR. MARTIN: Your Honor, can we have a quick sidebar?

THE COURT: I'm sorry. Yes, of course.

(The following was held at sidebar:)

MR. MARTIN: For the record, and for the same reasons previously stated, I object to Government's Exhibits 600 through 615 and 616A through 619.

THE COURT: Okay. And anything different you would like to say?

MS. HOWARD-ALLEN: No. I rest on my previous presentation.

THE COURT: And for the reasons I said earlier, I think it's appropriate that she be called as a witness. Your objection is noted but overruled. Thank you.

(Sidebar ended.)

THE COURT: You may proceed.

MS. HOWARD-ALLEN: Thank you, Your Honor.

BY MS. HOWARD-ALLEN:

Q. I'm going to publish some of these exhibits as we go, but I'd like to first look -- have you look, Miss Knott, at an exhibit that has previously been admitted into evidence, and it's Government's Exhibit 500. Do you recognize what this particular item is?

A. Yes. This is a signature card for Dion Fisher's Hancock Bank account ending in 9814.

Q. And what type of account is this?

A. It's an individual single party account.

Q. And are you able to see -- note when this account was first opened?
A. It was opened on October 1st of 2013.
Q. And do you see who is the signatory on this account?
A. The signatory is Dion Fisher.
Q. And do you -- is there an employer listed on this particular page of these opening account documents for Hancock Bank account ending in 9814?
A. Yes. The employer is shown as Top Dog Hot Dog, LLC.
Q. Are there any other signatories who control -- would be able to control this account?
A. No. Additional signatories would be listed on the second page, and there are none.
Q. All right. If you could, take a look. And I would ask Agent Phelps to publish Government's Exhibit 601. And you can turn to the one in front of you.
What is this particular exhibit, Miss Knott?
A. This is an exhibit that I prepared. And it's an overview indicating that Dion Fisher provided Konrad Guzewicz with $35,000 on four separate occasions, for a total of $140,000. And that Mr. Guzewicz deposited the money into four separate bank accounts and, in turn, wrote four $30,000 checks, which Dion Fisher then deposited to his Hancock Bank account ending in 9814.
Q. And what are those four accounts that the checks were

written out of?
A. One is at Pinellas Federal Credit Union. It's a personal account in the name of Wolfe, his wife, Anna Wolfe, and himself, Guzewicz. There is an account at Bank of America in the name of Onyx Automotive, LLC; another Bank of America account in the name of AK Tires & Rims, LLC, and another personal account at Suncoast Federal Credit Union, again, in the name of his wife and Guzewicz.
Q. And we'll turn to those in a moment. But did you prepare -- have you prepared a separate chart on each one of those transactions?
A. Yes, I have.
Q. And those four banks that you just discussed, did you have to go through and analyze those in any particular way?
A. Yes. I took the bank statements and created a spreadsheet so that I could organize the transactions chronologically.
Q. And in each case, in each of those four checks that you just discussed, where did all -- were all of those $30,000 checks deposited?
A. All four of the checks were deposited into Dion Fisher's Hancock Bank account ending in 9814.
Q. And that's the one we just examined the signature page for?
A. That's correct.

Q. All right. Let's take a look, then, at the summary chart that you have drafted for the first check. That would be Government's Exhibit 604. Let's take a look at that.

And what does this chart show, Miss Knott?

A. This chart, it shows that -- if you look at the way it's organized, the first two boxes indicate the actual disbursement account and the receiving account.

So the first box is for Pinellas Federal Credit Union, the one we talked about in the name of Anna Wolfe and Konrad Guzewicz. And it shows that on 6-18, the posted date to the account, that Guzewicz disbursed $30,000 in the form of an official check, payable to Dion Fisher. And, in turn, Dion Fisher deposited it to his Hancock Bank account ending in 9814.

Q. And on the lower half, what two items do you have listed below that?

A. The two items are the actual deposit slip, which would show the deposit date of 6-19-15. It would show the account number earning in 9814, the $30,000 deposit. And then on the right is the actual check that was deposited to the account. It's drawn on -- it's an official check drawn on Pinellas Federal Credit Union, dated 6-18-15 in the amount of $30,000, and it's payable to Dion Fisher.

Q. And who's endorsed that check?

A. Dion Fisher.

Q. Now, the top part of this you indicated was just part of a -- like a disbursement journal. So let's take a look at the account for this Pinellas Federal Credit Union account. Let's take a look at Exhibit 612. And just generally, what is this and how did -- what did you do to prepare this -- what we call a check spread?

A. This is -- what I do is I take the actual bank statements, and I take the transactions and put them into an Excel spreadsheet so that we can sort them chronologically and date. So if you look at this, the first column is the date that it's posted to the account. The second column is a description, what kind of -- what kind of transaction it was at the bank.

The third column is the actual deposit amount. The fourth column is the withdrawal amount, or the disbursement amount. The fifth column is a description of either what the source of the deposit was or who the check or withdrawal was payable to. And then the last column is the actual running balance in the account.

Q. And we'll look at these -- did you prepare these for a number of different accounts that we're going to look at this afternoon?

A. Yes, I did.

Q. And when you did this, were you able to -- what generally -- why are there yellow lines on those?

A. Well, I highlighted all of the cash deposits in yellow, and then I highlighted the subject check that we're talking about in green.
Q. And just before we go to that subject transaction, what generally did you see going on in this kind of account, as you prepared this check spread?
A. There's a few cash deposits. It's not the norm. And then when we get into June, around the time that the $30,000 check is purchased, we see an increase in cash deposits.
Q. All right. So let's take a look around 6-18. Was there enough money in this account for this $30,000 official check to be purchased?
A. No. And on the date that that check is purchased -- well, if we look at the date -- if we look at the date just prior on 6-17, there is $22,383.43 in the account. So on the 18th, there is a $9,000 cash deposit made, which would bring the balance in the account above 30,000. So the $30,000 disbursement is then allowed to be made, and there is a purchase of an official check.
Q. And these larger kind of cash deposits were not the norm you mentioned in this account?
A. No.
Q. So did you prepare some kind -- a similar kind of check spread for Mr. Fisher's Hancock Bank account ending in 9814?
A. Yes, I did.

Q. All right. So let's lake a look at that, which is Government's Exhibit 611.

And, generally, what kind of things did you see in this account, Miss Knott?

A. I saw there's quite a bit of cash deposited to this account.

Q. All right. Let's take a look, if we can, at the date of that check and the deposit of the check, which I think from our Government's Exhibit -- from our earlier charts shows it was deposited on June 19th. What do you see there?

A. That is the line item which shows the deposit on 6-19-15 for $30,000. And it reflects the same official check that was purchased by Konrad Guzewicz on 6-18.

Q. All right. So let's move to the chart that you prepared for the second $30,000 check. That would be 605, Government's Exhibit 605. And what does this chart show, Miss Knott?

A. This chart is laid out in the same manner as the previous one. It shows, however, this time the $30,000 disbursement is from the Bank of America Onyx Automotive, LLC account ending in 7106.

So we see the disbursement of $30,000. We see that via check number 1743. The payee is Dion Fisher. And then we see the deposit into the Hancock Bank account.

These are the actual -- this is the -- the item on

the left is the actual deposit slip showing on 7-17 of 2015 a $30,000 deposit going into the account ending in 9814. And on the right is the actual check that was written on the Onyx Automotive account. It shows the payee is Dion Fisher in the amount of $30,000. Dion Fisher has endorsed the back of the check when he deposited it. And the memo section indicates it's for a loan.

Q. Now, it looks like the check was written on the 15th, but it appears to have been deposited two days later; is that right?

A. That's correct.

Q. All right. So did you prepare a similar check spread of the account that this $30,000 check -- this July 15th, $30,000 check was drafted?

A. I did. Yes.

Q. And let's move to Government's Exhibit 613. What is this, 613?

A. This, again, is a check spread for the Bank of America Onyx Automotive, LLC account ending in 7106. And it's laid out in the same manner as the previous check spread.

Q. And what generally did you see going on -- is this a lengthy document?

A. Yes. It's a business account. So, yes, it is.

Q. So what did you see generally going on on this -- in this account?

A. There's business deposits. There is some cash. It's not -- the cash being deposited generally are not large amounts of cash.
Q. All right. So let's take a look around page -- around the time of this check, around 7-18, and take a look and see, was there enough money in this account before the -- this check was written on July 15th?
A. Can we go to the previous page? So around July 15th, prior to the check being written, there is not enough cash in the account. We have $16,530. Actually, before that $12,000 deposit, there's about $4,000 in the account.
So on 7-15, we see a large cash deposit of $12,020. We also see a transfer from the Pinellas Federal Credit Union account of $13,000. And then we see another cash deposit of $8,960. And then another one -- I believe this check was written on 7-15. So it doesn't post to the account until 7 -- I believe 7-20, though.
Q. All right. Let's take a look just to the next page and see where that check did post. And what -- it was written on the 15th. Why would it take so long to clear that account?
A. Well, it was written on the 15th. It wasn't deposited until the 17th. And it could have been over a weekend time period. It just took a while for the -- it actually to hit this particular account.
Q. And if we go to the prior page, there's actually a

number of items that are posted on June 20th, the day that cleared towards -- if we look -- just do the bottom half of it. Is that fair to say, all of those items were on the 20th?

A. Yes.

Q. And the 21st. The 20th, I guess. And let's go up to some of these cash deposits. You indicated there was a $12,000 cash deposit.

And let's look a little earlier in July on the previous page. Did you see some deposits in -- unusual deposits, cash deposits in the early part of July, July 2nd and --

A. Yes. Yes. So if we go to July 2nd, we see a $2,000 deposit. Those actually consisted of money orders. There were two $1,000 money orders, and the money orders indicated that the purchaser was Dion Fisher.

Q. And let's take a look. Do you have the -- let's take a look at Government's Exhibit 515. What does 515 -- what is the deposit?

A. 515 is -- that is the deposit slip for that particular deposit on July 2nd of 2015 into the Onyx Automotive account.

Q. And who are the money orders from?

A. It indicates that the purchaser is Dion Fisher. If we go to the next page, you will see the actual items. That's one of the -- that's one of the money orders, indicating that

the payee is Onyx Automotive, LLC, and the purchaser is Dion Fisher.

Q. Did you see other deposits that consisted of money orders from Dion Fisher in this account?

A. Yes. There's two other deposits. One is for 8,000, I believe, and the other one is for 7,000.

Q. Let's take a look at Government's Exhibit 514. What is this item?

A. This is a deposit slip dated 6-19-15. And it indicates that there's a cash deposit of 4,000 and checks for 8,000.

Q. And when you look at these, are they checks or are they money orders?

A. They're actually money orders.

Q. And are all eight of these similar to this one?

A. Yes.

Q. And you indicated there were some more money orders that appeared to be deposited into this account. I believe that those were in August. Let's take a look at 516.

When we go back a page, what does it mean -- what does general ledger mean?

A. Well, when you have these kind of electronic type of deposit slips, when the customer doesn't actually prepare a deposit slip, the bank prepares a deposit slip. And when it says general ledger, general ledger means that it's cash. And money orders are considered cash.

Q. So let's take a look at what this -- the rest of this Exhibit 516 consists of. Are there a number of these Amscot money orders to Onyx Automotive from Dion Fisher?
A. Yes.
Q. All right. So let's take a look at -- were you able to find this -- we are back on the original chart detailing the second check to Dion Fisher. Were you able to locate that $30,000 check deposited into Mr. Fisher's account on Government's Exhibit 611, which was the check spread of Mr. Fisher's account?
A. Yes. We can see the actual -- we can see the check being deposited into his account.
Q. And if we take a little bigger picture and see some of these other items. Was this -- what was the general balance running around that time of that particular check deposit?
A. That particular check, when the $30,000 deposited, it's a little cut off, but it's $72,798.05.
Q. Was that generally a fairly high balance?
A. Yes.
Q. All right. Let's take a look at the next chart that you prepared for the third check that was written to Dion Fisher for $30,000. Government's Exhibit 606. What does Government's Exhibit 606 show, Miss Knott?
A. Again, this is the same type of format. We show the $30,000 being disbursed from the Bank of America, AK Tires &

Rims, LLC account ending in 9813. It's check number 5730, and it's payable to Dion Fisher. And then we show that that particular check was then deposited to --
Q. Let's look at the two items below. What do they show?
A. This is the deposit slip on the left. And it shows that on 7-27 of 2015, into account number 9814, we have a $30,000 deposit. And to the right is the actual check that was deposited. It's a check dated 7-24 of 2015 for $30,000. It's written on the AK Tires & Rims account, payable to Dion Fisher. It's endorsed by Dion Fisher on the back, and it says it's for a loan payment.
Q. So when we turn to the check spread that you've prepared for AK Tires, which is Exhibit 614, were you able to see when that check was written on July the 24th, if there was enough money in this account to fund that $30,000 check? I believe it's Page 29.
A. So if we look back on the day before, on 7-23, we see that the balance in this particular AK Tires & Rims account is $19,293.54. So he could not have written the check on that date and had it clear the bank on that day. So we see that on 7-24, there's three cash deposits; one for $7,960, one for $980, and one for $920.
It still doesn't quite bring up the balance to $30,000. We have another cash deposit on July 27th of $1200. And then the -- we have another one on 7-28 for $2500. And

the check eventually clears the bank on the next page, on 7-28.
Q. So, again, that takes a couple of days for that check to clear?
A. That's correct.
Q. And what generally did you see going on in the AK Tires account?
A. Again, we see -- we see cash deposits. They're not unusually large deposits. It seems typical for a tire and rim business, for there to be some cash deposits.
Q. And some of these around the time of this check are a little larger?
A. That's correct.
Q. All right. Were you able to locate this check being deposited into Dion Fisher's account in Government's Exhibit 611 at Page 23?
A. Yes.
Q. And when you see this item deposited, what is the account balance at that time?
A. This particular -- on 7-27, when it's deposited, the balance is $69,406.61.
Q. All right. And then we'll take a look at, finally, the last check of the four that were originally in Government's Exhibit 601, in that overview exhibit. What does Government's Exhibit 607 show?

A. Again, this is the same format. It's the fourth check. And it shows that it is -- this particular check is withdrawn from the Suncoast Credit Union personal account of Wolfe and Guzewicz, and the account number ends in 2798. And, again, then down at the bottom, we see the deposit slip and the -- for $30,000, and the actual check that was made payable to Dion Fisher. The memo section states that it's a loan payment, and it was endorsed by Dion Fisher.
Q. All right. And when you take a look at the check spread that you prepared -- have you prepared a check spread for the Suncoast Credit Union account?
A. Yes, I did.
Q. And let's take a look at 615. Is this the check spread for that account?
A. Yes, it is.
Q. And is this a fairly short exhibit?
A. Yes, it is.
Q. So what kind of account -- what did you see in this account?
A. It was a personal account. There's not -- there's not that many transactions. There were two smaller cash deposits between March and July. And then when we get into August of 2015, there are numerous large cash deposits around the time that the $30,000 check was written.
Q. All right. So, again, when we take a look at the time

that that check was written, are there sufficient funds in this Suncoast Credit Union account of Miss Wolfe and Mr. Guzewicz?

A. Yes. At that time there actually was. However, if you look down on 8-28, they were -- obviously, it appears as though they were purchasing some property, and they needed to write a $68,000 -- well, they needed to make a $68,000 wire. Therefore, they needed to deposit money in order to clear this $30,000 check so that they would be able to wire out the funds for this property.

Q. So, in essence, it was just about enough for both?

A. Yes.

Q. All right. Miss Knott, so we've taken a look at these four checks, and then looked at the check spread for each of those four accounts of Mr. -- the business and personal accounts of Mr. Guzewicz and Miss Wolfe.

Did you prepare some kind of a chart that was able to look at all of these accounts overall and observe any sort of trend?

A. I did. I prepared a summary of cash deposits to all of Mr. Guzewicz's accounts.

Q. All right. So let's take a look at Government's Exhibit 602, and see if you can explain to the members of the jury what this exhibit exactly shows.

A. So, again, this is a summary of the cash deposits. So

if we look at the top, we see that there's the date of the cash deposit. And then there's five different accounts that I analyzed. One was the Pinellas County Federal Credit Union account that we've looked at, 1670. There was an additional account at Pinellas County Federal Credit Union ending in 140 -- excuse me, 1410. There's the Onyx Automotive account at Bank of America, the AK Tires & Rims account at Bank of America, and the Suncoast Credit Union account.

Q. And what was the purpose -- what were you looking to do in this exhibit?

A. I was trying to show that in the months that Mr. Guzewicz had received the cash from Dion Fisher, that you actually see a sharp increase in cash deposits to all these accounts.

Q. So the only things listed in these -- amongst these five accounts of Miss Wolfe and Mr. Guzewicz were cash deposits? That's what you were comparing?

A. Yes. And that included the money orders, as well.

Q. And are those the -- so what did you -- what did you find, then, as a result of preparing Government's Exhibit 602, the summary chart of cash deposits to the Guzewicz accounts?

A. Well, if we look at the monthly totals for each month, for instance, in January of 2015, we have total cash deposits of $54,205. February, $56,360. March, $35,647. In April,

$62,690. In May, $17,435. And then in June, which would have been the first time that Mr. Guzewicz wrote a $30,000 check, we see the cash significantly increases to $103,150.

Similarly, in July, when he writes two $30,000 checks, the cash increases to $118,140. And then in August, when he deposited or, excuse me, wrote the fourth $30,000 check, we had monthly cash deposits of $70,034. And we see in September, it drops down to $26,101.

Q. So what were the largest months?

A. The largest months were June, July, and August.

Q. Are those the same months that these checks -- that Mr. Guzewicz wrote the $30,000 checks after he received $35,000?

A. Yes.

Q. And let's take -- if we could do the close-up just on the July period, which is on the second-to-the-last page. What are some of the things that you were able to highlight or did in this chart?

A. To the very right, I highlighted some of the dates in which the significant event occurred. And, for instance, on 7-17 of 2016 is when Mr. Guzewicz gives Dion Fisher a $30,000 check in exchange for $35,000 in cash. So we can see over 7-16, 7-17, and 7-22 we see -- and even into 7-23 and 7-24, we see a large amount of cash being disbursed among all five accounts.

Q. If you take a look at the deposit, that $12,000 deposit on July 15th that I think we looked at previously in the Bank of America Onyx Automotive account, are there -- from your experience, are there any reporting requirements for a bank or anyone else for cash deposits over $10,000?
A. Yes. Cash over $10,000, the bank is required to file a CTR.
Q. And what is that?
A. Excuse me, a currency transaction report, which is then submitted to the IRS.
Q. And then if we just go down in August, have you also noted some -- and look in the middle of August, did you notate the money orders in any particular way on this chart?
A. I did. The money orders are indicated with a blue arrow.
Q. Miss Knott, did you prepare any kind of visual graph that would show this in a one-page format?
A. I did.
Q. All right. Let's take a look at Government's Exhibit 603. What does this chart show?
A. This just summarizes the previous chart. And it -- so on the left are the cash deposit totals and the months. And then the graph shows that the cash deposits significantly increased in June, July, and August.
Q. And, Miss Knott, when you were taking a look and

reviewing all these accounts, were you able to -- and looking at every transaction in them, were you ever able to trace $35,000, you know, spread amongst evenly where you could count that up amongst those five accounts?

A. No, because Mr. Guzewicz likely kept some of the cash out for cash expenditures. He deposited cash, you know, amongst five different accounts, and then he also commingled it with legitimate cash received in his business.

Q. And did you see transfers among the accounts, as well, from where there were cash deposits maybe in another account at the same time?

A. Yes.

Q. And you generally saw them spread out?

A. Yes.

Q. All right. Miss Knott, did you make similar charts relating to the other money laundering transactions that were charged in this case?

A. I did, yes.

Q. All right. So let's take a look, then, at Government's Exhibit 610. What is Government's Exhibit 610?

A. So 610 is an overview of the purchase of a 2009 Audi R8 Quattro.

Q. And this looks like a complicated transaction. Can you explain what this overview of this shows?

A. So on the far left, we have three large arrows. And

those are three different deposits into Bank of America Onyx Automotive, LLC account ending in 7106. So if we look at the first top arrow, you can highlight the top check and the arrow.

Q. And why is that highlighted? Why is that a significant transaction and deposit into the Onyx Automotive Bank of America account?

A. That particular deposit includes a $22,000 cashier's check that was purchased with funds from Dion Fisher's Hancock Bank account. And it is part of the total amount that was deposited to the Onyx Automotive account in order to purchase the 2009 Audi R8 Quattro.

Q. And what was the -- does this overview show the price of the Audi R8 Quattro that's shown on the right?

A. Yes. The sales price for that vehicle was $40,969.

Q. And how is that vehicle actually -- what are the funds that made to deposit it, how did it -- what are the exact funds to pay for that?

A. The exact funds to pay for that were $40,969.

Q. And is this a multiple-page exhibit, Miss Knott?

A. Yes.

Q. So let's take a look, then, at the second page. What does this page show?

A. This page shows a withdrawal slip from Dion Fisher's Hancock Bank account ending in 9814. So we see it's almost

like a withdrawal slip. It's written like a check. So it shows a $22,000 withdrawal. And we see Dion Fisher has endorsed the back and also signed the bottom of it.

Up in the left corner, it says Onyx Automotive. Many times the bank teller will write the name of the -- who the payee of the cashier's check that you're going to purchase, will write it on the deposit slip. So that's why that's there.

And then on the right, we see the actual cashier's check that Dion Fisher purchased payable to Onyx Automotive in the amount of $22,000.

Q. And when you see on that official cashier's check, is there actually -- is his name actually noted as the remitter on that check in the lower left?

A. Yes.

Q. And is this the actual charge -- is this particular $22,000 check the actual charge charged in this case?

A. Yes. The withdrawal of the $22,000 and the purchase of the check is the charge.

Q. And why is that the particular charge? Is there a requirement that it be over a certain amount of money?

A. Yes. The money laundering charge must be over $10,000.

Q. All right. So let's look how the rest of the purchase took place because, obviously, this check was written to Onyx, and Onyx is the one who acquired the actual car through

this next document, which is the auction sales receipt or bill of sale. What is significant on this page, Miss Knott?
A. So this is the actual sales receipt. So we see that -- we see that the purchase is 8-10 of 2015. And we see the member is Onyx Automotive, LLC, which he's the person that's authorized to go to the auction and purchase the vehicle.
So we see that it's for an Audi R8, a 2009, black Audi R8. The VIN number ends in 2963. And then we see at the bottom that the actual price that Onyx Automotive had to pay for the car was $40,969.
Q. And, Miss Knott, if this noted secure funds discount was not applied to this, what would be the total price?
A. It would be $42,169.
Q. And what's the next page, what does it show on this page?
A. The next page on the left is the back of the actual title. And we see that the actual buyer is listed as Lavonte Fisher. However, if you look at the writing on the back of the title there, we can see that if you compare it to other items that Dion Fisher signed, that the writing on the back is very similar to his handwriting.
Q. And does this take place, you know, at a good amount of time after the actual sales purchase in early August?
A. Yes.
Q. Let's take a look at the last page. And what does this

page show, Miss Knott?
A. This page is a picture of Lavonte Fisher's driver's license. And if we look in the top right corner -- let's look at the bottom right, we see the date of 10-19 of 2015 at 11:30 p.m. And if we look at the top right, it was actually sent via Gmail.
Q. All right.
A. It would give the indication that it was sent, that he wasn't actually there presenting the driver's license.
Q. And, Miss Knott, were you able to locate this purchase in the -- in Mr. Fisher's 9814 account, which was number 611, Government's Exhibit 611?
A. Yes.
Q. And let's take a look at that. I believe that's on page -- in August, I believe, that's on Page 24. Were you able to see that in August 5th?
A. Yes. That's correct. So on 8-5 of '15, he purchases the cashier's check for $22,000.
Q. Miss Knott, were you able to -- since this involved Onyx Automotive, were you able to prepare any sort of a summary graph or chart to include all of the transactions that occurred between Dion Fisher, or the cash transactions that occurred between Dion Fisher and Konrad Guzewicz?
A. Yes.
Q. Let's take a look, please, at Government's Exhibit

616A.

And what does this show, Miss Knott? What's included on Government's Exhibit 616A in terms of the items that you placed on there?

A. This is a timeline which shows that the top left on June 18th of 2015, that indicates that Dion Fisher purchased a cashier's check payable to Dion Fisher for $30,000 in exchange for $35,000 in cash.

Then on the next day, 6-19, we can see that he deposits $8,000 in money orders. And then we also see -- on 6-22, we see that Dion Fisher purchases a 2011 Porsche Panamera from Onyx Automotive for $28,300 in cash.

Q. Miss Knott, let me stop you there. Did you review some records, including the bank accounts as well as Onyx business records that established how that car was -- that Porsche Panamera was paid for?

A. I did.

Q. And how was that paid for?

A. It was paid for in cash.

Q. All right. Let's continue.

A. Then we see on 7-5 of '15 down at the bottom, we see another $2,000 in money orders deposited. And then on 7-15, again, we have another $30,000 check written to Dion Fisher in exchange for $35,000 in cash.

And then again on 7-24, another $30,000 check

payable to Dion Fisher in exchange for $35,000 in cash.

On August 9th, we have another $7,000 in money orders deposited.

On 8-10 of 2015, we see that Dion Fisher purchases a 2009 Audi R8 Quattro, which is the document we just looked at, for $42,169 in cash.

On 8-24, Mr. Guzewicz issues another $30,000 check payable to Dion Fisher in exchange for $35,000 in cash.

And then in September of 2016, after reviewing the records and reports about Mr. Guzewicz, I know that Dion Fisher provided Mr. Guzewicz with approximately $25,855. We think it was a little bit more than that, though. And then in turn, a few months later, in December, the paperwork is prepared for this sale in the amount of $27,800.

Q. And so this was another cash purchase of another vehicle?

A. That's correct.

Q. And what vehicle was that?

A. That was a 2005 Aston Martin.

Q. So what we have just in this -- you know, even without the 16 transactions, we have four checks for $30,000, and two vehicles with -- that are over $25,000, in addition to the $27,000 Aston Martin?

A. That's correct.

Q. And the Audi -- in the case of the Audi R8, that was

over $40,000?
A. That's correct.
Q. All right. Miss Knott, let's take a look at some of the other money laundering charges in this case.
Did you prepare a summary chart of -- relating to a money laundering transaction dealing with the purchase of property?
A. I did.
Q. Let's take a look, please, at Government's Exhibit 608. And what does this chart show, Miss Knott?
A. This chart shows that the top is an excerpt from Dion Fisher's Hancock Bank account. And we show that on July 21st of 2015, Dion Fisher wired out $30,920.51 to Stewart Title Company to purchase a property located on Green Leaf Road.
Q. And this is July 21st of 2015. This is a similar time period as those checks that we looked at, the previous checks that Mr. Fisher wrote to Konrad Guzewicz?
A. That Konrad Guzewicz wrote to Dion Fisher, yes. That's correct.
Q. Thank you for correcting me.
So those were the same time periods he was writing checks -- Dion Fisher was getting these $30,000 checks and made this payment. So can you explain what happens here?
A. On the left is the actual wire transfer authorization. We show the wire date of July 21st of 2015. We show that the

beneficiary account is to Stewart Title Company. We show the amount of $30,920.51. It's for the purchase of the property located at 2476 Green Leaf Road in Zolfo Springs. And we show that the ordering party is Dion Fisher, and the ending account number is 9814.

On the right is the actual settlement statement for the property. We can see at the top, it says it's a cash sale, which means there was no loan. We see that the borrower or the name of the purchaser is Dion Fisher.

Again, we have the property address on Green Leaf Road. And we show cash from borrower, the settlement, the final settlement cost is $30,920.51, which is the amount that he wired to Stewart Title. And we see that Dion Fisher signed the actual settlement statement.

Q. Miss Knott, when you were reviewing some of the other evidence in this case, did you find evidence that was searched at -- found at Mr. Fisher's residence that substantiated both the ownership of this property and then anything else about this property?

A. Yes. I saw a contract actually where he sold the property at a subsequent date.

Q. And let's take a look quickly at Government's Exhibit 152. And what does -- what were you able to ascertain as -- with regard to this document that was found at Mr. Fisher's residence?

A. This is the contract for sale. And we show that the parties -- Dion Fisher is selling the property to Rodriguez and Medinez. And we show that the purchase price is $55,000. So we can show that he sold the property for approximately -- let's see. He sold it for -- the settlement was for -- he sold it -- basically, he purchased it for 31,000 and turned around and sold it for 55. So he made about $24,000 on the property.

Q. And if we take a look, did you also locate -- do you know what county this property is in? Let me take a look at Government's Exhibit 145R. Were you able to tell anything about this particular item?

A. Yes. This is a personal money order that was purchased. It's payable to the order of Hardee Tax Collector, and it's to pay the property taxes, the 2015 taxes for the 2476 Green Leaf Road. And the amount is for $914.10.

Q. And, obviously, if that's a money order, the funding source for that would be what?

A. Cash.

Q. All right. And, obviously, that purchase that we looked at in Government's Exhibit 608 was, obviously, greater than $10,000, as well?

A. That's correct.

Q. All right. Let's take a look. Did you also prepare some money -- some charts with respect to money laundering

transactions that involved other vehicles that Mr. Fisher purchased?
A. Yes, I did.
Q. Let's take a look at Government's Exhibit 600. How many pages is this chart, Miss Knott?
A. Four pages.
Q. All right. So what does the first page of the overview of this transaction show?
A. This particular page shows that Dion Fisher -- if we look at the far left, Dion Fisher deposited $24,000 in cash to his Hancock Bank account ending in 9814. That was on March 23rd of 2015.
And then he wires out -- after depositing the cash, he then wires out $22,950 to Worldwide Auto, Inc., which is who he purchased the 2008 Maserati GranTurismo from for $24,100.
Q. All right. So, in fact, then, the actual charge in this case is for what item?
A. The actual charge is for the wire out on March 23rd of 2015 to Worldwide Auto, Inc., in the amount of $22,950.
Q. And from where to where?
A. He's wiring it from his Hancock Bank account ending in 9814.
Q. All right. So let's take a look at the second page, Miss Knott. And if you could explain what you are showing on

this page.

A. This particular page, the first thing that Mr. Fisher did was on March 19th of 2015, he used his Paypal account to disburse $1,000 as a down payment on the actual vehicle. And so if we look at the item on the right, on the bottom, that's the actual sales receipt, which would show that he was purchasing the 2008 Maserati GranTurismo from Worldwide Auto, Inc. The purchaser's name was Dion Fisher. We see the $1,000 Paypal down payment. And the total is $24,100. And then if we go to the next page, we can --

Q. And then just on that Worldwide -- that sales contract on the right, who -- where was that document obtained?

A. That particular document was obtained from Worldwide Auto, Inc.

Q. Which is what the purchase was through?

A. Yes.

Q. All right. Let's take a look at the next page. What does this show?

A. The next page shows that after he made the $1,000 deposit, that he deposits $24,000 in cash to the Hancock Bank account ending in 9814. So we actually see the deposit slip. And on the right, that's the bank's documentation that it was a cash deposit.

Q. All right. And then let's take a look at the last page of this exhibit. And what does this show, Miss Knott?

A. Again, if we look at the bottom left, we can see the actual -- it's the same document we looked at before. But what I have circled in the middle is the wire. They received a wire for $22,950.

Q. That was the wire funded by the $24,000 deposit that Dion Fisher made into his Hancock Bank account ending in 9814?

A. That is correct.

Q. And then if you look on the right is the actual wire itself that's reflected in that; is that right?

A. That's correct. That's the actual wire transfer advice from the bank. It's a little light, but it shows on March 23rd of 2015, there's a $22,950 wire. It shows that the source is from Dion Fisher, and that the beneficiary at the bottom is Worldwide Auto, Inc.

Q. And in terms of the communications between Dion Fisher and -- about this wire, if we can look on the bottom left, what did you -- what is that there? What did you find?

A. Dion Fisher sends an e-mail to Sally at Worldwide Auto, which said, thank you. I just signed the documents. I will do the wire Monday. I am out of town until then. And he signs the e-mail as, thanks, Dion Fisher, real estate marketing specialist.

Q. All right. Miss Knott, let's take a look. Did you prepare another exhibit involving the purchase of a high end

automobile?
A. Yes, I did.
Q. Let's take a look at Government's Exhibit 609. What is this chart, Miss Knott?
A. This chart shows the purchase of a 2005 Bentley Continental. We can -- the top part of it shows that on September 3rd of 2014, he put a $30,000 payment -- he made a $30,000 payment to J.G. Auto Finance, Inc., to purchase this 2005 Bentley Continental on the right. He also financed part of the purchase, so he financed $41,142.14. So the actual purchase price was over $70,000.
And then on the left, eventually several months later, in July of 2015, he then pays off that particular loan at National Auto Lenders.
Q. And so the rest of the purchase price after the $30,000 down payment was financed through what company?
A. National Auto Lenders.
Q. And were you able to review those records and summarize them in part to make this chart?
A. I was.
Q. All right. Let's take a look, then, at the second page of this exhibit, about the purchase of the 2005 Bentley. What does it show just at the top, the general chart at the top?
A. At the top it's just an overview. It just shows that

Dion Fisher put a $30,000 down payment on the vehicle, and then financed the balance, as we talked about before, with National Auto Lenders.

Q. And what's the document on the left on the bottom?

A. The left is the application for the loan.

Q. And what does that indicate, that application?

A. It indicates that the dealer's name was J.G. Auto Finance, that the applicant was Dion Fisher, as an employer name of -- it says he's employed with Top Dog Hot Dog. That's kind of in the middle of the document.

Q. And does he indicate a salary for his employment with Top Dog Hot Dog, LLC?

A. It indicates that he's making $8,000 a month with Top Dog Hot Dog.

Q. And how much would that be yearly?

A. $96,000 a year.

Q. All right. And what is the document on the right?

A. The document on the right is the actual financing document. It would show that Dion Gregory Fisher is the borrower. It would show that the dealer is J.G. Auto Finance. Then it indicates that he's purchasing a used Bentley Continental. And then it shows the amount financed.

It shows that the cash price is $69,662.94. There was a cash down payment of $30,000. So then there was an unpaid balance of 39,000 and something. I can't read the

whole amount.
Q. So the price of this vehicle, despite it being used, was nearly $70,000?
A. That's correct.
Q. Let's take a look at the final page of this exhibit. And if you can, tell me what this exhibit shows, Miss Knott.
A. This exhibit is the actual money laundering count. It shows that on July 27th of '15, he made a payment to National Auto Lenders with a cashier's check for $30,000. And we can see that the payee of the check was National Auto Lenders.
We also note the account number in the bottom left corner, which corresponds with the account number on the payment history report on the right.
Q. Now, at the top, it shows that there is more than one payment to National Auto Lenders, more than the $30,000 transaction that's charged as the money laundering count in Count Fourteen of the Indictment. And what are the other payments, the other 9,000 and then 218.87, what does that show?
A. Four days after he made the $30,000 payment, he purchased two more cashier's check totaling $9,218.87 and that paid off the balance of the loan.
Q. So I think when we took a look at the initial application where it indicated Mr. Fisher's employment at Top Dog Hot Dog for $8,000 a month, what does -- how much money

would he have had to make to make these payments? What does that tell you?

A. Well, I mean, if you kind of look at it, he applied for the loan back in I believe it was September of 2015, and he stated that he was making $8,000 a month. So 10 months later, he would have made -- that's $80,000, so he took a significant portion of his income, if that's what he was really making, just to make a loan payment on this vehicle.

Q. A total loan payment of about what, when you add all those together?

A. Well, if we add 30,000 plus nine, that's 39,000, a little over $39,000.

Q. Did you -- were you able to -- did you see anything else that indicated proof of ownership when you looked at the items that were seized from Mr. Fisher's house with regard to the ownership of the Bentley? And if we could take a look at Government's Exhibit 153.

A. Can I go back to the last question? In the last question, you asked me how many payments. He had actually made almost -- he had made over $50,000 in payments, because he had also made monthly payments, as well, so ...

Q. Which was what was shown when you look at that National Auto Lenders, that was kind of a loan payment balance on that last page?

A. Yes.

Q. And so if you totaled up the payments between when he started financing it and towards the end?
A. That's correct.
Q. All right. And what was Government's Exhibit -- that I'm showing you now, what's been previously admitted in evidence, Government's Exhibit 153?
A. This is a vehicle -- a Florida vehicle registration for the 2005 Bentley that was found at his home.
Q. All right. So we just talked about this Top Dog Hot Dog account. Did you -- were you able to do any kind of a chart to take a look at what was going on in the Top Dog Hot Dog bank account?
A. Yes, I did.
Q. All right. So let's take a look at Government's Exhibit 618. And if you can, tell me kind of what this exhibit is and what you're summarizing.
A. Again, this is a check spread, similar to the other ones that we've looked at. It has the posting date, the description of the item, the credits and debits and the source of either the deposit or payee and then it runs a running balance.
I then -- I highlighted all of the deposits from Bitcoin in blue, and I highlighted the disbursements to the U.S. Postal Service in green.
Q. And when you looked at some of these transactions, did

they look to you like transactions that would be involved in a hot dog business?

A. No. There were no transactions in this account to suggest that -- that suggested it was supporting a hot dog business.

Q. And who did you find -- when you reviewed this account, who were the signatories on this Top Dog Hot Dog account at Hancock Bank ending in 9806?

A. When the account was opened, it was Dion Fisher and Christopher McKinney.

Q. And what kind of transfers in terms of -- I know you noted the Bitcoin and the postal. Did you observe any kind of transfers of funds out of this account?

A. Yes. Throughout the whole account history, there are transfers out of this account to Dion Fisher's Hancock Bank that we've been talking about ending in 9814.

Q. Did you see any transfers to Mr. McKinney's account?

A. No.

Q. Now, when we -- we just had that enlarged. Were you able to make any kind of correlations between what you designated -- what you highlighted in green, which was the postal packaging or postal service charges, and the blue Bitcoin deposits?

A. Yes. As you know, he's receiving deposits from Bitcoin, which is a common currency used on the dark web, we

then see corresponding payments out to the U.S. Postal Service, which suggests that he was selling something on the internet, receiving Bitcoin as payment, and then turning around and shipping items at the U.S. Postal Service.

Q. And this particular exhibit started the opening account, when this account was opened was when, Miss Knott?

A. Opening date was October 1st of 2013.

Q. All right. And finally, the last couple of charts I want to discuss, were you able to take a look at -- we've been focused on cash deposits. So did you prepare a chart that just took a look at cash deposits and cash purchases by Dion Fisher?

A. Yes, I did. I created a chart that would include all of those items, yes, cash deposits to bank accounts, credit cards, debit cards, as well as cash receipts that I reviewed.

Q. And before we take a look at that, when you did this, Miss Knott, did you feel that you had sort of comprehensive, you know, an overview of sort of all of the cash deposits? I mean, in your experience as a financial analyst, how do you view these kind of items that you're able to recreate about cash?

A. You're asking is it a comprehensive?

Q. Yes.

A. No. I couldn't possibly know every cash expenditure he made, especially if you're just making a cash expenditure at

a 7-Eleven or at a grocery store or a department store. I wouldn't necessarily know unless I had the receipt that cash had been spent.
Q. So then when we take a look at Government's Exhibit 617 and 617A, do you feel like these are, you know, conservative examples of the cash?
A. Yes. It's definitely a conservative amount.
Q. And you were able to only base it on what?
A. On receipts that I had witnessed and bank deposits records that I had reviewed.
Q. So when you prepared 617 and 617A, what does 617 attempt to show by category? How did you organize this?
A. So I organized this particular spreadsheet by -- well, the first section are cash receipts that I reviewed that indicated that an item had been paid for with cash.
And then the other items, there's a second section that indicates --
Q. So before we go to that, because I want to take a look section by section. So you just totaled cash at various places through bank accounts, through various businesses where you were able to find cash?
A. That's correct.
Q. So if we take a look at the first one, what exactly did you tally in this $53,888 cash in this first section?
A. These are receipts that I reviewed that were obtained

at Dion Fisher's home, obtained in the search warrant.
Q. And these were all verified cash deposits by the actual receipt itself?
A. Yes.
Q. And they included receipts like what?
A. Well, for instance, the first ones were hotel receipts for -- but they were two hotel receipts for $66.08. We had numerous receipts for Louis Vuitton. We had numerous receipts for Gold and Diamonds Tampa. And those actual receipts were verified by the actual documents received from Gold and Diamonds. There were a couple of receipts to Dimmitt Automotive.
Q. And those were all cash expenditures?
A. That's correct.
Q. And then what's the second section, Miss Knott? What were you able to total for the second section?
A. The second section is what we've been discussing. These are all cash payments made to Konrad Guzewicz.
Q. And these were -- some of these were highlighted in the overview chart of the four checks, which was 601, and then each chart subsequent to that, and also the chart as to the Audi R8 purchase for $42,169?
A. That's correct.
Q. And what was the total cash to Guzweicz over that time period?

A. Total cash was $259,296.
Q. And the next item?
A. The next item indicates the cash down payment for the Bentley for $30,000 in cash.
Q. And that was in addition to the other 40,000 that you had charted out, which was a money laundering transaction for the other $40,000 payment, making it a nearly $70,000 payment?
A. That's correct.
Q. All right. And then if we take a look, what is it -- what did you total for the next section?
A. The next section is cash deposits to his Hancock Bank account ending in 9814 in the name of Dion Fisher. And those cash deposits totaled $123,182.
Q. And is this just a re -- have we just done this for 2015? Is that what -- the deposits for bank account, they go from 20 -- 10-1-13 through 8-24-15?
A. That's correct.
Q. All right. And what's the next section? What is the next section of cash deposits?
A. The next section that was from the previous page, as well, these are cash deposits to his Top Dog Hot Dog Hancock Bank account, and the total cash deposits were $45,830.
Q. And the next section?
A. The next section, he also had a bank account at Hancock

Bank ending in 6775. And this was in the name of Million Dollar Plans, and the total cash deposits were $16,770.

Q. And then the next account that you were able to find cash deposits for related to Dion Fisher?

A. He also had a personal account at Wells Fargo ending in 1543. The cash deposits to those -- that account was $89,139.19.

Q. And then what else did you include from Wells Fargo?

A. I also included -- there was another -- if we go to the next page, there's --

Q. There are cash deposits for two other accounts at Wells Fargo?

A. That's correct. Both in the name of Million Dollar Plans.

Q. And what were those two totals?

A. One was $3500 and the other was $12,790.

Q. All right. Then the next section, if you look at it, including in the description of it, it goes a couple of pages. What is this particular item? I believe it says the destination is a Netspend card ending in 4390. And what are the total cash deposits to Netspend?

A. Total cash deposits was $51,870.

Q. And what is Netspend?

A. Netspend is a debit card. It's like a prepaid visa card that you can open. It's essentially like having a bank

account on a card. You go online and you register for the card. You have to register with your name and the same kind of information that you would give to a bank. And you can make recurring cash deposits to the card. You can also even have your -- you could even have your paycheck deposited to it. And they maintain the same kind of rules and regulations that would be associated with a bank account.

Q. If we could just take a look, when you look at the Netspend, when you review the Netspend records, which are at Government's Exhibit 534, what does that initial page -- what does it show in terms of when this account was opened and by whom?

A. This particular account was opened by Dion Fisher. We would have to go down one more.

Q. To the account creation on the lower left?

A. Yes.

Q. And what does that show?

A. This shows that the account was created on February 17th of 2015, and that it was a MasterCard, and the account was eventually closed on July 12th of 2016, due to suspicious activity.

Q. And was there -- you mentioned something about the -- about how these particular cards are required to function somewhat like a bank. So was there a particular reason why this account was eventually closed?

A. Yes. I mean, Netspend also is required to know their customers. So they're required to know what the origin of the cash deposits was. The people at Netspend actually contacted Dion Fisher, inquiring as to what the sources of the multiple cash deposits were to the account.
Q. Could those be substantiated?
A. No. They could not be substantiated.
Q. And did you have an opportunity to review some of the -- this is like a regular credit card statement. Did you have the opportunity to review some of the credit card -- the accounts -- the expenditures from this account?
A. I did.
Q. And would you like me to approach, and I can provide you with a copy of these to look through?
A. Okay.
(*Documents tendered.*)
BY MS. HOWARD-ALLEN:
Q. We're starting on the page that's Bates stamped with 13 at the bottom. What kind of expenditures did you see in this Netspend account when you were able to look through some of the expenditures on Mr. Fisher's Netspend account?
A. Well, for instance, in March of 2015, there's an expenditure with Allegiant Airlines for $642. Also at that same time, March 14th of 2015, there's a $569 purchase for Vivid Seats. There is more Allegiant Airlines, a purchase

for $112. There's a Hotels.com purchase for $233. There's another purchase for a Delta Airlines ticket. More hotel purchases. We also see Enterprise Rental Car purchases, another hotel purchase.
Q. So is there a fair amount of travel items on this?
A. Yes.
Q. And when you see these credits to Walmart, these $500 credits that are made quite regularly, what do those indicate when you take a look at some of those?
A. If we look at the ones -- if we go to the top of the page, the very top.
Q. Yes.
A. Those are the credits to the -- those are the credits to the debit card. In other words, Dion Fisher went to Walmart on multiple occasions, actually, four times on March 12th of 2015, and each time he deposited $500 in cash to the Netspend card.
Q. And does that just kind of increase your balance so you can spend more money?
A. That's correct.
Q. And it's just like a regular Visa, if you were using it somewhere; is that right?
A. Yes.
Q. All right. Now, if we go back to Government's Exhibit 617, one of the items we had gone through was the Wells Fargo

accounts that related to Mr. Fisher.
A. Yes.
Q. And specifically, there were a couple of items for the signature card -- for the account ending in 1543. Do you see that item on 1543 for Wells Fargo?
A. Yes. There were several deposits in March and April of 2017 into the Wells Fargo 1543 account.
Q. And were you able -- through your review of all of the bank records able to verify that those -- besides the signature card being in Dion Fisher's name, were you able to verify that Mr. Fisher made some of those deposits?
A. Yes. The bank actually captured Mr. Fisher on video making these cash deposits.
Q. So let's take a look, then, if we could at some of those items. Let's look at Government's Exhibit 533C. And what does this particular exhibit show in terms of cash deposit to the Wells Fargo account ending in 1543?
A. This is a video captured of Mr. Fisher making the deposit on March 21st of 2017.
Q. And what about Government's Exhibit 533D?
A. This is another video captured of Mr. Fisher making the cash deposit on April 13th of 2017.
Q. And then finally, 533K. What date does this show a deposit into Government's Exhibit -- I mean, into Wells Fargo ending in 1543?

A. This is April 27th of 2017.
Q. All right. So if we go back to Government's Exhibit 617, and we'll be on page six after the -- we were just looking at the Netspend cash deposits, a total of $51,870. What does the next section show?
A. The next section shows total deposits to credit cards. In other words, Mr. Fisher actually made payments to his credit cards in cash. And that account is a Wells Fargo credit card ending in 1810. The card was subsequently lost or stolen, and the account number then changed to 2790.
Q. And, Miss Knott, did you find statements relating to both the -- did you review statements that were found at Mr. Fisher's house that both related to these credit card accounts ending in 1810 and 2790?
A. Yes, I did.
Q. And so what was the cash deposits -- what was the next section after these credit card cash deposits?
A. The next section are money orders or money transfers purchased at Publix.
Q. And what does that mean? What do you do at Publix that would show that there was cash?
A. You would go to Publix, similar to a Western Union, and you could transfer money to someone else. Publix has that service available. So he would -- it totaled a little over $23,000 that he did via Publix money transfers.

Q. And how much was it?
A. $23,168.11.
Q. And were you able to do this after reviewing the Publix transfers, the records from Publix itself?
A. I did. I reviewed those records from Publix.
Q. And in terms of making transfers, were you able to look at -- I think just above that, some of the names of the transfers that were -- where cash was transferred to on the previous page. And were you able to observe anything about these cash transfers?
A. Many of them are -- most of them have Oriental-type names.
Q. All right. And the next section, if we can take a look at the next section. What is the cash transfers in the next section?
A. These are cash transfers, again, just like Publix, but these were made via Western Union. And those total cash transfers were $42,547.11.
Q. And again, if we look on the previous page where a lot of those cash transfers are listed, what did you notice about the receivers of cash that was transferred from Dion Fisher to someone else?
A. The receivers had -- most of them had Oriental-type names.
Q. And then, finally, I believe there's -- well, there's

two more sections. What is the next-to-the-last section?
A. There were a few transfers via the same manner, transfers via Amscot for $2,256.
Q. And then what was the next item?
A. The last section involved cash that was found at Dion Fisher's house during the search warrant, totaling $5,001.
Q. And then what did you actually come up with in terms of the total for -- this conservative total that you testified to about cash deposits and purchases by Dion Fisher in Government's Exhibit 617?
A. The total was $794,434.78.
Q. And, Miss Knott, were you able to take these figures and these total cash deposits, were you able to take a look and break this down in a way that would let you examine those by year, by date?
A. I did. I took the same exact information and just sorted it by year.
Q. All right. Let's take a look at Government's Exhibit 617. Is this the chart that you sorted, Government's Exhibit 617, all the cash deposits and purchases by Dion Fisher into year by year?
A. I did.
Q. What were -- what did you find, Miss Knott, when you did this, when you sorted it this way?
A. I sorted it, and I found that the greatest cash

purchases were made in the year 2015. Nearly half of the amount was -- or probably more than half of the amount was made in the year of 2015.

Q. What was that figure?

A. The figure was $441,577.

Q. And when you look at the previous year in 2014, what was the total?

A. $95,601.

Q. And so you mentioned it was over 441,000 in 2015. What was it in 2016, Miss Knott?

A. $172,528.24.

Q. So a substantial difference, but still a fair amount of money in 2016, as well?

A. That's correct.

Q. And then, finally, as your final summary chart, Miss Knott, were you able to make any kind of a summary chart as related to travel by Dion Fisher?

A. Yes, I did. I looked at all of his bank accounts, the Netspend account, the credit card, and I took those line items in which there was payment made to airlines, hotels, or rental cars, and I just combined them all into a spreadsheet.

Q. All right. So let's look at 619. And so the three categories are airlines, hotels, and rental cars?

A. That's correct.

Q. So if we take a look, does this look like a fairly high

volume of travel?
A. Yes, it is.
Q. Let's just look at the bottom, like the month of March in 2015. What are your observations here in terms of expenditures, travel-related expenditures by Dion Fisher?
A. Well, for instance, we had travel on March 9th, March 15th, March 18th, March 20th, March 30th.
Q. And then did you find -- when you go to the next section, which is like two pages later where you're looking at the hotels, did you find similar type of hotel expenditures around the March and April time period on the lower half of that?
A. I did. We have charges on March 6th, March 16th, March 19th, March 23rd, March 30th, several on March 30th.
Q. What did you observe if we just showed the bottom half of this, in terms of the types of hotels or places or reservations and expenditures? What were you able to observe about these hotels?
A. Well, some of them were out of town but some of them were also local.
Q. And they're made -- and when you look at the -- on the far right column, there's a fair amount of -- they're made throughout a number of accounts is the source of the funding for that; right?
A. Yes.

Q. And then, finally, where the last category is the rental cars?
A. That's correct.
Q. And when you take a look at some of these hotel stays, some of them appear to be out of the country. Were you able to take a look -- like on the ones around December of 2016, were you able to find anything else that would have corroborated stays in the Wyndham Reef Resort in Grand Cayman or the Hotel Casa Marina in Puerta Plata, the Dominican Republic, around December 15th of 2016?
A. Yes. I looked at his passport that was found at the search warrant, and there were numerous entries for travel to those countries.
Q. And were you able to look at any of the car rentals or other expenditures that corresponded with any other items that were found at the residence?
A. Yes. I found corresponding entries or purchases for car rentals and hotels in Las Vegas, and those corresponded with large ticket purchases of fight tickets in Las Vegas.
Q. So you found car rentals that corresponded in '14, '15, and '17 with those exact dates of those boxing fights?
A. That's correct.
MS. HOWARD-ALLEN: May I have a moment, Your Honor?
THE COURT: Of course.

MS. HOWARD-ALLEN: I don't have any further questions for Miss Knott at this time, Your Honor.

THE COURT: All right. Thank you very much.

Do you wish to inquire, Mr. Martin?

MR. MARTIN: No. Thank you, Your Honor.

THE COURT: All right. Anything else from this witness, then, Miss Howard-Allen?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: Thank you. You're excused. Thank you. We appreciate your coming in today to testify.

THE WITNESS: Thank you.

THE COURT: Anything else, Miss Howard-Allen?

MS. HOWARD-ALLEN: No, Your Honor. At. This time the government rests.

THE COURT: Okay. Ladies and gentlemen, we're going to take a short recess because the government has rested its case, and we will resume in about 15 minutes or so. We will resume at about 3 o'clock.

Please don't discuss the case or form any opinions until you've heard all the evidence. We'll see you back here at 3 p.m.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 2:45 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: So the government has rested its case.

Mr. Martin, do you have a motion you would like to make?

MR. MARTIN: Yes, briefly, Your Honor.

THE COURT: Yes, please.

MR. MARTIN: Under Rule 29, I move for a judgment of acquittal for Counts One through Seven and Nine through Sixteen on the grounds that the prosecution has failed to present sufficient proof on each and every element of every count in which a rational juror could conclude beyond a reasonable doubt that Mr. Fisher is guilty.

THE COURT: Okay. Thank you, Mr. Martin. Miss Howard-Allen, do you wish to respond?

MS. HOWARD-ALLEN: Your Honor, I believe -- I'm just searching for my indictment. Thank you.

I think that we have presented more than sufficient evidence on -- as to -- we presented drug evidence that corresponds to Counts One through Seven, so that is included with the willful possession and distribution and manufacture of fentanyl, methoxyacetyl fentanyl, and also pentylone. All of them have been admitted into evidence. And there's been sufficient testimony as to the distribution and the manufacture of both, in the form of witnesses and in the form of scales and other small baggies that would indicate distribution.

So I believe that the government has presented evidence sufficient to meet the elements on One through

Seven.

As to Counts Nine through Sixteen, we have also presented evidence on each and every money laundering transaction. And we presented evidence that the unlawful activity of those -- of narcotics distribution and manufacture is the source of the funds involved in each of those ten money -- those eight money laundering transactions.

We've had witness testimony from the individual directly involved in five of them. And then we've had testimony from Miss Knott as to the source of the funds and the actual money laundering transactions for the other three money laundering counts.

So I submit that the Court should respectfully deny Mr. Martin's Rule 29 motion at this time, and we go forward with the jury.

THE COURT: All right. I agree. I think the government has shown more than ample evidence. So the motion is denied.

All right. Mr. Martin, it's now your opportunity when the jury comes back to present your case, if you choose to present any testimony or any evidence. Are there -- first of all, I think you told me earlier that, if any, you would only be calling your client as a witness. Is that right?

MR. MARTIN: That's right, Your Honor.

THE COURT: Okay. And will your client be

testifying during this trial?

MR. MARTIN: No, Your Honor.

THE COURT: Okay. So I'll go ahead and inquire. Mr. Fisher, earlier I talked to you a little bit about testifying. And so I understand from Mr. Martin that you will not be testifying; is that correct, sir?

THE DEFENDANT: Correct.

THE COURT: All right. You understand that it's your decision whether to testify or whether not to testify; correct, sir?

THE DEFENDANT: Correct.

THE COURT: All right. So that's your decision. And today, are you telling me that it is your decision not to testify?

THE DEFENDANT: Yes.

THE COURT: And you've made that decision after consulting with Mr. Martin?

THE DEFENDANT: Yes.

THE COURT: And you've decided it's in your best interest to proceed in that fashion; is that right?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Martin, is there anything else you would like me to cover with Mr. Fisher?

MR. MARTIN: No, Your Honor.

THE COURT: All right. So the jury is going to

come back at 3:00. What we're going to do then is I'm going to ask you if you have any testimony or if you have anything you would like to present. You should then go ahead and rest in front of the jury. And what I'll do is I'll tell the jury that they should come back tomorrow morning at 9 o'clock.

MR. MARTIN: Your Honor, does the Court prefer I rest from table or the --

THE COURT: It doesn't make any difference at all. Whatever is easier for you.

MR. MARTIN: Thank you, Your Honor.

THE COURT: It's perfectly fine for me. And then we're going to move to -- after we do that and I excuse the jury, we're going to move to jury instructions and the verdict form.

There are forfeitures here, if I'm not mistaken; right? I haven't looked at this in a while. But there are forfeitures; right?

MS. HOWARD-ALLEN: Yes, Your Honor. And Miss Nebesky, who is in our asset forfeitures division, wanted me to reiterate, and I don't have the document number handy, that she and Mr. Martin have spoken, and I think they filed a notice that the forfeiture would be taken up -- that there would be no forfeiture trial, and it would be decided, should the jury convict at that time.

THE COURT: Okay. That was going to be my

question to you, because if he's acquitted, then there is not an issue. If your client is convicted, then, you know, normally they should be able to present enough evidence during the course of the trial for the forfeitures. And most certainly -- I most certainly heard evidence during the course of the trial.

So they would make a short oral argument to the jury and the jury would decide. But most certainly, you have every right to waive that and to go in front of the judge as opposed to the jury. Is that what you would like to do?

MR. MARTIN: Yes. I spoke with Mr. Fisher. It's been months ago, and he opted to go with the judge in the event that occurs.

THE COURT: Okay. And that's what you relayed to the U.S. Attorney's Office; right? That you would be waiving that right to go in front of the jury? Because, I mean, it's a different standard. It's by the preponderance of the evidence as opposed to beyond a reasonable doubt. But most certainly, you have the right to a jury trial on that issue.

MR. MARTIN: Correct. I relayed that I think via e-mail. I don't have the date. It was a while ago. I can say that.

THE COURT: Okay.

MS. HOWARD-ALLEN: I think there's actually -- it's called notice of filing of forfeiture or something. I

think it's actually in the docket and it indicates their agreement.

MR. MARTIN: It certainly -- I'm sure it is. We decided this months ago. And frankly, you know, I haven't reviewed it for this.

THE COURT: Okay. Well, I didn't really think about it too much until right now, heading down to the wire here. So that's fine, then. I won't cover forfeitures with them at all.

And as a matter of fact, the redacted indictment won't alert them to the fact there is a forfeiture because they're not supposed to know that until they convict, if they convict.

So that's where we're at. So I'll probably excuse them a little bit after 3:00. And then we'll see about the jury instructions, the verdict form, and we'll move forward tomorrow morning.

MS. HOWARD-ALLEN: Your Honor, when -- after we just double-check the exhibits, I intend to file an exhibit list either later tonight or in the morning that just has only the items that have been admitted.

THE COURT: Okay. We need to check to make certain that we have the same list.

MS. HOWARD-ALLEN: We will do that so that that list may go back with the jury.

THE COURT: All right. Anything else? All right. Let's take --

MR. MARTIN: The exhibit list is going to go back with the jury?

THE COURT: Yes. I've done that. I haven't done it. But I also have done it. I've done it both ways. I think it's okay if you've got a lot of exhibits.

MR. MARTIN: I understand the reason for it. I'm just trying to think of the description of the exhibits.

THE COURT: Well, take a look at it. If it bothers you, then --

MS. HOWARD-ALLEN: If he has any -- he's welcome to e-mail me if he has any objections, and I'm sure that we can work it out. I tried to make them as innocuous as possible. But he's certainly -- if there's anything that he wants to discuss about the ones that have been admitted, I'm happy to discuss it with him and then bring it before Your Honor if there's an issue.

THE COURT: Okay. All right. Well, we'll cross that bridge when we get there. But I have sent exhibit lists routinely to the jury.

Okay. I don't think I have anything else, then. We'll resume in a few minutes. See you later.

(Recess taken from 2:54 p.m. to 3:04 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Is the government ready and defense ready? We'll bring in the jury, then. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 3:05 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Welcome back, ladies and gentlemen.

So as you heard earlier, the government has rested its case. Mr. Martin.

MR. MARTIN: Your Honor, the defense rests.

THE COURT: All right. Thank you, Mr. Martin. And the defendant has rested his case, as well.

Since it's a little bit after 3:00, we could have gotten started on the closing arguments, but it's a little bit late in the day, and so I think it's better to just do that tomorrow morning.

So what we're going to do is we're going to recess for the day. We will resume tomorrow morning at 9 a.m. Here's the agenda of what's going to happen. I will give the government up to an hour-and-a-half for their closing argument, because the government always has the burden of proof, and I give them the opportunity to take half an hour of that for rebuttal closing argument.

I'll give Mr. Martin an hour-and-a-half, but he

doesn't need to use the entire time. Neither of them do.

So the government will go first. They will probably take up to an hour for its first closing argument, then Mr. Martin will make his closing argument, and then the government will make its rebuttal closing argument.

All things considered, that will probably be about an hour-and-a-half to two hours, something in that range. So it will probably be from about 9:00 to about 11:00-ish, give or take. I'll then read jury instructions to you, and I'll give you each a copy to follow along with me. And you'll have a copy of the jury instructions to take back with you to the jury deliberations room. It normally takes about half an hour, again, give or take, to read those jury instructions.

That's going to take you about half an hour -- or it will take me about half an hour to read it and then some. So that puts us pretty darn close to the noon hour, with breaks, with a break in there. So what I'm going to do is I'm going to go and order lunch for you for tomorrow so you don't have to worry about getting lunch during your deliberations. It's just going to be something like sandwiches, so if anybody has any particular dietary restriction, please let Miss Lee know now when you're excused or let Nona -- let somebody know that you have a dietary -- like vegetarian or somebody is gluten-free or some other issues. Please let us know. But it's basically just

sandwiches and potato chips and things like that.

But I estimate that will be around noon, give or take. Maybe a little bit earlier. It's going to be earlier than noon. It will be about 11:30, give or take.

There is no time limit on your deliberations. However long it takes you is fine. There is not a time limit. But that's the agenda, that's the schedule for tomorrow.

Remember, tomorrow I really don't want the cell phones or any devices in the jury room during your deliberations. So you can do one of two things. You can either lock it up on the third floor in the jury assembly room when you get in in the morning, or as soon as closing arguments and jury instructions have finished. But before you begin your deliberations, you need to bring it downstairs and lock it up on the third floor.

So I'll ask before you do that, if anybody still has their phone, and if you do, then I'm going to ask you to please go downstairs and lock it up.

Any questions from anybody? Please remember to continue not to do any research or to discuss the case with anybody or with each other. Those are part of my general instructions that continue to be in place.

The exhibits will be sent back tomorrow. You will also have the opportunity, if you would like, to listen again

to any of the tape recordings. There is -- we have equipment for that so that you can listen to it. And that will be made available to you.

As I said earlier, I don't send contraband back or things of that nature, but you do have the pictures and you can look at that in the courtroom.

Very good. We'll see you tomorrow morning at 9 o'clock. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 3:11 p.m.)

THE COURT: Does anybody need to take more of a break? Okay. Otherwise, we're going to move forward with jury instructions. Just let me switch gears here. So let's go through these.

The first one that we have is Basic 2.1. And by the way, these will be numbered Jury Instruction No. 1, Jury Instruction No. 2, without anything else. We won't -- I won't include what the title is or, obviously, where it came from. So the first one is Basic 2.1. The duty to follow instructions and the presumption of innocence. I think that's fine.

Basic 2.2, the duty to follow instructions and presumption of innocence when a defendant does not testify. Okay. So I think instead of B2.1, we can use B2.2, right, since he didn't testify? Is everybody in agreement with

that?

MS. HOWARD-ALLEN: Yes, Your Honor.

MR. MARTIN: Yes, Your Honor.

THE COURT: So no B2.1 but, yes, B2.2.

All right. Basic 3, definition of reasonable doubt. That's okay.

B-4, consideration of direct and circumstantial evidence. That looks okay to me. Basic 5, credibility of witnesses. That also looks okay.

Basic 6, because Mr. Fisher didn't testify, I think that's the one that we would use instead of Basic 6.5; right? Okay. Basic 6.2, are we all okay on that? Yes to Basic 6.2, no to Basic 6.5.

Okay. Let's see what we have here. Here we had testimony of accomplices, informants or witnesses with immunity. Well, we had basically accomplices. So that was -- it's Special Instruction 1.1 and Special Instruction 1.3 combined, because we also had some witnesses who used drugs; right? So we had a witness who testified that he used drugs.

MS. HOWARD-ALLEN: Your Honor, I don't think there were any witnesses who have been promised immunity from prosecution.

THE COURT: Okay. For example, paid witnesses, witnesses who have been promised -- I don't think we have

any, so we can make that -- do we have any paid informants? I didn't hear any.

MS. HOWARD-ALLEN: There were any paid informants.

THE COURT: So we could say, for example, witnesses who hope to gain more favorable treatment in their own cases, and take out paid informants, witnesses who have been promised immunity from prosecution or witnesses. We can take out, if you would like, the first part of that sentence. And this is the way that it reads, but I don't have any problem taking that first part out. Would you like that first part out, then?

MS. HOWARD-ALLEN: Yes.

THE COURT: Mr. Fisher, what it's going to read is, it will say, you must consider some witnesses' testimony with more caution than others. For example, witnesses who hope to gain more favorable treatment in their own cases may have a reason to make a false statement in order to strike a good bargain with the government.

Okay. So paid informants, witnesses who have been promised immunity from prosecution is going to come out. Okay.

That's okay. Let's see. Special Instruction 1.2, we're making it a separate instruction. It's going to come right after that instruction that we just -- you just read or I just heard. It says, again, you must consider some

witnesses' testimony with more caution than others. In this case, the government has made a plea agreement with a co-defendant in exchange for his testimony.

I mean, it is a little repetitive of what we -- did I hear -- let's see. I think every witness that I heard -- I'm trying to remember now -- has been charged in one way or the other who were accomplices or co-accomplices. Of course, we had the co-defendant who's also in front of me for sentencing. We had the gentleman who's in front of Judge Kovachevich for sentencing, Bjorn Brunvand's client. We have the gentleman who testified from the car business. Who is he in front of?

MR. MARTIN: Judge Bucklew. I'm pretty sure.

THE COURT: Okay.

MS. HOWARD-ALLEN: I think so. And then Mr. Kulic is the only one who is, in fact, you know, not -- it's charged in the state, so I don't know that he's got a plea bargain. It is covered in hopes to gain for favorable treatment. The prior one, it's like who hopes to gain more favorable treatment in their own cases. And that's Mr. Kulic, I guess.

THE COURT: Yes. Let's see here. Well, there is truly only one co-defendant, and that's Mr. Huffman. There's only one co-defendant.

MS. HOWARD-ALLEN: Although Mr. McKinney is, you

know, charged --

THE COURT: But not in front of me. I'm just concerned -- when they take that indictment back, I don't know if you redacted Mr. Huffman's name.

MS. HOWARD-ALLEN: I did. I didn't want to, but there is a Count Eight that was against Mr. Huffman, so that's clearly got to be taken out. I would be happy to put Mr. Huffman back at the top of Page 1 and in Count One, but I don't think we had a status and I didn't raise it. But in an abundance of caution, I fully redacted him from the indictment.

And quite frankly, you know, Mr. McKinney pled to the exact same charge, and it says with Dion Fisher in his case. And Konrad Guzewicz says, I did money laundering charges with Dion Fisher. So they are all, in fact, you know, whether charged in the same indictment or not, I think their testimony and the charging documents are as conspirators.

So I think the only -- you know, it is somewhat repetitive just because, you know, the ones with pleas may be seeking more favorable treatment, and Mr. Kulic is just not in the plea bargaining portion because he does not have a plea agreement in his state court case. That's all that's pending against him.

THE COURT: I think it's fine the way it is. I

think it's slightly repetitive, but it's not -- I don't have a problem at all with it. So I think S1.1 and S1.3 combined is fine. S1.2 as it is is fine, too.

All right. This Middle District of Florida basic witnesses, you know, that's fine. I routinely include it, Mr. Fisher. I don't know what your position is.

MR. MARTIN: Your Honor, with that, I do object to that. I didn't have a chance to file this. I've given a copy to the prosecutor. If it's given, I think it potentially -- absence of evidence alone can create reasonable doubt. And I think this is misleading. Absence of evidence should potentially be ignored. If I can approach and --

THE COURT: Of course. Yes, sir.

(*Document tendered.*)

THE COURT: I don't know about that. I don't know about that. Have you seen this, Miss Howard-Allen?

MS. HOWARD-ALLEN: I have, Your Honor. And, certainly, our contention is that it's fully covered in the reasonable doubt definition, which is the B3 one that's before, you know, the pattern instruction.

THE COURT: I mean, if you'd like, I'll make this part of the record, Mr. Martin, so you've preserved your objection.

MR. MARTIN: Yes, ma'am. And for the record, I do

object to the instruction.

THE COURT: Okay. You know, this one has been around for a long time, from at least from the '90s, it's been there. And I'm sure somebody at some point had a bad experience and they said, you know, we need to throw something in there.

And judges in this district routinely give it. I don't think that it says something that's not accurate. I think it is absolutely accurately. The law does not require the prosecution to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matter in issue with this trial. Nor does the law require the prosecution to produce its exhibits, all papers and things mentioned in the evidence.

I think that's fine. I think what you proposed goes overboard and is not called for. While it's true, it's covered elsewhere. So I'm not going to give it there. But I will mark this that you have proposed adding as Court's Exhibit 1.

(Court's Exhibit No. 1 was received.)

THE COURT: So it's part of the record there. If I'm wrong, a higher authority will let me know. I hope not. But I think my analysis is correct.

MR. MARTIN: Thank you, Your Honor.

THE COURT: All right. Next is Basic 7, expert witness. We heard from a lot of expert witnesses. So that one is staying in.

Then, let's see. Certain exhibits in the forms of charts, summaries, and calculations and the like have been received in evidence. Such exhibits are received in evidence where voluminous writings, documents, and records are involved. These exhibits are available for your assistance and convenience in considering the evidence.

And that's primarily with the flip charts, Miss Howard-Allen?

MS. HOWARD-ALLEN: It's both the flip charts and Miss Knott's charts.

THE COURT: Oh, yes. I forgot about hers. Okay. So I think that's fine to come in.

All right. Basic 9.1A, the on or about, and the definition of knowingly and willfully. If there is any objection -- if I don't hear anything, I going to assume everybody is okay with it. Okay.

Basic 10.2, punishment, single defendant, multiple counts. That's fine with me, too.

Special 6 about possession. That looks okay to me, too.

Special 7, aiding and abetting. Let's see, remind me, in the indictment, has he been charged with aiding and

abetting?

MS. HOWARD-ALLEN: The substantive counts. Let me look at the indictment. There are five substantive counts. The 1957 counts have -- all eight of them have an 18 U.S.C., too, as well as the six substantive counts.

THE COURT: So it does. I think this is okay.

All right. Moving on, this conjunctive disjunctive. That's another one, Mr. Martin, that's been there, I don't know, since the '90s. I'm sure somebody at some point didn't understand and and or, so that's why they throw it in there. But the judges here allow it and I've allowed it routinely. So I don't know if there is anything you want to say. I'm happy to consider it. Otherwise, it's my intention to give that Middle District of Florida basic conjunctive charge.

MR. MARTIN: For the record, I'll go ahead and object and just -- I understand the law is totally against me, but and means and, and or means or.

THE COURT: Well, I understand. I understand your argument, but it's overruled.

Okay. Basic 8, we've got, let's see, 15 separate counts against Mr. Fisher; right, Miss Howard-Allen?

MS. HOWARD-ALLEN: We do, Your Honor.

THE COURT: So he's in one.

MS. HOWARD-ALLEN: One through Seven and Nine

through Sixteen.

THE COURT: Right. Because One is the conspiracy.

MS. HOWARD-ALLEN: Right.

THE COURT: Okay. And Two through Seventeen are the substantive counts, but he's not charged in Eight.

MS. HOWARD-ALLEN: Correct. Eight was the substantive count against Mr. Huffman.

THE COURT: Okay. So I think this is correct. Okay. So that ought to be okay by everybody. The next one is -- here we get into the specific crimes. We have controlled substances conspiracy 21 U.S.C. 846.

Let me just make certain that I pronounce these correctly. It's going to be tough. Fentanyl. That's one I've heard over and over again. What is this N phenyl N phenyl lit -- gosh, propanamide? Something like that. Does that sound close enough? I'm going to have to practice how to even pronounce these words.

MS. HOWARD-ALLEN: Miss Guzman knows at least the last word.

MS. GUZMAN: Propanamide. I had a trial with it so I found out. It's Propanamide.

THE COURT: Well, say it again.

MS. GUZMAN: Propanamide.

THE COURT: Propanamide and fenalethyl? The one in front of that in the brackets? Gosh. Is that the

compound? I mean, who knows?

MS. HOWARD-ALLEN: It think it's fentanylethal. It's actually in the statutes, that's how you know fentanylethal.

THE COURT: How about on the next line?

MS. HOWARD-ALLEN: Methoxyacetyl, fentanyl.

THE COURT: Say it again.

MS. HOWARD-ALLEN: Methoxyacetyl.

THE COURT: Gosh. Methoxyacetyl. Oh, my goodness. Fentanyl. I'm going to have to have this spelled out phonetically. Okay. Well, anyway. That's the conspiracy. That's on the controlled substances.

It goes on to say what needs to be shown. Anybody about any -- do you have -- on the verdict form, do you have a place there for the weight?

MS. HOWARD-ALLEN: I do, Your Honor.

THE COURT: Okay. Just double-checking.

MS. HOWARD-ALLEN: In all three counts.

THE COURT: I'm just double-checking. We'll get to that in a minute.

Okay. The next one is controlled substances, possession with intent to distribute. So these are the substantive counts; right. In Counts Two through Four, he's charged with possessing with intent to distribute.

I don't think Counts Two through Seven deal with

methy -- gosh, whatever that word is, methy --

MS. HOWARD-ALLEN: No. Two through Seven is all fentanyl except for Count Seven, which is pentylone.

THE COURT: Okay. Because I think originally on the one you submitted, you did add the word methoxyacetyl, and we took it out. Do you see that? On Page 23, I think you have our draft. Anyway, the one you had had that in there originally.

MS. HOWARD-ALLEN: Oh, okay. I see.

THE COURT: So we took it out for that reason. I may not know how to pronounce, but I do know what's in there.

So okay. But if we're wrong, please let me know. Please check on that tonight. And if I'm wrong, speak up.

MS. HOWARD-ALLEN: You're right.

THE COURT: Or check on it now so we have time to make these copies. Okay. Counts Five, Six, Seven. Then we get to the money laundering, 1957.

Then we have the note-taking. The duty to deliberate. The verdict.

Okay. Anything that I may have missed? Before I get to the verdict form, anything anybody wants me to consider, take up, et cetera?

MS. HOWARD-ALLEN: Your Honor, I know that you have given the T3 explanatory explanation of transcript -- transcript of tape-recorded conversations, you know,

throughout the trial. It was in our -- I think it was in both of our submissions.

THE COURT: Okay. So would you like me to add that back?

MS. HOWARD-ALLEN: I mean, I don't -- it --

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay. I'm going to add the transcript.

MS. HOWARD-ALLEN: And if you want, I can refer to the exhibit list and give you the exhibits to read if you would like to put them --

THE COURT: Yes. You're going to have to. And since we print this up and give it to them, if you could give it to me today, it would make our life tomorrow so much easier. We've got time today and tomorrow is always challenging.

MS. HOWARD-ALLEN: I think that's fine. So I think we would do 300B, 301B, 302B, 303B, 305A, 308A, 309A, 310B, and 311A.

THE COURT: 300B, 301B, 302B, 303B, 305A, 308A, 309A, 310B, 311A. Are these the actual -- these are the transcripts as opposed to the tape recordings?

MS. HOWARD-ALLEN: Yes. Although you read them fast, but I think it was just 302A, not three -- there is no 302B. So I think it's just 302A.

THE COURT: Okay. I thought that's what you said. Okay. 302A, not a B. And these are the transcripts.

MS. HOWARD-ALLEN: Yes. And 305 is an A, not a B.

THE COURT: Yeah. I have 305A. So 302A, 303B, and 305A.

MS. HOWARD-ALLEN: Correct. And then 308A.

THE COURT: I think the form says these tapes have been admitted as -- and I need to say those --

MS. HOWARD-ALLEN: When you read T11 -- I'm happy to hand up -- it says, these have been identified as a typewritten transcript of the oral conversation heard on the tape-recordings received in evidence as exhibits -- and then it has the exhibits again. These transcripts purport to identify the speakers --

THE COURT: I thought you had me say it twice.

MS. HOWARD-ALLEN: It has you refer to the actual exhibit, so I can read those exhibits to you, if you want.

THE COURT: That's what I need. Do you have that?

MS. HOWARD-ALLEN: Yes. So the exhibits that they are the transcripts of --

THE COURT: Yes. That's what I need.

MS. HOWARD-ALLEN: Okay. So the first -- these are just the second part of that; right? So this is -- the actual recording is 300A.

THE COURT: That's the one in connection with

300B, or related to. Okay.

MS. HOWARD-ALLEN: 301A is in connection with 301B. And then 302, which is in connection with 302A.

THE COURT: All right.

MS. HOWARD-ALLEN: And 303A, which is in connection with 303B. Then 305, which is in connection with 305A.

THE COURT: Okay.

MS. HOWARD-ALLEN: And 308, which is in connection with 308A. And 309, which is in connection with 309A. 310A, which is in connection with 310B. And 311, which is in connection with 311A.

THE COURT: Got it. Okay.

Mr. Martin, I think you had something you wanted to say?

MR. MARTIN: Yes. With regard to the exhibit list going back, I mean, one of my -- my objection to the transcript was that they identify the speakers. And you're covering that with an instruction. The exhibit list in the 300 series does the same thing.

I mean, in other words, it says, recorded meeting between Danny Kulic and Dion Fisher, you know. So the exhibit list does the same thing. So perhaps a similar instruction regarding the exhibit list.

MS. HOWARD-ALLEN: Your Honor, I think each one of

these transcripts and the tapes, when they were played, the witnesses identified the speakers. And when you read this -- you know, this transcript of tape-recorded conversation, it does say, you're specifically instructed whether the transcript correctly reflects the content of the conversations or the identity of the speakers is entirely for you to decide based on your own evaluation.

So I don't think having the individuals in there -- because even if you took it out of the transcript, it would still be -- I mean, I guess you could say recorded phone call and meeting with Dion Fisher on 12-14-17, and then transcript of 300A.

MR. MARTIN: I mean, my problem is the exhibit list in that area makes a conclusion. And I'm not trying to be hard with the exhibit list. I just looked at it real quickly. There are other parts that say, found at Dion Fisher's residence. Again, I agree that, as a whole, the exhibit list is -- and I can't remember the term Miss Howard-Allen used, but is not trying to be inflammatory.

But, you know, my whole objection on the transcript is kind of the same thing on the exhibit list. And for one thing, for the record, I think if I don't object to it, I perhaps waive it.

THE COURT: Yes. That's probably true.

MR. MARTIN: And, also -- and I looked at the

exhibit list quickly. And the other thing that jumped out at me is there's a number of occasions where it says, at Fisher's residence. And I would request that that be removed.

THE COURT: What are your thoughts on that, Miss Howard-Allen?

MS. HOWARD-ALLEN: Your Honor, we were trying to remedy the transcript issues, so I'm not sure I heard about the house issue because we were addressing a way to possibly -- in terms of saying, like, I'm just looking at the first one, if we said, recorded phone call and meeting including Danny Kulic on 12-14-17. So that includes the witness who testified and then doesn't purport to identify anybody other than the person who said that was me. I made that call. Because all those people who are on these recordings made those calls.

So if 300 said, recorded meeting -- recorded phone call and meeting including Danny Kulic. And then the same for the ones as they went to Mr. McKinney, you would say, recorded call including Christopher McKinney on January 31st, 2018. And that will take care of his identity of speaker issue, and would identify the witness who appeared in front of the jury.

THE COURT: Okay. I'm okay with it, Mr. Martin. I'm happy to think about it some more if there's anything you

want to call to my attention, but --

MR. MARTIN: With the exhibit list or --

THE COURT: Yes, sir, with the exhibit list.

MR. MARTIN: And I'm trying, obviously, to call it now so it can be changed.

THE COURT: Of course.

MR. MARTIN: The things I noticed on a quick review were the things that said, at Fisher residence. And my recommendation would be to delete, at Fisher residence. And that was -- and I wrote these down quickly, Your Honor, so I'm not saying they're correct. I may have missed one. Government Exhibits 150 through 154A, 156, 157A, 164, 165, 166, 167A, and 167B. The other things that I noted were just three other small things.

MS. HOWARD-ALLEN: May I just address that before we go to the other ones? If I substitute -- whenever it says, at Fisher residence, if I substitute at 10124 Nassau Court, would that be acceptable?

MR. MARTIN: Yes.

THE COURT: So what are you going to do with that, Miss Howard-Allen?

MS. HOWARD-ALLEN: I'm not sure I caught all the numbers, but I'll just do a check. And when it says -- like I was just looking at 142 and it says, photograph of black Audi in garage at Fisher residence. I'm going to say at

10124 Nassau Court. And I'll substitute at 10124 Nassau Court, because that's what the evidence custodian said where he collected them. I mean, they identified it as the residence of Fisher, but they also identified the address.

THE COURT: Okay. How are we going to handle that, then?

MS. HOWARD-ALLEN: I'm just going to change this. Just as I was going to take out the exhibits when Agent Phelps got together with your deputy clerk and then submit it, you know, either tonight or tomorrow morning. And I'll try to get it tonight and I'll bring a copy for Mr. Martin to look over again. I think he had just two or three more items now.

THE COURT: Okay. All right. So I will add an instruction on transcripts as we talked about. I've got the listing here. You'll take care of that last item on the exhibit list. Let's go through the verdict form.

So Count One is the conspiracy. Okay. Let's see. It's either ... they have the weights here, Mr. Martin. So Count Two, possession with intent to distribute. Count Three, possession with intent to distribute. Count Four, possession with intent to distribute. Count Five, possession with intent to distribute. Count Six, possession with intent to distribute. Count Seven, possession with intent to distribute. Count Eight is not here. Count Nine,

money laundering. Count Ten, money laundering. Count Eleven, money laundering. Count twelve, money laundering. Count 13, money laundering. Count 14, money laundering. Count 15, money laundering. Count 16, money laundering.

Looks okay to me. We've studied -- other than what we've discussed earlier, anything else anybody would like to say, Miss Howard-Allen? Are you satisfied with these, then?

MS. HOWARD-ALLEN: Yes, Your Honor.

THE COURT: Okay. How about you, Mr. Martin? Other than the objections that you've already made that have been preserved, is there anything else you would like to call to my attention?

MR. MARTIN: Nothing else, Your Honor.

THE COURT: All right. We will make copies of this and finalize it. I will add the transcript one, and I'll make these other changes that we've discussed. And we will do all that this afternoon. And I'll hand it to you first thing in the morning so that you have it so that you can use in your closing arguments, if you would like.

Miss Howard-Allen, do you want us to tell you when you have five minutes left?

MS. HOWARD-ALLEN: That would be fine, Your Honor.

THE COURT: Okay. How about you, Mr. Martin?

MR. MARTIN: Sure. I'll take a side bet you don't

have to.

THE COURT: I was going to say, I bet you're right on that. Normally, the government has a lot to say and the defense keeps it short and sweet.

Okay. I don't think I have anything. I'll just say I want to thank all of you for the collegiality and professionalism. It's such a pleasure to get to sit here when everybody is so professional and so collegial.

Mr. Martin, I think you did a great job for your client. You really did. And Miss Howard-Allen and Miss Guzman, I think you've done a fine job, too.

MS. HOWARD-ALLEN: Thank you, Your Honor.

MS. GUZMAN: Thank you.

THE COURT: We will see what happens tomorrow. Okay. Anything else?

MS. HOWARD-ALLEN: No, Your Honor.

THE COURT: Okay. Thank you. We're in recess.

(Proceedings adjourned at 3:46 p.m. and reconvened on June 5, 2019.)

\- - -

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. DION GREGORY FISHER*, Case No. 8:18-cr-236-T-33TGW (Pages 1 through 219), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ *Scott N. Gamertsfelder*, *RMR, FCRR*

*Official Court Reporter*

Date: January 20, 2020